# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

LEAGUE OF WOMEN VOTERS, *et al.*,

Plaintiff-Appellee,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

# REPLY IN SUPPORT OF EMERGENCY MOTION FOR AN IMMEDIATE ADMINISTRATIVE STAY AND STAY PENDING APPEAL

BRETT A. SHUMATE
  *Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
BENJAMIN C. WEI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7263*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-2875*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................2

ARGUMENT ...............................................................................3

I.    THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS ..............3

    A.    Plaintiffs Lack Standing ........................................................3

    B.    The Government Had Authority To Verify Citizenship
        Status ......................................................................................7

    C.    The Social Security Act Was Not Violated .............................9

    D.    Privacy Act ............................................................................11

        1.    No Administrative Procedure Act relief. .....................11

        2.    No substantive violation. .............................................11

        3.    No continuing procedural violation. ...........................12

II.    THE EQUITABLE FACTORS FAVOR A STAY........................................14

CONCLUSION ...........................................................................16

CERTIFICATE OF COMPLIANCE

## INTRODUCTION

Plaintiffs do not dispute that the district court's order impairs the federal government's ability to answer millions of requests to verify citizenship. Their only rejoinder is that the improved system is "riddled with inaccuracies." Opp'n. 28. But these so-called "inaccuracies" mean only that the Systematic Alien Verification for Entitlements (SAVE) system sometimes does not verify the citizenship of some citizens—the same result the old system produced for a far larger group of citizens and what has resulted from the court's order.

Defendants are likely to succeed on appeal. Plaintiffs' asserted injuries are either not cognizable or instead traceable to the independent decisions of state officials. The latter is confirmed by the district court's order, which did nothing to remedy the voter injuries plaintiffs assert. Conversely, plaintiffs' claims on the merits are largely premised on the self-refuting assertion that even though the federal government is statutorily compelled to verify citizenship status for States, it cannot do so for the vast majority of natural-born citizens.

Plaintiffs erroneously characterize the irreparable harms to the government and the public as "self-inflicted" because the government

continued to operate the system after the district court expressed doubts about its legality. But a party does not inflict harm on itself by continuing lawful operations while litigating. And plaintiffs' only other argument is that the government can simply use the old SAVE system even though, as plaintiffs admit, it suffered from significant limitations that made it unsuitable to satisfy the government's obligations under 8 U.S.C. § 1373(c).

The district court's vacatur should be stayed. At a minimum, this Court should grant a temporary stay for a reasonable period to allow the government to seek relief from the Supreme Court.

## ARGUMENT

### I. THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS

#### A. Plaintiffs Lack Standing

1. Plaintiffs assert injury based on Texas's actions toward four voters, which they attribute to a SAVE response. But that injury is neither traceable to SAVE nor redressed by relief entered against it.

A SAVE response, for inquiries created using an SSN, states that the individual is a citizen, is deceased, or that additional information is required. DHS-AR 1508. Any response "is not intended to be, and should not be construed as, an opinion" by the government that an

3

individual is (or is not) eligible to vote. DHS-AR 767. SAVE responses alone do not justify removing a voter, DHS-AR 763; instead, SAVE users must "contact the registrant … to obtain proof of U.S. citizenship" when SAVE does not confirm citizenship, Opp'n. 14. That is effectively no different from what SAVE users were forced to do under the old system, where citizenship status was confirmed less often. The same error underlies plaintiffs' assertion that their injuries are caused by "inaccuracies," Opp'n 14-15, which again refers only to circumstances in which even the improved SAVE cannot affirmatively verify citizenship.

The bottom line is that with or without the improved system, a citizen whose status SAVE cannot confirm faces the same steps if a State chooses to act. The difference is that the improved system verifies *more* citizens, shrinking the pool who must take any further step. Plaintiffs' theory thus reduces to a grievance that the improved system, while verifying more citizens than before, does not verify all of them. The fact that the system works better (but not perfectly) does not cause a cognizable injury traceable to the federal defendants.

