[ORAL ARGUMENT NOT SCHEDULED]

**Nos. 26-5243 & 26-5301**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

LEAGUE OF WOMEN VOTERS, *et al.*,
*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,
*Defendants-Appellants*,

STATE OF TEXAS,
*Intervenor-Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Columbia

---

# BRIEF FOR FEDERAL DEFENDANTS-APPELLANTS

---


BRETT A. SHUMATE
*Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
BENJAMIN C. WEI
*Attorneys, Appellate Staff*
*Civil Division, Room 7263*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-2875*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Defendants-appellants are the United States Department of Homeland Security; Markwayne Mullin, in his official capacity as Secretary of Homeland Security; the Social Security Administration; and Frank Bisignano, in his official capacity as Commissioner of the Social Security Administration.

Plaintiffs-appellees are the League of Women Voters; League of Women Voters of Texas; League of Women Voters of Louisiana; League of Women Voters of Louisiana Education Fund; League of Women Voters of Virginia; and the Electronic Privacy Information Center.

Defendant-intervenor-appellant is the State of Texas.

Amici curiae that have appeared before the district court are United States Senator Alex Padilla; United States Senator Gary Peters; Campaign Legal Center; Travis County Tax Assessor-Collector Celia Israel; Travis County Clerk Dyana Limon-Mercado; Travis County, Texas; Texas Civil Rights Project; Lawyers Defending American Democracy, Inc.; Service

Employees International Union; UnidosUS; Center for Media and Democracy; Common Cause; Protect Democracy Project; and American Civil Liberties Union.

Amici curiae that have appeared in before this Court are Steven Montenegro, Warren Peterson, the Honest Elections Project, and the States of Florida, Indiana, Iowa, and Ohio.

**B. Rulings Under Review**

Defendants seek review of the June 22, 2026 order and opinion of the district court (Sooknanan, J.) granting summary judgment to plaintiffs. JA 47, 122.

**C. Related Cases**

This case has not previously been before the Court. Cases in other district courts raise similar issues, but defendants-appellants are not aware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

/s/

Benjamin C. Wei

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..... v

GLOSSARY ..... xii

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 4

STATEMENT OF THE ISSUES ..... 5

PERTINENT STATUTES AND REGULATIONS ..... 5

STATEMENT OF THE CASE ..... 5

A. Legal and Factual Background ..... 5

B. Prior Proceedings ..... 10

C. Parallel Proceedings in *Florida v. DHS* ..... 19

SUMMARY OF ARGUMENT ..... 20

STANDARD OF REVIEW ..... 22

ARGUMENT ..... 22

I. The Modified SAVE System Is Authorized by 8 U.S.C. § 1373 ..... 22

II. Plaintiffs' Social Security Act Claims Lack Merit ..... 30

A. SSA data used in the modified SAVE system is not governed by 42 U.S.C. § 405(c)(2)(C)(viii)(I). ..... 30

B. The data DHS discloses to SAVE users is not governed by 42 U.S.C. § 405(c)(2)(C)(viii)(I). ..... 35

C. This Court should consider these arguments notwithstanding claims of forfeiture.....38

III. Plaintiffs' Privacy Act Claims Lack Merit.....42

A. The Privacy Act cannot be enforced through the APA.....42

B. The modified SAVE system complies with the Privacy Act's substantive and procedural requirements.....49

CONCLUSION.....58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 49

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984) .......... 44

*Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*,
461 U.S. 273 (1983) .......... 45

*Bowen v. Roy*,
476 U.S. 693 (1986) .......... 50

*Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989) .......... 50

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 22

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Just.*,
846 F.3d 1235 (D.C. Cir. 2017) .......... 48

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 54

*Claybrook v. Slater*,
111 F.3d 904 (D.C. Cir. 1997) .......... 28

*Department of Com. v. New York*,
588 U.S. 752 (2019) .......... 55

*Department of Homeland Sec. v. League of Women Voters*,
225 L. Ed. 2d 1134 (2026) .......... 17, 18, 19, 24, 25, 26, 27, 28, 53

*Doe v. Chao*,
540 U.S. 614 (2004) .......... 47

*Doe v. DiGenova*,
779 F.2d 74 (D.C. Cir. 1985)........................................................................46

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988)....................................................................46

*FAA v. Cooper*,
566 U.S. 284 (2012)......................................................................................47

*Florida v. U.S. Dep't of Homeland Sec.*:
836 F. Supp. 3d 1171 (N.D. Fla. 2026)........................................................19
No. 24-cv-509, 2026 U.S. Dist. LEXIS 173772
(N.D. Fla. July 19, 2026).........................................................................20

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005)..................................................................45, 48

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025)......................................................................................29

*Hinck v. United States*,
550 U.S. 501 (2007)......................................................................................46

*Jama v. ICE*,
543 U.S. 335 (2005)......................................................................................56

*Kamen v. Kemper Fin. Servs., Inc.*,
500 U.S. 90 (1991)........................................................................................39

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
Nos. 26-5243, 26-5301, 2026 U.S. App. LEXIS 27474
(D.C. Cir. Sep. 4, 2026) ...................15, 16, 16-17, 17, 25, 27, 31, 33, 35, 35-36,
37, 38, 40-41, 42, 50, 51, 52, 54, 55, 56

*Liff v. Office of Inspector Gen. for the U.S. Dep't of Lab.*,
881 F.3d 912 (D.C. Cir. 2018).....................................................................40

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020)......................................................................................55

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012)....................................................................44

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................................................................57

*Patel v. Garland*,
596 U.S. 328 (2022)....................................................................28, 48

*PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011)....................................................................26

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................................................................45, 46

*Schoenthal v. Irving Tr. Co.*,
287 U.S. 92 (1932)....................................................................43

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985)....................................................................45

*United States v. Chemical Found., Inc.*,
272 U.S. 1 (1926)....................................................................55

*Vanda Pharms., Inc. v. U.S. FDA*,
123 F.4th 513 (D.C. Cir. 2024)....................................................................22

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*,
435 U.S. 519 (1978).................................................................... 56-57

*Yee v. City of Escondido*,
503 U.S. 519 (1992)....................................................................39

**Statutes:**

Administrative Procedure Act (APA):
5 U.S.C. § 553(c)....................................................................56
5 U.S.C. § 701(a)(1)....................................................................44
5 U.S.C. § 702....................................................................44
5 U.S.C. § 704....................................................................44, 47

5 U.S.C. § 705....................10

Food, Agriculture, Conservation, and Trade Act of 1990,
Pub. L. No. 101-624, 104 Stat. 3359....................32

Illegal Immigration Reform and Immigrant Responsibility
Act of 1996 (IIRIRA),
Pub. L. No. 104-208, div. C, 110 Stat. 3009....................6
§ 402(e)(1)(A)(i)....................14
§ 404(e)....................14, 27
§ 404(h)....................27
§ 404(h)(1)....................14
8 U.S.C. § 1373....................2, 5, 12, 13, 16, 18, 18-19, 19, 22, 23
8 U.S.C. § 1373(a)....................13, 21, 23, 26
8 U.S.C. § 1373(a)-(b)....................7, 26
8 U.S.C. § 1373(b)....................23
8 U.S.C. § 1373(b)(2)....................7
8 U.S.C. § 1373(c)....................1, 3, 6, 16, 20, 24, 29

Immigration Reform and Control Act of 1986,
Pub. L. No. 99-603, 100 Stat. 3359....................5
8 U.S.C. § 1324a note....................14, 27

Privacy Act of 1974:
5 U.S.C. § 552a....................3
5 U.S.C. § 552a(a)(2)....................42
5 U.S.C. § 552a(a)(7)....................50
5 U.S.C. § 552a(b)....................50
5 U.S.C. § 552a(b)(3)....................50, 52
5 U.S.C. § 552a(e)(11)....................53, 56
5 U.S.C. § 552a(g)....................42
5 U.S.C. § 552a(g)(1)....................42
5 U.S.C. § 552a(g)(1)(C)-(D)....................43
5 U.S.C. § 552a(g)(2)-(3)....................43
5 U.S.C. § 552a(g)(4)....................43

Social Security Act, ch. 531, 49 Stat. 620 (1935)....................31

Social Security Amendments of 1972,
Pub. L. No. 92-603, sec. 137(2), 86 Stat. 1329
(codified at 42 U.S.C. § 405(c)(2)(B)(ii))....................32

8 U.S.C. § 1644 ....................7

28 U.S.C. § 1291 ....................4

28 U.S.C. § 1331 ....................4

42 U.S.C. § 405(c)(2)(C)(viii)(I)....................4, 5, 11, 16, 17, 21, 30

42 U.S.C. § 405(c)(2)(C)(viii)(IV) ....................36

42 U.S.C. § 1306(a)....................33

42 U.S.C. § 1320b-7 note ....................1, 5

42 U.S.C. § 18081(c)(4) ....................34

52 U.S.C. § 20501(b)(4) ....................41

52 U.S.C. § 21083(a)(4) ....................41

**Regulations:**

20 C.F.R. § 401.120 ....................33

20 C.F.R. § 401.150 ....................34

20 C.F.R. § 401.150(a)....................33

**Rules:**

Fed. R. Civ. P. 52(b) ....................41

Fed. R. Civ. P. 56(a)....................22

Fed. R. Civ. P. 59(e)....................41

**Other Authorities:**


Agency Information Collection Activities: Proposed Request, 84 Fed. Reg. 66704 (Dec. 5, 2019) .......... 37