Plaintiffs do not advance their argument by contending that States respond to a SAVE response in "predictable ways." Opp'n 13. Plaintiffs' prediction apparently panned out in only one of the 27 States that agreed to use the improved system—four individuals out of tens of millions of verification queries, Add. 83—highlighting that plaintiffs' quarrel is with how States carry out their "independent obligation" to maintain accurate rolls, 52 U.S.C. § 21083(a)(4). For similar reasons, plaintiffs cannot establish redressability, as the district court's order neither reinstates the two revoked registrations nor constrains Texas' (or any State's) independent authority to question or remove voters going forward.

None of this is changed by plaintiffs' claim in their Rule 28(j) letter that "DHS is openly pressuring states to use Modified SAVE." If anything, it confirms their problem: the States control voter-roll management, not the federal government. Nor is it germane to this case, in which plaintiffs challenge the improvements to SAVE and not any subsequent actual or contemplated DHS action.

2. Plaintiffs' alleged privacy and reputational injuries fail for lack of concreteness. The only disclosure outside the federal government is

citizenship status and whether the individual is deceased, Add. 19; DHS-AR 1508, which the user must keep confidential, DHS-AR 763. Plaintiffs only allege injury from these narrow disclosures by erroneously contending, as discussed above, that they contain "inaccuracies."

As for intragovernmental sharing, the only SSN disclosure is from SSA to DHS, and only when the user supplied a partial SSN. DHS-AR 116. Apart from that, SSA merely confirms an identity match and discloses citizenship status and whether the individual is deceased. Add. 18. The limited intragovernmental sharing of SSNs is not the kind of disclosure that supports a cognizable privacy injury supported by history and tradition, even if it is unauthorized. *AFGE v. Dep't of Hous. & Urban Dev.*, 118 F.3d 786, 793 (D.C. Cir. 1997) (Observing that an individual's privacy interest is "significantly less important where the information is . . . not disseminated publicly.").

Plaintiffs' only answer is the Fourth Circuit's decision in *AFSCME v. SSA*, 172 F.4th 361 (4th Cir. 2026) (en banc). That case involved the disclosure of "Social Security numbers, citizenship status, birth dates, bank account numbers, tax information, medical history, and more," *id.*

at 365, which the court analogized to "rifling through someone's wallet, bank account, or personal documents," *id*. at 369. Whether or not *AFSCME* correctly decided that non-dispositive issue (the government prevailed on other grounds), nothing in this case remotely resembles the kind of sweeping intrusion into "private affairs or concerns" that *AFSCME* found concrete. *Id.*

3. The district court properly declined to adopt plaintiffs' alternative argument that operation of the improved system forces them to "expend greater resources." Opp'n 15-16. The Supreme Court has squarely rejected a diversion-of-resources theory of organizational injury. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 390 (2024). And plaintiffs implicitly acknowledge that their procedural-injury claim rises and falls with their other claims. Opp'n 16 n.8; *see Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

## B. The Government Had Authority To Verify Citizenship Status

Plaintiffs begin their merits argument in this Court with the extraordinary argument on which they focused in district court: that the federal government has no authority to verify citizenship status using data other than the limited information maintained by DHS. Opp'n 16-

18. Even the district court did not go that far, holding only that the statutes invoked by the government were inadequate to override various privacy protections.

Absent an affirmative prohibition, it would be surprising if the federal government needed express statutory authority to provide basic information to the States about their residents. But in any event, Congress expressly provided that DHS "shall respond" to a citizenship inquiry by "a Federal, State, or local government agency … by providing the requested verification or status information." 8 U.S.C. § 1373(c).