DHS, Reference No. DHS/USCIS/PIA-006(d), *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program* (Oct. 31, 2025), https://perma.cc/HXG9-83G2 .......... 10

Identification of Taxpayers Under Title VIII of the Social Security Act, 1 Fed. Reg. 2023 (Nov. 7, 1936) .......... 31-32

Order, *Florida v. League of Women Voters*, No. 26-12533 (11th Cir. Aug. 26, 2026), Dkt. No. 31 .......... 20

Privacy Act of 1974; System of Records, 90 Fed. Reg. 48948 (Oct. 31, 2025) .......... 8, 10, 31, 35, 51, 53

Privacy Act of 1974; System of Records, 90 Fed. Reg. 50879 (Nov. 12, 2025) .......... 10, 34, 51, 53

Privacy Act of 1974; System of Records, 91 Fed. Reg. 69297 (Nov. 3, 2026) .......... 53

Carolyn Puckett, *The Story of the Social Security Number,* 69 Soc. Sec. Bulletin, July 2009, https://perma.cc/BBE8-E5NZ .......... 32

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......... 24-25, 29

SSA, Original Social Security Number Application Forms, https://perma.cc/Q3KH-GTST .......... 32

SSA, *The Expansion of the SSN as an Identifier*, https://perma.cc/JQZ6-YSJH .......... 52

USCIS, *About SAVE* (Oct. 7, 2025), https://perma.cc/5888-TH46 .......... 6

USCIS, *Guide to Understanding SAVE Verification Responses* 3 (Apr. 2022), https://perma.cc/BW9M-WJUT ....... 7

USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76 ....... 7

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| DHS | Department of Homeland Security |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act of 1996 |
| SAVE | Systematic Alien Verification for Entitlements |
| SORN | System of Records Notice |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| USCIS | U.S. Citizenship and Immigration Services |

## INTRODUCTION

The district court entered an order that substantially impairs the federal government's ability to respond to requests from States seeking to verify the citizenship status of individuals within their jurisdictions. States depend on such information to fulfill their responsibilities to maintain accurate voter-registration rolls and administer public-benefit and licensing programs. Recognizing those needs, Congress directed the Department of Homeland Security (DHS) to "implement a system for the verification of immigration status" that is "available to all the States," 42 U.S.C. § 1320b-7 note (Immigration and Naturalization Service to Establish Verification System by October 1, 1987), and separately required DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency . . . by providing the requested verification or status information," 8 U.S.C. § 1373(c).

DHS fulfills those obligations through the Systematic Alien Verification for Entitlements (SAVE) program, an online service that enables government agencies to verify citizenship and immigration status, often within seconds. Until recently, however, SAVE suffered from significant

limitations. Most significantly, it required users to supply an alien registration number or another DHS-issued identifier—information that States often lack and that natural-born citizens generally do not possess. Those restrictions substantially limited the system's usefulness in verifying citizenship.

In May 2025, DHS modified SAVE to permit users to submit Social Security numbers (SSNs) instead of DHS-specific immigration identifiers and to submit verification requests in bulk rather than individually. These changes substantially improved the system's ability to respond to citizenship-verification inquiries. Following the modifications, SAVE processed more than a million requests per day, including requests concerning eligibility to register to vote and receive public benefits. Yet the district court vacated both the notices governing the modifications and the modified system itself. The court concluded that the updated system violated federal statutory restrictions on the disclosure of information. The Supreme Court stayed that order, concluding that the government was likely to succeed on the merits because 8 U.S.C. § 1373 authorizes the information sharing necessary to operate the modified system.

This Court should reach the same conclusion as the Supreme Court at the stay stage and reverse the district court on the merits. Section 1373(c) commands DHS to provide citizenship- or immigration-status information in response to qualifying government inquiries concerning "any individual." 8 U.S.C. § 1373(c). That obligation necessarily authorizes DHS to employ ordinary and appropriate means of fulfilling it, including consulting Social Security Administration (SSA) records to verify the citizenship of individuals who lack DHS immigration identifiers. Moreover, § 1373(a) and (b) provide that, "[n]otwithstanding any other provision" of federal, state, or local law, government entities and officials may not prohibit or restrict the exchange with DHS of information regarding an individual's citizenship or immigration status. Those provisions authorize the information sharing that the modified SAVE system facilitates and supersede any otherwise applicable restrictions in the Privacy Act or Social Security Act.

Plaintiffs' claims fail even independently of § 1373. The district court concluded that the modified SAVE system violates the Privacy Act, 5 U.S.C. § 552a, but Congress expressly limited the remedies available under that statute, including the circumstances in which prospective relief may be awarded. Plaintiffs cannot circumvent those restrictions by invoking the

Administrative Procedure Act (APA). In any event, the modified system complies with the Privacy Act's substantive requirements, and the agencies have satisfied their notice-and-comment procedures. The court also concluded that the system violates 42 U.S.C. § 405(c)(2)(C)(viii)(I), a provision of the Social Security Act protecting certain SSNs and related records. But that provision applies only to records obtained or maintained "pursuant to any provision of law enacted on or after October 1, 1990." 42 U.S.C. § 405(c)(2)(C)(viii)(I). SSA maintains the relevant information pursuant to statutory authorities enacted decades earlier, and DHS does not disclose SSNs or related identifying records to SAVE users. The provision therefore does not prohibit the challenged information sharing.

The judgment should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. Dkt. No. 1, at 12. The district court granted summary judgment to plaintiffs on June 22, 2026. JA 122. Defendants filed a notice of appeal on June 25, 2026. JA 148. This Court has jurisdiction under 28 U.S.C. § 1291.[1]

[1] In light of the Supreme Court's holding regarding standing at the stay stage, the government is no longer pressing its objection to plaintiffs' standing.

## STATEMENT OF THE ISSUES

1. Whether the modifications to SAVE are authorized by 8 U.S.C. § 1373.

2. Whether the modifications to SAVE violate a confidentiality provision contained in the Social Security Act, 42 U.S.C. § 405(c)(2)(C)(viii)(I).

3. Whether plaintiffs may invoke the APA to obtain relief for alleged violations of the Privacy Act and, if so, whether the modifications to SAVE violate the Privacy Act.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Legal and Factual Background

1. In 1986, Congress directed the federal government to "implement a system for the verification of immigration status . . . so that the system is available to all the States." 42 U.S.C. § 1320b-7 note (citation omitted) (Immigration and Naturalization Service to Establish Verification System by October 1, 1987); *see* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391. Pursuant to that mandate, the federal government established the SAVE program. SAVE is an "online

service . . . that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies." U.S. Citizenship & Immigr. Servs. (USCIS), *About SAVE* (Oct. 7, 2025), https://perma.cc/5888-TH46. The system can verify an individual's "immigration status or U.S. citizenship . . . within seconds." *Id.* SAVE does not, however, "[d]etermine [a person's] eligibility for a specific benefit." *Id.* That determination remains with the agency administering the benefit, ordinarily a state or local agency. *Id.*

2. In 1996, Congress expanded the federal government's obligations to provide citizenship and immigration-status information. In particular, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009 (IIRIRA), requires DHS (which succeeded to the relevant functions of the Immigration and Naturalization Service) to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). To satisfy this express obligation, Congress twice provided that "[n]otwithstanding any other provision of Federal, State,

or local law," federal entities and officials, among others, may not "prohibit, or in any way restrict," the sharing with or by federal immigration authorities of "information regarding" an individual's citizenship or immigration status. *Id.* § 1373(a)-(b); *see also id.* § 1644. Congress also stated that "no person or agency may prohibit, or in any way restrict," a government entity from "[m]aintaining such information." *Id.* § 1373(b)(2).

Since 2005, States have entered into agreements with DHS to use SAVE to verify putative voters' citizenship status. *See* Dkt. No. 77-2, ¶ 21 (Broderick Decl.). Yet, until recently, SAVE suffered from significant limitations. Most importantly, it could not verify citizenship status without a DHS-specific immigration identifier, such as an alien registration number (or "A-number")—which States do not always know, and which natural-born citizens generally do not have. *See* USCIS, *Guide to Understanding SAVE Verification Responses* 3 (Apr. 2022), https://perma.cc/BW9M-WJUT. SAVE could also accept only one verification request at a time. *See* USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76 (Optimizing SAVE).

3. In April 2025, DHS began a comprehensive update to SAVE. The following month, DHS announced the two changes relevant here: users may now make requests using SSNs, and they may submit multiple requests at once. *See* Optimizing SAVE.

Under the updated system, a SAVE user may submit a bulk query by uploading a spreadsheet containing the following information: first name; last name; date of birth; full or partial SSN, A-number, or other DHS numeric identifier; and the reason for verification. JA 532. For queries using SSNs, SAVE first checks SSA records. SSA reports whether the submitted identifying information matches its records, whether the individual is a citizen, and whether the individual is deceased. Privacy Act of 1974; System of Records, 90 Fed. Reg. 48948, 48950 (Oct. 31, 2025).