This provision applies to "citizenship or immigration status of any individual"—leaving no doubt that it includes citizens—and authorizes requests "for any purpose authorized by law," including voter verification. And a separate provision forecloses any barrier to DHS obtaining the information needed to answer those inquiries: "[n]otwithstanding any other provision of Federal, State, or local law," no government entity "may ... prohibit, or in any way restrict, any government entity or official from sending to, or receiving from" DHS "information regarding the citizenship or immigration status ... of any individual." 8 U.S.C. § 1373(a); *see id*. § 1373(b) (same as to

"maintaining" and "exchanging" such information). This clear statutory language not only refutes plaintiffs' contention that the government lacks affirmative authority but also forecloses any reading of the Social Security Act or the Privacy Act that would make it impossible to satisfy DHS's mandate. *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 478 (2025) (authority to act implies authority to employ "ordinary and appropriate means" to do so).

## C. The Social Security Act Was Not Violated

The lone Social Security Act provision upon which the district court relied applies only to the disclosure of records "obtained or maintained ... pursuant to any provision of law enacted on or after October 1, 1990." Add. 45 (quoting 42 U.S.C. § 405(c)(2)(C)(viii)(I)). That cannot apply to SSA, which undisputedly "obtained or maintained" the records at issue under authorities long predating 1990.

Plaintiffs advance no contrary argument regarding SSA, but suggest that DHS has violated the statute. On that score, plaintiffs attempt to confuse the issue by arguing that "what matters is DHS's statutory authority to 'obtain' those records *from* SSA." Opp'n 20. But that statutory authority, while enacted after 1990, expressly provides

for disclosure "notwithstanding any other provision of . . . law."  8 U.S.C. § 1373(a).  In any event, the information DHS discloses to the SAVE user is a citizenship verification—not the individual's identity. Add. 19.  The identifying information flows the other way.  Add. 17. DHS is not itself disclosing the relevant records and thus cannot violate the statute.

It is therefore unsurprising that plaintiffs bury their merits arguments after a claim of forfeiture.  Opp'n 19.  In district court, plaintiffs argued that § 405(c)(2)(C)(viii)(I) limited § 1373, Dkt. 66-1 at 32-33, to which the government responded that § 405(c)(2)(C)(viii)(I) is "inapplicable on its face" to the statute that established SAVE and, in any event, § 1373 expressly applies "notwithstanding any other provision of . . . law," Dkt. 77 at 49-50.  In all events, any imprecision with which the issue was presented in district court cannot justify applying a statutory prohibition to circumstances it does not, on its face, reach.

### D. Privacy Act

#### 1. No Administrative Procedure Act relief.

The Privacy Act itself forecloses plaintiffs' efforts to enforce the Privacy Act through the APA. The Act authorizes injunctive relief in only two circumstances, neither present here. 5 U.S.C. § 552a(g)(2)-(3). As this Court held in *Doe v. Stephens*, "the Act precludes other forms of declaratory and injunctive relief," including the relief plaintiffs obtained. 851 F.2d 1457, 1463 (D.C. Cir. 1988).

Plaintiffs have no explanation for why they should be permitted to circumvent the Privacy Act's remedial limitations. Although the statute at issue in *Stephens* borrowed the Privacy Act's substance, plaintiffs are mistaken to assert that its "remedial scheme *is* the Privacy Act." Opp'n 22. The provision they cite governs substance and bears no resemblance to the Privacy Act's reticulated scheme for judicial review and limited remedies. *Compare* 38 U.S.C. § 5701(j) *with* 5 U.S.C. § 522a(g).

#### 2. No substantive violation.

Plaintiffs entirely ignore the government's argument that the Privacy Act allows intragovernmental sharing that is authorized by other statutes. For instance, SSA has long characterized as a routine

use the disclosure of SSA data to enforce draft registration. *See* 90 Fed. Reg. at 50,879. It is unclear whether plaintiffs believe that this longstanding routine use is unlawful or that the use at issue here is different, but neither contention is tenable. To the extent there is any salient difference, it is that section 1373 applies "notwithstanding any other provision of … law," reinforcing the permissibility of the disclosures here.