When a user submits a request using an SSN without a DHS numeric identifier, SAVE may return several responses. If SSA records match the identifying information and indicate that the individual is a living U.S. citizen, SAVE reports that result, and no further verification is required. JA 592. If the records indicate that the individual is deceased, SAVE reports that information. *Id.* If no matching SSA record is found, SAVE explains that the discrepancy may concern the individual's "name, date of birth,

and/or Social Security number" and closes the query. *Id.* But if SSA records indicate that the individual is not a U.S. citizen, SAVE often requires a DHS immigration identifier to conduct further verification. *Id.* SAVE users are expressly warned not to deny benefits based on an initial response when additional verification is required. JA 545.

When a DHS numeric identifier is available, SAVE searches 16 additional federal systems. JA 539-47. If those searches do not confirm U.S. citizenship, the case proceeds to manual review by a DHS analyst. Broderick Decl. ¶ 15. That review may involve additional electronic searches and, where necessary, examination of physical records. *Id.* ¶ 16. The review may establish that an individual is not a U.S. citizen—for example, when DHS records indicate that the individual is a lawful permanent resident. JA 595.

SAVE also imposes requirements on participating agencies before they make adverse eligibility determinations. Users agree to complete "any additional verification procedures SAVE requires and/or the . . . registered voter requests" and acknowledge that they "cannot deny the benefit based on a SAVE response where additional action is required . . . by SAVE or additional verification is requested by the [registered voter] but has not been completed." *See, e.g.*, JA 469, 480. Where citizenship cannot be confirmed,

SAVE directs users either to submit additional identifying information or to "contact the registrant or registered voter to obtain proof of U.S. citizenship." *See, e.g.*, JA 468, 479, 610. SAVE users further agree to provide a process for appealing verification results and an opportunity to contact DHS to correct immigration records before any final decision. *See, e.g.*, JA 470, 481.

### B. Prior Proceedings

1. Plaintiffs initiated this suit in September 2025 and moved for a preliminary injunction or stay under 5 U.S.C. § 705. Dkt. No. 16. In October 2025, DHS published a System of Records Notice (SORN) and a Privacy Impact Assessment relating to the updates to SAVE. *See* 90 Fed. Reg. at 48948; DHS, Reference No. DHS/USCIS/PIA-006(d), *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program* (Oct. 31, 2025), https://perma.cc/HXG9-83G2. In November 2025, SSA published a SORN relating to the same updates. *See* Privacy Act of 1974; System of Records, 90 Fed. Reg. 50879, 50879 (Nov. 12, 2025). Later that month, the district court denied plaintiffs' motion for preliminary relief, holding that plaintiffs had failed to show irreparable harm. Dkt. Nos. 55, 56.

2. In June 2026, the district court granted summary judgment to plaintiffs. JA 121. To start, the court concluded that three types of injuries to plaintiffs' members each independently sufficed to confer Article III standing: privacy and reputational injuries from the disclosure of members' "private information in SSA records (including their SSNs and citizenship status) without their consent" to SAVE users, JA 70; voter injuries arising from Texas—a SAVE user—asking four naturalized-citizen members with inaccurate SSA records to confirm their citizenship to maintain their voter registrations, JA 78-79; and procedural injuries from defendants' failure to satisfy the Privacy Act's notice-and-comment requirements, JA 84-86.

Turning to the merits, the district court held that the modified SAVE system is unlawful on several grounds. First, the court concluded that the modified system violates a provision of the Social Security Act requiring that "[s]ocial security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential" and prohibiting authorized persons from disclosing those records. JA 89 (quoting 42 U.S.C. § 405(c)(2)(C)(viii)(I)). The court concluded, without further analysis, that "[t]here can be no question that the modified SAVE system violates this

prohibition" because it "discloses both Social Security numbers and related records maintained by SSA." *Id.* As discussed below, the court rejected the government's argument that 8 U.S.C. § 1373 overrode any prohibition that might exist.

Second, the district court held that the modified system violates the Privacy Act. JA 90-107. As a threshold matter, the court concluded that violations of the Privacy Act could be challenged under the APA, even though the Privacy Act provides its own judicial remedies for certain violations but does not authorize equitable relief to enforce the provisions at issue here. JA 91. On the merits, the court held that the modified system violates the Privacy Act's restrictions on disclosure because the sharing of SSA records does not qualify for the statutory exception permitting disclosure for a "routine use." JA 96. In the court's view, there was no sufficient connection between the purpose for which SSA collected the information—administering Social Security benefits—and its use to verify voter eligibility. JA 100. The court further held that the modified system violated the Privacy Act's procedural requirements because the required SORNs had not been published 30 days before the new use. JA 102-103. The court also concluded

that the agencies' failure to comply with those procedures rendered their actions arbitrary and capricious under the APA. JA 107.

Finally, the district court rejected the government's argument that 8 U.S.C. § 1373 authorized the modified SAVE system notwithstanding the Social Security Act and Privacy Act. JA 113-118. The court first considered § 1373(c), which requires DHS to respond to inquiries from federal, state, and local government agencies seeking to verify an individual's citizenship or immigration status for any purpose authorized by law. The court reasoned that this duty did not authorize DHS to obtain otherwise-protected SSA information because the government could fulfill its verification obligations without that information. JA 114-115.

The district court next rejected the government's reliance on § 1373(a), which provides that, "[n]otwithstanding any other provision of Federal, State, or local law," no government entity or official may "prohibit, or in any way restrict," another government entity or official from "sending to, or receiving from, [DHS] information regarding the citizenship or immigration status" of any individual. JA 115-116 (second alteration in original) (quoting 8 U.S.C. § 1373(a)). Despite that language, the court concluded that § 1373(a) did not affirmatively authorize the disclosure of information otherwise

protected by federal law. The court reasoned that prohibitory language such as "may not" ordinarily does not confer affirmative authority, and it relied on a 1999 Office of Legal Counsel opinion concluding that § 1373(a) does not clearly authorize disclosures that another federal statute would otherwise prohibit. JA 116. The court thus characterized § 1373(a) as "merely a prohibition on conduct" rather than an independent source of authority. *Id.*

The district court also relied on another provision of the same 1996 legislation that enacted § 1373. That provision authorized SSA to participate in an employment-verification program and in particular to "compare[] the name and social security account number provided in an inquiry" against its records but only "to confirm (or not confirm) the validity of the information provided regarding an individual whose identity and employment eligibility must be confirmed" and prohibited the disclosure or use of the program's data "for any other purpose." IIRIRA §§ 402(e)(1)(A)(i), 404(e), (h)(1), 110 Stat. at 3009-658, 3009-665 (codified at 8 U.S.C. § 1324a note (Pilot Programs for Employment Eligibility Confirmation)). The court reasoned that those express limitations would be superfluous if § 1373 already authorized SSA to disclose its records. JA 116-117. The court also concluded that Congress

knew how to authorize SSA information sharing when it wished to do so but had not provided comparable authorization in § 1373. JA 117-118.

As a remedy, the district court "set[] aside and vacate[d]" two notices issued under the Privacy Act—one by DHS, the other by SSA—articulating the modifications to SAVE. JA 120-121. The court also "set[] aside[] and vacate[d] the SAVE 'modified system' described in" DHS's notice. JA 121.

Defendants moved for a stay pending appeal, Dkt. No. 116, which the district court denied, JA 147.

3. A divided panel of this Court denied applicants' motion for a stay pending appeal. *League of Women Voters v. U.S. Dep't of Homeland Sec.* (*LOWV I*), Nos. 26-5243, 26-5301, 2026 U.S. App. LEXIS 27474, at *6 (D.C. Cir. Sep. 4, 2026) (per curiam). On standing, the majority concluded that plaintiffs likely have standing because members of the plaintiff organizations who are naturalized citizens but remain identified as noncitizens in SSA records could be required to prove their citizenship to maintain their voter registrations. *Id.* at *14-15. The majority further concluded that the intervening actions of state election officials did not change the result because the federal government's disclosure of citizenship information in response to state inquiries "sets the process in motion." *Id.* at *16.

On the merits, the majority concluded that applicants had not established a likelihood of success based on 8 U.S.C. § 1373. *LOWV I*, 2026 U.S. App. LEXIS 27474, at *28. In its view, the "general duty to answer a citizenship inquiry under 8 U.S.C. § 1373(c) does not by itself authorize disclosure of information that another statute specifically makes confidential." *Id.* (citation omitted). The majority also held that the government's arguments that the modified SAVE system complies with the Social Security Act had been forfeited. *Id.* at *27. Alternatively, the majority concluded that those arguments did not establish a sufficient likelihood of success because they "implicate unresolved legal questions whose factual premises are incompletely developed in the available briefing and record." *Id.* at *30. The majority did not address the district court's remaining merits holdings. *Id.* at *44.

Judge Katsas dissented. On the merits, he concluded that the modified SAVE system likely complies with the Social Security Act. *LOWV I*, 2026 U.S. App. LEXIS 27474, at *54-56 (Katsas, J., dissenting). He reasoned that the confidentiality provision at issue, 42 U.S.C. § 405(c)(2)(C)(viii)(I), applies only to SSNs and related records "obtained or maintained . . . pursuant to any provision of law enacted on or after October 1, 1990." *LOWV I*, 2026

U.S. App. LEXIS 27474, at *53 (Katsas, J., dissenting) (quoting 42 U.S.C. § 405(c)(2)(C)(viii)(I)). SSA's records, however, are maintained "pursuant to statutes enacted decades before 1990." *Id.* at *54. Judge Katsas separately concluded that the provision does not prohibit DHS's disclosures, *id.* at *55, and that any forfeiture of these arguments should be excused in light of the importance of the issues presented, *id.* at *56-58.