### 3. No continuing procedural violation.

1. Plaintiffs fail to establish any basis for prospective relief based on an alleged past failure to follow the Privacy Act's notice-and-comment procedures. The Act requires 30 days' advance notice of a new routine use and an opportunity to comment. 5 U.S.C. § 552a(e)(11). Both DHS and SSA published SORNs and solicited comment for that period, 90 Fed. Reg. 48,948; 90 Fed. Reg. 50,879, and both considered the comments received, Dkt. 64 & 65. Plaintiffs' contention that the improved system took effect before the comment period closed, Opp'n 24-25, would at most have justified delaying the effective date, an issue that is now moot. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 113-14 (D.D.C. 2026).

Plaintiffs relatedly fault defendants for not explaining their response to the comments. Opp'n. 25. But the Privacy Act, unlike the APA, imposes no such duty, as evidenced by the undisputed fact that agencies do not ordinarily explain their treatment of SORN comments. And the OMB guidelines on which plaintiffs rely require only that changes be explained "so that the public will be fully informed of the proposed use," 40 Fed. Reg. at 28,966—something the published SORNs accomplished.

2. Plaintiffs contend that the same procedural failures independently render defendants' actions arbitrary and capricious. Opp'n. 18-19. But their arbitrary-and-capricious theory is derivative of their Privacy Act claims, Opp'n 18, and fails for the same reasons. Any suggestion that the APA imposes additional obligations beyond the Privacy Act is an additional reason why APA relief is inappropriate, and in any event the government has made it entirely clear why it is dramatically improving the capabilities of a statutorily mandated verification system through a highly controlled dissemination of information.

**II.    THE EQUITABLE FACTORS FAVOR A STAY**

1.  Plaintiffs do little to contest the harms to the government and the public, whose interests here merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The improved SAVE system had processed over one million status-verification requests each day, Add. 86; multiple States have enacted statutes requiring the use of the improved SAVE system, Add. 89, Brief of *Amicus Curiae* Iowa *et al.*, at 7-10; and the Department of Transportation requires States to use the improved system to verify eligibility for commercial driver's licenses, Add. 86.  DHS can also no longer update its own records with the more current information held by its sister agencies, which creates security vulnerabilities.  Add. 87-88.  The government is also facing compliance issues regarding a settlement that resolved claims by several States challenging the old SAVE system.  *See* Order Florida, No. 3:24-cv-00509 (July 7, 2026), Dkt. 45; Brief of *Amicus Curiae* Iowa *et al.*, at 10-12.

Plaintiffs respond with the remarkable argument that these harms should be disregarded as "self-inflicted" because defendants continued operating the improved system after the district court expressed doubts about its legality in an opinion *denying* plaintiffs'

14

motion for a preliminary injunction. Opp'n 28. An agency need not abandon a program the moment a district court voices skepticism or forfeit its ability to seek a stay of an adverse judgment. A party does not inflict harm on itself by continuing lawful operations while litigating.

On the magnitude of the harm, plaintiffs' primary response is that the government can simply use the old SAVE system. Opp'n 26. But as plaintiffs themselves emphasize, that system could not confirm citizenship for most natural-born citizens. And plaintiffs seek to dismiss harm to the States, Opp'n 27, but it is plainly relevant to the public interest and the equities.

2. On the other side of the ledger, a temporary stay would restore the *status quo* before the judgment, pending this Court's review. Plaintiffs contend that a stay would expand harms their members have "already experienced." Opp'n 28. But those are the same injuries that fail to establish standing, *supra* Part I.A., and do not outweigh the government's own operational harms and harm to the public interest— harms plaintiffs largely concede, Opp'n 26.

# CONCLUSION

The Court should stay the district court's order pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/*
BENJAMIN C. WEI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7263*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-2875*
  *benjamin.c.wei@usdoj.gov*

July 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Rule 27(d)(2)(A) because it contains 2593 words, according to Microsoft Word.

*/s/ Benjamin C. Wei*
Benjamin C. Wei