Judge Katsas also concluded that the government was likely to succeed in challenging the district court's Privacy Act holdings. *LOWV I*, 2026 U.S. App. LEXIS 27474, at *63 (Katsas, J., dissenting). In his view, the challenged disclosures qualify for the Act's "routine use" exception, and any violation of the Act's procedural requirements could not justify prospective relief once the notices had been published and the statutory 30-day period had elapsed. *Id.* at *64.

4. The Supreme Court granted the government's application for a stay pending appeal. *Department of Homeland Sec. v. League of Women Voters* (*LOWV II*), 225 L. Ed. 2d 1134, 1136 (2026) (per curiam). On standing, the Court concluded that plaintiffs likely have standing because at least one member of a plaintiff organization is a naturalized citizen whose SSA records do not accurately reflect her citizenship status. *Id.* at 1137. As a result, she

faces the prospect of being required to provide additional proof of citizenship to maintain her voter registration—an injury sufficient to support standing. *Id.*

On the merits, however, the Court concluded that plaintiffs' claims are unlikely to succeed. *LOWV II*, 225 L. Ed. 2d at 1138. The Court relied principally on 8 U.S.C. § 1373. It reasoned that "[b]y prohibiting interference with the disclosure of information regarding citizenship status to DHS—'[n]otwithstanding any other provision of Federal, State, or local law'—Congress necessarily authorized DHS to request and receive that information." *Id.* (second alteration in original). The Court further explained that § 1373(c), which requires DHS to respond to government inquiries seeking to verify citizenship or immigration status for any lawful purpose, reinforces that conclusion by contemplating "an information-sharing regime like the modified SAVE program." *Id.* In light of these statutory provisions, the Court concluded that it was "likely to reverse the District Court's holding that the federal defendants violated the Social Security Act, the Privacy Act, and the APA." *Id.*

Three Justices dissented. *LOWV II*, 225 L. Ed. 2d at 1140 (Jackson, J., joined by Sotomayor & Kagan, JJ., dissenting). They concluded that 8

U.S.C. § 1373 does not authorize the SAVE modifications because it does "not affirmatively grant any power." *Id.* at 1143. Like the district court, the dissent relied on both a provision enacted alongside § 1373 that expressly authorized SSA to participate in an employment-verification program and a 1999 Office of Legal Counsel opinion concluding that § 1373(a) does not clearly authorize disclosures that another federal statute would otherwise prohibit. *Id.* at 1144. The dissent did not address the remaining arguments concerning the Privacy Act and the APA. *Id.* at 1145.

### C. Parallel Proceedings in *Florida v. DHS*

In 2024 and 2025, five States sued the federal government under 8 U.S.C. § 1373, alleging that the old SAVE system could not meaningfully respond to their verification requests. After DHS updated SAVE, the government settled four of those suits by agreeing to maintain certain SAVE capabilities. When the district court in this case subsequently vacated the modifications, DHS disabled them and sought a stay. *See* Dkt. No. 126, at 4. But the Florida court issued a conflicting order requiring DHS to restore the plaintiff States' access to those features. *Florida v. U.S. Dep't of Homeland Sec.*, 836 F. Supp. 3d 1171, 1178 (N.D. Fla. 2026). Plaintiffs intervened and appealed that order to the Eleventh Circuit, which has directed that the case

be placed on the next available oral-argument calendar. *See Florida v. U.S. Dep't of Homeland Sec.*, No. 24-cv-509, 2026 U.S. Dist. LEXIS 173772 (N.D. Fla. July 19, 2026); Notice of Appeal, *Florida v. U.S. Dep't of Homeland Sec.*, No. 24-cv-509 (N.D. Fla. July 20, 2026), Dkt. No. 55; Order, *Florida v. League of Women Voters*, No. 26-12533 (11th Cir. Aug. 26, 2026), Dkt. No. 31.

## SUMMARY OF ARGUMENT

The district court vacated modifications to the SAVE system that enabled DHS to verify citizenship using SSNs and process verification requests in bulk. Those improvements allow DHS to respond more effectively to requests from States seeking to verify voter eligibility and administer public-benefit programs. The Supreme Court stayed the district court's order after concluding that the government was likely to succeed on the merits. This Court should reach the same conclusion as the Supreme Court at the stay stage and reverse the district court's judgment on the merits.

I. Section 1373 authorizes the SAVE modifications. Congress expressly directed DHS to respond to government inquiries seeking to verify the citizenship or immigration status of "any individual." 8 U.S.C. § 1373(c). That command necessarily authorizes DHS to use ordinary and appropriate

means of fulfilling it, including consulting SSA records. Congress also prohibited restrictions on the exchange of citizenship-status information with DHS, "[n]otwithstanding any other provision" of law. *Id.* § 1373(a). As the Supreme Court recognized in granting a stay, § 1373 authorizes the information sharing necessary to operate modified SAVE and likely supersedes otherwise applicable statutory restrictions.

II. Even apart from § 1373, the modifications do not violate the Social Security Act on its own terms. The provision invoked by the district court, 42 U.S.C. § 405(c)(2)(C)(viii)(I), applies only to records obtained or maintained pursuant to laws enacted on or after October 1, 1990. SSA maintains the relevant information pursuant to statutory authority that predates that cutoff. Moreover, DHS does not disclose SSNs or related identifying records to SAVE users; it returns only citizenship-verification information. The provision therefore does not prohibit the challenged disclosures.

III. The Privacy Act provides no basis for vacatur. Congress limited the Privacy Act's remedies, authorizing prospective relief only for specified violations. Plaintiffs cannot circumvent those limitations through the APA. In any event, the challenged disclosures qualify as a permissible "routine use" because verifying citizenship is compatible with SSA's collection and use

of identifying information. And although the agencies initially implemented the modifications before publishing the Privacy Act notices, they have since satisfied all applicable procedural requirements. The district court therefore erred in vacating the system based on alleged procedural and arbitrary-and-capricious violations.

The judgment should be reversed.

## STANDARD OF REVIEW

This Court reviews appeals from summary judgments de novo, applying the standards set forth in Federal Rule of Civil Procedure 56(a). *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Under Rule 56(a), summary judgment is warranted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Vanda Pharms., Inc. v. U.S. FDA*, 123 F.4th 513, 520 (D.C. Cir. 2024) (quotation marks omitted).

## ARGUMENT

### I. The Modified SAVE System Is Authorized by 8 U.S.C. § 1373

1. The modifications to SAVE address two limitations in the system's ability to respond to requests to verify an individual's citizenship status. First, the modified system permits users to submit SSNs rather than DHS-

specific immigration identifiers, which natural-born citizens generally do not possess. Second, it permits users to submit multiple verification requests at once. *See* Optimizing SAVE. These changes enable DHS to respond more effectively to citizenship-verification inquiries concerning any individual, as Congress expressly required and authorized in 8 U.S.C. § 1373.

Section 1373 contains three complementary provisions. Section 1373(a) provides that, "[n]otwithstanding any other provision" of law, a "government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status . . . of any individual." 8 U.S.C. § 1373(a). Section 1373(b), captioned "Additional Authority of Government Entities," provides that, "[n]otwithstanding any other provision" of law, "no person or agency may prohibit, or in any way restrict," a government entity from sending, requesting, exchanging, or maintaining "information regarding the immigration status . . . of any individual." *Id.* § 1373(b). Finally, § 1373(c), captioned "Obligation to Respond to Inquiries," provides that DHS "shall respond to an inquiry" by a State "seeking to verify or ascertain the citizenship or immigration status of any individual within

[its] jurisdiction . . . by providing the requested verification or status information." *Id.* § 1373(c).

As the Supreme Court explained in granting a stay, § 1373(a)'s prohibition on interference with the exchange of citizenship-status information necessarily authorizes DHS to request and receive that information. *LOWV II*, 225 L. Ed. 2d 1134, 1138 (2026) (per curiam). Otherwise, federal officials could face conflicting obligations: disclosing information as § 1373 contemplates might violate another statute, while withholding that information to comply with the other statute might violate § 1373. *Id.* In particular, any invocation of another federal statute to prohibit agency employees from disclosing information covered by § 1373 would constitute prohibiting or restricting an agency from sharing, maintaining, or exchanging such information. The Court thus properly reasoned that Congress was unlikely to have intended that result and that therefore § 1373 "likely supersedes restrictions on disclosure elsewhere in the Code." *Id.*

Section 1373(c) reinforces that conclusion. It goes further than permitting DHS to respond to requests for citizenship-status information; it commands DHS to do so. And a statutory command necessarily carries authorization to perform the commanded act. *See* Antonin Scalia & Bryan A.

Garner, *Reading Law: The Interpretation of Legal Texts* 193-94 (2012) (noting that "[c]ommand includes permission" and that "[i]f you must do something, then you are necessarily allowed to do it" (quotation marks omitted)). Accordingly, the Supreme Court properly recognized that "[c]onsidered alongside section 1373's 'notwithstanding' clauses, section 1373(c) appears to contemplate an information-sharing regime like the modified SAVE program." *LOWV II*, 225 L. Ed. 2d at 1138.

2. This Court read § 1373 as imposing only a "general duty to answer a citizenship inquiry," without authorizing DHS to obtain or disclose information otherwise protected by federal law. *LOWV I*, Nos. 26-5243, 26-5301, 2026 U.S. App. LEXIS 27474, at *28 (D.C. Cir. Sep. 4, 2026) (per curiam). The Supreme Court dissent similarly read subsections (a) and (b) as prohibiting government officials from interfering only with information exchanges that other statutes independently permit. *LOWV II*, 225 L. Ed. 2d at 1143 (Jackson, J., joined by Sotomayor & Kagan, JJ., dissenting). But the Supreme Court majority properly rejected that distinction. It explained that the statutory prohibition on "in any way restrict[ing]" the exchange of information necessarily encompasses an official's invocation of another law to

deny a request for, or transfer of, the information. *Id.* at 1138 n.1 (per curiam) (alteration in original) (emphasis and quotation marks omitted).

That interpretation follows from the text of § 1373, particularly its repeated use of "[n]otwithstanding any other provision of Federal, State, or local law." 8 U.S.C. § 1373(a)-(b). A notwithstanding clause signals that Congress intended the provision to operate despite otherwise conflicting law. As Justice Thomas explained in *PLIVA, Inc. v. Mensing*, such clauses "acknowledge[] that the statute might contradict prior law and instruct[] courts not to apply the general presumption against implied repeals." 564 U.S. 604, 622 (2011) (Thomas, J.) (quotation marks omitted). The interpretive task is therefore to give effect to the new provision's ordinary meaning, rather than distort it to avoid every possible conflict with existing law. *Id.* at 623.

Here, the ordinary meaning of § 1373(a) precludes restrictions on government officials' "sending to, or receiving from, [DHS] information regarding the citizenship or immigration status" of any individual. 8 U.S.C. § 1373(a). That exchange of citizenship information is precisely what the modifications to the SAVE system do. Reading § 1373 to permit other

statutory provisions to prohibit the exchange would deny operative effect to Congress's express notwithstanding clause.

3. This Court and the Supreme Court dissent also relied on a separate provision of the IIRIRA authorizing SSA to participate in an employment-verification program subject to express restrictions on information sharing. *LOWV I*, 2026 U.S. App. LEXIS 27474, at *28; *LOWV II*, 225 L. Ed. 2d at 1143-44 (Jackson, J., joined by Sotomayor & Kagan, JJ., dissenting); *see* IIRIRA § 404(e), (h), 110 Stat. at 3009-665 (codified at 8 U.S.C. § 1324a note (Pilot Programs for Employment Eligibility Confirmation)). But the two provisions address qualitatively different information exchanges. The employment-verification provisions govern SSA's role in verifying employment eligibility through a program involving private employers. Section 1373, by contrast, addresses the exchange of citizenship and immigration-status information among government entities and officials, and subsection (c) imposes an obligation on DHS to respond to inquiries from federal, state, and local government agencies. The existence of specific restrictions governing information made available through an employment-verification program does not establish that Congress did not intend to give effect to the clear language of § 1373.

The Supreme Court dissent likewise relied on IIRIRA's enactment history, reasoning that Congress principally sought to address state and local restrictions on cooperation with federal immigration enforcement. *LOWV II*, 225 L. Ed. 2d at 1144 (Jackson, J., joined by Sotomayor & Kagan, JJ., dissenting). But the dissent acknowledged that the language Congress enacted "sweeps more broadly," *id.*, and nothing in § 1373 limits its provisions to federal immigration enforcement. Given the clear statutory text, "it is both unnecessary and inappropriate to track legislative history." *Claybrook v. Slater*, 111 F.3d 904, 908 (D.C. Cir. 1997).

4. The district court also reasoned that access to SSA information was not "absolutely necessary" for DHS to respond to citizenship-verification inquiries because DHS had performed that function before the May 2025 modifications. JA 115 (quotation marks omitted). But § 1373 does not condition the exchange of citizenship-status information on a showing of absolute necessity. Section 1373(a) covers "information regarding the citizenship or immigration status" of an individual, and the term "regarding" ordinarily broadens a provision's reach to include matters related to its subject, *see Patel v. Garland*, 596 U.S. 328, 339 (2022). SSA records containing citizenship-status information fall within that description

regardless of whether DHS could respond to some inquiries without consulting them.

Moreover, a grant of statutory authority ordinarily encompasses the means reasonably necessary to exercise it. Under the predicate-act canon, authorization to perform an act includes authorization to undertake its reasonably necessary predicate acts. Scalia & Garner, *supra*, at 192-93. Similarly, the Supreme Court has explained that a grant of governmental power encompasses the "ordinary and appropriate means" of exercising that power. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 478 (2025) (quotation marks omitted).

The SAVE modifications readily satisfy that standard. Section 1373(c) directs DHS to respond to qualifying requests to verify the citizenship or immigration status of "any individual." 8 U.S.C. § 1373(c). The modifications at issue here directly address significant limitations in the ability of SAVE to satisfy this command by permitting searches using SSNs and the submission of bulk requests. These are ordinary and appropriate means of carrying out DHS's statutory obligation.

## II. Plaintiffs' Social Security Act Claims Lack Merit

Even apart from § 1373, plaintiffs' Social Security Act claims fail. Section 405 of the Social Security Act, captioned "Evidence, Procedure, and Certification for Payments," provides, in a subsection captioned "Wage Records," that "[s]ocial security account numbers and related records that are obtained or maintained . . . pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential." 42 U.S.C. § 405(c)(2)(C)(viii)(I). The district court held that "[t]here can be no question that the modified SAVE system" violates § 405(c)(2)(C)(viii)(I). JA 89. But that provision applies only to SSNs and related records obtained or maintained pursuant to laws enacted on or after October 1, 1990. SSA maintains the relevant records under earlier laws, and DHS returns only citizenship-verification information to States, not SSNs or related records. Neither disclosure therefore falls within § 405(c)(2)(C)(viii)(I).

### A. SSA data used in the modified SAVE system is not governed by 42 U.S.C. § 405(c)(2)(C)(viii)(I).

1. Under the modified SAVE system, SSA provides DHS with a limited set of information: (1) a confirmation of whether a submitted SSN matches SSA records or, when DHS submits a partial number, the corresponding full number; (2) an indication whether the individual's name

matches; (3) an indication whether the date of birth matches; (4) the citizenship or immigration status reflected in SSA records; (5) the State or country reflected in the individual's mailing address; (6) an indication whether the individual was born in American Samoa; (7) an Alien Registration Number, if available; (8) an indication whether the individual is deceased; and (9) any applicable error codes. 90 Fed. Reg. at 48950. All of that information falls within categories of records that SSA has been authorized to collect and maintain under laws enacted long before October 1, 1990. Neither plaintiffs nor any court has suggested otherwise or identified any post-1990 statute that is even arguably relevant to SSA's collection and maintenance of this information. Section 405(c)(2)(C)(viii)(I)'s confidentiality restriction therefore does not apply.

Although the details of SSA's authorizations need not be evaluated given the absence of any even arguably relevant post-1990 statute, SSA's pre-1990 authority is quite clear. As Judge Katsas explained, "[t]he Social Security Act of 1935 authorizes the SSA to create and maintain SSNs." *LOWV I*, 2026 U.S. App. LEXIS 27474, at *54 (Katsas, J., dissenting) (first citing Social Security Act, ch. 531, § 808, 49 Stat. 620, 638 (1935); and then citing Identification of Taxpayers Under Title VIII of the Social Security Act,

1 Fed. Reg. 2023, 2024 (Nov. 7, 1936)). The original applications for SSNs, introduced in 1936, requested identifying information including the applicant's name, address, date of birth, and place of birth. *See* SSA, Original Social Security Number Application Forms, https://perma.cc/Q3KH-GTST. In 1972, Congress amended the Social Security Act to require SSA to obtain evidence sufficient to establish an applicant's "age, citizenship, or alien status, and true identity." Social Security Amendments of 1972, Pub. L. No. 92-603, sec. 137(2), § 205(c)(2), 86 Stat. 1329, 1364-65 (codified at 42 U.S.C. § 405(c)(2)(B)(ii)). SSA has accordingly collected and maintained information concerning the "citizenship or alien status of SSN applicants" since 1972. *See* Carolyn Puckett, *The Story of the Social Security Number*, 69 Soc. Sec. Bulletin, July 2009, at 55, 65, https://perma.cc/BBE8-E5NZ. Section 405(c)(2)(C)(viii)(I) thus does not govern SSA's disclosures here.

The provision's enactment history and statutory context reinforce that reading. Congress enacted § 405(c)(2)(C)(viii)(I) in November 1990 as part of legislation addressing, among other matters, the collection and use of SSNs by entities other than SSA. *See* Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101-624, secs. 1735(a), 2201(a)-(b), §§ 205(c)(2)(C), 506, 104 Stat. 3359, 3791-92, 3951-52. As Judge Katsas observed, it is "thus

hardly surprising that this 1990 bar does not cover the SSA's management of its own core records." *LOWV I*, 2026 U.S. App. LEXIS 27474, at *54 n.1 (Katsas, J., dissenting).

That interpretation also follows from the contrast between § 405(c)(2)(C)(viii)(I) and the Social Security Act's general confidentiality provision, 42 U.S.C. § 1306(a). Section 1306(a)—which the district court did not reach, *see* JA 89 n.8—expressly governs information obtained by SSA in administering the Social Security Act and contains no temporal limitation on the records to which it applies. Importantly, it permits disclosure "as the head of the applicable agency may by regulations prescribe" or "as otherwise provided by Federal law." 42 U.S.C. § 1306(a). Consistent with that authorization, SSA regulations expressly permit, among other things, disclosure without the subject's consent for any "routine use" under the Privacy Act. 20 C.F.R. § 401.150(a). The regulations also expressly permit disclosures required by law, including to "U.S. Citizenship and Immigration Services to carry out its duties regarding aliens." *Id.* § 401.120. Section 405(c)(2)(C)(viii)(I), by contrast, contains no comparable exceptions. Reading that provision to govern all of SSA's core records would render § 1306(a)'s

disclosure exceptions and implementing regulations inoperative, effectively prohibiting disclosures that Congress expressly authorized.

That reading would thus cast doubt on longstanding SSA information-sharing practices authorized under the agency's disclosure regulations and other federal laws. Those practices include providing information to employers for wage-reporting purposes and to the Department of Justice in connection with investigations and prosecutions of Social Security Act violations. *See* 90 Fed. Reg. at 50881 (routine uses 1 and 3). *See generally* 20 C.F.R. § 401.150. Likewise, Congress directed SSA to verify SSNs and citizenship status for the Department of Health and Human Services as part of the Patient Protection and Affordable Care Act in 2010. 42 U.S.C. § 18081(c)(4). The more coherent interpretation gives both provisions effect: Section 1306(a) governs disclosure of information SSA obtains in administering the Social Security Act, while § 405(c)(2)(C)(viii)(I) imposes additional confidentiality protections on records obtained or maintained pursuant to laws enacted on or after October 1, 1990. Because the records used in the modified SAVE system are maintained by SSA pursuant to earlier statutory authority, the latter provision does not prohibit their disclosure.

2. In denying a stay, this Court suggested that SSA might create a "new, query-specific match record" when responding to SAVE inquiries and that such a record might fall within § 405(c)(2)(C)(viii)(I) even if the underlying SSA records do not. *LOWV I*, 2026 U.S. App. LEXIS 27474, at *33. But the information transmitted to DHS consists of data drawn from records that SSA already maintains pursuant to pre-1990 statutory authority. *See* JA 448; 90 Fed. Reg. at 48952. Matching that information against a query and transmitting the result does not establish that SSA has obtained or maintained a new record pursuant to a law enacted on or after October 1, 1990. Were it otherwise, then any contemporary disclosure of information from those records could be characterized as involving a new, query-specific record and the statutory cutoff would have no effect.

### B. The data DHS discloses to SAVE users is not governed by 42 U.S.C. § 405(c)(2)(C)(viii)(I).

1. DHS's disclosure of information to SAVE users likewise does not violate § 405(c)(2)(C)(viii)(I), which protects only "[s]ocial security account numbers and related records." A SAVE user supplies an individual's name and SSN to DHS to initiate a verification request. Although SSA may provide DHS with a complete SSN when the requesting agency submits only a partial number, that information "never leaves DHS." *LOWV I*, 2026 U.S.

App. LEXIS 27474, at *54 (Katsas, J., dissenting). DHS therefore does not disclose SSNs to SAVE users.

Nor does DHS disclose "related records," which the statute defines as records "indicat[ing], directly or indirectly, the identity of any individual" who has been issued or requested an SSN. 42 U.S.C. § 405(c)(2)(C)(viii)(IV). The information DHS returns to a SAVE user is limited to citizenship-verification information and an indication whether the individual is deceased. JA 592; *LOWV I*, 2026 U.S. App. LEXIS 27474, at *56 (Katsas, J., dissenting). That response does not provide SSN or identifying information previously unknown to the user. Rather, identifying information flows in the opposite direction: the SAVE user supplies DHS with the information necessary to identify the individual whose citizenship it seeks to verify. DHS then returns the requested verification result, not the individual's SSN or other identifying records. Its disclosures therefore do not fall within § 405(c)(2)(C)(viii)(I)'s prohibition.

2. In denying a stay, this Court reasoned that SSA's verification of an SSN for DHS may constitute a "'disclos[ure]' of an SSN for purposes of § 405(c)(2)(C)(viii)(I)." *LOWV I*, 2026 U.S. App. LEXIS 27474, at *36-37 (alteration in original). However, a yes-or-no verification of an SSN by SSA

is not disclosure because it does not indicate "identity" of those who have been issued or requested an SSN. But even assuming it were, there is still no prohibited disclosure by DHS. The complete SSN remains within DHS and is not transmitted to the SAVE user. And SSA's disclosure to DHS does not implicate § 405(c)(2)(C)(viii)(I) because, as explained above, SSA maintains the underlying information pursuant to laws enacted before the provision's October 1, 1990 cutoff.

This Court also reasoned that a SAVE response, viewed in its entirety, includes identifying information. *LOWV I*, 2026 U.S. App. LEXIS 27474, at *39-40. But as this Court acknowledged, that information is supplied by the SAVE user itself. *Id.* at *35-36. Returning a verification result does not disclose identifying information the requesting agency already possesses. As SSA explained in a different context, it "does not provide specific information on what data elements did not match, nor does SSA provide any SSNs or other identifying information. In addition, the verification does not authenticate the identity of individuals or conclusively prove the individuals we verify are who they claim to be." Agency Information Collection Activities: Proposed Request, 84 Fed. Reg. 66704 (Dec. 5, 2019). This is confirmed by how SAVE works: the requesting agency identifies the

individual, transmits the relevant identifying information to DHS, and receives a verification result. DHS has no reason to identify the individual back to the agency. The information DHS supplies is thus citizenship-status information, not an SSN or other identifying record.

It would be anomalous to interpret the Social Security Act as prohibiting DHS from using an SSN supplied by a requesting agency to retrieve information that is not itself subject to the statutory restriction, merely because the response concerns the individual identified by that number. The Internal Revenue Service, for example, does not disclose a taxpayer's SSN merely by using that number to locate the taxpayer's W-2 forms or calculate tax liability. Using an SSN to retrieve information is not the same as disclosing it. The contrary interpretation would improperly treat the routine use of SSNs as identifiers as a disclosure of protected information.

### C. This Court should consider these arguments notwithstanding claims of forfeiture.

The district court did not address these arguments on the merits. Instead, it concluded that the government had forfeited them. JA 127-131. This Court agreed for purposes of denying a stay. *LOWV I*, 2026 U.S. App. LEXIS 27474, at *27. But in resolving this appeal on the merits, the Court

should address the issue, either on the ground that it was fairly encompassed in the government's prior arguments or as an exercise of its "independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

The government is not raising a new claim on appeal. The applicability of the Social Security Act's confidentiality provision has been at issue throughout this litigation, and defendants argued below that the provision does not apply. To the extent defendants did not advance this particular interpretation until their motion for a stay pending appeal in district court, that reflects plaintiffs' framing of the dispute, which focused on whether the 1986 Act establishing SAVE authorized the modifications. And since the district court relied solely upon this provision (rather than any of plaintiffs' primary arguments), the government now offers additional arguments concerning the proper interpretation of the same confidentiality provision that it previously addressed in more summary fashion. As the Supreme Court has explained, "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). Because the applicability of the confidentiality provision is

properly before this Court and its resolution requires no further factual development, the Court should consider the government's arguments and resolve the issue on the merits.

Even if some aspects of the government's arguments were forfeited, several considerations warrant excusing any forfeiture. First, this Court has exercised its discretion to consider previously unraised issues where the case "involves a straightforward legal question, and both parties have fully addressed the issue on appeal," or where "the new argument relates to a threshold question such as the clear inapplicability of a statute." *Liff v. Office of Inspector Gen. for the U.S. Dep't of Lab.*, 881 F.3d 912, 919 (D.C. Cir. 2018) (quotation marks omitted). Those considerations favor review here. The statute plainly does not apply: SSA maintains the relevant records pursuant to statutory authority predating 1990, and DHS does not disclose SSNs to SAVE users. Additionally, the parties will fully address this issue on appeal.

Second, the importance of the issues independently favors consideration of the government's arguments. As Judge Katsas explained, this case concerns the ongoing administration of a federal verification program and implicates significant federal and state interests. *LOWV I*,

2026 U.S. App. LEXIS 27474, at *57-58 (Katsas, J., dissenting). States have statutory responsibilities to maintain accurate voter-registration rolls. *See* 52 U.S.C. §§ 20501(b)(4), 21083(a)(4). State benefit programs likewise may require verification of citizenship or immigration status. *See* Br. of Amici Curiae Iowa, Florida, Indiana, and Ohio 5-7. States need reliable access to citizenship-verification information to discharge those responsibilities. Even accepting the motion panel's decision not to consider arguments that had not been fully developed at the stay stage, the Court should not affirm on the merits based on a statute that is inapplicable on its face.

Third, considering the arguments would neither prejudice plaintiffs nor improperly circumvent the district court. The government raised them in seeking a stay before both the district court and this Court, and plaintiffs had an opportunity to respond at that time. And plaintiffs will have another opportunity to address the arguments in their answering brief.

Nor does the government's decision not to seek post-judgment relief under Federal Rules of Civil Procedure 52(b) or 59(e) justify declining to consider the arguments. Most significantly, even a successful motion would not have altered the judgment, which rested independently on the district court's Privacy Act and APA holdings. JA 102, 106-107, 111. Such a motion

would only have delayed the urgently needed appellate review. Moreover, Rule 52(b), which permits amended or additional factual findings, would not directly address the asserted error in the court's statutory interpretation. And a Rule 59(e) motion would merely have presented the district court with the same question now before this Court: whether to consider legal arguments that the district court previously deemed forfeited.

## III. Plaintiffs' Privacy Act Claims Lack Merit

Once again putting aside § 1373, the district court erred in invalidating the update to SAVE based on the Privacy Act for two independently sufficient reasons. JA 90-111. First, plaintiffs lack a right of action to seek prospective relief for violations of the Privacy Act. And in any event, their substantive and procedural claims fail on the merits. This Court, which did not reach those issues in its stay decision, has not suggested otherwise. *See LOWV I*, 2026 U.S. App. LEXIS 27474, at *44.

### A. The Privacy Act cannot be enforced through the APA.

1. Congress prescribed a detailed remedial scheme for violations of the Privacy Act. *See* 5 U.S.C. § 552a(g). That scheme authorizes civil actions only by an "individual," *id.* § 552a(g)(1), defined as a citizen or lawful permanent resident, *id.* § 552a(a)(2). It also carefully limits the relief

available. For two categories of violations—an agency's refusal to amend a record or to provide access to a record—Congress authorized prospective relief. *See id.* § 552a(g)(2)-(3). For other violations, including those alleged here, Congress authorized damages upon a showing that the agency acted intentionally or willfully and that the plaintiff sustained the requisite injury. *See id.* § 552a(g)(1)(C)-(D), (g)(4).

Plaintiffs are organizations, not "individuals" entitled to sue under the Privacy Act. And even if individual members had brought these claims, the Act would not authorize the prospective relief plaintiffs seek. The alleged violations of the Act's disclosure restrictions and notice requirements fall outside the two categories for which Congress expressly authorized injunctive relief. Instead, Congress provided a damages remedy, subject to specified statutory conditions. Damages are the paradigmatic remedy at law, *see Schoenthal v. Irving Tr. Co.*, 287 U.S. 92, 95 (1932), and the traditional remedy for the privacy torts to which the district court analogized the alleged violations here, *see* JA 69-77. The Privacy Act therefore supplies no cause of action authorizing these plaintiffs to obtain vacatur of the modified SAVE system.

Plaintiffs cannot circumvent those limitations by invoking the APA's general authorization of judicial review. The APA withholds review where other "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), and its waiver of sovereign immunity does not apply where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *id.* § 702. The APA further provides for review where "there is no other adequate remedy in a court." *Id.* § 704. The Privacy Act "impliedly forbids the relief which is sought" here by expressly authorizing suits by individuals, but not organizations, and by permitting prospective relief only for two specified categories of violations, neither at issue here.

The Supreme Court has repeatedly recognized that the APA cannot be used "to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). Thus, a statute's carefully drawn review provisions may preclude APA challenges by parties whom Congress did not authorize to sue. *See Block v. Community Nutrition Inst.*, 467 U.S. 340, 345-48 (1984). Nor may litigants invoke general review provisions to avoid restrictions that Congress imposed on the remedies or procedures available under a more specific

statute. *See Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 n.22 (1983).

This Court has applied the same principle. In *Spectrum Leasing Corp. v. United States*, this Court held that a plaintiff could not use the APA to obtain "the classic contractual remedy of specific performance" when Congress had prescribed a damages remedy under the Tucker Act. 764 F.2d 891, 894 (D.C. Cir. 1985). And in *Fornaro v. James*, this Court held that the Civil Service Retirement Act's comprehensive remedial structure foreclosed an APA action even for a claim as to which that statute afforded no relief. 416 F.3d 63, 67 (D.C. Cir. 2005). As the Court explained: "[W]hat you get under the [Civil Service Retirement Act] is what you get." *Id.* The same principle applies here: Congress's decision to authorize particular plaintiffs and remedies under the Privacy Act forecloses resorting to the APA to obtain relief Congress withheld.

That conclusion follows from the settled rule that "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Where a general authorization and a more limited, specific authorization coexist, "[t]he terms of the specific authorization must be complied with." *Id.* Otherwise, the specific provision would be "swallowed

by the general one," contrary to the principle that every part of a statute should be given effect. *Id.* Accordingly, "a precisely drawn, detailed statute pre-empts more general remedies." *Hinck v. United States*, 550 U.S. 501, 506 (2007) (quotation marks omitted). The Privacy Act embodies Congress's judgment about the appropriate remedies for violations of its provisions. Courts cannot replace that judgment with a broader remedial scheme under the APA.

2. The district court concluded that this Court had rejected the government's argument in *Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988). JA 92. But *Stephens* supports the government's position. There, this Court held that the Privacy Act's civil-remedies provision "authorizes entry of injunctive relief in only two specific situations" and "precludes other forms of declaratory and injunctive relief." 851 F.2d at 1463. Although the Court separately permitted relief under the APA, that relief rested on a violation of the Veterans' Records Statute, which independently required compliance with the Privacy Act's substantive protections. *Id.* at 1466-67; *Doe v. DiGenova*, 779 F.2d 74, 79 (D.C. Cir. 1985). Unlike the Veterans' Records Statute, however, the Privacy Act provides its own limited remedial scheme. And unlike the plaintiff in *Stephens*, plaintiffs here identify no separate

statute incorporating the Privacy Act's substantive requirements that could independently support APA relief. They therefore cannot invoke the APA to circumvent the Privacy Act's express remedial limitations.

Nor have the Supreme Court's subsequent decisions resolved the question in plaintiffs' favor. In *FAA v. Cooper*, the Court noted the "possib[ility]" that the Privacy Act permits injunctive relief through the APA. 566 U.S. 284, 303 n.12 (2012). Similarly, *Doe v. Chao* observed that "it may be" possible to pursue relief for Privacy Act violations under the APA. 540 U.S. 614, 619 n.1 (2004). Those qualified observations leave the question open; they do not hold that the APA overrides the Privacy Act's express remedial restrictions. And they provide no basis for departing from the statutory text or from this Court's recognition in *Stephens* that the Privacy Act itself precludes the prospective relief sought here.

3. The district court also suggested that the APA's adequate-remedy limitation is inapplicable because the Privacy Act and the APA are both codified in Title 5, and therefore Privacy Act remedies are not available "elsewhere" within the meaning of 5 U.S.C. § 704. JA 93-95. But this Court has applied § 704's adequate-remedy limitation to other Title 5 statutes. In *Fornaro*, the Court held that the Civil Service Retirement Act foreclosed an

APA action. 416 F.3d at 67. And in *Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice*, the Court held that the Freedom of Information Act afforded an adequate alternative remedy precluding APA review. 846 F.3d 1235, 1244-46 (D.C. Cir. 2017). The fact that those statutes share a title with the APA did not prevent their remedial schemes from foreclosing APA relief.

In any event, the government's principal argument does not depend on § 704. Section 702 independently preserves limitations imposed by statutes that expressly or impliedly forbid the relief sought. The Privacy Act's express restriction of prospective remedies to specified violations supplies that limitation regardless of whether its damages remedy qualifies as an adequate remedy under § 704.

4. The presumption favoring judicial review does not require a different result. The Privacy Act itself provides judicial review but limits that review to suits brought by specified plaintiffs seeking specified remedies. The question is not whether Congress foreclosed all judicial review, but whether it authorized this particular suit for this particular relief. And the presumption is not irrebuttable; it "may be overcome" by evidence "drawn from the statutory scheme as a whole." *Patel*, 596 U.S. at 347

(quotation marks omitted). The Privacy Act's detailed remedial provisions supply that evidence.

Nor does it matter that the remedies Congress provided may be less useful to plaintiffs than systemwide vacatur. The available remedies are those "that Congress enacted into law," not those a court considers preferable "as a policy matter." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) (quotation marks omitted). That principle has particular force where Congress created both the substantive statutory protections and the mechanism for enforcing them. Having determined that damages actions brought by individuals generally provide the appropriate remedy for violations of the Privacy Act's disclosure requirements, Congress was entitled to confine prospective relief to the narrow categories it identified.

The Privacy Act thus provides no basis for the organizational plaintiffs to obtain vacatur of the modified SAVE system, and the APA does not authorize them to circumvent that result.

### B. The modified SAVE system complies with the Privacy Act's substantive and procedural requirements.

1. **Substantive requirements**. Even if plaintiffs could pursue their Privacy Act claims, those claims would fail on the merits. The district court concluded that SSA's disclosure of information through the modified SAVE

system violates the Privacy Act's general prohibition against disclosing records without the consent of the individuals to whom they pertain. 5 U.S.C. § 552a(b). But that prohibition is subject to express exceptions, including for disclosures made pursuant to a "routine use." *Id.* § 552a(b)(3). The disclosures here fall within that exception.

The Privacy Act defines "routine use" as the "use of [a] record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7). Under the "ordinary meaning" of "compatible," "[a] disclosure of a record is 'compatible' so long as it does not conflict with or frustrate the purposes for which the record was collected." *LOWV I*, 2026 U.S. App. LEXIS 27474, at *62 (Katsas, J., dissenting). At most, compatibility requires a "meaningful degree of convergence" between the purposes of collection and disclosure. *Cf. Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549 (3d Cir. 1989). The modified SAVE system satisfies either formulation.

A central purpose of SSNs is to identify individuals accurately. SSNs are "unique numerical identifiers" used throughout federal programs to "keep track" of individuals and ensure that information is "match[ed]" to the correct person. *Bowen v. Roy*, 476 U.S. 693, 710-11 (1986). The modified

SAVE system uses SSNs for precisely that purpose: to match a citizenship-verification request with the correct SSA record and return the corresponding citizenship information. *See* 90 Fed. Reg. at 48950; 90 Fed. Reg. at 50880 (explaining that SSNs serve "a number of administrative and program purposes," including as "a case control number" and "for verification of individual identity factors"). That use is fully compatible with the identifying function for which SSNs are collected and maintained.

That is not changed by the fact that SSNs were originally created to determine eligibility for federal benefits. As Judge Katsas explained, "[e]ven if [SSA] data was originally collected only to establish . . . eligibility for social-security benefits, disclosing that data to confirm eligibility for other benefits and voting neither conflicts with nor frustrates those initial purposes." *LOWV I*, 2026 U.S. App. LEXIS 27474, at *63 (Katsas, J., dissenting). Indeed, SSA has long recognized routine uses that extend beyond the administration of Social Security benefits. For example, one longstanding routine use is disclosure of information for purposes of enforcing the draft registration requirements of the Military Selective Service Act. 90 Fed. Reg. at 50882 (routine use 21). That established

practice underscores that compatibility is not limited to the administration of government benefits.

The district court nevertheless rejected the routine-use exception because it characterized the relevant collection purposes as limited to verifying "work authorization and eligibility for SSA benefits." JA 97. That understanding is unduly narrow. SSNs have long served as identifying information across a wide range of government and private activities, including tax administration, banking, Selective Service registration, passport applications, and driver licensing. *See* SSA, *The Expansion of the SSN as an Identifier*, https://perma.cc/JQZ6-YSJH. Their utility is not confined to employment authorization or the administration of Social Security benefits. The court thus erred by "framing the collection purpose at too low a level of generality," contrary to both the Privacy Act's use of the comparatively broad term "compatible" and the SSN's established role as a "nearly universal identifier." *LOWV I*, 2026 U.S. App. LEXIS 27474, at *63-64 (Katsas, J., dissenting) (quotation marks omitted). Because the modified SAVE system uses SSA records for purposes compatible with their collection, the challenged disclosures fall within the Privacy Act's routine-use exception. 5 U.S.C. § 552a(b)(3).

2. **Procedural requirements.** Plaintiffs' claim that the agencies failed to comply with the Privacy Act's notice-and-comment requirements likewise provides no basis for vacating the SAVE modifications. The Privacy Act requires an agency proposing a new routine use to "publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." 5 U.S.C. § 552a(e)(11). There is no dispute that DHS and SSA published notices concerning the modified SAVE system.[2] *See* 90 Fed. Reg. at 48948; 90 Fed. Reg. at 50879. Nor is there any dispute that the agencies provided an opportunity for public comment and that the relevant notice periods have elapsed. Both agencies subsequently certified that they received and considered the comments submitted. *See* Dkt. Nos. 64-1, 65-1. Thus, whatever defects may have attended the initial

---

[2] Following the Supreme Court's grant of a stay based on its conclusion that § 1373 "likely supersedes restrictions on disclosure elsewhere in the Code," *LOWV II*, 225 L. Ed. 2d at 1138, SSA republished its SORN without identifying the modified SAVE system as a routine use. 91 Fed. Reg. 69297. But the issue here is whether the district court was correct to grant prospective relief when it was ordered. On that score, the latest SORN is not germane.

implementation of the SAVE modifications, the statutory notice-and-comment requirements have since been satisfied.

The district court relied on the fact that the agencies implemented the SAVE modifications in May 2025, several months before publishing the required notices in October and November. JA 103. But that does not justify the prospective relief plaintiffs seek. Plaintiffs seek to prevent the future operation of the modified SAVE system, not to obtain damages for injuries caused by disclosures made before the notices were published. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111-13 (1983) (distinguishing past injuries from those supporting prospective relief). The delayed notices do not establish that the system's continued operation violates the Privacy Act. As Judge Katsas explained, "now that the agencies have provided the requisite notice and opportunity to comment, any past procedural violations cannot justify forward-looking relief against modified SAVE." *LOWV I*, 2026 U.S. App. LEXIS 27474, at *65 (Katsas, J., dissenting) (emphasis omitted).

The district court separately faulted the agencies for failing to remain sufficiently "open-minded" during the comment process. JA 104. But the Supreme Court has rejected an open-mindedness requirement under the APA, explaining that judicial review of notice-and-comment procedures must

focus on the objective requirements Congress prescribed, rather than a judicial assessment of an agency's willingness to reconsider its position. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020). The same reasoning applies to the Privacy Act. Section 552a(e)(11) requires notice and an opportunity to submit comments; it does not condition compliance on proof that agency officials approached those comments with a particular subjective attitude. *LOWV I*, 2026 U.S. App. LEXIS 27474, at *65-66 (Katsas, J., dissenting). By imposing that additional requirement, the district court departed from the principle that courts generally may not inquire into "the mental processes of administrative decisionmakers." *Department of Com. v. New York*, 588 U.S. 752, 781 (2019) (quotation marks omitted). The court also failed to give appropriate weight to the "presumption of regularity" attending the agencies' certifications that they considered the comments. *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14 (1926).

The district court further concluded that the agencies were required to issue written responses to the comments. JA 109. That conclusion disregards the distinction between the APA's rulemaking procedures and the Privacy Act's requirements for publishing routine uses. The APA requires

an agency to provide notice; permit submission of "written data, views, or arguments"; and issue "a concise general statement of [the rule's] basis and purpose" after "consideration of the relevant matter presented." 5 U.S.C. § 553(c). The Privacy Act, by contrast, requires notice and an opportunity to submit "written data, views, or arguments," but contains no corresponding requirement that an agency issue a statement of basis and purpose or written responses to the comments. *Id.* § 552a(e)(11). As Judge Katsas observed, "[g]iven the ubiquity of APA notice-and-comment procedures, Congress's omission of the 'consideration' requirement for SORNs is striking." *LOWV I*, 2026 U.S. App. LEXIS 27474, at *66 (Katsas, J., dissenting). Courts ordinarily "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," particularly when Congress has demonstrated elsewhere that it knows how to impose such requirements. *Jama v. ICE*, 543 U.S. 335, 341 (2005). And it is a "basic tenet of administrative law" that agencies generally may fashion their own procedures, while courts are not free to impose additional procedural requirements beyond those Congress prescribed. *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 524, 544

(1978). Indeed, SORNs are routinely published without any accompanying explanation, and plaintiffs do not even identify a contrary example.

Finally, the district court erred in concluding that the agencies acted arbitrarily and capriciously by failing to provide written responses to comments. JA 107-111. An agency acts arbitrarily if it "entirely fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). But the absence of written responses that the Privacy Act does not require does not establish that the agencies failed to consider an important aspect of the problem.

The district court sought to bridge that gap by invoking the purported "reliance interests of persons who had provided information to SSA." JA 108. But individuals who obtain SSNs have no reasonable expectation that those numbers will never be used to verify their identities. Plaintiffs, for example, have identified no basis to conclude that their members would have declined to obtain SSNs had they known that SSA would share citizenship-status information with DHS through SAVE. The court thus identified no concrete reliance interest that the agencies overlooked, much less one sufficient to render the modified SAVE system arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

/s/ ________________________
BENJAMIN C. WEI
*Attorneys, Appellate Staff*
*Civil Division, Room 7263*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-2875*
*benjamin.c.wei@usdoj.gov*

November 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,415 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

*/s/*
Benjamin C. Wei

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/*
Benjamin C. Wei

# ADDENDUM

# TABLE OF CONTENTS

8 U.S.C. § 1373 .......................................................................................... A1

42 U.S.C. § 405(c)(2)(C)(viii) ......................................................................... A2

**8 U.S.C. § 1373**

(a) IN GENERAL

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) ADDITIONAL AUTHORITY OF GOVERNMENT ENTITIES

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) OBLIGATION TO RESPOND TO INQUIRIES

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**42 U.S.C. § 405(c)(2)(C)(viii)**

(I) Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record.

(II) Paragraphs (1), (2), and (3) of section 7213(a) of the Internal Revenue Code of 1986 shall apply with respect to the unauthorized willful disclosure to any person of social security account numbers and related records obtained or maintained by an authorized person pursuant to a provision of law enacted on or after October 1, 1990, in the same manner and to the same extent as such paragraphs apply with respect to unauthorized disclosures of return and return information described in such paragraphs. Paragraph (4) of section 7213(a) of such Code shall apply with respect to the willful offer of any item of material value in exchange for any such social security account number or related record in the same manner and to the same extent as such paragraph applies with respect to offers (in exchange for any return or return information) described in such paragraph.

(III) For purposes of this clause, the term "authorized person" means an officer or employee of the United States, an officer or employee of any State, political subdivision of a State, or agency of a State or political subdivision of a State, and any other person (or officer or employee thereof), who has or had access to social security account numbers or related records pursuant to any provision of law enacted on or after October 1, 1990. For purposes of this subclause, the term "officer or employee" includes a former officer or employee.

(IV) For purposes of this clause, the term "related record" means any record, list, or compilation that indicates, directly or indirectly, the identity of any individual with respect to whom a social security account number or a request for a social security account number is maintained pursuant to this clause.