**Nos. 25-5243 & 26-5301**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

LEAGUE OF WOMEN VOTERS, *et al.*,
*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,
*Defendants-Appellants*.

STATE OF TEXAS,
*Intervenor-Defendant-Appellant*.

On Appeal from the United States District Court
for the District of Columbia

# JOINT APPENDIX


BRETT A. SHUMATE
*Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
BENJAMIN C. WEI
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-2875*

## TABLE OF CONTENTS


Docket Report for *League of Women Voters*, *et al.*,
*v. U.S. Department of Homeland Security*, *et al.*, Case No. 25-cv-3501 .............JA 001

Memorandum Opinion On Summary Judgment
(Dkt. No. 111).........................................................................................JA 047

Order Granting Summary Judgment
(Dkt. No. 112).........................................................................................JA 122

Memorandum Opinion On Motion to Stay
(Dkt. No. 123).........................................................................................JA 124

Order Denying Motion to Stay
(Dkt. No. 124).........................................................................................JA 147

Notice of Appeal Federal Defendants
(Dkt. No. 113).........................................................................................JA 148

Notice of Appeal State of Texas
(Dkt. No. 141).........................................................................................JA 149

Memorandum in Support of Plaintiffs' Motion for Summary Judgment
(Dkt. No. 66-1) ......................................................................................JA 152

Defendants' Combined Memorandum of Law in Support
of Their Motion to Dismiss (Dkt. 77-1) .......................................................JA 215

Defendants' Reply in Support of Their Motion to Dismiss
(Dkt. 106)...............................................................................................JA 294

SAVE Program Privacy Impact Assessment
(DHS A.R. 221-243)..................................................................................JA 337

SAVE Program Optimization Privacy Threshold Analysis, July 17, 2025
(DHS A.R. 244-285)..................................................................................JA 360

SAVE Program Optimization Privacy Threshold Analysis, Sept. 11, 2025
(DHS A.R. 286-327)..................................................................................JA 402

Letter Agreement Providing For Information Sharing
(DHS A.R. 420-431) ........ JA 444

Narrative Statement for SORN Update
(DHS AR 483-490) ........ JA 456

MOU with Brevard County, FL
(DHS A.R. 615-626) ........ JA 464

MOU with Flager County, FL
(DHS A.R. 759-769) ........ JA 476

SAVE User Reference Guide
(DHS A.R. 1398-1478) ........ JA 487

SAVE Tutorial
(DHS A.R. 1484-1523) ........ JA 568

Voter Registration and Voter List Maintenance Fact Sheet, Feb. 12, 2026
(DHS A.R. 1524-1527) ........ JA 608

Voter Registration and Voter List Maintenance Fact Sheet, Feb. 19, 2026
(DHS A.R. 1528-1531) ........ JA 612

Agreement Between Federal Program Agencies for Intragovernmental
Reimbursable Buy/Sell Activity (SSA A.R. 30-49) ........ JA 616

# 1:25cv3501, League Of Women Voters Et Al V. U.S. Department Of Homeland Security Et Al

US District Court Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 10/27/2026**

## Header

**Case Number:** 1:25cv3501
**Date Filed:** 09/30/2025
**Assigned To:** Judge Sparkle L. Sooknanan
**Nature of Suit:** Other Statutory Actions (890)
**Cause:** Judicial Review of Agency Actions
**Lead Docket:** None
**Other Docket:** USCA, 26-05243, USCA, 26-05301
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Closed
**Closed:** 06/22/2026
**Statute:** 05:0706
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutory Actions

## Participants

### Litigants

League of Women Voters
**Plaintiff**

### Attorneys

Aman Tewari George
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
USA
202-701-1783 Email:Ageorge@democracyforward.Org

John B. Hill
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
Po Box 14596
Washington, DC 20044
USA
202-408-5565 Email:Jhill@citizensforethics.Org

Lauren Crowell Bingham
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Citizens for Responsibility and Ethics in Washington
Po Box 14596
Washington, DC 20044
USA
202-408-5565 Email:Lbingham@citizensforethics.Org

Nikhel Sus
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON

| Litigants | Attorneys |
|---|---|
| | Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Nsus@citizensforethics.Org |
| | Ronald A. Fein<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD<br>Po Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Rfein@democracyforward.Org |
| | Emily Davis<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/30/2026]<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington Dc, DC 20006<br>USA<br>202-331-0114 Email:Edavis@fairelectionscenter.Org |
| | Jennifer Fountain Connolly<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Jconnolly@democracyforward.Org |
| | Johanna M. Hickman<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Hhickman@democracyforward.Org |
| | Jonathan Sherman<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Suite 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Jsherman@fairelectionscenter.Org |
| | Mark Samburg<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Msamburg@democracyforward.Org |
| | Michelle Kanter Cohen<br>ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300 |

| Litigants | Attorneys |
| --- | --- |
| | Washington, DC 20006<br>USA<br>202-331-0114 Email:Mkantercohen@fairelectionscenter.Org<br><br>Robin F. Thurston<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-455-9060 Email:Rthurston@democracyforward.Org<br><br>Sophie Rose Gelber<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>786-877-0505 Email:Sgelber@democracyforward.Org<br><br>Yoseph T. Desta<br>ATTORNEY TO BE NOTICED<br>[Terminated: 02/24/2026]<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>2100 Pennsylvania Ave. Nw<br>Washington, DC 20037<br>USA<br>202-339-8624 Email:Ydesta@orrick.Com |
| League of Women Voters of Virginia<br>**Plaintiff** | Aman Tewari George<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-701-1783 Email:Ageorge@democracyforward.Org<br><br>John B. Hill<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Jhill@citizensforethics.Org<br><br>Lauren Crowell Bingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Citizens for Responsibility and Ethics in Washington<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Lbingham@citizensforethics.Org<br><br>Nikhel Sus<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596 |

| Litigants | Attorneys |
|---|---|
| | Washington, DC 20044<br>USA<br>202-408-5565 Email:Nsus@citizensforethics.Org |
| | Ronald A. Fein<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD<br>Po Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Rfein@democracyforward.Org |
| | Emily Davis<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/30/2026]<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington Dc, DC 20006<br>USA<br>202-331-0114 Email:Edavis@fairelectionscenter.Org |
| | Jennifer Fountain Connolly<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Jconnolly@democracyforward.Org |
| | Johanna M. Hickman<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Hhickman@democracyforward.Org |
| | Jonathan Sherman<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Suite 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Jsherman@fairelectionscenter.Org |
| | Mark Samburg<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Msamburg@democracyforward.Org |
| | Michelle Kanter Cohen<br>ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington, DC 20006 |

| Litigants | Attorneys |
|---|---|
| | USA<br>202-331-0114 Email:Mkantercohen@fairelectionscenter.Org<br><br>Robin F. Thurston<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-455-9060 Email:Rthurston@democracyforward.Org<br><br>Sophie Rose Gelber<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>786-877-0505 Email:Sgelber@democracyforward.Org<br><br>Yoseph T. Desta<br>ATTORNEY TO BE NOTICED<br>[Terminated: 02/24/2026]<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>2100 Pennsylvania Ave. Nw<br>Washington, DC 20037<br>USA<br>202-339-8624 Email:Ydesta@orrick.Com |
| League of Women Voters of Louisiana<br>**Plaintiff** | Aman Tewari George<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-701-1783 Email:Ageorge@democracyforward.Org<br><br>John B. Hill<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Jhill@citizensforethics.Org<br><br>Lauren Crowell Bingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Citizens for Responsibility and Ethics in Washington<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Lbingham@citizensforethics.Org<br><br>Nikhel Sus<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044 |

## Litigants

## Attorneys

USA
202-408-5565 Email:Nsus@citizensforethics.Org

Ronald A. Fein
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD
Po Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Rfein@democracyforward.Org

Emily Davis
ATTORNEY TO BE NOTICED
[Terminated: 07/30/2026]
FAIR ELECTIONS CENTER
1629 K Street Nw Ste. 300
Washington Dc, DC 20006
USA
202-331-0114 Email:Edavis@fairelectionscenter.Org

Jennifer Fountain Connolly
ATTORNEY TO BE NOTICED
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Jconnolly@democracyforward.Org

Johanna M. Hickman
ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Hhickman@democracyforward.Org

Jonathan Sherman
PRO HAC VICE;ATTORNEY TO BE NOTICED
FAIR ELECTIONS CENTER
1629 K Street Nw Suite 300
Washington, DC 20006
USA
202-331-0114 Email:Jsherman@fairelectionscenter.Org

Mark Samburg
ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Msamburg@democracyforward.Org

Michelle Kanter Cohen
ATTORNEY TO BE NOTICED
FAIR ELECTIONS CENTER
1629 K Street Nw Ste. 300
Washington, DC 20006
USA

| Litigants | Attorneys |
|---|---|
| | 202-331-0114 Email:Mkantercohen@fairelectionscenter.Org<br><br>Robin F. Thurston<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-455-9060 Email:Rthurston@democracyforward.Org<br><br>Sophie Rose Gelber<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>786-877-0505 Email:Sgelber@democracyforward.Org<br><br>Yoseph T. Desta<br>ATTORNEY TO BE NOTICED<br>[Terminated: 02/24/2026]<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>2100 Pennsylvania Ave. Nw<br>Washington, DC 20037<br>USA<br>202-339-8624 Email:Ydesta@orrick.Com |
| League of Women Voters of Louisiana Education Fund<br>**Plaintiff** | Aman Tewari George<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-701-1783 Email:Ageorge@democracyforward.Org<br><br>John B. Hill<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Jhill@citizensforethics.Org<br><br>Lauren Crowell Bingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Citizens for Responsibility and Ethics in Washington<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Lbingham@citizensforethics.Org<br><br>Nikhel Sus<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA |

| Litigants | Attorneys |
|---|---|
| | 202-408-5565 Email:Nsus@citizensforethics.Org<br><br>Ronald A. Fein<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD<br>Po Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Rfein@democracyforward.Org<br><br>Emily Davis<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/30/2026]<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington Dc, DC 20006<br>USA<br>202-331-0114 Email:Edavis@fairelectionscenter.Org<br><br>Jennifer Fountain Connolly<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Jconnolly@democracyforward.Org<br><br>Johanna M. Hickman<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Hhickman@democracyforward.Org<br><br>Jonathan Sherman<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Suite 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Jsherman@fairelectionscenter.Org<br><br>Mark Samburg<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Msamburg@democracyforward.Org<br><br>Michelle Kanter Cohen<br>ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Mkantercohen@fairelectionscenter.Org |

| Litigants | Attorneys |
|---|---|
| | Robin F. Thurston<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-455-9060 Email:Rthurston@democracyforward.Org |
| | Sophie Rose Gelber<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>786-877-0505 Email:Sgelber@democracyforward.Org |
| | Yoseph T. Desta<br>ATTORNEY TO BE NOTICED<br>[Terminated: 02/24/2026]<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>2100 Pennsylvania Ave. Nw<br>Washington, DC 20037<br>USA<br>202-339-8624 Email:Ydesta@orrick.Com |
| Electronic Privacy Information Center<br>**Plaintiff** | Aman Tewari George<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-701-1783 Email:Ageorge@democracyforward.Org |
| | John L. Davisson<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ELECTRONIC PRIVACY INFORMATION CENTER<br>1519 New Hampshire Ave, Nw<br>Washington, DC 20036<br>USA<br>(202) 483-1140 Ext. 120 Email:Davisson@epic.Org |
| | John B. Hill<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Jhill@citizensforethics.Org |
| | Lauren Crowell Bingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Citizens for Responsibility and Ethics in Washington<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Lbingham@citizensforethics.Org |

| Litigants | Attorneys |
|---|---|
| | Nikhel Sus<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Nsus@citizensforethics.Org |
| | Ronald A. Fein<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD<br>Po Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Rfein@democracyforward.Org |
| | Abigail Kunkler<br>ATTORNEY TO BE NOTICED<br>ELECTRONIC PRIVACY INFORMATION CENTER<br>1519 New Hampshire Ave Nw<br>Washington, DC 20036<br>USA<br>773-569-1814 Email:Kunkler@epic.Org |
| | Emily Davis<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/30/2026]<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington Dc, DC 20006<br>USA<br>202-331-0114 Email:Edavis@fairelectionscenter.Org |
| | Jennifer Fountain Connolly<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Jconnolly@democracyforward.Org |
| | Johanna M. Hickman<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Hhickman@democracyforward.Org |
| | Jonathan Sherman<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Suite 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Jsherman@fairelectionscenter.Org |

## Litigants

## Attorneys

Mark Samburg
ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Msamburg@democracyforward.Org

Michelle Kanter Cohen
ATTORNEY TO BE NOTICED
FAIR ELECTIONS CENTER
1629 K Street Nw Ste. 300
Washington, DC 20006
USA
202-331-0114 Email:Mkantercohen@fairelectionscenter.Org

Robin F. Thurston
ATTORNEY TO BE NOTICED
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
USA
202-455-9060 Email:Rthurston@democracyforward.Org

Sophie Rose Gelber
ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
USA
786-877-0505 Email:Sgelber@democracyforward.Org

Yoseph T. Desta
ATTORNEY TO BE NOTICED
[Terminated: 02/24/2026]
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Ave. Nw
Washington, DC 20037
USA
202-339-8624 Email:Ydesta@orrick.Com

J. Doe 1
on behalf of themselves and others similarly situated |
[Terminated: 01/21/2026]
**Plaintiff**

Aman Tewari George
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
USA
202-701-1783 Email:Ageorge@democracyforward.Org

John B. Hill
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
Po Box 14596
Washington, DC 20044
USA
202-408-5565 Email:Jhill@citizensforethics.Org

## Litigants

## Attorneys

Lauren Crowell Bingham
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Citizens for Responsibility and Ethics in Washington
Po Box 14596
Washington, DC 20044
USA
202-408-5565 Email:Lbingham@citizensforethics.Org

Nikhel Sus
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
Po Box 14596
Washington, DC 20044
USA
202-408-5565 Email:Nsus@citizensforethics.Org

Emily Davis
ATTORNEY TO BE NOTICED
FAIR ELECTIONS CENTER
1629 K Street Nw Ste. 300
Washington Dc, DC 20006
USA
202-331-0114 Email:Edavis@fairelectionscenter.Org

Jennifer Fountain Connolly
ATTORNEY TO BE NOTICED
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Jconnolly@democracyforward.Org

Johanna M. Hickman
ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Hhickman@democracyforward.Org

Jonathan Sherman
PRO HAC VICE;ATTORNEY TO BE NOTICED
FAIR ELECTIONS CENTER
1629 K Street Nw Suite 300
Washington, DC 20006
USA
202-331-0114 Email:Jsherman@fairelectionscenter.Org

Mark Samburg
ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Msamburg@democracyforward.Org

| Litigants | Attorneys |
|---|---|
| | Michelle Kanter Cohen<br>ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Mkantercohen@fairelectionscenter.Org<br><br>Robin F. Thurston<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-455-9060 Email:Rthurston@democracyforward.Org<br><br>Yoseph T. Desta<br>ATTORNEY TO BE NOTICED<br>[Terminated: 02/24/2026]<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>2100 Pennsylvania Ave. Nw<br>Washington, DC 20037<br>USA<br>202-339-8624 Email:Ydesta@orrick.Com |
| J. Doe 2<br>on behalf of themselves and others similarly situated \|<br>[Terminated: 01/21/2026]<br>**Plaintiff** | Aman Tewari George<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-701-1783 Email:Ageorge@democracyforward.Org<br><br>John B. Hill<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Jhill@citizensforethics.Org<br><br>Lauren Crowell Bingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Citizens for Responsibility and Ethics in Washington<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Lbingham@citizensforethics.Org<br><br>Nikhel Sus<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Nsus@citizensforethics.Org |

| Litigants | Attorneys |
|---|---|
| | Emily Davis<br>ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington Dc, DC 20006<br>USA<br>202-331-0114 Email:Edavis@fairelectionscenter.Org |
| | Jennifer Fountain Connolly<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Jconnolly@democracyforward.Org |
| | Johanna M. Hickman<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Hhickman@democracyforward.Org |
| | Jonathan Sherman<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Suite 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Jsherman@fairelectionscenter.Org |
| | Mark Samburg<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Msamburg@democracyforward.Org |
| | Michelle Kanter Cohen<br>ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Mkantercohen@fairelectionscenter.Org |
| | Robin F. Thurston<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-455-9060 Email:Rthurston@democracyforward.Org |
| | Yoseph T. Desta<br>ATTORNEY TO BE NOTICED |

| Litigants | Attorneys |
|---|---|
| | [Terminated: 02/24/2026]<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>2100 Pennsylvania Ave. Nw<br>Washington, DC 20037<br>USA<br>202-339-8624 Email:Ydesta@orrick.Com |
| J. Doe 3<br>on behalf of themselves and others similarly situated \| [Terminated: 01/21/2026]<br>**Plaintiff** | Aman Tewari George<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-701-1783 Email:Ageorge@democracyforward.Org<br><br>John B. Hill<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Jhill@citizensforethics.Org<br><br>Lauren Crowell Bingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Citizens for Responsibility and Ethics in Washington<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Lbingham@citizensforethics.Org<br><br>Nikhel Sus<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Nsus@citizensforethics.Org<br><br>Emily Davis<br>ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington Dc, DC 20006<br>USA<br>202-331-0114 Email:Edavis@fairelectionscenter.Org<br><br>Jennifer Fountain Connolly<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Jconnolly@democracyforward.Org<br><br>Johanna M. Hickman<br>ATTORNEY TO BE NOTICED |

| Litigants | Attorneys |
| --- | --- |
| | DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Hhickman@democracyforward.Org |
| | Jonathan Sherman<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Suite 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Jsherman@fairelectionscenter.Org |
| | Mark Samburg<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Msamburg@democracyforward.Org |
| | Michelle Kanter Cohen<br>ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Mkantercohen@fairelectionscenter.Org |
| | Robin F. Thurston<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-455-9060 Email:Rthurston@democracyforward.Org |
| | Yoseph T. Desta<br>ATTORNEY TO BE NOTICED<br>[Terminated: 02/24/2026]<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>2100 Pennsylvania Ave. Nw<br>Washington, DC 20037<br>USA<br>202-339-8624 Email:Ydesta@orrick.Com |
| J. Doe 4<br>on behalf of themselves and others similarly situated \|<br>[Terminated: 01/21/2026]<br>**Plaintiff** | Aman Tewari George<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-701-1783 Email:Ageorge@democracyforward.Org |
| | John B. Hill<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON |

| Litigants | Attorneys |
|---|---|
| | Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Jhill@citizensforethics.Org |
| | Lauren Crowell Bingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Citizens for Responsibility and Ethics in Washington<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Lbingham@citizensforethics.Org |
| | Nikhel Sus<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Nsus@citizensforethics.Org |
| | Emily Davis<br>ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington Dc, DC 20006<br>USA<br>202-331-0114 Email:Edavis@fairelectionscenter.Org |
| | Jennifer Fountain Connolly<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Jconnolly@democracyforward.Org |
| | Johanna M. Hickman<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Hhickman@democracyforward.Org |
| | Jonathan Sherman<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Suite 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Jsherman@fairelectionscenter.Org |
| | Mark Samburg<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553 |

| Litigants | Attorneys |
|---|---|
| | Washington, DC 20043<br>USA<br>202-448-9090 Email:Msamburg@democracyforward.Org<br><br>Michelle Kanter Cohen<br>ATTORNEY TO BE NOTICED<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington, DC 20006<br>USA<br>202-331-0114 Email:Mkantercohen@fairelectionscenter.Org<br><br>Robin F. Thurston<br>ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-455-9060 Email:Rthurston@democracyforward.Org<br><br>Yoseph T. Desta<br>ATTORNEY TO BE NOTICED<br>[Terminated: 02/24/2026]<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>2100 Pennsylvania Ave. Nw<br>Washington, DC 20037<br>USA<br>202-339-8624 Email:Ydesta@orrick.Com |
| J. Doe 5<br>on behalf of themselves and others similarly situated \|<br>[Terminated: 01/21/2026]<br>**Plaintiff** | Aman Tewari George<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-701-1783 Email:Ageorge@democracyforward.Org<br><br>John B. Hill<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Jhill@citizensforethics.Org<br><br>Lauren Crowell Bingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Citizens for Responsibility and Ethics in Washington<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Lbingham@citizensforethics.Org<br><br>Nikhel Sus<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596 |

| Litigants | Attorneys |
|---|---|

Washington, DC 20044
USA
202-408-5565 Email:Nsus@citizensforethics.Org

Emily Davis
ATTORNEY TO BE NOTICED
FAIR ELECTIONS CENTER
1629 K Street Nw Ste. 300
Washington Dc, DC 20006
USA
202-331-0114 Email:Edavis@fairelectionscenter.Org

Jennifer Fountain Connolly
ATTORNEY TO BE NOTICED
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Jconnolly@democracyforward.Org

Johanna M. Hickman
ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Hhickman@democracyforward.Org

Jonathan Sherman
PRO HAC VICE;ATTORNEY TO BE NOTICED
FAIR ELECTIONS CENTER
1629 K Street Nw Suite 300
Washington, DC 20006
USA
202-331-0114 Email:Jsherman@fairelectionscenter.Org

Mark Samburg
ATTORNEY TO BE NOTICED
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
USA
202-448-9090 Email:Msamburg@democracyforward.Org

Michelle Kanter Cohen
ATTORNEY TO BE NOTICED
FAIR ELECTIONS CENTER
1629 K Street Nw Ste. 300
Washington, DC 20006
USA
202-331-0114 Email:Mkantercohen@fairelectionscenter.Org

Robin F. Thurston
ATTORNEY TO BE NOTICED
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
USA

| Litigants | Attorneys |
|---|---|
| | 202-455-9060 Email:Rthurston@democracyforward.Org |
| | Yoseph T. Desta<br>ATTORNEY TO BE NOTICED<br>[Terminated: 02/24/2026]<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>2100 Pennsylvania Ave. Nw<br>Washington, DC 20037<br>USA<br>202-339-8624 Email:Ydesta@orrick.Com |
| League of Women Voters of Texas<br>**Plaintiff** | Aman Tewari George<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-701-1783 Email:Ageorge@democracyforward.Org |
| | Johanna M. Hickman<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Hhickman@democracyforward.Org |
| | John B. Hill<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Jhill@citizensforethics.Org |
| | Ronald A. Fein<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD<br>Po Box 34553<br>Washington, DC 20043<br>USA<br>202-448-9090 Email:Rfein@democracyforward.Org |
| | Emily Davis<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/30/2026]<br>FAIR ELECTIONS CENTER<br>1629 K Street Nw Ste. 300<br>Washington Dc, DC 20006<br>USA<br>202-331-0114 Email:Edavis@fairelectionscenter.Org |
| | Sophie Rose Gelber<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, DC 20043<br>USA<br>786-877-0505 Email:Sgelber@democracyforward.Org |

| Litigants | Attorneys |
|---|---|
| | Nikhel Sus<br>ATTORNEY TO BE NOTICED<br>CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>Po Box 14596<br>Washington, DC 20044<br>USA<br>202-408-5565 Email:Nsus@citizensforethics.Org |
| U.S. Department of Homeland Security<br>**Defendant** | Stephen M. Pezzi<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC 20530<br>USA<br>(202) 305-8576 Fax: (202) 616-8470<br>Email:Stephen.Pezzi@usdoj.Gov<br><br>Cesar Azrak<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/22/2026]<br>United States Department of Justice<br>Civil Division, Federal Programs Branch 1100 L St. Nw<br>Washington, DC 20005<br>USA<br>202-305-0693 Email:Cesar.E.Azrak@usdoj.Gov |
| Kristi L. Noem<br>in her official capacity as Secretary of Homeland Security \|<br>**Defendant** | Stephen M. Pezzi<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC 20530<br>USA<br>(202) 305-8576 Fax: (202) 616-8470<br>Email:Stephen.Pezzi@usdoj.Gov<br><br>Cesar Azrak<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/22/2026]<br>United States Department of Justice<br>Civil Division, Federal Programs Branch 1100 L St. Nw<br>Washington, DC 20005<br>USA<br>202-305-0693 Email:Cesar.E.Azrak@usdoj.Gov |
| Social Security Administration<br>**Defendant** | Stephen M. Pezzi<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC 20530<br>USA<br>(202) 305-8576 Fax: (202) 616-8470<br>Email:Stephen.Pezzi@usdoj.Gov<br><br>Cesar Azrak<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/22/2026]<br>United States Department of Justice<br>Civil Division, Federal Programs Branch 1100 L St. Nw<br>Washington, DC 20005<br>USA |

| Litigants | Attorneys |
|---|---|
| | 202-305-0693 Email:Cesar.E.Azrak@usdoj.Gov |
| Frank Bisignano<br>in his official capacity as Commissioner of the Social Security Administration \|<br>**Defendant** | Stephen M. Pezzi<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC 20530<br>USA<br>(202) 305-8576 Fax: (202) 616-8470<br>Email:Stephen.Pezzi@usdoj.Gov<br><br>Cesar Azrak<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/22/2026]<br>United States Department of Justice<br>Civil Division, Federal Programs Branch 1100 L St. Nw<br>Washington, DC 20005<br>USA<br>202-305-0693 Email:Cesar.E.Azrak@usdoj.Gov |
| U.S. Department of Justice<br>[Terminated: 01/21/2026]<br>**Defendant** | Stephen M. Pezzi<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC 20530<br>USA<br>(202) 305-8576 Fax: (202) 616-8470<br>Email:Stephen.Pezzi@usdoj.Gov |
| Pamela J. Bondi<br>in her official capacity as U.S. Attorney General \|<br>[Terminated: 01/21/2026]<br>**Defendant** | Stephen M. Pezzi<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC 20530<br>USA<br>(202) 305-8576 Fax: (202) 616-8470<br>Email:Stephen.Pezzi@usdoj.Gov |
| State of Texas<br>**Movant** | William D. Wassdorf<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL OF TEXAS<br>Executive Administration P.O. Box 12548<br>Austin, TX 78711<br>USA<br>737-226-4398 Email:Will.Wassdorf@oag.Texas.Gov<br><br>Ali Thorburn<br>ATTORNEY TO BE NOTICED<br>[Terminated: 05/15/2026]<br>Texas Attorney General's Office<br>P.O. Box 12548 Capitol Station<br>Austin, TX 78711-2548<br>USA<br>512-463-2100 Email:Ali.Thorburn@oag.Texas.Gov<br><br>Brianna Krominga<br>ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL<br>General Litigation Division P.O. Box 12548<br>Austin, TX 78711<br>USA<br>737-230-5914 Email:Brianna.Krominga@oag.Texas.Gov |
| Alex Padilla | Mimi Marziani |

| Litigants | Attorneys |
|---|---|
| Senator \|<br>**Amicus** | LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>MARZIANI, STEVENS & GONZALEZ PLLC<br>500 W. 2nd Street Suite 1900<br>Austin, TX 78701<br>USA<br>615-293-5003 Email:Mmarziani@msgpllc.Com<br><br>Rebecca S. LeGrand<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>LEGRAND LAW PLLC<br>1100 H Street Nw Suite 1220<br>Washington, DC 20005<br>USA<br>202-587-5725 Email:Rebecca@legrandpllc.Com |
| Gary Peters<br>Senator \|<br>**Amicus** | Mimi Marziani<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>MARZIANI, STEVENS & GONZALEZ PLLC<br>500 W. 2nd Street Suite 1900<br>Austin, TX 78701<br>USA<br>615-293-5003 Email:Mmarziani@msgpllc.Com<br><br>Rebecca S. LeGrand<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>LEGRAND LAW PLLC<br>1100 H Street Nw Suite 1220<br>Washington, DC 20005<br>USA<br>202-587-5725 Email:Rebecca@legrandpllc.Com |
| Campaign Legal Center<br>**Amicus** | ELIZABETH D. SOLTAN<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Whistleblower Partners LLP<br>745 Fifth Avenue Suite 500<br>New York, NY 10151<br>USA<br>646-516-2067 Email:Liz@whistleblower.Law<br><br>Robert Brent Ferguson<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br><br>3465 Holmead Place Nw<br>Washington, DC 20010<br>USA<br>918-576-4318 Email:Bferguson@campaignlegalcenter.Org<br><br>Michael J. Ronickher<br>ATTORNEY TO BE NOTICED<br>WHISTLEBLOWER PARTNERS LLP<br>1101 Connecticut Avenue Nw Suite 450<br>Washington, DC 20036<br>USA<br>202-935-5446 Email:Mike@whistleblower.Law |
| Celia Israel<br>Travis County Tax Assessor-Collector \|<br>**Amicus** | Susan Musser<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Wilmer Cutler Pickering Hale and Dorr LLP |

| Litigants | Attorneys |
|---|---|
| | 2100 Pennsylvania Avenue Nw<br>Washington, DC 20037<br>USA<br>202-663-6155 Email:Susan.Musser@wilmerhale.Com |
| Dyana Limon-Mercado<br>Travis County Clerk \|<br>**Amicus** | Susan Musser<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>2100 Pennsylvania Avenue Nw<br>Washington, DC 20037<br>USA<br>202-663-6155 Email:Susan.Musser@wilmerhale.Com |
| Travis County, Texas<br>**Amicus** | Susan Musser<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>2100 Pennsylvania Avenue Nw<br>Washington, DC 20037<br>USA<br>202-663-6155 Email:Susan.Musser@wilmerhale.Com |
| Texas Civil Rights Project<br>**Amicus** | Nina Oishi<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>TEXAS CIVIL RIGHTS PROJECT<br>1405 Montopolis Drive<br>Austin, TX 78741<br>USA<br>512-474-5073 Fax: 512-474-0726<br>Email:Noishi@texascivilrightsproject.Org<br><br>Karla Maradiaga<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>TEXAS CIVIL RIGHTS PROJECT<br>1405 Montopolis Drive<br>Austin, TX 78741<br>USA<br>512-474-5073 Fax: 512-474-0726<br>Email:Kmaradiaga@texascivilrightsproject.Org |
| LAWYERS DEFENDING AMERICAN DEMOCRACY, INC<br>**Amicus** | Aderson Bellegarde Francois<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>GEORGETOWN UNIVERSITY LAW CENTER<br>Civil Rights Clinic 600 New Jersey Avenue, Nw Suite 352<br>Washington, DC 20001<br>USA<br>(202) 661-6721 Fax: 202-662-9634<br>Email:Aderson.Francois@georgetown.Edu |
| Service Employees International Union<br>**Amicus** | Steven Ury<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Service Employees International Union<br>1800 Massachusetts Avenue Nw<br>Washington, DC 20036<br>USA<br>202-730-7428 Email:Steven.Ury@seiu.Org |
| Center for Media and Democracy<br>**Amicus** | ELIZABETH D. SOLTAN<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Whistleblower Partners LLP<br>745 Fifth Avenue Suite 500<br>New York, NY 10151<br>USA<br>646-516-2067 Email:Liz@whistleblower.Law |

| Litigants | Attorneys |
|---|---|
| | Michael J. Ronickher<br>ATTORNEY TO BE NOTICED<br>WHISTLEBLOWER PARTNERS LLP<br>1101 Connecticut Avenue Nw Suite 450<br>Washington, DC 20036<br>USA<br>202-935-5446 Email:Mike@whistleblower.Law |
| Common Cause<br>**Amicus** | ELIZABETH D. SOLTAN<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Whistleblower Partners LLP<br>745 Fifth Avenue Suite 500<br>New York, NY 10151<br>USA<br>646-516-2067 Email:Liz@whistleblower.Law<br><br>Michael J. Ronickher<br>ATTORNEY TO BE NOTICED<br>WHISTLEBLOWER PARTNERS LLP<br>1101 Connecticut Avenue Nw Suite 450<br>Washington, DC 20036<br>USA<br>202-935-5446 Email:Mike@whistleblower.Law |
| Protect Democracy Project<br>**Amicus** | ELIZABETH D. SOLTAN<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Whistleblower Partners LLP<br>745 Fifth Avenue Suite 500<br>New York, NY 10151<br>USA<br>646-516-2067 Email:Liz@whistleblower.Law<br><br>Michael J. Ronickher<br>ATTORNEY TO BE NOTICED<br>WHISTLEBLOWER PARTNERS LLP<br>1101 Connecticut Avenue Nw Suite 450<br>Washington, DC 20036<br>USA<br>202-935-5446 Email:Mike@whistleblower.Law |
| American Civil Liberties Union<br>**Amicus** | Brian Matthew Hauss<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Bhauss@aclu.Org<br><br>Cody James Venzke<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>915 15th St Nw<br>Washington, DC 20005<br>USA<br>713-487-6350 Email:Venzkec@gmail.Com |
| Warren Petersen<br>**Amicus** | S. Lee Whitesell<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>FUSION LAW<br>3515 Urban Woods Trail |

| Litigants | Attorneys |
| --- | --- |
| | Houston, TX 77008<br>USA<br>856-364-6090 Email:Slw@fusion.Law |
| Steve Montenegro<br>**Amicus** | S. Lee Whitesell<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>FUSION LAW<br>3515 Urban Woods Trail<br>Houston, TX 77008<br>USA<br>856-364-6090 Email:Slw@fusion.Law |

## Proceedings

| # | Date | Proceeding Text | Source |
| --- | --- | --- | --- |
| 1 | 09/30/2025 | COMPLAINT for injunctive and declaratory relief against All Defendants ( Filing fee $ 405 receipt number ADCDC-11993894) filed by J. DOE 2, LEAGUE OF WOMEN VOTERS OF VIRGINIA, LEAGUE OF WOMEN VOTERS, J. DOE 1, LEAGUE OF WOMEN VOTERS OF LOUISIANA, J. DOE 4, J. DOE 3, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, J. DOE 5, ELECTRONIC PRIVACY INFORMATION CENTER. (Attachments: # 1 Civil Cover Sheet, # 2 Summons DHS, # 3 Summons DHS Secretary, # 4 Summons SSA, # 5 Summons SSA Commissioner, # 6 Summons DOJ, # 7 Summons US Attorney General, # 8 Summons USAO-DC)(Sus, Nikhel) (Entered: 09/30/2025) | |
| 2 | 09/30/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA (Sus, Nikhel) (Entered: 09/30/2025) | |
| 3 | 09/30/2025 | NOTICE of Appearance by Yoseph T. Desta on behalf of All Plaintiffs (Desta, Yoseph) (Entered: 09/30/2025) | |
| 4 | 09/30/2025 | NOTICE of Appearance by Aman Tewari George on behalf of J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA (George, Aman) (Main Document 4 replaced on 10/1/2025) (znmw). (Entered: 09/30/2025) | |
| 5 | 09/30/2025 | NOTICE of Appearance by Jennifer Fountain Connolly on behalf of J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA (Connolly, Jennifer) (Main Document 5 replaced on 10/1/2025) (znmw). (Entered: 09/30/2025) | |
| 6 | 09/30/2025 | NOTICE of Appearance by Mark Samburg on behalf of J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | LEAGUE OF WOMEN VOTERS OF VIRGINIA (Samburg, Mark) (Main Document 6 replaced on 10/1/2025) (znmw). (Entered: 09/30/2025) | |
| 7 | 09/30/2025 | NOTICE of Appearance by Robin F. Thurston on behalf of J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA (Thurston, Robin) (Main Document 7 replaced on 10/1/2025) (znmw). (Entered: 09/30/2025) | |
| 8 | 09/30/2025 | NOTICE of Appearance by Johanna M. Hickman on behalf of J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA (Hickman, Johanna) (Main Document 8 replaced on 10/1/2025) (znmw). (Entered: 09/30/2025) | |
| 9 | 09/30/2025 | NOTICE of Appearance by Michelle Kanter Cohen on behalf of All Plaintiffs (Kanter Cohen, Michelle) (Entered: 09/30/2025) | |
| 10 | 09/30/2025 | NOTICE of Appearance by Emily Davis on behalf of All Plaintiffs (Davis, Emily) (Entered: 09/30/2025) | |
| 11 | 09/30/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- John B. Hill, Filing fee $ 100, receipt number ADCDC-11995414. Fee Status: Fee Paid. by J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Declaration of John B. Hill, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Sus, Nikhel) (Entered: 09/30/2025) | |
| 12 | 10/01/2025 | NOTICE of Appearance by Abigail Kunkler on behalf of ELECTRONIC PRIVACY INFORMATION CENTER (Kunkler, Abigail) (Entered: 10/01/2025) | |
| 13 | 10/01/2025 | NOTICE of Appearance by John L. Davisson on behalf of ELECTRONIC PRIVACY INFORMATION CENTER (Davisson, John) (Entered: 10/01/2025) | |
| | 10/01/2025 | NOTICE OF NEW CASE ERROR regarding 1 Complaint. The following error(s) need correction: Please promptly file a motion to proceed under pseudonym using the event Sealed Motion to Proceed Under Pseudonym. COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied. (znmw) (Entered: 10/01/2025) | |
| 14 | 10/01/2025 | SEALED MOTION to Proceed Under Pseudonym filed by J. DOE 1, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5 (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Declaration Ex. A - J. Doe 1 Decl., # 4 Declaration Ex. B - J. Doe 2 Decl., # 5 Declaration Ex. C - J. Doe 3 Decl., # 6 Declaration Ex. D - J. Doe 4 Decl., # 7 Declaration Ex. E - J. Doe 5 Decl.)(George, Aman) (Entered: 10/01/2025) | |
| 15 | 10/01/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lauren C. Bingham, Filing fee $ 100, receipt number ADCDC-11998873. Fee Status: Fee Paid. by J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Declaration of Lauren C. Bingham, # 2 Exhibit of Florida Certificate of Good Standing, # 3 Text of Proposed Order)(Sus, Nikhel) (Entered: 10/01/2025) | |
| 16 | 10/07/2025 | MOTION to Stay , MOTION for Preliminary Injunction by J. DOE 1, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Memorandum in Support, # 2 Declaration Plaintiff Doe 1 Declaration, # 3 Declaration Plaintiff Doe 4 Supplemental Declaration, # 4 Declaration Plaintiff Doe 5 Declaration, # 5 Declaration Stewart Declaration, # 6 Declaration Porte Declaration, # 7 Declaration Green Declaration, # 8 Declaration Doe 6 Declaration, # 9 Declaration McCall Declaration, # 10 Text of Proposed Order Proposed Order)(Sus, Nikhel) (Entered: 10/07/2025) | |
| 17 | 10/07/2025 | WITHDRAWN PURSUANT TO NOTICE FILED 10/29/2025..... MOTION to Certify Class by J. DOE 1, J. DOE 4, J. DOE 5. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 (Connolly Declaration), # 3 Text of Proposed Order)(Hickman, Johanna) Modified on 10/31/2025 (znmw). (Entered: 10/07/2025) | |
| 18 | 10/08/2025 | NOTICE of Appearance by Stephen M. Pezzi on behalf of All Defendants (Pezzi, Stephen) (Entered: 10/08/2025) | |
| 19 | 10/08/2025 | MOTION to Stay all Proceedings due to Lapse in Appropriations by FRANK BISIGNANO, PAMELA J. BONDI, KRISTI NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Text of Proposed Order)(Pezzi, Stephen) (Entered: 10/08/2025) | |
| 20 | 10/08/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jon Sherman, Filing fee $ 100, receipt number ADCDC-12011678. Fee Status: Fee Paid. by J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Declaration Declaration of Jon Sherman, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Davis, Emily) (Entered: 10/08/2025) | |
| 21 | 10/08/2025 | Memorandum in opposition to re 19 MOTION to Stay all Proceedings due to Lapse in Appropriations filed by J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Sus, Nikhel) (Entered: 10/08/2025) | |
| 22 | 10/09/2025 | REPLY to opposition to motion re 19 Motion to Stay, filed by FRANK BISIGNANO, PAMELA J. BONDI, KRISTI NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE. (Pezzi, Stephen) (Entered: 10/09/2025) | |
| 23 | 10/10/2025 | MEMORANDUM OPINION AND ORDER: The Court ORDERS that: 1) Plaintiffs' 14 Motion to Proceed Under Pseudonym is GRANTED, subject to any further consideration by the United States District Judge to whom this case is randomly assigned; 2) all parties shall use the pseudonyms listed in the Complaint in all | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | documents filed in this action; and 3) within fourteen days of this Order, Plaintiffs shall file on the public docket a pseudonymous version of their 14 Motion and any attachments; and a sealed ex parte declaration containing their real names and residential addresses. Signed by Chief Judge James E. Boasberg on October 10, 2025. (lcjeb3) (Main Document 23 replaced on 10/10/2025) (znbn). Modified on 10/10/2025 (znbn). (Entered: 10/10/2025) | |
| 24 | 10/10/2025 | Consent MOTION for Leave to File Amicus Brief by ALEX PADILLA, GARY PETERS. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(LeGrand, Rebecca) (Entered: 10/10/2025) | |
| 25 | 10/10/2025 | NOTICE of Appearance by Rebecca S. LeGrand on behalf of ALEX PADILLA, GARY PETERS (LeGrand, Rebecca) (Entered: 10/10/2025) | |
| 26 | 10/10/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Mimi Marziani, Filing fee $ 100, receipt number ADCDC-12017571. Fee Status: Fee Paid. by ALEX PADILLA, GARY PETERS. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing)(LeGrand, Rebecca) (Entered: 10/10/2025) | |
| 27 | 10/10/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Rebecca (Beth) Stevens, Filing fee $ 100, receipt number ADCDC-12017575. Fee Status: Fee Paid. by ALEX PADILLA, GARY PETERS. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing)(LeGrand, Rebecca) (Entered: 10/10/2025) | |
| 28 | 10/10/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Joaquin Gonzalez, Filing fee $ 100, receipt number ADCDC-12017579. Fee Status: Fee Paid. by ALEX PADILLA, GARY PETERS. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing)(LeGrand, Rebecca) (Entered: 10/10/2025) | |
| | 10/14/2025 | Case Assigned to Judge Sparkle L. Sooknanan. (znmw) (Entered: 10/14/2025) | |
| 29 | 10/14/2025 | SUMMONS (7) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 10/14/2025) | |
| | 10/14/2025 | MINUTE ORDER denying the Defendants' 19 Motion to stay all proceedings. The Defendants are ORDERED to file a response to the 16 Motion for Preliminary Injunction, the 16 Motion to Stay, and the 17 Motion to Certify Class by October 22, 2025. The Plaintiffs shall file any reply by October 24, 2025. "[T]he United States' deadlines to respond to motions for temporary restraining orders or preliminary injunctions" remain in effect during the current lapse of appropriations to the Department of Justice. In re: Stay of Civil Proceedings Involving the United States in Light of Lapse of Appropriations, Standing Order No. 25-55 (Oct. 1, 2025) (Boasberg, C.J.). And the Department of Justice's Contingency Plan recognizes that "[i]f a court . . . orders a case to continue, the Government will comply with the court's order, which would constitute express legal authorization for the activity to continue" during a lapse of appropriations. U.S. Department of Justice FY 2026 Contingency Plan, at 3 (Sept. 29, 2025), https://www.justice.gov/jmd/media/1377216/dl. The Department of Justice has "express authority" by this Court's Order to "continue" briefing in this proceeding "during [the] appropriations lapse." Id. at 1. Signed by Judge Sparkle L. Sooknanan on 10/14/2025. (lcak) (Entered: 10/14/2025) | |
| | 10/15/2025 | MINUTE ORDER granting the 24 Motion for Leave to File Amicus Brief. The Court will treat the motion's attachment, ECF No. 24-1, | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | as the amicus brief. Signed by Judge Sparkle L. Sooknanan on 10/15/2025. (lcak) (Entered: 10/15/2025) | |
| | 10/15/2025 | MINUTE ORDER granting 11 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Sparkle L. Sooknanan on 10/15/2025. (lcak) (Entered: 10/15/2025) | |
| | 10/15/2025 | MINUTE ORDER granting the 15 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Sparkle L. Sooknanan on 10/15/2025. (lcak) (Entered: 10/15/2025) | |
| | 10/15/2025 | MINUTE ORDER granting the 20 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Sparkle L. Sooknanan on 10/15/2025. (lcak) (Entered: 10/15/2025) | |
| | 10/15/2025 | MINUTE ORDER granting the 26 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Sparkle L. Sooknanan on 10/15/2025. (lcak) (Entered: 10/15/2025) | |
| | 10/15/2025 | MINUTE ORDER granting the 27 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Sparkle L. Sooknanan on 10/15/2025. (lcak) (Entered: 10/15/2025) | |
| | 10/15/2025 | MINUTE ORDER granting the 28 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Sparkle L. Sooknanan on 10/15/2025. (lcak) (Entered: 10/15/2025) | |
| 30 | 10/15/2025 | NOTICE of Appearance by Jonathan Sherman on behalf of All Plaintiffs (Sherman, Jonathan) (Entered: 10/15/2025) | |
| 33 | 10/15/2025 | AMICUS BRIEF by ALEX PADILLA, GARY PETERS. (zjm) (Entered: 10/17/2025) | |
| 31 | 10/16/2025 | NOTICE of Appearance by John B. Hill on behalf of All Plaintiffs (Hill, John) (Entered: 10/16/2025) | |
| 32 | 10/16/2025 | NOTICE of Appearance by Lauren Crowell Bingham on behalf of All Plaintiffs (Bingham, Lauren) (Entered: 10/16/2025) | |
| | 10/17/2025 | MINUTE ORDER: A hearing on the Plaintiffs' 16 Motion for Preliminary Injunction and 16 Motion for Stay is set for October 28, 2025, at 2:30 PM in Courtroom 14 before Judge Sparkle L. Sooknanan. Signed by Judge Sparkle L. Sooknanan on 10/17/2025. (lcak) (Entered: 10/17/2025) | |
| 34 | 10/21/2025 | NOTICE of Appearance by Mimi Marziani on behalf of ALEX PADILLA, GARY PETERS (Marziani, Mimi) (Entered: 10/21/2025) | |
| 35 | 10/21/2025 | REDACTED DOCUMENT- Motion to Proceed Under Pseudonym See ECF 14 by J. DOE 1, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Declaration Ex. A - J. Doe 1 Decl., # 4 Declaration Ex. B - J. Doe 2 Decl., # 5 Declaration Ex. C - J. Doe 3 Decl., # 6 Declaration Ex. D - J. Doe 4 Decl. Redacted, # 7 Declaration Ex. E - J. Doe 5 Decl.)(George, Aman) (Entered: 10/21/2025) | |
| 36 | 10/21/2025 | SEALED DOCUMENT filed by J. DOE 1, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5(This document is SEALED and only available to authorized persons.)(Bingham, Lauren) (Entered: 10/21/2025) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 37 | 10/22/2025 | Memorandum in opposition to re 16 MOTION to Stay MOTION for Preliminary Injunction filed by FRANK BISIGNANO, PAMELA J. BONDI, KRISTI NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Ex. 1 - Decl. of Brian Broderick (Oct. 22, 2025))(Pezzi, Stephen) (Entered: 10/22/2025) | |
| 38 | 10/22/2025 | Memorandum in opposition to re 17 MOTION to Certify Class filed by FRANK BISIGNANO, PAMELA J. BONDI, KRISTI NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Ex. 1 - Letter from S. Pezzi to N. Sus (Oct. 17, 2025))(Pezzi, Stephen) (Entered: 10/22/2025) | |
| 39 | 10/23/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 10/22/2025., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 10/15/2025. ( Answer due for ALL FEDERAL DEFENDANTS by 11/14/2025.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. FRANK BISIGNANO served on 10/20/2025; PAMELA J. BONDI served on 10/22/2025; KRISTI NOEM served on 10/21/2025; SOCIAL SECURITY ADMINISTRATION served on 10/20/2025; U.S. DEPARTMENT OF HOMELAND SECURITY served on 10/21/2025; U.S. DEPARTMENT OF JUSTICE served on 10/22/2025 (Sus, Nikhel) (Entered: 10/23/2025) | |
| 40 | 10/24/2025 | Consent MOTION for Leave to File Amicus Brief by CAMPAIGN LEGAL CENTER. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Ferguson, Robert) (Entered: 10/24/2025) | |
| | 10/24/2025 | MINUTE ORDER granting the 40 Motion for Leave to File Amicus Brief. The Court will treat the motion's attachment, ECF No. 40-1, as the amicus brief. Signed by Judge Sparkle L. Sooknanan on 10/24/2025. (lcak) (Entered: 10/24/2025) | |
| 41 | 10/24/2025 | REPLY to opposition to motion re 16 Motion to Stay,,, Motion for Preliminary Injunction,, filed by J. DOE 1, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Declaration Supplemental J. Doe 5)(Sus, Nikhel) (Entered: 10/24/2025) | |
| 42 | 10/24/2025 | REPLY to opposition to motion re 17 Motion to Certify Class filed by J. DOE 1, J. DOE 4, J. DOE 5. (Attachments: # 1 Exhibit 1)(Hickman, Johanna) (Entered: 10/24/2025) | |
| 44 | 10/24/2025 | AMICUS BRIEF by CAMPAIGN LEGAL CENTER. (zjm) (Entered: 10/27/2025) | |
| 43 | 10/27/2025 | Emergency MOTION to Intervene as Defendant by STATE OF TEXAS. (Attachments: # 1 Exhibit State of Texas's Motion to Dismiss and Response to Preliminary Injunction, # 2 Exhibit Exhibit 1 - Adkins Declaration, # 3 Text of Proposed Order Proposed Order Granting MTD and Denying PI, # 4 Text of Proposed Order Proposed Order Granting Motion to Intervene)(Wassdorf, William). Added MOTION for Hearing on 10/27/2025 (zjm). (Entered: 10/27/2025) | |
| | 10/27/2025 | MINUTE ORDER: Any response to the 43 Emergency Motion to Intervene shall be filed by October 31, 2025. Any reply shall be filed by November 3, 2025. These deadlines will not be stayed pursuant to Chief Judge Boasberg's Standing Order No. 25-55 ("In | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | re: Stay of Civil Proceedings Involving the United States in Light of Lapse of Appropriations"). Signed by Judge Sparkle L. Sooknanan on 10/27/2025. (lcak) (Entered: 10/27/2025) | |
| 45 | 10/27/2025 | NOTICE of Appearance by Ali Thorburn on behalf of STATE OF TEXAS (Thorburn, Ali) (Entered: 10/27/2025) | |
| | 10/28/2025 | Minute Entry for Motion Hearing held before Judge Sparkle L. Sooknanan on 10/28/2025. Oral arguments submitted on the Plaintiffs' Motion 17 to Certify Class and Plaintiffs' Motion 16 to Stay and Preliminary Injunction. As discussed on the record, the Plaintiffs' shall file their Supplemental Memorandum by 10/29/2025 at midnight and the Government shall file their Response by 11/3/2025. Motions taken under advisement; forthcoming Order. (Court Reporter: Elizabeth Davila) (lsj) (Entered: 10/28/2025) | |
| 46 | 10/29/2025 | NOTICE OF WITHDRAWAL OF MOTION by J. DOE 1, J. DOE 4, J. DOE 5 re 17 MOTION to Certify Class (Sus, Nikhel) (Entered: 10/29/2025) | |
| 47 | 10/29/2025 | SUPPLEMENTAL MEMORANDUM to re 16 MOTION to Stay MOTION for Preliminary Injunction filed by J. DOE 1, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Declaration Christopher Davis)(Sus, Nikhel) (Entered: 10/29/2025) | |
| 48 | 10/30/2025 | TRANSCRIPT OF PROCEEDINGS before Judge Sparkle L. Sooknanan held on 10-28-2025; Page Numbers: 1 - 97. Date of Issuance: 10-30-2025. Court Reporter, Elizabeth Davila, Telephone number: 202-354-3242. Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 11/20/2025. Redacted Transcript Deadline set for 11/30/2025. Release of Transcript Restriction set for 1/28/2026.(Davila, Elizabeth) (Entered: 10/30/2025) | |
| 49 | 10/31/2025 | Memorandum in opposition to re 43 Emergency MOTION to Intervene as Defendant MOTION for Hearing filed by J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Davis, Emily) (Entered: 10/31/2025) | |
| 50 | 10/31/2025 | RESPONSE re 43 Emergency MOTION to Intervene as Defendant MOTION for Hearing filed by FRANK BISIGNANO, PAMELA BONDI, KRISTI NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE. (Pezzi, Stephen) (Entered: 10/31/2025) | |
| 51 | 11/03/2025 | RESPONSE re 47 Supplemental Memorandum, filed by FRANK | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | BISIGNANO, PAMELA J. BONDI, KRISTI NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE. (Pezzi, Stephen) (Entered: 11/03/2025) | |
| 52 | 11/03/2025 | REPLY to opposition to motion re 43 Motion to Intervene,, Motion for Hearing, filed by STATE OF TEXAS. (Thorburn, Ali) (Entered: 11/03/2025) | |
| 53 | 11/06/2025 | NOTICE of Potential Related Case by J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA (Attachments: # 1 Exhibit Ex. A, # 2 Exhibit Ex. B, # 3 Exhibit Ex. C, # 4 Exhibit Ex. D, # 5 Exhibit Ex. E)(George, Aman) (Entered: 11/06/2025) | |
| 54 | 11/13/2025 | NOTICE of Publication of System of Records Notice (SORN) by Defendant Social Security Administration by FRANK BISIGNANO, PAMELA J. BONDI, KRISTI NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE (Pezzi, Stephen) (Entered: 11/13/2025) | |
| 55 | 11/17/2025 | MEMORANDUM OPINION re the 16 Motion to Stay. See the attached document for details. Signed by Judge Sparkle L. Sooknanan on 11/17/2025. (lcak) Modified on 11/17/2025 (zlsj). (Entered: 11/17/2025) | |
| 56 | 11/17/2025 | ORDER denying the 16 Motion to Stay. See the 55 Memorandum Opinion for details. Signed by Judge Sparkle L. Sooknanan on 11/17/2025. (lcak) (Entered: 11/17/2025) | |
| 57 | 11/21/2025 | PROPOSED BRIEFING SCHEDULE Joint Scheduling Proposal by J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Text of Proposed Order)(George, Aman) (Entered: 11/21/2025) | |
| 58 | 11/21/2025 | MOTION for Leave to File Supplemental Complaint by J. DOE 1, ELECTRONIC PRIVACY INFORMATION CENTER, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Text of Proposed Order)(George, Aman) (Entered: 11/21/2025) | |
| | 11/24/2025 | MINUTE ORDER granting the 58 Motion for Leave to File a Supplemental Complaint. Leave for filing a supplemental pleading should be "freely granted...where such supplementation will promote the economic and speedy disposition of the controversy between the parties, will not cause undue delay of trial, inconvenience and will not prejudice the rights of any other party." Health Ins. Assn of Am. v. Goddard Claussen Porter Novelli, 213 F.R.D. 63, 66 (D.D.C. 2003) (citation omitted). At this early stage and with the rapid ongoing developments, a supplemental pleading promotes "judicial economy" and will not cause undue delay. Id. (citation omitted). The Defendants do not oppose supplemental pleading and are not prejudiced by supplementation at this early stage. Signed by Judge Sparkle L. Sooknanan on 11/24/2025. (lcak) Modified on 11/24/2025 (zlsj). (Entered: 11/24/2025) | |
| | 11/24/2025 | MINUTE ORDER: In light of the 57 Proposed Briefing Schedule, | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | the Parties are ORDERED to file a further Joint Scheduling Proposal by January 9, 2026. The Plaintiffs shall file any amended or supplemental pleadings by December 22, 2025. Signed by Judge Sparkle L. Sooknanan on 11/24/2025. (lcak) (Entered: 11/24/2025) | |
| 59 | 12/05/2025 | NOTICE by FRANK BISIGNANO, PAMELA J. BONDI, KRISTI NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE (Pezzi, Stephen) (Entered: 12/05/2025) | |
| 60 | 12/11/2025 | Unopposed MOTION to Modify Scheduling Order by J. DOE 1, J. DOE 2, J. DOE 3, J. DOE 4, J. DOE 5, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Text of Proposed Order)(Sus, Nikhel) (Entered: 12/11/2025) | |
| | 12/11/2025 | MINUTE ORDER granting the 60 Unopposed Motion to Modify Scheduling Order. The Plaintiffs shall file any amended or supplemental pleadings by January 21, 2026. The Parties shall file a further joint scheduling proposal by February 4, 2026. Signed by Judge Sparkle L. Sooknanan on 12/11/2025. (lcak) (Entered: 12/11/2025) | |
| 61 | 01/21/2026 | AMENDED COMPLAINT against FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY filed by LEAGUE OF WOMEN VOTERS OF VIRGINIA, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS OF TEXAS.(Sus, Nikhel) (Entered: 01/21/2026) | |
| 62 | 02/04/2026 | Joint STATUS REPORT and Proposed Schedule by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Pezzi, Stephen) (Entered: 02/04/2026) | |
| | 02/04/2026 | MINUTE ORDER: In light of the 62 Joint Status Report, the Parties are ORDERED to comply with the following schedule. The Defendants shall produce the administrative record and file the certified list outlined in the 62 Joint Status Report by March 2, 2026. The Plaintiffs shall file their motion for summary judgment by March 12, 2026. The Defendants shall file their combined dispositive motion and opposition to Plaintiffs' motion for summary judgment by April 2, 2026. The Plaintiffs shall file their combined reply in support of their motion for summary judgment and opposition to the Defendants' dispositive motion by April 24, 2026. The Defendants shall file their reply in support of their dispositive motion by May 15, 2026. The briefs shall comply with the page limits in the 62 Joint Status Report. The Parties need not submit statements of fact under D.D.C. Local Rule 7(h) in support of their motions for summary judgment. Signed by Judge Sparkle L. Sooknanan on 2/4/2026. (lcak) (Entered: 02/04/2026) | |
| 63 | 02/24/2026 | NOTICE OF WITHDRAWAL OF APPEARANCE as to ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. Attorney Yoseph T. Desta terminated. (Desta, Yoseph) (Entered: 02/24/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 64 | 03/02/2026 | ADMINISTRATIVE RECORD (Notice of Filing of Certified List of Contents) by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 SSA Certification of Administrative Record, # 2 SSA Administrative Record Index, # 3 DHS Certification of Administrative Record, # 4 DHS Administrative Record Index)(Pezzi, Stephen) (Entered: 03/02/2026) | |
| 65 | 03/11/2026 | ADMINISTRATIVE RECORD (Notice of Filing of Corrected Certified List of Contents - DHS) by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 DHS Certification of Corrected Administrative Record, # 2 Corrected DHS Administrative Record Index)(Pezzi, Stephen) (Entered: 03/11/2026) | |
| 66 | 03/12/2026 | MOTION for Summary Judgment by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Memorandum in Support, # 2 Appendix Index of Declarations, # 3 Declaration Nel, # 4 Declaration Alex Doe, # 5 Declaration Bailey Doe, # 6 Declaration Cory Doe, # 7 Declaration LeBombard, # 8 Declaration Green, # 9 Declaration Stewart, # 10 Declaration Butler, # 11 Declaration Kisselburgh, # 12 Text of Proposed Order)(Sus, Nikhel) (Entered: 03/12/2026) | |
| 67 | 03/19/2026 | Unopposed MOTION for Leave to File Amicus Brief by CELIA ISRAEL, DYANA LIMON-MERCADO, TRAVIS COUNTY, TEXAS. (Attachments: # 1 Exhibit 1 - Amicus Brief, # 2 Exhibit 2 - Declaration of Christopher Davis, # 3 Text of Proposed Order)(Musser, Susan) (Entered: 03/19/2026) | |
| | 03/20/2026 | MINUTE ORDER granting the 67 Motion for Leave to File Amicus Brief. The Court will treat the motion's attachments, ECF Nos. 67-1 & 67-2, as the amicus brief. Signed by Judge Sparkle L. Sooknanan on 3/20/2026. (lcak) (Entered: 03/20/2026) | |
| 68 | 03/20/2026 | AMICUS BRIEF by CELIA ISRAEL, DYANA LIMON-MERCADO, TRAVIS COUNTY, TEXAS. (Attachments: # 1 Declaration of Christopher Davis)(zjm) (Entered: 03/23/2026) | |
| 69 | 03/24/2026 | Unopposed MOTION for Leave to File Amicus Brief by TEXAS CIVIL RIGHTS PROJECT. (Attachments: # 1 Exhibit 1 - Amicus Brief, # 2 Exhibit A - Exhibit to Amicus Brief, # 3 Exhibit B - Exhibit to Amicus Brief, # 4 Exhibit C - Exhibit to Amicus Brief, # 5 Exhibit D - Exhibit to Amicus Brief, # 6 Exhibit E - Exhibit to Amicus Brief, # 7 Exhibit F - Exhibit to Amicus Brief, # 8 Exhibit G - Exhibit to Amicus Brief, # 9 Exhibit H - Exhibit to Amicus Brief, # 10 Exhibit I - Exhibit to Amicus Brief, # 11 Exhibit LCvR 7.1 Certificate of Corporate Disclosure, # 12 Text of Proposed Order)(Oishi, Nina) (Entered: 03/24/2026) | |
| 70 | 03/24/2026 | Unopposed MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Karla Rosali Maradiaga, Filing fee $ 100, receipt number ADCDC-12317935. Fee Status: Fee Paid. by TEXAS CIVIL RIGHTS PROJECT. (Attachments: # 1 Declaration, # 2 Exhibit Certification from State Bar Under LCvR 83.2)(Oishi, Nina) (Entered: 03/24/2026) | |
| 71 | 03/24/2026 | NOTICE of Appearance by Nina Oishi on behalf of TEXAS CIVIL RIGHTS PROJECT (Oishi, Nina) (Entered: 03/24/2026) | |
| | 03/27/2026 | MINUTE ORDER granting the 69 Motion for Leave to File Amicus Brief. The Court treats the 69 Motion's attachments, ECF No. 69-1 | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | through ECF No. 69-10, as the amicus brief. Signed by Judge Sparkle L. Sooknanan on 3/27/2026. (lcak) (Entered: 03/27/2026) | |
| 72 | 03/27/2026 | NOTICE of Change of Address by Michelle Kanter Cohen (Kanter Cohen, Michelle) (Entered: 03/27/2026) | |
| 91 | 03/27/2026 | AMICUS BRIEF by TEXAS CIVIL RIGHTS PROJECT. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(zjm) (Entered: 04/08/2026) | |
| 73 | 03/30/2026 | MOTION for Leave to File Amicus Brief in Support of Plaintiffs' Motion for Summary Judgment by LAWYERS DEFENDING AMERICAN DEMOCRACY, INC. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Francois, Aderson) (Entered: 03/30/2026) | |
| | 03/31/2026 | MINUTE ORDER granting the 70 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Sparkle L. Sooknanan on 3/31/2026. (lcak) (Entered: 03/31/2026) | |
| | 03/31/2026 | MINUTE ORDER granting the 73 Motion for Leave to File Amicus Brief. The Court treats the 73 Motion's attachment, ECF No. 73 -1, as the amicus brief. Signed by Judge Sparkle L. Sooknanan on 3/31/2026. (lcak) (Entered: 03/31/2026) | |
| 87 | 03/31/2026 | AMICUS BRIEF by LAWYERS DEFENDING AMERICAN DEMOCRACY, INC. (zjm) (Entered: 04/08/2026) | |
| 74 | 04/01/2026 | MOTION for Leave to File amicus brief by SERVICE EMPLOYEES INTERNATIONAL UNION. (Attachments: # 1 amicus brief, # 2 proposed order)(Ury, Steven) (Entered: 04/01/2026) | |
| | 04/01/2026 | MINUTE ORDER granting the 74 Motion for Leave to File Amicus Brief. The Court treats the 74 Motion's attachment, ECF No. 74-1, as the amicus brief. Signed by Judge Sparkle L. Sooknanan on 4/1/2026. (lcak) (Entered: 04/01/2026) | |
| 88 | 04/01/2026 | AMICUS BRIEF by SERVICE EMPLOYEES INTERNATIONAL UNION. (zjm) (Entered: 04/08/2026) | |
| 75 | 04/02/2026 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lauren A. Newby, Filing fee $ 100, receipt number ADCDC-12338306. Fee Status: Fee Paid. by CELIA ISRAEL, DYANA LIMON-MERCADO, TRAVIS COUNTY, TEXAS. (Attachments: # 1 Declaration, # 2 Certification from State Bar Under LCvR 83.2, # 3 Proposed Order)(Musser, Susan) (Entered: 04/02/2026) | |
| 76 | 04/02/2026 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lydia Bailey, Filing fee $ 100, receipt number ADCDC-12338428. Fee Status: Fee Paid. by CELIA ISRAEL, DYANA LIMON-MERCADO, TRAVIS COUNTY, TEXAS. (Attachments: # 1 Declaration, # 2 Certification from State Bar Under LCvR 83.2, # 3 Proposed Order)(Musser, Susan) (Entered: 04/02/2026) | |
| 77 | 04/02/2026 | MOTION to Dismiss (or, in the Alternative, MOTION for Summary Judgment ) and Opposition to Plaintiffs' Motion for Summary Judgment (Combined) by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Memorandum in Support, # 2 Ex. 1 - Broderick Decl. (Apr. 2, 2026), # 3 Text of Proposed Order)(Pezzi, Stephen) (Entered: 04/02/2026) | |
| 78 | 04/02/2026 | Memorandum in opposition to re 66 MOTION for Summary Judgment filed by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Ex. 1 - Decl. of Brian Broderick (Apr. 2, 2026))(Pezzi, Stephen) (Entered: 04/02/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 79 | 04/03/2026 | Unopposed MOTION for Leave to File Amicus Brief by CAMPAIGN LEGAL CENTER, CENTER FOR MEDIA AND DEMOCRACY, COMMON CAUSE, PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Exhibit 1 - Amicus Brief, # 2 Text of Proposed Order)(Ronickher, Michael) (Entered: 04/03/2026) | |
| 80 | 04/03/2026 | NOTICE of Appearance by Michael J. Ronickher on behalf of CAMPAIGN LEGAL CENTER, CENTER FOR MEDIA AND DEMOCRACY, COMMON CAUSE, PROTECT DEMOCRACY PROJECT (Ronickher, Michael) (Entered: 04/03/2026) | |
| 81 | 04/03/2026 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Elizabeth D. Soltan, Filing fee $ 100, receipt number ADCDC-12340149. Fee Status: Fee Paid. by CAMPAIGN LEGAL CENTER, CENTER FOR MEDIA AND DEMOCRACY, COMMON CAUSE, PROTECT DEMOCRACY PROJECT. (Attachments: # 1 Declaration of Elizabeth D. Soltan, # 2 Certificate of Good Standing)(Ronickher, Michael) (Entered: 04/03/2026) | |
| 82 | 04/03/2026 | NOTICE of Appearance by Sophie Rose Gelber on behalf of ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA (Gelber, Sophie) (Main Document 82 replaced on 4/6/2026) (zjm). (Entered: 04/03/2026) | |
| 83 | 04/03/2026 | NOTICE of Appearance by Karla Maradiaga on behalf of TEXAS CIVIL RIGHTS PROJECT (Maradiaga, Karla) (Entered: 04/03/2026) | |
| 84 | 04/03/2026 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Melissa Lee Hargis, Filing fee $ 100, receipt number ADCDC-12340959. Fee Status: Fee Paid. by CELIA ISRAEL, DYANA LIMON-MERCADO, TRAVIS COUNTY, TEXAS. (Attachments: # 1 Declaration, # 2 Certification from State Bar Under LCvR 83.2, # 3 Proposed Order)(Musser, Susan) (Entered: 04/03/2026) | |
| 85 | 04/04/2026 | NOTICE of Executive Order 14399 by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA (Sus, Nikhel) (Entered: 04/04/2026) | |
| | 04/06/2026 | MINUTE ORDER granting the 79 Motion for Leave to File Amicus Brief. The Court treats the 79 Motion's attachment, ECF No. 79-1, as the amicus brief. Signed by Judge Sparkle L. Sooknanan on 4/6/2026. (lcak) (Entered: 04/06/2026) | |
| 86 | 04/06/2026 | ORDER granting the 43 Motion to Intervene. The Court ORDERS the Parties to comply with the following schedule. The State of Texas shall file an answer or otherwise respond to the 61 Amended Complaint by April 22, 2026. Should the State of Texas file a dispositive motion, the Plaintiffs shall file an opposition by May 8, 2026. The State of Texas shall file a reply by May 18, 2026. Signed by Judge Sparkle L. Sooknanan on 4/6/2026. (lcak) (Entered: 04/06/2026) | |
| 89 | 04/06/2026 | AMICUS BRIEF by CAMPAIGN LEGAL CENTER, CENTER FOR MEDIA AND DEMOCRACY, COMMON CAUSE, PROTECT DEMOCRACY PROJECT. (zjm) (Entered: 04/08/2026) | |
| | 04/08/2026 | MINUTE ORDER granting the 75 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions.. Signed by Judge Sparkle L. Sooknanan on 4/8/2026. | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | (lcak) (Entered: 04/08/2026) | |
| | 04/08/2026 | MINUTE ORDER granting the 76 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Sparkle L. Sooknanan on 4/8/2026. (lcak) (Entered: 04/08/2026) | |
| | 04/08/2026 | MINUTE ORDER granting the 81 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Sparkle L. Sooknanan on 4/8/2026. (lcak) (Entered: 04/08/2026) | |
| | 04/08/2026 | MINUTE ORDER granting the 84 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Sparkle L. Sooknanan on 4/8/2026. (lcak) (Entered: 04/08/2026) | |
| 90 | 04/08/2026 | NOTICE of Appearance by Brian Matthew Hauss on behalf of AMERICAN CIVIL LIBERTIES UNION (Hauss, Brian) (Entered: 04/08/2026) | |
| 92 | 04/08/2026 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Cody Venzke, Filing fee $ 100, receipt number ADCDC-12349375. Fee Status: Fee Paid. by AMERICAN CIVIL LIBERTIES UNION. (Attachments: # 1 Declaration Declaration of Attorney Cody Venzke and CGOS)(Hauss, Brian) (Entered: 04/08/2026) | |
| 93 | 04/08/2026 | MOTION for Leave to File Amicus Brief In Support of Plaintiffs Motion for Summary Judgment by AMERICAN CIVIL LIBERTIES UNION. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order Proposed Order)(Hauss, Brian) (Entered: 04/08/2026) | |
| | 04/09/2026 | MINUTE ORDER granting the 93 Motion for Leave to File Amicus Brief. The Amicus American Civil Liberties Union is directed to file its amicus brief by April 20, 2026. Signed by Judge Sparkle L. Sooknanan on 4/9/2026. (lcak) (Entered: 04/09/2026) | |
| | 04/14/2026 | MINUTE ORDER granting the 92 Motion for Leave to Appear Pro Hac Vice. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Sparkle L. Sooknanan on 4/14/2026. (lcak) (Entered: 04/14/2026) | |
| 94 | 04/14/2026 | AMICUS BRIEF In Support of Plaintiffs Motion for Summary Judgment by AMERICAN CIVIL LIBERTIES UNION. (Hauss, Brian) (Entered: 04/14/2026) | |
| 95 | 04/14/2026 | NOTICE of Appearance by Elizabeth D. Soltan on behalf of CAMPAIGN LEGAL CENTER, CENTER FOR MEDIA AND DEMOCRACY, COMMON CAUSE, PROTECT DEMOCRACY PROJECT (Soltan, Elizabeth) (Entered: 04/14/2026) | |
| 96 | 04/21/2026 | NOTICE of Appearance by Cody James Venzke on behalf of AMERICAN CIVIL LIBERTIES UNION (Venzke, Cody) (Entered: 04/21/2026) | |
| 97 | 04/23/2026 | MOTION to Dismiss Plaintiffs' Amended Complaint by STATE OF TEXAS. (Wassdorf, William) (Entered: 04/23/2026) | |
| 98 | 04/23/2026 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN CIVIL LIBERTIES UNION (Venzke, Cody) (Entered: 04/23/2026) | |
| 99 | 04/24/2026 | REPLY to opposition to motion re 66 Motion for Summary Judgment,, and Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Combined) filed by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Sus, Nikhel) (Entered: 04/24/2026) | |
| 100 | 04/24/2026 | Memorandum in opposition to re 77 MOTION to Dismiss (or, in the Alternative MOTION for Summary Judgment ) and Opposition to Plaintiffs' Motion for Summary Judgment (Combined) and Reply in Support of Plaintiffs' Motion for Summary Judgment (Combined) filed by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Sus, Nikhel) (Entered: 04/24/2026) | |
| 101 | 04/27/2026 | Unopposed MOTION for Extension of Time to File Moton to Dismiss by STATE OF TEXAS. (Attachments: # 1 Text of Proposed Order)(Wassdorf, William) (Entered: 04/27/2026) | |
| | 04/28/2026 | MINUTE ORDER granting the 101 Motion for Extension of time nunc pro tunc. The State of Texas' deadline to answer or otherwise respond to the 61 Amended Complaint is extended to April 23, 2026. Signed by Judge Sparkle L. Sooknanan on 4/28/2026. (lcak) (Entered: 04/28/2026) | |
| | 04/28/2026 | MINUTE ORDER: The Court directs the Plaintiffs to deliver two (2) printed courtesy copies of the briefing for the 66 Motion for Summary Judgment, the 77 Motion to Dismiss, and the 97 Motion to Dismiss, including amicus briefs. The courtesy copies should be sent after the reply in support of the 97 Motion to Dismiss is filed. Such courtesy copies should include the headers added by the Case Management/Electronic Case Files (CM/ECF) System and be submitted in binders, three-hole punched, with double-sided pages. Briefs and exhibits shall be tabbed and indexed for ease of reference. Courtesy copies should be mailed to Chambers, not the Clerk's Office. For any redacted or sealed documents, courtesy copies should be unredacted, but the portions redacted from public filings should be highlighted. Signed by Judge Sparkle L. Sooknanan on 4/28/2026. (lcak) (Entered: 04/28/2026) | |
| 102 | 05/06/2026 | Unopposed MOTION to Withdraw as Attorney Ali M. Thorburn by STATE OF TEXAS. (Attachments: # 1 Text of Proposed Order)(Thorburn, Ali) (Entered: 05/06/2026) | |
| | 05/07/2026 | MINUTE ORDER granting the 102 Motion to Withdraw. The Court ORDERS that Ali M. Thorburn is no longer the counsel of record for the State of Texas. Signed by Judge Sparkle L. Sooknanan on 5/7/2026. (lcak) (Entered: 05/07/2026) | |
| 103 | 05/08/2026 | Unopposed MOTION for Extension of Time to File Response/Reply as to 77 MOTION to Dismiss (or, in the Alternative MOTION for Summary Judgment ) and Opposition to Plaintiffs' Motion for Summary Judgment (Combined) by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Text of Proposed Order)(Pezzi, Stephen) (Entered: 05/08/2026) | |
| | 05/08/2026 | MINUTE ORDER granting the 103 Motion for Extension of Time. The Federal Defendants' deadline to file a reply in support of their 77 Motion to Dismiss is extended to May 29, 2026. The Plaintiffs shall submit the courtesy copies requested in this Courts April 28, 2026, Minute Order, when the Federal Defendants' reply is filed. Signed by Judge Sparkle L. Sooknanan on 5/8/2026. (lcak) (Entered: 05/08/2026) | |
| 104 | 05/08/2026 | Memorandum in opposition to re 97 MOTION to Dismiss Plaintiffs' | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Amended Complaint filed by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Davis, Emily) (Entered: 05/08/2026) | |
| 105 | 05/16/2026 | REPLY to opposition to motion re 97 Motion to Dismiss filed by STATE OF TEXAS. (Wassdorf, William) (Entered: 05/16/2026) | |
| 106 | 05/29/2026 | REPLY to opposition to motion re 77 Motion to Dismiss,, Motion for Summary Judgment, filed by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Pezzi, Stephen) (Entered: 05/29/2026) | |
| | 06/01/2026 | MINUTE ORDER: The Court ORDERS the Federal Defendants to transmit to Chambers a digital copy of the administrative record in a flash drive by overnight mail. The digital copy should be searchable. Signed by Judge Sparkle L. Sooknanan on 6/1/2026. (lcak) (Entered: 06/01/2026) | |
| 107 | 06/08/2026 | NOTICE regarding implementation of Executive Order 14399, Ensuring Citizenship Verification and Integrity in Federal Elections by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA (Attachments: # 1 Exhibit Implementation Notice)(Hill, John) (Entered: 06/08/2026) | |
| 108 | 06/09/2026 | RESPONSE re 107 Notice (Other), filed by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Ex. 1 - June 8, 2026 Notice in DSCC v. Trump (D.D.C.))(Pezzi, Stephen) (Entered: 06/09/2026) | |
| 109 | 06/12/2026 | JOINT APPENDIX to Cross-Dispositive Motions by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Hill, John) (Entered: 06/12/2026) | |
| 110 | 06/12/2026 | ERRATA attaching Joint Appendix by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA re 109 Joint Appendix,. (Attachments: # 1 Appendix JA DHS_1_End 178, # 2 Appendix JA DHS_2_End 285, # 3 Appendix JA DHS_3_End 395, # 4 Appendix JA DHS_4_End 527, # 5 Appendix JA DHS_5_End 555, # 6 Appendix JA DHS_6_End 577, # 7 Appendix JA DHS_7_End 602, # 8 Appendix JA DHS_8_End 626, # 9 Appendix JA DHS_9_End 747, # 10 Appendix JA DHS_10_End 793, # 11 Appendix JA DHS_11_End 853, # 12 Appendix JA DHS_12_End 889, # 13 Appendix JA DHS_13_End 938, # 14 Appendix JA DHS_14_End 974, # 15 Appendix JA DHS_15_End 1019, # 16 Appendix JA DHS_16_End 1065, # 17 Appendix JA DHS_17_End 1113, # 18 Appendix JA DHS_18_End 1158, # 19 Appendix JA DHS_19_End 1203, # 20 Appendix JA DHS_20_End 1258, # 21 Appendix JA DHS_21_End 1303, # 22 Appendix JA DHS_22_End 1353, # 23 Appendix JA DHS_23_End 1535, # 24 Appendix JA SSA_1_End 163, # 25 Appendix JA SSA_2_End 363)(Hill, John) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | (Entered: 06/12/2026) | |
| 111 | 06/22/2026 | MEMORANDUM OPINION re the 66 Motion for Summary Judgment, the 77 Motion to Dismiss (or, in the Alternative, for Summary Judgment), and the 97 Motion to Dismiss. See the attached document for details. Signed by Judge Sparkle L. Sooknanan on 6/22/2026. (lcak) (Entered: 06/22/2026) | |
| 112 | 06/22/2026 | ORDER granting the 66 Motion for Summary Judgment and denying the 77 and 97 Motions to Dismiss. The Court directs the Clerk of the Court to terminate this case from the active docket. See the 111 Memorandum Opinion for Details. Signed by Judge Sparkle L. Sooknanan on 6/22/2026. (lcak) (Entered: 06/22/2026) | |
| 113 | 06/25/2026 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 112 Order on Motion for Summary Judgment,, Order on Motion to Dismiss,,,,, 111 Memorandum & Opinion, by U.S. DEPARTMENT OF HOMELAND SECURITY, SOCIAL SECURITY ADMINISTRATION, KRISTI L. NOEM, FRANK BISIGNANO. Fee Status: No Fee Paid. (Pezzi, Stephen) (Entered: 06/25/2026) | |
| 114 | 06/26/2026 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 113 Notice of Appeal to DC Circuit Court,. (zjm) (Entered: 06/26/2026) | |
| 115 | 06/26/2026 | NOTICE of Appearance by Cesar Azrak on behalf of All Defendants (Azrak, Cesar) (Entered: 06/26/2026) | |
| | 06/29/2026 | USCA Case Number 26-5243 for 113 Notice of Appeal to DC Circuit Court, filed by SOCIAL SECURITY ADMINISTRATION, FRANK BISIGNANO, KRISTI L. NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (mg) (Entered: 06/29/2026) | |
| 116 | 07/01/2026 | MOTION to Stay Pending Appeal by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Text of Proposed Order)(Azrak, Cesar) (Entered: 07/01/2026) | |
| | 07/02/2026 | MINUTE ORDER: On June 22, 2026, the Court granted the Plaintiffs' 66 Motion for Summary Judgment and denied the Defendants' 77 and 97 Motions to Dismiss. See ECF No. 111. On July 1, 2026, the Federal Defendants filed a 116 Motion to Stay the Court's Order Pending Appeal. The Court ORDERS the Plaintiffs to respond to that 116 Motion by July 6, 2026, at 5:00 PM, and the Federal Defendants to file any reply by July 7, 2026, at 5:00 PM. Signed by Judge Sparkle L. Sooknanan on 7/2/2026. (lcak) (Entered: 07/02/2026) | |
| 117 | 07/02/2026 | NOTICE of Appearance by Ronald A. Fein on behalf of All Plaintiffs (Fein, Ronald) (Main Document 117 replaced on 7/8/2026) (zjm). (Entered: 07/02/2026) | |
| 118 | 07/06/2026 | MOTION for Leave to File Amicus Briefin Support of Defendants' Motion for Stay Pending Appeal by Arizona Senate President Warren Petersen and Arizona Speaker of the House of Representatives Steve Montenegro by WARREN PETERSEN, STEVE MONTENEGRO. (Attachments: # 1 Proposed Brief, # 2 Text of Proposed Order Proposed Order)(Whitesell, S.) (Entered: 07/06/2026) | |
| 119 | 07/06/2026 | RESPONSE re 116 MOTION to Stay Pending Appeal filed by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Affidavit Declaration of | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | A. George)(George, Aman) (Entered: 07/06/2026) | |
| | 07/07/2026 | MINUTE ORDER granting the 118 Motion for Leave to File Amicus Brief. The Court treats the Motion's Attachment, ECF No. 118-1, as the amicus brief. Signed by Judge Sparkle L. Sooknanan on 7/7/2026. (lcak) (Entered: 07/07/2026) | |
| 120 | 07/07/2026 | REPLY to opposition to motion re 116 Motion to Stay, filed by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Ex. 1 - United States Opp'n to Florida Plaintiffs' Mot. to Enforce (N.D. Fla. July 2, 2026), # 2 Ex. 2 - Florida Order Granting Motion to Enforce (July 7, 2026))(Pezzi, Stephen) (Entered: 07/07/2026) | |
| 121 | 07/07/2026 | NOTICE re Timing (if Necessary) of Intended Request for Relief from the D.C. Circuit by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY (Pezzi, Stephen) (Entered: 07/07/2026) | |
| 122 | 07/07/2026 | AMICUS BRIEF by STEVE MONTENEGRO, WARREN PETERSEN. (zjm) (Entered: 07/08/2026) | |
| 123 | 07/08/2026 | MEMORANDUM OPINION re the 116 Motion to Stay. See the attached document for details. Signed by Judge Sparkle L. Sooknanan on 7/8/2026. (lcak) (Entered: 07/08/2026) | |
| 124 | 07/08/2026 | ORDER denying 116 Motion to Stay. See the 123 Memorandum Opinion for details. Signed by Judge Sparkle L. Sooknanan on 7/8/2026. (lcak) (Entered: 07/08/2026) | |
| 125 | 07/09/2026 | NOTICE by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY (Pezzi, Stephen) (Entered: 07/09/2026) | |
| | 07/09/2026 | MINUTE ORDER: In light of the 125 Notice, the Court directs the Parties to meet and confer and to submit a joint status report by 5:00 PM on July 10, 2026. This joint status report should address: (1) what actions the Federal Defendants are taking to comply with this Court's 112 Order, (2) whether the Social Security Administration is still making NUMIDENT records available to SAVE and/or DHS, (3) whether SAVE still confirms social security numbers beyond those collected through the "very limited circumstances" recognized in the Notice of Modified System of Records, 85 Fed. Reg. 31,798, 31,801 (May 27, 2020), and (4) any other issues raised by the Parties in response to the 125 Notice. Signed by Judge Sparkle L. Sooknanan on 7/9/2026. (lcak) (Entered: 07/09/2026) | |
| 126 | 07/10/2026 | Joint STATUS REPORT by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Ex. 1 - Email from S. Pezzi to J. Muehlhoff (July 9, 2026), # 2 Ex. 2 - Broderick Decl. of July 10, 2026, # 3 Ex. 3 - Steffensen Decl. of July 10, 2026)(Pezzi, Stephen) (Entered: 07/10/2026) | |
| | 07/11/2026 | MINUTE ORDER: In light of the 126 Joint Status Report and the Federal Defendants' representations about the exigency of this matter, the Court directs the Social Security Administration to file a notice by 5:00 PM on July 13, 2026, explaining whether the Social Security Administration is bound by the consent decree and the July 7, 2026, order enforcing the consent decree in Florida v. DHS, No. 3:24-cv-00509, ECF Nos. 30, 31, 45 (N.D. Fla.). The Court further directs the Parties to meet and confer by July 13, 2026, to try to resolve their disputes amicably. If they are unable to do so, the Court directs the Parties to comply with the following briefing schedule. The Plaintiffs shall file any motion to enforce or clarify the 112 Order by July 14, 2026. The Defendants shall file any response by July 16, 2026. The Plaintiffs shall file any reply | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | by July 17, 2026. The Parties should be prepared to attend a hearing on this matter at 10:00 AM on July 20, 2026, if needed. The Court encourages the Parties to try to resolve this dispute amicably in light of the Northern District of Florida's recognition that there is "merit" to the Plaintiffs' argument that the Social Security Administration is not bound by its July 7, 2026, Order. Signed by Judge Sparkle L. Sooknanan on 7/11/2026. (lcak) (Entered: 07/11/2026) | |
| 127 | 07/13/2026 | NOTICE in Response to the Court's Minute Order of July 11, 2026 by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY (Pezzi, Stephen) (Entered: 07/13/2026) | |
| 128 | 07/14/2026 | MOTION to Enforce Judgment by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Text of Proposed Order)(Hickman, Johanna) (Entered: 07/14/2026) | |
| 129 | 07/16/2026 | Memorandum in opposition to re 128 MOTION to Enforce Judgment filed by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Ex. 1 - Defs. Opp'n to Mot. to Enforce in Florida (N.D. Fla. July 2, 2026))(Pezzi, Stephen) (Entered: 07/16/2026) | |
| 130 | 07/17/2026 | REPLY to opposition to motion re 128 Motion to Enforce Judgment, filed by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Attachments: # 1 Exhibit 1)(Hickman, Johanna) (Entered: 07/17/2026) | |
| | 07/18/2026 | MINUTE ORDER: In the 126 Joint Status Report, the Plaintiffs represented to the Court that they are seeking intervention in the Northern District of Florida to appeal that court's order. The Northern District of Florida recognized that "the circumstances outlined in th[at] motion plainly justify expedited action" and has not yet issued a ruling. Florida v. DHS, No. 3:24-cv-509, ECF No. 49 (N.D. Fla. July 9, 2026). The Court notes that a ruling on the motion to intervene and/or an appeal of that order may moot this Court's need to address the 128 Motion to Enforce. The Court thus ORDERS the Parties to file supplemental memoranda by 3:00 PM on July 20, 2026. These supplemental memoranda should: (1) update the Court on the status of the Plaintiffs' intervention request in Florida v. DHS, No. 3:24-cv-509 (N.D. Fla.), (2) provide the Parties' best understanding of the Northern District of Florida's expected timeline for ruling on that motion, and (3) update the Court on whether the Federal Defendants have appealed the Northern District of Florida's ruling in light of their representations in the 129 Opposition that the Northern District of Florida lacked jurisdiction to enter its judgment.In their 129 Opposition, the Federal Defendants also reject any contention that they engaged in forum shopping by representing that "the United States had no say over where the lawsuits by Florida, Ohio, Indiana, [and] Iowa" were filed. The Court has been operating on the assumption that the Amended Complaint consolidating those States' claims in the Northern District of Florida (as opposed to the other districts where many of those claims were initially filed) was entered with the Department of Homeland Security's consent | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | pursuant to Federal Rule of Civil Procedure 15(a)(2). See Am. Compl., at 1 n.1, Florida v. DHS, No. 3:24-cv-509, ECF No. 29 (N.D. Fla. November 28, 2025); Fed. R. Civ. P. 15(a)(2) (noting that after the 21 day deadline has expired, plaintiffs can only amend their complaint without the court's leave when they have "the opposing party's written consent"). The Federal Defendants should address whether this Court's understanding is incorrect in their July 20, 2026, supplemental memorandum as well. Signed by Judge Sparkle L. Sooknanan on 7/18/2026. (lcak) (Entered: 07/18/2026) | |
| 131 | 07/20/2026 | SUPPLEMENTAL MEMORANDUM to in Response to the Court's Minute Order of July 18, 2026 filed by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Ex. 1 - Order Granting LWV Motion to Intervene (N.D. Fla. July 19, 2026), # 2 Ex. 2 - LWV Notice of Appeal (N.D. Fla. July 20, 2026))(Pezzi, Stephen) (Entered: 07/20/2026) | |
| 132 | 07/20/2026 | SUPPLEMENTAL MEMORANDUM to in Response to the Court's Minute Order of July 18, 2026 filed by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Sus, Nikhel) (Entered: 07/20/2026) | |
| | 07/20/2026 | MINUTE ORDER: The Court has reviewed the Parties' briefing on the 128 Motion to Enforce Judgment and the 131 132 Supplemental Memoranda. In light of the Northern District of Florida's grant of the Plaintiffs' Intervention Motion, there is a possibility that further proceedings in the Eleventh Circuit may moot the Court's need to address the 128 Motion to Enforce. Accordingly, the Court defers ruling on the 128 Motion to Enforce pending further proceedings in the Eleventh Circuit that may grant the Plaintiffs the relief that they seek. The Court directs the Parties to file a joint status report on July 22, 2026, and every seven days thereafter, updating the Court on the status of the appeal of Florida v. DHS, No. 3:24-cv-509 (N.D. Fla.) in the Eleventh Circuit. The Court has reviewed the Northern District of Florida's Order on the Intervention Motion and finds that no response is necessary. Signed by Judge Sparkle L. Sooknanan on 7/20/2026. (lcak) (Entered: 07/20/2026) | |
| 133 | 07/22/2026 | Joint STATUS REPORT by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Ex. 1 - Order re MTD in Texas v. Mullin (W.D. Tex. July 21, 2026))(Pezzi, Stephen) (Entered: 07/22/2026) | |
| 134 | 07/22/2026 | NOTICE OF WITHDRAWAL OF APPEARANCE as to FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. Attorney Cesar Azrak terminated. (Azrak, Cesar) (Entered: 07/22/2026) | |
| 135 | 07/23/2026 | NOTICE of Appearance by Brianna Krominga on behalf of STATE OF TEXAS (Krominga, Brianna) (Entered: 07/23/2026) | |
| 136 | 07/29/2026 | Joint STATUS REPORT by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Pezzi, Stephen) (Entered: 07/29/2026) | |
| 137 | 07/30/2026 | NOTICE OF WITHDRAWAL OF APPEARANCE as to ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. Attorney Emily Davis terminated. (Davis, Emily) (Entered: 07/30/2026) | |
| 138 | 08/05/2026 | Joint STATUS REPORT by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Hill, John) (Entered: 08/05/2026) | |
| 139 | 08/12/2026 | Joint STATUS REPORT by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Pezzi, Stephen) (Entered: 08/12/2026) | |
| 140 | 08/19/2026 | Joint STATUS REPORT by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Sus, Nikhel) (Entered: 08/19/2026) | |
| 141 | 08/21/2026 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 112 Order on Motion for Summary Judgment,, Order on Motion to Dismiss,,,,, 111 Memorandum & Opinion, by STATE OF TEXAS. Filing fee $ 605, receipt number ADCDC-12624984. Fee Status: Fee Paid. (Krominga, Brianna) (Entered: 08/21/2026) | |
| 142 | 08/24/2026 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 141 Notice of Appeal to DC Circuit Court,. (znmw) (Entered: 08/24/2026) | |
| | 08/26/2026 | USCA Case Number 26-5301 for 141 Notice of Appeal to DC Circuit Court, filed by STATE OF TEXAS. (mg) (Entered: 08/26/2026) | |
| 143 | 08/26/2026 | Joint STATUS REPORT by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Pezzi, Stephen) (Entered: 08/26/2026) | |
| 144 | 09/02/2026 | Joint STATUS REPORT by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Pezzi, Stephen) (Entered: 09/02/2026) | |
| 145 | 09/09/2026 | Joint STATUS REPORT by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Pezzi, Stephen) (Entered: 09/09/2026) | |
| 146 | 09/14/2026 | NOTICE by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Ex. 1 - Decl. of N. Bartell (DHS), # 2 Ex. 2 - Second Decl. of M. Steffensen (SSA))(Pezzi, Stephen) (Entered: 09/14/2026) | |
| 147 | 09/16/2026 | Joint STATUS REPORT by ELECTRONIC PRIVACY INFORMATION CENTER, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF LOUISIANA, LEAGUE OF WOMEN VOTERS OF LOUISIANA EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, LEAGUE OF WOMEN VOTERS OF VIRGINIA. (Samburg, Mark) (Entered: 09/16/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 148 | 09/23/2026 | Joint STATUS REPORT by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY. (Pezzi, Stephen) (Entered: 09/23/2026) | |
| 149 | 09/28/2026 | NOTICE OF SUPPLEMENTAL AUTHORITY by FRANK BISIGNANO, KRISTI L. NOEM, SOCIAL SECURITY ADMINISTRATION, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Ex. 1 - DHS v. League of Women Voters, No. 26A308, 609 U.S. ----, --- S. Ct. ----, 2026 WL 2879700 (U.S. Sept. 25, 2026))(Pezzi, Stephen) (Entered: 09/28/2026) | |
| | 09/29/2026 | MINUTE ORDER: On September 25, 2026, the Supreme Court stayed this Court's 112 June 22, 2026, Order. See Dep't of Homeland Sec. v. League of Women Voters, No. 26A308, slip op. at 6–7 (U.S. Sept. 25, 2026). The stay is in effect "pending the disposition of appeal" to the D.C. Circuit and disposition of a petition for a writ of certiorari. Id. at 6. A stay operates by "temporarily divesting an order of enforceability." Nken v. Holder, 556 U.S. 418, 428 (2009); see also Dep't of Homeland Sec. v. D.V.D., 145 S. Ct. 2627, 2629 (2025) (explaining that following the Supreme Court's grant of a stay pending appeal, the district court's remedial order "cannot . . . be used to enforce an injunction that our stay rendered unenforceable"). While the stay remains in effect, the Court therefore cannot grant the requested relief compelling compliance with this Court's June 22, 2026, Order. Accordingly, the Court DENIES the Plaintiffs' 128 Motion to Enforce Summary Judgment Order without prejudice to renewal should the judgment become enforceable in light of further appellate proceedings. The Court further VACATES the July 20, 2026, Minute Order ordering weekly joint status reports on the status of the appeal in Florida v. DHS, No. 3:24-cv-509 (N.D. Fla.) in the Eleventh Circuit. Signed by Judge Sparkle L. Sooknanan on 9/29/2026. (lcsls1) (Entered: 09/29/2026) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-3501 (SLS)<br>Judge Sparkle L. Sooknanan |

## MEMORANDUM OPINION

This case implicates two fundamental rights that protect Americans from government overreach: the right to privacy and the right to vote. In the past year, several federal agencies have joined forces to create a centralized federal database that contains the private information of United States citizens, including Social Security numbers, citizenship status, and other sensitive data. But decades ago, Congress put protections in place to prevent precisely this type of centralized data bank. And the record in this case shows that the federal agencies that created this database knew that the database violates those statutory protections. The agencies were scrambling to comply with an Executive Order aimed at reshaping federal elections, which directed them to create a system for mass voter verification. So they haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable. Since then, states have partnered with the federal government to access the database and are actively removing United States citizens from voter rolls based on inaccurate information. All in all, the federal government has knowingly trampled on the privacy rights of American citizens in a manner that threatens the sacred right to vote. This Court cannot stand idly by while that happens.

Last March, President Donald J. Trump signed a sweeping Executive Order directing actions related to the administration of elections. Exec. Order No. 14248 of March 25, 2025, Preserving and Protecting the Integrity of American Elections, 90 Fed. Reg. 14,005 (Mar. 28, 2025) (DHS AR 334–39). Several lawsuits followed, and courts across the country have since enjoined various aspects of that Executive Order. As relevant here, the Executive Order instructed certain federal agencies, including the Department of Homeland Security (DHS) and the Social Security Administration (SSA), to put systems in place for state and local authorities to verify the citizenship or immigration status of registered voters or individuals registering to vote. The Executive Order triggered an overhaul of a system maintained by DHS to verify citizenship and immigration status—the Systematic Alien Verification for Entitlements (SAVE) system. The 2025 SAVE overhaul modified the system in three major ways: (1) to include the records of natural-born citizens, (2) to access SSA records, including Social Security numbers, and (3) to permit bulk searches of records by SAVE users.

The League of Women Voters, its local affiliates, and the Electronic Privacy Information Center sued DHS, SSA, and other federal governmental actors (collectively, the Federal Defendants) to challenge the overhaul of SAVE, including the establishment of the modified system and two related notices published by DHS and SSA. They allege that the modifications transformed the system's functionality, increased the scope of covered individuals, made SAVE less accurate, violated statutory procedures, and were contrary to law. The Plaintiffs originally moved for an Administrative Procedure Act (APA) stay, which this Court denied for failure to show irreparable harm. Since then, states have run their voter rolls through the modified SAVE system, and some of the Plaintiffs' members have been wrongfully identified as non-citizens by

SAVE, resulting in the cancellation of their voter registrations. Meanwhile, the Court permitted the State of Texas to intervene as a Defendant in this action.

The Plaintiffs now move for summary judgment. The Court agrees that the establishment of the SAVE modified system and the notices that followed are unlawful in several respects. First, they violate a prohibition in the Social Security Act against the disclosure of Social Security numbers and other related SSA records. Second, they violate both substantive and procedural protections in the Privacy Act, which prevent the non-consensual disclosure of certain information (both by federal agencies and between federal agencies) and require notice and comment for certain actions relevant here. Third, they violate the APA. The Court therefore sets aside and vacates the 2025 SAVE modified system and the related notices because they were contrary to law, arbitrary and capricious, in excess of statutory authority, and without observance of procedure required by law.

## BACKGROUND

### A. Social Security Act

The Social Security Act of 1935 creates financial assistance benefit programs for certain Americans. Pub. L. No. 74–271, 49 Stat. 620 (codified at 42 U.S.C. § 301 *et seq.*). Soon after its enactment, the Social Security Board established the Social Security number (SSN) as an identifier for "U.S. workers, enabling employers to submit accurate reports of covered earnings for use in administering benefits under the new Social Security program." Carolyn Puckett, *The Story of the Social Security Number*, Soc. Sec. Bull., Vol. 69, No. 2 (July 2009), https://www.ssa.gov /policy/docs/ssb/v69n2/v69n2p55.html [https://perma.cc/ H96G-835X]. This "is still the primary purpose for the SSN." *Id.*

Privacy was central to the newly formed regulatory scheme. In 1937, the Social Security Board enacted its very first regulation, which "governed privacy and disclosure of Social Security

records." *Social Security History: Regulation No. 1*, SSA, https://www.ssa.gov /history/reg1.html [https://perma.cc/NGU4-FPM6]. That regulation prohibited any "member, officer, or employee of the Board" from producing or disclosing "any record . . . or any information acquired therefrom . . . pertaining to any person." Disclosure of Official Records & Information, 2 Fed. Reg. 1,256, 1,256 (June 18, 1937). In 1939, Congress codified the language of that regulation into the Social Security Act, prohibiting the disclosure of "any file, record, report, or other paper, or any information" obtained by the Board except as the agency's regulations prescribe. Social Security Act Amendments of 1939, Pub. L. No. 76–379, title VIII, § 1106, 53 Stat. 1360, 1398 (codified as amended at 42 U.S.C. § 1306(a)). Today, the Social Security Act expressly prohibits federal employees from disclosing the "[s]ocial security account numbers and related records . . . obtained or maintained . . . pursuant to any provision of law enacted on or after October 1, 1990." 42 U.S.C. § 405(c)(2)(C)(viii)(I).

**B. Privacy Act**

The Privacy Act of 1974 establishes "certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies" to "collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose." Pub. L. No. 93–579, § 2(b)(4), 88 Stat. 1896, 1896 (codified at 5 U.S.C. § 552a note). The Act "was passed largely out of concern over 'the impact of computer data banks on individual privacy.'" *U.S. DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 766 (1989) (quoting H.R. Rep. No. 93–1416, at 7 (1974)).

**1. Statutory Background**

The Privacy Act's animating concern is that "the increasing use of computers and sophisticated information technology, while essential to the efficient operations of the

Government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information." Privacy Act of 1974 § 2(a)(2), 88 Stat. at 1896 (codified at 5 U.S.C. § 552a note). Indeed, the Act was precipitated by proposals in the 1960s for a computerized "data center" maintained by the Executive Branch that would bring "the data collected by various agencies into a single consistent body" and "identify individual respondents in some way, [likely] by social security number." *Computer Privacy: Hearings Before the Subcomm. on Admin. Prac. and Proc. of the S. Comm. on the Judiciary*, 90th Cong. 4–5 (1967) (statement of Carl Kaysen, Dir., Inst. for Advanced Study, Princeton Univ.). Rather than garner support, these proposals "immediately caused a public outcry," necessitating a congressional response. Dongsheng Zang, *The Privacy Act of 1974: The American Bill of Rights on Data and Its Unfinished Business*, 86 U. Pitt. L. Rev. 85, 100 (2024) (detailing the legislative background of the Privacy Act of 1974).

Congress reacted by holding high-profile hearings on "The Computer and Invasion of Privacy" and "Federal Data Banks," where extensive criticism ensured that "the National Data Center [idea was] probably dead." *Id.* at 114–121 (citations omitted); *see also Sampson v. Murray*, 415 U.S. 61, 96 n.2 (1974) (Douglas, J., dissenting) (recognizing that the hearings reflected a "congressional concern" that "we live in an Orwellian age in which the computer has become 'the heart of a [national] surveillance system'" (quoting Arthur R. Miller, *Computers, Data Banks and Individual Privacy: An Overview*, 4 Colo. Human Rights L. Rev. 1, 2 (1972))). At the time, it became evident that there was a grave "threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files," and that "[t]he right to collect and use such data for public purposes is typically accompanied by a

concomitant statutory or regulatory duty to avoid unwarranted disclosures." *Whalen v. Roe*, 429 U.S. 589, 605 (1977).

Congress enacted the Privacy Act to address this "growing awareness that governmental agencies were accumulating an ever-expanding stockpile of information about private individuals that was readily susceptible to . . . inaccuracies that the citizen would never know of, let alone have an opportunity to rebut or correct." *Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981). It responded with a detailed statutory scheme to prevent "the creation of secret information systems or data banks" by the federal government that would result in "the wrongful disclosure and use, in some cases, of [such] personal files held by Federal agencies." *Id.* (quoting S. Rep. No. 1183, at 1, 2 (1974)). Thus, the Privacy Act "was designed to provide individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves," *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 76 (D.C. Cir. 1982) (emphasis omitted), and to "establish safeguards to protect individuals against the disclosure of confidential records 'which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained,'" *FAA v. Cooper*, 566 U.S. 284, 294–95 (2012) (quoting 5 U.S.C. § 552a(e)(10)).

The statute's provisions work together "to prevent the creation of formal or de facto national data banks," "centralized Federal information systems[,]" or "interagency computer data banks"—by making it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen, and [ensuring] proper regard for individual privacy, the confidentiality of data, and the security of [any] system" of records maintained by the federal government. *See United States v. Weber*, 816 F. Supp. 3d 1168, 1194 (C.D. Cal. 2026) (cleaned up) (quoting S. Comm. on Gov't Operations & H.R. Comm. On Gov't

Operations, 94th Cong., Source Book on Privacy 168, 217, 884 (Joint Comm. Print 1976)). The Act accomplishes its goal through both substantive and procedural "safeguards . . . against an invasion of personal privacy." *Cooper*, 566 U.S. at 294–95 (quoting Privacy Act of 1974 § 2(b), 88 Stat. at 1896).

**2. Substantive Safeguards**

The Privacy Act's substantive safeguards provide robust protections related to significant governmental use and retention of identifiable personal information. *See* 5 U.S.C. § 552a. For instance, the statute instructs federal agencies to "collect information to the greatest extent practicable directly from the subject individual" when use of the information can adversely affect the individual's rights. *Id.* § 552a(e)(2). It requires agencies to maintain records "with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual." *Id.* § 552a(e)(5). And it provides various mechanisms to give individuals notice of what records are maintained by the federal government as well as to correct any inaccuracies in those records. *Id.* § 552a(d)–(g). Importantly, the Act prohibits both inter-agency and extra-agency disclosure of government records except in limited circumstances. *Id.* § 552a(b). One such circumstance is a "routine use," which is defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected." *Id.* § 552a(a)(7), (b)(3).

The statute also has special provisions governing the use of Social Security numbers. The Act provides that "[i]t shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number." Privacy Act of 1974 § 7(a)(1), 88 Stat. at 1909 (codified at 5 U.S.C. § 552a note). The Act further requires that "[a]ny Federal, State, or local government agency which requests an individual to disclose his social security account

number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it." *Id.* § 7(b), 88 Stat. at 1909.

In 1988, Congress amended the Privacy Act with the Computer Matching and Privacy Protection Act of 1988. Pub. L. No. 100–503, 102 Stat. 2507 (codified at 5 U.S.C. § 552a note). That statute prohibits federal agencies from disclosing records to other federal agencies, state governments, or local governments through a "computer matching program" without a written agreement. 5 U.S.C. § 552a(o)(1). The Act establishes various statutory procedures and requirements governing such agreements. *Id.* § 552a(o). And it prohibits state or local governments from duplicating or disclosing federal records received pursuant to such an agreement "except where required by law or essential to the conduct of the matching program." *Id.* § 552a(o)(1)(H). That same prohibition applies to federal agencies with respect to records provided by "any State or local government, or agency thereof, which discloses records to be used in a matching program." *Id.* § 552a(a)(11), (o)(1)(H).

Congress further provided that nothing in the 1988 Act "shall be construed to authorize (1) the establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies; (2) the direct linking of computerized systems of records maintained by Federal agencies"; or "(3) the computer matching of records not otherwise authorized by law." Computer Matching and Privacy Protection Act of 1988 § 9, 102 Stat. at 2514.

**3. Procedural Safeguards**

The Privacy Act also prescribes procedural safeguards that apply when records maintained by a federal agency—a so-called "system of records"—are changed or used in a new way. 5 U.S.C.

§ 552a(a)(5), (e). Congress enacted these safeguards to "permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by [federal] agencies" and to ensure "adequate safeguards are provided to prevent misuse of such information." Privacy Act of 1974 § 2(b)(1), (4), 88 Stat. at 1896.

In relevant part, the statute establishes strict notice and comment requirements in these circumstances. 5 U.S.C. § 552a(e)(4), (11). When an agency "establish[es] or revis[es]" any "system of records," it must "publish in the Federal Register . . . a notice of the existence and character of the system of records," *i.e.*, a System of Records Notice (SORN). *Id.* § 552a(e)(4). Each SORN "shall include" nine categories of information:

> (A) the name and location of the system;
>
> (B) the categories of individuals on whom records are maintained in the system;
>
> (C) the categories of records maintained in the system;
>
> (D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;
>
> (E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;
>
> (F) the title and business address of the agency official who is responsible for the system of records;
>
> (G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;
>
> (H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and
>
> (I) the categories of sources of records in the system.

*Id.* To publish a statutorily compliant SORN, a federal agency must provide at least thirty days prior "notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11). And the agency must provide notice to Congress as well. *Id.* § 552a(r).

### C. Factual Background

#### 1. SAVE System of Records

SAVE is a system administered by DHS that is "designed to help federal, state, tribal, and local government agencies confirm citizenship and immigration status prior to granting benefits and licenses, as well as for other lawful purposes." DHS AR 195. SAVE users "formalize the purpose and use in which they use SAVE through a Memorandum of Agreement (MOA) or Computer Matching Agreement (CMA)" establishing "the terms and conditions for the user agency's participation in SAVE." DHS AR 195–96. One purpose for which states can enter into such an agreement is to verify the citizenship of registered voters. Notice of a Modified System of Records, 90 Fed. Reg. 48,948, 48,951 (Oct. 31, 2025) (DHS AR 117) (DHS 2025 SORN). Prior to May 2025, SAVE users could access the immigration status of individuals with information stored in the SAVE system, and SAVE's response was based on the limited records maintained by DHS, the State Department, and the Justice Department. *See* Notice of Modified System of Records, 85 Fed. Reg. 31,798, 31,802 (May 27, 2025) (DHS AR 112) (2020 SORN). Also prior to May 2025, DHS recognized SAVE as a system of records subject to the Privacy Act—which means that DHS appeared to comply with the statute's notice-and-comment requirements and issued SORNs for changes to SAVE.[1]

---

[1] *See* Notice of Modified System of Records, 85 Fed. Reg. 31,798, 31,798 (May 27, 2020) (DHS AR 108); DHS USCIS–004 SAVE Program System of Records, 81 Fed. Reg. 78,619, 78,619 (Nov. 8, 2016); DHS USCIS—004—SAVE Program System of Records, 77 Fed. Reg. 47,415, 47,415 (Aug. 8, 2012); USCIS–004 Verification Information System (VIS) System of Records Notice, 73 Fed. Reg. 75,445, 75,445–46 (Dec. 11, 2008); USCIS VIS System of Records Notice, 73 Fed. Reg. 10,793, 10,793 (Feb. 28, 2008); Privacy Act: VIS Records Notice, 72 Fed. Reg. 17,569, 17,569 (Apr. 9, 2007); Privacy Act of 1974 System of Records, 67 Fed. Reg. 64,134, 64,134 (Oct. 17, 2002); Privacy Act of 1974 System of Records, 66 Fed. Reg. 46,812, 46,812 (Sep. 7, 2001).

### 2. Establishment of the Modified SAVE

On March 25, 2025, President Trump signed a sweeping Executive Order directing federal agencies to take various actions related to the administration of federal elections. Exec. Order No. 14248, 90 Fed. Reg. at 14,006–09 (DHS AR 335–38). The Executive Order instructs that for the purpose of "identify[ing] unqualified voters registered in the States," "the Secretary of Homeland Security shall, consistent with applicable law, ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered." *Id.* at 14,006 (DHS AR 335). The Executive Order further requires DHS to "share database information with States upon request" under 8 U.S.C. § 1373(c) for voter list maintenance, and it directs DHS, in coordination with the Department of Government Efficiency, to compare voter records with "Federal immigration databases." *Id.* at 14,005–06 (DHS AR 334–35). And the Executive Order specifically directs SSA to make its databases available "to all State and local election officials" for verifying voter eligibility. *Id.* at 14,007 (DHS AR 336).

The Executive Order prompted a flurry of action by the Federal Defendants charged with its implementation. SSA AR 1–2; DHS AR 39–68. On May 15, 2025, DHS and SSA executed a letter agreement to overhaul the SAVE system, which authorized "information sharing" between DHS and SSA "by matching data submitted through SAVE to SSA records in SSA's Master Files of Social Security Number (SSN) Holders and SSN Applications." DHS AR 423 (citation omitted); SSA AR 9 (citation omitted). The "SSA Master Files" (or NUMIDENT)—which would be linked to SAVE under the new information sharing agreement—contains SSNs, names, dates and places of birth, citizenship indicators, death records, and information obtained while processing requests for SSNs. SSA AR 170–71; DHS AR 253. On May 22, 2025, the Federal

Defendants publicly launched the expanded SAVE system. DHS AR 493; DHS AR 1385. But no agency published a SORN or otherwise provided an opportunity for the public to comment on the modifications prior to publication. Mot. Hr'g Tr. 71:15–22, ECF No. 48. At that juncture, the operative SORN for SAVE was published on May 27, 2020. Notice of Modified System of Records, 85 Fed. at 31,798 (DHS AR 108).

### 3. Present Litigation and Promulgation of New SORNs

In September 2025, the Plaintiffs filed this action challenging the modified SAVE as unlawful, *see* Compl., ECF No. 1, and moved for an emergency stay under Section 705 of the APA, Mot. Stay, ECF No. 16. During those emergency proceedings, the Federal Defendants would not say one way or the other whether the Privacy Act applies to modifications to SAVE—despite DHS's prior practice of publishing SORNs for modifications to the system. Mot Hr'g Tr. 69:18–24. But the Federal Defendants conceded that the then-recent modification to SAVE was substantial enough that the Privacy Act would require a SORN if it applied. *Id.* The Court ultimately denied the Plaintiffs' emergency motion for failure to show irreparable harm. *See League of Women Voters v. DHS.*, No. 25-cv-3501, 2025 WL 3198970, at *5 (D.D.C. Nov. 17, 2025).

The administrative record provides a window into DHS's understanding of the SAVE "modified system." Notice of a Modified System of Records, 90 Fed. Reg. at 48,948 (DHS AR 114). Internal "Privacy Threshold Analysis" documents from July and September 2025 show that DHS was aware that the modification of SAVE was "not in compliance" with the Privacy Act, DHS AR 277; DHS AR 319, and that "[s]hortfalls in data accuracy" in SSA citizenship data integrated into the new SAVE system "could cause incomplete or false results," DHS AR 260; DHS AR 302. This was in part because "[t]here is no obligation for an individual to report to SSA

a change in their citizenship or immigration status until they request a replacement card or file a claim for a Social Security benefit." SSA AR 103. Thus, a naturalized citizen who applied for a Social Security card or otherwise interacted with SSA prior to naturalization may be incorrectly identified as a non-citizen in SSA records. *Id.*

After the hearing on the Plaintiffs' emergency motion, DHS and SSA both published SORNs (2025 SORNs) for the modifications made to their respective systems. Notice of a Modified System of Records, 90 Fed. Reg. at 48,948–55 (DHS AR 114–21); Notice of a Modified System of Records, 90 Fed. Reg. 50,879 (Nov. 12, 2025) (SSA AR 206) (SSA 2025 SORN); Fed. Defs.' Suppl. Resp. 8, ECF No. 51; Fed. Defs.' Notice of Publication of SORN, ECF No. 54. The 2025 SORNs outlined the "modified system" that resulted from the modification of SAVE in May 2025. Notice of a Modified System of Records, 90 Fed. Reg. at 48,949 (DHS AR 115); *see also* Notice of a Modified System of Records, 90 Fed. Reg. at 50,880 (SSA AR 207). The DHS 2025 SORN established a new "Routine Use L" to enable DHS to disclose records to SSA "and other federal, state, tribal, territorial, local, governments and other authorized entities to assist [SAVE] user agencies [to] determine U.S. citizenship and immigration status of an individual when a DHS approved agreement is in place between DHS and the entity." Notice of a Modified System of Records, 90 Fed. Reg. at 48,954 (DHS AR 120). The SSA 2025 SORN added a new "Routine Use No. 49" for disclosures of "citizenship and immigration status" to DHS "pursuant to 8 U.S.C. [§] 1373(a)." Notice of a Modified System of Records, 90 Fed. Reg. at 50,883 (SSA AR 210). The 2025 SORNs solicited comments from the public—but they also provided that the modified SAVE system outlined in the 2025 SORNs would be effective immediately (*i.e.*, before the public could submit comments). *See* Notice of a Modified System of Records, 90 Fed. Reg. at 48,949 (DHS AR 115); Notice of a Modified System of Records, 90 Fed. Reg. at 50,880 (SSA AR 207)

(recognizing immediate effect except for new routine uses which would automatically take effect after thirty days). The modified system that resulted from the Federal Defendants' self-described "overhaul" of SAVE differed from SAVE's prior functionality (authorized by DHS's 2020 SORN) in three primary ways. *See* DHS AR 493.

*First*, the old SAVE did not previously have access to the records of natural-born citizens unless those individuals had some other interaction with DHS, *e.g.*, as a sponsor of a non-citizen. *See* Notice of Modified System of Records, 85 Fed. Reg. at 31,801 (DHS AR 111). But the new SAVE includes records about "U.S. citizens by birth." Notice of a Modified System of Records, 90 Fed. Reg. at 48,949–51 (DHS AR 115–17).

*Second*, the old SAVE only accessed records stored in DHS systems, along with certain immigration-related records systems at the State Department and the Department of Justice identified in the 2020 SAVE SORN. *See* Notice of Modified System of Records, 85 Fed Reg. at 31,802 (DHS AR 112). The old SAVE did not access SSA databases and SAVE users could not run initial SAVE searches using an individual's SSN or partial SSN. Notice of Modified System of Records, 85 Fed Reg. at 31,798–99, 31,802 (DHS AR 108–09, 112). Instead, users had to provide an individual's DHS numeric identifier (*e.g.*, an alien registration number or A-Number). Notice of Modified System of Records, 85 Fed Reg. at 31,799 (DHS AR 09); DHS AR 248; DHS AR 399. The old SAVE only had access to Social Security numbers "in very limited circumstances" when benefits applicants submitted that number through DHS's Form G-845, a form used to document a person's immigration status and verify their identity. Notice of Modified System of Records, 85 Fed Reg. at 31,802 (DHS AR 111). Previously, "[i]f SAVE display[ed] an 'Institute Additional Verification' message," SAVE users could require completion of the form "G-845 with the applicant's knowledge and consent," which could include a social security

number. DHS AR 192; *see also* DHS AR 205–06, 278. But beyond this circumstance, SAVE did not have access to social security numbers. *See* Notice of Modified System of Records, 85 Fed Reg. at 31,802 (DHS AR 112); DHS AR 278. Because most U.S.-born citizens do not have DHS numeric identifiers, before 2025 SAVE generally did not query the records of natural-born U.S. citizens. *See* DHS AR 248.

Meanwhile, the new SAVE "update[d] the categories of records in the system to include collecting both full and truncated (last four digits) Social Security number[s]" and added the SSA Master File as a "record source" for SAVE. Notice of a Modified System of Records, 90 Fed. Reg. at 48,949 (DHS AR 115). The result is that SAVE users may use the modified system to query any non-citizen, naturalized citizen, and natural-born citizen who have Social Security numbers in the SSA Master File. *See* DHS AR 248.

*Third*, the old SAVE could only conduct individual searches; SAVE users could not conduct bulk searches of more than one person's data at a time. *See* DHS AR 247. But the new SAVE added "the capability to create cases in SAVE by uploading a file with a list of multiple cases" for a bulk search. Notice of a Modified System of Records, 90 Fed. Reg. at 48,951 (DHS AR 117).

**4. Modified SAVE's User Experience**

The SAVE "modified system" operates as follows. *Id.* at 48,948 (DHS AR 114). After user agencies execute an MOA or CMA with USCIS, which establish "the terms and conditions for the user agency's participation in SAVE," DHS AR 195–96; *see also* DHS AR 223; DHS AR 1344, those users may conduct bulk searches.

A SAVE user first downloads a spreadsheet and manually enters some or all the following data: first name, last name, date of birth, either a full or partial SSN, and the reason for verification

(*e.g.*, voter verification). DHS AR 1443. The SAVE user can also provide voters' DHS numeric identifiers (*e.g.*, an A-number). DHS AR 225; DHS AR 2. The user then uploads the completed file into the SAVE interface. DHS AR 1444. Once that happens, SAVE automatically discloses the voters' uploaded data to SSA and uses it to search the SSA Master File. *See* DHS AR 224–25; DHS AR 253; DHS AR 1525. SSA automatically discloses the SSA Master File search results to DHS, including the following fields:

- SSN Match (True/False);
- Full SSN for all matches (when a partial SSN is provided);
- Name Match (True/False);
- Date of Birth Match (True/False);
- Citizenship/Foreign Indicator:
  - Blank – Citizenship code is blank and foreign-born indicator is blank;
  - "A" – U.S. citizen;
  - "B" – Legal alien, eligible to work;
  - "C" – Legal alien, not eligible to work;
  - "D" – Other;
  - "E" – Alien student, restricted work authorized; and
  - "F" – Conditionally legalized alien;
- Foreign Born indicator (citizenship code is not present, but voter was foreign born);
- State/Country Code;
- American Samoa indicator (True/False);
- Alien Registration number (where applicable);
- Death indicator (Yes Deceased/Not Deceased); and
- Error code descriptions (transaction and record levels).

Notice of a Modified System of Records, 90 Fed. Reg. at 48,950 (DHS AR 116); DHS AR 225–26; DHS AR 233; DHS AR 424; DHS AR 437–38.

If the search identifies a potential non-U.S. citizen and a DHS numeric identifier is available (either from the user's initial input or SSA records), SAVE automatically queries

additional systems across the federal government, DHS AR 1450–58; DHS AR 1525; Notice of a Modified System of Records, 90 Fed. Reg. at 48,953–54 (DHS AR 119–20); DHS AR 227–30. After a manual review of responses, SAVE may then return a response that will either include the voter's citizenship status—*e.g.*, "U.S. Citizen" or "Lawful Permanent Resident"—or request additional actions by the SAVE user, including requesting the submission of additional documents. DHS AR 1525; DHS AR 1507; DHS AR 1378–79; DHS AR 1530.

If the match to SSA records is inconclusive, the SSA records confirm that a voter is a citizen or is deceased, or SAVE identifies a potential non-U.S. citizen status and no DHS numeric identifier is available, then SAVE ends the automated query, DHS AR 254–55; DHS AR 297, and generates one of the following responses:

- U.S. Citizen (per SSA Record);
- Deceased (per SSA record);
- Immigration Enumerator [*i.e.* DHS identifier] Required – Resubmit with Additional Information;
- Unable to Return Record from SSA – Resubmit with Additional Information; or
- Full SSN Required – Resubmit with Additional Information.

DHS AR 1379.

If SAVE identifies a voter as a citizen, then the SAVE user need not take any further steps or gather "additional information." *See* DHS AR 1507–08. If SAVE identifies the individual as anything else, then the template SAVE MOA directs the SAVE user to "contact the registrant or registered voter to obtain proof of U.S. citizenship." DHS AR 762. And if the SAVE result is inconclusive (*e.g.*, SAVE provides an "Immigration Enumerator Required – Resubmit with Additional Information" response), then (1) the SAVE user must provide the voter's DHS numeric identifier (which state and local agencies likely do not possess), and/or (2) the SAVE user must

"contact the registrant or registered voter to obtain proof of U.S. citizenship." *See* DHS AR 762; DHS AR 1526.

**D. Procedural Background**

On January 21, 2026, after the comment period expired for the 2025 SORNs, the Plaintiffs—the League of Women Voters, League of Women Voters of Texas, League of Women Voters of Louisiana, League of Women Voters of Louisiana Education Fund, League of Women Voters of Virginia, and the Electronic Privacy Information Center (EPIC)—filed an Amended and Supplemental Complaint challenging the three major modifications to the SAVE system outlined in those SORNs. Am. Compl., ECF No. 61. On April 6, 2026, the Court permitted the State of Texas, a SAVE user, to intervene as a Defendant in this action. Order, ECF No. 86. The Plaintiffs moved for summary judgment, asking this Court to set aside and vacate the modified SAVE system and 2025 SORNs as unlawful under the APA and the Constitution. Pls.' Mem. Supp. Summ. J. Mot., ECF No. 66-1 (Pls.' Mot.). The Federal Defendants cross-moved for either dismissal of this action for lack of subject matter jurisdiction and failure to state a claim or for summary judgment. Fed. Defs.' Combined Mem. Supp. Mot. Dismiss/Mot. Summ. J. and Opp'n to Pls.' Mot. (Fed. Defs.' Mot.), ECF No. 77-1. And the State of Texas moved to dismiss for lack of subject matter jurisdiction and failure to state a claim. Texas Mot. Dismiss (Texas Mot.), ECF No. 97. These motions are fully briefed and ripe for review. Pls.' Combined Reply & Opp'n to Fed. Defs.' Mot. (Pls.' Reply), ECF Nos. 99 & 100; Pls.' Opp'n to Texas Mot. (Pls.' Opp'n), ECF No. 104; Texas Reply, ECF No. 105; Fed. Defs.' Reply, ECF No. 106.[2]

[2] The Court has received and considered amicus briefs in support of the Plaintiffs filed by Travis County, Travis County Tax Assessor-Collector Celia Israel, and Travis County Clerk Dyana Limon-Mercado; Campaign Legal Center, Center for Media and Democracy, Common Cause, and Protect Democracy Project; Texas Civil Rights Project; Lawyers Defending American

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of an APA challenge, summary judgment "serves as a mechanism for deciding, as a matter of law, whether the administrative record supports the agency action and whether the agency action is consistent with the APA standard of review." *Int'l Swaps & Derivatives Ass'n v. U.S. CFTC*, 887 F. Supp. 2d 259, 266 (D.D.C. 2012) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

"A motion under Rule 12(b)(1) 'presents a threshold challenge to a court's [subject-matter] jurisdiction.'" *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 69 (D.D.C. 2022) (quoting *Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85, 89 (D.D.C. 2011)). The plaintiff "bears the burden of proving by a preponderance of the evidence that the Court has subject-matter jurisdiction over her claims." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 69 (D.D.C. 2011). When evaluating a motion under Rule 12(b)(1), "the court may consider documents outside the pleadings to assure itself that it has jurisdiction." *Sandoval v. U.S. DOJ*, 322 F. Supp. 3d 101, 104 (D.D.C. 2018).

Under Rule 12(b)(6), a court must dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts "must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). But

---

Democracy, Inc.; Service Employees International Union; and the American Civil Liberties Union. ECF Nos. 68, 89, 91, 87, 88 & 94.

courts need not accept as true "a legal conclusion couched as a factual allegation," nor an "inference[] . . . unsupported by the facts set out in the complaint." *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (first quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986); and then quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## DISCUSSION

The Plaintiffs contend that the Federal Defendants have unlawfully established a modified SAVE system of records in violation of the APA and the Constitution. Specifically, they argue that the establishment of the modified SAVE and the 2025 SORNs (1) violated the APA because of substantive provisions in the Social Security Act and the Privacy Act, (2) violated certain procedural protections in the Privacy Act and are arbitrary and capricious under the APA, and (3) violated the constitutional separation of powers. The Plaintiffs seek summary judgment on their claims, asking the Court to hold unlawful, vacate, and set aside the modified SAVE system and the accompanying 2025 SORNs.

The Federal Defendants and the State of Texas (collectively, the Defendants) seek dismissal of the Plaintiffs' claims. They first raise threshold arguments in support of dismissal—arguing that the Plaintiffs lack standing, that the challenged activity is not a final agency action, and that the Plaintiffs have an adequate remedy elsewhere. They also defend the establishment of the modified SAVE and the 2025 SORNs on the merits, asserting that they did not violate the APA or the Constitution and were otherwise authorized by immigration laws.

Having reviewed the comprehensive briefing in this case, the Court is convinced that the Plaintiffs have the better of the arguments. The Defendants' threshold arguments are easily dispensed with. And on the merits, the Court holds that the establishment of the modified SAVE system and the 2025 SORNs are unlawful for at least three reasons. First, they violated the Social Security Act. Second, they violated both substantive and procedural protections in the Privacy Act.

And third, they are arbitrary and capricious in violation of the APA. Because relief is warranted on these claims alone, the Court declines to address the Plaintiffs' remaining claims.[3]

**A. Standing**

Standing leads off. Recall that the Plaintiffs are non-profit organizations. An organization may demonstrate standing by either (1) asserting associational "standing solely as the representative of its members," or (2) identifying an organizational injury "in its own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). To establish associational standing, an organization must show that: "(1) at least one of its members has standing to sue in her or his own right, (2) the interests it seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 (D.C. Cir. 2025) (quoting *Wash. All. of Tech. Workers v. DHS*, 50 F.4th 164, 175 (D.C. Cir. 2022)). The first two prongs are rooted in Article III of the Constitution, but the "third prong is a prudential one" focused on "matters of administrative convenience and efficiency." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–57 (1996).

Here, the Defendants do not appear to challenge the final two prongs. The League of Women Voters and their state affiliates seek to protect the voting rights of their members, which is germane to the League's purpose to "empower voters and defend democracy, including by registering voters and increasing voter participation." Stewart Decl. ¶¶ 2, 7, ECF No. 16-5; *see also* LeBombard Decl. ¶¶ 2, 5, 14, ECF No. 66-7; Suppl. Green Decl. ¶¶ 2, 6, ECF No. 66-8; Porte

[3] The Court need not address the Plaintiffs' constitutional claims; Privacy Act accuracy claims, 5 U.S.C. § 552a(e)(5), (6), (10); claims under Section 1306(a)(1) of the Social Security Act; and mandamus claims to enforce the Computer Matching and Privacy Protection Act.

Decl. ¶¶ 2, 3, 11, 14, ECF No. 16-6. And EPIC seeks to protect the privacy rights of its members, which is germane to its "mission . . . to secure the fundamental right to privacy in the digital age." Butler Decl. ¶ 3, ECF No. 66-10. Furthermore, individual member participation is not necessary where an organization seeks APA vacatur on behalf of its members. *See Powder River Basin Res. Council v. U.S. Dep't of Interior*, 749 F. Supp. 3d 151, 162 (D.D.C. 2024); *Sierra Club v. Perry*, 373 F. Supp. 3d 128, 135 (D.D.C. 2019).

Standing thus turns on whether "at least one of [the Plaintiffs'] members has standing to sue in her or his own right." *Institutional S'holder Servs.*, 142 F.4th at 764 (quoting *Wash. All. of Tech. Workers*, 50 F.4th at 175). "To establish Article III standing, a plaintiff must show (1) injury in fact that is concrete and particularized and actual or imminent rather than conjectural or hypothetical, (2) causation fairly traceable to the defendant's challenged action and (3) redressability by a favorable decision that is likely as opposed to merely speculative." *Am. Whitewater v. FERC*, 125 F.4th 1139, 1150 (D.C. Cir. 2025) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The "plaintiff[] must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). And where an action involves only non-monetary relief, "[o]nly one plaintiff . . . needs standing in order for a particular claim to go forward. . . . That is, if constitutional standing 'can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs to raise that claim.'" *Whitman-Walker Clinic v. U.S. HHS*, 485 F. Supp. 3d 1, 18 (D.D.C. 2020) (quoting *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017)).

Here, the Court concludes that the League of Women Voters and the League of Women Voters of Texas have standing to proceed. *See* Nel Decl., ECF No. 66-3; A. Doe Decl., ECF

No. 66-4; B. Doe Decl., ECF No. 66-5; J. Doe 4 Suppl. Decl., ECF No. 16-3.[4] Their members suffered three types of injuries: privacy or reputational injuries, voter injuries, and procedural injuries. Pls.' Mot. 13.[5] The Court addresses each in turn.

**1. Privacy or Reputational Injuries**

The Plaintiffs first argue that the disclosure of their members' personal information in violation of the Social Security Act and the Privacy Act has caused privacy or reputational injuries that are sufficiently concrete to confer Article III standing. *See id.* The Court agrees.

"[F]or Article III purposes, an injury is 'concrete' if it is similar to a type of harm cognizable at common law." *Pileggi v. Washington Newspaper Publ'g Co.*, 146 F.4th 1219, 1226 (D.C. Cir. 2025) (quoting *TransUnion*, 594 U.S. at 424). Of course, "Article III does not require 'an exact duplicate in American [common-law] history and tradition'"—"an injury is concrete if it has 'a close historical or common-law analogue'" and there is a "close relationship" between the harm that Congress sought to remedy and that analogue. *Id.* (quoting *TransUnion*, 594 U.S. at 424–25). In providing a private cause of action, Congress may even "identif[y] a modern relative of a harm with long common law roots," *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.), and "elevate to the status of legally cognizable injuries [those] concrete, *de facto* injuries that were previously inadequate in law," *TransUnion*, 594 U.S. at 425–26 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Thus, the injury-in-fact requirement is satisfied if a party brings a "private right of action to remedy" a harm recognized in common law or "a harm that is a lesser form of a harm recognized at common law." *Pileggi*, 146 F.4th

[4] Members of local and state Leagues of Women Voters are also members of the League of Women Voters. Stewart Decl. ¶ 6, ECF No. 16-5; Supp. Stewart Decl. ¶ 10, ECF No. 66-5.

[5] Because the Plaintiffs' injuries suffice to confer standing for their claims, the Court does not address the Plaintiffs' argument that organizational or informational standing can also support some of their claims. *See* Pls.' Mot. 13.

at 1227. "Th[e]se include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion*, 594 U.S. at 425.

The Privacy Act "provide[s] certain safeguards for an individual against an invasion of personal privacy." *Cooper*, 566 U.S. at 294–95 (quoting Privacy Act of 1974 § 2(b), 88 Stat. at 1896). "[T]he Act serves interests similar to those protected by defamation and privacy torts"—"there is good reason to infer that Congress relied upon those torts in drafting the Act" and "parallel[ed]" those "common-law torts" in its statutory scheme. *Id.* at 295–96.

Here, the Plaintiffs have established privacy injuries because of the modified SAVE system. They claim that the Federal Defendants have disclosed their members' private information in SSA records (including their SSNs and citizenship status) without their consent through bulk SAVE queries. Specifically, they allege that Texas, Louisiana, and other SAVE users have accessed and continue to have access to this private information through SAVE in violation of the Social Security Act and the Privacy Act. *See* Nel Decl. ¶¶ 27–43; A. Doe Decl. ¶¶ 18, 23–24; B. Doe Decl. ¶¶ 32–44, 46–47; C. Doe Decl. ¶¶ 19–25, ECF No. 66–6. The Plaintiffs further allege that their members provided this private information to SSA when they applied for SSNs, and that they reasonably expected the agency to keep that information confidential and use it only for that purpose. *See* Nel Decl. ¶ 33; A. Doe Decl. ¶ 18; B. Doe Decl. ¶ 38; C. Doe Decl. ¶ 25; Kisselburgh Decl. ¶ 15, ECF No. 66-11; Suppl. Green Decl. ¶ 49; J. Doe 4 Suppl. Decl. ¶ 9; J. Doe 6 Decl. ¶¶ 10, 20, ECF No. 16-8.

The Plaintiffs establish reputational injuries, too. As they tell it, their members include individuals who applied for SSNs when they were non-citizens but have since naturalized. Nel Decl. ¶ 34; A. Doe Decl. ¶¶ 4–6; B. Doe Decl. ¶¶ 4–6; Suppl. Green Decl. ¶¶ 32, 35; J. Doe 4 Suppl. Decl. ¶¶ 2, 8; C. Doe Decl. ¶¶ 4–5; J. Doe 6 Decl. ¶¶ 2, 9. For those individuals, their Social

Security files are outdated and incorrectly list them as non-citizens. Nel Decl. ¶ 34; B. Doe Decl. ¶ 39; Suppl. Green Decl. ¶ 11; J. Doe 4 Suppl. Decl. ¶ 14; C. Doe Decl. ¶ 26; J. Doe 6 Decl. ¶ 15. The Plaintiffs state that their members had no reason to believe that failure to update their citizenship status with SSA would have any impact on their lives. Nel Decl. ¶ 34; A. Doe Decl. ¶ 19; B. Doe Decl. ¶ 39; C Doe Decl. ¶ 26. But because of the Federal Defendants' disclosure of their citizenship status through the modified SAVE, these individuals were identified as potential non-citizens by the State of Texas based on a "comparison of the information in [their] voter registration records with the United States Citizenship and Immigration Services SAVE records." Nel Decl., Ex. 1; A. Doe Decl., Ex. 1; B. Doe Decl., Ex. 2; C. Doe Decl., Ex. 1. And they have had to provide proof of citizenship within thirty days to avoid cancellation of their voter registrations. A. Doe Decl. ¶¶ 11–14 & Ex. 1; C. Doe Decl. ¶¶ 12–14, 18 & Ex. 1. Some of the Plaintiffs' members have had their voter registrations wrongfully cancelled for failure to provide documentation within thirty days of these notices. *See* Nel Decl. ¶¶ 19–21, 24, 26 & Exs. 1, 2; B. Doe Decl. ¶¶ 11–17, 21–22, 24–27, 30–31 & Exs. 1, 2.

The Plaintiffs argue that statutory claims challenging the disclosure of their private information to both DHS and SAVE users have three common-law analogues: intrusion upon seclusion, breach of confidence, and defamation. Pls.' Mot. 14–16. The Court agrees that all three analogues fit the bill. Therefore, it concludes that the Plaintiffs have established concrete injuries that serve as a basis for standing in this Court.

**a. Intrusion Upon Seclusion**

The first analogue is intrusion upon seclusion. Pls.' Mot. 14. An "injury . . . closely analogous to the harm of intrusion upon seclusion" is cognizable under Article III. *Pileggi*, 146 F.4th at 1228. Intrusion upon seclusion is an "intentional[] intrusi[on], physical or otherwise, upon

the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." *Id.* (quoting Restatement (Second) of Torts § 652B (A.L.I. 1977)). Various courts across the country, *see, e.g.*, *Am. Fed. of State, Cnty. & Mun. Emps. v. SSA*, 172 F.4th 361, 369 (4th Cir. 2026) (en banc), and nearly "every court in this circuit" have held that the unauthorized disclosure of Social Security and other "private information" by government employees is the exact type of injury protected by the tort of intrusion upon seclusion, *AFL-CIO v. Dep't of Lab.*, No. 25-cv-339, 2026 WL 879518, at *10 (D.D.C. Mar. 31, 2026) (collecting cases). And the Plaintiffs are challenging just that—an unauthorized disclosure of Social Security and other private information. This supports Article III standing.

The Defendants urge the contrary. They say that intrusion upon seclusion has an additional requirement: "knowledge that a third party is engaged in" the invasion of privacy, relying on the Fourth Circuit's abrogated opinion in *Am. Fed'n of Teachers v. Bessent*, 152 F.4th 162, 172 (4th Cir. 2025), *abrogated by* 172 F.4th 361 (4th Cir. 2026). *See* Fed. Defs.' Mot. 19; Texas Mot. 11–12. That decision reasoned that intrusion upon seclusion is targeted to privacy injuries "that invade[] one's space or disrupt[] one's daily activities," while "[u]nauthorized knowledge of sensitive information" like Social Security information without a "feeling of unease" or "trespass" stemming from knowledge of that disclosure is more akin to "defamation." *Bessent*, 152 F.4th at 172 (citation omitted). *Bessent*'s rationale is both unconvincing and inapposite for three reasons.

First and foremost, *Bessent* was decided on an emergency basis and therefore on an expedited timeline, and it thus concluded only that the plaintiffs there *likely* lacked standing. *Id.* at 171. With more time to consider the issue, the *en banc* Fourth Circuit concluded that *Bessent* misread the Second Restatement of Torts and held instead that disclosure of SSA data is akin to

the tort of intrusion upon seclusion irrespective of knowledge of the disclosure. *Am. Fed. of State, Cnty. & Mun. Emps.*, 172 F.4th at 370–71.

Second, *Bessent* is inapposite. In *Bessent*, none of the plaintiffs alleged that "any particular row of information [in the database] belonging to any particular Plaintiff [was] examined" by a third party. 152 F.4th at 172. In stark contrast, the record here abounds with declarations that SSA handed over individuals' private information to state authorities, that those authorities revoked or threatened to revoke voter registrations based on the unauthorized and inaccurate disclosures, and that the unauthorized and inaccurate disclosures disrupted the individuals' daily lives when they were forced to correct the inaccuracies. *See, e.g.*, A. Doe Decl. ¶¶ 11–14; C. Doe Decl. ¶¶ 12–14, 18. These facts—United States citizens receiving notices from state authorities threatening revocation of their voter registration and possible criminal sanctions based on the unauthorized disclose of inaccurate, private information—undoubtedly create a "feeling of unease when and where one should ideally be at peace." *Bessent*, 152 F.4th at 172.

Third, *Bessent* is unpersuasive on its own terms. Most glaringly, it did not grapple with *TransUnion*'s instruction that Article III does not "require an exact duplicate" to a harm cognizable in common law and that Congress "may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *TransUnion*, 594 U.S. at 425–26, 433 (quoting *Spokeo*, 578 U.S. at 341). Courts considering this instruction have held that the disclosure of SSA data is undoubtedly the "same kind of harm that common law" privacy torts, like intrusion upon seclusion, protect. *See All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 104 (D.D.C. 2025) (quoting *Gadelhak*, 950 F.3d at 462). Indeed, *TransUnion* itself made clear that "retention of information *lawfully* obtained, *without further disclosure*, traditionally has not provided the basis for a lawsuit in American courts," but a different analysis is necessary in

equitable suits where (1) private information is "provided" to third parties, (2) there is a "serious likelihood of disclosure" of that information, or (3) when plaintiffs are "aware of . . . misleading information" provided about them. 594 U.S. at 434, 436 n.7, 438 (emphases added) (cleaned up). Courts have long held that the "*unlawful*" "collection, storage, and use" of private data "qualifies as an invasion of a 'private domain, much like an act of trespass would be'" and "is closely analogous to historical claims for invasion of privacy." *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1155 (7th Cir. 2020) (emphasis added) (cleaned up) (collecting cases and holding that a plaintiff's claim that her workplace unlawfully retained and shared her biometric data with a third-party was sufficiently analogous to historical claims for invasion of privacy to establish an Article III injury).

Accordingly, the Court concludes that the tort of intrusion upon seclusion is a sufficient analogue for the disclosure claims under the Privacy and Social Security Acts. The Plaintiffs have suffered a concrete injury for purposes of Article III standing.

**b. Breach of Confidence**

The Parties next dispute whether the tort of breach of confidence provides an analogue. Pls.' Mot. 14; Fed. Defs.' Mot. 20–21; Texas Mot. 14–15. The tort of breach of confidence—"a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts"—"'lies where a person offers private information to a third party in confidence and the third party reveals that information' to another." *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (first quoting *Spokeo*, 578 U.S. at 340–41; and then quoting *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175, 1190–91 (11th Cir. 2019)). Importantly, breach of confidence bears a close resemblance to the Privacy Act's prohibition on "disclosure" or "use of [a] record for a purpose which is [in]compatible with the purpose for which it was collected."

5 U.S.C. § 552a(a)(7), (b)(3). "[T]here is good reason to infer[, then,] that Congress relied upon [this] tort[] in drafting the Act," *Cooper*, 566 U.S. at 295, and that a violation of this provision in the Privacy Act is a close "analogue" to breach of confidence, *TransUnion*, 594 U.S. at 424. Accordingly, the Court agrees that the Plaintiffs' Privacy Act claim challenging the "wrongful sharing of sensitive information" through SAVE "bears a close relationship to the harms traditionally redressable through . . . breach of confidence" as well. *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 110 (D.D.C. 2026).

**c. Defamation**

Finally, the Plaintiffs also rely on the common law tort of defamation as an analogue for their disclosure injuries. Pls.' Mot. 16. "Under longstanding American law, a person is injured when a defamatory statement 'that would subject him to hatred, contempt, or ridicule' is published to a third party." *TransUnion*, 594 U.S. at 432 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990)) (citing Restatement (First) of Torts § 559 (A.L.I. 1938)). "Any act whereby the defamatory matter is intentionally or negligently communicated to a third person is a publication." Restatement (First) of Torts § 577 cmt. a (A.L.I. 1938). Thus, when a plaintiff is "injured by [the] dissemination of allegedly inaccurate information" to a third party—that injury "bears a close relationship to the common-law tort of defamation" and constitutes an Article III injury. *Ranjan v. U.S. DHS*, 747 F. Supp. 3d 192, 199–200 (D.D.C. 2024). As another judge in this District has explained:

> To understand this [harm], it is useful to begin with the Supreme Court's decision in *TransUnion*. The plaintiff class sued TransUnion, a credit reporting agency, arguing that it had "failed to use reasonable procedures to ensure the accuracy of their credit files." 594 U.S. at 417. For about 1,800 class members, TransUnion had disseminated misleading credit reports to businesses, "label[ing] the class members as potential terrorists, drug traffickers, or serious criminals." *Id.* at 432. The Court analogized that injury to the tort of defamation . . . [where] "a person is injured when a defamatory statement 'that would subject him to hatred, contempt, or

> ridicule' is published to a third party." *Id.* (quoting [*Milkovich*, 497 U.S. at 13]). Because those class members had "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation," the Court had "no trouble concluding" that they had experienced a concrete harm sufficient to confer standing. *Id.* . . . [But] the Court held that the roughly 6,000 [other] class members whose inaccurate reports had never been disseminated could not satisfy the concrete-harm requirement. *Id.* at 434–35[.]

*Ranjan*, 747 F. Supp. 3d at 199–200.

Similarly, here, the undisputed record shows that the Plaintiffs' members have been injured by "dissemination of . . . inaccurate information" falsely indicating that they are non-citizens. *Id.* at 199. Such publication is defamatory not only because it resulted in the revocation or threatened revocation of their voter registrations but because it carries an implication that those members are "serious criminals." *TransUnion*, 594 U.S. at 432; *see* 18 U.S.C. § 611 (criminalizing non-citizen voting); *id.* § 1015 (criminalizing voter registration by non-citizens); Press Release, Tex. Sec'y of State, *Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025), https://www.sos.state.tx.us/about/newsreleases/2025/102025.shtml [https://perma.cc/9WZ2-XVDA] (stating that "individuals who are deemed non-citizens" under SAVE and "that voted in a Texas election will be referred to the Office of the Attorney General" of Texas for investigation). Undoubtedly then, the Plaintiffs have suffered injuries with "a sufficiently close relationship to the harm[s] from . . . false and defamatory statement[s]." *TransUnion*, 594 U.S. at 433.

The Defendants' arguments to the contrary border on the absurd. The Defendants argue that "a former non-citizen being described as a current non-citizen—even if mistakenly and inaccurately, after naturalization—does not come close to" defamation and "is nothing like being labeled a 'potential terrorist.'" Fed. Defs.' Mot. 22; *see also* Texas Mot. 15. The Defendants' view on the importance of citizenship bears little resemblance to reality. *See Schneiderman v. United States*, 320 U.S. 118, 122 (1943) ("[I]t is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to

exaggerate its value and importance. By many it is regarded as the highest hope of civilized men."); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963) ("Citizenship is a most precious right."); *Fedorenko v. United States*, 449 U.S. 490, 506–07 (1981) (citizenship is a "priceless treasure" (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 791 (1950) (Black, J., dissenting))). As evidenced by the actions taken by state authorities in this case, even the mere suggestion of non-citizenship can cause grievous consequences. *See Klapprott v. United States*, 335 U.S. 601, 616 (1949) (Rutledge, J., concurring in judgment) ("To take away a man's citizenship deprives him of a right no less precious than life or liberty, indeed of one which today comprehends those rights and almost all others."). This remains as true for a naturalized citizen as any other. *See Luria v. United States*, 231 U.S. 9, 22 (1913) ("Under our Constitution, a naturalized citizen stands on an equal footing with the native citizen in all respects, save that of eligibility to the Presidency."). Suffice it to say that in the context of voting—where citizenship status can distinguish an engaged voter from a criminal—accusing a registered voter of being a non-citizen counts as, at the very least, "a lesser form" of defamation. *Pileggi*, 146 F.4th at 1227.

* * *

Having found that the Plaintiffs have suffered privacy and reputational injuries, the remaining standing inquiries are easily satisfied. The Defendants do not contest that those injuries are the result of the SAVE modified system, and a favorable decision by this Court would undoubtedly redress those injuries.

**2. Voter Injuries**

The Plaintiffs next argue that they have suffered cognizable Article III voter injuries that can alternatively provide standing for all their claims. Pls.' Mot. 16. The Court agrees.

It goes without saying that voting is "a process 'of the most fundamental significance under our constitutional structure.'" *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77 (2026) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). Thus, "[t]here is no doubt that the right to vote is a legally protected interest" cognizable under Article III of the Constitution. *Am. Encore v. Fontes*, 152 F.4th 1097, 1111 (9th Cir. 2025). And "[a] plaintiff need not have the franchise wholly denied to suffer injury" to this concrete interest. *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005). Voters are injured when "they [a]re wrongly identified as non-citizens" and their franchise is burdened as a result. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). Even an "increased risk" of disenfranchisement can make an injury "sufficiently 'imminent' for standing purposes." *Richardson v. Trump*, 496 F. Supp. 3d 165, 179 (D.D.C. 2020) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017)). For instance, in a challenge to an Arizona law requiring the use of SAVE, the Ninth Circuit found that naturalized voters had standing based on evidence that "SAVE may not" have up-to-date "naturalization records," and the resulting "danger" that "properly registered voters, who in fact are citizens, may have their voter registrations cancelled[,] . . . losing their constitutional right to vote." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708–09 (9th Cir. 2025). And the Eleventh Circuit similarly held that naturalized voters had "standing to prospectively challenge" Florida's "attempt to remove non-citizens from the voter rolls using the SAVE database" based on "potential errors that could occur when the Secretary attempted to confirm their immigration status in various state and federal databases." *Arcia*, 772 F.3d at 1341.

Here, as the Federal Defendants admit, the "Plaintiffs have found four people who were apparently asked to confirm their citizenship to Texas officials." Fed. Defs.' Mot. 24 (citing Nel Decl.; A. Doe Decl.; B. Doe Decl.; C. Doe Decl.). Sworn declarations from those individuals

establish that they were naturalized citizens with inaccurate SSA records; that Texas threatened to revoke their voter registrations because of information obtained through the modified SAVE system; and that they were required to confirm their citizenship to maintain their voter registrations. *See, e.g.*, Nel Decl. ¶¶ 19–21, 24–26, 34 & Exs. 1, 2; A. Doe Decl. ¶¶ 11–14 & Ex. 1; B. Doe Decl. ¶¶ 11–17, 21–22, 24–28, 30–31, 39; C. Doe Decl. ¶¶ 12–14, 18 & Ex. 1. Two members had to provide proof of citizenship to maintain their registered voter status. A. Doe Decl. ¶¶ 11–14; C. Doe Decl. ¶¶ 12–14, 18. One member had her voter registration revoked without her knowledge and was asked to submit new documentation to restore her registration. B. Doe Decl. ¶¶ 11–17, 21–22, 24–27, 30–31. And two members' voter registrations remained revoked at the time that they filed their declarations in this case. Nel Decl. ¶¶ 19–26; B. Doe Decl. ¶¶ 30–31. The Defendants have neither disputed this sworn testimony nor challenged their introduction. *See* Fed. R. Civ. P. 56(c) (requiring a party opposing summary judgment to point to a contrary portion of the record, assert the presence of a dispute, or argue evidence is inadmissible in order to show a genuine dispute of material fact).[6] On this record, the Plaintiffs' voter injuries are sufficient to confer standing.

The Defendants' arguments do not alter this conclusion. First, the Defendants ask this Court to "infer[] . . . that, after denial of their preliminary-injunction motion," the "Plaintiffs went searching for affected individuals, found a few, and signed them up for membership." Fed. Defs.' Mot. 13. If the Defendants are arguing that the Plaintiff organizations engaged in improper solicitation, they cite no record evidence whatsoever to support that claim. And they never asked

[6] Although Rule 56 operates differently with respect to a court's review of an administrative record, Rule 56(c), alongside that rule's other provisions, governs the consideration of declarations in support of standing at the summary judgment posture, even in APA cases. *See, e.g.*, *Teva Pharms. USA, Inc. v. U.S. FDA*, 514 F. Supp. 3d 66, 89 n.3 (D.D.C. 2020).

this Court for discovery on this issue. *See* Fed. Defs.' Mot. 13 n.6 (noting that the Federal Defendants requested this information, did not receive it, but never raised the issue before the Court); Fed. R. Civ. P. 56(e)(2) (permitting the Court to "consider [a] fact undisputed" if the opposing party fails to properly address it). Regardless, the Court can think of no reason why this is relevant to the standing inquiry, and the Defendants certainly do not explain why.

Next, the Defendants characterize the voting-related injury suffered by the member whose voter registration was cancelled because of the modified SAVE as a "past injury." Fed. Defs.' Mot. 24; Texas Mot. 12. They are wrong. This member was facing "continuing, present adverse effects" when the Plaintiffs filed this lawsuit by virtue of her voter registration being cancelled—which is more than enough to satisfy Article III. *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). And nothing in the record suggests that this injury has been redressed. Nel Decl. ¶ 26.

Relatedly, the Federal Defendants suggest that no Article III injury exists because the identified members "hav[e] now had the opportunity to correct their records" and have not claimed "any paperwork issues" preventing them from doing so. Fed. Defs.' Mot. 24–25; Fed. Defs.' Reply 10. But it is well established that the need to take "affirmative steps to avoid the risk of harm" is itself an Article III injury. *Meese v. Keene*, 481 U.S. 465, 475 (1987). And the "disruption of daily activities" to correct one's citizenship information to vote is an injury-in-fact under Article III. *Env't Def. Fund v. FERC*, 2 F.4th 953, 971 (D.C. Cir. 2021) (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017)); B. Doe Dec.; ¶¶ 19–23 (describing various phone calls with Texas election officials to determine why their voter registration was cancelled and how to fix it). The same is true of the pocket-book injury of "even a small amount of money," such as the cost of printing, postage, and obtaining an envelope to correct one's voter registration. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017); *see also Mack v. Resurgent Cap.*

*Servs., L.P.*, 70 F.4th 395, 405–07 (7th Cir. 2023) (holding that the time, effort, and money for postage that a consumer spent responding to improper debt collector communication constituted a concrete injury); *Ebaugh v. Medicredit, Inc.*, No. 24-1838, 2025 WL 1088077, at *1 (8th Cir. Apr. 11, 2025) (same); *See* B. Doe Decl. ¶ 23 (resubmitting voter registration forms was necessary when their voter registration was cancelled due to SAVE).

In any event, "past wrongs may serve as evidence" of "a real and immediate threat of repeated injury" as well. *Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) (cleaned up) (quoting *N.B. ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 84 (D.C. Cir. 2012)). That risk is particularly pronounced on this record. The Plaintiffs have produced affidavits from individuals whose citizenship status in SSA records is incorrect and who live in states that have agreements with the Federal Defendants to use the modified SAVE to purge voter rolls. J. Doe 4 Decl. ¶¶ 8–12; J. Doe 6 Decl. ¶¶ 5, 14–15. The administrative record shows that DHS "assumes the accuracy of the Social Security Administration data" in its operation of SAVE, and thus, the system runs the risk of "incomplete or false results" when individuals with inaccurate SSA data are run through it. DHS AR 260; DHS AR 302; *see also* DHS AR 760 n.2. Indeed, the State of Texas does not dispute that an independent investigation in Travis County, Texas, found that "twenty-five percent of the non-citizen matches" in that county were individuals who had already proven citizenship in the United States. Texas Mot. 17 (quoting Am. Compl. ¶¶ 141–42). The administrative record also shows that, pursuant to its template agreement, DHS requires SAVE users to "contact the registrant or registered voter to obtain proof of U.S. citizenship" "in all cases where the User Agency receives any SAVE response other than that of U.S. citizen." DHS AR 762. Thus, the Plaintiffs have shown that their members will necessarily need to take "affirmative steps to avoid the risk of harm" that accompanies being labeled a potentially ineligible voter should the modified SAVE system

continue to operate. *Meese*, 481 U.S. at 475. This is sufficient to demonstrate an Article III injury. *See Mi Familia Vota*, 129 F.4th at 708–09; *Arcia*, 772 F.3d at 1341; *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (holding that the "experience of the Kansas League" showed it was "almost certain that similar obstacles to registration will spring up in Alabama and Georgia when those States decide to enforce their [proof-of-citizenship] laws").

The Defendants make much of the fact that only a small proportion of the U.S. electorate are naturalized voters with potentially inaccurate citizenship data in SSA records. This is a red herring. The fact that only a "tiny number" of people are impacted by unlawful activity does not mean that an Article III injury is not present. *Contra* Texas Mot. 16. Members of the Plaintiff organizations are among those people—they live in States that have agreed to use SAVE data to purge voter rolls and their SSA citizenship data is out of date. J. Doe 4 Decl. ¶¶ 8–12; Doe 6 Decl. ¶¶ 5, 15. The rule is not that an injury must be a generally shared grievance for it to be brought in federal court. Rather, to sustain an action, an organization need only show that "one of its members" suffered a particularized harm. *Institutional S'holder Servs.*, 142 F.4th at 764 (quoting *Wash. All. of Tech. Workers*, 50 F.4th at 175). And in this context, "even one disenfranchised voter" is one "too many." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014).

Having established cognizable voter injuries, the Court turns to causation and redressability. The Federal Defendants contend that the Plaintiffs' voter injuries are caused by "the independent action of some third party not before the court"—namely, states such as Texas. Fed. Defs.' Mot. 25–26 (citation omitted). Before addressing the Federal Defendants' argument head on, the Court notes that Texas is now a Defendant in this case. And "[w]hen a party intervenes, it becomes a full participant in the lawsuit and is treated just as if it were an original party"—the

Court's decision constitutes a "complete adjudication" on the merits and "the possibility that the plaintiff will be able to obtain relief against the intervenor-defendant is part of the price paid for intervention." *Schneider v. Dumbarton Devs., Inc.*, 767 F.2d 1007, 1017 (D.C. Cir. 1985) (first quoting *United States v. Oregon*, 657 F.2d 1009, 1014 (8th Cir. 1981); and then quoting *District of Columbia v. MSPB*, 762 F.2d 129, 132 (D.C. Cir. 1985)); *see also Food & Water Watch v. U.S. EPA*, 5 F. Supp. 3d 62, 67 n.1 (D.D.C. 2013); *Donovan v. Oil, Chem., & Atomic Workers Int'l Union & Its Loc. 4-23*, 718 F.2d 1341, 1350–51 (5th Cir. 1983); *United States v. Jim*, 891 F.3d 1242, 1252–53 (11th Cir. 2018).

Nevertheless, the Federal Defendants' argument about third parties does not change the result. As the Federal Defendants recognize, Article III "requires no more than *de facto* causality." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)); Fed. Defs.' Mot. 26–27. A plaintiff has standing to sue the federal government if "'third parties will likely react' to the government['s] [action] (or judicial relief) 'in predictable ways' that will likely cause (or redress) the plaintiff's injury." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (quoting *Alliance for Hippocratic Medicine*, 602 U.S. 367, 383 (2024)). The Defendants argue that states are the true cause of the Plaintiffs' injuries because "[n]o voter is cancelled from the rolls based solely on a SAVE response"; rather, Texas engages in "additional verification" before cancelling voter registration. Texas Mot. 17; *see also* Fed. Defs.' Mot 26–27. But as explained above, that additional verification is itself an Article III injury. And the undisputed record shows that the Plaintiffs' members suffer that injury because "SAVE records show that [they] are not . . . United States citizen[s]." B. Doe Decl., Ex. 2. It is hardly surprising that additional voter verification and potential voter disenfranchisement is "the predictable effect of" the federal government incorrectly informing a state that an individual may

be ineligible to vote. *Hawkins v. Haaland*, 991 F.3d 216, 225 (D.C. Cir. 2021) (quoting *New York*, 588 U.S. at 768).

Furthermore, this injury "is likely to be redressed by a favorable judicial decision." *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Spokeo*, 578 U.S. at 338). Reverting SAVE to its prior functionality before the recent changes—without the inaccurate SSA data labeling the Plaintiffs' members as non-citizens—would likely redress the Plaintiffs' harms. Their future harms from "potential errors" would certainly be redressed. *Arcia*, 772 F.3d at 1341; *see also Mi Familia Vota*, 129 F.4th at 708–09.

**3. Procedural Injuries**

Finally, the Parties seem to dispute whether the Plaintiffs have standing to pursue their procedural claims under the Privacy Act and the APA as well. *See* Pls.' Mot. 22–25; Fed. Defs.' Mot. 11–32; Texas Mot. 12–21. The Court finds that these injuries, too, are sufficient to support standing.

Again, to demonstrate standing, a plaintiff must show: (1) that she suffered an "injury in fact" that is concrete, particularized, and imminent, (2) that there is a fairly traceable "causal connection between the injury and the conduct complained of," and (3) that it is "likely" rather than "speculative" that "the injury will be redressed by a favorable decision." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting *Lujan*, 504 U.S. at 560–61). But for a procedural injury, "courts relax—while not wholly eliminating—the issues of imminence and redressability[.]" *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005); *see Brown*, 600 U.S. at 561. A plaintiff need only show "some concrete interest that is affected by the deprivation." *Brown*, 600 U.S. at 562 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009)). A plaintiff need not demonstrate that observing proper procedure "would have led to (caused) a

different substantive outcome." *Id.* at 565–66. Rather, the question is whether an agency's "*substantive* decisions" have any "causal relationship" to the interests that the plaintiff seeks to vindicate. *Id.* at 566.

For instance, "a plaintiff with concrete plans to observe nature in a particular area 'would be harmed if [a] [land-management project] went forward without incorporation of the ideas he would have suggested' in his comments." *Id.* (second alteration in original) (quoting *Summers*, 555 U.S. at 494). This is true even if it is "uncertain whether public comment would alter [that] particular land-management decision[.]" *Id.* "A person 'living adjacent to the site for proposed construction of a federally licensed dam'" similarly "has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered." *Id.* at 561 (quoting *Lujan*, 504 U.S. at 572 n.7). "In th[ese] context[s], the fact that the defendant might well come to the same decision[s] after abiding by the contested procedural requirement does not deprive a plaintiff of standing." *Id.* at 561–62. On the other hand, a plaintiff cannot bring a procedural challenge to an agency action that bears no relationship to the "*substantive* decisions" made by that agency. *Id.* at 566. For instance, a plaintiff whose application for a statutory benefit was denied cannot challenge an agency's procedure in deciding "to give other people [that benefit] under a different statutory scheme." *Id.* at 565 (emphasis omitted). That plaintiff's injury—denial of the statutory benefit—cannot be "traced" because the agency's procedures governed a different kind of benefit altogether. *Id.* at 567 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43 (1976)). The question is whether the "procedural right" a plaintiff seeks to vindicate has any bearing on the "protect[ion]" of the "concrete interest[s]" of that plaintiff. *Ctr. for L. & Educ.*, 396 F.3d at 1157 (emphasis omitted).

Here, as discussed, the Plaintiffs' "legally protect[able] interest[s]" in privacy and voting have been put at risk by the Federal Defendants' failure to comply with the procedural requirements of the Privacy Act and the APA. *See Fontes*, 152 F.4th at 1111. And the Federal Defendants' failure to follow these procedures deprived the Plaintiffs of the "adequate safeguards . . . to prevent misuse of [their] information" that the law provides. Privacy Act of 1974 § 2(b)(1), (4), 88 Stat. at 1896. Without these safeguards, the Plaintiffs were subject to nonconsensual disclosure of their private information to DHS and SAVE users and the voter injuries that resulted from inaccuracies in that data—the types of harms that these procedures were designed to remedy. Undoubtedly then, the Plaintiffs have also shown that they have met the relaxed standard for procedural standing based on the threat to their privacy and voting interests.

* * *

In sum, the Plaintiffs have unlocked three doors to show concrete injuries suffered by their members. And with causation and redressability, they have sufficiently met their burden of establishing Article III standing.

**B. Final Agency Action**

Moving to the next threshold argument, the Defendants contend that the establishment of the modified SAVE system outlined in the DHS and SSA SORNs does not constitute a final agency action reviewable under the APA. Texas Mot. 21–23; Fed. Defs.' Mot. 36–38. This does not pass muster.

The APA only permits review of "final agency action." 5 U.S.C. § 704. An agency action is final if it is (1) "the consummation of the agency's decision-making process," and (2) an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1026 (D.C. Cir. 2016) (quoting *Bennett v.*

*Spear*, 520 U.S. 154, 177–78 (1997)). But whether rights or obligations have been determined or "'legal consequences will flow' from an agency action is a 'pragmatic' inquiry." *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016)). Courts focus on the "concrete consequences" of the "agency action" at issue. *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019).

The D.C. Circuit has long recognized that establishing "a policy of disclosing confidential information without notice" constitutes a final agency action—observing that "permitting [federal] employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process.'" *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (quoting *Bennett*, 520 U.S. at 177–78). After all, such a policy both determines "the submitter's rights" over the information handed over "and the agency's obligations" on how to handle that information. *Id.* (cleaned up). This is the exact result of the establishment of the SAVE "modified system" outlined in the 2025 SORNs. Notice of a Modified System of Records, 90 Fed. Reg. at 48,948 (DHS AR 114); *see also* Notice of a Modified System of Records, 90 Fed. Reg. at 50,879–84 (SSA AR 206–11). Those SORNs—which "illuminate[] the nature of the policy"—reflect that establishing the modified system constituted the adoption of "a policy of disclosing confidential information without notice." *Venetian Casino*, 530 F.3d at 931. Thus, establishing the SAVE modified system of records, as it is described in the 2025 SORNs, is a final agency action.

In addition, the Plaintiffs challenge the SORNs themselves, which also count as final agency action. *See* Pls.' Reply 23.The SORNs permitted new "routine use[s] of the records contained in the system[]" that they described and laid out "the policies and practices of the agency

regarding storage, retrievability, access controls, retention, and disposal of the records." 5 U.S.C. § 552a(e)(4)(D)–(E); *see* Notice of a Modified System of Records, 90 Fed. Reg. at 48,948–49 (DHS AR 114–15); Notice of a Modified System of Records, 90 Fed. Reg. at 50,880 (SSA AR 207).[7]

The Defendants try to argue otherwise by relying on the D.C. Circuit's decision in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1236 (D.C. Cir. 2026). Fed. Defs.' Mot. 37–38; Texas Mot. 5. But that case is inapposite. There, the D.C. Circuit held that when the "text of the statute unambiguously authorizes . . . disclosure" of information, then a memorandum of understanding explaining how that mandated disclosure will be executed is not a final agency action. *Centro de Trabajadores Unidos*, 167 F.4th at 1234. This is because the memorandum "does not impose binding duties—and therefore causes no legal consequences—when it merely clarifies existing duties under a statute." *Id.* at 1236 (cleaned up).

But unlike the statute at issue in *Centro*, the Privacy Act only authorizes a routine use disclosure "within the scope of a routine use notice published by the agency." *Ames v. U.S. DHS*, 861 F.3d 238, 240 (D.C. Cir. 2017) (citing 5 U.S.C. § 552a(a)(7), (e)(4)(D)). Thus, the 2025 DHS and SSA SORNs are undoubtedly final agency actions, because the "concrete consequence[]" of their promulgation is authorizing the challenged disclosures to occur, a consequence not authorized by any other separate statutory mandate. *Cal. Cmtys. Against Toxics*, 934 F.3d at 637; *see Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("[D]ocument[s] reflecting a settled agency position and having legal consequences . . . may constitute 'final agency action' for

---

[7] The 2025 SSA SORN provided that its authorization of new routine uses would become automatically effective after thirty days. Notice of a Modified System of Records, 90 Fed. Reg. 50,879, 50,880 (Nov. 12, 2025) (SSA AR 207) Thus, even if the SORN did not constitute final agency action when it was issued, it certainly does now.

the purpose of judicial review."). The SORNs act both as final "agency statement[s] of . . . future effect designed to implement" the modified SAVE system and "license[s]" "permit[ting]" or acting as a "form of permission" for the system, routine uses, and disclosures that they outline. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (first alteration in original) (quoting 5 U.S.C.§ 551). Both the establishment of the modified SAVE system described by the 2025 SORNs and the SORNs themselves are final agency actions that may be challenged under the APA.

### C. The Social Security Act

Turning to the merits, the Plaintiffs first argue that the modified SAVE system of records violates the Social Security Act. They are correct.[8]

The Social Security Act instructs that: "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I). An "authorized person" is "an officer or employee of the United States, an officer or employee of any State, political subdivision of a State, or agency of a State or political subdivision of a State, and any other person" who has access to such records. *Id.* § 405(c)(2)(C)(viii)(III).

There can be no question that the modified SAVE system violates this prohibition—the system discloses both Social Security numbers and related records maintained by SSA. And the Defendants do not argue otherwise. Instead, they contend that the Plaintiffs lack a cause of action to enforce the Social Security Act—relying on inapposite cases where the relevant cause of action

---

[8] Because the Plaintiffs succeed on their Social Security Act claim based on 42 U.S.C. § 405(c)(2)(C)(viii)(I), the Court does not address their alternative argument that the modified SAVE also violates 42 U.S.C. § 1306(a)(1). Pls.' Mot. 32.

was not the APA. Fed. Defs.' Mot. 50 (citing *Biccum v. City of Watertown*, No. 17-cv-645, 2019 WL 4752927 (N.D.N.Y. Sep. 30, 2019) (concerning a Section 1983 claim)). But the Defendants ignore that "the APA provides an omnibus cause of action for violations of other statutes." *FDA v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 n.4 (2025). The Plaintiffs' claim challenging compliance with the Social Security Act was brought under the APA. *See* Am Compl. ¶ 204. And the APA's judicial review provision, 5 U.S.C. § 702, "permits suit[s]" by any person aggrieved by agency action "for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). The Defendants do not explain why the APA's cause of action may not be used to remedy the Plaintiffs' injuries caused by violations of the Social Security Act. Indeed, the Defendants' briefs are devoid of any mention of this subject. *See* Fed. Defs.' Mot. 49–50; Texas Mot. 26–27. Accordingly, the Defendants have conceded both (1) that an APA cause of action exists for this claim, and (2) that the Social Security Act forbids disclosure of SSA data to DHS or in responses to SAVE users. *Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." (quoting *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014))). By itself, this is sufficient for the Plaintiffs to prevail.[9]

**D. The Privacy Act**

But there is more. Turning to the Privacy Act, the Plaintiffs argue that the SAVE modified system violates the Act's substantive and procedural protections. Pls.' Mot. 35–40. The

---

[9] The Defendants do argue that other statutes authorize the disclosure notwithstanding the Social Security Act, which the Court addresses below. *See infra* Discussion F; *see also* Fed. Defs.' Mot. 49–50; Texas Mot. 26–27.

Defendants challenge the Plaintiffs' ability to bring these claims under the APA and argue that they fail in any event. *See* Fed. Defs.' Mot. 54–59. The Plaintiffs' arguments are more persuasive.

### 1. Other-Adequate-Remedy Bar

First, the Defendants argue that the Plaintiffs' Privacy Act claims fail because "judicial review" under the APA is not available when there is "[an]other adequate remedy in a court." 5 U.S.C. § 704; Fed. Defs.' Mot. 39. They point out that the Privacy Act provides judicial remedies for some violations but does not authorize equitable relief to enforce the statute's notice and comment requirements or its limitations on disclosure. *See* Fed. Defs.' Mot. 40–41 (citing 5 U.S.C. § 552a(g)); *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007). Because the Privacy Act provides limited avenues for judicial review, 5 U.S.C. § 552a(g), the Federal Defendants argue that Section 704 precludes APA relief based on that "other . . . remedy," 5 U.S.C. § 704. *See* Fed. Defs.' Mot. 39; Texas Mot. 23–24.

It is true that courts in this District have precluded APA suits for Privacy Act violations when they "duplicate existing procedures for review of agency action." *Haleem v. U.S. Dep't of Def.*, No. 23-cv-1471, 2024 WL 230289, at *13–14 (D.D.C. Jan. 22, 2024) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)). But these precedents are inapplicable to the statute's procedural requirements, 5 U.S.C. § 552a(e)(4), (11), and to forward-looking remedies to enforce the statute's disclosure provisions, 5 U.S.C. § 552a(b), for which the Privacy Act does not "offer[] relief of the same genre," *Haleem*, 2024 WL 230289, at *13 (quoting *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)). Rather than suggesting a bar on APA review, the "absence of equitable relief" for these claims in the Privacy Act's judicial review provisions is easily "explained by the availability of such relief under the APA," *Cooper*, 566 U.S. at 303 n.12 (characterizing *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004)); *see also id.* ("The [Privacy] Act deters violations of its

substantive provisions in other ways—for instance . . . possibly by allowing for injunctive relief under the [APA]" (citations omitted)).[10]

Indeed, the D.C. Circuit has held that APA equitable or vacatur relief is available for Privacy Act violations in a case where "the Privacy Act does not by itself authorize the injunctive relief sought" by a plaintiff. *Doe v. Stephens*, 851 F.2d 1457, 1463, 1465–67 (D.C. Cir. 1988) (challenging agency disclosure as not constituting a routine use under 5 U.S.C. § 552a(a)(7), (b)). Various district courts have similarly rejected the Defendants' reading of Section 704. *See Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 43 (D.D.C. 2025); *Am. Fed'n of Gov't Emps. v. U.S. OPM*, 786 F. Supp. 3d 647, 691–92 (S.D.N.Y. 2025); *Doe v. Noem*, 783 F. Supp. 3d 907, 923–24 (W.D. Va. 2025). And the Supreme Court has cautioned that the APA's other-adequate-remedy bar, 5 U.S.C. § 704, should be "construed" narrowly and primarily to avoid "duplication," rather than "to defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action." *Bowen*, 487 U.S. at 903. "The mere fact that some acts are made reviewable," *Abbott*

[10] The Court notes that the inquiry is more complex for 5 U.S.C. § 552a(e)(5) and (e)(6), which require federal agencies to ensure the "accura[cy], complete[ess], timel[iness], and relevan[ce]" of records maintained to "mak[e] any determination about any individual" or that are "disseminated . . . to any person other than an agency." These provisions are violated when it is reasonably "feasible, necessary, and proper for the agency . . . to determine whether each filed item of information is accurate," timely, and relevant, but the agency fails to do so. *Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859, 866 (D.C. Cir. 1989) (quoting *Doe v. United States*, 821 F.2d 694 (D.C. Cir. 1987) (en banc)). The Privacy Act provides for some injunctive relief when an agency fails to correct records "which the individual believes is not accurate, relevant, timely, or complete." 5 U.S.C. § 552a(d)(2)–(3), (g)(1)(A). But the D.C. Circuit has made clear that the Privacy Act's remedial provisions were not "intended to be [the] exclusive" remedies for such violations. *Vymetalik v. F.B.I.*, 785 F.2d 1090, 1098 n.12 (D.C. Cir. 1986). And it is evident that Sections 552(e)(5) and (6) were violated here. *See, e.g.*, DHS AR 240 (finding "risk" that the modified SAVE "may share inaccurate information with registered agencies"); DHS AR 260 (recognizing the modified SAVE's "[s]hortfalls in data accuracy"); DHS AR 302 (same); SSA AR 44 ("[C]itizenship information in SSA's records might not be current."). Nevertheless, the Court does not rest its conclusion with respect to the Privacy Act on these violations given that the Federal Defendants also violated other provisions of the Privacy Act for which there is unambiguously no adequate relief for the Plaintiffs other than 5 U.S.C. §§ 702, 706.

*Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967) (citation omitted), or that "a naked money judgment" could be sought does not preclude APA review, *Bowen*, 487 U.S. at 905.

Stepping back, it is unclear whether the APA's other-adequate-remedy bar even applies to the Privacy Act. 5 U.S.C. § 704. Although courts commonly use terms like the "Administrative Procedure Act" (or the "Freedom of Information Act") to refer to the parts of Title 5 that carry forward the substantive provisions of that Act, that language is technically imprecise. It is true that the provisions of Chapter 5 and Chapter 7 of Title 5 "were originally enacted by act June 11, 1946, ch. 324, 60 Stat. 237, popularly known as the 'Administrative Procedure Act.'" 5 U.S.C. ch. 5, subch. II note. But the Administrative Procedure Act was actually "repealed as part of [a] general revision" by Congress in 1966. *Id.* In that revision, Congress repealed various statutes "relating to the organization of government" and reenacted them as a single consolidated "Act" known as "title 5." Pub. L. No. 89–554, pmbl., §§ 7(a), 8, 80 Stat. 378, 378, 631–32 (1966). The APA was one of the statutes repealed, *id.* § 8, 80 Stat. at 632 (repealing the APA, Pub. L. No. 79–404, 60 Stat. 237 (1946)), and Congress reenacted its provisions throughout the new "Act" "without substantive change," Pub. L. No. 89–554 § 7(a), 80 Stat. at 631. Thus, although courts popularly use terms like the "Administrative Procedure Act"—there is in fact no Administrative Procedure Act, just Title 5. *See id.* § 7(b), 80 Stat at 631 ("A reference to a law replaced by sections 1–6 of this Act, including a reference in a regulation, order, or other law, is deemed to refer to the corresponding provision enacted by this Act."); *Univ. of Cincinnati v. Shalala*, 891 F. Supp. 1262, 1269 n.18 (S.D. Ohio 1995) ("Defendant cites to the Administrative Procedure Act (APA). The APA was, however, repealed by Pub. L. No. 89–554, Sept. 6, 1966, 80 Stat. 381. The former APA's provisions were incorporated into 5 U.S.C. ch. 5 and 7." (citation omitted)).

Importantly, in 1974, Congress enacted the Privacy Act as an amendment to that Act, Title 5, and placed it in Chapter 5 alongside the APA's provisions. Privacy Act of 1974 pmbl., 88 Stat. at 1896 ("To amend title 5, United States Code, by adding a section 552a[.]"). Thus, it is unclear whether the other-adequate-remedy bar (Section 704 of Title 5) directs a comparison between relief under the Privacy Act and relief under the APA. Think of it this way. Section 704 asks whether "there is no *other* adequate remedy in a court" to review "final agency action," 5 U.S.C. § 704 (emphasis added), meaning that "APA review is not available if Congress has provided a 'special and adequate review procedure' elsewhere," *V.I. Hous. Fin. Auth. v. Fed'l Emergency Mgmt. Agency*, 151 F.4th 409, 418 (D.C. Cir. 2025) (quoting *Bowen*, 487 U.S. at 904)). But review under the Privacy Act might not count as review "elsewhere," *id.*, given that both the Privacy Act and the APA might be properly conceived of as components of the same scheme: Title 5. *Compare* 5 U.S.C. § 552a(g) (authorizing "civil action[s] against [an] agency" regarding "the matters under the provisions of this subsection"), *with id.* § 702 (entitling aggrieved persons "to judicial review"); *cf. id.* § 552a(d)(3) (referring to § 552a(g)(1)(A) as provisions for "judicial review"). This would explain why the "inattention" to detail in the Privacy Act's equitable relief provisions is largely "explained by the general provisions for equitable relief within the Administrative Procedure Act" provisions of Title 5. *Doe*, 540 U.S. at 619 n.1.[11]

---

[11] Indeed, the APA's typical remedy for a violation of Title 5 is to "set aside" the agency action altogether. 5 U.S.C. § 706. But for some violations not at issue here, the Privacy Act provides for lesser, more tailored equitable relief. *See* 5 U.S.C. § 552a(g)(2)–(3) (authorizing the court to order lesser remedies of amending records or mandating disclosure when an agency violates provisions in 5 U.S.C. § 552a(d)). Authorizing courts to grant lesser relief for some violations does not mean that the ordinary set-aside remedy is no longer available for others (*e.g.*, failure to provide notice and comment). *See Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988) (remedial schemes providing "doubtful and limited relief" for the violation at issue are not adequate remedies within the meaning of the APA).

This understanding—that Section 704 does not bar Privacy Act relief—is supported by the Office of Management and Budget's interpretive guidelines "issued contemporaneously with the statute," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024), which recognized that the Privacy Act's judicial review provisions would not preclude "judicial review under *other* provisions of the [APA]," OMB Privacy Act Implementation: Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28,968 (July 9, 1975) (emphasis added). And subsequent enactments show that this was Congress' understanding, too. Later amendments (not at issue here) expanding civil liability under the Privacy Act have indicated when Privacy Act remedies are "exclusive." Judicial Redress Act of 2015, Pub. L. No. 114–126, § 2(b), 130 Stat. 282, 282–84 (codified at 5 U.S.C. § 552a note). And "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *City & Cnty. of S.F. v. EPA*, 604 U.S. 334, 344 (2025) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Thus, the statutory scheme and context suggest that Privacy Act claims (when not brought under the provisions explicitly designated exclusive) are neither exclusive nor barred by Section 704 of the APA.

Ultimately, the Defendants ask this Court to discard this statutory structure and depart from the D.C. Circuit's binding precedent in *Stephens*, arguing that the Circuit's decision is not entitled to deference because it *sua sponte* construed the plaintiff's complaint as raising an APA claim. *See* Fed. Defs.' Mot. 42 n.10. But the Defendants do not explain why this means that *Stephens* is entitled to less precedential weight. "[I]t is axiomatic" that any precedential holding of the D.C. Circuit must be "binding on this court." *Alabama v. U.S. Army Corps of Eng'rs*, 774 F. Supp. 3d 142, 154 (D.D.C. 2025). The Defendants may not like it, but Section 704 is not a bar to the Plaintiffs' APA claims.

### 2. Disclosure Claims

On the merits of the disclosure claims, the Plaintiffs argue that the Federal Defendants' disclosure of their SSA data to DHS and SAVE users violates the Privacy Act's protections against non-consensual disclosures. Pls.' Mot. 35. They are plainly correct.

The Privacy Act makes it "unlawful for an agency to disclose a record to another agency" or to any other entity "without the written consent of the person to whom the record pertains." *Cooper*, 566 U.S. at 289 n.2 (citing 5 U.S.C. § 552a(b)). The Act defines a "record" broadly as encompassing "any item, collection, or grouping of information about an individual that is maintained by an agency, including . . . his name, or the *identifying number*, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(4) (emphasis added). And a disclosure encompasses "any means of communication." *Id.* § 552a(b). Thus, the Act is violated whenever there is a "nonconsensual disclosure of any information that has been retrieved from a protected record." *Bartel v. FAA*, 725 F.2d 1403, 1408 (D.C. Cir. 1984).

This limitation is subject to "certain exceptions." *Cooper*, 566 U.S. at 289 n.2. One such exception is a "routine use," which is defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7), (b)(3). "To fit within the confines of the routine-use exception to the Privacy Act, an agency's disclosure of a record must be both (i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency." *Ames*, 861 F.3d at 240 (first quoting 5 U.S.C. § 552a(a)(7); and then citing *id.* § 552a(e)(4)(D)). "[C]ourts have held that compatibility requires a 'meaningful degree of convergence' between the agency's purpose in collecting the record and the agency's purpose in disclosing the record." *Id.* at 240 n.1 (quoting *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549 (3d Cir. 1989)) (citing *Swenson v.*

*Postal Service*, 890 F.2d 1075, 1078 (9th Cir. 1989)); *see also Chichakli v. Tillerson*, 882 F.3d 229, 233–34 (D.C. Cir. 2018).[12]

On this record, the Court concludes that DHS's use of Social Security numbers and other SSA data for voter verification through SAVE is not a routine use under the Privacy Act. Although the DHS and SSA SORNs adopted new routine uses for SSA data for "citizenship and immigration" verification "to the Department of Homeland Security," Notice of a Modified System of Records, 90 Fed. Reg. at 50,880 (SSA AR 207); *see also* Notice of a Modified System of Records, 90 Fed. Reg. at 48,954 (DHS AR 120), this does not change the fact that SSA collected this information for purposes concerning work authorization and eligibility for SSA benefits, *see* SSA AR 115–16; SSA AR 132; SSA AR 149; SSA AR 168–69; SSA AR 188–89; Notice of a Modified System of Records, 90 Fed. Reg. at 50,880 (SSA AR 207). The purpose of collecting such information was never the maintenance of "U.S. citizenship records" for voter verification. SSA AR 103. Indeed, SSA recognizes that its "citizenship information is accurate for SSA's program purposes" only—"if used later for other purposes, it may not be current." *Id.*

The Federal Defendants' response to this argument is underwhelming. The Federal Defendants start by rejecting the premise that SSA "'collected' some form of 'personal data' from individuals" at all. Fed Defs.' Mot. 58 (emphasis omitted). That is because, they say, "Social Security numbers are issued by SSA, to individuals"—thus, SSA collected nothing. *Id.* (emphasis

[12] It has long been suggested that the Privacy Act requires "actual notice" of any routine uses at the time the record was collected. *USPS v. Nat'l Ass'n of Letter Carriers*, 9 F.3d 138, 146 (D.C. Cir. 1993); *Covert v. Harrington*, 876 F.2d 751, 755–56 (9th Cir. 1989). This understanding is based on the Privacy Act's requirement that "the routine uses which may be made of the information, as published pursuant to [the SORN]" must be "on the form which [the agency] uses to collect the information or on a separate form that can be retained by the individual." 5 U.S.C. § 552a(e)(3)(C). The Parties do not brief this issue. But without question, the record provides nothing supporting that the Plaintiffs' members received actual notice that their SSA data would be used for voter verification purposes when they disclosed that information to SSA.

omitted). As an initial matter, it is unclear what the Federal Defendants believe to be the upshot of this argument. Asking about the "purpose for which [a record] was collected" is an inquiry prompted by the routine-use exception, 5 U.S.C. § 552a(a)(7), not the Privacy Act's prohibition on disclosure, 5 U.S.C. § 552a(b), or the definition of record, 5 U.S.C. § 552a(a)(4). The Federal Defendants do not explain why the source of Social Security numbers permits them to circumvent the Privacy Act's disclosure prohibition.

If the Federal Defendants are arguing that Social Security numbers are not records subject to the Privacy Act's prohibition on disclosure, that position does not square with the statutory text. Under the Privacy Act, a "record" encompasses any "grouping of information about an individual"—which includes an "identifying number" (such as an SSN), the individual's "name," and any other particularized information about that individual (*e.g.*, "criminal or employment history"). 5 U.S.C. § 552a(a)(4). The disclosure prohibition comes into effect whenever such a record becomes retrievable by that "name," "identifying number," or "identifying particular." *Id.* § 552a(a)(5), (b). Further, the contemporary ordinary meaning of the verb "collect" at the time the Privacy Act was passed was: "[t]o bring together into a group; gather; assemble"; "[t]o accumulate as a hobby or study"; "[t]o recover control of"; "[t]o gather together; congregate; accumulate." *Collect*, *American Heritage Dictionary of the English Language* 261 (New Coll. Ed. 1976). And the contemporary ordinary meaning of the adjective "collected" was "brought together or placed from various sources." *Id.* Thus, both the statutory definitions and the ordinary meaning of the Privacy Act's text suggest that an SSN is a record—at least when it is grouped, gathered together, or placed with other personal information. So when an individual fills out a Social Security application with her name and other personal information and SSA attaches an "identifying number" to that information, a record is "collected" within the meaning of the Privacy Act. And

undoubtedly, SSA's master file is a system of records containing private data organized by these identifiers. The Court thus concludes that an SSN and any information accumulated with it are records that are subject to the non-disclosure provisions of the Privacy Act.

As icing on the cake, this understanding is supported by the enactment history of the Privacy Act. When Congress enacted the statute, it created an expert "Privacy Protection Study Commission" to examine government "data banks, automated data processing programs, and information systems"; to recommend practices consistent with "the requirements and principles" of the Act to the President; and to make "legislative recommendations" to Congress "to protect the privacy of individuals while meeting the legitimate needs of government." Privacy Act of 1974 § 5(b), 88 Stat. at 1906 (codified at 5 U.S.C. § 552a note). In particular, Congress instructed the Commission to study the "use of social security numbers . . . to gain access to, integrate, or centralize information systems and files." *Id.* § 5(c)(1)(C), 88 Stat at 1906.

That Commission examined the Internal Revenue Service's (IRS) existing practice of disclosing individuals' "name[s], address[es]," and "Social Security number[s]" "primarily to identify individuals who may have failed to file." Priv. Prot. Study Comm'n, Federal Tax Return Confidentiality, at 46 (June 1976). The Commission concluded that there was "uncertainty" about the IRS's privacy obligations, that the Privacy Act "would appear to constrain [the IRS's] disclosure[] of data about taxpayers," and that the IRS had continued such disclosures after the passage of the Act. *Id.* at 15. The Commission thus recommended "that the Congress permit the Internal Revenue Service to disclose the Social Security numbers of Federal taxpayers in a locality" in certain circumstances. *Id.* at 4. Congress thereafter amended the Internal Revenue Code to authorize this use of Social Security numbers and implement the Commission's recommendation. Tax Reform Act of 1976, Pub. L. No. 94–455, § 1211(c), 90 Stat. 1520, 1712

(codified as amended at 26 U.S.C. § 6109(a), (d)). Indeed, since the enactment of the Privacy Act, Congress has consistently employed express statutory authorizations when it permits disclosure or use of Social Security numbers for verification purposes. Lawyers Defending American Democracy Amicus Br. 12–13 (collecting statutes), ECF No. 87. These provisions would be superfluous if the Federal Defendants were correct and SSNs were not subject to the non-disclosure requirements of the Privacy Act. The Court declines to adopt such an interpretation. *Nielsen v. Preap*, 586 U.S. 392, 414 (2019) (recognizing that courts generally do not construe statutes such that they cause other statutory provisions "to have no consequence" (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012))).

The Federal Defendants next argue that sharing SSA records to verify U.S. citizenship for voting is a proper routine use because government agencies have widely used the Social Security number as a "means of identifying and gathering information about an individual." Fed Defs.' Mot. 58 (citation omitted). But this is irrelevant, as it does not go to why a Social Security number and the accompanying information were "collected" in the first place. 5 U.S.C. § 552a(a)(7). The routine-use inquiry looks to whether the disclosure is "compatible with the purpose for which [the record] was collected." *Id.* And the Defendants fail to explain why the federal government's collection of private information to assess Social Security benefits has any nexus to state governments' voter verification efforts.

Finally, the Defendants ask this Court to defer to an OMB interpretation, promulgated over a decade after the Privacy Act was enacted, stating that a routine use encompasses any use that the Executive considers "necessary and proper." Texas Mot. 29 (citing OMB, Guidance on the Privacy Act, 52 Fed. Reg. 12,990, 12,993 (Apr. 20, 1987)); Fed. Defs.' Mot. 57 (same). The Defendants concede that the OMB interpretation is less "searching" than the widely accepted interpretation of

the Privacy Act "articulated by the Third Circuit and cited approvingly by the D.C. Circuit" and other courts nationwide, *see* Tex. Mot. 29, but they advance it, nonetheless. It is hard to understand how this argument could survive the Supreme Court's recent instruction to not afford blind deference to agency interpretations. *See generally Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024); *see also USPS v. Nat'l Ass'n of Letter Carriers*, 9 F.3d 138, 148–49 (D.C. Cir. 1993) (Randolph, J., dissenting) (suggesting that the prior regime of "judicial deference" to agency interpretations of the Privacy Act has allowed "the federal government [to] cede[]—lock, stock and barrel—its statutory responsibility under the Privacy Act to preserve the confidentiality of records pertaining to individuals"). And regardless, the statute does not contain the sort of ambiguity that would previously have invited such deference—"the term 'routine use' means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7). Indeed, the Defendants fail to identify any language in the statute that supports interpreting the routine-use exception to mean any use designated "necessary and proper" by the Executive Branch. *See* Texas Mot. 29; Fed. Defs.' Mot. 57.

Without question, it is the duty of Congress, not federal agencies, to determine what is "necessary and proper for carrying into [e]xecution" other enactments. Art. I, § 8, cl. 18. Congress determined that "it is necessary and proper for the Congress" itself, not agencies, "to regulate the collection, maintenance, use, and dissemination of information" "to protect the privacy of individuals identified in information systems maintained by Federal agencies." Privacy Act of 1974 § 2(a)(5), 88 Stat. at 1896 (codified at 5 U.S.C. § 552a note). And Congress provided that it is the duty of federal agencies to not disclose records for any purpose not "compatible with the purpose for which [the record] was collected." 5 U.S.C. § 552a(a)(7), (b)(3). SSA's disclosure of

Social Security numbers and associated information that SSA collected to DHS and states for voter verification is not such a "compatible" use.

Meanwhile, Texas argues that the disclosure is authorized under another exception altogether—the law enforcement exception in 5 U.S.C. § 552a(b)(7). That exception permits disclosure for law enforcement "within or under the control of the United States" when "the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought." *Id.*; Texas Mot. 29–30. As the Plaintiffs correctly point out, there is no suggestion that any such request was made. *See* Pls.' Opp'n 19. Texas does not dispute this point and candidly admits that the "Plaintiff[s] identified several errors in Texas's Motion." Texas Reply 1 n.1. So this argument is unavailing as well. The Federal Defendants clearly violated the Privacy Act's non-disclosure bar by disclosing SSA records to DHS and SAVE users (including states) without the consent of the Plaintiffs' members. *See* 5 U.S.C. § 552a(b).

**3. Procedural Claims**

Next, the Plaintiffs argue that the establishment of the modified SAVE system outlined in the 2025 SORNs without notice and comment violates the Privacy Act's procedural protections. Pls.' Mot. 38–44. The Court agrees.

The Privacy Act requires notice and comment at least thirty days in advance of a "new use or intended use of the information" in a system of records. 5 U.S.C. § 552a(e)(11). The statute further requires the publication of a SORN "upon establishment or revision" of such a system. *Id.* § 552a(e)(4). Undoubtedly, SAVE is a system of records under the statute—a fact that DHS has

acknowledged in at least eight SORNs,[13] and in a May 2025 agreement governing data sharing between DHS and SSA, DHS AR 420–31. At a prior stage of these proceedings, the Federal Defendants even conceded that the 2025 modifications to SAVE were substantial enough that the Privacy Act would require notice if it covered SAVE. Mot Hr'g Tr. 69:21–24.

Yet the Defendants failed to publish SORNs at least thirty days before overhauling SAVE. They instead launched the modified SAVE system without a SORN on May 22, 2025. *See* DHS AR 491; DHS AR 493; DHS AR 1385. And they continued the new uses for five months before DHS issued a SORN on October 31, 2025, and SSA issued a SORN on November 12, 2025. *See* Notice of a Modified System of Records, 90 Fed. Reg. at 48,948 (DHS AR 114); Notice of a Modified System of Records, 90 Fed. Reg. at 50,879–80 (SSA AR 206–07). Further, the SORNs—when eventually published—had some curious features. The DHS SORN made clear that the modification was already "effective upon publication"; that relevant individuals could "[s]ubmit comments on or before December 1, 2025"; and that "[n]ew or modified routine uses w[ould] be effective December 1, 2025," regardless. Notice of a Modified System of Records, 90 Fed. Reg. at 48,949 (DHS AR 115).

The Plaintiffs argue that the establishment of the modified SAVE system as described in the 2025 SORNs—as well as the SORNs themselves—violated a long line of D.C. Circuit cases holding that an opportunity to comment must be "meaningful," *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009), and that a postponed opportunity for notice and comment can

---

[13] *See* Notice of Modified System of Records, 85 Fed. Reg. at 31,798 (DHS AR 108); DHS USCIS–004 SAVE Program System of Records, 81 Fed. Reg. at 78,619; DHS USCIS—004—SAVE Program System of Records, 77 Fed. Reg. at 47,415; USCIS–004 Verification Information System of Records Notice, 73 Fed. Reg. at 75,445; USCIS VIS System of Records Notice, 73 Fed. Reg. at 10,793; Privacy Act: VIS Records Notice, 72 Fed. Reg. at 17,569; Privacy Act of 1974 System of Records, 67 Fed. Reg. at 64,134; Privacy Act of 1974 System of Records, 66 Fed. Reg. at 46,812.

have a "curative effect depend[ing] on the agency's mind remaining open enough at [that] later stage," *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988). Undoubtedly, the Federal Defendants' process was anything but open-minded. The DHS SORN made clear that the modifications to SAVE were immediately effective and that new uses would go into effect automatically on December 1, 2025, on the last day that comments were still being solicited. *See* Notice of a Modified System of Records, 90 Fed. Reg. at 48,949 (DHS AR 115). And the SSA SORN added the disclosure of Social Security numbers to DHS as a new routine use long after SSA had already begun such disclosures, offering no opportunity for benefits applicants and concerned persons to offer comments prior to the sharing of their data. *See* DHS AR 431 (May 2025 agreement authorizing disclosure of records); Notice of a Modified System of Records, 90 Fed. Reg. at 50,880 (SSA AR 207) (notice of new routine use on November 12, 2025). The SAVE notice and comment process thus provided little opportunity for meaningful input and consideration of comments.

The Defendants argue that the line of D.C. Circuit precedents upon which the Plaintiffs rely was overturned by the Supreme Court's recent instruction in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania* that "the APA imposes no general 'open-mindedness' requirement on agencies beyond the statute's specific 'objective criteria.'" *Bahman Grp. v. Palluconi*, No. 22-cv-3826, 2025 WL 3225196, at *5 (D.D.C. Sep. 29, 2025) (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020)); Fed. Defs.' Mot. 55; Texas Mot. 30–31. But *Little Sisters* was just an application of the "general proposition that courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." *Little Sisters*, 591 U.S. at 685 (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)). That rule has little relevance here.

Indeed, in *Little Sisters*, the lower court held that an agency failed to maintain an open mind when its "final rules" were "virtually identical" to their pre-comment counterparts. *Id.* (citation omitted). The Supreme Court recognized that the APA, among other things, "requires that final rules must be published 30 days before they become effective" and that "interested persons" must be provided an opportunity to comment. *Id.* at 685–86. There, the rules at issue "were published on November 15, 2018, [and] did not become effective until January 14, 2019—more than 30 days after being published" and subject to comment. *Id.* at 686. Since the agency "complied with . . . these statutory procedures," the Supreme Court ruled that the lower court erred in "impos[ing] judge-made procedures in addition to the APA's mandates" by requiring the agency to "maintain[] an open mind" as well. *Id.* at 684–86 (cleaned up).

Here, unlike in *Little Sisters*, SAVE's "modified system [was] effective upon publication" of the SORNs, and public comment was permitted only *after the modified SAVE system was implemented*. Notice of a Modified System of Records, 90 Fed. Reg. at 48,949 (DHS AR 115); *see also* Notice of a Modified System of Records, 90 Fed. Reg. at 50,880 (SSA AR 207). This is flatly inconsistent with the Privacy Act's statutory requirement that "notice of any new use or intended use of the information in the system" and "an opportunity" for comment must be provided "at least 30 days prior" to the final SORN. 5 U.S.C.§ 552a(e)(11). And a final SORN must be published "subject to the provisions" of the Act requiring notice and comment. *Id.* § 552a(e)(4). The SSA and DHS SORNs—as well at the modified SAVE system they describe—fail to meet these statutory requirements because they were never preceded by proposed revision notice and comment periods "30 days prior." *Id.* § 552a(e)(11). Unlike in *Little Sisters* where the final rule was promulgated "more than 30 days after" they were proposed, the 2025 SORNs at issue here

were not in compliance with the "procedural requirements that Congress"—not the courts—established. *Little Sisters*, 591 U.S. at 686 (cleaned up).

"The Privacy Act's public notice and comment structure is an essential component of the Act and an essential piece of American democracy. Americans deserve to know the nature, scope, and routine uses of the records *before* they are collected by the federal government." *Weber*, 816 F. Supp. 3d at 1193 (emphasis added); *see also* Privacy Act of 1974 § 2(b)(1), 88 Stat. at 1896 (noting the Privacy Act's protections seek to "permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by such agencies"). Indeed, "[i]t is flatly inconsistent with the text, structure, and purpose of the Privacy Act for an agency to initiate a major new data-sharing program affecting the sensitive data of millions of Americans, then validate that program as a 'routine use' months after it has begun." *League of United Latin Am. Citizens*, 818 F. Supp. 3d at 115–16. These requirements were imposed by Congress—they are not "judge-made." *Little Sisters*, 591 U.S. at 685 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015)).

Assuming that the Federal Defendants are correct and *Little Sisters* abrogated the D.C. Circuit's use of the open-mindedness test, the Federal Defendants are no better off. The open-mindedness test is at best a "judge-made procedur[e]" to *excuse* failure to comply with statutory obligations. *Id.* at 685 (quoting *Mortg. Bankers Ass'n*, 575 U.S. at 102). Without it, there is no basis to conclude that the Federal Defendants may ever use "additional commentary" to excuse failure to provide notice "without actual suspension of the [agency action] in question." *Forester v. Consumer Prod. Safety Comm'n*, 559 F.2d 774, 788 n.19 (D.C. Cir. 1977). Thus, since the Federal Defendants have neither shown compliance with the open-mindedness test nor the Privacy

Act's notice and comment requirements, 5 U.S.C. § 552a(e)(11), they have acted "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).[14]

**E. The Administrative Procedure Act**

The Plaintiffs also argue that the establishment of the SAVE modified system was arbitrary and capricious under the APA, 5 U.SC. § 706(2)(A). Pls.' Mot. 40–44. The Court is persuaded.

The APA "requires agencies to engage in reasoned decision-making" and "to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. Of Locomotive Eng'rs v. Fed. R.R. Admin*., 972 F.3d 83, 115 (D.C. Cir. 2020) (quoting *DHS v. Regents of the Univ. of Cal.* (*Regents*), 591 U.S. 1, 16 (2020)). To do so, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

---

[14] The Defendants claim that the comment period provided by the SORNs render the notice-and-comment claim moot and suggest that the Plaintiffs must establish standing for each component of the modified SORN (*i.e.*, bulk searches). *See* Fed. Defs.' Mot. 33; Texas Reply 6–7. But the Plaintiffs' notice-and-comment claim is not moot because notice and comment is required "prior to" the new use. 5 U.S.C. § 552a(e)(11). The Plaintiffs have shown procedural standing to challenge the agency action—the 2025 SORNs and the modified SAVE detailed in the 2025 SORNs—which the record shows affected their privacy disclosure and voter registration interests. That injury is not moot. The Defendants' point about each component of the modified SORN perhaps goes to severability. But that is an issue that was not properly raised before this Court and is thus conceded.

Importantly, this "standard demands that an agency give a reasoned justification for its decision to alter an existing regulatory scheme," *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1500 (D.C. Cir. 1984), a principle known as the "change-in-position doctrine," *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025). "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox Television*, 556 U.S. at 515 (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)). "And of course the agency must show that there are good reasons for the new policy." *Id.* Under the doctrine, agencies are "free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Wages & White Lion Invs.*, 604 U.S. at 568 (cleaned up).

Here, the Federal Defendants concede that they changed position, but they stress that they expressed awareness of the change through press releases. Fed. Defs.' Mot. 56. But by failing to engage in notice and comment when "expanding the scope" of the SAVE program, the Federal Defendants neither "consider[ed] serious reliance interests" nor considered opposing views. *Fox Television*, 556 U.S. at 515,517. Indeed, the "central object of requiring that the public be afforded notice and an opportunity to comment is to assure that the agency fully understands the potential impact of a proposed rule before finalizing it. Public notice and comment, that is, might alter an agency's initial assumptions about whether (and how) a proposed rule affects the public at large." *City of Billings v. TSA*, 153 F.4th 46, 53 (D.C. Cir. 2025). By changing their position without the statutorily required notice and comment, the Federal Defendants both failed to consider "factors which Congress . . . intended [them] to consider" (*i.e.*, the "written data, views, or arguments" of impacted persons, 5 U.S.C. § 552a(e)(11)), and they "entirely failed to consider an important aspect of the problem" (*i.e.*, the reliance interests of persons who had provided information to SSA

or failed to update SSA data without knowledge of how it would now be used). *State Farm*, 463 U.S. at 43. Even "[s]tanding alone, a notice and comment violation establishes that the government's conduct was arbitrary and capricious." *See In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 637 (D.C. Cir. 2014).

Furthermore, even if the Federal Defendants later considered comments in response to the modified SORNs, those comments could not provide a "reasoned explanation for the change" that the Federal Defendants undertook. *Wages & White Lion Invs.*, 604 U.S. at 568 (citation omitted). Indeed, an agency's "explanation 'must be viewed critically' to ensure that the [change] is not upheld on the basis of impermissible '*post hoc* rationalization.'" *Regents*, 591 U.S. at 21 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe* (*Overton Park*), 401 U.S. 402, 420 (1971)). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* at 20 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). This is mandated by the APA's instruction to consider "the 'whole record'" before the agency when engaging in judicial review. *Overton Park*, 401 U.S. at 419 (quoting 5 U.S.C. § 706). Since the Federal Defendants implemented the SAVE modified system in May 2025, the explanations in the 2025 SORNs and the comments received thereafter are not properly before the Court because they postdate the decision to implement the challenged program. And without the statutorily mandated comments, the Federal Defendants were unable to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. To state the obvious, this was arbitrary and capricious. *Id.*

Since the Federal Defendants are unable to rely on "belated justifications" to explain their failure to comply with the procedural requirements of the APA and Privacy Act, they must "deal

with the problem afresh" should they wish to implement any SAVE modifications not barred by the substantive provisions of the Privacy Act or Social Security Act. *Id.* at 21, 23 (first quoting *SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80, 94 (1943); and then quoting *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 201 (1947)). In the words of the Supreme Court:

> The Government . . . protests that requiring a new decision before considering . . . new justifications would be "an idle and useless formality." Procedural requirements can often seem such. But here the rule serves important values of administrative law. Requiring a new decision before considering new reasons promotes "agency accountability[]" by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority.

*Id.* at 23 (citations omitted). Accordingly, this Court must vacate the modified SAVE system and the Federal Defendants "must comply with the procedural requirements for new agency action." *Id.* at 21. That means revising SAVE or authorizing any other "new use or intended use of the information in the system" only *after* engaging in notice and comment. 5 U.S.C. § 552a(e)(11).

Finally, the Federal Defendants argue that they are not required to comply with the APA's arbitrary and capricious procedural requirement because:

> Unlike for an APA rulemaking . . . —which starts with a notice of proposed rulemaking and ends with a final rule—a Privacy Act SORN publication does not end with any agency obligation to state "in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). So arbitrary-and-capricious review—which is typically based on the quality and the content of the agency's explanation in that "statement" of the final rule's "basis and purpose," *id.*—does not make sense in this . . . context.

Fed. Defs.' Mot. 54 (emphasis omitted). But this argument is not supported by the text of the APA. The arbitrary-and-capricious principle is laid out in Section 706 of the APA, not Section 553(c). And the argument has also been rejected by the Supreme Court. *See Overton Park*, 401 U.S. at 417–21 (holding that an agency that was exempt from making findings under Section 553(c) due to exclusion in Section 553(a)(2) was nevertheless subject to arbitrary-and-capricious review, with review focusing on the "whole record" before the agency when it took the decision).

"Justice Holmes famously wrote that 'men must turn square corners when they deal with the Government.' But it is also true, particularly when so much is at stake, that the Government should turn square corners in dealing with the people. The basic rule here is clear . . . [t]his is not the case for cutting corners to allow DHS to rely upon reasons absent from its original decision." *Regents*, 591 U.S. at 24 (cleaned up).

**F. Other Statutes**

Having flunked compliance with the Social Security Act, the Privacy Act, and the APA, the Defendants look to other statutes to justify the establishment of the modified SAVE system. They contend that even if the agency action violates the Social Security Act, the Privacy Act, or the APA, it is nevertheless authorized by provisions of the Immigration Reform and Control Act of 1986 (1986 Act), Pub. L. No. 99–603, 100 Stat. 3359, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (1996 Act), Pub. L. No. 104–208, 110 Stat. 3009–546. Fed. Defs.' Mot. 45–53; Texas Mot. 25–27. This argument is not a winner either.

Start with this: The Defendants are effectively arguing that the 1986 Act and the 1996 Act displace or supersede the relevant provisions of the Social Security Act, the Privacy Act, and the APA. But that argument runs contrary to the "strong presumption that repeals by implication are disfavored and that Congress will specifically address pre-existing law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). When interpreting statutory provisions that appear to be in tension, a court "must . . . strive to give effect to both" and is not at "liberty to pick and choose among" them. *Id.* (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). A court will only imply otherwise "if there is a 'positive repugnancy' between overlapping statutes," and even then, the court must cure such a conflict only "to the extent of the repugnancy." *United States v. Philip Morris Inc.* 263 F. Supp. 2d

72, 76 (D.D.C. 2003) (quoting *United States v. Borden Co.*, 308 U.S. 188, 198–99 (1939)). Thus, courts find implied repeals only in cases where: (1) "two statutes are in 'irreconcilable conflict,'" or (2) "the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" *Branch v. Smith*, 538 U.S. 254, 273 (2003) (Scalia, J.) (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)).

The Federal Defendants argue that applying this canon runs contrary to the understanding that "statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified." Fed. Defs.' Mot. 49 (quoting *Dorsey v. United States*, 567 U.S. 260, 274 (2012)). But this argument misapprehends the basis of the presumption against implied repeals. The presumption is founded on the principle that:

> Since laws are presumed to be passed with deliberation, and with full knowledge of existing ones on the same subject, it is but reasonable to conclude that the legislature, in passing a statute, did not intend to interfere with or abrogate any former law relating to the same matter, unless the repugnancy between the two is irreconcilable.

Scalia & Garner, *Reading Law* 328 (citation omitted). Undoubtedly then, requiring a "clear[] statement" for implied repeals does not in any way impair Congress' authority to undo or modify its predecessors' actions but merely "reflect[s] 'common sense as to the manner in which Congress is likely'" to do so. *See Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

Here, the Defendants have failed to meet their "heavy burden of showing" that the statutes they cite and the Privacy Act "cannot be harmonized." *Epic Sys. Corp.*, 584 U.S. at 510. Indeed, none of the provisions that the Defendants cite support their proposition.

The Defendants first point to the 1986 Act, which provides that DHS "shall implement a system for the verification of immigration status under paragraphs (3) and (4)(B)(i) of

section 1137(d) of the Social Security Act (as amended by this section) so that the system is available to all the States." § 20(c)(1), 100 Stat. at 3391 (codified at 42 U.S.C. § 1320b–7 note). But this provision, alongside its cross-references, has little relevance to this case. Section 1137(d) governs "income and eligibility verification," "documentation," and "denial of benefits" under the Social Security Act. 42 U.S.C. § 1320b–7(d). Paragraph (3) provides that "the State shall utilize the individual's alien file or alien admission number to verify with [DHS] the individual's immigration status through an automated or other system" when a non-citizen or non-national applies for certain benefits. *Id.* § 1320b–7(d)(3). It is expressly limited to benefits applications for applicants who are "not a citizen or national of the United States" and makes no reference to using a Social Security number as opposed to "the individual's alien file or alien admission number." *Id.* § 1320b–7(d)(2), (3). Paragraph (4)(B)(i) provides that if a State finds that a non-citizen has other documentation which "constitutes reasonable evidence" that he is eligible for benefits, then the State must provide "photostatic or other similar copies of such documents, or information from such documents, as specified by [DHS], for official verification." *Id.* § 1320b–7(4)(B)(i).

While SAVE was originally established to effectuate the 1986 Act's benefit-verification provisions, DHS AR 420, these provisions govern benefits, not voter eligibility. And nothing in the 1986 Act suggests that any resulting system could not be harmonized with the protections in the Privacy Act. To the contrary, the 1986 Act expressly amended the Social Security Act to ensure that the "automated or other system . . . protects the individual's privacy to the maximum degree possible." § 121(d)(3)(B), 100 Stat. at 3385 (codified at 42 U.S.C. § 1320b–7(d)(3)(B)).

Next, the Defendants rely on a provision in the 1996 Act that provides that DHS "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any

purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). The Federal Defendants argue that this provision authorizes the modified SAVE and permits DHS to verify citizenship in any manner that it sees fit—notwithstanding prior statutory limitations on inter-agency data sharing and disclosure of private information. *See* Fed. Defs.' Mot 46–49. But such a reading is inconsistent with normal rules of statutory interpretation.[15] "[N]o statute pursues any single purpose at all costs," and courts no longer depart from a statute's ordinary meaning merely to effectuate the executive's claim that doing so would merely help it "make effective a statute's purpose." *See Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368 (2025) (cleaned up). Rather, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

"Context is not found exclusively within the four corners of a statute"; "[b]ackground legal conventions, for instance, are part of the statute's context." *Nebraska*, 600 U.S. at 512 (Barrett, J., concurring) (cleaned up). One such convention is that the 1996 Act should not be read to impliedly amend or repeal the Privacy Act's protections unless it "expressly contradicts" those protections or "such a construction is absolutely necessary in order [for] the words" of the 1996 Act to "have any meaning at all." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662–63

[15] Because the Defendants lack a basis for their actions based on the plain meaning of the statutes that they cite, the Court does not address whether they would also satisfy the "clear statement" rule of the major questions doctrine—should that rule apply in this context. *See Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023); *but see* Louis J. Capozzi III, *Biden v. Nebraska and the Continued Refinement of the Major Questions Doctrine*, Harv. J.L. & Pub. Pol'y: Per Curiam, Summer 2024 No. 13, at 6–7 (suggesting that an action is politically significant for purposes of the major questions doctrine if it raises concerns that the Executive is using vague terms to "try to enact policies circumventing Congress," especially on an issue of ongoing public debate).

(2007) (cleaned up); *see also id.* at 664 n.8 ("[W]e have repeatedly recognized that implied amendments are no more favored than implied repeals."). As evidenced by the record before this Court, the Federal Defendants do not need to depart from the Privacy Act's procedural requirements or its substantive protections to verify citizenship requests. Indeed, since the 1996 Act's passage, the Federal Government has never needed SSA data or to depart from Privacy Act procedures to verify citizenship requests. *See supra* Bkd. (noting that SAVE did not access SSA data until 2025). Furthermore. the ordinary meaning of "verify 'is "to establish the truth, accuracy, or reality of" something. *Verify*, *Merriam Webster's Collegiate Dictionary* (10th Ed. 1996); *see also Verification*, *Merriam Webster's Collegiate Dictionary* (10th Ed. 1996) ("the act or process of verifying"; "the state of being verified"). And the record shows that the modified SAVE has caused inaccurate rather than accurate matching of citizenship data. *See, e.g.*, DHS AR 240 (finding "risk" that the modified SAVE "may share inaccurate information with registered agencies"); DHS AR 260 (recognizing the modified SAVE's "[s]hortfalls in data accuracy"); DHS AR 302 (same); SSA AR 44 ("[C]itizenship information in SSA's records might not be current."). Simply put, there is no reason to believe that an implied repeal or amendment of the protections of the Privacy Act or Social Security Act is "absolutely necessary" for the verification provisions in Section 1373(c) to have any effect. *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 306 (D.C. Cir. 2014) (quoting *Nat'l Ass'n of Home Builders*, 551 U.S. at 662–63).

Finally, the Defendants argue that Section 1373(a) of the 1996 Act authorized the establishment of the modified SAVE system of records. *See* Fed Defs.' Mot. 45–46. That provision states: "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or

immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). But prohibitory language such as "shall not" or "may not" is generally not read as an "an affirmative grant of power." *See New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982). Nothing in this provision permits the Federal Defendants to create a new system of records with complete disregard for the Privacy Act's protections. Indeed, the "Executive Branch interpretation . . . issued roughly contemporaneously with enactment of the statute" and "the longstanding 'practice of the government'" since the 1996 Act's enactment confirms that this is not the case. *Loper Bright*, 603 U.S. at 386 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)); *see Relationship Between Illegal Immigr. Reform & Immigrant Resp. Act of 1996 & Statutory Requirement for Confidentiality of Census Info.*, 23 Op. O.L.C. (May 18, 1999) (slip op. at 6), 1999 WL 34995963 (recognizing that Section 1373(a) does "not clearly invest governmental officials or entities with the affirmative authority to disclose information in circumstances where they otherwise would be prohibited from doing so by a federal statute"); *see supra* Bkd. (explaining that DHS complied with the Privacy Act in instituting SAVE up until 2025). Simply put, Section 1373(a) does not on its own authorize the establishment of the SAVE modified system—it is merely a prohibition on conduct.

Moreover, "the overall statutory scheme" of the 1996 Act also does not support the Defendants' interpretation. *West Virginia*, 597 U.S. at 721 (quoting *Davis*, 489 U.S. at 809). For instance, another provision of the 1996 Act authorizes SSA to "compare[] the name and social security account number provided in an inquiry" to its own files, but only "to confirm (or not confirm) the validity of the information provided regarding an individual whose identity and employment eligibility must be confirmed," and only as part of a temporary employment verification pilot program (E-Verify) that, among others, states and the "Department[s] of the

Federal Government shall elect to participate in." §§ 402(e)(1)(A)(i), 404(e), 110 Stat. at 658, 665 (codified at 8 U.S.C. § 1324a note). Importantly, that temporary "system" does not permit SSA to "disclose or release social security information (other than such confirmation or nonconfirmation)" and prohibits SSA from "utiliz[ing] any information, data base, or other records" in the program "for any other purpose." *Id.* § 404(e), (h)(1), 110 Stat. at 3009–665. The 1996 Act also provides that the authorization for this matching system would be temporary and only last a "4-year period." *Id.* § 401(b), 110 Stat. at 3009–655–56 (codified at 8 U.S.C. § 1324a note).[16] The 1996 Act's authorization for limited Social Security number verification for employment purposes only, its strict controls on what SSA information can be accessed and how it is used, and the limited program duration would make little sense if another provision of that same Act, *e.g.*, Section 1373(a) or (c), already authorized SSA to share any of its records regardless of any other law, as the Defendants suggest. *Cf.* 1986 Act § 101(a), 100 Stat. at 3361–65 (codified as amended at 8 U.S.C. § 1324a(b), (d)) (establishing that, like voter eligibility, the Federal Government is also authorized to verify employment eligibility of non-citizens). Courts generally presume that Congress does not enact such "surplusage." *Preap*, 586 U.S. at 414 (recognizing that courts are hesitant to adopt an interpretation that "causes [a provision] to duplicate another provision" (quoting Scalia & Garner, *Reading Law* 174)). And "[w]here Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012). Here, the statutory scheme of the 1996 Act shows that "Congress knew how to" permit Social Security number verification "when it wanted to" and chose not to in Section 1373(a) or (c). *Allina Health Servs. v.*

---

[16] Congress has since extended the deadline for termination of that program to September 30, 2026. Consolidated Appropriations Act of 2026, Pub. L. No. 119–75, § 5014, 140 Stat. 173, 631 (codified at 8 U.S.C. § 1324a note).

*Price*, 863 F.3d 937, 944 (D.C. Cir. 2017) (Kavanaugh, J.). None of the provisions that the Defendants cite support the overhaul of SAVE.

### G. Comity and Equitable Considerations

Finally, the Defendants ask this Court to deny relief to the Plaintiffs based on "principles of equity and comity"; entering a judgment for the Plaintiffs, they say, may interfere with consent decrees entered during this litigation in other federal courts while this litigation was ongoing. *See* Fed. Defs.' Mot. 62. The Court is not convinced for two reasons.

First, the Defendants' argument necessarily requires this Court to construe the Defendants' consent decrees before other courts—something that this Court lacks the authority to do. *See Martini v. Republic Steel Corp.*, 532 F.2d 1079, 1081 (6th Cir. 1976) ("As to those counts of appellants' complaint which allege that the consent decree is not being properly implemented we note that . . . [t]he consent decree applies nationwide, but principles of comity certainly require that these issues be raised before the court which granted the decree."). This alone is a basis to reject the Defendants' argument.

Second, even if it were a proper consideration, comity does not favor dismissing or abstaining in this circumstance. "[T]he doctrine of federal comity . . . permits one federal district court to defer to the jurisdiction of another federal district court on an issue properly before the latter court in order to avoid unnecessarily burdening the federal judiciary and delivering conflicting judgments." *Beck v. U.S. DOJ*, No. 88-cv-3433, 1991 WL 519827, at *5 (D.D.C. Jan. 31, 1991) (citing *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180 (1952)). The doctrine applies most readily "where previously-filed litigation is brought promptly to the attention of the district court" and comity considerations are asserted early in litigation. *See Church of Scientology of Cal. v. U.S. Dep't of the Army*, 611 F.2d 738, 750 (9th Cir. 1979), *overruled on*

*other grounds by Animal Legal Def. Fund v. U.S. FDA*, 836 F.3d 987, 989 (9th Cir. 2016) (per curiam). The Court's decision is "equitable in nature," with an eye towards "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation[.]" *Kerotest Mfg.*, 342 U.S. at 183. And this Court has "ample . . . discretion" in assessing these interests, *Stone & Webster, Inc. v. Ga. Power Co.*, 779 F.3d 614, 617 (D.C. Cir. 2015) (quoting *Kerotest Mfg.*, 342 U.S. at 183–84), which "requires a balancing not of empty priorities but of equitable considerations genuinely relevant to the ends of justice," *Columbia Plaza Corp. v. Sec. Nat. Bank*, 525 F.2d 620, 628 (D.C. Cir. 1975) (quoting *Polaroid Corp. v. Casselman*, 213 F. Supp. 379, 381 (S.D.N.Y. 1962)). *See Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922) ("The forbearance which courts of co-ordinate jurisdiction, administered under a single system, exercise towards each other . . . [has] perhaps no higher sanction than the utility which comes from concord[.]" (quoting *Covell v. Heyman*, 111 U.S. 176, 182 (1884))).

The Court doubts that judicial administration and efficiency warrant dismissing this case for comity reasons at this late stage of proceedings—where all Parties have briefed the merits and the Court is ready to enter final relief. Nor is it apparent that the Federal Defendants having entered a consent decree purportedly barring the very relief sought in this litigation while it was ongoing is consistent with the equitable considerations of clean hands, "good faith," and the prevention of "forum shopping." *EEOC v. Univ. of Pa.*, 850 F.2d 969, 972, 979 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990). The Court finds that equity would not bar this suit where the result would be "to circumvent" the APA action at issue. *Id.* at 978. Indeed, comity does not favor deferring to another forum when it is not "apparent that a remedy is available there"—and the Plaintiffs have no say in the consent decrees that the Federal Defendants enter in other districts. *Mann Mfg., Inc. v. Hortex,*

*Inc.*, 439 F.2d 403, 408 (5th Cir. 1971) (quoting *Lapin v. Shulton, Inc.*, 333 F.2d 169, 172 (9th Cir. 1964)).

Simply put, even if they were appropriately before the Court in these circumstances, the Defendants' comity arguments are unavailing. *See Emrick v. Bethlehem Steel Corp.*, 624 F.2d 450, 454 (3d Cir. 1980) (affirming the district court's dismissal of a direct challenge to a consent decree for comity purposes but reversing the district court's dismissal of other statutory claims merely because they may implicate the consent decree).

### H. Constitutional Claims

Finally, because this case can be resolved on a statutory basis, the Court does not reach the Plaintiffs' constitutional claims. *See* Pls.' Mot. 33. "[C]ourts 'ought not to pass on questions of constitutionality unless such adjudication is unavoidable.'" *United States v. Gaffney*, 812 F. Supp. 3d 49, 81 (D.D.C. 2025) (quoting *Matal v. Tam*, 582 U.S. 218, 231 (2017)).

## REMEDY

The APA mandates that a "reviewing court *shall* . . . hold unlawful and set aside agency action" that is in excess of statutory authority, contrary to law, unconstitutional, arbitrary and capricious, or procedurally defective. 5 U.S.C. § 706(2)(A)–(D) (emphasis added). Setting aside an agency action means "re-establish[ing] the status quo absent the unlawful agency action." *Las Ams. Immigrant Advoc. Ctr. v. U.S. DHS*, 783 F. Supp. 3d 200, 233 (D.D.C. 2025) (citation omitted); *see also Ctr. for Biological Diversity v. Haaland*, No. 22-cv-3588, 2023 WL 5161741, at *7 (D.D.C. Aug. 11, 2023) ("The remedy of vacatur under the Administrative Procedure Act restores the prior regulatory status quo; the invalid rule is eliminated and replaced by any preexisting rule it had superseded." (cleaned up)). Accordingly, the Court sets aside and vacates the 2025 DHS and SSA SORNs as unlawful. Notice of a Modified System of Records, 90 Fed. Reg. 48,948 (DHS AR 114–21); Notice of a Modified System of Records, 90 Fed. Reg. 50,879

(SSA AR 205–11). The Court further sets asides and vacates the SAVE "modified system" described in the 2025 DHS SORN. Notice of a Modified System of Records, 90 Fed. Reg. at 48,948 (DHS AR 114–21).

## CONCLUSION

For the foregoing reasons, the Court grants the Plaintiffs' Motion for Summary Judgment, ECF No. 66, and denies the Federal Defendants' Motion to Dismiss (or in the alternative Motion for Summary Judgment), ECF No. 77, and the State of Texas' Motion to Dismiss, ECF No. 97.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: June 22, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br>*Plaintiffs*,<br>v.<br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br>*Defendants*. | Civil Action No. 25-3501 (SLS)<br>Judge Sparkle L. Sooknanan |

**ORDER**

For the reasons stated in the Court's Memorandum Opinion, ECF No. 111, the Court grants the Plaintiffs' Motion for Summary Judgment, ECF No. 66, and denies the Federal Defendants' Motion to Dismiss (or in the alternative Motion for Summary Judgment), ECF No. 77, and the State of Texas' Motion to Dismiss, ECF No. 97.

The Court vacates and sets aside the October 2025 Department of Homeland Security Notice of a Modified System of Records for the SAVE system of records. Notice of a Modified System of Records, 90 Fed. Reg. 48,948 (October 31, 2025) (DHS AR 114–21). The Court vacates and sets aside the November 2025 Social Security Administration Notice of a Modified System of Records for the Master Files of Social Security Number Holders and Social Security Number Applications. Notice of a Modified System of Records, 90 Fed. Reg. 50,879 (November 12, 2025) (SSA AR 205–11). The Court further vacates and sets aside the SAVE "modified system" described in the October 2025 Department of Homeland Security Notice of a Modified System of Records for the SAVE system of records. Notice of a Modified System of Records, 90 Fed. Reg.

at 48,948 (October 31, 2025) (DHS AR 114–21). The Court directs the Clerk of the Court to terminate this case from the active docket.

**SO ORDERED.**

SPARKLE L. SOOKNANAN
United States District Judge

Date: June 22, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-3501 (SLS)<br>Judge Sparkle L. Sooknanan |

## MEMORANDUM OPINION

This case is about the unlawful creation of a centralized federal database containing the private information of United States citizens. On June 22, 2026, this Court set aside (1) the establishment of the database, a modified version of the Systematic Alien Verification for Entitlements (SAVE) system, a system of records maintained by the Department of Homeland Security (DHS) to verify citizenship and immigration status; and (2) two System of Records Notices (SORNs) for the modified SAVE, which authorized the establishment, revisions, and disclosures from the DHS system of records and from the Social Security Administration's (SSA) central file used to operate the modified SAVE. The Court determined that the modified SAVE system and its respective SORNs violated the Social Security Act, the Privacy Act, and the Administrative Procedure Act (*i.e.*, Chapter 5 and 7 of Title 5). *See* ECF Nos. 111, 112. On June 25, 2026, the Federal Defendants appealed that decision, ECF No. 113, and they now move to stay the Court's order pending appeal, Mot., ECF No. 116-1. For the reasons explained below, the Court denies the Federal Defendants' motion.

**LEGAL STANDARD**

"A stay pending appeal is an extraordinary remedy." *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)). "It is 'an intrusion into the ordinary processes of administration and judicial review and accordingly is not a matter of right.'" *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). "It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (cleaned up). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34.

Courts must consider four factors in connection with a stay motion: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). For the first factor, the D.C. Circuit has said that the chance of success on the merits must be "substantial." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). Failure to satisfy this standard is "an arguably fatal flaw for a stay application." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1017–19 (D.C. Cir. 2018) (per curiam). For the second factor, "[w]here there is a low likelihood of success on [the] merits, a movant must show a proportionally greater irreparable injury[.]" *M.M.V.*, 459 F. Supp. 3d at 4 (citing *Cuomo*, 772 F.2d at 974). And the final two factors "merge when the Government" is a party. *Id.* (quoting *Nken*, 556 U.S. at 435).

## DISCUSSION

The Federal Defendants fall well short of satisfying the high burden needed for a stay pending appeal. The Court is not convinced that they are likely to succeed on the merits, that they will be irreparably injured absent a stay, or that the balance of equities favors a stay.[1]

### A. Likelihood of Success on the Merits

As explained at length in the Court's Memorandum Opinion, *League of Women Voters v. DHS*, __ F. Supp. 3d.__, No. 25-cv-3501, 2026 WL 1784297 (D.D.C. June 22, 2026), ECF No. 111, the Federal Defendants cannot show a substantial likelihood of success on the merits. The Court's Memorandum Opinion lays out its reasoning on the merits. But in urging the Court to grant the extraordinary remedy of a stay, the Federal Defendants do two things that the Court will address here. Most egregiously, they make arguments that they did not advance in prior briefing, including arguments that the Court found had been conceded in its Memorandum Opinion. *See, e.g.*, *League of Women Voters*, 2026 WL 1784297, at *20 ("[T]he Defendants have conceded . . . that the Social Security Act forbids disclosure of SSA data to DHS or in responses to SAVE users."). The Federal Defendants certainly know that a stay motion is not an avenue to raise new arguments that they chose not to advance earlier. Such an approach would cause manifest injustice to the Parties and disrupt the orderly judicial resolution of the disputes before the Court. The Federal Defendants do not stop there. In seeking a stay, they mischaracterize the Court's Memorandum Opinion, accusing it of stepping into the shoes of Congress and inventing new

---

[1] The Federal Defendants waited nine days to move for a stay after this Court issued its Memorandum Opinion. The Court nonetheless moved expeditiously to set a briefing schedule on their stay motion to close in roughly six days (which included a federal holiday and weekend). Yet hours after the Federal Defendants filed their reply brief, they proceeded to give this Court roughly a day and a half to decide their motion—promising to bypass this Court and go to the D.C. Circuit then. *See* Notice re Timing, ECF No. 121.

statutory requirements under the Privacy Act. The Court did no such thing. Indeed, according to the administrative record, DHS itself recognized that the modified SAVE was not in compliance with the Privacy Act. *League of Women Voters*, 2026 WL 1784297, at *6. In the end, the Federal Defendants cannot show a "substantial" likelihood of success on the merits, which is "an arguably fatal flaw" for their stay application. *Citizens for Resp. & Ethics in Wash.*, 904 F.3d at 1017–19.

**1. Forfeited Arguments**

"[A] motion to stay should not be used to relitigate matters, submit new evidence, or 'raise arguments which could, and should, have been made before the judgment issued.'" *ODonnell v. Harris Cnty.*, 260 F. Supp. 3d 810, 815 (S.D. Tex. 2017) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003)) (citing 11 Charles A Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 (3d ed. 2012)).

The Federal Defendants seek a stay of the Court's decision that the modified SAVE violated the Social Security Act's prohibition that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I). In their stay motion, the Federal Defendants raise two arguments never previously presented to the Court. First, they argue that the data in the modified SAVE are not "related records" under the Act, and that the matching and confirmation of social security numbers to SAVE users under the modified SAVE does not constitute a disclosure under the Act. Second, they contend that the

original Social Security Act of 1935 authorizes the collection and maintenance of all information in SSA's central file (NUMIDENT). These arguments are forfeited.[2]

To start, through a series of cross references, the Federal Defendants contend that the matching and confirmation of social security data under the modified SAVE does not constitute the disclosure of "related record[s]" under the Social Security Act because it does not "indicate[], directly or indirectly, the identity of any individual with respect to whom a social security account number or a request for a social security account number is maintained." Mot. 7–8 (citation omitted). This argument is nowhere to be found in the Federal Defendants' summary judgment briefing. Indeed, a search for the term "related record" in the Federal Defendants' briefs yields zero results. *See* Fed. Defs.' Mot. Dismiss, ECF No. 77-1; Fed. Defs.' Reply, ECF No. 106. The Federal Defendants surely know that they did not contest this point at summary judgment, despite the Plaintiffs having argued that the Federal "Defendants are collecting, verifying, and disclosing SSNs and related records en masse" pursuant to "a statute enacted 'after October 1, 1990.'" Pls.' Summ. J. Mot. 33, ECF No. 66-1. The Federal Defendants chose not to dispute the Plaintiffs' characterization of "related records." And the Court thus found: The modified SAVE "system discloses both Social Security numbers and related records maintained by SSA. And the Defendants did not argue otherwise." *League of Women Voters*, 2026 WL 1784297, at *20.

Relatedly, the Federal Defendants say that although there may have been disclosures of social security numbers and related records to DHS, there were no such "disclosures" to SAVE users as that term is understood in the Social Security Act. Mot. 7–8. But again, this argument never shows up in the Federal Defendants' summary judgment briefs. *See* Fed. Defs.'

[2] Although the State of Texas did not move for a stay, the Court notes that it did not advance these arguments at summary judgment either. No Defendant raised the arguments now advanced in the Federal Defendants' stay motion.

Mot. Dismiss; Fed. Defs.' Reply. Rather than be forthright about the fact that they are making a new argument, the Federal Defendants pretend that it was before the Court all along, suggesting that the Court "conflate[d] two interactions at play in any given query to the SAVE system: first, the disclosure of information by SSA to DHS; second, the disclosure of information by DHS to the SAVE user." Mot. 6. But that was not the Court's analysis. The Court merely stated a fact that no Party to this litigation had then disputed—that the modified SAVE requires the disclosure of social security numbers and related records. Unhappy with their litigating decision, the Federal Defendants cannot now change course and ask this Court to re-engage in fact-finding in this emergency stay posture.

In other words, the Federal Defendants are too late. It is impermissible to raise new arguments in the posture of a stay motion and ask for judicial fact-finding on issues for the first time after final judgment has been entered. The Court need not now, on an expedited basis, scour the administrative record to explain to the Federal Defendants why each record first transmitted from SSA to DHS and then from DHS to SAVE users constituted a social security number or related record under the Social Security Act. Nor would it be appropriate for the Court to explain how the matching and confirmation of a social security number constitutes a disclosure of that individual's social security number to SAVE users. If the Federal Defendants wished to contest these points, they should have raised them during summary judgment proceedings when the Plaintiffs first openly argued that the modified SAVE is "collecting, verifying, and disclosing SSNs and related records en masse[.]" Pls.' Summ. J. Mot. 33.

Next, the Federal Defendants, without citing a specific collection or maintenance provision of the Act, contend that the maintenance of the SSA central file (NUMIDENT) is actually authorized by the original Social Security Act of 1935 and thus not maintained pursuant to "a

statutory authority prior to October 1, 1990." *See* Mot. 8. Of course, it is odd for a party seeking the extraordinary remedy of a stay to attempt to meet its burden on a question of statutory interpretation without citing a single provision of the U.S. Code on the subject. But the Court need not address this new argument because, like the last, it appears nowhere in the Federal Defendants' merits briefing, *see* Fed. Defs.' Mot. Dismiss, Fed. Defs.' Reply, and was thus forfeited.

Ultimately, the Plaintiffs posited that the Federal "Defendants are collecting, verifying, and disclosing SSNs and related records en masse" pursuant to "a statute enacted 'after October 1, 1990.'" Pls.' Summ. J. Mot. 33. And the Federal Defendants made only two counterarguments to that assertion: (1) that the Plaintiffs lacked a cause of action, and (2) that other immigration statutes nevertheless authorized disclosure. Fed. Defs.' Mot. Dismiss. 49–50. The Court made factual findings and addressed those arguments in detail. *League of Women Voters*, 2026 WL 1784297, at *20 & n.9, *30–33. But that is the extent of the Court's consideration. The Court stated clearly in its Memorandum Opinion that the Defendants had conceded "that the Social Security Act forbids disclosure of SSA data to DHS or in responses to SAVE users." *Id.* at *20. A stay motion does not give defendants a do-over, which is exactly what the Federal Defendants seem to want.

Indeed, courts apply rules of forfeiture because tardy and overdue arguments are "not only unfair to [a litigant] but also entails the risk of an improvident or ill-advised opinion on the legal issues" by reducing the time in which the Court may engage in meaningful review. *See McBride v. Merrell Dow & Pharmaceuticals, Inc.*, 800 F.2d 1208, 1210 (D.C. Cir. 1986) (cleaned up). This case, though expedited, was not decided on a short timeline or emergency briefing. In fact, the Court denied the Plaintiffs' early request for preliminary relief so that the Parties could conduct factual development and establish a record. *See League of Women Voters v. DHS*, No. 25-cv-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025), ECF No. 55. And the Court granted the Federal

Defendants additional time to flesh out their arguments, despite the time-sensitive nature of the Plaintiffs' injuries. *See* Min. Order (May 8, 2026). The Parties spent months briefing these issues in hundreds of pages. And the Court spent significant time reviewing the record and the Parties' arguments, resulting in a 75-page Memorandum Opinion. Yet the Federal Defendants now want another bite at the apple to raise new arguments on an emergency basis through a stay motion—arguments that they had every opportunity to raise earlier. And rather than acknowledge that they are asking for just that and explain why the Court should consider their belated arguments, the Federal Defendants feign that these arguments are fair game. The Court will not tolerate such gamesmanship.[3] Manifest justice favors "assessment . . . when the factual record and legal arguments of the parties are fully developed and the Court has time for thorough consideration." *Pippenger v. U.S. Doge Serv.*, No. 25-cv-1090, 2025 WL 1148345, at *2 (D.D.C. Apr. 17, 2025). Given that the Federal Defendants forfeited these arguments by raising them for the first time in their stay motion, they are unlikely to succeed on appeal on these bases.

---

[3] The Federal Defendants seemingly recognize that they forfeited these arguments in their reply brief, though they stop short of admitting it outright. Reply 2 ("[T]hose arguments were originally framed differently or in a more abbreviated fashion[.]"). And they seemingly ask the Court to excuse any such forfeiture. *Id.* ("Had Plaintiffs emphasized 42 U.S.C. § 405(c)(2)(C)(viii)(I) as heavily in their briefing as this Court did in its opinion, the United States would surely have addressed that provision in more detail. But, particularly in a case of this significance, it would be inequitable to hold that the United States forfeited a response to an argument that appeared in full form only in the Court's opinion."). But a court may discretionarily forgive forfeiture only where correction is needed to ensure "the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (cleaned up). And the fairness and integrity of these judicial proceedings do not support reviving forfeited arguments in an expedited fashion through a stay motion. The Federal Defendants are free to ask this Court to excuse their forfeited arguments in a Rule 52(b) motion, where they can receive adequate and thorough consideration. *See id.* (suggesting that Rule 52(b) is the proper vehicle to argue that forfeiture should be excused).

### 2. Other Mischaracterizations

Next, the Federal Defendants mischaracterize the Court's Privacy Act conclusions, saying that the "Court disagree[d] with Congress's assessment." Mot. 1. They suggest that the Court "imposed judge-made procedures in addition to the statute's mandates" when deciding the procedural claims. Mot. 10 (cleaned up). And they claim that the Court imposed "independent notice-and-comment obligation[s] . . . on top of that required by the Privacy Act." *Id.* (emphasis omitted). A review of the Court's Memorandum Opinion reveals that none of that is true.

As the Court explained, *see League of Women Voters*, 2026 WL 1784297, at *26–28, the Privacy Act's procedural requirements do not permit the Federal Defendants to issue SORNs *after* the establishment or modification of a system of records. Rather, the statute requires that a SORN be published "upon establishment or revision" of a system of records. 5 U.S.C. § 552a(e)(4). And as noted in the Memorandum Opinion, the Federal Defendants did not dispute that the SAVE system was modified to include SSA data long before the agencies published the relevant SORNs. *See League of Women Voters*, 2026 WL 1784297, at *26–28. Nor could they, because when the Parties first appeared before the Court for preliminary injunction proceedings, the agencies had published no SORNs at all.

Further, a SORN may only be published "subject to the provisions of paragraph (11)" of subsection (e) of the Privacy Act. 5 U.S.C. § 552a(e)(4). The term "*subject to* indicates that the main clause it introduces . . . does not derogate from the provision to which it refers." Antonin Scalia & Brian Garner, Reading Law: The Interpretation of Legal Texts 126 (2012). That cross-referenced provision mandates that any SORN publishing "each routine use of the records contained in the system, including the categories of users and the purpose of such use," 5 U.S.C. § 552a(e)(4)(D), must afford "30 days *prior to* publication" "notice" in the Federal Register "of

any new use or intended use of the information in the system," and "provide an opportunity for interested persons to submit written data, views, or arguments to the agency," *id.* § 552a(e)(11) (emphasis added). The DHS SORN "include[d] updates and modifications to the (1) purpose(s) of the system, (2) categories of individuals covered by the system, (3) categories of records in the system, (4) records source categories, and (5) routine uses of records maintained in the system." Notice of a Modified System of Records, 90 Fed. Reg. 48,948, 48,948 (Oct. 31, 2025) (DHS SORN). Yet it expressly stated: "This modified system will be effective upon publication." *Id.* at 48,949.[4] The Federal Defendants do not dispute that this modified system alongside its new routine uses were already effective at the time the SORN was published. *See League of Women Voters*, 2026 WL 1784297, at *26. As the Court previously detailed, the same is true of the SSA SORN, which also added a new routine use. *Id.* In other words, the modified SAVE and the 2025 SORNs failed to comply with 5 U.S.C. § 552a(e)(4) and (11).

Permitting an agency to publish a SORN *after* already establishing or modifying a system of records—as the Federal Defendants did—would eviscerate the "prior to" language from the Privacy Act's text. 5 U.S.C. § 552a(e)(11). It would also nullify the provisions ensuring notice and comment—disclosure could be made with or without prior notice. *See id.* And other provisions of the Privacy Act, such as those requiring "routine uses" in the SORN be included on intake forms, *id.* § 552a(e)(3)(C), and for disclosures, *id.* § 552a(b)(3), would be put in jeopardy as well.

Rather than focus on the Court's analysis of the Privacy Act's text, the Federal Defendants say: "[T]o the extent the Court's opinion suggests that the APA imposes an independent notice-and-comment obligation—including some obligation to provide a written explanation or

[4] The DHS SORN also included new functionalities that were not yet in effect, *see, e.g.*, DHS SORN at 48,951, that are not at issue in this suit.

response to comments received—on top of that required by the Privacy Act, that imposition would call into question virtually every SORN publication dating back decades." Mot. 10 (emphasis omitted) (citation omitted). The Court made no such suggestion. It merely identified the notice-and-comment obligations already in the statute. 5 U.S.C. § 552a(e)(11). Indeed, it is notable that the Federal Defendants provide no citation to the Court's Memorandum Opinion to support this proposition, citing only their own merits brief. Mot. 10.[5]

Of course, it is an uncontroversial point that agencies that fail to comply with statutorily obligated notice-and-comment requirements act "without observance of procedure required by law" and in an "arbitrary" and "capricious" manner. 5 U.S.C. § 706(2)(A), (D). The Court relied on these APA provisions to enforce the very procedure required by the Privacy Act itself, not to impose obligations "on top of that required by the Privacy Act." *Compare* Mot. 10, *with League of Women Voters*, 2026 WL 1784297, at *28–30.

* * *

With these clarifications, the Court reiterates that for the reasons explained in its Memorandum Opinion, the Federal Defendants cannot show a substantial likelihood of success on the merits. *See League of Women Voters v. DHS*, __ F. Supp. 3d.__, No. 25-cv-3501, 2026 WL 1784297 (D.D.C. June 22, 2026). Accordingly, this factor weighs heavily against a stay.

---

[5] Since the Federal Defendants do not provide any citation to the Memorandum Opinion, it is unclear what APA argument they are even referencing. The lack of citation is good reason to question whether the Federal Defendants actually understand the Court's Memorandum Opinion to add procedural requirements beyond those in the statute. The Court stresses (as it did in its Memorandum Opinion) that application of the change-in-position doctrine and arbitrary-and-capricious review generally does not require the findings and statement of purpose normally required under 5 U.S.C. § 553(c). *See League of Women Voters*, 2026 WL 1784297, at *30 ("[A]n agency that [i]s exempt from making findings under Section 553(c) . . . [i]s nevertheless subject to arbitrary-and-capricious review, with review focusing on the 'whole record' before the agency when it took the decision." (characterizing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417–21 (1971)).

**B. Irreparable Harm, Public Interest, and Balance of the Equities**

Given their low likelihood of success on the merits, the Federal Defendants "must show a proportionally greater irreparable injury" to justify a stay. *M.M.V.*, 459 F. Supp. 3d at 4 (citing *Cuomo*, 772 F.2d at 974). And since the "the Government" is the moving party, "harm to the opposing party and the public interest, merge." *See Nken*, 556 U.S. at 435. Together, these remaining factors do not help the Federal Defendants.

The Federal Defendants' arguments fall into three buckets. First, they discuss their purported harms and interests in citizenship verification. Second, they focus on their purported harms and interests related to a consent decree. *See* Mot. 11–13. Third, they discuss injuries stemming from a court order enforcing that decree. *See* Reply 7–9, ECF No. 120. The Court addresses each in turn.

**1. Verification Injuries**

First, the Federal Defendants argue that they are irreparably harmed because without the modified SAVE, "verifications can only occur much more slowly and at much greater cost." Mot. 11.[6] And the Federal Defendants go on to suggest that this harm extends to "state and local agencies [that] rely on the modified SAVE system to maintain accurate voter-registration lists and to verify eligibility for public benefits." Mot. 12. To the extent that the Federal Defendants can

---

[6] The Federal Defendants claim that they face "substantial cost" to retain "both the 'old' SAVE and the upgraded system in parallel." Mot. 11 (citing Broderik Decl. ¶ 10, Mot. Ex. A, ECF No. 116-2). But in support of this proposition, the Defendants cite only a declaration stating that the parallel system of records is being maintained to "prevent[] costly code divergence"—not that maintaining both systems is costly. Broderik Decl. ¶ 10. And it is the moving party's burden to "substantiate the claim" of irreparable injury. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The Federal Defendants do not carry their burden. Even if the Federal Defendants did provide evidence of increased costs from parallel maintenance, the Court is perplexed as to how those costs could be attributed to its Order. Nothing in the Court's Order calls for or authorizes maintenance of a parallel systems of records.

rely on purported injuries to others to show irreparable harm,[7] this argument is misguided.

As the Court explained in its Memorandum Opinion, the ordinary meaning of "verification" is "the act or process of verifying" or "the state of being verified." *League of Women Voters*, 2026 WL 1784297, at *32 (quoting *Verification*, Merriam Webster's Collegiate Dictionary (10th ed. 1996)). And to "verify" means "'to establish the truth, accuracy, or reality of' something." *Id.* (quoting *Verify*, Merriam Webster's Collegiate Dictionary (10th ed. 1996)). Here, the Court found, based on the administrative record, that SSA data in the modified SAVE was partially "inaccurate" and therefore resulted in false identifications of U.S. citizens as non- citizens, a fact that the Federal Defendants did not dispute. *See, e.g.*, *id.* at *15, *32. Based on this finding, the Court held that the modified SAVE was not being used for "verification" of the Plaintiffs' members—because it failed to establish the "truth," "accuracy," or "reality" of their citizenship on voter registration forms. *Id.* at *32. In fact, it did the opposite. *See id.* at *15, *32. The Federal Defendants face little harm to their ability to verify the accuracy of information if the verification system that they seek to use has known inaccuracies in the first place. *See id.* at *6 (noting that the Federal Defendants were aware of the inaccuracies).

But even assuming that the Federal Defendants suffer verification injuries, the extent of those injuries are minimal. The Federal Defendants can hardly complain that it slows them down to comply with the Social Security Act and the Privacy Act. After all, Congress enacted those statutes to protect the privacy interests of Americans, recognizing that the statutory protections might lead to decreased government efficiency. And recall that DHS has long conducted similar verifications without using SSA data. It is also unclear whether any verification injuries are

[7] *See DeRouin v. NASA*, No. 26-cv-1087, 2026 WL 890421, at *2 n.1 (D.D.C. Apr. 1, 2026) ("[I]njuries to third parties are not a basis to find irreparable harm." (alteration in original) (quoting *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018))).

imminent since many states have already conducted voter roll maintenance through SAVE. The Federal Defendants previously represented that state voter roll maintenance in the ninety days prior to a federal primary or general election would be unlawful. *See* Opp'n to Prelim. Inj. Mot. 35–36, ECF No. 37. So it is unclear what harm the Federal Defendants truly face from failure to use the modified SAVE in the immediate future.

In sum, any verification injuries, to the extent they exist, are minimal and do not outweigh the other stay factors.

**2. Consent Decrees**

Somewhat audaciously, the Federal Defendants next argue that they are irreparably harmed based on their belief that complying with the Court's Order "brings [the Federal] Defendants out of compliance with a" consent decree "entered in the Northern District of Florida" *during the course of this litigation*. Mot. 12. The Defendants made a similar argument at summary judgment when they asked the Court to dismiss the case altogether based on this very decree. As the Court noted then, it is unclear whether "equitable considerations of clean hands, 'good faith,' and the prevention of 'forum shopping'" would permit the award of equitable relief based on such a decree. *League of Women Voters*, 2026 WL 1784297, at *34 (quoting *EEOC v. Univ. of Pa.*, 850 F.2d 969, 972, 979 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990)).

That consent decree was filed on November 28, 2025, and approved on December 1, 2025—nearly two months after the Plaintiffs filed this action. *See* Pl.'s Mot. Dismiss, *Florida v. DHS*, No. 3:24-cv-00509, ECF No. 30 (N.D. Fla. Nov. 28, 2025); Order, *Florida v. DHS*, No. 3:24-cv-00509, ECF No. 31 (N.D. Fl. Dec. 1, 2025). The proposed decree was accompanied by an Amended Complaint that added various states into that action who had initially filed suits in other fora. *See* Am. Comp., *Florida v. DHS*, No. 3:24-cv-00509, ECF No. 29 (N.D. Fla. Nov. 28,

2025); Notice (Dec. 5, 2025), ECF No. 59. In doing so, the Federal Defendants were able to consolidate several suits against them nationwide into a single forum and reach a consent decree in their chosen district. *See* Notice (Dec. 5, 2025). At that time, the Federal Defendants were also fully aware that the Plaintiffs were seeking the relief at issue in this case and had adverse interests to the parties to that consent decree. Indeed, the Federal Defendants expeditiously informed the Court when that decree was entered, making clear that they knew the interrelated nature of these suits. *See* Notice (Dec. 5, 2025).

The Federal Defendants thus knew that this suit had the potential to implicate the permissible "terms" under that agreement and their statutory "authority" to make certain concessions in a consent decree. *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997). The Defendants choose to ignore those considerations, making any injury arising from that decision self-inflicted. And "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A Charles A Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed., Apr. 2026 Update) (citing *Bennett v. Isagenix International LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024); and *Di Biase v. SPX Corporation*, 872 F.3d 224, 235 (4th Cir. 2017)); *see also Cuomo*, 772 F.2d at 977.

Stepping back, consider the upshot of the Federal Defendants' argument in light of the other stay factors. No one denies that the "perpetuation of unlawful agency action" does not serve the "public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Yet accepting the Federal Defendants' argument would eviscerate that factor altogether. The Executive Branch could enter into settlement agreements to engage in statutorily prohibited conduct and thus circumvent any restriction that Congress placed on it during the course of an appeal. In other words, put a consent decree into the mix and the stay inquiry will always be

inversed: the proper enforcement of federal statutes would always weigh against a stay (as irreparable harm arising from tension with the consent decree) rather than only for it (in favor of the public interest). The Executive Branch could manufacture "irreparable injury" in advance of judgment in an action. Where a stay was once an "extraordinary remedy," it would become a mundane one. *M.M.V.*, 459 F. Supp. 3d at 4. Neither law nor common sense supports such an absurd result.

To the extent that manufactured harms can be considered injury, the public's "substantial" interest "in having governmental agencies abide by the federal laws that govern their existence and operations" overrides it. *Newby*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). "[T]he thrust of the [] laws cannot be avoided merely by claiming that the otherwise illegal conduct is compelled by contractual obligations. Were it otherwise, the [] laws could be nullified. Contractual obligations cannot thus supersede statutory imperatives." *United States v. Loew's, Inc.*, 371 U.S. 38, 51 (1962), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). For this reason, the "United States" is not "bound" by an "agreement to do or cause to be done what the law does not sanction or permit." *OPM v. Richmond*, 496 U.S. 414, 420 (1990) (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 408–409 (1917)). Any other approach would make a mockery of Congress and our constitutional structure. *See Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 642 (1993) ("If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions." (quoting *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 223–24 (1986))); *Connolly*, 475 U.S. at 224 ("[W]hen contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity."); *Guar. Tr. Co. of New York v. Henwood*,

307 U.S. 247, 258–59 (1939) ("[C]ontracts between private parties cannot create vested rights which serve to restrict and limit an exercise of a constitutional power of Congress.").

Not only does the Federal Defendants' argument make a mockery of separation of powers, it undercuts the very underpinning of our justice system. Due process deeply rooted in "Anglo-American jurisprudence" has long recognized that one cannot be "bound by a judgment in personam in a litigation in which [one] is not designated as a party or to which [one] has not been made a party by service of process." *In re Admin. Subpoena 25 1431 032 to Rhode Island Hosp.*, No. 1:26-cv-0007, 2026 WL 1392565, at *4 (D.R.I. May 14, 2026) (quoting *Martin v. Wilks*, 490 U.S. 755, 765 (1989)); *see also Hansberry v. Lee*, 311 U.S. 32, 40 (1940). But the Federal Defendants ask the Court to do just that. Under their approach, the Plaintiffs' rights are determined not by an action where they are given notice and an opportunity to be heard. Rather, the Federal Defendants posit that a "decree among parties to a[nother] lawsuit" should "conclude the[ir] rights" to speedy resolution of disputes. *In re Admin. Subpoena*, 2026 WL 1392565, at *4. Equity and the public interest do not require such hardship. And this self-imposed harm plainly does not favor a stay.

**3. Florida Court Order**

Finally, the Federal Defendants say that they are irreparably harmed because a court in the Northern District of Florida entered an order yesterday—shortly before the reply deadline set by this Court—enforcing the Florida consent decree. *See* Reply, ECF No. 120; Florida Order, ECF No. 120-2. But with all due respect, that court, which was no doubt pressed for time with emergency briefing on a motion to enforce the consent decree over a holiday weekend, erred in significant ways. And that court may well correct those errors down the road once made aware of them, which would mitigate any harm to the Federal Defendants.

For starters, the Northern District of Florida court presumed that it could determine "the precise legal rights of the parties" or "resolve the merits of the claims" underlying the Florida consent decree. *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (quoting *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980)). In enforcing the decree yesterday, that court stated that it had "implicitly found that the modifications [to SAVE] were not inconsistent with federal law when it approved the [consent decree]"—despite admittedly approving the decree without "undertak[ing] an extensive assessment of the legality of the features that the settlement agreement required the SAVE system to include." Florida Order 6 & n.5. The court clarified that it was engaging in a merits assessment and "ma[de] explicit what was implicit in the approval of the settlement agreement—the modifications to the SAVE system, including the bulk-upload and SSN-search features, do not violate the Social Security Act or the Privacy Act." Florida Order 6 n.5. But of course, it is black-letter law that "a decree, which appears by the record to have been rendered by consent is always affirmed, *without considering the merits of the cause*." *Swift & Co. v. United States*, 276 U.S. 311, 324 (1928) (emphasis added) (quoting *Nashville, C. & St. L. Ry. Co. v. United States*, 113 U.S. 261, 265 (1885)); *see also NLRB. v. Ochoa Fertilizer Corp.*, 368 U.S. 318, 323 (1961) (same).

"When entering consent decrees, federal courts do 'not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy.'" *Mi Familia Vota v. Fontes*, 152 F.4th 1153, 1156 (9th Cir. 2025) (Nelson, J., concurring in part and dissenting from denial rehearing *en banc*) (quoting *Gorsuch*, 718 F.2d at 1126); *see also EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (collecting cases) ("[A] district court should refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights."). This is because Article III limits the "judicial power" only to "actual

controversies arising between *adverse litigants*." *Muskrat v. United States*, 219 U.S. 346, 361 (1911) (emphasis added). And "[w]hen 'both litigants desire precisely the same result,' as with consent decrees, there is 'no case or controversy within the meaning of Art. III of the Constitution.'" *Mi Familia Vota*, 152 F.4th at 1156 (Nelson, J., concurring in part and dissenting from denial of rehearing *en banc*) (quoting *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971)). It follows, then, that the Northern District of Florida court had no authority to make merits determinations about the legality of SAVE, either implicitly or explicitly.[8]

The prohibition on rendering advisory opinions without adverse parties is not only jurisdictional but prudential. The only parties before the Northern District of Florida court were the federal government and the States that it mutually contracted with. And a decision on the merits without adverse briefing from directly affected parties is fundamentally unsound. *Cf. NRC v. Texas*, 605 U.S. 665, 677 (2025) ("[P]articipation by amici in a court proceeding does not make the amici parties[.]"). This Court's 75-page Memorandum Opinion was the result of thorough, adverse briefing on the merits. The Northern District of Florida court spent roughly one paragraph to reach differing conclusions, Florida Order 7–8, and did so without the benefit of adverse parties raising every argument in their favor and pointing out the flaws in contrary ones. The errors in the resulting order, both on the nature of review when entering a consent decree and on the merits issues themselves, illustrate why courts do not proceed in this way.

For instance, the Northern District of Florida court cites to a provision of the Social Security Act in its Privacy Act analysis to suggest that the purpose of a social security number is "to establish the age, citizenship, or alien status and true identity" of individuals. Florida Order 8

---

[8] The Court does not fault the Northern District of Florida court for the oversight, as none of the parties in that litigation (chiefly, DHS) seemed to have alerted the court to these constraints.

(quoting 42 U.S.C. § 405(c)(2)(B)(ii)). But the cited provision does not govern the purpose of social security numbers at all. Rather, that provision merely explains the contents of an application for a social security number:

> The Commissioner of Social Security shall require of applicants for social security account numbers such evidence as may be necessary to establish the age, citizenship, or alien status, and true identity of such applicants, and to determine which (if any) social security account number has previously been assigned to such individual.

42 U.S.C. § 405(c)(2)(B)(ii). And, of course, application requirements do not necessarily illuminate the purpose of the thing being applied for.[9]

In the end, the federal government entered into a consent decree with non-adverse parties with full recognition that adverse third parties—*i.e.*, the Plaintiffs in this suit—were challenging the legality of the very terms that they were agreeing to. And they did not make the Northern District of Florida court aware of this fact. Indeed, that court observed that "the conundrum that now exists might have been avoided" had "the parties to th[at] case" brought the instant "case to th[at] [c]ourt's attention before it approved the settlement agreement." Florida Order 7 n.6. And had the federal government chosen to proceed in that manner instead, the Northern District of Florida court certainly could have weighed the principle based in equity and comity that "judges should not enter consent decrees interfering with the legal entitlements of non-consenting parties." *People Who Care v. Rockford Bd. of Educ. Sch. Dist. No. 205*, 964 F.2d 639, 640 (7th Cir. 1992). The Northern District of Florida court was correct in observing that "the conundrum that now exists might have been avoided" by the actions of the Federal Defendants. Florida Order 7 n.6.

[9] For instance, an individual applying for a library card from their county library might be asked to provide proof that they reside in that county. That does not mean that the purpose of the library card is to establish proof of the applicant's residence. The purpose of the card is to allow that individual to borrow books.

And such "self-imposed" injuries cannot constitute irreparable harm that would warrant the stay that the Federal Defendants now seek in this Court. *See Gorsuch*, 718 F.2d at 1126.

More broadly, it is abundantly clear that this Court would have erred had it simply "deferred to [the Northern District of Florida's] implicit determination that the modifications to the SAVE system were lawful" in deciding the instant case—as that court suggested was the proper course. Florida Order 7 n.6. There are no "implicit" merits determinations in the entry of a consent decree. *Cf. Gorsuch*, 718 F.2d at 1126 ("The court's duty when passing upon a settlement agreement is fundamentally different from its duty in trying a case on the merits."). To the contrary, it is a consent decree that may "warrant reexamination" based on "changes in governing law or its interpretation by the courts." *Horne v. Flores*, 557 U.S. 433, 447–48 (2009); *see also Agostini v. Felton*, 521 U.S. 203, 215, 239 (1997) (holding a district court abused its discretion by failing to modify its consent decree prospectively based on changes in "decisional law" under Federal Rule of Civil Procedure 60(b)(5) but noting a court "rarely" needs to do so retrospectively under Rule 60(b)(6)); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992) ("A consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law," including intervening "decisional law"). It goes without saying that decisional law may only arise from cases or controversies between "adverse parties, whose contentions are submitted to the court for adjudication." *Muskrat*, 219 U.S. at 357 (quoting *In re Pac. Ry. Comm'n*, 32 F. 241, 255 (C.C.N.D. Cal. 1887) (Field, J.)). And favorable parties cannot contract for judicial determination of a legal issue where an Article III controversy would not otherwise exist. *Cf. id.* at 359–60 ("It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act." (quoting *Chi. & G.T. Ry. Co. v. Wellman*, 143 U.S. 339,

345 (1892)); *Sosna v. Iowa*, 419 U.S. 393, 398 (1975) ("[Parties] may not by stipulation invoke the judicial power of the United States in litigation which does not present an actual 'case or controversy.'" (quoting *Richardson v. Ramirez*, 418 U.S. 24 (1974)).

Ultimately though, even if the order from the Northern District of Florida stands, any (self-imposed) harm to the Federal Defendants does not justify a stay of the entirety of this Court's Order. The consent decree in Florida binds only DHS, not SSA, as SSA is not a party to that action. *See* Order, *Florida v. DHS*, No. 3:24-cv-00509, ECF No. 31 (N.D. Fl. Dec. 1, 2025). So that consent decree has no bearing on this Court's order with respect to SSA. It is well established that a judgment in a suit against one federal agency is not "binding" upon others—"[t]hey were not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 (1992). Further, the equitable relief obtained as a result of the Florida consent decree governs only the states that are parties in that action. *See generally Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Thus, it would not be a basis to stay the effects of the Court's order with respect to other SAVE users.

* * *

Weighing the stay factors in totality, the Federal Defendants do not meet their heavy "burden of showing that the circumstances justify" a stay. *Nken*, 556 U.S. at 434.

## CONCLUSION

For the foregoing reasons, the Court denies the Defendants' Motion for Stay Pending Appeal, ECF No. 116.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: July 8, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br>*Plaintiffs*,<br>v.<br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br>*Defendants*. | Civil Action No. 25-3501 (SLS)<br>Judge Sparkle L. Sooknanan |

**ORDER**

For the reasons stated in the Court's Memorandum Opinion, ECF No. 123, the Court **DENIES** the Federal Defendants' Motion to Stay Pending Appeal, ECF No. 116.

**SO ORDERED.**

SPARKLE L. SOOKNANAN
United States District Judge

Date: July 8, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | No. 1:25-cv-03501-SLS |

**NOTICE OF APPEAL**

All Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Memorandum Opinion and Order issued on June 22, 2026. ECF Nos. 111, 112.

Dated: June 25, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLUMBIA

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, ET AL., *Plaintiffs,* v. U.S. DEPARTMENT OF HOMELAND SECURITY, ET AL. *Defendants,* | Case No. 1:25-cv-003501 |

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendant-Intervenor, the State of Texas, hereby appeals to the United States Court of Appeals for the District of Columbia from the Memorandum Opinion and Order (ECF No. 111, 112) entered on June 22, 2026. Under Fed. R. App. P. 3(c)(4), this notice of appeal encompasses all orders merged into the Court's Order.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ *Brianna M. Krominga*
BRIANNA M. KROMINGA
Assistant Attorney General
Texas Bar No. 24103252
WILLIAM D. WASSDORF
Associate Deputy AG for Civil Litigation
Texas Bar No. 24103022

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(240) 290-8884 | FAX: (512) 320-0667
Will.wassdorf@oag.texas.gov
brianna.krominga@oag.texas.gov
*Counsel for State Defendant-Intervenor*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on August 21, 2026, a true and correct copy of the above and foregoing document has been served using the CM/ECF system to all counsel of record and parties of record.

*/s/ Brianna M. Krominga*
BRIANNA M. KROMINGA

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Case No. 25-cv-3501-SLS |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. SAVE was previously a limited tool used to verify citizenship or immigration status of individuals who had interacted with the immigration system. ........ 3

II. Defendants unlawfully transform SAVE into a national citizenship data bank pursuant to the Elections EO. ........ 5

III. DHS and SSA belatedly publish modified SORNs and solicit public comment in response to this suit. ........ 7

IV. How the overhauled SAVE process works for voter roll bulk uploads and SSN searches.. 8

V. States are rapidly using SAVE to conduct mass voter citizenship checks, imperiling millions of Americans' privacy and voting rights, including Plaintiffs' members. ........ 11

LEGAL STANDARD ........ 12

ARGUMENT ........ 12

I. Plaintiffs have standing. ........ 13

A. Plaintiffs have associational standing. ........ 13

1. Privacy injuries to Plaintiffs' members ........ 14

2. Reputational injuries to LWVTX and EPIC members ........ 16

3. Voting-related injuries to LWVTX members ........ 16

4. Plaintiffs satisfy the remaining elements of associational standing ........ 19

B. LWVTX and LWVLA have organizational standing based on overhauled SAVE's harm to their mission-critical functions. ........ 20

C. EPIC has standing to challenge Defendants' violations of the Privacy Act's procedural requirements for matching programs. ........ 22

D. Plaintiffs' injuries are caused by Defendants' SAVE overhaul and redressable by this Court. ........ 24

II. Plaintiffs are entitled to summary judgment. ........ 25

A. The SAVE overhaul lacks statutory authorization and affirmatively violates the Social Security Act (Count One). ........ 25

1. Traditional tools of construction show that the SAVE overhaul lacks statutory authorization. ........ 26

2. The major questions doctrine confirms that the SAVE overhaul lacks statutory authorization. ........ 30

3. Defendants' unauthorized disclosures violate the Social Security Act. ... 32

B. The SAVE overhaul violates the separation of powers (Counts Two and Three). 33

C. The SAVE overhaul violates the APA because it was contrary to the Privacy Act's substantive restrictions (Count Four). ... 35

1. Overhauled SAVE improperly discloses and repurposes records in bulk in violation of 5 U.S.C. § 552a(b) and § 552a(a)(7). ... 35

2. Overhauled SAVE maintains records that are inaccurate, untimely, and incomplete and uses them for agency determinations about individuals, contrary to 5 U.S.C. §§ 552a(e)(5), (6), and (10). ... 38

D. The SAVE overhaul violates the APA because it failed to comply with the Privacy Act's procedural requirements (Count Five). ... 38

E. The SAVE overhaul violates the APA because it was arbitrary and capricious (Count Six). ... 40

1. Defendants predetermined the outcome ... 40

2. Defendants disregarded relevant factors. ... 41

3. Defendants disregarded adverse evidence. ... 41

4. Defendants violated the change-in-position doctrine. ... 43

F. Defendants have unlawfully withheld compliance with the Privacy Act's requirements for computer matching programs (Counts Seven and Eight). ... 44

G. Counts One, Two, and Four through Seven are reviewable under the APA. ... 45

1. Plaintiffs challenge final agency action. ... 45

2. Plaintiffs have an APA remedy for the Privacy Act violations alleged in Counts Four, Five, and Seven. ... 46

III. Plaintiffs are entitled to their requested relief. ... 48

CONCLUSION ... 50

## TABLE OF AUTHORITIES†

### Cases

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006) .......... 13

**AFL-CIO v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025) .......... 14, 15, 46, 47

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .......... 32

*All. for Retired Ams. v. Bessent*,
770 F. Supp. 3d 79 (D.D.C. 2025) .......... 14, 15

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) .......... 12

*Am. C.R. Union v. Phila. City Comm'rs*,
872 F.3d 175 (3d Cir. 2017) .......... 34

*Am. Encore v. Fontes*,
152 F.4th 1097 (9th Cir. 2025) .......... 16

*Am. Hosp. Ass'n v. Burwell*,
812 F.3d 183 (D.C. Cir. 2016) .......... 50

*Ames v. DHS*,
861 F.3d 238 (D.C. Cir. 2017) .......... 35

**Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) .......... *passim*

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......... 34

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) .......... 17

*Babamuradova v. Blinken*,
633 F. Supp. 3d 1 (D.D.C. 2022) .......... 50

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020) .......... 40

*Bridgeport Hosp. v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024) .......... 48, 49

*Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989) .......... 35, 36

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025) .......... 33, 49

† Authorities marked with an asterisk are those on which counsel chiefly relies.

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019) ........................................ 40, 41

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
408 F.3d 1349 (11th Cir. 2005) ........................................ 17

*Chichakli v. Tillerson*,
882 F.3d 229 (D.C. Cir. 2018) ........................................ 35

*City & County of San Francisco v. EPA*,
604 U.S. 334 (2025) ........................................ 29, 30

*Common Cause Indiana v. Lawson*,
937 F.3d 944 (7th Cir. 2019) ........................................ 22

*Common Cause/Ga. League of Women Voters of Ga., Inc. v. Billups*,
439 F. Supp. 2d 1294 (N.D. Ga. 2006) ........................................ 19

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ........................................ 17

*Ctr. for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025) ........................................ 42

*Ctr. for Taxpayer Rts. v. IRS*,
2025 WL 3251044 (D.D.C. Nov. 21, 2025) ........................................ 14, 16, 47

*Dalton v. Specter*,
511 U.S. 462 (1994) ........................................ 34

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................ 24

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........................................ 40

*Doe v. Chao*,
540 U.S. 614 (2004) ........................................ 47

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) ........................................ 47

*Drs. for Am. v. OPM*,
793 F. Supp. 3d 112 (D.D.C. 2025) ........................................ 25

*Equal Rts. Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ........................................ 22

*FCC v. Consumers' Rsch.*,
145 S. Ct. 2482 (2025) ........................................ 27

*FCC v. NextWave Pers. Commc'ns, Inc.*,
537 U.S. 293 (2003) ........................................ 30

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........................................ 20

*FDA v. Wages & White Lion Invs.*,
604 U.S. 542 (2025) .......... 43

*FEC v. Cruz*,
596 U.S. 289 (2022) .......... 25

*Fish v. Schwab*,
957 F.3d 1105 (10th Cir. 2020) .......... 17

*Friends of Animals v. Jewell*,
824 F.3d 1033 (D.C. Cir. 2016) .......... 23

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 13

*Garcia v. Vilsack*,
563 F.3d 519 (D.C. Cir. 2009) .......... 47

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .......... 20, 21

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018) .......... 34

*Jeffries v. Volume Servs. Am.*,
928 F.3d 1059 (D.C. Cir. 2019) .......... 15, 16

*Judge Rotenberg Educ. Ctr., Inc. v. FDA*,
3 F.4th 390 (D.C. Cir. 2021) .......... 25

*Kennedy v. Braidwood Mgmt.*,
606 U.S. 748 (2025) .......... 28

*LaRoque v. Holder*,
650 F.3d 777 (D.C. Cir. 2011) .......... 13

*Las Ams. Immigrant Advoc. Ctr. v. DHS*,
783 F. Supp. 3d 200 (D.D.C. 2025) .......... 48

**League of United Latin Am. Citizens v. EOP*,
2026 WL 252420 (D.D.C. Jan. 30, 2026) .......... *passim*

**League of United Latin Am. Citizens v. EOP*,
808 F. Supp. 3d 29 (D.D.C. 2025) .......... *passim*

*League of Women Voters of Fla., Inc. v. Lee*,
576 F. Supp. 3d 1004 (N.D. Fla. 2021) .......... 19

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 48, 49

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 25, 36

*Marin Audubon Soc'y v. FAA*,
121 F.4th 902 (D.C. Cir. 2024) .......... 25

*Maydak v. United States*,
363 F.3d 512 (D.C. Cir. 2004) ....................36

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ....................24

**Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) ....................16, 18, 19

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999) ....................33

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ....................49

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................40

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ....................49

*N.H. Youth Movement v. Scanlan*,
2026 WL 323171 (D.N.H. Feb. 6, 2026) ....................17

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
595 U.S. 109 (2022) (per curiam) ....................31

*New Eng. Power Co. v. New Hampshire*,
455 U.S. 331 (1982) ....................27

*New Mexico v. Musk*,
784 F. Supp. 3d 174 (D.D.C. 2025) ....................14

*NRDC v. EPA*,
755 F.3d 1010 (D.C. Cir. 2014) ....................24

*Powder River Basin Res. Council v. Dep't of Interior*,
749 F. Supp. 3d 151 (D.D.C. 2024) ....................20

*Pub. Emps. for Env't Resp. v. Hopper*,
827 F.3d 1077 (D.C. Cir. 2016) ....................41

*RAICES v. Noem*,
793 F. Supp. 3d 19 (D.D.C. 2025) ....................21

*Richardson v. Trump*,
496 F. Supp. 3d 165 (D.D.C. 2020) ....................17

*Richman v. United States*,
350 F.R.D. 401 (D.D.C. 2025) ....................48

*RNC. v. N. Carolina State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) ....................20, 21

*Rural Cellular Ass'n v. FCC*,
588 F.3d 1095 (D.C. Cir. 2009) ....................39

*Sandusky Cnty. Democratic Party v. Blackwell*,
387 F.3d 565 (6th Cir. 2004) ....................34

*Sierra Club v. Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025)....................41

*Sierra Club v. Perry*,
373 F. Supp. 3d 128 (D.D.C. 2019)....................20

*Sierra Club v. Salazar*,
177 F. Supp. 3d 512 (D.D.C. 2016)....................41

*South Carolina v. United States*,
907 F.3d 742 (4th Cir. 2018) ....................50

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)....................13

*Stuttering Found. of Am. v. Springer*,
498 F. Supp. 2d 203 (D.D.C. 2007)....................12

*Townsend v. United States*,
236 F. Supp. 3d 280 (D.D.C. 2017)....................35

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................14, 16

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)....................45

*U.S. Sugar Corp. v. EPA*,
113 F.4th 984 (D.C. Cir. 2024)....................25

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*,
517 U.S. 544 (1996)....................20

*United States v. Weber*,
2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ....................40

*United to Protect Democracy v. Pres. Advisory Comm'n on Election Integrity*,
288 F. Supp. 3d 99 (D.D.C. 2017)....................23

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)....................30

*Va. Coal. for Immigrant Rts. v. Beals*,
803 F. Supp. 3d 454 (E.D. Va. 2025) ....................20, 21, 22

*Venetian Casino Resort, LLC v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008)....................46

*Voto Latino v. Hirsch*,
712 F. Supp. 3d 637 (M.D.N.C. Jan. 21, 2024)....................22

*Washington v. Trump*,
2026 WL 73866 (W.D. Wash. Jan. 9, 2026)....................33, 49

*West Virginia v. EPA*,
597 U.S. 697 (2022)....30, 32, 34

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....33

**Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 1....34

U.S. Const. art. I, § 4, cl. 1....34

**Statutes, Rules, & Regulations**

*5 U.S.C.
§ 552a(a)(2)....48
§ 552a(a)(3)....38
§ 552a(a)(7)....35, 37
§ 552a(a)(8)(A)(i)(I)....44, 45
§ 552a(a)(8)(B)(i)....30
§ 552a(a)(8)(B)(ix)....30
§ 552a(b)....35
§ 552a(b)(3)....35
§ 552a(b)(7)....38
§ 552a(e)(4)....6, 39
§ 552a(e)(5)....38
§ 552a(e)(6)....38
§ 552a(e)(10)....38
§ 552a(e)(11)....6, 39, 46
§ 552a(e)(12)....6
§ 552a(g)....48
§ 552a(g)(1)(D)....48
§ 552a(o)....45
§ 552a(o)(1)(A)....44
§ 552a(o)(1)(B)....44
§ 552a(o)(1)(C)....44
§ 552a(o)(1)(D)....44
§ 552a(o)(1)(E)....44
§ 552a(o)(1)(F)....44
§ 552a(o)(1)(G)....44
§ 552a(o)(1)(J)....44

*5 U.S.C.
§ 552a(o)(2)(A) ....45
§ 552a(o)(2)(C) ....45
§ 552a(p)(1) ....44
§ 704 ....47
§ 706(1) ....49
§ 706(2) ....47
§ 706(2)(A) ....33, 37, 38, 47, 48
§ 706(2)(B) ....48
§ 706(2)(C) ....33, 48
§ 706(2)(D) ....39, 40, 48

8 U.S.C.
§ 1324a note ....29
§ 1373 ....26, 27
§ 1373(a) ....27, 28
§ 1373(c) ....27, 28

18 U.S.C.
§ 611 ....16
§ 1015(f) ....16

*42 U.S.C.
§ 405(c)(2)(C)(viii)(I) ....33
§ 405(c)(2)(C)(viii)(IV) ....33
§ 1306(a) ....32
§ 1320b-7(d) ....3, 26
§ 1320b-7 note ....1, 3, 26

44 U.S.C. § 3501 note ....4

52 U.S.C.
§ 20506 ....34
§ 20507 ....34
§ 20509 ....34
§ 21085 ....34

20 C.F.R.
§ 401.120 ....32
§ 401.155 ....38
§ 422.104 ....36
§ 422.107 ....36

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 642, 110 Stat. 3009 (1996) ....26

Immigration Reform Control Act of 1986, Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359 (1986) ....1, 3, 26

Pub. L. No. 104-208, § 404, 110 Stat. 3009 (1996) ....29

Fed. R. Civ. P. 56(a) ....12

Executive Order 14,248, Preserving and Protecting the Integrity of American Elections, 90 Fed. Reg. 14005 (Mar. 28, 2025) ....................2

*OMB Privacy Act Guidelines, 40 Fed. Reg. 28949 (July 1, 1975) ....................36, 39, 40

**Other Authorities and Materials**

DOJ Office of Inspector General, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients* (May 31, 2016)....................28

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica & Texas Tribune (Feb. 13, 2026)....................2

Jude Joffe-Block, *Trump's SAVE tool is looking for non-citizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025) ....................3

Legislative History of the Privacy Act of 1974, Source Book on Privacy (1976)....................1

Letter from SSA Office of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023)....................37

National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025) ....................37

Office of Justice Programs, *Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373*....................28

OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act* (2016) ....................39, 40

Press Release, DHS*, DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025)....................2

Press Release, Tex. Sec'y of State, *Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025)....................18

Press Release, USCIS, *USCIS Deploys Common Sense Tools to Verify Voters* (May 22, 2025)....................6

Press Release, USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025) ....................2, 7

*Relationship Between Illegal Immigr. Reform & Immigrant Resp. Act of 1996 & Statutory Requirement for Confidentiality of Census Info.*, 1999 WL 34995963, at *4 (O.L.C. May 18, 1999)....................28

Restatement (2d) of Torts, § 652B....................15

Sarah Miller, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2024 and Revised 2023*, Office of Homeland Security Statistics (Sept. 2024)....................31

SSA Office of the Inspector General, *Accuracy of the Help America Vote Verification Program Responses*, No. A-03-09-29115 (June 22, 2009)....................42

SSA, Program Operations Manual System (POMS), *GN 00303.000 Citizenship, Alien Status and Residency* (Jan. 9, 2026) ....................36

SSA, Program Operations Manual System (POMS), *GN 03312.001 Disclosure Without Consent for Law Enforcement Purposes* (Sept. 12, 2005) ....................................38

SSA, Program Operations Manual System (POMS), *GN 03312.080 Valid Law Enforcement Requests* (Nov. 9, 2023) ....................................................................38

SSA, Program Operations Manual System (POMS), *GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN) Without Consent* (2023) ........................15

U.S. Census Bureau, *Nativity and Citizenship Status in the United States* (accessed Feb. 23, 2026).......................................................................................31

USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (Jan. 24, 2025).....................4

*Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at A Loss*, 2025 WL 3251685 (Nov. 7, 2025) ......................................................28

## INTRODUCTION

Congress has not authorized the federal government to create a master registry of U.S. citizens. As a result, no single agency has a comprehensive dataset capable of providing accurate, real-time verification of individuals' U.S. citizenship status. Federal agencies instead possess citizenship data that they collected for disparate, congressionally authorized functions, but that was never meant to be fed into a centralized database.

This is no accident. Half a century ago, in response to unprecedented Executive Branch abuse of Americans' personal data, Congress enacted the Privacy Act of 1974 specifically to prevent the government from creating "centralized Federal information systems" that consolidate our sensitive information across agencies in ways that could endanger our fundamental rights. Legislative History of the Privacy Act of 1974, Source Book on Privacy, at 168, 217, 884 (1976), https://perma.cc/9W9F-R5ZL.

But in 2025, the Department of Homeland Security ("DHS") created—without statutory authorization—a never-before-seen system for mass citizenship checks to "verify" individuals' eligibility to vote and obtain government benefits. DHS made the system by haphazardly combining and repurposing millions of Americans' sensitive personal data, including citizenship data known to be unreliable, from disparate records systems at the Social Security Administration ("SSA"), DHS, the State Department, and various other federal and state agencies. In doing so, DHS vastly exceeded its lawful authority, usurped powers our Constitution reserves for the States and Congress, and flouted multiple statutes that protect Americans' privacy and data security.

Defendants carried out this illegal operation by repurposing a preexisting system housed at U.S. Citizenship and Immigration Services ("USCIS") called the Systematic Alien Verification for Entitlements ("SAVE") system. As its name indicates, Congress established SAVE to help agencies verify whether *non-citizens* ("aliens") are eligible for certain government *benefits* ("entitlements"). *See* Immigration Reform Control Act of 1986, Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359, 3391 (1986), *codified at* 42 U.S.C. § 1320b-7 note. SAVE was never meant to conduct bulk queries about U.S. citizens or mass voter eligibility checks. Thus, before

2025, SAVE was exceedingly limited: it did not access databases with information on U.S.-born citizens, incorporate SSA records, or permit bulk searches of more than one individual at a time.

Now, Defendants have "overhaul[ed]" SAVE by transforming it into what they call "a single, reliable source for verifying immigration status and U.S. citizenship nationwide." Press Release, DHS, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M; *see* DHS-AR-491. Without following the Privacy Act's notice-and-comment procedures, Defendants dramatically expanded SAVE by connecting it to SSA and various other agency systems, allowing it to access records on U.S.-born citizens, and enabling it to accept "bulk" uploads and search hundreds of millions of Americans' sensitive data in a single query. Defendants hastily took these actions to enable mass voter citizenship checks pursuant to the President's directives in Executive Order 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 28, 2025), DHS-AR-334, without public input or reasoned decision-making.[2]

DHS claims that, as of November 3, 2025, overhauled SAVE has already "enabled state voting agencies to submit over 46 million voter verification queries and has also allowed federal agencies to submit over 110 million queries to help verify eligibility for federally funded benefits." DHS-AR-1341. And DHS is "encourag[ing] *all* federal, state, and local agencies to use the SAVE program," based on a false narrative of "voter fraud" by people other than "American citizens." Press Release, USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025), https://perma.cc/8JWH-G64X (emphasis added).

Predictably, DHS's haphazard and poorly vetted SAVE overhaul has yielded harmful results. As one recent investigation found, "SAVE has made persistent mistakes, particularly in assessing the status of people born outside the U.S." Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica &

---

[2] As used here, the "SAVE overhaul" refers to Defendants' expansion of SAVE in 2025 to allow bulk searches, using non-DHS unique identifiers, of systems of record that are housed outside of DHS and include information on U.S.-born citizens.

Texas Tribune (Feb. 13, 2026), https://perma.cc/GKU7-3C9E. In states like Texas, the overhauled SAVE process has falsely identified significant numbers of eligible voters as non-citizens, forced them to needlessly provide documentary proof of citizenship to retain their voter registration, caused some to be wrongfully removed from voter rolls, and even disenfranchised some. Overhauled SAVE has also subjected its victims to potential investigation for "non-citizen voting" by state and federal authorities. *See id.*; Jude Joffe-Block, *Trump's SAVE tool is looking for non-citizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU. Plaintiffs are voting and privacy rights organizations whose members have suffered these injuries, and whose core functions are directly harmed by Defendants' illegal actions.

No statute or constitutional provision authorizes Defendants' overhaul of SAVE, and their bulk inter-agency disclosures and repurposing of Americans' sensitive data violates the substantive and procedural protections of the Privacy Act, the Social Security Act, and longstanding SSA policies. Separately, to the extent that overhauled SAVE is being used as a new "computer matching program" to verify eligibility for federal benefits, Defendants have flouted the Privacy Act's notice-and-comment requirements for matching programs.

The Court should enter summary judgment for Plaintiffs; hold unlawful, vacate, and set aside Defendants' overhaul of SAVE; order them to publish all matching agreement information required by law; and issue corresponding declaratory and injunctive relief.

## BACKGROUND

### I. SAVE was previously a limited tool used to verify citizenship or immigration status of individuals who had interacted with the immigration system.

Congress established SAVE in the Immigration Reform and Control Act of 1986 to help agencies verify whether non-citizens were eligible for certain government benefits. *See* Pub. L. No. 99-603, title I, § 121(a)(1)(C), 100 Stat. 3359, 3384-86 (1986), *codified at* 42 U.S.C. § 1320b-7(d) (section titled "Verification of Immigration Status of Aliens Applying for Benefits under Certain Programs"); *see also id.* §1 21(c)(1), 100 Stat. at 3391, *codified at* 42 U.S.C. § 1320b-7 note; DHS-AR-420.

Before 2025, SAVE was limited in three critical respects. First, it did not permit queries of U.S.-born citizens. DHS-AR-278; *see also* DHS-AR-108. As confirmed by SAVE's 2020 System of Records Notice ("SORN") and 2020 Privacy Impact Assessment ("PIA"),[3] SAVE could only verify the "citizenship and immigration status of an immigrant, nonimmigrant, and certain *naturalized and derived* U.S. citizens." DHS-AR-195 (emphasis added); *see also* DHS-AR-108. SAVE rarely had access to records about U.S.-born citizens unless they had some other interaction with DHS, *e.g.*, as a sponsor for a non-citizen. *See* DHS-AR-111.

Second, SAVE only accessed records stored in DHS systems, along with certain immigration-related records systems at the State Department and DOJ. *See* DHS-AR-112. Prior to 2025, SAVE did not access databases housed at SSA, nor did it allow users to run searches using an individual's SSN. Instead, it required users to provide an individual's DHS numeric identifier (*e.g.*, an alien registration number or "A-Number"). DHS-AR-248; *see also* DHS-AR-399. Because most U.S.-born citizens do not have DHS numeric identifiers, SAVE could not query most U.S. citizens' records. *See* DHS-AR-248.

Third, SAVE searches could only be conducted on an individualized basis; SAVE did not permit bulk searches of more than one person's data at a time. DHS-AR-247.

Confirming SAVE's prior limited scope, USCIS stated as recently as April 26, 2025, that "SAVE <u>does not</u> verify U.S.-born citizens under any circumstances" and "does not access databases that contain U.S.-born citizen information (for example, birth certificate databases)." USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (Jan. 24, 2025), https://perma.cc/QW29-JZK8 (captured on Apr. 26, 2025).

Since 2009, election officials in some states have used SAVE for voter registration and voter list maintenance purposes, even though no statute explicitly authorizes using SAVE in this

[3] The E-Government Act of 2002 requires federal agencies to conduct a PIA for certain collections of information, addressing what information will be collected, why it is being collected, how it will be used, how it will be secured, with whom it will be shared, whether a system of records is being created under the Privacy Act, and what "notice or opportunities for consent" will be provided to those impacted. *See* 44 U.S.C. § 3501 note.

way. *See* DHS-AR-402. But "[s]ome states . . . complained to DHS-USCIS about the limitation on their ability to verify voters caused by the [DHS] unique identifier requirement," since states typically do not possess individuals' DHS identifiers. DHS-AR-421. In a February 2025 letter to DHS, a group of secretaries of state asked DHS to expand SAVE to, among other things, allow bulk searches of "multiple individuals . . . at once," and enable searches using numeric identifiers other than those issued by DHS. DHS-AR-2.

## II. Defendants unlawfully transform SAVE into a national citizenship data bank pursuant to the Elections EO.

On March 25, 2025, President Trump signed an Executive Order directing federal agencies to take various actions related to the administration of federal elections (the "Elections EO"). DHS-AR-334. The Elections EO instructs that, for the purpose of "identify[ing] unqualified voters registered in the States . . . the Secretary of Homeland Security shall, consistent with applicable law, ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered." DHS-AR-335. It further states that DHS "is required to share database information with States upon request" under "8 U.S.C. 1373(c)" for voter list maintenance, and directs DHS, in coordination with the Department of Government Efficiency ("DOGE"), to compare voter records with "Federal immigration databases." *Id.* And the EO directs SSA to make its databases available "to all State and local election officials" for verifying voter eligibility. *Id.*

Defendants immediately began implementing the Election EO's directives. SSA-AR-1-2 (March 2025 request for DHS-SSA "Voter Verification Service" to begin "immediately"); *see also* DHS-AR-39-67 (March 2025 appendix to prior DHS-State Department data sharing agreement). On April 22, 2025, DHS, USCIS, and DOGE publicly announced they were expanding SAVE to "ensure government officials can swiftly verify legal status, halting entitlements and voter fraud." April 2025 DHS Release, *supra.* They described this transformation as an "overhaul" of SAVE that "breaks down silos for accurate results, streamlines mass status checks, and integrates criminal

records, immigration timelines, and addresses." *Id.*; *see also* DHS-AR-253.

On May 15, 2025, DHS and SSA executed a letter agreement for the overhauled SAVE system ("DHS-SSA SAVE Agreement"). DHS-AR-420-431. Invoking the Elections EO and other directives, DHS-AR-420-422, the agreement purports to authorize "information sharing" between the agencies "by matching data submitted through SAVE to SSA records in SSA's Master Files of Social Security Number (SSN) Holders and SSN Applications, System of Record Notice 60-0058, 90 Fed. Reg. 10025 (Feb. 20, 2025)" ("SSA Master File"), specifies the data elements SSA will share with DHS in response to SAVE inquiries relating to voter eligibility and other purposes, and notes SSA records provided under the agreement will be maintained in the SAVE system of records. DHS-AR-423; SSA-AR-9.

The SSA Master File (also known as NUMIDENT)—to which SAVE is now linked—is a comprehensive database of individuals who have applied for or obtained an SSN. *See* SSA-AR-149. It is a highly sensitive SSA system of record that contains SSNs, other identifying numbers, names, dates and places of birth, citizenship indicators, death records, and information obtained while processing requests for SSNs, *see* SSA-AR-170; DHS-AR-253, including information on "easily over 300 million" Americans, SSA-AR-238.

On May 22, 2025, Defendants publicly launched the expanded SAVE system, touting it as "a single, reliable source for verifying immigration status and U.S. citizenship." DHS-AR-491; *see also* DHS-AR-493, 1385. USCIS announced that overhauled SAVE had two new major features. First, USCIS touted a "new partnership" between SSA and USCIS allowing user agencies to "input Social Security numbers" to "help verify U.S. citizenship." Press Release, USCIS, *USCIS Deploys Common Sense Tools to Verify Voters* (May 22, 2025), https://perma.cc/HBZ5-RW2E. Second, USCIS highlighted that "for the first time" user agencies could bulk upload requests to search millions of individuals' records in a single query. *Id.*; *see also* DHS-AR-491.

Defendants ran roughshod over the Privacy Act's requirements by failing to publish modified SORNs and solicit public comment on their major changes to SAVE. *See* 5 U.S.C. §§ 552a(e)(4), (11), (12). Internal "Privacy Threshold Analysis" documents from July and September

2025 show that DHS was aware that SAVE's continued operation was "not in compliance" with the Privacy Act, DHS-AR-277, 319, and that "[s]hortfalls in data accuracy" in the SSA citizenship data integrated into the overhauled SAVE system "could cause incomplete or false results," DHS-AR-260; DHS-AR-302; *see infra* Argument § II.E. Despite *internally* acknowledging these risks, DHS *publicly* touted SAVE's reliability and enabled and encouraged officials across the country to use the flawed system for "voter verification" and benefits eligibility checks. *See* DHS-AR-449; DHS-AR-491; Press Release, USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025), https://perma.cc/9LN5-SEDU.

### III. DHS and SSA belatedly publish modified SORNs and solicit public comment in response to this suit.

Plaintiffs sued on September 30, 2025, challenging, among other things, Defendants' violations of the Privacy Act's notice-and-comment requirements in overhauling SAVE. *See* Compl. ¶¶ 204-218, ECF 1. DHS and SSA then published—on October 31 and November 12, respectively—modified SORNs for SAVE and the SSA Master File. DHS-AR-114 ("2025 SAVE SORN"); SSA-AR-206 ("2025 SSA Master File SORN") (collectively, the "Modified SORNs").[4] DHS modified the SAVE SORN in part because of this suit. *See* DHS-AR-85.

The 2025 SAVE SORN describes various changes to SAVE, including incorporating records about "U.S. citizens by birth," "revising the record source categories to add [SSA's Master File] and state or other national agencies that issue or maintain driver's license information," and describing the new "capability to create cases in SAVE by uploading a file with a list of multiple cases." DHS-AR-115-17. Invoking the Elections EO, *see id.*, the SORN established new "Routine Use L" to enable DHS to disclose records to SSA "and other federal, state, tribal, territorial, local, governments and other authorized entities to assist [SAVE] user agencies [to] determine U.S. citizenship and immigration status of an individual when a DHS approved agreement is in place between DHS and the entity." DHS-AR-120. Along with the 2025 SAVE SORN, DHS also

[4] SSA issued two modified SORNs for the SSA Master File in 2025—one in February and another in November. As used here, "2025 SSA Master File SORN" refers to the November 2025 SORN.

published an updated PIA for SAVE. *See* DHS-AR-221.

The 2025 SSA Master File SORN provides no details about the SAVE overhaul, but it adds new Routine Use No. 49 for disclosures of "citizenship and immigration information to the Department of Homeland Security, pursuant to 8 U.S.C. 1373(a)." SSA-AR-207.

The Modified SORNs solicited public comment but also included automatic effective dates that made clear Defendants had decided to continue operating SAVE as they had since May 2025, notwithstanding any comments. *See* DHS-AR-115; SSA-AR-207. Within the 30-day comment periods, DHS received over 9,350 comments and SSA received over 21,200, the overwhelming majority of which opposed the SAVE overhaul. *See* FAC ¶¶ 85, 93.[5] Commenters opposing the overhaul included Plaintiffs; a group of 20 state attorneys general; a group of 12 state secretaries of state; members of Congress; state and local agencies; former federal privacy officials and SSA personnel; several voting, immigrant, and privacy rights organizations; and many thousands of individual Americans who objected to DHS and SSA repurposing and misusing their data without notice or their consent. *See* FAC ¶¶ 85, 93 (collecting comments).

Defendants have continued to operate overhauled SAVE since the SORNs' comment periods closed in December 2025 without addressing the tens of thousands of comments opposing their actions. *See generally* DHS-AR; SSA-AR.

## IV. How the overhauled SAVE process works for voter roll bulk uploads and SSN searches.

To access SAVE, user agencies must execute "a Memorandum of Agreement (MOA) or Computer Matching Agreement (CMA)" with USCIS, which establishes "the terms and conditions for the user agency's participation in SAVE." DHS-AR-195-96; *see also* DHS-AR-223; DHS-AR-1344. The Administrative Record reflects the following overhauled SAVE process for when a

[5] Instead of reproducing public comments on the Modified SORNs in the Administrative Record, Defendants have incorporated all comments by reference by linking to regulations.gov. *See* DHS-AR-1537; SSA-AR-0212. Here, Plaintiffs cite to the paragraphs in their FAC compiling links to relevant comments available on regulations.gov.

SAVE user agency runs a bulk search using voters' full names, dates of birth, and full or partial SSNs for mass "voter verification" checks:

**First**, a SAVE user downloads a CSV file (*i.e.*, a spreadsheet) from DHS's SAVE website. DHS-AR-1443. The user then manually enters at least the following data elements into the spreadsheet, for up to millions of voters: first name, last name, date of birth, either a full or partial SSN, and the reason for verification (e.g., voter verification). *Id.* The user then uploads the completed file into the SAVE interface. DHS-AR-1444. While the SAVE user can also provide voters' DHS numeric identifiers (*e.g.*, an A-number) at this step, state and local election agencies typically do not have this information. DHS-AR-225; DHS-AR-2.

**Second**, DHS automatically discloses the voters' uploaded data elements to SSA and uses it to search the SSA Master File. *See* DHS-AR-225; DHS-AR-253; DHS-AR-1525.

**Third**, SSA automatically discloses the SSA Master File search results to DHS, including the following fields:

- SSN Match (True/False)
- Full SSN for all matches (when a partial SSN is provided)
- Name Match (True/False)
- Date of Birth Match (True/False)
- Citizenship/Foreign Indicator
    - Blank – Citizenship code is blank and foreign-born indicator is blank
    - "A" - U.S. citizen
    - "B" - Legal alien; eligible to work;
    - "C" - Legal alien, not eligible to work;
    - "D"- Other;
    - "E" - Alien student- restricted work authorized; and
    - "F"- Conditionally legalized alien
- Foreign Born indicator (Citizenship code is not present, but voter was foreign born);
- State/Country code;
- American Samoa indicator (True/False);
- Alien Registration number (where applicable);
- Death indicator (Yes Deceased/Not Deceased); and
- Error code descriptions (transaction and record levels).

DHS-AR-116; DHS-AR-225-26; DHS-AR-424; DHS-AR-437-438.

The **fourth** step can proceed in several ways, depending on what results DHS receives from SSA's Master File.

If a potential non-U.S. citizen status is identified and a DHS numeric identifier is available (either found in SSA records or provided to DHS by the SAVE user), then SAVE will automatically query additional systems available to it, DHS-AR-1450-1458; DHS-AR-1525, including systems housed at DHS, the Department of Defense, the Department of Education, the Department of Health and Human Services, DOJ, the Department of State, state driver's licensing agencies and, in the future, non-governmental sources such as the National Law Enforcement Telecommunications System (NLETS). DHS-AR-119-120; DHS-AR-227-230. After a manual review of system responses, SAVE will then return a response that will either include the voter's citizenship status—*e.g.*, "U.S. Citizen" or "Lawful Permanent Resident"—or request additional actions by the SAVE user, like submitting additional documents. DHS-AR-1525; DHS-AR-1507; DHS-AR-1378-1379; DHS-AR-1530.

Alternatively, if (a) a potential non-U.S. citizen status is identified and no DHS numeric identifier is found in SSA records or provided to DHS by the SAVE user, (b) the match to SSA records is inconclusive, or (c) SSA records confirm a voter is a citizen or is deceased, then SAVE ends the automated query and generates a response based solely on its search of SSA records. DHS-AR-255; DHS-AR-297. Those possible SAVE responses include:

- U.S. Citizen (per SSA Record);
- Deceased (per SSA record);
- Immigration Enumerator [*i.e.* DHS identifier] Required – Resubmit with Additional Information;
- No Record Found with SSA – Resubmit with Additional Information
- Unable to Return Record from SSA – Resubmit with Additional Information; or
- Full SSN Required – Resubmit with Additional Information.

DHS-AR-1379.

Without a DHS identifier, SAVE cannot proceed beyond querying SSA records. SAVE cannot perform additional review of a response based solely on SSA records because DHS "does not have direct access to the [SSA] system to support these additional steps." DHS-AR-240-241.

**Fifth** and finally, SAVE users act based on the results of the above-described process, which will vary based on the response received.

If the SAVE result identifies a voter as a *citizen*, then the MOA between DHS and SAVE users permits the user to rely on SAVE's confirmation of citizenship. *See* DHS-AR-1508.

If the SAVE result identifies a voter as a *non-citizen* (*e.g.*, SAVE provides a "Lawful Permanent Resident" response), then the SAVE MOA directs that the SAVE user "contact the registrant or registered voter to obtain proof of U.S. citizenship" before denying or cancelling their voter registration. DHS-AR-762; *see also* DHS-AR-1526; DHS-AR-1530.

And if the SAVE result is inconclusive (*e.g.*, SAVE provides an "Immigration Enumerator Required – Resubmit with Additional Information" response), then the SAVE process requires that (1) the SAVE user provide the voter's DHS numeric identifier (which state and local agencies likely do not possess), or (2) the SAVE user "contact the registrant or registered voter to obtain proof of U.S. citizenship" before denying or cancelling their voter registration. DHS-AR-762; *see also* DHS-AR-1526.

## V. States are rapidly using SAVE to conduct mass voter citizenship checks, imperiling millions of Americans' privacy and voting rights, including Plaintiffs' members.

Despite the known and unmitigated problems with overhauled SAVE, *see infra* Argument § II.E, several states are—at the Administration's urging—rapidly deploying the system for mass voter citizenship checks. Early results are damning: they show that, in states such as Texas, the overhauled SAVE process has falsely identified eligible U.S. citizen voters as non-citizens, forced them to needlessly provide documentary proof of citizenship ("DPOC") to state and federal authorities, caused eligible voters to be wrongfully removed from voter rolls, and even disenfranchised some. *See*, *e.g.*, LeBombard Decl. ¶¶ 31-45; Nel Decl. ¶¶ 12-26; B. Doe Decl. ¶¶ 28-31; C. Doe Decl. ¶¶ 17-18. SAVE has also created significant confusion and problems for election administrators, and jeopardized millions of Americans' privacy and data security, including Plaintiffs' members. *See* FAC ¶¶ 131-155; *infra* Argument § I.A-B.

Yet DHS continues to "encourage all federal, state, and local agencies to use the SAVE program" based on false claims of widespread non-citizen voting. Nov. 2025 USCIS Release, *supra*. DHS has touted that overhauled SAVE has, as of November 3, 2025, "enabled state voting agencies to submit over 46 million voter verification queries and ha[d] also allowed federal agencies to submit over 110 million queries to help verify eligibility for federally funded benefits." *Id.*; DHS-AR-1339.

After the close of public comment on the Modified SORNs, Plaintiffs League of Women Voters ("LWV"), League of Women Voters of Texas ("LWVTX"), League of Women Voters of Louisiana and League of Women Voters of Louisiana Education Fund (together, "LWVLA"), League of Women Voters of Virginia ("LWVVA") (collectively, "the League"), and the Electronic Privacy Information Center ("EPIC") filed their First Amended and Supplemental Complaint ("FAC"), on January 21, 2026, ECF 61, and now move for summary judgment.

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing agency action under the APA, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007). "[T]he district judge sits as an appellate tribunal[] [and] [t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

## ARGUMENT

In overhauling SAVE, Defendants vastly exceeded their authority, violated multiple statutes, usurped constitutional powers reserved for the States and Congress, acted arbitrarily and capriciously, and withheld publication of statutorily mandated information. Plaintiffs—voting and privacy rights organizations whose members and missions are directly harmed by Defendants' unlawful actions—are entitled to summary judgment on each of their claims.

## I. Plaintiffs have standing.

To demonstrate Article III standing, a plaintiff must show that (1) "it has suffered an injury in fact" that is "concrete and particularized" and "actual or imminent," (2) "the injury is fairly traceable to the challenged action of the defendant," and (3) "it is likely . . . that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). In evaluating standing, the Court "must assume [Plaintiffs] will prevail on the merits." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011).

Here, LWV, LWVTX, LWVLA, and LWVVA have **associational standing** "on behalf of [their] members,"[6] based on their members' privacy, reputational, and voting-related injuries caused by overhauled SAVE, and LWVTX and LWVLA have **organizational standing** "on [their] own behalf," based on harm to their mission-critical functions. *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). And EPIC has **associational standing** based on the privacy and reputational injuries to its members. Any one of these standing bases, for any Plaintiff, confers jurisdiction over Counts One through Six of the FAC. Moreover, all Plaintiffs have **procedural injuries** to assert Count Five due to the SAVE overhaul's harm to their concrete interests. And EPIC has **informational standing** to challenge Defendants' failure to publish matching agreement notices for the SAVE overhaul, conferring jurisdiction over Counts Seven and Eight. *See* Index of Decls. ISO Pls.' MSJ.

### A. Plaintiffs have associational standing.

To establish associational standing, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). Plaintiffs meet each requirement based on various theories of injury.

---

[6] "Members of local and state Leagues are also members of LWV." Stewart Decl. ¶ 6, ECF 16-5; *see also* Supp. Stewart Decl. ¶ 10.

### 1. Privacy injuries to Plaintiffs' members

As explained below, *see infra* Argument § II.A-D, overhauled SAVE is purpose-built to violate Plaintiffs' members' statutory privacy rights under the Social Security Act and the Privacy Act. While a statutory violation alone cannot confer standing, Defendants' violations here inflict concrete privacy injuries akin to those long recognized as sufficient to confer standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (injuries are concrete when they have "a close historical or common-law analogue"). Specifically, as several judges in this District have held, the government unlawfully disclosing private information bears a close relationship to the harms vindicated by the common law torts of "intrusion upon seclusion and breach of confidence." *E.g.*, *League of United Latin Am. Citizens v. EOP ("LULAC II")*, 2026 WL 252420, *51 (D.D.C. Jan. 30, 2026) ("wrongful sharing of sensitive [voter] information" through SAVE "bears a close relationship to the harms traditionally redressable through suits for intrusion upon seclusion and breach of confidence"); *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025) (disclosure of financial information has close relationship to harm vindicated by intrusion upon seclusion); *Ctr. for Taxpayer Rts. v. IRS*, 2025 WL 3251044, *13-15 (D.D.C. Nov. 21, 2025) (disclosure of taxpayer addresses has close relationship to harms vindicated by intrusion upon seclusion and breach of confidence); *New Mexico v. Musk*, 784 F. Supp. 3d 174, 195 (D.D.C. 2025) (disclosure of financial information has close relationship to harm vindicated by intrusion upon seclusion); *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025) (disclosure of PII including SSNs has close relationship to harms vindicated by intrusion upon seclusion and breach of confidence).

Here, Defendants have already unlawfully accessed and disclosed the private voter registration and SSA information of LWV, LWVTX, LWVLA, and EPIC members without their consent, through the bulk queries run in SAVE by Texas and Louisiana, and their members' SSA data remains unlawfully accessible via SAVE to DHS and user agencies. *See* Nel Decl. ¶¶ 27-33 (LWVTX); A. Doe Decl. ¶¶ 18, 23-24 (LWVTX and EPIC); B. Doe Decl. ¶¶ 32-38 (LWVTX); C. Doe Decl. ¶¶ 19-25 (LWVTX); Kisselburgh Decl. ¶¶ 13-15 (EPIC); Green Supp. Decl. ¶¶ 8,

45-46, 48-50 (LWVLA President); J. Doe 4 Supp. Decl. ¶¶ 8-12, ECF 16-3 (LWVLA). LWVVA members' sensitive SSA data is likewise unlawfully accessible to DHS and SAVE user agencies without their consent. *See* J. Doe 6 Decl. ¶¶ 9-11, ECF 16-8 (LWVVA).

These statutory violations parallel both essential features of intrusion upon seclusion: (1) an intentional intrusion into private affairs, which (2) would be "highly offensive to a reasonable person." *All. for Retired Americans*, 770 F. Supp. 3d at 102 (quoting Restatement (2d) of Torts, § 652B). Through overhauled SAVE, Defendants are verifying and disclosing individuals' information from the SSA Master File including SSNs, dates of birth, full names, and various data elements about citizenship status. *See supra* Background § IV.[7] Verification of an SSN alone is a disclosure sensitive enough to parallel the interests protected by the tort of intrusion upon seclusion. *See AFL-CIO*, 778 F. Supp. 3d at 73. And Plaintiffs' members confirm that these disclosures are highly offensive to them. *See* Nel Decl. ¶¶ 35, 40-44; A. Doe Decl. ¶¶ 18, 22-24; B. Doe Decl. ¶¶ 40, 45-47, 50; C. Doe Decl. ¶¶ 27, 31-33, 36; Kisselburgh Decl. ¶¶ 16-20; J. Doe 4 Supp. Decl. ¶ 20, ECF 16-3; J. Doe 6 Decl. ¶¶ 21, ECF 16-8.

SSA's conduct is also analogous to a breach of confidence. That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Jeffries v. Volume Servs. Am.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019). Plaintiffs' members provided their citizenship and other information to SSA in confidence when they applied for an SSN and reasonably expected it to be kept confidential, based on longstanding statutory protections and agency policies. *See* Nel Decl. ¶ 33; A. Doe Decl. ¶ 18; B. Doe Decl. ¶ 38; C. Doe Decl. ¶ 25; Kisselburgh Decl. ¶ 15; Green Supp. Decl. ¶ 49; J. Doe 4 Supp. Decl., ECF 16-3, ¶ 19; J. Doe 6 Decl., ECF 16-8, ¶ 20. Indeed, SSA policy assures it will only disclose SSNs where a statute "specifically mandate[s] that SSA disclose SSNs," and that SSA "do[es] not have the legal authority to disclose information about U.S. citizens to DHS." SSN Disclosure Policy, *supra* n.7.

---

[7] Under SSA policy, "verification" of an individual's protected SSA information is tantamount to a "disclosure" of that information. *See* SSA, Program Operations Manual System (POMS), *GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN) Without Consent* (2023), https://perma.cc/PE44-2QBK ("SSN Disclosure Policy").

SSA's betrayal of trust in disclosing this information to DHS and SAVE users parallels the type of injury vindicated by the tort of breach of confidence. *See Jeffries*, 928 F.3d at 1064; *LULAC II*, 2026 WL 252420, *51; *Ctr. for Taxpayer Rts.*, 2025 WL 3251044, *13-15.

**2. Reputational injuries to LWVTX and EPIC members**

Further, Defendants' statutory violations inflicted harms on LWVTX and EPIC members similar to those protected by the common law tort of defamation. DHS provided false information to SAVE users, through overhauled SAVE, indicating that certain LWVTX and EPIC members were not citizens. *See* Nel Decl. ¶ 36 & Ex.1; A. Doe Decl. ¶ 23 & Ex.1; B. Doe Decl. ¶¶ 22, 25-26, 34, 41 & Ex.1; C. Doe Decl. ¶¶ 20-21, 28 & Ex.1. *TransUnion* recognizes that the injury associated with such false statements bears a "close relationship" to the reputational harm associated with the tort of defamation. 594 U.S. at 432. There, the defendant provided third parties with information labeling the plaintiff class members as potential criminals. So too here: It is a federal crime for non-citizens to vote or register to vote in federal elections, *see* 18 U.S.C. §§ 611, 1015(f), so when DHS represented to state election officials in Texas that certain registered voters were non-citizens, it was effectively labeling them as criminals. Under facts also implying criminal conduct, the *TransUnion* Court had "no trouble concluding that the 1,853 class members suffered a concrete harm that qualifies as an injury in fact." 594 U.S. at 432. It is no defense that SAVE only labels voters as *potential* non-citizens: *TransUnion* considered and rejected a similar argument, explaining that "[t]he harm from being labeled a '*potential* terrorist' bears a close relationship to the harm from being labeled a 'terrorist'" and that Article III does not require "an exact duplicate." *Id.* at 433 (emphasis added).

**3. Voting-related injuries to LWVTX members**

The overhauled SAVE system has also harmed and will continue to harm LWVTX's members' voting rights. "There is no doubt that the right to vote is a legally protected interest" for standing purposes. *Am. Encore v. Fontes*, 152 F.4th 1097, 1111 (9th Cir. 2025). Because "the fundamental right to vote is a cornerstone premise of democracy," courts must zealously "guard" against, and "firmly and unequivocally reject," burdens on that right. *Mi Familia Vota v. Fontes*,

129 F.4th 691, 709 n.3 (9th Cir. 2025) (citing cases). A voter "need not have the franchise wholly denied to suffer injury." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005). Rather, "any concrete, particularized, non-hypothetical" burden on the right to vote "is sufficient." *Id.* For example, requiring voters to produce DPOC "would directly harm the concrete interests of [voters] in registering to vote," and "having their votes counted in upcoming federal elections." *League of United Latin Am. Citizens v. EOP ("LULAC I")*, 808 F. Supp. 3d 29, 59, 60-61 (D.D.C. 2025); *LULAC II*, 2026 WL 252420, at *38 (same); *accord N.H. Youth Movement v. Scanlan*, 2026 WL 323171, at *11 (D.N.H. Feb. 6, 2026) (citing *Fish v. Schwab*, 957 F.3d 1105, 1120 (10th Cir. 2020), and *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009)). And even an "increased risk" of disenfranchisement can make an injury "sufficiently 'imminent' for standing purposes." *Richardson v. Trump*, 496 F. Supp. 3d 165, 179 (D.D.C. 2020) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017)); *accord Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014).

Here, overhauled SAVE has already harmed LWVTX's members' voting rights, and its continued operation substantially increases the risk of future burdens and outright disenfranchisement.

As LWVTX's declarants attest, the overhauled SAVE process has played out exactly as DHS and the SAVE MOAs contemplate: in October 2025, the Texas Secretary of State used SAVE's new bulk upload function to run the state's entire voter registration list with more than 18 million voters through SAVE, and identified at least "2,724 potential non-citizens who are registered to vote in Texas." LeBombard Decl. ¶ 33. Relying entirely on SAVE's output, the Secretary referred those "potential non-citizens" to Texas counties for investigation, and created a template notice for county registrars to send those voters demanding that they provide DPOC (such as a U.S. passport or birth certificate) within 30 days or else have their voter registration cancelled. *Id.* ¶ 34. LWVTX has submitted multiple member declarations by eligible U.S. citizen voters who received these SAVE "non-citizenship notices." Per those notices, as a direct result of a "comparison of the information in [their] voter registration records with the United States

Citizenship and Immigration Services SAVE records," Nel Decl., Ex. 1; A. Doe Decl., Ex. 1; B. Doe Decl., Ex. 2; C. Doe Decl., Ex. 1, the LWVTX members have:

- been forced to quickly provide DPOC within 30 days or else face wrongful cancellation of their voter registration, *see* A. Doe Decl. ¶¶ 11-14 & Ex. 1; C. Doe Decl. ¶¶ 12-14, 18 & Ex. 1;
- had their voter registration wrongfully cancelled for failure to provide DPOC within 30 days, *see* Nel Decl. ¶¶ 19-21, 24, 26 & Exs. 1, 2; B. Doe Decl. ¶¶ 11-17, 21-22, 24-27, 30-31 & Exs. 1, 2;
- been disenfranchised and prevented from voting in the March 2026 primary election, *see* B. Doe Decl. ¶¶ 11-31 ; and
- felt compelled to regularly check their voter registration status to ensure it is not wrongfully cancelled, *see* Nel Decl. ¶ 39; B. Doe Decl. ¶ 44; C. Doe Decl. ¶ 30.

LWVTX members also fear facing unwarranted criminal investigation for their prior lawful voting due to DHS's overhauled SAVE process. *See* Nel Decl. ¶ 37; B. Doe Decl. ¶ 42. These fears are reasonable and non-speculative based on public statements of state and federal authorities.[8]

These harms are ongoing and likely to recur. LWVTX have submitted declarations from naturalized and derived citizen members whose SSA data does not reflect they are U.S. citizens. *See* Nel Decl. ¶ 34; B. Doe Decl. ¶ 39; C. Doe Decl. ¶ 26. These and other similarly situated LWXTX members face substantially increased risks of being forced to provide DPOC in the future, being wrongfully removed from the voter rolls, and facing other burdens due to SAVE's continued operation and its reliance on unreliable citizenship data and verification methods. *See* Nel Decl. ¶¶ 38-39; B. Doe Decl. ¶¶ 43-44; C. Doe Decl. ¶¶ 29-30; *infra* Argument § II.E.

The LWVTX member declarants have an even stronger basis for standing than in prior cases where naturalized voters challenged the use of pre-overhauled SAVE. *See Mi Familia Vota*,

---

[8] *See, e.g.*, Press Release, Tex. Sec'y of State, *Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025), https://perma.cc/9WZ2-XVDA ("[I]ndividuals who are deemed non-citizens" based on overhauled SAVE process "that voted in a Texas election will be referred to the Office of the Attorney General" for investigation.); Fifield & Despart, *supra* ("[S]peaking at a recent conference, [USCIS official Brian] Broderick said that when SAVE flags voters as noncitizens, they are also referred to DHS for possible criminal investigation.").

129 F.4th at 708-09; *Arcia*, 772 F.3d at 1341-42. In *Mi Familia Vota*, the Ninth Circuit held that naturalized voters had standing to challenge an Arizona law requiring use of SAVE based on evidence that "SAVE may not" have up-to-date "naturalization records," creating the "danger" that "properly registered voters, who in fact are citizens, may have their voter registrations cancelled . . . losing their constitutional right to vote," even though the plaintiffs identified no voter whose registration was actually cancelled. 129 F.4th at 708-09. Similarly, in *Arcia*, the Eleventh Circuit held that naturalized voters had "standing to prospectively challenge" Florida's "attempt to remove non-citizens from the voter rolls using the SAVE database" based on "*potential* errors that *could* occur when the Secretary attempted to confirm their immigration status in various state and federal databases in the hurried 90–day window before the election." 772 F.3d at 1341 (emphasis added). Here, LWVTX has adduced evidence of *actual* cases where SAVE generated inaccurate citizenship responses, resulting in concrete burdens on their members' voting rights and even disenfranchisement, not just "potential errors." *See id.*

**4. Plaintiffs satisfy the remaining elements of associational standing.**

The remaining elements of associational standing are easily met. LWV, LWVTX, LWVLA, and LWVVA seek to protect the voting and privacy rights of their members, which is germane—indeed central—to the League's purpose to "empower voters and defend democracy, including by registering voters and increasing voter participation." Stewart Decl. ¶¶ 2, 7, ECF 16-5 (LWV); *see also* LeBombard Decl. ¶¶ 2, 5, 14 (LWVTX); Suppl. Green Decl. ¶¶ 2, 6 (LWVLA); Porte Decl. ¶¶ 2, 3, 11, 14, ECF 16-6 (LWVVA). Courts routinely deem this element met in cases brought by the League. *E.g.*, *League of Women Voters of Fla., Inc. v. Lee,* 576 F. Supp. 3d 1004, 1009 (N.D. Fla. 2021); *Common Cause/Ga. League of Women Voters of Ga., Inc. v. Billups*, 439 F. Supp. 2d 1294, 1302 (N.D. Ga. 2006). Similarly, EPIC is seeking to protect the privacy rights of its members, in furtherance of its "mission [] to secure the fundamental right to privacy in the digital age." Butler Decl. ¶ 3; *see also id.* ¶¶ 24, 31-41. Nothing requires the participation of individual members in this suit. Courts routinely hold that individual member participation is not necessary where, as here, only vacatur, declaratory, and injunctive relief is sought in APA cases.

*E.g.*, *Powder River Basin Res. Council v. Dep't of Interior*, 749 F. Supp. 3d 151, 162 (D.D.C. 2024); *Sierra Club v. Perry*, 373 F. Supp. 3d 128, 135 (D.D.C. 2019); *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 546 (1996).

**B. LWVTX and LWVLA have organizational standing based on overhauled SAVE's harm to their mission-critical functions.**

LWVTX and LWVLA have organizational standing to challenge the SAVE overhaul based on the "perceptibl[e]" harms it causes to their "core" voter-services mission and "activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Courts frequently hold that voter services and political party organizations have standing to challenge conduct that impairs their mission-critical functions. *See, e.g.*, *Arcia*, 772 F.3d at 1341-42; *RNC. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 395 (4th Cir. 2024); *LULAC I*, 808 F. Supp. 3d at 57-59; *LULAC II*, 2026 WL 252420, at *28; *Va. Coal. for Immigrant Rts. v. Beals*, 803 F. Supp. 3d 454, 465-67 (E.D. Va. 2025). So too here.

LWVTX's and LWVLA's shared mission is to protect the right to vote and increase voter registration and participation, including by providing voter counseling to U.S.-born, naturalized, and derived citizens. *See* LeBombard Decl. ¶¶ 2, 14, 16-28 (LWVTX); Suppl. Green Decl. ¶¶ 2, 12-13 (LWVLA). Consistent with this mission, their core services are to provide voter outreach, education, and assistance to Texas and Louisiana citizens to aid them in checking their voter registration and encouraging and helping them to register or re-register. *See* LeBombard Decl. ¶¶ 16, 18, 20-28; Suppl. Green Decl. ¶¶ 13, 15-22. Providing these services and programming to naturalized and derived citizens is essential to fulfilling their mission of ensuring that *all* eligible voters, including those born abroad who became U.S. citizens, can fully participate in the democratic process. *See* LeBombard Decl. ¶ 28; Suppl. Green Decl. ¶ 22.

Overhauled SAVE directly interferes with LWVTX's and LWVLA's core mission to ensure voter access and maximize participation, and their work to register Texas and Louisiana voters and keep them registered. *See* LeBombard Decl. ¶¶ 29-45 (LWVTX); Suppl. Green Decl. ¶¶ 23-36 (LWVLA). As Defendants admit, *see infra* Argument § II.E, overhauled SAVE conducts

bulk queries of unreliable citizenship data using unreliable methods that create high risks of error, especially for naturalized and derived citizens across the country, *see* LeBombard Decl. ¶¶ 36-37 & nn.15-17 (LWVTX); Suppl. Green Decl. ¶¶ 29-30 & nn.6-7 (LWVLA). As a result, Defendants' SAVE overhaul predictably has hampered and will continue to hamper the registration of eligible voters in Texas and Louisiana and their right to vote. It requires those erroneously identified by SAVE as potential non-citizens to take additional steps to register or remain registered, and enables improper voter-roll removals and investigation of those unable or unwilling to take these steps and discouraged from voting after having their eligibility questioned pursuant to the overhauled SAVE process. *See, e.g.*, LeBombard Decl. ¶¶ 38-45 ; Suppl. Green Decl. ¶¶ 31-36 (LWVLA); Nel Decl. ¶¶ 12-26, 36-39 (LWVTX); A. Doe Decl. ¶¶ 11-21 (LWVTX); B. Doe Decl. ¶¶ 11-31, 41-43 (LWVTX); C. Doe Decl. ¶¶ 12-18, 28-30 (LWVTX). These voting impediments are not hypothetical: thousands of Texas and Louisiana registered voters have already faced removal from voter rolls and potential investigation due to overhauled SAVE, and, predictably, there have been demonstrable errors. *See, e.g.*, LeBombard Decl. ¶¶ 32-40, 43 (LWVTX); Green Decl. ¶¶ 26-29, 34 (LWVLA); Nel Decl. ¶¶ 12-26; A. Doe Decl. 11-14; B. Doe Decl. ¶¶ 11-31, 41; C. Doe Decl. ¶¶ 12-18, 28. Such SAVE-caused errors, and attendant disruptions, directly impair LWVTX's and LWVLA's core work of maximizing participation by eligible voters.

Courts regularly find organizational standing in similar circumstances. *See, e.g.*, *Arcia* 772 F.3d at 1341-42 (voting rights groups had organizational standing to challenge Florida's use of pre-overhauled SAVE because it risked wrongful purging of naturalized voters and thus "impair[ed]" plaintiffs' mission-critical functions relating to "voter registration and education" and increasing voter participation); *LULAC I*, 808 F. Supp. 3d at 57-59 (similar); *accord LULAC II*, 2026 WL 252420, at *37-38; *Beals*, 803 F. Supp. 3d at 465-66. LWVTX and LWVLA's standing here also tracks *Havens* itself, insofar as SAVE's *inaccurate* citizenship information frustrates their ability to provide their core registration and engagement services. *Cf. RNC*, 120 F.4th at 397 (similarly analogizing to *Havens*); *accord LULAC I*, 808 F. Supp. 3d at 57-59; *LULAC II*, 2026 WL 252420, at *15; *RAICES v. Noem*, 793 F. Supp. 3d 19, 69 (D.D.C. 2025).

Moreover, the overhauled SAVE process is forcing LWVTX and LWVLA to expend greater resources to fulfill their mission-critical functions. *See LULAC*, 2025 WL 3042704, at *13, 15 (citing *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). LWVTX explains that (1) it has already devoted nearly ten staff and volunteers, 65 hours of staff and volunteer time, and $7,000 to identify and contact by letter the more than 2,000 Texas voters who have received SAVE non-citizenship notices and may be erroneously purged from voter rolls, and (2) it anticipates needing to devote additional personnel, time, and money—totaling approximately $5,000 to $10,000 in organizational resources each year—to address Texas's use of the flawed SAVE system used for voter list maintenance, so long as the state continues to use the system. *See* LeBombard Decl. ¶¶ 47-53; *cf., e.g.*, *Arcia*, 772 F.3d at 1341-42 (finding standing where voting nonprofits "expended resources to locate and assist" individuals identified as noncitizens by SAVE and "ensure that they were able to vote"); *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 657 (M.D.N.C. Jan. 21, 2024) (similar). LWVTX has also devoted and will continue to devote similar resources to update and increase its various programming and communications on voter registration—to educate Texas voters about the overhauled SAVE process and its DPOC requirements, to encourage more voters to check and re-check their voter registration status so that use of SAVE does not deprive them of their right to vote, and to equip their staff and volunteers with the necessary information to assist voters potentially impacted by SAVE. *See, e.g.*, LeBombard Decl. ¶¶ 54-56; *cf., e.g.*, *Common Cause Indiana v. Lawson*, 937 F.3d 944, 951-53 (7th Cir. 2019) (similar) (citing cases); *LULAC*, 2025 WL 3042704, at *14–15 (similar); *Beals*, 803 F. Supp. 3d at 466-67 (similar). LWVLA has likewise shown such resource harms. Suppl. Green Decl. ¶¶ 37-43.

In sum, LWVTX and LWVLA have shown paradigmatic organizational injuries to their voter-protection and voter-engagement missions.

### C. EPIC has standing to challenge Defendants' violations of the Privacy Act's procedural requirements for matching programs.

Defendants' SAVE overhaul constitutes a new "matching program" under the Privacy Act. *See infra* Argument § II.F. The creation of a new matching program triggers various procedural and transparency obligations under the Privacy Act and implementing OMB guidelines, which Defendants have flouted. *Id.* In doing so, Defendants injured EPIC by depriving it of information and notice-and-comment opportunities to which it is legally entitled.

First, Defendants' SAVE overhaul has inflicted informational injuries on EPIC. A plaintiff suffers an informational injury when "(1) it has been deprived of information that . . . a statute requires the government . . . to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016). The second prong turns on whether "Congress, in mandating disclosure, sought to protect individuals or organizations like" the plaintiff. *Id.*; *see also United to Protect Democracy v. Pres. Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99, 108-10 (D.D.C. 2017).

EPIC routinely relies on information that the Privacy Act mandates agencies to disclose, including information in SORNs and matching agreements. Butler Decl. ¶¶ 8-13. These documents are often the only publicly-available records of how and why a federal entity is collecting personal information, what information is being collected, what burdens collection will impose, how that information may be used and shared, how it will be stored and secured, and for how long it will be retained. *Id.* ¶ 12. EPIC depends on this public information to inform its research, advocacy, public education, and education of its members concerning the systems and databases used throughout the government. *Id.* ¶¶ 8-13, 17-19, 24-30. EPIC's ability to perform these mission-critical functions is directly impaired by Defendants' failure to disclose statutorily required information, which constitutes a cognizable informational injury. *See Friends of Animals*, 824 F.3d at 1040; *Protect Democracy*, 288 F. Supp. 3d at 108-10.

Second, EPIC has standing to challenge Defendants' failure to follow the procedural requirements for new matching programs in overhauling SAVE. A plaintiff has standing to challenge agency "action taken without required procedural safeguards" if that action "threatens

their concrete interest." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). Such a plaintiff "need not demonstrate that but for the procedural violation the agency action would have been different"; rather, the plaintiff need only "demonstrate a causal relationship between the final agency action and the alleged injuries," after which "the court will 'assume the causal relationship between the procedural defect and the final agency action.'" *Id.*

By failing to publish notices of matching agreements and solicit public comment on them as required by the Privacy Act and OMB guidelines, Defendants have acted "without required procedural safeguards." *Mendoza*, 754 F. 3d at 1010. Defendants' procedural violations threaten and impact EPIC's core interests in transparency and public education about private data collection, and impede EPIC's ability to carry out its mission. The unlawful matching programs also threaten the concrete privacy and reputational interests of EPIC's members. *See supra* Argument § II.A.1-2. The Privacy Act's matching program requirements are precisely the types of safeguards that would remedy the injuries suffered by EPIC's members.[9]

**D. Plaintiffs' injuries are caused by Defendants' SAVE overhaul and redressable by this Court.**

Plaintiffs' injuries are all traceable to the SAVE overhaul. But for Defendants' expansion of SAVE to collect, use, disclose, and match in bulk the sensitive personal data of Plaintiffs' members and millions of other Americans, none of these injuries would have occurred. "Because Article III 'requires no more than *de facto* causality,' traceability is satisfied here." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (citation modified) (citing cases).

That Plaintiffs' voting-related injuries were inflicted in part by state actors does not defeat traceability. "[S]tanding will lie where 'a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise.'" *NRDC v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014). Defendants entered into MOAs authorizing states to run their entire voter rolls through SAVE with its new bulk-upload

[9] Because overhauled SAVE harms each Plaintiff's concrete interests (on the various grounds outlined above), all Plaintiffs have cognizable procedural injuries sufficient to assert Count Five of the FAC. *See*, *e.g.*, Supp. Stewart Decl. ¶¶ 6-11; *see also infra* Argument § II.D.

and search-by-SSN features, and to require individuals whom SAVE identifies as potential non-citizens to provide DPOC or have their voter registration cancelled or denied. *See*, *e.g.*, DHS-AR-1281-91 (Texas SAVE MOA); DHS-AR-1193-1203 (Louisiana SAVE MOA); Worrell Adkins Decl. ¶¶ 6-12, ECF 43-2 (Texas official touting the state's reliance on SAVE). Absent Defendants' actions, SAVE users would not have lawful access to the data SAVE is utilizing to perform citizenship checks en masse. *See* Nel Decl., Ex. 1 (template notice stating voter was identified as non-citizen based on "SAVE records"); *accord* A. Doe Decl., Ex. 1; B. Doe Decl. 22 & Ex. 2; C. Doe Decl., Ex. 1.

Redressability is also easily met. Plaintiffs' requested relief would redress their injuries by requiring Defendants to reverse the SAVE overhaul and undo its effects, and to publish matching-agreement information required by law. *See infra* Argument § III.

## II. Plaintiffs are entitled to summary judgment.

Defendants' overhaul of SAVE was unlawful for multiple reasons, each of which is independently sufficient to enter summary judgment for Plaintiffs.

### A. The SAVE overhaul lacks statutory authorization and affirmatively violates the Social Security Act (Count One).

An "agency . . . literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022); *accord Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 911 (D.C. Cir. 2024); *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021). "And if an agency acts without statutory authority, then a court must set that action aside" under the APA. *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 143 (D.D.C. 2025). "To determine 'whether an agency has acted within its statutory authority,' [courts] use 'the traditional tools of statutory construction.'" *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024)).

Here, no statute authorizes Defendants' dramatic expansion of SAVE to (i) ingest and retain millions of Americans' sensitive records bulk-uploaded by SAVE user agencies, including but not limited to state voter roll data with individuals' full names, dates of birth, and full or partial

SSNs; (ii) disclose that data from DHS to SSA for purposes of querying SSA's Master File; (iii) disclose the queried data elements from SSA's Master File—including information about U.S. citizens of all types—to DHS and cross-check those results against DHS and other federal, state, and non-governmental systems of records; and (iv) disclose the results of this bulk inter-agency data-sharing and data-matching to SAVE user agencies. And absent statutory authorization, SAVE's bulk disclosure of individuals' protected SSA data violates the Social Security Act. *See* FAC ¶¶ 196-205 (Count One).

**1. Traditional tools of construction show that the SAVE overhaul lacks statutory authorization.**

Even Defendants seem to recognize that the statute establishing SAVE—the Immigration Reform and Control Act of 1986—does not authorize the newly expanded system. That law directed DHS's predecessor agency to create a "system for the verification of immigration status" to assist states in determining whether "aliens" are eligible for "benefits." Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359, 3391 (1986), *codified at* 42 U.S.C. § 1320b-7 note; *see also id.* § 121(a)(1)(C), 100 Stat. at 3384-86, *codified at* 42 U.S.C. § 1320b-7(d). The statute's plain text—referring to the "immigration status" of "aliens"—indicates that SAVE was only meant to be used for *non-citizens*. No provision of the statute authorizes SAVE to query records of U.S. citizens or to conduct mass voter eligibility checks.

Defendants have instead invoked, per the Elections EO, 8 U.S.C. § 1373 as statutory authority for the SAVE overhaul. *See* DHS-AR-116; DHS-AR-421-422; SSA-AR-7-8; SSA-AR-207, 210. Section 1373 was enacted 30 years ago as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 642, 110 Stat. 3009, 707 (1996). That statute provides in relevant part:

> **(a) In general**
> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.
> . . .

> **(c) Obligation to respond to inquiries**
> [DHS] shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

8 U.S.C. §§ 1373(a), (c).

Section 1373 does not even mention SAVE (or any comparable system), let alone contemplate its use for mass citizenship checks. Nonetheless, for the first time since the statute's enactment nearly three decades ago, Defendants insist that § 1373 broadly authorizes—and indeed *requires*—DHS to use SAVE to siphon up millions of Americans' citizenship data from seemingly *any federal agency* and then disclose it to SAVE user agencies in response to "voter verification" and benefits eligibility inquiries. *See* DHS-AR-115, 117; SSA-AR-7-8.

Section 1373 does no such thing. For starters, § 1373(a)'s plain text does not affirmatively grant any authority. It is framed in purely *prohibitory* terms, instructing that an "entity or official *may not prohibit, or in any way restrict*" certain information sharing. 8 U.S.C. § 1373(a) (emphasis added). Plaintiffs have identified no case where prohibitory language in a statute was read to confer affirmative authority on an agency. And cases interpreting the plain text of prohibitions like those in § 1373 show that such statutes do not confer affirmative authority. *See New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982) (section of Federal Power Act stating it "shall not . . . deprive a State or State commission of its lawful authority" was "in no sense an affirmative grant of power to the states" (citation modified)).

Indeed, Defendants' reading of § 1373(a) is irreconcilable with the nondelegation doctrine, which requires congressional delegations of authority to set out an "intelligible principle" that "[makes] clear both the general policy that the agency must pursue and the boundaries of its delegated authority," allowing courts to "ascertain whether the agency has followed the law." *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2497 (2025) (citation modified). Statutory instructions *not* to take certain actions inherently lack such an "intelligible principle" that could constrain any implied affirmative authorization, and cannot establish an agency's power to *do* anything. Insofar as Defendants' reading of § 1373(a) would violate the Constitution's nondelegation principle, the

"constitutional avoidance" canon "would counsel against adopting [their] expansive interpretation." *Kennedy v. Braidwood Mgmt.,* 606 U.S. 748, 775 (2025) (applying canon in different context).

Defendants' newfound reading of § 1373(a) is also contrary to the Executive Branch's longstanding interpretation of that law. In 1999, DOJ's Office of Legal Counsel ("OLC")[10] considered the sharing of confidential census data and concluded that § 1373(a) does "not clearly invest governmental officials or entities with the affirmative authority to disclose information in circumstances where they otherwise would be prohibited from doing so by a federal statute"; rather, the statute merely "limit[s] . . . the authority" of government offices "to impose prohibitions or restrictions on disclosures" otherwise authorized by law. *Relationship Between Illegal Immigr. Reform & Immigrant Resp. Act of 1996 & Statutory Requirement for Confidentiality of Census Info.*, 1999 WL 34995963, at *4 (O.L.C. May 18, 1999) (Acting Ass't Att'y Gen. Randolph D. Moss). OLC noted hypothetical language that *would* have granted such disclosure authority: "a federal, state, or local official or entity may provide information, without restriction." *Id.* But absent such language, it was improper to read affirmative powers into § 1373's prohibitory text. *See id.* Other DOJ components have similarly construed § 1373. *See, e.g.*, DOJ Office of Inspector General, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients*, 6 n.7 (May 31, 2016), https://tinyurl.com/f6kyj5xv; Office of Justice Programs, *Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373*, https://perma.cc/8R8M-XTL2.

The only affirmative obligation in § 1373 is in § 1373(c), which requires *DHS* "to respond to inquiries" from government entities seeking to verify the immigration status of an individual. 8 U.S.C. § 1373(c). But nothing in that provision empowers DHS to *acquire data from other federal agencies* like SSA to respond to such inquiries, nor does it empower other federal agencies like

[10] OLC "exercises the Attorney General's delegated authority to interpret the Constitution and laws for the Executive Branch." *Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at A Loss*, 49 Op. O.L.C. __, 2025 WL 3251685, at *22 (Nov. 7, 2025).

SSA to *disclose their data to DHS*. Moreover, SSA is disclosing much more than just individuals' "citizenship and immigration" data through overhauled SAVE; it is also disclosing their SSNs, names, dates of birth, and death indicators, none of which concerns "citizenship and immigration status." *See supra* Background § IV. So even under Defendants' flawed reading of § 1373(c), they are vastly exceeding their statutory authority.

Other canons of construction further confirm that § 1373 does not authorize the bulk inter-agency data collection, disclosure, and matching that SAVE now performs. The Supreme Court has, "time and time again," "invoked th[e] canon" that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *City & County of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) (citing cases). Here, while nothing in § 1373 expressly authorizes the SAVE overhaul, different provisions of the same statute—the IIRIRA—*do* expressly authorize similar types of inter-agency data sharing and matching between DHS and SSA solely for purposes of determining an employee's work-authorization status under the E-Verify program (formerly known as the "Basic Pilot Program"). Pub. L. No. 104-208, § 404, 110 Stat. 3009, 664-65 (1996), *codified at* 8 U.S.C. § 1324a note.[11] Those provisions require that E-Verify's inter-agency data-matching and data-sharing be conducted using "reliable, secure method[s]," strictly limits the data that SSA can share with DHS, mandates that both agencies "shall update their information in a manner that promotes the maximum accuracy and shall provide a process for the prompt correction of erroneous information," and prohibits the data from being used "for any other purpose other than" for E-Verify. *Id.* §§ 404(e)-(h), 110 Stat. at 665. The IIRIRA omits any similar provisions authorizing data-matching and data-sharing between DHS and SSA for citizenship checks through SAVE,

[11] SAVE and E-Verify utilize the same "underlying technology"—DHS's "Verification Information System"—but are separate programs subject to different legal authorities and parameters. DHS-AR-94; *see also* DHS-AR-146, 248, 422.

creating a strong presumption that "Congress act[ed] intentionally and purposely in the disparate . . . exclusion." *San Francisco*, 604 U.S. at 344.

Congress has elsewhere shown that when it wants to authorize the type of bulk matching of information across federal and non-federal agencies that SAVE now performs, it does "so clearly and expressly." *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 302 (2003) (applying canon in different context). For instance, Congress has amended the Privacy Act several times—in 1988, 1997, 1999, 2010, and 2014—to create specific carve-outs from the Act's robust restrictions on inter-agency and inter-governmental data sharing and matching. 5 U.S.C. §§ 552a(a)(8)(B)(i)-(x). To take one example, the Affordable Care Act of 2010 amended the Privacy Act to add an exclusion for "matches performed by [HHS] or the [HHS Inspector General] with respect to potential fraud, waste, and abuse, including matches of a system of records with non-Federal records." *Id.* § 552a(a)(8)(B)(ix). Congress has adopted no such express carve-out for SAVE, or for any data-matching purportedly authorized by § 1373.

In addition to § 1373, the 2025 SAVE SORN summarily cites other statutes as "authority." DHS-AR-118. Yet the Administrative Record confirms that Defendants' expansion of SAVE hinges entirely on their and the President's new misreading of § 1373. *See, e.g.*, DHS-AR-1361; DHS-AR-1479; SSA-AR-132; DHS-AR-116; DHS-AR-334-335; SSA-AR-7-8.

### 2. The major questions doctrine confirms that the SAVE overhaul lacks statutory authorization.

Under the Supreme Court's major questions doctrine, when an agency "assert[s] highly consequential power" of "vast economic and political significance," it "must point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Based on the cases in which the Court has invoked the doctrine, this case easily triggers major questions scrutiny, and Defendants lack the requisite "clear congressional authorization" for their actions.

First, Defendants have "'claim[ed] to discover in . . . long-extant statute[s] 'an unheralded power' representing a 'transformative expansion [of their] . . . authority.'" *Id.* at 724. In the nearly

40-year period between SAVE's creation in 1986 and 2025, DHS never asserted the statutory authority to operate SAVE as a comprehensive system for verifying U.S. citizenship status. To the contrary, prior to 2025, SAVE could only conduct individualized searches of "certain naturalized and derived U.S. citizens," and could "not verify U.S. born citizens *under any circumstances*." *Supra* Background § I (second emphasis added). Yet in 2025, DHS suddenly "discover[ed]" the "unheralded power" under a statute passed in 1996, § 1373, to grab mass amounts of citizenship data from *any agency*—including information on U.S.-born citizens from SSA's Master File—and funnel it to SAVE users free of all legal constraints, including the substantive limitations of the Privacy Act. *See, e.g.*, Defs.' PI Opp. at 2, ECF 37 (arguing that § 1373 supersedes the Privacy Act). The total "'lack of historical precedent'" for DHS's actions, "coupled with the breadth of authority that [DHS] now claims, is a 'telling indication'" that the SAVE overhaul "extends beyond the agency's legitimate reach." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 119 (2022) (per curiam).

Second, by expanding SAVE to conduct bulk searches of U.S.-born citizens, Defendants enlarged the population whose sensitive personal information SAVE accesses *by more than 1,000%*—from about 27 million naturalized and derived citizens to more than 300 million citizens of all types.[12] Major questions cases often consider whether the agency's action expands the class of persons or entities affected by orders of magnitude. *See, e.g.*, *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 118 (vaccine mandate went beyond merely regulating "employers" to burdening "a vast number of employees").

[12] *Contrast* U.S. Census Bureau, *Nativity and Citizenship Status in the United States*, https://data.census.gov/table/ACSDT1Y2023.B05001?q=B05001 (accessed Feb. 23, 2026) (estimating around 25 million naturalized citizens in United States), *and* Sarah Miller, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2024 and Revised 2023*, Office of Homeland Security Statistics, at 3 (Sept. 2024), https://perma.cc/E4TP-6FWX (estimating roughly 2 million lawful permanent residents who derived citizenship from a parent since 1980), *with* SSA-AR-238 (SSA Master File includes information on "easily over 300 million" Americans).

Third, Defendants' SAVE overhaul "intrudes into an area that is the particular domain of state law" and is of "vast . . . political significance," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021)—namely, the administration of elections and verification of voter eligibility. *See infra* Argument § II.B. The Supreme Court's "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors*, 594 U.S. at 764 (eviction moratorium intruded into state-law domain of "the landlord-tenant relationship"). That rule applies with special force in the context of elections, over which our Constitution vests powers in the States and Congress, but not the President. *See LULAC II*, 2026 WL 252420, at *42 (citing *West Virginia*, 597 U.S. at 723)). As explained above, such a clear statement is entirely absent here.

In sum, both traditional tools of construction and the major questions doctrine confirm that the SAVE overhaul vastly exceeds Defendants' statutory authority.

**3. Defendants' unauthorized disclosures violate the Social Security Act.**

Defendants' unauthorized and ongoing disclosure of millions of Americans' protected SSA data through the overhauled SAVE system also affirmatively violates two provisions of the Social Security Act. First, it violates the Act's prohibition on SSA's "disclosure . . . of any file, record, report, or other paper, or any information . . . except as . . . agency . . . regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a). No statute or SSA regulation authorizes the agency to disclose SSA information to DHS for use in the overhauled SAVE system. Moreover, SSA policy states unequivocally that SSA does "not have the legal authority to disclose information about U.S. citizens to DHS," and that "[i]f DHS requests information and we determine the information pertains to both U.S. citizens and aliens, only information about the aliens can be disclosed." SSN Disclosure Policy, *supra* n.7; *cf.* 20 C.F.R. § 401.120 (recognizing SSA's authority to disclose information "regarding aliens" to DHS).

Second, Defendants' disclosures violate another provision of the Act providing that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no

authorized person shall disclose any such social security account number or related record."[13] 42 U.S.C. § 405(c)(2)(C)(viii)(I). Here, Defendants are collecting, verifying, and disclosing SSNs and related records en masse through overhauled SAVE, *see supra* Background § IV, and they are doing so under § 1373, a statute enacted "after October 1, 1990." Because no statute authorizes these disclosures, they violate § 405(c)(2)(C)(viii)(I).

For all these reasons, the SAVE overhaul was "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A), (C).

**B. The SAVE overhaul violates the separation of powers (Counts Two and Three).**

Recall that Defendants expanded SAVE pursuant to the President's Elections EO. *See supra* Background § II. Multiple courts have enjoined federal agencies from implementing provisions of that EO on the ground that it violates "the constitutional separation of powers." *LULAC II*, 2026 WL 252420, at *4-5, *44; *see also LULAC I*, 808 F. Supp. 3d at 80; *Washington v. Trump*, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026); *California v. Trump*, 786 F. Supp. 3d 359, 396 (D. Mass. 2025). The same rationale applies to Defendants here: by following the President's direction to expand SAVE to conduct mass voter verification, Defendants violated the separation of powers by "acting in the total absence of authority from Congress in a domain that the Constitution assigns to Congress and the States." *LULAC II*, 2026 WL 252420, at *5; *see* FAC ¶¶ 206-17 (Counts Two and Three).

It is "black letter law" that the Executive's "'power, if any, . . . must stem either from an act of Congress or from the Constitution itself.'" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 189 (1999) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). "Our Constitution provides that only the States—not Congress, and certainly not the President—may decide who is qualified to vote in federal elections." *LULAC II*, 2026 WL

---

[13] "[T]he term 'related record' means any record, list, or compilation that indicates, directly or indirectly, the identity of any individual with respect to whom a social security account number or a request for a social security account number is maintained pursuant to this clause." 42 U.S.C. § 405(c)(2)(C)(viii)(IV).

252420, at *42; *see also LULAC I*, 808 F. Supp. 3d at 42; U.S. Const. art. I, § 2, cl. 1 (Voter Qualifications Clause); *id.* amend. XVII. Determining voter qualifications "forms no part of the power to be conferred upon the national government." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013). As for the "procedural conduct of federal elections, the Constitution grants broad regulatory authority to the States but reserves final, supervisory authority to Congress." *LULAC II*, 2026 WL 252420, at *6; *see* U.S. Const. art. I, § 4, cl. 1 (Elections Clause). "The Constitution assigns no direct role to the President in either domain." *LULAC II*, 2026 WL 252420, at *5; *LULAC I*, 808 F. Supp. 3d at 42.

Nor has Congress delegated to the Executive Branch any power to create a federal system for "verification of registrants and registered voters in voter registration and voter list maintenance processes." DHS-AR-115. The National Voter Registration Act ("NVRA") "'erects a complex superstructure of federal regulation atop state voter-registration systems.'" *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) (citation modified). And the Help America Vote Act ("HAVA") requires, among other things, "that each state maintains a computerized database for voter registrations." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 180-81 (3d Cir. 2017). But neither statute authorizes Defendants to intervene in voter list maintenance or determine voter qualifications—through SAVE or otherwise. Rather, the NVRA and HAVA explicitly charge *the States* with maintaining their voter rolls. *See* 52 U.S.C. §§ 20506, 20507, 20509, 21085; *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004).

Defendants thus have not merely "*exceeded* their statutory authority." *Cf. Dalton v. Specter*, 511 U.S. 462, 474 (1994) (emphasis added). They have acted with a "*total absence* of authority from Congress in a domain that the Constitution assigns to Congress and the States." *LULAC II*, 2026 WL 252420, at *5 (emphasis added). Given the significant horizontal and vertical separation-of-powers concerns at stake, "Congress must speak clearly if it intends to delegate any part of [its Elections Clause] power to the Executive Branch." *Id.* at *42 (citing *West Virginia*, 597 U.S. at 723). Congress has not done so. *Supra* Argument § I.A. And neither the President nor Defendants have any constitutional authority to arrogate election administration to themselves.

Defendants have thus "overstepped the constitutional separation of powers." *LULAC II*, 2026 WL 252420, at *31.

### C. The SAVE overhaul violates the APA because it was contrary to the Privacy Act's substantive restrictions (Count Four).

In overhauling SAVE, Defendants acted contrary to the Privacy Act's substantive restrictions in two respects. *See* FAC ¶¶ 218-26 (Count Four). First, they enabled SAVE to improperly disclose and repurpose records in bulk in violation of 5 U.S.C. § 552a(b) and § 552a(a)(7). Second, they enabled SAVE to maintain records that are inaccurate, untimely, and incomplete for use in determinations about individuals, contrary to §§ 552a(e)(5), (6), and (10).

#### 1. Overhauled SAVE improperly discloses and repurposes records in bulk in violation of 5 U.S.C. § 552a(b) and § 552a(a)(7).

"An agency violates the [Privacy] Act when it 'discloses' information in the form of a 'record' from a 'system of records' and the disclosure is not pursuant to a valid exception under the Act." *Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018) (citing 5 U.S.C. § 552a(b)). One of those exceptions permits disclosure pursuant to a properly noticed "routine use." *Id.* § 552a(b)(3). "To fit within the confines of the routine use exception to the Privacy Act, an agency's disclosure of a record must be both (i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency." *Ames v. DHS*, 861 F.3d 238, 240 (D.C. Cir. 2017) (quoting 5 U.S.C. § 552a(a)(7) and citing § 552a(e)(4)(D)). Although the D.C. Circuit "has not definitively determined the precise meaning of 'compatible'" as used in § 552a(a)(7), *id.* at 240 n.1, other courts have sensibly construed the term to require a "concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure," *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549-50 (3d Cir. 1989); *see also Townsend v. United States*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017). The compatible-use requirement prevents "personal data collected by one organization for a stated purpose" from being "used and traded by another organization for a completely unrelated purpose," which could "seriously threaten[]" Americans' "individual rights." *Britt*, 886 F.2d at 550.

OMB's Original Privacy Act Guidelines—issued close in time to passage of the Act—reinforce that the Act's routine use provisions are "intended to discourage the unnecessary exchange of information to other persons or to agencies who may not be as sensitive to the collecting agency's reasons for using and interpreting the material." OMB, Privacy Act Guidelines, 40 Fed. Reg. 28949, 28953 (July 1, 1975), https://perma.cc/776J-4L46. Thus, "a 'routine use' must be not only compatible with, but related to, the purpose for which the record is maintained." *Id.* OMB's "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time," are "especially useful in determining the [Privacy Act's] meaning." *Loper Bright*, 603 U.S. at 394; *see also Maydak v. United States*, 363 F.3d 512, 518 (D.C. Cir. 2004) (relying on OMB's 1975 Privacy Act Guidelines in construing statute).

Here, the Modified SORNs adopted two new routine uses to enable overhauled SAVE's bulk voter verification checks. *See* DHS-AR-115, 120 (Routine Use L); SSA-AR-207, 210 (Routine Use 49). Both new routine uses flunk § 552a(a)(7)'s compatible-use requirement.

With respect to the SSA Master File records being bulk disclosed through SAVE, *see supra* Background § IV, SSA collected this information for its own program purposes concerning work authorization and eligibility for SSA benefits. *See* SSA-AR-115-116, 0132, 0149, 0168-69, 0188-89, 0207.[14] SSA did not collect the data for disclosure to DHS and state and local agencies to determine individuals' eligibility to vote. Nor does such a new use of SSA data have any "meaningful degree of convergence" with the reasons for SSA's initial data collection. *See Britt*, 886 F.2d at 549-50. In fact, SSA has explicitly warned agencies *not* to repurpose its citizenship data for other uses, explaining that while "citizenship information is accurate for SSA's program purposes, if used later for other purposes, it may not be current" because "SSA is not the custodian

[14] *See also* SSA, Program Operations Manual System (POMS), *GN 00303.000 Citizenship, Alien Status and Residency* (Jan. 9, 2026), https://perma.cc/R7CE-W26P; 20 C.F.R. § 422.104 (section titled "Who can be assigned a social security number"); *id.* § 422.107 (section titled "Evidence requirements").

of U.S. citizenship records." SSA-AR-103.[15] So it is no surprise that Defendants' "compatibility analysis" for the Modified SORNs' new routine uses were entirely perfunctory, lacking any discussion of statutory criteria. *See* DHS-AR-488-489 (Routine Use L); SSA-AR-145 (Routine Use 49). And SSA is, in any event, disclosing far more than just information on individuals' "citizenship and immigration status" through SAVE, *see supra* Argument § II.A, and thus it is acting well beyond its new routine use.

Similarly, with respect to the voter roll data that DHS is ingesting in bulk from SAVE user agencies and then disclosing to various other federal agencies, that information was collected for use by *state and local* officials as part of the voter registration process. Those officials did not collect the data to be fed into a massive national data bank for *federal government officials* to conduct citizenship checks,[16] or, as SAVE user agreements broadly authorize, for "any [other] purpose permitted by law, including, but not limited to, the prosecution of violations of Federal administrative or criminal law." DHS-AR-1351. DHS itself acknowledged in the 2025 SAVE PIA that there is a "risk" it "cannot mitigate" that "United States born citizens" whose data is now being accessed by SAVE lacked notice or opportunity to consent to how DHS is repurposing their sensitive personal data. DHS-AR-242; *see also* DHS-AR-484.

Thus, overhauled SAVE and its new routine uses are enabling mass repurposing of millions of Americans' sensitive information in ways that are fundamentally incompatible with and unrelated to "the purpose for which [the information] was collected." 5 U.S.C. § 552a(a)(7). Because these new uses are contrary to § 552a(a)(7), and because Defendants' disclosures through SAVE for bulk voter verification checks fit no other routine use or exception to § 552a(b),[17] the disclosures are "not in accordance with law." 5 U.S.C. § 706(2)(A).

---

[15] *See also* Letter from SSA Office of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023), https://perma.cc/C6CU-9BQB ("2023 SSA Ltr.") (same).

[16] Indeed, many states prohibit disclosure of the sensitive data elements included in voter rolls. *See* National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/3jr9w6a3.

[17] The Privacy Act's "law enforcement" exception does not permit these disclosures. First, the Administrative Record contains no indication that the relevant agency "head[s]" made the requisite

### 2. Overhauled SAVE maintains records that are inaccurate, untimely, and incomplete and uses them for agency determinations about individuals, contrary to 5 U.S.C. §§ 552a(e)(5), (6), and (10).

Defendants also acted contrary to the Privacy Act's substantive restrictions by overhauling SAVE to "maintain" (a term the statute defines as "maintain, collect, use, or disseminate," 5 U.S.C. § 552a(a)(3)) citizenship records that are inaccurate, untimely, and incomplete, for purposes of making "determination[s]" about individuals. *See id.* §§ 552a(e)(5), (6). Defendants have conceded that overhauled SAVE uses and disseminates such inaccurate records. *See, e.g.*, DHS-AR-240 (finding "risk" that overhauled SAVE "may share inaccurate information with registered agencies"); DHS-AR-260 (recognizing overhauled SAVE's "[s]hortfalls in data accuracy"); DHS-AR-302 (same); SSA-AR-44 ("citizenship information in SSA's records might not be current"); Mem. Op. at 8, ECF 55 ("The Government does not dispute that . . . inaccuracies" in SSA citizenship data "likely still exist."). And these data inaccuracies have in fact caused "substantial harm, embarrassment, inconvenience, or unfairness," *id.* § 552a(e)(10), to individuals wrongfully identified as non-citizens or potential non-citizens, including Plaintiffs' members. *See supra* Argument § I.A.1-3. Defendants' decision to overhaul SAVE without protecting against these known and substantial risks of "unfairness" caused by SAVE's inaccurate citizenship "determination[s]," *see* 5 U.S.C. §§ 552a(e)(5), (6), and (10), was "not in accordance with law," *id.* § 706(2)(A).

### D. The SAVE overhaul violates the APA because it failed to comply with the Privacy Act's procedural requirements (Count Five).

---

"written request[s]" for records. 5 U.S.C. § 552a(b)(7). Second, § 552a(b)(7) by its plain terms does not authorize the type of bulk, automated data sharing that SAVE enables; it instead requires a targeted request specifying the "particular portion" of a record sought and "law enforcement activity" at issue. *Id.*; *see* SSA, Program Operations Manual System (POMS), *GN 03312.080 Valid Law Enforcement Requests* (Nov. 9, 2023), https://perma.cc/K4Q7-QSJV. Third, SSA's privacy regulations "are more restrictive than the Privacy Act's law enforcement exception." SSA, Program Operations Manual System (POMS), *GN 03312.001 Disclosure Without Consent for Law Enforcement Purposes* (Sept. 12, 2005), https://perma.cc/YE7Z-N9SL. They only allow disclosure of information about an individual who "has been indicted or convicted" of committing "a violent crime such as murder or kidnapping," or information about "[c]riminal activity involving the social security program or another program with the same purposes." 20 C.F.R. § 401.155.

Defendants also overhauled SAVE without following the Privacy Act's notice-and-comment requirements and thus acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *see* FAC ¶¶ 227-35 (Count Five).

Under the Privacy Act, an agency "shall" "publish in the Federal Register notice of any new use or intended use of the information in [a] system [of records], and provide an opportunity for interested persons to submit written data, views, or arguments to the agency" at least 30 days *before* using the system in new ways. *Id.* § 552a(e)(11); *see id.* § 552a(e)(4). OMB's Original Privacy Act Guidelines, and more recent guidelines, underscore that § 552a(e)(11) requires agencies to *both* provide advance notice before using systems in new ways *and* meaningfully consider public comments received. *See* 40 Fed. Reg. at 28966; OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*, at 7, 12 (2016), https://perma.cc/N9QK-SDLE ("OMB Circular A-108"). Defendants did neither.

First, Defendants failed to publish Modified SORNs at least 30 days before overhauling SAVE. They instead launched the overhauled system on May 22, 2025. *See* DHS-AR-491; *see also* DHS-AR-493; DHS-AR-1385. And they continued its new uses for five months before DHS issued its modified SORN on October 31, 2025, and SSA issued its modified SORN on November 12, 2025. *See* DHS-AR-114; SSA-AR-207.

Defendants further violated § 552a(e)(11) by predetermining they would not consider public comments on the Modified SORNs. Although the SORNs solicited comments, they also made clear that the new routine uses would automatically take effect after 30 days. *See* DHS-AR-115; SSA-AR-207. Defendants predetermined they would not await, let alone consider, any public comments and would continue operating overhauled SAVE as they had since May 2025. That violated the Privacy Act and OMB guidelines. As the D.C. Circuit has held in other notice-and-comment contexts, for the "opportunity for comment" to be "meaningful," the agency must "remain sufficiently open minded." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009). Here, Defendants were anything but. And they still have failed to provide any public response to the more than 30,000 comments received, in violation of their duty to provide "as

complete an explanation of the routine uses and any changes made or not made as a result of the public comment as possible so that the public will be fully informed of the proposed use." 40 Fed. Reg. at 28966; *see also* OMB Circular A-108 at 7, 12.

"The Privacy Act's public notice and comment structure is an essential component of the Act and an essential piece of American democracy. Americans deserve to know the nature, scope, and routine uses of the records *before* they are collected by the federal government." *United States v. Weber*, 2026 WL 118807, at *18 (C.D. Cal. Jan. 15, 2026) (emphasis added). Indeed, "it is flatly inconsistent with the text, structure, and purpose of the Privacy Act for an agency to initiate a major new data-sharing program affecting the sensitive data of millions of Americans, then validate that program as a 'routine use' months after it has begun." *LULAC II*, 2026 WL 252420, at *55. By flouting these requirements, Defendants acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

**E. The SAVE overhaul violates the APA because it was arbitrary and capricious (Count Six).**

The SAVE overhaul was also arbitrary and capricious. *See* FAC ¶¶ 236-38 (Count Six). The APA "'requires agencies to engage in reasoned decisionmaking'" and "to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020) (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020)). "An agency violates this standard if it 'entirely fail[s] to consider an important aspect of the problem.'" *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "An agency also violates this standard if it fails to respond to 'significant points' and consider 'all relevant factors' raised by the public comments." *Id.* Here, the paltry Administrative Record amply confirms that Defendants' SAVE overhaul was neither reasonable nor reasonably explained.

**1. Defendants predetermined the outcome.**

As noted, the Modified SORNs stated their new routine uses would automatically take

effect after 30 days, with Defendants continuing operating overhauled SAVE while public comment was ongoing. The Administrative Record confirms Defendants acted in blind adherence to the Elections EO without reasoned decision-making, failing to undertake *any* consideration of the tens of thousands of public comments opposing the SAVE overhaul. *See* DHS-AR-224-25, 421-22; SSA-AR-7-8. Insofar as Defendants predetermined the outcome and "acted essentially as a rubber stamp" for the Election EO's directives, they acted arbitrarily and capriciously. *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 541 (D.D.C. 2016).

**2. Defendants disregarded relevant factors.**

Defendants failed to consider highly relevant factors raised in the public comments. A diverse array of public officials; election administrators; former federal privacy officials and SSA personnel; voting, immigrant, and privacy rights organizations; and many thousands of individuals objected to the SAVE overhaul. *See supra* Background § III. They asserted that Defendants' expansion of SAVE exceeded their lawful authority, and violated the Privacy Act, the Social Security Act, other federal laws, and state privacy laws. DHS-AR-1537; SSA-AR-212; FAC ¶¶ 86, 95. Commenters also explained that overhauled SAVE now incorporates SSA citizenship data known to be unreliable and difficult to link to DHS records; includes unreliable search methods (e.g., searching by the last four digits of an SSN); exacerbates pre-existing problems with SAVE; threatens eligible voters' fundamental right to vote, including by imposing burdensome DPOC requirements, burdens state and local election administrators and other officials; jeopardizes millions of Americans' data privacy and security and repurposes their sensitive SSA data without notice or consent, *id.*; and has been justified by DHS based on the empirically false premise that voting by non-citizens is widespread. *See* DHS-AR-1537; SSA-AR-212; FAC ¶¶ 87, 96. Defendants' "decision to disregard" each of these salient points was "arbitrary and capricious." *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1090 (D.C. Cir. 2016); *accord Carlson*, 938 F.3d at 344; *Sierra Club v. Dep't of Transp.*, 125 F.4th 1170, 1182 (D.C. Cir. 2025).

**3. Defendants disregarded adverse evidence.**

Defendants further disregarded, without explanation, their own findings about the serious

risks posed by overhauled SAVE's data and methods. *See Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 172 (D.C. Cir. 2025) (arbitrary and capricious for agency to "disregard[] the results of [their] own literature . . . without adequate explanation").

First, SAVE now incorporates SSA citizenship data that SSA has long acknowledged is incomplete and stale, especially for persons born abroad who become U.S. citizens—*i.e.*, naturalized and derived citizens. *See* 2023 SSA Ltr. at 2. The Administrative Record shows that Defendants acknowledged these data problems, but failed to explain why they were proceeding with the overhaul anyway. *See supra* Argument § II.C.2; *see also e.g.*, SSA-AR-44 (SSA "citizenship information is accurate for SSA's program purposes," but "if used for later purposes, it may not be current," and "SSA is not the custodian of U.S. citizenship records").

Second, Defendants disregarded known difficulties linking DHS and SSA datasets due to the lack of a "common [numeric] identifier" between the agencies, as well as known gaps in DHS's own citizenship data. *See, e.g.*, LWV Comment on 2025 SAVE SORN, at 8-9 https://perma.cc/GB3B-YQLB (citing sources). DHS acknowledges these data gaps are especially likely to impact derived citizens. *See* DHS-AR-1525 (if a derived citizen "has not received a Certificate of Citizenship from USCIS (e.g., some foreign-born children of U.S. citizens), . . . SAVE may not be able to confirm that individual's U.S. citizenship"); DHS-AR-259 (derived citizens "frequently do not apply for and thus do not receive a determination and certificate of United States citizenship"). Plaintiffs' naturalized and derived citizen members have experienced firsthand the fallout from these known data deficiencies. *See supra* Argument § I.A.2-3.

Third, Defendants disregarded known problems with conducting searches using the last four digits of an SSN, which SAVE now enables. *See* DHS-AR-1339. SSA has long known that such searches produce a "high no-match response rate" of "31 percent," because "the last four digits of the SSN is not a unique identifier." SSA Office of the Inspector General, *Accuracy of the Help America Vote Verification Program Responses*, No. A-03-09-29115, at 4 (June 22, 2009), https://perma.cc/3NKGTLWP (cited in LWV Comment on 2025 SSA Master File SORN, at 12-14, https://perma.cc/6R7N-TDEA).

Fourth, the 2025 SAVE PIA and DHS's "Narrative Statement" for the 2025 SAVE SORN reveal several other major risks with overhauled SAVE that DHS failed to mitigate or sufficiently address. *See* DHS-AR-240 (risks that DHS "may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual," and that "due to misspelling of names, transposed numbers, or incomplete information, the SAVE Program may produce inaccurate results"); DHS-AR-484 (same); DHS-AR-241 (risks posed by search-by-SSN functionality because it "does not allow for a second and third step review" and "registered agencies may not go through all steps to ensure accuracy of information"); DHS-AR-484 (same); DHS-AR-241 (risks that new categories of individuals lacked sufficient notice and opportunity to consent to DHS's mass repurposing of their sensitive data); DHS-AR-484 (same).

**4. Defendants violated the change-in-position doctrine.**

Finally, Defendants violated the "change-in-position doctrine" by failing to "provide a reasoned explanation" for their departure from longstanding agency policy, failing to "display awareness that they [were] changing position," and failing to "consider serious reliance interests." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 568 (2025) (citation modified).

Since its creation, SSA has collected and maintained some of Americans' most sensitive data for program-specific purposes including work authorization and eligibility for SSA benefits. *See supra* Argument § II.C.1. Never before has SSA collected data for bulk disclosure to DHS to conduct mass citizenship checks. To the contrary, longstanding agency policy provides that SSA will only disclose SSNs where explicitly mandated by statute, that it unequivocally does "not have the legal authority to disclose information about U.S. citizens to DHS," and that "[i]f DHS requests information and we determine the information pertains to both U.S. citizens and aliens, only information about the aliens can be disclosed"—a statement that remains SSA policy to this day. SSN Disclosure Policy, *supra* n.7. And the record shows that DHS repeatedly recognized it "must" issue an updated PIA explaining its "change in legal rationale for now collecting and maintaining Social Security Numbers of United States natural born citizens." DHS-AR-277; DHS-AR-319.

Yet the record is devoid of a reasoned explanation for Defendants' change in policy and mass repurposing of Americans' sensitive data. And both SSA and DHS failed to consider the reliance interests and reasonable privacy expectations of the hundreds of millions of Americans who never consented to their personal data being pooled and repurposed. By failing to do so, Defendants acted arbitrarily and capriciously.

**F. Defendants have unlawfully withheld compliance with the Privacy Act's requirements for computer matching programs (Counts Seven and Eight).**

Defendants have also unlawfully withheld compliance with the Privacy Act's non-discretionary requirements for "matching programs." *See* FAC ¶¶ 239-51 (Counts Seven and Eight). A matching program is "any computerized comparison of two or more automated systems of records or a system of records with non-Federal records for the purpose of verifying the eligibility of . . . applicants for, recipients or beneficiaries of … Federal benefit programs." 5 U.S.C. § 552a(a)(8)(A)(i)(I). To use agency records in a matching program, the Privacy Act requires that both the source and recipient agencies first execute a "written agreement . . . specifying" a variety of information, including, among other things:

- The purpose, legal authority, and justification for the matching program, a description of the records to be matched, and the start and end dates of the matching program, 5 U.S.C. § 552a(o)(1)(A)-(C);
- A process for providing "individualized notice at the time of application … as directed by the Data Integrity Board of such agency" to applicants and recipients of benefits that the information they provide "may be subject to verification through matching programs," *id.* § 552a(o)(1)(D);
- Procedures for verifying information produced in the matching program before any individual faces a suspension, termination, or reduction of benefits or faces other adverse action as a result of the matching program, *id.* § 552a(o)(1)(E), (p)(1);
- Data retention and destruction procedures, *id.* § 552a(o)(1)(F);
- Procedures for ensuring the security of the records matched and the results of the matching programs, *id.* § 552a(o)(1)(G); and
- Information on "assessments that [have been] made on the accuracy of the records that have been used in such matching program," *id.* § 552a(o)(1)(J).

Matching agreements must be transmitted to relevant congressional committees and available upon request to the public. *Id.* § 552a(o)(2)(A). And they must be subject to time limits (not to exceed 18 months) set by agency Data Integrity Boards. *Id.* § 552a(o)(2)(C). Notice of any matching program with a non-Federal agency must be published in the Federal Register "at least 30 days prior to conducting such program." *Id.* § 552a(e)(12). And OMB guidelines require agencies to review and consider any "public comments on a . . . published matching [program] notice." OMB Circular A-108 at 7, 19.

Overhauled SAVE is a new matching program subject to the requirements of 5 U.S.C. § 552a(o). SAVE and the various federal systems it accesses are "systems of record"; SAVE ingests "non-Federal records" uploaded in bulk by state and local SAVE users; and SAVE undertakes a "computerized comparison" of those records to verify the eligibility of applicants for federal benefit programs. *See* 5 U.S.C. § 552a(a)(8)(A)(i)(I); *see* DHS-AR-114-117. Yet Defendants have not executed matching agreements for these new programs, published notice in the Federal Register, or solicited public comment, in violation of their mandatory duties.

**G. Counts One, Two, and Four through Seven are reviewable under the APA.**

**1. Plaintiffs challenge final agency action.**

Defendants' overhaul of SAVE is final agency action reviewable under the APA, as are the associated Modified SORNs and DHS-SSA SAVE Agreement.

For agency action to be "final" and subject to APA review, it must (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which 'legal consequences will flow.'" *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). Defendants' self-described "overhaul" of SAVE is the consummation of Defendants' relevant decision-making. Defendants call the overhauled SAVE system a "single, reliable source for verifying immigration status" and a new "partnership" with powerful functionalities. DHS-AR-491; *see also* DHS-AR-493; DHS-AR-1385; May 2025 USCIS Release, *supra*. The legal consequences flowing from the overhaul are likewise clear: SAVE user agencies now have access to a massive trove of sensitive records

containing data on millions of individuals, and are now able to bulk query that information to access and analyze it en masse. Another judge in this District recently held that SAVE's "sharing [of] sensitive records with others outside the agency" "clearly" constitutes final agency action. *LULAC II*, 2026 WL 252420, at *53; *see also Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("policy of disclosing confidential information without notice" was final agency action); *AFL-CIO*, 778 F. Supp. 3d at 77 (policy of granting DOGE personnel access to agency systems was final agency action).

Defendants' Modified SORNs are also final agency action. The Privacy Act requires that SORN modifications be made through notice and comment, 5 U.S.C. § 552a(e)(11), a quintessential "consummation" of agency decision-making. The modifications here also gave rise to a range of legal consequences: adding whole categories of citizens to SAVE, drawing in data from new systems, and repurposing individuals' data in ways to which they never consented and that is detrimental to them. *See supra* Argument § III.C. And both Modified SORNs add broad categories of information-sharing with other agencies as "new routine uses." DHS-AR-115, 117; SSA-AR-207, 210.

The DHS-SSA SAVE Agreement, *see* DHS-AR-420-31; SSA-AR-6-17, is an instrumental piece of SAVE's "overhaul," and is "final" for similar reasons to the other actions Plaintiffs challenge: it prescribes specific procedures and requirements for inter-agency information-sharing, sets agency policies with regard to specific information-sharing practices, and in doing so, both determines agency employees' obligations and alters the rights of individuals whose data is contained in the systems to which it applies.

**2. Plaintiffs have an APA remedy for the Privacy Act violations alleged in Counts Four, Five, and Seven.**

While the Privacy Act provides for relief not sought here—damages to individuals for wrongful disclosure under 5 U.S.C. § 552a(g)(1)(D), and injunctive relief to correct wrongful withholding or factual inaccuracies in individuals' records under §§ 552a(g)(1)(A)-(C)—plaintiffs may seek judicial review under the APA to seek other forms of relief for Privacy Act violations.

The APA's "set aside" remedy generally applies to violations of "*any* law," *NextWave Pers.*, 537 U.S. at 300 (quoting 5 U.S.C. § 706(2)(A)), but not where another statute provides an "adequate remedy in court," 5 U.S.C. § 704. In evaluating whether a particular statutory remedy displaces APA review, courts evaluate congressional intent to create a comprehensive scheme that would prelude judicial review of APA claims, and whether the alternate remedy is of such a nature as to provide an adequate substitute for APA review. *See Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009).

Congress did not intend to preclude APA review of all claims for injunctive relief grounded in violations of the Privacy Act. Both the Supreme Court and D.C. Circuit have contemplated that the APA authorizes relief for Privacy Act violations beyond the remedies built into the Act itself. In *Doe v. Chao*, the Supreme Court posited that the "inattention" of the Privacy Act to certain "standards of proof governing equitable relief . . . may be . . . explained by the general provisions for equitable relief within the" APA. 540 U.S. 614, 619 n.1 (2004). In *Doe v. Stephens*, the D.C. Circuit considered a claim that an agency improperly disclosed medical records in violation of the Act. 851 F.2d 1457, 1460-61, 1463 (D.C. Cir. 1988). After finding that the "Privacy Act [did] not by itself authorize the injunctive relief sought by Doe," the court explained that such relief nevertheless *was* available under the APA, because Doe's "clearly [was] a case of agency action 'not in accordance with law' within the meaning of 5 U.S.C. 706(2) . . . [where] the disclosure of Doe's psychiatric records violated . . . the Privacy Act." *Id.* at 1463, 1466. Several judges in this District have expressly held that the Privacy Act does not preclude the type of APA relief Plaintiffs seek here. *See, e.g.*, *AFL-CIO*, 778 F. Supp. 3d at 81; *LULAC II*, 2026 WL 252420, *51-52; *Ctr. for Taxpayer Rights*, 2025 WL 3251044, at *21.

Nor does the Privacy Act provide Plaintiffs an adequate alternative remedy for Counts Four, Five, and Seven of the FAC.[18] An "alternative remedy will not be adequate . . . if the remedy offers only doubtful and limited relief." *Garcia*, 563 F.3d at 522 (citation modified). The Privacy

[18] Counts One, Two, Three, and Six of the FAC do not depend on Privacy Act violations.

Act only authorizes individuals to seek injunctive relief to force the release or modification of their records and monetary damages for unlawful disclosures. *See* 5 U.S.C. § 552a(g). Plaintiffs here seek vacatur of the SAVE overhaul; directions to SAVE user agencies to delete, disentangle, and unlink data unlawfully shared with them through the overhauled SAVE system; and publication of matching agreements and opportunity to comment on them as required by the Privacy Act. *See* FAC, Prayer for Relief. The Privacy Act grants none of these remedies to Plaintiffs.

If relegated to the Privacy Act's limited remedies with respect to Counts Four, Five, and Seven of the FAC, Plaintiffs' members would have no recourse for their ongoing privacy injuries, *see supra* Argument § I.A.1, which are "non-monetary" injuries "not fully redressable by damages alone," *Richman v. United States*, 350 F.R.D. 401, 420 (D.D.C. 2025). Nor would they have a remedy for the ongoing threats to their fundamental voting rights, including outright disenfranchisement, *see supra* Argument § I.A.3; *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (once an election passes, "there can be no do over and no redress"). Plaintiffs have also directly suffered organizational injuries as a result of Defendants' Privacy Act violations. *See supra* Argument § I.B-C. Because they are not "individuals" within the meaning of the Act, the statute does not offer them *any* remedy, let alone an adequate one. *See* 5 U.S.C. §§ 552a(a)(2), (g)(1)(D). But the APA can and does afford such relief.

## III. Plaintiffs are entitled to their requested relief.

The APA mandates that a "reviewing court *shall* . . . hold unlawful and set aside agency action" that is in excess of statutory authority, contrary to law, unconstitutional, arbitrary and capricious, or procedurally defective. 5 U.S.C. §§ 706(2)(A)-(D) (emphasis added). "[T]o 'set aside'" an agency action "is to vacate it." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024). And vacatur requires an agency to "re-establish the status quo absent the unlawful agency action." *Las Ams. Immigrant Advoc. Ctr. v. DHS*, 783 F. Supp. 3d 200, 233 (D.D.C. 2025). Here, that means ordering Defendants to revert SAVE to its functionality prior to the overhaul and undo its effects, delete any unlawfully obtained data, instruct SAVE users to do the same, and

terminate all MOAs for overhauled SAVE.[19] *See* FAC, Prayer for Relief. Defendants can effectuate such relief under the SAVE users' MOAs, which provide that "DHS-USCIS may suspend or terminate this MOA, and thereby the Agency's use of SAVE, without prior notice if deemed necessary because of a requirement of law or policy." DHS-AR-1353.

Plaintiffs are also entitled to a permanent injunction prohibiting Defendants from continuing to operate overhauled SAVE,[20] and a declaratory judgment that the overhaul was unlawful and unconstitutional. *See LULAC I*, 808 F. Supp. 3d at 80-86 (granting similar relief); *accord LULAC II*, 2026 WL 252420, at *43-44; *Washington*, 2026 WL 73866, at *37; *California*, 786 F. Supp. 3d at 395. The SAVE overhaul will "irreparably harm Plaintiffs' interests in the absence of an injunction because, in the inherently time-constrained context of an election cycle, the Court cannot provide meaningful redress for lost opportunities," *LULAC II*, 2026 WL 252420, at *44, including the threatened irreparable loss of voting rights, *see Newby*, 838 F.3d at 9. And "because agencies have no legitimate interest in the perpetuation of unlawful practices and because the public interest 'favors permitting as many qualified voters to vote as possible,' both the balance of hardships and the public interest weigh in favor of granting a permanent injunction." *LULAC II*, 2026 WL 252420, at *44 (quoting *Newby*, 838 F.3d at 12). Since LWV and EPIC are national organizations, Stewart Decl. ¶ 4, ECF 16-5; Butler Decl. ¶ 32, nationwide relief is necessary. *See LULAC I*, 808 F. Supp. 3d at 84-86; *LULAC II*, 2026 WL 252420, at *44.

Finally, under the APA, the Court "shall . . . compel" Defendants to comply with their mandatory duties under § 552a(e)(12) of the Privacy Act to publish matching-agreement information. *See* 5 U.S.C. § 706(1). Because Congress "by organic statute set[] a specific deadline

---

[19] D.C. Circuit precedent only permits remand-without-vacatur in "exceptional" cases where "an agency's error is 'curable.'" *Bridgeport Hosp.*, 108 F.4th at 890. Because Defendants "can't 'cure' the fact that [they] lack[] authority to take a certain action, remand-without-vacatur is unavailable here." *Id.*

[20] "The Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would 'have a meaningful practical effect independent of its vacatur.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 312 (D.D.C. 2025) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). Thus, the Court need not issue an injunction if it grants identical relief under the APA.

for agency action," the Court "must compel the action unlawfully withheld." *South Carolina v. United States*, 907 F.3d 742, 758 (4th Cir. 2018). Alternatively, if the Court finds Plaintiffs lack an APA remedy for this claim, it should issue a writ of mandamus under 28 U.S.C. § 1361 because "no adequate alternative remedy exists," and there are "compelling equitable grounds" for issuing the writ. *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *see Babamuradova v. Blinken*, 633 F. Supp. 3d 1, 19 (D.D.C. 2022) ("What plaintiffs must show to establish a mandamus claim is similar to what they must show to succeed on their . . . unlawful withholding claims under [§ 706(1) of] the APA").

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment.

Dated: March 12, 2026

Respectfully submitted,


<u>*/s/ Nikhel S. Sus*</u>
Nikhel S. Sus (D.C. Bar No. 1017937)
John B. Hill (N.Y. Bar No. 5505508)*
Lauren C. Bingham (Fl. Bar No. 105745)*
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jhill@citizensforethics.org
lbingham@citizensforethics.org

*Counsel for All Plaintiffs*

Jon Sherman (D.C. Bar No. 998271)*
Michelle Kanter Cohen (D.C. Bar No. 989164)
Emily Davis (D.C. Bar No. 90020129)
FAIR ELECTIONS CENTER
1825 K St. NW, Suite 701
Washington, DC 20006
(202) 331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
edavis@fairelectionscenter.org

*Counsel for All Plaintiffs*

Aman T. George (D.C. Bar No. 1028446)
Jennifer Fountain Connolly (D.C. Bar No. 1019148)
Johanna M. Hickman (D.C. Bar No. 981770)
Mark B. Samburg (D.C. Bar No. 1018533)
Robin Thurston (D.C. Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
ageorge@democracyforward.org

John L. Davisson (D.C. Bar No. 1531914)
Enid Zhou (D.C. Bar No. 1632392)
Abigail Kunkler (D.C. Bar No. 90030868)
Mayu Tobin-Miyaji (D.C. Bar No. 90033340)
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140
davisson@epic.org
zhou@epic.org
kunkler@epic.org

jconnolly@democracyforward.org
hhickman@democracyforward.org
msamburg@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*

*Counsel for Plaintiff Electronic Privacy Information Center*

* admitted pro hac vice

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants.[1] | No. 1:25-cv-03501 (SLS) |

**DEFENDANTS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS (OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT) AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

STEPHEN M. PEZZI (D.C. Bar No. 995500)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

[1] Under Federal Rule of Civil Procedure 25(d), Markwayne Mullin is automatically substituted as a Defendant in his official capacity as Secretary of Homeland Security, in place of his predecessor Kristi Noem.

# TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **4**

I. The Creation of the SAVE System .......... 4

II. The use of SAVE for Voter Verification .......... 6

III. Improvements and Modernization of SAVE .......... 7

IV. This Litigation .......... 8

**ARGUMENT** .......... **10**

**I. PLAINTIFFS LACK ARTICLE III STANDING** .......... **11**

A. Several Plaintiffs lack associational standing for failure to identify any member with Article III standing. .......... 11

B. No Plaintiff attempts to show standing to challenge bulk-upload capability. .......... 14

C. All remaining Plaintiffs also lack Article III standing to challenge intra-governmental data-sharing. .......... 15

1. Plaintiffs' alleged privacy-related interests are too speculative and amorphous to support Article III standing. .......... 15

2. Plaintiffs' alleged voting-related injuries are impermissibly speculative, and are neither caused by the federal government nor redressable in this suit. .......... 23

3. Plaintiffs' diversion-of-resources theory of organizational standing is inconsistent with recent Supreme Court precedent. .......... 29

4. EPIC's alleged procedural and informational injuries cannot independently support Article III standing. .......... 30

**II. PLAINTIFFS' PRIVACY ACT NOTICE-AND-COMMENT CLAIM (COUNT 5) IS MOOT** .......... **33**

**III. PLAINTIFFS DO NOT CHALLENGE ANY DISCRETE AND FINAL AGENCY ACTION.** .......... **36**

**IV. PLAINTIFFS CANNOT BRING APA CLAIMS PREDICATED ON PRIVACY ACT VIOLATIONS.** .......... **39**

**V. ALL OF PLAINTIFFS' CLAIMS LACK MERIT. .... 44**

A. SAVE is authorized by statute (Count 1). .... 45

B. SAVE does not exceed the government's constitutional authority or violate the separation of powers (Counts 2 and 3). .... 53

C. Plaintiffs' Privacy Act claims (purportedly brought under the APA) lack merit (Counts 4, 5, and 6). .... 54

D. Plaintiffs' mandamus and unreasonable delay claims about computer-matching agreements lack merit (Counts 7 and 8). .... 59

**VI. PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD AND SUBJECT TO EQUITABLE LIMITS .... 61**

**CONCLUSION .... 64**

## TABLE OF AUTHORITIES

### CASES

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)........................................................................................... 51

*AFL-CIO v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025)..................................................................... 19, 21

*AFL-CIO v. Dep't of Lab.*,
No. 25-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026)................................. 19

*Alaska v. USDA*,
17 F.4th 1224 (D.C. Cir. 2021)............................................................................. 36

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013)............................................................................................... 35

*Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO v. SSA*,
No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025), *stay granted*,
605 U.S.---, 145 S. Ct. 1626 (2025) (mem.)........................................................ 19, 20

*Am. Fed'n of Tchrs. v. Bessent*,
152 F.4th 162 (4th Cir. 2025)........................................................................ 19, 20, 42

*Am. First Legal Found. v. Greer*,
153 F.4th 1311 (D.C. Cir. 2025)........................................................................... 30

*Am. Hosp. Ass'n v. Burwell*,
812 F.3d 183 (D.C. Cir. 2016)......................................................................... 60, 61

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946)............................................................................................... 51

*Ames v. DHS*,
861 F.3d 238 (D.D.C. 2017)................................................................................. 58

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022)................................................................................ 62

*Bahman Grp. v. Palluconi*,
No. 22-3826 (RDM), 2025 WL 3225196 (D.D.C. Sep. 29, 2025)........................... 55

*Baltimore v. ATF*,
No. CV 23-3762 (RDM), 2026 WL 143346 (D.D.C. Jan. 20, 2026)........................ 50

*Bennett v. Spear*,
520 U.S. 154 (1997)...................................................................................... 36, 37, 39

*Berardi v. U.S. Dep't of the Air Force*,
No. 05-2269 (JR), 2006 WL 8448631 (D.D.C. Sep. 29, 2006) ........ 41

*Bergh v. Washington*,
535 F.2d 505 (9th Cir. 1976) ........ 64

*Biccum v. City of Watertown*,
2019 WL 4752927 (N.D.N.Y. Sept. 30, 2019) ........ 50

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........ 50, 51

*Bierly v. Dep't of Def.*,
No. 23-2386 (RCL), 2024 WL 4227154 (D.D.C. Sep. 18, 2024) ........ 41

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ........ 39

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ........ 39

*Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989) ........ 57, 58, 59

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........ 62

*California v. Texas*,
593 U.S. 659 (2021) ........ 62

*Carver v. Knox Cnty.*,
887 F.2d 1287 (6th Cir. 1989) ........ 64

*Cell Assocs., Inc. v. NIH*,
579 F.2d 1155 (9th Cir. 1978) ........ 41, 42

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) ........ 3, 36, 37, 38

*Chamber of Com. of U.S. v. EPA*,
642 F.3d 192 (D.C. Cir. 2011) ........ 11

*Chichakli v. Tillerson*,
882 F.3d 229 (D.C. Cir. 2018) ........ 57

*City of Erie v. Pap's A.M.*,
529 U.S. 277 (2000) ........ 34

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................................................................................... 16, 22, 24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................ *passim*

*Clarke v. United States*,
915 F.2d 699 (D.C. Cir. 1990) ............................................................................ 35

*Coal. of Airline Pilots Ass'ns v. FAA*,
370 F.3d 1184 (D.C. Cir. 2004) .......................................................................... 35

*Colby v. J.C. Penney Co.*,
811 F.2d 1119 (7th Cir. 1987) ............................................................................ 64

*Collette v. District of Columbia*,
No. 18-cv-1104 (RC), 2019 WL 3502927 (D.D.C. Aug. 1, 2019) .......................... 35, 36

*Common Cause v. Jud. Ethics Comm.*,
473 F. Supp. 1251 (D.D.C. 1979) ........................................................................ 63

*Competitive Enter. Inst. v. Mann*,
150 A.3d 1213 (D.C. 2016), *as amended* (Dec. 13, 2018) ............................ 17, 22, 23

*Conservation Force, Inc. v. Jewell*,
733 F.3d 1200 (D.C. Cir. 2013) .......................................................................... 33

*Ctr. for L. & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005) .......................................................................... 30

*Dalton v. Specter*,
511 U.S. 462 (1994) ........................................................................................... 53

*Dew v. United States*,
192 F.3d 366 (2d Cir. 1999) ............................................................................... 39

*Dickson v. Direct Energy, LP*,
69 F.4th 338 (6th Cir. 2023) ............................................................................... 19

*Doe v. Chao*,
540 U.S. 614 (2004) ........................................................................................... 42

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) ..................................................................... 41, 42

*Dorsey v. United States*,
567 U.S. 260 (2012) ...................................................................................... 49, 50

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
396 F.3d 1265 (D.C. Cir. 2005) .......... 39

*EPIC v. PACEI*,
878 F.3d 371 (D.C. Cir. 2017) .......... 31

*FAA v. Cooper*,
566 U.S. 284 (2012) .......... 40, 41

*EPIC v. OPM, No.*,
No. 1:25-CV-255 (RDA/WBP), 2025 WL 580596 (E.D. Va. Feb. 21, 2025) .......... 16

*EPIC v. Dep't of Com.*,
928 F.3d 95 (D.C. Cir. 2019) .......... 16, 30, 31, 32

*FBI v. Fikre*,
601 U.S. 234 (2024) .......... 35

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) .......... 51

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 55, 56

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... *passim*

*FDA v. Wages & White Lion Invs.*,
604 U.S. 542 (2025) .......... 56

*Feller v. Brock*,
802 F.2d 722 (4th Cir. 1986) .......... 63

*Fletcher v. Peck*,
10 U.S. (6 Cranch) 87 (1810) .......... 50

*FPC v. Hope Nat. Gas Co.*,
320 U.S. 591 (1944) .......... 52

*Gadelhak v. AT&T Servs., Inc.*,
950 F.3d 458 (7th Cir. 2020) .......... 18, 19

*Garcia v. Vilsack*,
563 F.3d 519 (D.C. Cir. 2009) .......... 39

*Garey v. James S. Farrin, P.C.*,
35 F.4th 917 (4th Cir. 2022) .......... 18

*Gill v. Whitford*,
585 U. S. 48 (2018) ... 62

*Glob. Health Council v. Trump,*
153 F.4th 1 (D.C. Cir.), *reh'g en banc denied*,
2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) ... 53

*Grams v. Esters*,
No. 1:07CV-145-R, 2007 WL 9780467 (W.D. Ky. Nov. 19, 2007) ... 50

*Guedes v. ATF*,
920 F.3d 1 (D.C. Cir. 2019) ... 33

*Gundy v. United States*,
588 U.S. 128 (2019) ... 51

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ... 26

*Haleem v. Dep't of Def.*,
No. 23-1471 (JEB), 2024 WL 230289 (D.D.C. Jan. 22, 2024) ... 41

*Harrison v. Fed. Bureau of Prisons*,
248 F. Supp. 3d 172 (D.D.C. 2017) ... 41

*Harvey v. Lynch*,
123 F. Supp. 3d 3 (D.D.C. 2015) ... 35

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ... 29

*Hinck v. United States*,
550 U.S. 501 (2007) ... 41

*Humane Soc'y of the U.S. v. Hodel*,
840 F.2d 45 (D.C. Cir. 1988) ... 13

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ... 11

*J.T. v. District of Columbia*,
983 F.3d 516 (D.C. Cir. 2020) ... 35

*Jeffries v. Volume Servs. Am. Inc.*,
928 F.3d 1059 (D.C. Cir. 2019) ... 20, 21

*Jones v. HUD*,
No. 11 CV 0846 RJD JMA, 2012 WL 1940845 (E.D.N.Y. May 29, 2012) ... 39

*Krakauer v. Dish Network, LLC*,
925 F.3d 643 (4th Cir. 2019) .......... 18, 19

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
--- F. Supp. 3d ----, 2026 WL 252420 (D.D.C. Jan. 30, 2026) .......... *passim*

*League of Women Voters v. DHS*,
No. CV 25-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025) .......... *passim*

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026) .......... 50

*Little Sisters of the Poor v. Pennsylvania*,
591 U.S. 657 (2020) .......... 55

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 11, 23

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 36

*Lupia v. Medicredit, Inc.*,
8 F.4th 1184 (10th Cir. 2021) .......... 19

*Make the Rd. N.Y. v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) .......... 62

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) .......... 22, 27

*Mistretta v. United States*,
488 U.S. 361 (1989) .......... 52

*Muransky v. Godiva Chocolatier, Inc.*,
922 F.3d 1175 (11th Cir. 2019), *reh'g en banc granted, opinion vacated*,
939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020) .......... 20

*Muransky v. Godiva Chocolatier, Inc.*,
979 F.3d 917 (11th Cir. 2020) .......... 20

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 26, 27

*NAACP, Jefferson Cnty. Branch v. Brock*,
619 F. Supp. 846 (D.D.C. 1985) .......... 63

*Nat. Res. Def. Council, Inc. v. NRC*,
680 F.2d 810 (D.C. Cir. 1982) .......... 33, 34

*Nat'l Broad. Co. v. United States*,
319 U.S. 190 (1943) ........ 52

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
595 U.S. 109 (2022) ........ 50

*Nat'l Mining Ass'n v. Dep't of Interior*,
251 F.3d 1007 (D.C. Cir. 2001) ........ 34

*Nemeth-Greenleaf v. OPM*,
No. 25-CV-407 (CRC), 2026 WL 607905 (D.D.C. Mar. 4, 2026) ........ 19

*Nieves v. Bartlett*,
587 U.S. 391 (2019) ........ 27

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........ 36, 60

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935) ........ 51

*Parks v. IRS*,
618 F.2d 677 (10th Cir. 1980) ........ 41

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ........ 43

*Poss v. Kern*,
No. 23-cv-2199 (DLF), 2024 WL 4286088 (D.D.C. Sep. 25, 2024) ........ 41

*Rimmer v. Holder*,
700 F.3d 246 (6th Cir. 2012) ........ 39

*Robert F. Kennedy Hum. Rts. v. Dep't of State*,
No. 25-cv-1774 (JEB), 2026 WL 820811 (D.D.C. Mar. 25, 2026) ........ 37, 38

*Rural Cellular Ass'n v. FCC*,
588 F.3d 1095 (D.C. Cir. 2009) ........ 55

*Six v. IQ Data Int'l, Inc.*,
129 F.4th 630 (9th Cir.), *cert. denied*, 146 S. Ct. (2025) (mem.) ........ 19

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 17, 20

*SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
145 S. Ct. 1626 (2025) ........ 20

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) ........................................ 62

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........................................ 16

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........................................ 11, 30

*Sussman v. U.S. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) ........................................ 41

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................ *passim*

*Tripp v. DOD*,
193 F. Supp. 2d 229 (D.D.C. 2002) ........................................ 41

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................ 61, 62

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
9 F.3d 138 (D.C. Cir. 1993) ........................................ 58

*United States v. Cooper*,
750 F.3d 263 (3d Cir. 2014) ........................................ 51

*United States v. Texas*,
599 U.S. 670 (2023) ........................................ 33, 62

*Univ. of Cal. Student Ass'n v. Carter*,
766 F. Supp. 3d 114 (D.D.C. 2025) ........................................ 61

*Valley Reg'l Ctr., LLC v. DHS*,
106 F.4th 1195 (D.C. Cir. 2024) ........................................ 38

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ........................................ 43, 55

*W. Gulf Maritime Ass'n v. ILA Deep Sea Loc. 24*,
751 F.2d 721 (5th Cir. 1985) ........................................ 64

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........................................ 51

*Westcott v. McHugh*,
39 F. Supp. 3d 21 (D.D.C. 2014) ........................................ 3, 41

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 51, 52

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 11

*Williams v. Dep't of Veterans Affs.*,
104 F.3d 670 (4th Cir. 1997) .......... 31

*Wolf v. Regardie*,
553 A.2d 1213 (D.C. 1989) .......... 17, 18

*Yakus v. United States*,
321 U.S. 414 (1944) .......... 52

*Young v. DOJ*,
882 F.2d 633 (2d Cir. 1989) .......... 20, 21

*Zambrana v. Califano*,
651 F.2d 842 (2d Cir. 1981) .......... 64

**STATUTES**

5 U.S.C. § 552a .......... *passim*

5 U.S.C. § 553 .......... *passim*

5 U.S.C. § 704 .......... 36, 37, 39

5 U.S.C. § 705 .......... 9

5 U.S.C. § 706 .......... 44, 62

8 U.S.C. § 1373 .......... *passim*

8 U.S.C. § 1644 .......... 2, 6

42 U.S.C. § 405 .......... 6, 49

42 U.S.C. § 1306 .......... 49

42 U.S.C. § 1320b-7 (note) .......... *passim*

52 U.S.C. § 21083 .......... 6, 27, 48

52 U.S.C. § 21083 .......... 6, 48

Immigration Reform and Control Act of 1986,
Pub. L. No. 99-603, 100 Stat. 3359 .......... *passim*

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
Pub. L. No. 104-193, 110 Stat. 2105 ........................................................................ 5

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
Pub. L. No. 104-208, 110 Stat. 3009 ........................................................................ 5, 45

Restatement (Second) of Torts § 652B (A.L.I. 1977)................................................ 17

Restatement (Second) of Torts § 652B cmt. a ........................................................ 19

**REGULATIONS**

*Guidance on the Privacy Act*,
52 Fed. Reg. 12,990 (Apr. 20, 1987) ........................................................................ 57, 58

*Reissuance of OMB Circular No. A-108, "Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*,"
81 Fed. Reg. 94,424 (Dec. 23, 2016), https://perma.cc/B5KU-PN8H .............................. 43, 57

*Notice of a Modified System of Records*,
90 Fed. Reg. 48,948 (Oct. 31, 2025)......................................................................... 34

*Notice of a Modified System of Records*,
90 Fed. Reg. 50,879 (Nov. 12, 2025)......................................................................... 34

**OTHER AUTHORITIES**

C. Puckett, SSA, *The Story of the Social Security Number* (July 2009),
https://perma.cc/8Z3Z-DDB3 ..................................................................................... 58

GAO, GAO-14-44, *Computer Matching Act* (2014),
https://perma.cc/YMK8-PTD7..................................................................................... 60

*Letter Agreement Providing for Information-Sharing Between DHS, USCIS, and SSA re: Citizenship* (May 15, 2025),
https://perma.cc/8SVE-SES5 ..................................................................................... 8

*Relationship Between IIRIRA & Statutory Requirement for Confidentiality of Census Info.*,
1999 WL 34995963 (O.L.C. May 18, 1999) ............................................................... 47

SSA, Program Operations Manual System, RM 10210.500, *General Information on Evidence of U.S. Citizenship for a Social Security Number Card*,
https://perma.cc/HX8Y-W2XK ..................................................................................... 28

USCIS, *About SAVE*,
https://perma.cc/5888-TH46 ....................................................................................... 1, 5, 23

USCIS, *About SAVE: History*,
https://perma.cc/MG5B-MCZH..................................................................................... 5

USCIS, *About SAVE: Verification Process*, https://perma.cc/49CU-XL6G ........ 8

USCIS, *Guide to Understanding SAVE Verification Responses* (Apr. 2022), https://perma.cc/BW9M-WJUT ........ 6, 7

USCIS, *Mem. of Agreement Between DHS, USCIS and Indiana Sec. of State re: Participation in SAVE for Voter Registration and Voter List Maintenance Purposes* (July 8, 2025), https://perma.cc/A6LC-9CLQ ........ 8, 23

USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76 ........ 7, 8, 56

USCIS Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M ........ 7, 8, 56

USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (last updated Feb. 2, 2026), https://perma.cc/F63E-PQ87 ........ 8, 28, 56

## INTRODUCTION

In the Immigration Reform and Control Act of 1986, Congress provided that the predecessor agency of the Department of Homeland Security (DHS) "shall implement a system for the verification of immigration status." Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391; 42 U.S.C. § 1320b-7 (note). Then, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress placed an affirmative "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). To fulfill these obligations, DHS has long used the SAVE system, which "is an online service administered by U.S. Citizenship and Immigration Services (USCIS) that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies." USCIS, *About SAVE*, https://perma.cc/5888-TH46. This is not new: SAVE was created in 1986 and, "[i]n fiscal year 2023, SAVE performed over 21.5 million verifications." *Id.*

Congress also spoke directly to the issue of "[c]ommunication between" other "government agencies and" DHS. 8 U.S.C. § 1373. Congress provided expressly that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a). Congress also emphasized—again "[n]otwithstanding any other provision of Federal, State, or local law"—that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[m]aintaining" or "[e]xchanging . . . with any other Federal, State, or local government entity" any "information regarding the immigration status, lawful or unlawful, of any individual." *Id.* § 1373(b). Congress provided similar clarity about sharing information with States for this purpose: "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or

in any way restricted, from sending to or receiving from [DHS] information regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644.

Despite these clear congressional directives to DHS to provide citizenship verification services for other government agencies, the core premise of this lawsuit (as amended) is that DHS lacks statutory and constitutional authority to effectively and efficiently do what Congress tasked DHS to do. Plaintiffs likewise insist that various "other provision[s] of Federal . . . law," such as the Privacy Act, implicitly require maintaining strict firewalls between Defendant DHS and other "Federal . . . government entit[ies]," *id.* § 1373(a), (b), such as Defendant Social Security Administration (SSA). All of those claims lack merit, but the court should never have to reach them—because several threshold defects doom this case at the outset.

First, Plaintiffs lack Article III standing. The primary target of Plaintiffs' lawsuit is the fact that USCIS queries of the SAVE system can now search using Social Security numbers that DHS verifies against records held by SSA—a modernization that assists USCIS in more effectively fulfilling its statutory obligations. But Plaintiffs suffer no concrete and particularized harm from intra-governmental sharing of information that was created by the government, for the government. Generalized fears of possible future privacy-related harms are not enough. Plaintiffs' concerns that *State* officials may, one day, accidentally and unlawfully use information from SAVE to remove them from voter rolls not only remain highly speculative but also provide no basis for relief against the federal government. And Plaintiffs' concerns about SAVE users submitting bulk verification requests (as opposed to one-by-one verification requests) do not give rise to any Article III injury in the first place—Plaintiffs have no cognizable legal interest in whether government computer systems move slowly or quickly.

Other threshold problems abound. Plaintiffs' notice-and-comment claim under the Privacy Act—the linchpin of the preliminary-injunction motion that this Court denied—is now moot. Both DHS and SSA have now published new System of Records Notices (SORNs) that went through the notice-and-comment process required by the Privacy Act—whether or not that was required. Now, Plaintiffs' "claim for injunctive relief against the relevant changes to SAVE and Numident

based on the Privacy Act is moot." *League of United Latin Am. Citizens v. Exec. Off. of the President*, --- F. Supp. 3d ----, 2026 WL 252420, at *53 (D.D.C. Jan. 30, 2026) ("*LULAC*").

Plaintiffs also fail to challenge any final agency action under the APA. For example, as for the information-sharing agreement between DHS and SSA, the D.C. Circuit recently held that an analogous intra-governmental data-sharing "MOU is a nonbinding, nonfinal policy statement that is not reviewable under the APA." *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1236 (D.C. Cir. 2026). That holding is straightforwardly fatal to many of Plaintiffs' claims.

Moreover, Plaintiffs' Administrative Procedure Act (APA) claims are largely premised on alleged violations of the Privacy Act, but "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014). The importance of that general principle is underscored by this very case, in which Plaintiffs repeatedly try to graft APA-specific litigation concepts—for example, DHS's alleged failure to respond to comments—despite the absence of any comparable procedures in the Privacy Act. More generally, allowing these sorts of Privacy Act claims to proceed under the rubric of the APA would effectively rewrite the sections of the Privacy Act in which Congress painstakingly specified the judicial remedies that are (or are not) available for violations of that statute.

On the merits, Plaintiffs' claims only get worse. In a significant shift from their original complaint, the core of this case is now premised on Plaintiffs' allegations that the recent changes to SAVE exceed DHS's statutory and constitutional authority. But Congress provided expressly that DHS "shall implement a system for the verification of immigration status." 42 U.S.C. § 1320b-7 (note). And DHS is not just permitted, but under an affirmative legal "[o]bligation" to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). Congress had no obligation to further specify the technical software mechanisms by which DHS should carry out those obligations. Plaintiffs' arguments to the contrary would hamper many federal programs—which virtually never include the level of granular detail

that Plaintiffs demand here. Instead, such programs evolve and improve over time, as technological progress marches forward. That is good government, not a statutory violation.

As for Plaintiffs' constitutional claims, all are either (1) statutory-authority claims repackaged in constitutional garb, or (2) premised on a fundamental misunderstanding of what SAVE does. For example, this case does not present the question of whether "Defendants have any constitutional authority to arrogate election administration to themselves." Pls.' Mot. for Summ. J. at 34, ECF No. 66 ("Pls.' Br."). By improving the effectiveness and efficiency of SAVE, neither DHS nor SSA is engaged in any "election administration" at all. *Id.* And Plaintiffs' obvious dissatisfaction with State election officials cannot be remedied by suing the United States.

Finally, Plaintiffs also offer a series of more technical privacy-related arguments about, for example, the limits of the "compatible use" requirement in the Privacy Act, internal SSA disclosure policies, requirements to publish computer-matching agreements (even seeking mandamus on the latter), and so on. All of those more technical claims also lack merit—though the scarcity of comparable precedent also underscores why most of these sorts of Privacy Act claims have never before been understood to be subject to routine APA review in the first place.

Defendants acknowledge that, at the preliminary-injunction stage, the Court expressed concerns about "the lawfulness of the Government's actions" under the Privacy Act. *League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). But the issue at the forefront of those proceedings—that is, making changes to SAVE without first completing notice-and-comment under the Privacy Act—has now been resolved. Plaintiffs' remaining claims raise no comparable concerns. This suit should be dismissed in its entirety.

## BACKGROUND

### I. The Creation of the SAVE System

The Systematic Alien Verification for Entitlements (SAVE) system was created by Congress in 1986, as part of the Immigration Reform and Control Act of 1986. *See* Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391; 42 U.S.C. § 1320b-7 (note). In that statute, Congress

provided that DHS "shall implement a system for the verification of immigration status." *Id.* Fulfilling that statutory obligation, today, SAVE "is an online service administered by" USCIS "that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies." *About SAVE*, *supra* at 1. Over "1,200 agencies nationwide use SAVE to support their benefit eligibility and licensing determinations," and "[i]n fiscal year 2023, SAVE performed over 21.5 million verifications." *Id.* The purpose of SAVE is to carry out congressional intent to "[h]elp[] ensure that only applicants who are eligible for benefits and licenses receive them." *Id.* In doing so, SAVE "[i]ncorporates privacy principles and security measures into user agencies' processes and procedures." *Id.* Ultimately, however, SAVE does not "[d]etermine applicant eligibility for a specific benefit or license." *Id.* "That determination is made by the benefit issuing or licensing agency," *id.*—often, a State or local government agency.

In 1996, SAVE took on greater importance, because of two new congressional enactments. First, in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, Congress "restructured the welfare system in the United States and restricted immigrant eligibility for public benefits," thus "expanding the need for benefit-granting agencies to verify immigration status." USCIS, *About SAVE: History*, https://perma.cc/MG5B-MCZH. Second, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009, Congress placed an affirmative "[o]bligation" on what was then the INS (now, DHS) to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c).

In doing so, Congress also spoke to the issue of "[c]ommunication between" other "government agencies and" DHS. *Id.* § 1373. Congress provided expressly that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or

unlawful, of any individual." *Id.* § 1373(a). Congress also emphasized—again "[n]otwithstanding any other provision of Federal, State, or local law"—that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[m]aintaining" or "[e]xchanging . . . with any other Federal, State, or local government entity" any "information regarding the immigration status, lawful or unlawful, of any individual." *Id.* § 1373(b).

## II. The use of SAVE for Voter Verification

Separately, Congress also placed an affirmative legal obligation on the States: to "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4); *see also id.* § 20501(b)(4) ("ensure that accurate and current voter registration rolls are maintained"). In doing so, Congress also provided that States must establish "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* § 21083(a)(4)(B). Congress also emphasized that the same sort of information-sharing that it was now authorizing within the federal government also applied to the States: "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [DHS] information regarding the immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C. § 1644.[2]

Since the mid-2000s, in carrying out these statutory obligations, States have entered into agreements with USCIS to use SAVE to confirm the citizenship or immigration status of voters. *See* Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶ 20. For many years, however, SAVE suffered from some significant information-technology limitations when used for this purpose. Most significantly, until recently, SAVE could not verify immigration status without a DHS-specific immigration identifier, such as an "A-Number," which most voters do not have. *See* USCIS, *Guide to Understanding SAVE Verification Responses* (Apr. 2022), https://perma.cc/BW9M-WJUT. SAVE could not run searches based on other government documents, such as a Social Security

[2] Separately, under the Help America Vote Act of 2002, SSA has long been required to provide Social Security Number (SSN) verification responses directly to States for voter-verification purposes, including verifications on last-four-digit SSNs. *See* 42 U.S.C. § 405(r)(9).

number or a passport number. *See id.* SAVE could not verify any information at all of those individuals—including most U.S. citizens, born in the United States—who had never had any encounter with DHS and thus did not appear in DHS systems. *See id.* And SAVE could only accept one verification request at a time, rather than bulk requests. *See* USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76.

Dissatisfied with those outdated systems, between October of 2024 and April of 2025, five States sued the federal government, arguing that DHS and USCIS were violating 8 U.S.C. §§ 1373 and 1644 due to the inability of SAVE to provide meaningful responses to most of their verification requests. *See Florida v. DHS*, No. 24-cv-00509 (N.D. Fla., filed Oct. 16, 2024); *Texas v. Noem*, No. 24-cv-49 (W.D. Tex., filed Oct. 22, 2024); *Ohio v. DHS*, No. 24-cv-283 (S.D. Ohio, filed Oct. 24, 2024); *Bird v. Noem*, No. 24-cv-423 (S.D. Iowa, filed Dec. 3, 2024); *Indiana v. DHS*, No. 25-cv-732 (S.D. Ind., filed Apr. 16, 2025). After nearly a year of settlement discussions, *see Florida* ECF Nos. 19, 23, 25, 27, the United States ultimately entered into a settlement agreement in *Florida*, which was approved by a court order in the U.S. District Court for the Northern District of Florida. *Florida* ECF Nos. 30, 31. Plaintiffs in *Ohio*, *Bird*, and *Indiana* then dismissed their suits. *Ohio* ECF No. 19; *Bird* ECF No. 23; *Indiana* ECF No. 29. As of this filing, the *Texas* case remains pending; the United States recently filed an (opposed) motion to dismiss on mootness grounds, which was fully briefed as of February 12, 2026. *Texas* ECF Nos. 12, 15, 16.

## III. Improvements and Modernization of SAVE

In his second term, President Trump has made it a priority to modernize and improve outdated government information-technology systems. As part of those efforts, on April 22, 2025, DHS announced that it had begun "a comprehensive optimization of the [SAVE] database to ensure a single, reliable source for verifying non-citizen status nationwide." USCIS Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M. The update "eliminates fees for database searches, breaks down silos for accurate results, streamlines mass status checks, and integrates criminal records,

immigration timelines, and addresses." *Id.* And on May 22, 2025, DHS announced two specific changes: (1) "[u]sers are now able to create cases using a Social Security number (SSN) as the applicant's enumerator," and (2) "users may now create cases in bulk." *Optimizing SAVE*, *supra* at 7. The information-sharing agreement between DHS and SSA is available on the SSA website. *See Letter Agreement Providing for Information-Sharing Between DHS, USCIS, and SSA re: Citizenship* (May 15, 2025), https://perma.cc/8SVE-SES5. The agreement discusses data-security procedures, loss reporting, breach notifications, and other administrative safeguards. *See id.*

When States use SAVE for purposes of verifying eligible voters, they likewise are required to enter into a written agreement with USCIS. *See, e.g.*, USCIS, *Mem. of Agreement Between DHS, USCIS and Indiana Sec. of State re: Participation in SAVE for Voter Registration and Voter List Maintenance Purposes* (July 8, 2025), https://perma.cc/A6LC-9CLQ. Those agreements require procedures for "additional verification" for any "voter that does not verify as a U.S. citizen on initial verification," provision of "notice and hearing or other due process available under State or other applicable law" before "any removal from a voter roll," and acknowledge all parties' obligations to comply with other applicable federal and State laws. *See id.* at 4, 6.

The SAVE website provides detailed instructions to user agencies about how the system works. Among other things, it specifies that, "[i]f SAVE cannot provide a response after initial verification for a case created using only a Social Security number, SAVE will close the case and instruct the user agency to submit a new case with corrected/updated information or to include an immigration enumerator, if available." USCIS, *About SAVE: Verification Process*, https://perma.cc/49CU-XL6G. It further explains that "SAVE prohibits agencies from rejecting a voter registration or removing an individual from a voter roll based on a SAVE response until the agency has completed all SAVE-required steps." USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (last updated Feb. 2, 2026), https://perma.cc/F63E-PQ87.

## IV. This Litigation

Plaintiffs filed this suit on September 30, 2025—four months after the key changes to SAVE had already been announced. Compl., ECF No. 1. Plaintiffs then filed a motion for a

preliminary injunction or for a stay under 5 U.S.C. § 705. ECF No. 16. Plaintiffs also filed a motion for certification of a preliminary-relief subclass. ECF No. 17. The Court held a hearing on October 28, 2025. After that hearing, Plaintiffs withdrew their certification motion. ECF No. 46. Defendants then informed the Court that DHS and SSA had each published new draft System of Records Notices (SORNs), soliciting comments for 30 days, ensuring that the information-sharing at issue would be subject to a "routine use" under the Privacy Act. *See* ECF Nos. 51, 54.

On November 17, 2025, the Court denied Plaintiffs' motion for preliminary relief, holding that Plaintiffs had failed to show irreparable harm. ECF Nos. 55, 56; *see League of Women Voters v. DHS*, No. 25-cv-3501-SLS, 2025 WL 3198970 (D.D.C. Nov. 17, 2025).

On December 5, 2025, Defendants filed a notice, ensuring that both the Court and the Plaintiffs were aware of developments in other related litigation, including the *Florida* settlement. ECF No. 59; *see supra* at 7. After an extension, ECF No. 60, Plaintiffs filed an amended complaint on January 21, 2026. ECF No. 61. Now, Plaintiffs are the League of Women Voters, four of its affiliate organizations, and the Electronic Privacy Information Center (EPIC). The amended complaint names four Defendants: DHS, SSA, and their leaders in their official capacities.[3]

In their amended complaint, Plaintiffs bring eight claims, alleging that Defendants: (1) exceeded their statutory authority in using and improving SAVE for purposes of voter-verification, Am. Compl. ¶¶ 197-205; (2) violated the Constitution in using and improving SAVE for purposes of voter-verification, *id.* ¶¶ 207-14; (3) violated "the separation of powers" "[f]or the same reasons set forth above in Count Two," *id.* ¶¶ 216-17; (4) violated various substantive restrictions in the Privacy Act and thus also violated the APA, *id.* ¶¶ 219-26; (5) violated the Privacy Act's notice-and-comment requirements by failing to timely publish new SORNs and thus also violated the APA, *id.* ¶¶ 228-35; (6) violated the APA due to a failure to consider or failure to explain all of the above, *id.* ¶¶ 237-38; (7) violated the Privacy Act by failure to publish certain "computer

[3] Unlike the original complaint, the amended complaint includes no allegations relating to the Department of Justice and does not name the Department of Justice as a Defendant. Also unlike the original complaint, the amended complaint includes no individual Plaintiffs (only associations).

matching agreements" and thus also violated the APA, *id.* ¶¶ 240-45; and (8) should be subject to a writ of mandamus "[f]or the same reasons alleged above in Count Seven," about computer-matching agreements, *id.* ¶¶ 247-51. Plaintiffs request not only vacatur under the APA, but also a long list of specific mandatory injunctions that would substantially overhaul SAVE "within 14 days of entry of this Order." Proposed Order, ECF No. 66-12.

Defendants produced an Administrative Record on March 2, 2026. ECF Nos. 64, 65.[4] Plaintiffs moved for summary judgment on March 12, 2026. ECF No. 66. Defendants now oppose Plaintiffs' motion and also move to dismiss (or, in the alternative, for summary judgment).

## ARGUMENT

Plaintiffs throw a remarkable amount of material at the wall, hoping something will stick. But what used to be Plaintiffs' primary argument has now been mooted by the publication of new SORNs from both DHS and SSA. Plaintiffs' remaining claims are far weaker, on the merits—which is why they range wildly from the small and technical (*e.g.*, whether DHS needed to proceed by "computer matching agreements" rather than a more routine MOU), to high-concept constitutional law (*e.g.*, seeking to persuade this Court to find the first violation of the nondelegation doctrine since 1935), to very easy questions of statutory-interpretation (*e.g.*, whether a program created by Congress is authorized by Congress). Ultimately, all of Plaintiffs' claims lack merit.

Before the Court can reach the merits, however, Plaintiffs need to establish subject-matter jurisdiction. Although their standing theories have multiplied, their evidence of actual or imminent harm remains sparse and speculative. They have failed to identify any discrete and final agency action. One claim is moot. And they still have no answer to the problem of the Privacy Act specifying a comprehensive set of remedies for exactly the sort of legal violations they are concerned about here—none of which bears any resemblance to the remedies they seek here.

This case should be dismissed, or judgment should be entered for Defendants on all claims.

[4] In doing so, Defendants maintained their position that no Administrative Record was necessary in this case (including for Count Six), but "nonetheless agreed to produce such a record, in the interest of avoiding unnecessary ancillary litigation over the record." ECF No. 62 at 1 n.*.

## I. PLAINTIFFS LACK ARTICLE III STANDING

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To support standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* (quoting *Lujan*, 504 U.S. at 564 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon.").

### A. Several Plaintiffs lack associational standing for failure to identify any member with Article III standing.

Plaintiffs rely heavily on associational standing—indeed, every Plaintiff is an association. Generally, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). On the first requirement, when a litigant "claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). Instead, the plaintiff "must specifically 'identify members who have suffered the requisite harm.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Several Plaintiffs fail to satisfy that requirement.

**League of Women Voters of Louisiana (LWVLA).** Plaintiff LWVLA has failed to identify any member with Article III standing—indeed, it has failed to identify any member at all. Plaintiffs did not submit any declaration from any member in connection with their summary-judgment motion. Instead, Plaintiffs submitted a declaration only from the organization's President. Suppl. Decl. of M. Green, ECF No. 66-8. But the Supplemental Green Declaration merely makes vague reference to the declaration of J. Doe 4, ECF No. 16-3, which was submitted in connection with preliminary-injunction proceedings. Even if Plaintiffs can proceed by incorporating a prior declaration by reference, and even if the requisite member with standing may proceed anonymously, that prior declaration does not establish any actual or imminent injury. To the contrary, it says that J. Doe 4 "plan[s] on voting in Louisiana's upcoming local elections, which will be held on October 11, 2025." *Id.* ¶ 7. Presumably, J. Doe 4 did so without incident—or Plaintiffs would have said so. In part because of those very shortcomings in the record at the preliminary-injunction stage, this Court found it "telling that the Plaintiffs have not identified a single individual who has experienced this hypothetical injury." *League of Women Voters*, 2025 WL 3198970, at *7. Plaintiffs cannot show standing now based on the same declarations that this court previously concluded (correctly) established nothing more than a "hypothetical injury." *Id.*

In addition, Plaintiff the League of Women Voters of Louisiana Education Fund goes almost entirely unmentioned in Plaintiffs' brief, as well as the amended complaint (other than the caption). It has not even tried to identify any member with standing. Accordingly, both entities called LWVLA, *see* Am. Compl. ¶ 13, should be dismissed from this case on that basis.

**League of Women Voters of Virginia (LWVVA).** Plaintiff LWVVA has submitted even less evidence than LWVLA—indeed, it has submitted no summary-judgment declarations at all. LWVVA relies entirely on the same speculative declaration (of "J. Doe 6") that was insufficient at the preliminary-injunction phase. *See* ECF No. 16-8. Again, J. Doe 6 stated last fall that he or she "plan[ned] on voting in the November 4, 2025 election in Virginia." *Id.* ¶ 6. Presumably, much like J. Doe 4, the speculative concerns of J. Doe 6 did not play out in the manner that Plaintiffs feared. There is no reason to take that speculation any more seriously now.

**League of Women Voters of Texas (LWVTX).** Plaintiff LWVTX, in contrast to LWVLA and LWVVA, has identified at least one member by name, *see* Am. Compl. ¶ 165; Decl. of A. Nel, ECF No. 66-3, and also identified three additional members who seem to have received correspondence from Texas regarding their citizenship status and eligibility to vote, Decl. of A. Doe, ECF No. 66-4; Decl. of B. Doe, ECF No. 66-5; Decl. of C. Doe, ECF No. 66-6.

These "members" raise another problem, however. Plaintiffs do not even allege (much less establish with evidence at the summary-judgment stage) that *any* of these individuals were actually members of LWVTX at the time of the alleged injury that forms the basis of their allegations of Article III standing.[5] The natural inference is that, after denial of their preliminary-injunction motion, Plaintiffs went searching for affected individuals, found a few, and signed them up for membership—and in doing so, tried to sign these associations up for this lawsuit.[6]

The D.C. Circuit has sought to apply associational-standing doctrine in a way that "prevent[s] associations from being merely law firms with standing." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988). Unfortunately, Plaintiffs' tactics here squarely implicate that concern. Although associational standing remains a viable theory of standing in general, this Court need not sign off on this sort of lawsuit-by-recruitment—after all, even in a more typical case, associational standing already presses on the outer bounds of modern understandings of Article III remedies and jurisdiction. *Cf. All. for Hippocratic Med.*, 602 U.S. at 397 (Thomas, J., concurring). This Court should not extend the doctrine even further, by allowing these Plaintiff associations to strategically recruit their way into federal court.

---

[5] The same is true of Alex Doe's membership in EPIC, but his declaration is not offered in support of EPIC's associational standing (only that of LWVTX). *See* Pls.' Index of Declarations, ECF No. 66-2. Defendants address the standing theories unique to EPIC *infra*, at 30-33.

[6] After the filing of the amended complaint, undersigned counsel asked Plaintiffs' counsel whether or not Mr. Nel was a member of LWVTX at the time of the events described in the complaint, in an effort to avoid the need to brief this issue. Plaintiffs' counsel refused to provide any additional information on this subject.

**B. No Plaintiff attempts to show standing to challenge bulk-upload capability.**

One of the few discrete changes to SAVE that Plaintiffs challenge here is the move from requiring all verification requests to be submitted one-by-one, to acceptance of verification requests submitted in bulk. Plaintiffs thus request an order "disabling any functionality that allows SAVE users to conduct bulk searches." Proposed Order at 1-2.

But "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. Despite their extensive arguments about standing, *see* Pls.' Br. at 13-25, none of the Plaintiffs has even attempted to establish any concrete Article III injury from the acceptance of bulk requests. Nor has any Plaintiff explained how any injury would be redressed by an order requiring SAVE to revert back to a more logistically cumbersome, one-by-one request-submission system.

That failure is unsurprising—as nobody has any concrete or cognizable Article III interest in whether SAVE searches move slowly or quickly. That is fatal to this portion of Plaintiffs' case: "No concrete harm, no standing." *TransUnion*, 594 U.S. at 417. Even if Plaintiffs had attempted to show standing for this request for relief, "[c]entral" to that inquiry would be "whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* And a desire for less-effective computer systems at USCIS does not come anywhere close to satisfying that standard. There is no tradition in American courts of litigation over whether, for example, a user of government computer systems submits requests via drop-down menu, a text box, one email submission, multiple email submissions, or (as is currently the case for SAVE) by uploading an excel spreadsheet with one or more requests at once.

The same problem could also be viewed through the lens of redressability. All of Plaintiffs' concerns about voting and privacy rights, for example, would be equally applicable to a version of SAVE that allowed searches on SSA data, but still required those searches to be submitted one-by-one, as was the case before the spring of 2025 (or on paper, or by making an appointment at USCIS headquarters, or through any other method). So although intentionally degrading SAVE to simulate 1990s era technology would make the system less efficient—and might require hiring

more staff—the end result for Plaintiffs' privacy and voting-related interests would be exactly the same. All the same searches could happen on all the same data, all of which could still be reported to State and local governments in the same way that Plaintiffs dislike—just more slowly. In other words, the relief that Plaintiffs' request on this issue would not actually redress any harm to Plaintiffs—it would just make things harder for government employees.

Accordingly, all of Plaintiffs' claims (and requests for relief) relating to the move from one-by-one to bulk submission of verification requests should be dismissed for lack of standing.

### C. All remaining Plaintiffs also lack Article III standing to challenge intra-governmental data-sharing.

That leaves only one discrete change to SAVE: the agreement between USCIS and SSA that now allows SAVE users to submit requests to USCIS using a Social Security Number (partial or complete). Plaintiffs offer several theories of standing on this issue, but all are meritless.

#### 1. <u>Plaintiffs' alleged privacy-related interests are too speculative and amorphous to support Article III standing.</u>

**a.** Plaintiffs allege that their members "reasonably fear and are emotionally distressed by the unauthorized inter-governmental disclosure, aggregation, misuse, and potential mishandling of their sensitive personal data." Am. Compl. ¶ 158. Essentially, they claim to be worried that, due to increased information-sharing between DHS and SSA, they face some marginally increased risk that their data may, one day, be hacked or otherwise misused by some as-yet-unidentified bad actors. This causes them stress. In the words of Plaintiffs' declarants:

- "I am disturbed, uneasy, anxious, and frustrated that the government has violated my trust by collecting, disclosing, matching, and repurposing my personal information." Decl. of A. Nel ¶ 41; Decl. of B. Doe ¶ 46 (same); Decl. of C. Doe ¶ 32 (similar).

- "Beyond feeling violated by the disclosure of my personal information, I also feel scared. . . . I question how secure my information is." Decl. of A. Doe ¶ 24.

- "Learning that my SSA data has been shared without my consent is distressing because it makes me feel vulnerable and nervous like I felt before I became a U.S. citizen." Decl. of B. Doe ¶ 40.

- "I am distressed by the fact that the government has repurposed my sensitive SSA data without my consent to determine my eligibility to vote, when the information is not suitable for that purpose and was never intended to be used in that way." Decl. of C. Doe ¶ 27.

This sort of speculative and emotional anxiety is not enough to support standing. In general, "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). Instead, "it is the *reality* of the threat of [future] injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). The "emotional consequences" of government action "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*

The Supreme Court rejected a similar theory of standing in *Clapper*. There, the Second Circuit had "allowed respondents to establish standing by asserting that they suffer present costs and burdens that are based on a fear of surveillance, so long as that fear is not fanciful, paranoid, or otherwise unreasonable." *Clapper*, 568 U.S. at 416. The Supreme Court reversed, explaining that the Second Circuit's approach "improperly waters down the fundamental requirements of Article III." *Id.* Those plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.*

*Clapper* is fatal to Plaintiffs' standing here. After all, unlike in *Clapper*, these Plaintiffs have not even demonstrated that they have "incurred certain costs as a reasonable reaction to a risk of harm," *id.*—they are mostly just *worried* about those risks. That is not enough, as the D.C. Circuit and other courts have recognized in analogous litigation brought by some of the same parties. *See, e.g.*, *EPIC v. Dep't of Com.*, 928 F.3d 95, 102 (D.C. Cir. 2019) ("[T]o the extent that EPIC relies on the potential disclosure of their citizenship status to third parties as the source of injury, we reject the theory as a 'speculative chain of possibilities' that cannot establish an injury." (quoting *Clapper*, 568 U.S. at 414)); *EPIC v. OPM*, No. 2025 WL 580596, at *5 (E.D. Va. Feb. 21, 2025) ("Plaintiffs' fear of harm from future exfiltration of their data by bad actors 'relies on a

highly attenuated chain of possibilities, and does not satisfy the requirement that threatened injury must be certainly impending.'" (quoting *Clapper*, 568 U.S. at 410)).

**b.** *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), is also fatal to Plaintiffs' theories of privacy-related injury. There, the Supreme Court rejected a standing theory based on "the risk of future harm" due to the mere existence of inaccurate credit-reporting information sitting in a computer database. *Id.* at 437. Because "the inaccurate OFAC alerts in their internal TransUnion files were" never "provided to third parties or caused a denial of credit," they did not cause any concrete Article III injury—only a speculative, increased risk of future harm, which did not suffice. *Id.* And although the Supreme Court formally reserved the question of whether "emotional or psychological harm" might support standing under different facts "by analogy to the tort of intentional infliction of emotional distress," *id.* at 436 n.7, Plaintiffs do not rely on any such analogy here. Nor could they—there is no allegation of any intentional conduct by any of the Defendants that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016), *as amended* (Dec. 13, 2018).

To be sure, *TransUnion* also recognizes that "[v]arious intangible harms can . . . be concrete" for standing purposes, at least in some circumstances. 594 U.S. at 425. But to qualify, such an injury must, at a minimum, bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.*; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016). As examples, in *TransUnion*, the Supreme Court mentioned "reputational harms, disclosure of private information, and intrusion upon seclusion." 594 U.S. at 425. But for the reasons that follow, the harms alleged here bear no resemblance to any of those three theories:

**i. Intrusion Upon Seclusion.** The tort of intrusion upon seclusion makes liable any person "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (A.L.I. 1977); *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989). The tort has three elements: "(1) an invasion or interference by physical

intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person." *Id.* (cleaned up). The D.C. Court of Appeals has explained that "the kind of invasion that this cause of action seeks to redress" are various forms of offensive "invasions" including harassment, peeping, eavesdropping, and so on. *See id.* at 1217-18; *see also Krakauer v. Dish Network, LLC*, 925 F.3d 643, 653 (4th Cir. 2019) (addressing "intrusions made via phone calls"). Or, as then-Judge Barrett termed it in a case cited in *TransUnion* itself, "irritating intrusions." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020); *see also TransUnion*, 594 U.S. at 425.

Plaintiffs' alleged injuries primarily stem from USCIS's ability to run searches based on Social Security numbers—numbers that were created by and for the use of the federal government—in a federal government database. But sharing of government-created data within the government bears no resemblance to the "irritating" intrusions envisioned by the tort of intrusion upon seclusion, even accepting the (incorrect) premise that such sharing is forbidden by statute.

Even if Plaintiffs could show that allowing USCIS to run searches involving their Social Security numbers could be analogized to an "invasion or interference" that has traditionally been actionable at common law, the access is not analogous to the types of conduct that have been deemed "highly offensive to an ordinary, reasonable person" for purposes of the tort. *Wolf*, 553 A.2d at 1217. Here, the federal government is simply using federal-government information to carry out its legal responsibilities under federal law. *See* 8 U.S.C. § 1373. Indeed, much like in *TransUnion* itself, Plaintiffs here would generally have no reason even to *know* that a USCIS employee has queried their information for purposes of responding to a SAVE request. *See* 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an injury sufficient to support standing where no evidence showed they "even *knew*" their files contained inaccurate information).[7]

[7] For additional examples of injury contemplated by the tort of intrusion upon seclusion, all of which stand in stark contrast with Plaintiffs' alleged injury here, *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919, 922 (4th Cir. 2022) (finding standing where defendants had obtained

The Fourth Circuit, in the preliminary injunction context, recently affirmed that allegedly unauthorized access by government employees to individual data is likely not closely related to the tort of intrusion upon seclusion. *See Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025). As the Fourth Circuit explained, "intrusion upon seclusion has long been understood to guard not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace." *Id.* at 172 (citing Restatement (Second) of Torts § 652B cmt. a). On the other hand, the alleged "harm that might come from [a] generalized grant of database access to an additional handful of government employees . . . seems different in kind, not just in degree, from the harm inflicted by reporters, detectives, and paparazzi" traditionally recognized by the tort. *Id.*; *see also Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO v. SSA*, No. 25-1411, 2025 WL 1249608, at *7 (4th Cir. Apr. 30, 2025) (en banc) (Richardson, J., dissenting) ("anxiety and distress from the fact DOGE-affiliated employees can access SSA databases" "does not establish the sort of 'unease' that has been 'traditionally recognized as providing a basis for a lawsuit' under the tort of intrusion upon seclusion" (quoting *TransUnion*, 594 U.S. at 424)); *stay granted*, 605 U.S. ---, 145 S. Ct. 1626 (2025) (mem.).[8]

---

plaintiffs' information to mail unsolicited advertising materials to the plaintiffs' homes); *Krakauer*, 925 F.3d at 653 (addressing "intrusions made via phone calls"); *Gadelhak*, 950 F.3d at 462 (finding standing based on "irritating intrusions" caused by unwanted text messages, which is "analogous to [the] type of intrusive invasion of privacy" covered by the tort of intrusion upon seclusion); *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345-46 (6th Cir. 2023) (concluding that "invasion-of-privacy-like harms flow[] from unwanted telephonic communications" in part because such communications "interject[] [the caller] into [the recipient's] private sphere"); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (standing based on unwanted telephone communications because they were an "unwanted intrusion into [the plaintiff's] peace and quiet"); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634 (9th Cir.) (explaining that other courts have "found that the harm caused by unwanted communications bears a close relationship to intrusion upon seclusion"), *cert. denied*, 146 S. Ct. 120 (2025) (mem.).

[8] Plaintiffs (at 14) cite a few recent district-court opinions to the contrary, such as *AFL-CIO v. Department of Labor*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025)—a case that agreed with, and relied upon, two decisions of the District of Maryland that were later rejected on appeal (once by the Fourth Circuit and once by the Supreme Court). *See also, e.g.*, 2026 WL 879518 (D.D.C. Mar. 31, 2026); *Nemeth-Greenleaf v. OPM*, 2026 WL 607905, at *5 (D.D.C. Mar. 4, 2026). Defendants

**ii. Breach of Confidence.** Plaintiffs' reliance on the tort of "breach of confidence" is also misplaced. That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (citation omitted). To start, it is doubtful whether this tort qualifies as a traditional cause of action that satisfies *TransUnion*. *See* 594 U.S. at 427 (stating that "lawsuit may not proceed because that plaintiff has not suffered any . . . harm traditionally recognized as providing a basis for a lawsuit in American courts"). While the D.C. Circuit in *Jeffries* invoked the tort to find standing, that decision predates *TransUnion*; does not address whether the tort has a sufficient historical origin; and relies, in part, on an Eleventh Circuit panel decision that was later overturned by the Eleventh Circuit sitting en banc. *See* 928 F.3d at 1064 (citing *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175 (11th Cir. 2019), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020)).

In that en banc decision, decided after *Jeffries*, the Eleventh Circuit questioned—without deciding—whether breach of confidence "can fairly be said to have 'traditionally been regarded as providing a basis for a lawsuit in English or American courts'" for standing purposes. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Spokeo*, 578 U.S. at 341). The Eleventh Circuit found that the tort has been "emerging" only since the 1980s in a "rudimentary form after initially dying out in its infancy." *Id.* (citation omitted). The Second Circuit, moreover, has described it as "a relative newcomer to the tort family" and found that the tort is usually limited to the physician-patient or bank-customer relationships. *Young v. DOJ*, 882 F.2d 633, 640 (2d Cir. 1989). The tort's nascent and underdeveloped pedigree raises serious doubts about whether this tort could ever serve as a valid analogue under *TransUnion*'s requirement of a historically grounded cause of action. 594 U.S. at 414.

---

respectfully disagree with those decisions for the reasons stated in this brief, in the relevant opinions from the Fourth Circuit, *see Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025); *AFL-CIO v. SSA*, 2025 WL 1249608, at *7 (en banc) (Richardson, J., dissenting), and consistent with the Supreme Court's subsequent decision to grant the government's application for a stay, *SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626 (2025).

But even if the breach-of-confidence tort could sometimes be a permissible analogue for standing purposes under *TransUnion*, the facts here bear no resemblance to the circumstances where it applies—*e.g.*, the physician-patient or bank-customer relationships. *Young*, 882 F.2d at 640. In *Jeffries*, the D.C. Circuit analogized it to a situation involving unauthorized disclosure of credit card information, which is close to the bank-customer framework. 928 F.3d at 1064. This case, by contrast, involves intra-governmental sharing of data created by and for the use of the federal government. Social Security numbers were not provided by Plaintiffs *to* the government in confidence—just the opposite, they were created by (and for) the federal government, and provided *to* the Plaintiffs. The tort "lies whe[n] a person offers private information to a third party in confidence and the third party reveals that information to another." *Am. Fed'n of Lab.*, 778 F. Supp. 3d at 73 (quoting *Jeffries*, 928 F.3d at 1064). This case alleges nothing of the sort. So Plaintiffs' reliance on an analogy to the tort of breach of confidence also fails.

**iii. Defamation.** For the first time in this case, Plaintiffs try a third common-law-tort analogue: defamation. In Plaintiffs' view, "DHS provided false information to SAVE users . . . indicating that certain LWVTX and EPIC members were not citizens," which was "effectively labeling them as criminals." Pls.' Br. at 16. Plaintiffs were right to omit this argument the first time, because nothing about the recent changes to SAVE bears any "close relationship" to the harm suffered by a victim of defamation at common law. Nobody here has been "labeled a 'potential terrorist,'" or anything close, *TransUnion*, 594 U.S. at 433—and certainly not by DHS or SSA.

As a threshold matter, unlike the breach-of-confidence and intrusion-upon-seclusion theories—which purport to be about the privacy rights of *everyone* with information accessible by SAVE—Plaintiffs' defamation theory only works for the exponentially smaller universe of people who have actually established that SAVE provided some inaccurate result to a SAVE user. Plaintiffs seem to recognize this, by limiting this argument to a handful of Plaintiffs' declarants, all of whom are in Texas. *See* Pls.' Br. at 16 (citing declarations of A. Nel, A. Doe, B. Doe, and C. Doe).

In any event, even with respect to the extremely small universe of people who have some reason to think that SAVE might have provided some inaccurate information about them in the

past, there is no reason to think that this harm will repeat itself. To the contrary, Plaintiffs' own declarations establish that States have established processes to remedy any such inaccuracies. *See, e.g.*, Decl. of A. Doe ¶ 14 ("I did email a scan of my passport to the County Elections Office in order to preserve my right to vote."). And where, as here, Plaintiffs seek only prospective injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Lyons*, 461 U.S. at 103. That is a significant (indeed, dispositive) distinction with *TransUnion*. Critically, in *TransUnion*, the individuals who had been labeled "potential terrorists" were seeking money damages to compensate for past harms. 594 U.S. at 421-22. These individuals are not (and could not, due to sovereign immunity).

Regardless, Plaintiffs have not alleged anything close to defamation. As the Supreme Court explained in *TransUnion* itself, "[u]nder longstanding American law, a person is injured when a defamatory statement 'that would subject him to hatred, contempt, or ridicule'" is published to a third party." *Id.* at 432 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990)). But a former non-citizen being described as a current non-citizen—even if mistakenly and inaccurately, after naturalization—does not come close to meeting that test. This is nothing like being labeled a "potential terrorist," as in *TransUnion*. *See, e.g.*, *Mann*, 150 A.3d at 1241 (a defamatory statement "must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous"). The factual predicate for this theory is thus not satisfied.

Plaintiffs argue that, because "[i]t is a federal crime for non-citizens to vote or register to vote in federal elections," Pls.' Br. at 16, someone could theoretically connect the dots and then make an (erroneous) assumption that the person in question had committed a crime. But DHS and SSA do not have any knowledge—and, critically here, made no public statement—about who is or is not registered to vote in any particular state, or who has voted in the past. In other words, even adopting the most dramatic interpretation possible of Plaintiffs' theory of reputational harm, it was State officials (if anyone) who uttered any statement that (arguably) implied any criminality. By responding to a SAVE verification request, DHS is not making any judgment—much less any public statement—about anyone's criminal culpability. USCIS does not "[d]etermine applicant

eligibility for a specific benefit or license." *About SAVE*, *supra* at 1. "That determination is made by the" SAVE user alone. *Id.* And so, as SAVE agreements makes clear, although "DHS-USCIS will verify limited citizenship and immigration status information," it "will not recommend" to the SAVE user what to do (if anything) with that information. *See* Memorandum of Agreement, *supra* at 8. Were there any doubt, those agreements also specify that "[t]he DHS-USCIS response is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right or benefit under any program administered by the User Agency." *Id.* Instead, it is the SAVE user who always retains "the responsibility to determine the registrant's or registered voter's eligibility for the benefit." *Id.* So, even accepting the (dubious) premise that anyone has suffered any defamation-like harm, it would not have been defamation *by Defendants*.

**2.** Plaintiffs' alleged voting-related injuries are impermissibly speculative, and are neither caused by the federal government nor redressable in this suit.

Plaintiffs allege that their members have "credible fears of being erroneously disenfranchised, facing additional obstacles to voting, and being subjected to baseless criminal investigations into their lawful voting." Am. Compl. ¶ 175. This theory of standing is baseless for multiple reasons—some factual, some legal. On the facts, Plaintiffs' own submissions confirm that it is extraordinarily unlikely that any individual (much less any member of any Plaintiff association) will suffer any of the problems that they claim to fear. That is so even if, as appears to be the case, Plaintiffs have now located four individuals—of the many *millions* of people at issue—who have had to deal with some minor inconveniences to correct their records. Absent speculation that State officials are going to commit widespread violations of the law, there is still no reason to think that any future injury to any of the Plaintiffs (or their members) is likely, let alone imminent or "certainly impending." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2). In any event, Plaintiffs cannot sue the federal government on the theory that *State* officials might improperly run an election in that State. That mismatch between Plaintiffs' theory of harm and the claims they bring here creates causation and redressability problems that independently warrant dismissal.

**a.** First, the facts. At the preliminary-injunction stage, this Court held (correctly) that, at that time, "Plaintiffs ha[d] not identified a single individual who has experienced" any actual (rather than "hypothetical") voting-related injury. *League of Women Voters*, 2025 WL 3198970, at *7. Now, after many more "millions of Americans" have been verified via SAVE, Am. Compl. ¶ 131, Plaintiffs have found four people who were apparently asked to confirm their citizenship to Texas officials. *See generally* Decl. of A. Nel; Decl. of A. Doe; Decl. of B. Doe; Decl. of C. Doe.

But Plaintiffs here are not seeking to redress a past injury—they are seeking prospective injunctive relief to redress a *future* injury. And there is no reason to think that any of the individuals who have already gone through this process once will be subjected to it again. *See Lyons*, 461 U.S. at 95. To the contrary, it is presumably even *less* likely that these particular individuals will ever again face any problem of the sort—all having now had the opportunity to correct their records. *See* Decl. of A. Nel ¶ 23; Decl. of A. Doe ¶ 14; Decl. of B. Doe ¶ 27; Decl. of C. Doe ¶ 18. Accordingly, those individuals lack standing to seek forward-looking relief just as much—or more—as anyone else relying on pure speculation about highly unlikely future events.

Indeed, despite a handful of edge cases, overall, the record is now even *less* favorable to Plaintiffs than it was at the preliminary-injunction stage. That is because the Court can now be *more* confident that the odds that any of these individuals—or *any* individual, much less one that also happens to be a member of a Plaintiff association—will ever face some concrete injury as a result of the 2025 changes to SAVE is astronomically small. In 2025 and 2026, approximately 59.7 million SAVE verifications were completed for purposes of voter-verification. Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶ 22. With numbers like that, finding mistakes in a single-digit number of individuals strongly suggests that SAVE is working well—not poorly. And in general, that Plaintiffs' doomsday predictions have already failed to come to pass once should inform this Court's assessment of their latest predictions. *See, e.g.*, Pls.' Mot. to Stay at 17, ECF No. 16 (in October of 2025, predicting incorrectly that "millions of eligible voters could be wrongly disenfranchised" in the absence of preliminary relief).

Plaintiffs' declarations further undermine their cause. For one thing, they repeatedly underscore the extraordinarily small number of individuals who have faced any issues of the sort that Plaintiffs are concerned about. For example, the President of LWVLA says that, according to Louisiana officials, there were "390 non-citizen registered voters" identified in Louisiana of the "2.9 million registered voters" that were recently run through SAVE. Suppl. Decl. of M. Green ¶ 27. That means that only 1 of about every 7,400 registered voters appeared on the sort of list that Plaintiff fears. And of those 390 individuals, surely some of them—one would expect, the vast majority—were on that list because they *are*, in fact, non-citizens. And returning to the preliminary-injunction record (which Plaintiffs seem to try to incorporate by reference, *see* Pls.' Index of Declarations, ECF No. 66-2), multiple individuals previously submitted sworn declarations to this Court about their concerns about voting in various elections in fall of 2025 and early 2026. That this Court never heard anything further from those declarants is even more "telling" now than it was at the preliminary-injunction phase. *League of Women Voters*, 2025 WL 3198970, at *7.

Ultimately, to support standing, "the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Alliance*, 602 U.S. at 381. Under these circumstances, the inability to identify even a full handful of examples of voters who faced any paperwork issues (much less actual disenfranchisement)—even though all the changes to the SAVE system that Plaintiffs complain about took effect approximately a year ago—significantly undermines the credibility of Plaintiffs' predictions about the likelihood of future harm coming to any of the Plaintiffs in this suit (or their members). In short, with respect to any particular individual (or member of an of the Plaintiff organizations), Plaintiffs still offer no more than a highly speculative theory of *possible* future injury. And "allegations of *possible* future injury are not sufficient" to support standing. *Clapper*, 568 U.S. at 409.

**b.** Second, on the law, Plaintiffs' voting-related standing theories are even more tenuous—because the critical role played by State officials enforcing State voting laws creates a straightforward causation (*i.e.*, traceability) and redressability problem. "[I]t is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not

before the court." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). When it comes to their fears of "obstacles to voting," or being "subjected to baseless criminal investigations," Am. Compl. ¶ 175, Plaintiffs have sued the wrong government. *See Haaland v. Brackeen*, 599 U.S. 255, 292 (2023) ("[E]njoining the federal parties would not remedy the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements.").

It bears repeating: this is a lawsuit against federal agencies, based on the theory that improved search functionality in a (congressionally mandated) USCIS database violates the law. Despite some scattered rhetoric that sweeps more broadly, Plaintiffs do not seek any relief (nor make any legal claims) relating to the management of State voter rolls. That is unsurprising, as neither SSA nor USCIS is responsible for how State officials manage State voter rolls under State law.

To be sure, if USCIS receives "an inquiry" from a State "seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law," then USCIS has an "[o]bligation to respond" "by providing the requested verification or status information." 8 U.S.C. § 1373(c). USCIS has fulfilled that obligation, for decades, using the SAVE system. But that doesn't make SSA or USCIS legally responsible for the possible future second- and third-order effects that may later result from State officials exercising their discretion to enforce State law.

So, for example, if a State official receives a verification response from USCIS, through SAVE, and then uses that information to subject a U.S. citizen "to baseless criminal investigations" that impedes "their fundamental right to vote," Am. Compl. ¶¶ 162, 175, that could conceivably be a legal problem—but it is a problem between that citizen and the relevant State. USCIS is not responsible (and this Court cannot confidently predict) how State officials will carry out their discretion under State law. The Supreme Court has appropriately been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 413, but Plaintiffs would have this Court do exactly that.

That all of Plaintiffs' examples are from the same State (Texas), only underscores why Plaintiffs' real gripe is with States, rather than DHS or SSA. To be clear, Defendants are not

suggesting that Texas has violated the law—only that the significant variation between States show that it is States, not the federal government, that are ultimately the cause of any voting-related injury attributed to State-led voter-verification processes. Neither DHS nor SSA should be on the hook for the widely varying procedures used (or not used) by State officials in carrying out States' legal obligations to maintain accurate voter rolls. After all, both federal law, *see* 52 U.S.C. § 21083(a)(4)(B), and SAVE user agreements, *see* Memorandum of Agreement, *supra* at 8, require States to proceed cautiously before cancelling anyone's voter registration. But beyond securing that commitment from States *before* fulfilling any voter-verification requests—as USCIS (undisputedly) does—DHS and SSA play no role in the management of state voter rolls.

To show standing via assumptions about independent third parties, at a minimum, "[r]ather than guesswork, the plaintiffs must show that the third-party" State officials "will likely react in predictable ways to the defendants' conduct." *Murthy*, 603 U.S. at 57-58. But States are always required to maintain "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(B). Plaintiffs have not alleged (let alone demonstrated) that any State has violated or will violate any of those laws. Plaintiffs' cynical assumptions of widespread, unlawful, accidental disenfranchisement of U.S. citizens would hardly be a "predictable" act by any State officials. Just the opposite—the Court should presume that State officials will *follow* the law, not violate it. *See Nieves v. Bartlett*, 587 U.S. 391, 400 (2019) (discussing the "presumption of regularity" that attaches to State law-enforcement officials).

Of course, there are many possible explanations for this disconnect between the rhetoric in Plaintiffs' filings and the evidence (or lack thereof) of any widespread real-world problems. Because it is Plaintiffs' burden to establish standing (rather than Defendants' burden to refute it), neither Defendants nor the Court needs to do any investigation of State law-enforcement practices to get to the bottom of Plaintiffs' concerns about the possible future mistakes that might be made by independent third parties who are not before the Court. Even so, there are several obvious logical flaws in Plaintiffs' assumptions about standing that are worth pointing out.

First, Plaintiffs seem to assume that they are the only ones who know that SSA "records do not provide definitive information about an individual's citizenship status." Am. Compl. ¶ 118. There is no factual basis for that assumption. In fact, SSA shares publicly many policies about the citizenship and immigration-related data that it does (or does not) collect and maintain. *See, e.g.*, SSA, Program Operations Manual System, RM 10210.500, *General Information on Evidence of U.S. Citizenship for a Social Security Number Card*, https://perma.cc/HX8Y-W2XK. Presumably, the relevant State officials know just as much (or more) than the Plaintiffs do about the systems they use to manage their own voter rolls.

Second, Plaintiffs likewise seem to assume that, because *SSA* does not have complete records about naturalization, that any SAVE verification involving an SSN for a naturalized citizen will necessarily return inaccurate results. Again, that assumption is baseless. Setting aside SSA, it is undisputed that *USCIS* has extensive records about which citizens have (or have not) naturalized, or derived citizenship, and so on. Plaintiffs offer no reason to think that USCIS would ignore its own records before responding to a SAVE verification request. And in fact, USCIS is appropriately cautious before providing any voter-verification response other than one that confirms that the voter in question is (1) a U.S. citizen, or (2) deceased. *See* Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶¶ 12-16 (discussing when cases are "escalated to manual review," and confirming that "SAVE only returns a response to a user agency based on an SSA record when: (1) the information matches an SSA record indicating U.S. Citizenship or (2) the information matches an SSA record indicating the individual is deceased"); *accord Voter Registration and Voter List Maintenance Fact Sheet*, *supra* at 8 (discussing procedures to be followed "[i]f the SAVE response is other than U.S. Citizen"); Oct. 22, 2025 Decl. of B. Broderick ¶¶ 11-14, ECF No. 37-1.

Ultimately though, whether it is for legal, practical, or political reasons, there is no basis to assume that State officials have any interest in haphazardly and unlawfully removing large numbers of U.S. citizens from their voter rolls, and no credible evidence that any such thing has happened or is going to happen any time soon. And even if it did, that would at most be a basis for a lawsuit against the relevant State—not the federal government.

3. Plaintiffs' diversion-of-resources theory of organizational standing is inconsistent with recent Supreme Court precedent.

Plaintiffs LWVTX and LWVLA rely on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), in an effort to show organizational standing. *See* Pls.' Br. at 20-22. Plaintiffs allege, for example, that the improvements to SAVE "harm[] the state League Plaintiffs' core mission and disrupts and impairs their mission-critical efforts." Am. Compl. ¶ 174. How so? For example, they have allegedly "expended scarce resources in response to the SAVE overhaul to counteract its harmful effects," which has "require[d] them to expend critical staff time and other resources" that could have instead been focused elsewhere. *Id.* ¶¶ 178, 182.

This theory of standing is inconsistent with *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The *Alliance* plaintiffs, medical associations and several individual doctors, challenged FDA actions making it easier for doctors to prescribe mifepristone. *Id.* at 376. Those plaintiffs did not prescribe or use mifepristone, and FDA did not impose any relevant regulatory requirements on plaintiffs. The *Alliance* Court observed that organizations may "sue on their own behalf for injuries *they* have sustained," *id.* at 393 (quoting *Havens*, 455 U.S. at 379 n.19) (emphasis added), but also clarified that an organization cannot establish injury by asserting the right of others: "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381. In doing so, *Alliance* explicitly rejected the argument that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified that "*Havens* does not support such an expansive theory of standing." *Id.* at 395. After *Alliance*, it is now clear that a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394.

Plaintiffs' extensive allegations about, for example, having "expended scarce resources in response to the SAVE overhaul," Am. Compl. ¶ 178, are exactly the sort of "diversion of resources" arguments rejected in *Alliance*. But Plaintiffs' brief does not engage with *Alliance* at all, nor its rejection of the maximalist interpretation of *Havens* that imbues the amended complaint.

Instead, Plaintiffs double down on a strained factual analogy to "*Havens* itself"—a case about racist lies regarding apartment availability to black renters—arguing that "SAVE's *inaccurate* citizenship information frustrates their ability to provide their core registration and engagement services." Pls.' Br. at 21. Unlike in *Havens*, none of the Plaintiff organizations here are requesting (or receiving) *any* information (accurate or inaccurate) from the Defendants. And more fundamentally, the factual coincidence that *Havens* happened to be a case (at least, at a very high level of generality) about inaccurate information has no bearing on the viability of the *legal* theory of Article III standing that *Alliance* rejected. After all, "*Havens* was an unusual case, and [the Supreme] Court has been careful not to extend the *Havens* holding beyond its context." *Alliance*, 602 U.S. at 396. Plaintiffs ask this Court to do exactly that.

4. <u>EPIC's alleged procedural and informational injuries cannot independently support Article III standing.</u>

Finally, Plaintiff EPIC (and only Plaintiff EPIC) also tries to show standing on a procedural-injury theory, claiming harm due to the absence of "notice-and-comment opportunities to which it is legally entitled." Pls.' Br. at 23; *see also* Am. Compl. ¶¶ 186-95. But those allegations of procedural injury—which seem to apply only to Counts 7 and 8, about computer-matching agreements—add nothing to EPIC's other theories of standing. That is because "the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient' to confer Article III standing." *Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1314 (D.C. Cir. 2025) (quoting *Summers*, 555 U.S. at 496). In other words, even when a plaintiff alleges a violation of some procedural right, the plaintiff still "must show that the violation of a procedural right 'resulted in injury' to some 'concrete, particularized interest.'" *Id.* at 1315 (quoting *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005)). So, if EPIC cannot show a separate concrete injury, then allegations of procedural violations get it no closer to standing. *See, e.g.*, *EPIC*, 928 F.3d at 102 ("EPIC must allege harm that is distinct from a simple failure to comply with the procedural requirements of § 208."). The

ultimate question thus remains the same: whether EPIC can demonstrate "some concrete interest" connected to the alleged violation of law. And for the reasons already explained above, it cannot.

At times, EPIC also refers to informational injuries, asserting that the organization "routinely relies on information that the Privacy Act mandates agencies to disclose, including information in SORNs and matching agreements." Pls.' Br. at 23. This is mostly just another way of repackaging their allegations of procedural harm, so it fails for the same reasons. But, to the extent that EPIC does try to rely on an independent theory of informational standing, that effort fails for two reasons: (1) because the relevant provisions of the Privacy Act do not create any "informational" rights, and (2) because EPIC already has the information that it claims to be looking for.

The D.C. Circuit has "recognized that a denial of access to information can, in certain circumstances, work an 'injury in fact' for standing purposes." *EPIC v. PACEI*, 878 F.3d 371, 378 (D.C. Cir. 2017). But, "[t]o carry its burden of demonstrating a sufficiently concrete and particularized informational injury, the plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Id.*

Unlike FOIA, the Privacy Act "was not designed to vest a general right to information in the public." *EPIC*, 928 F.3d at 103 (discussing the E-Government Act); *see also, e.g.*, First Compl. ¶ 50, ECF No. 1 ("The Privacy Act's 'raison d'etre' is 'to provide for protection against possible abuses of governmental power to affect an individual's privacy and confidential information.'" (quoting *Williams v. Dep't of Veterans Affs.*, 104 F.3d 670, 676 (4th Cir. 1997)). "Rather, the statute was designed to protect individual privacy by focusing agency analysis and improving internal agency decision-making." *EPIC*, 928 F.3d at 103. "In this respect," the Privacy Act "is fundamentally different from statutes like the Freedom of Information Act (FOIA) where the harm Congress sought to prevent was a lack of information itself." *Id.* Accordingly, "[b]ecause the lack of information itself is not the harm that Congress sought to prevent through" the Privacy Act,

Plaintiffs "must show how the lack of a timely" computer matching agreement "caused its members to suffer the kind of harm that Congress did intend to prevent: harm to individual privacy." *Id.* at 103-04. And again, for all the reasons above, Plaintiffs cannot make that showing—so Plaintiffs "cannot show an informational injury, just as [they] cannot show a privacy injury." *Id.* at 104.

Even if the Privacy Act were the sort of statute that created informational rights, this theory of standing still doesn't work, because EPIC already has the information it claims to be looking for. EPIC argues that it "routinely relies on information that the Privacy Act mandates agencies to disclose, including information in SORNs and matching agreements." Pls.' Br. at 23. But as for "information in SORNs," DHS and SSA have *already* published SORNs relating to the 2025 changes to SAVE. *See* Oct. 28, 2025 Hr'g Tr. at 76:4-6 (Mr. Sus: "If they do publish SORNS, that would, we agree, address our informational injuries both for DHS and SSA."), ECF No. 48.

As for information in "[m]atching agreements," those agreements typically include, for example, "the purpose and legal authority for conducting the program," "procedures for ensuring the administrative, technical, and physical security of the records," and so on. 5 U.S.C. § 552a(o). But that sort of information is already included in the DHS-SSA agreement that has been public for over six months and that is in the administrative record. *See supra* at 8; DHS-AR-420-31; SSA-AR-6-49, 89-108. And DHS and SSA have also published (and included in the administrative record) much *more* information in various Privacy Impact Assessments (PIAs) and SORN amendment records. *See* DHS-AR-141-243, 374-95, 483-90; SSA-AR-109-363. So even if EPIC could have alleged an informational injury before, any such injury has been long since resolved.[9]

One further point about informational injury warrants mention. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. And so, even if EPIC could show, for example, that it suffered some cognizable informational injury from the failure to publish

[9] Even if there were some small delta between the information required by 5 U.S.C. § 552a(o) and the information that has already been provided to EPIC, that would still only support standing if EPIC could show that that delta caused it some concrete injury. EPIC has not even tried to make that showing.

a computer-matching agreement about changes to SAVE, the appropriate remedy for that injury would be (at most) an order requiring publication of a computer-matching agreement. *See* Proposed Order at 2 ("Defendants shall publish all statutorily required matching-agreement information concerning the overhauled SAVE system in the Federal Register"). That theory of standing could never justify any of the other, more ambitious relief that Plaintiffs seek, relating to the general operations of what Plaintiffs describe as the "overhauled SAVE system." *Id.*

* * *

The law of Article III standing "is 'built on a single basic idea—the idea of separation of powers.'" *Alliance*, 602 U.S. at 378 (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). Plaintiffs seem to have sincere policy concerns with the way USCIS is carrying out its legal obligations to respond to citizenship verification requests. That is their right. But federal "courts do not opine on legal issues in response to citizens who might roam the country in search of governmental wrongdoing." *Id.* at 379. To enforce that important constitutional principle, this suit should be dismissed, in its entirety, for lack of subject-matter jurisdiction. At an absolute minimum, the court should dismiss any Plaintiffs (and any claims, or requests for relief) for which Plaintiffs have failed to carry their standing burden at summary judgment.

## II. Plaintiffs' Privacy Act Notice-and-Comment Claim (Count 5) is Moot.

The mootness doctrine "ensures compliance with Article III's case and controversy requirement by limiting federal courts to deciding actual, ongoing controversies." *Guedes v. ATF*, 920 F.3d 1, 12 (D.C. Cir. 2019). A dispute is moot when "the court can provide no effective remedy because a party has already obtained all the relief that it has sought." *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (cleaned up). "Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council, Inc. v. NRC*, 680 F.2d 810, 814 (D.C. Cir. 1982).

**a.** In their original complaint, Plaintiffs' lead claim alleged that Defendants changed SAVE "without first publishing a SORN or soliciting public comment . . . in violation of the Privacy Act."

First Compl. ¶ 210. Shortly before the Court denied Plaintiffs' motion for preliminary relief, however, DHS and SSA published revised SORNs to allow for the information-sharing in question, and solicited comments for 30 days. *See* DHS, *Notice of a Modified System of Records*, 90 Fed. Reg. 48,948 (Oct. 31, 2025); SSA, *Notice of a Modified System of Records*, 90 Fed. Reg. 50,879 (Nov. 12, 2025). Defendants notified Plaintiffs and the Court. *See* ECF Nos. 51, 54. Despite those significant intervening events, Count 5 of Plaintiffs' amended complaint continues to assert essentially the same notice-and-comment claim—though, tellingly, now phrased as a violation that occurred in the past tense. *See, e.g.*, Am. Compl. ¶ 232 ("DHS did not publish a modified SORN for SAVE or solicit public comment on new routine uses until October 31, 2025.").

Given these events, Count 5 is now moot. Whether or not the Privacy Act applies here at all, *but see* 8 U.S.C. § 1373, and whether or not the prior SORNs permitted the sharing of this information, DHS and SSA have now published the SORNs and solicited the comments that Plaintiffs alleged were required by the Privacy Act. In doing so, both agencies complied with all notice-and-comment provisions in the Privacy Act: by (1) providing notice of the change and (2) soliciting comments for 30 days. *See* 5 U.S.C. § 552a(e)(4), (e)(11).

Although Defendants do not concede that these specific updates to these SORNs were legally required, the Court need not decide that question now, because DHS and SSA have now addressed Plaintiffs' stated concerns through the new SORNs, which explicitly (1) detail the use of SAVE for verifying citizenship, including of U.S. citizens, (2) identify SSA's Numident database as an authorized source of information for SAVE, and (3) authorize sharing of SSA data to DHS for purposes of verifying citizenship. In other words, regardless of whether the agencies' previous actions violated the Privacy Act, those agencies took "[c]orrective action" by publishing the revised SORNs and soliciting comments. *Nat. Res. Def. Council*, 680 F.2d at 814. And because "[a] new system is now in place," in which published SORNs expressly authorize the use of SAVE to verify citizenship and the sharing of SSA data for that purpose, *Nat'l Mining Ass'n v. Dep't of Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001), the Court cannot grant "any effectual relief" on Count 5, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (cleaned up). So Count

5 is moot. *See Coal. of Airline Pilots Ass'ns v. FAA*, 370 F.3d 1184, 1191 (D.C. Cir. 2004) (reissuing rule with notice-and-comment mooted claim that rule was promulgated without those procedures); *Collette v. District of Columbia*, No. 18-cv-1104 (RC), 2019 WL 3502927, at *12 (D.D.C. Aug. 1, 2019) (claims asserting procedural violations moot once procedures invoked).

**b.** In rare cases, exceptions to mootness may apply for: (1) actions "capable of repetition yet evading review," *Clarke v. United States*, 915 F.2d 699, 703 (D.C. Cir. 1990), or (2) a defendant's "voluntary cessation of the challenged practice," *FBI v. Fikre*, 601 U.S. 234, 241 (2024). Neither exception applies here.

The capable-of-repetition-yet-evading-review exception requires that "a reasonable expectation that the same complaining party would be subjected to the same action again." *Clarke*, 915 F.2d at 703. But disputes that are "sharply focused on a unique factual context" "rarely present a reasonable expectation that the same complaining party would be subjected to the same actions again." *J.T. v. District of Columbia*, 983 F.3d 516, 524 (D.C. Cir. 2020) (citation omitted). Here, the current dispute regards the propriety of the use of particular information, in a particular program, by particular agencies, under particular Privacy Act SORNs—a unique factual and legal context. Moreover, the "discrete wrong" alleged by Plaintiffs—specifically, DHS accessing SSA Numident data through SAVE without first complying with all procedures in the Privacy Act—will not occur again. *Harvey v. Lynch*, 123 F. Supp. 3d 3, 8 (D.D.C. 2015). That alleged wrong "came to an end" when the revised SORNs took effect. *Id.* Accordingly, any future use of SAVE for the same purpose will be authorized by a SORN published pursuant to the Privacy Act.

The voluntary-cessation exception is also inapplicable. That exception prevents a defendant from manipulating the judicial process by stopping unlawful activity when sued, only to resume it again later to avoid judicial review. *See Fikre*, 601 U.S. at 241 (citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). Here, DHS and SSA have now published SORNs that explicitly authorize this information sharing. Now that they have done the work to draft and publish these new SORNs, there is no reasonable basis to expect either DHS or SSA to rescind them. Among other reasons, these new SORNs explicitly authorize the information sharing in question—thus

eliminating any litigation risk under the Privacy Act might have existed before. If Plaintiffs were to suggest otherwise, they would be asking this Court to improperly "impute . . . manipulative conduct to a coordinate branch of government" against the D.C. Circuit's express guidance. *Alaska v. USDA*, 17 F.4th 1224, 1227 (D.C. Cir. 2021) (citation omitted).

**c.** Judge Kollar-Kotelly recently came to the same conclusion on the same facts. Other plaintiffs brought a nearly identical claim as Plaintiffs do here, "challeng[ing] DHS's recent changes to the SAVE program, arguing that the new data-sharing practices violate the Privacy Act." *LULAC*, 2026 WL 252420, at *53. In that case, "[s]oon after briefing on the parties' cross-motions for summary judgment concluded, the Federal Defendants notified [Judge Kollar-Kotelly] that DHS and SSA had issued new SORNs relating to the use of SAVE and Numident." *Id.* As a result, Judge Kollar-Kotelly held that plaintiffs' "claim for injunctive relief against the relevant changes to SAVE and Numident based on the Privacy Act is moot." *Id.* at *54. So too here.

## III. PLAINTIFFS DO NOT CHALLENGE ANY DISCRETE AND FINAL AGENCY ACTION.

"The APA authorizes courts to review only 'final agency action[s].'" *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235 (D.C. Cir. 2026) (quoting 5 U.S.C. § 704). "To be final and thus reviewable, an agency action must (1) mark the 'consummation' of the agency's decisionmaking process" and (2) determine 'rights or obligations,' or produce 'legal consequences.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "Each prong of *Bennett* must be satisfied independently for agency action to be final." *Id.*

The agency action in question must also be "circumscribed" and "discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 64 (2004). Plaintiffs cannot, for example, "seek wholesale improvement of" an agency "program by court decree," they instead "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Id.* at 64 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)).

Here, Plaintiffs use the word "overhaul" to capture the 2025 changes to SAVE that they challenge in this suit. *See generally* Am. Compl.; Pls.' Br. That may work as rhetoric, but not as a discrete and final agency action that can be challenged under the APA. Instead, to satisfy those

requirements, Plaintiffs must identify what, exactly, the agency did that they are seeking to challenge, on the theory that it both violated the law and caused them some Article III injury that would be remedied by a court order. Ultimately, Plaintiffs offer only three plausible candidates: (1) the switch to acceptance of bulk requests; (2) the agreement between DHS and SSA allowing SAVE to search on SSA data; and (3) the Privacy Act SORNs that were published to memorialize the two changes above. *See* Am. Compl. ¶ 198 (listing alleged final agency actions); Proposed Order at 1 n.1 (defining the term "SAVE overhaul"). So, despite Plaintiffs' repeated references to a "SAVE overhaul," those are the only agency actions that are actually at stake in this litigation. None is challengeable "final agency action" within the meaning of 5 U.S.C. § 704.

First, allowing SAVE users to upload and submit SAVE requests in bulk is a software-based customer-service improvement—not an agency action that determines any "rights or obligations" or has "legal consequences." *Bennett*, 520 U.S. at 177-78. On this issue, the only difference between the old system and the new system is how quickly it works—before bulk upload, SAVE could verify all of the same records as it can now, it just took more time to submit requests. If DHS had retained the one-by-one request requirement, but then user agencies hired thousands of additional people to do nothing but submit SAVE requests more quickly, then Plaintiffs would be facing the same situation (and certainly the same legal regime). So this software improvement cannot be a final agency action. *See supra* at 14-15 (no standing to challenge bulk submission).

Second, as for the agreement between DHS and SSA that memorializes the agencies' intent to allow SAVE to search on SSA data, recent D.C. Circuit precedent confirms that it too fails to qualify as final agency action. In *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), the plaintiffs had challenged "an IRS-ICE memorandum of understanding for sharing taxpayer address information in connection with immigration enforcement." *Robert F. Kennedy Hum. Rts. v. Dep't of State*, No. 25-cv-1774 (JEB), 2026 WL 820811, at *18 (D.D.C. Mar. 25, 2026) (citing *Centro de Trabajadores*, 167 F.4th at 1224). That "MOU was not the product of notice-and-comment rulemaking," the government "never characterized it as a 'rule,' and neither party . . . argued that IRS relies on the MOU to justify its actions." *Centro de Trabajadores*, 167

F.4th at 1236. Instead, "[t]he MOU merely outline[d] the process through which ICE can request addresses from IRS." *Id.* Ultimately, its purpose was to "merely 'explain how IRS will administer' a process established by statute and 'make[] explicit existing requirements.'" *Id.* (quoting *Del. Valley Reg'l Ctr., LLC v. DHS*, 106 F.4th 1195, 1204 (D.C. Cir. 2024) (cleaned up)).

The same is true of the DHS-SSA agreement at issue here. It is not "a rule," and the government does not "rel[y] on the MOU" as legal justification for any of the information-sharing at issue in this case. *Id.* Instead, the agreement simply memorializes and explains how the agencies "will administer" the information-sharing already contemplated by statutes like 8 U.S.C. § 1373. So, as Chief Judge Boasberg held in a similar context just last week, "[a]ny substantive change" attributable to the MOU stemmed not from the MOU itself but "from the Administration's decision to use statutorily authorized tools" to "further its objectives." *Robert F. Kennedy Human Rights*, 2026 WL 820811, at *18 (quoting *Centro de Trabajadores*, 167 F.4th at 1228) (cleaned up). Plaintiffs, to be sure, disagree with the government's interpretation of those statutes on the merits. But before even reaching the merits, they need to identify a discrete and final agency action that determines rights or obligations or causes some legal consequence. Under recent cases like *Centro de Trabajadores* and *Robert F. Kennedy Human Rights*, they cannot.

Third, at times, Plaintiffs seem to imply that the new SORNs themselves are the relevant final agency action that they are challenging in this case. That is a counterintuitive theory, as Plaintiffs' original complaint argued strenuously that Defendants had erred by *not* publishing new SORNs. And taking Plaintiffs' allegations of harm seriously, vacating those SORNs would seem to make their alleged injuries worse, not better. *See, e.g.*, Am. Compl. ¶ 69 (lamenting that "Defendants effectuated the SAVE overhaul in May 2025" but "failed at that time to publish modified SORNs"). In any event, providing notice of a draft SORN modification is also not a final agency action that is challengeable under the APA. It does not "mark the 'consummation' of the agency's decisionmaking process" because it explicitly contemplates 30 days of comments and future agency consideration of those comments before any change may take effect. *Centro de Trabaja-*

*dores*, 167 F.4th at 1235 (quoting *Bennett v. Spear*, 520 U.S. at 177-78. So any true "legal consequences" come later, *id.*, after the comment period closes, with or without changes from the agency. *See infra*, Section IV (discussing how the Privacy Act interacts with the APA).

## IV. Plaintiffs Cannot Bring APA Claims Predicated on Privacy Act Violations.

**1.** Several of Plaintiffs' claims (Counts 4, 5, 6, 7, and 8) fail for the additional, independent reason that the APA does not grant a cause of action where there is "[an]other adequate remedy in a court." 5 U.S.C. § 704. This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Accordingly, a plaintiff has adequate relief—and thus cannot rely on the cause of action in 5 U.S.C. § 704—"'where a statute affords an opportunity for *de novo* district-court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)). Stated differently, where an agency action is subject to review in some manner under a separate statutory review scheme, then the general rule is that action must be reviewed within the confines of that scheme. The mode of review established by the statutory review scheme is presumed exclusive.

This is true even where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999). It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices. *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. HUD*, 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

**2.** Under these principles, Plaintiffs may not challenge purported violations of the Privacy Act under the APA, because the Privacy Act already provides an adequate alternative remedy for persons entitled to sue under that statute. The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D). And importantly here, the Privacy Act applies only to individuals—not corporate or organizational entities. *Id.* (authorizing a cause of action for adversely affected "individuals"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence."). But here, all Plaintiffs are organizations—the amended complaint (unlike the original) includes no individuals at all. Because Plaintiffs are not "individual[s]," *id.*, they are straightforwardly ineligible for any relief under the Privacy Act, and all of their claims predicated on violations of the Privacy Act should be dismissed on that basis alone.

**3.** Even if this case still included individuals as plaintiffs, more generally, relief under the Privacy Act is carefully circumscribed. Civil remedies are available—and thus the United States' sovereign immunity has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," (an "Amendment Action"), *id.* § 552a(g)(1)(A), (2) when the agency refuses to comply with an individual's request for access to her records, (an "Access Action"), *id.* § 552a(g)(1)(B), (3), when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," (a "Benefits Action"), *id.* § 552a(g)(1)(C), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," (an "Other Action"), *id.* § 552a(g)(1)(D). For Benefits Actions or Other Actions, a plaintiff may be entitled to "actual damages sustained by the individual as a result of the refusal or failure," subject to a $1,000 statutory minimum, but only if the "agency acted in a manner which was intentional or willful," 5 U.S.C. § 552a(g)(4)(A), and if that plaintiff could

prove "actual damages," which is "limited to proven pecuniary or economic harm." *Cooper*, 566 U.S. at 291, 299.

Beyond these monetary damages, the Privacy Act allows for injunctive relief in two circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A). But Plaintiffs here have not sought such relief. And injunctive relief, as the D.C. Circuit has recognized, is otherwise unavailable for any other situation arising out of the Privacy Act. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs" (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988))); *see also Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).

Because of the Privacy Act's comprehensive remedial scheme, courts have long recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott*, 39 F. Supp. 3d at 33; *see also, e.g.*, *Poss v. Kern*, No. 23-cv-2199 (DLF), 2024 WL 4286088, at *6 (D.D.C. Sep. 25, 2024); *Haleem v. Dep't of Def.*, No. 23-1471 (JEB), 2024 WL 230289, at *13-14 (D.D.C. Jan. 22, 2024); *Bierly v. Dep't of Def.*, No. 23-2386 (RCL), 2024 WL 4227154, at *8-9 (D.D.C. Sep. 18, 2024); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017); *Berardi v. U.S. Dep't of the Air Force*, No. 05-2269 (JR), 2006 WL 8448631, at *6 (D.D.C. Sep. 29, 2006); *Tripp v. DOD*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002). That result is consistent with the principle that, "[w]here, as here, [a] statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell Assocs.*, 579 F.2d at 1161-62). Congress concluded that suits for money damages provide an adequate remedy for violations of § 552a(b) and limited relief to suits for such damages. That congressional determination forecloses all of Plaintiffs' APA claims that are predicated on violations of the Privacy Act. *See Hinck v. United States*, 550 U.S. 501, 506 (2007) (applying the "the well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies" (cleaned up)).

This result is especially sensible with respect to the Privacy Act, because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell Assocs.*, 579 F.2d at 1158-59. Indeed, were injunctive relief freely available for violations of the Privacy Act generally—such as through the sort of generic APA claims that Plaintiffs bring here—"the detailed remedial scheme adopted by Congress would make little sense." *Id.* at 1160. It is "unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.*; *see also Am. Fed'n of Tchrs*, 152 F.4th at 175 ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here.").[10]

**4.** This case is a powerful illustration of the importance of these principles. In trying to force a Privacy Act peg into an APA hole, Plaintiffs' claims present paradoxes and conundrums that make orderly judicial review all but impossible. For example, the APA contains an explicit requirement that, "[a]fter consideration of the relevant matter presented" during the comment period, "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). That statutory provision is why courts have long held that, as

[10] Now anticipating this remedial argument, Plaintiffs (at 47) cite *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004), and *Doe v. Stephens*, 851 F.2d 1457, 1460-61 (D.C. Cir. 1988), but neither resolves the question presented here. *Chao* contains one sentence of unexplained dicta on this subject, and even that ultimately only offers a speculative and ambiguous pondering about what Congress "may" have intended. And in *Doe v. Stephens*, this remedial argument was seemingly not raised by the government—presumably because the plaintiff there (unlike here) did not even assert an equitable APA claim. *See* 851 F.2d at 1465 n.8 ("Strictly speaking, Doe does not premise his claim for equitable relief on the APA."). The D.C. Circuit instead seems to have construed the plaintiff's complaint to raise such a claim, in order to vindicate the "more important principle" of avoiding the need to resolve a difficult (and unrelated) Fourth Amendment question. *See id.* Ultimately, neither case is an obstacle to this Court faithfully interpreting the remedial provisions of the Privacy Act, now that the argument is raised by the government and fully briefed by the parties. *See also supra* at 19-20 n.8 (discussing other recent district-court cases that also address this issue).

part of an APA rulemaking, the agency "must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. § 553(c)). And that is why agencies publish a document titled a "Final Rule," in which they engage (often at great length) with commenters, explaining their reasoning.

But the Privacy Act's notice-and-comment provisions contain no comparable requirement—they require only notice of the proposed SORN modification and a 30-day comment period. *See* 5 U.S.C. § 552a(e)(4), (e)(11) (requiring "notice" and "an opportunity for interested persons to submit written data, views, or arguments to the agency"). That is why, unsurprisingly, agencies typically do not provide such an explanation, and did not provide one here. *See* OMB, *Reissuance of OMB Circular No. A-108, "Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*," 81 Fed. Reg. 94,424 (Dec. 23, 2016), https://perma.cc/B5KU-PN8H. But now, Plaintiffs ask this Court to hold that the agency's non-existent and not-required explanation was insufficient. *See, e.g.*, Pls.' Br. at 43 (arguing that Defendants "failed to provide a reasoned explanation"); Am. Compl. ¶ 238 (arguing that Defendants "failed to . . . reasonably explain their actions," "failed to consider" comments, and so on).

That makes no sense. If Plaintiffs are correct that every agency faces an implied APA-like obligation to respond to all significant comments received under the Privacy Act, then virtually *every* SORN publication (and OMB guidance since 1975, *see* 81 Fed. Reg. at 94,424) is unlawful under the APA—counsel's understanding is that agencies typically do not provide such an explanation, because there is no legal obligation to do so. Plaintiffs have certainly cited no case (and no example) to the contrary. And analogous case law under the APA itself confirms that federal courts are not permitted to innovate atextual procedural requirements that Congress declined to impose. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) (5 U.S.C. § 553 "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures").

As another example: Plaintiffs assert in (conclusory fashion) that inaccurate citizenship records "have in fact caused 'substantial harm, embarrassment, inconvenience, or unfairness,' to

individuals wrongfully identified as non-citizens or potential non-citizens." Pls.' Br. at 38 (quoting 5 U.S.C. § 552a(e)(10)). If that is true (which Plaintiffs have not established), those individuals may seek damages under the Privacy Act. But the availability of those remedies for "individuals," confirms that that argument does not belong in *this* case—which seeks only injunctive relief on behalf of *non*-individuals.

* * *

Congress specified the procedural requirements for agencies to follow when issuing rules under the APA, *see* 5 U.S.C. § 553, and also separately specified the remedies that are available for APA violations, *see id.* § 706. Congress likewise specified the procedural requirements for agencies to follow when making significant changes to a "system of records" under the Privacy Act, *see id.* § 552a(e)(4), (e)(11), and likewise separately specified the remedies that are available to "individual[s]" (but not organizations) for Privacy Act violations, *see id.* § 552a(g). Both the substantive arguments advanced and the relief requested in this suit make a mess of those choices, by mixing and matching from different parts of different statutes. In short, Congress's decision to provide narrow, targeted causes of action for damages or particular kinds of injunctive relief under the Privacy Act strongly suggests that it did not intend to allow plaintiffs to end-run that carefully constructed scheme via APA claims. This Court should respect that congressional choice.

## V. ALL OF PLAINTIFFS' CLAIMS LACK MERIT.

Because all of Plaintiffs' claims fail for non-merits reasons, the Court need not (and should not) reach the merits at all. Even so, all of Plaintiffs' claims would also fail on the merits. Indeed, rejecting Plaintiffs' claims on the merits would, in some ways, be easier than puzzling through some of the jurisdictional and remedial complexities addressed above. That is because, whatever can be said, for example, about the remains of *Havens Realty*, or the interactions between Privacy Act and APA remedies, this is an easy case on the merits. Congress told DHS to "implement a system for the verification of immigration status," Pub. L. No. 99-603, § 121(c)(1), 100 Stat. at 3391; 42 U.S.C. § 1320b-7 (note). Congress also imposed an "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the

citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). That is all that DHS is doing here. Plaintiffs' claims lack merit.

### A. SAVE is authorized by statute (Count 1).

After denial of their preliminary-injunction motion and publication of new SORNs, Plaintiffs' lead merits argument is now that the recent changes to SAVE "exceed[] DHS's authority under SAVE's authorizing statute." Am. Compl. ¶ 201. Citing everything from the major-questions doctrine to the nondelegation doctrine to OLC opinions about different statutes, Plaintiffs spill much ink over what is ultimately an easy question of statutory authority. SAVE was created at the specific *direction* of Congress, so it is also *authorized* by Congress. None of the recent software improvements change that straightforward conclusion.

**1.** In the Immigration Reform and Control Act of 1986, Congress provided that DHS "shall implement a system for the verification of immigration status," and directed that it be "available to all the States by not later than October 1, 1987." Pub. L. No. 99-603, § 121(c)(1), 100 Stat. at 3391; 42 U.S.C. § 1320b-7 (note). Then, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009, Congress also placed an affirmative legal "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c).

Congress also addressed "[c]ommunication between" other "government agencies and" DHS. *Id.* § 1373. Congress provided expressly that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a). Congress further emphasized—again "[n]otwithstanding any other provision of Federal, State, or local law"—that "no person or agency may prohibit, or in any way restrict, a

Federal, State, or local government entity from" "[m]aintaining" or "[e]xchanging . . . with any other Federal, State, or local government entity" any "information regarding the immigration status, lawful or unlawful, of any individual." *Id.* § 1373(b).

SAVE—whether in its original form, or after the recent improvements—fits comfortably within these statutory authorities and obligations. SAVE, after all, is nothing more than the very "system for the verification of immigration status" that Congress explicitly directed DHS to "implement" in 1987. Pub. L. No. 99-603, § 121(c)(1), 100 Stat. at 3391. Accordingly, Plaintiffs cannot be right that SAVE exceeds DHS's statutory authority unless the recent changes have, somehow, so fundamentally changed the system that it can no longer fairly be described as a "system for the verification of immigration status." *Id.* Plaintiffs have not made that showing.

Even setting aside the original text authorizing SAVE's creation, 8 U.S.C. § 1373 provides additional authority. That statute confirms that SAVE requests can come in from any "Federal, State, or local government agency," 8 U.S.C. § 1373(c)—resolving any doubt that DHS may (indeed, must) work with State and local governments for this purpose. Section 1373 also confirms that SAVE requests may "seek[] to verify or ascertain" either "citizenship *or* immigration status" of "*any* individual" in the relevant jurisdiction—thus making clear that the system may include U.S. citizenship information. *Id.* (emphases added). The statue further confirms that SAVE requests may be submitted "for any purpose authorized by law," *id.*— including, as relevant here, voter verification. That resolves all of the statutory-authority questions raised here.

**2.** Plaintiffs' arguments to the contrary lack merit. First, Plaintiffs argue that the 1986 act "refer[s] to the 'immigration status' of 'aliens,'" which "indicates that SAVE was only meant to be used for *non-citizens*." Pls.' Br. at 26. That argument ignores that there are also several references in the same section of the same statute to citizenship status. *See, e.g.*, Pub. L. No. 99-603, § 121(a)(1)(C), 100 Stat. at 3385 (requiring "a declaration in writing by the individual . . . under penalty of perjury, stating whether or not the individual is a citizen or national of the United States"). Regardless, that argument also fails the test of common-sense: the animating purpose of *any* "system for the verification of immigration status" is to sift those with a lawful "immigration

status" from those without a lawful "immigration status." In other words, to provide "verification" of those who are aliens and those who are not, those who are citizens and those who are not, and so on. As a result, there is no such thing as an effective "system for the verification of immigration status" that has no information at all about U.S. citizens—after all, one's citizenship (or lack thereof) is an extremely common form of "immigration status." To suggest that Congress wanted to limit the system so severely (but without saying so) strains credulity.

Were there any doubt, it was resolved in 1996, by the enactment of 8 U.S.C. § 1373(c). Again, that statute confirms explicitly that these requests may "seek[] to verify or ascertain" either "citizenship *or* immigration status" of "*any* individual" in the relevant jurisdiction. 8 U.S.C. § 1373(c) (emphases added). Plaintiffs make no attempt to square that language with their view that SAVE may not be used for purposes of verifying citizenship. Nor could they.

Plaintiffs do argue that 8 U.S.C. § 1373 "does not even mention SAVE (or any comparable system)." Pls.' Br. at 27. But Congress didn't have to specify the computer program by name, nor use any particular acronym. DHS can call the system whatever it wants—as long as it "implement[s] a system for the verification of immigration status" and "provid[es] the requested verification or status information" in response to lawful requests. The point is, SAVE is the mechanism by which DHS fulfills its statutory obligations under 8 U.S.C. 1373(c). That means SAVE is not only authorized by Congress, it (or some comparable alternative) is *required* by Congress.

When it comes to 8 U.S.C. § 1373, most of Plaintiffs' arguments are specific to § 1373(a), and conveniently brush aside § 1373(c). *See* Pls.' Br. at 27-28. Defendants also disagree with Plaintiffs' narrow reading of 1373(a),[11] but the Court need not resolve most of those questions.

[11] For example, Plaintiffs suggest that the government's position is inconsistent with an opinion from the Office of Legal Counsel (OLC) from 1999. *See* Pls.' Br. at 28 (citing *Relationship Between IIRIRA & Statutory Requirement for Confidentiality of Census Info.*, 1999 WL 34995963 (O.L.C. May 18, 1999)). Not so. That OLC opinion does not address 8 U.S.C. § 1373(c) at all, which is the most significant statutory provision for the government's statutory-authority argument in this case. Moreover, although it does interpret § 1373(a), it does so in the context of separate statutory provisions (not at issue here) about the confidentiality of responses to the decennial census. In all events, the mode of statutory-interpretation invoked in that opinion—which

That is because § 1373(c) alone is more than enough to justify SAVE. By telling DHS that it has an "[o]bligation" to do something, that is necessarily also *authorizing* DHS to do that very thing—§ 1373(c) is thus both a statutory obligation on DHS, and a statutory authorization for DHS.

At times, Plaintiffs argue that even if SAVE is authorized for *some* purposes, Congress did not specifically authorize its use for "mass voter eligibility checks." Pls.' Br. at 26. If that were correct, then the government has been violating the law for decades—SAVE was used for voter-verification purposes during the George W. Bush Administration, the Obama Administration, the first Trump Administration, and the Biden Administration. *See* Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶ 20; *see also, e.g.*, DHS-AR-551-55. In any event, even accepting the (dubious) premise that Congress had to specify all permissible purposes for the "system for the verification of immigration status" that it told DHS to create, Pub. L. No. 99-603, § 121(c)(1), 100 Stat. at 3391, it did so in 8 U.S.C. § 1373(c). And Congress went very broad: DHS must respond to verification requests "for *any* purpose authorized by law." 8 U.S.C. § 1373(c) (emphasis added). Confirming the citizenship of voters is a "purpose authorized by law," *id.*—States are not just permitted, but *required* to "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4); *see also id.* § 20501(b)(4) ("ensure that accurate and current voter registration rolls are maintained"). That resolves any question about the purpose of the system.

At other times, Plaintiffs suggest that the problem is the lack of specific statutory language authorizing information-sharing across agencies. *See, e.g.*, Pls.' Br. at 28 ("[N]othing in [8 U.S.C. § 1373(c)] empowers DHS to *acquire data from other federal agencies* like SSA to respond to such inquiries."). But again, no such specificity was required. After all, as Plaintiffs know better than anyone, there are several other statutes that explicitly speak to the sharing of information across federal agencies—most notably, the Privacy Act. Generally, the limits of that sort of information-sharing are specified in those statutes, and Congress need not repeat them in every other federal statute to remind agencies of those obligations, even if they apply. Of course, Plaintiffs

relies heavily, for example, on legislative committee reports—is in significant tension with more modern statutory-interpretation precedent that post-dates the opinion.

also think that *those* limitations were violated here. Plaintiffs are wrong, *see infra*, but that does not go to the agency's statutory authority—it goes to Plaintiffs' Privacy Act claims.

In any event, *this* case is an especially poor candidate for insisting on the sort of specificity that Plaintiffs are demanding on the topic of information-sharing across agencies. That is because, in the very same statute, Congress *did* specify that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also id.* § 1373(b). Despite this language, somehow, Plaintiffs seem to think, for example, that SSA should have "prohibit[ed]" or "in [some] way restrict[ed]" USCIS from searching on its "information regarding the citizenship or immigration status" of individuals in SSA systems—whether by pointing to the Privacy Act, the Social Security Act, or some "other provision of . . . law." *Id.* Congress made a different choice. Given the text of § 1373(a) and (b), it is impossible to imagine that Congress intended to prohibit DHS from obtaining information from other agencies to carry out its obligations under 8 U.S.C. § 1373(c).

**3.** Plaintiffs next argue that the information-sharing at issue here violates two provisions of the Social Security Act. But the first expressly *permits* sharing of information when "otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1). So that citation gets Plaintiffs no closer to relief; it just tees up the same questions about whether these actions are "otherwise" permissible.

The second statute that Plaintiffs cite purports to prohibit future federal statutes, beginning in 1990, from changing the rules surrounding sharing of SSNs. *See* Pls.' Br. at 32-33 (citing 42 U.S.C. § 405(c)(2)(C)(viii)(I)). As a threshold matter, that statute is inapplicable on its face to the Immigration Reform and Control Act of 1986, which is enough to resolve the argument. In any event, it is a foundational principle of Article I of the U.S. Constitution that "statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified." *Dorsey v. United States*, 567 U.S. 260, 274 (2012). And in doing

so, "Congress remains free to express any such intention either expressly or by implication as it chooses." *Id.*; *see also Baltimore v. ATF*, No. 23-cv-3762 (RDM), 2026 WL 143346, at *14 (D.D.C. Jan. 20, 2026) (discussing "the well-established rule that 'one legislature cannot abridge the powers of a succeeding legislature'") (quoting *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810)). So to the extent there is any conflict here, the more specific, later-enacted statute—which expressly applies "notwithstanding any other provision of . . . law," 8 U.S.C. § 1373—must prevail.

In all events, Plaintiffs do not have a private cause of action to enforce these provisions of the Social Security Act. *See, e.g.*, *Biccum v. City of Watertown*, 2019 WL 4752927 (N.D.N.Y. Sept. 30, 2019); *Grams v. Esters*, 2007 WL 9780467 (W.D. Ky. Nov. 19, 2007).[12]

**4.** Eventually, Plaintiffs retreat to the major-questions doctrine, arguing that Defendants cannot rely on just *any* statutory authority, but instead must identify some "*clear* congressional authorization." Pls.' Br. at 30-31 (emphasis added). If necessary, Defendants have already done so, for the reasons above. Plaintiffs' major-questions theory can be rejected on that basis.

In any event, the major-questions doctrine does not apply here. Past major-questions cases have turned on extraordinary economic impact, *see Biden v. Nebraska*, 600 U.S. 477, 503 (2023) (student loan forgiveness that would have "amount[ed] to nearly one-third of the Government's $1.7 trillion in annual discretionary spending"), unprecedented intrusions into the medical decisions of "84 million Americans," *see Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) (a mandate for "84 million Americans to either obtain a COVID-19 vaccine or undergo weekly medical testing"), or the asserted Presidential power "to impose tariffs on imports from any country, of any product, at any rate, for any amount of time," *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 637 (2026) (op. of Roberts, C.J.).

---

[12] Plaintiffs also cite what they call the "SSA Disclosure Policy," which is an SSA document with a chart with one entry that says "[w]e do not have the legal authority to disclose information about U.S. citizens to DHS." Pls.' Br. at 15 n.7. That unexplained, categorical statement has no citation, and it is incorrect (at least, as a blanket statement). *See, e.g.*, 8 U.S.C. § 1373(a). In any event, that sort of statement is not judicially enforceable. Plaintiffs do not argue otherwise.

This case is not remotely analogous. Plaintiffs are free to scrutinize SORNs to ensure that every Privacy Act "T" is crossed and "I" is dotted—but none of this reflects any "highly consequential power" of "vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022). Whether SAVE users submit one request or multiple requests at a time has no legal or economic effect on anyone—it just makes a few people's jobs easier. And intra-governmental data sharing of data created by the government is hardly some "transformative expansion" of any agency's authority, *id.* at 724. Ultimately, improving government software to make it easier to confirm the citizenship of registered voters is good government—not some "staggering" or "unprecedented" action claiming "virtually unlimited power" under a statute. *Nebraska*, 600 U.S. at 500-02. There is therefore no "'reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* at 501 (quoting *West Virginia*, 597 U.S. at 721).

**5.** Plaintiffs next turn to the nondelegation doctrine and the constitutional avoidance canon, arguing that Defendants' interpretation of 8 U.S.C. § 1373 raises constitutional questions under the "intelligible principle" test. Pls.' Br. at 27-28. It does not.

"[I]n examining a statute for the requisite intelligible principle," the Supreme Court has "generally assessed whether Congress has made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). "Those standards, the Court has made clear, are not demanding." *Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality op.). "On only two occasions has the Court invalidated legislation based on the nondelegation doctrine, and both occurred in 1935." *United States v. Cooper*, 750 F.3d 263, 268 (3d Cir. 2014). One of those statutory provisions "provided literally no guidance for the exercise of discretion," and the other "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). By con-

trast, in the 90 years since, the Supreme Court has consistently upheld "Congress' ability to delegate power under broad standards," *Mistretta v. United States*, 488 U.S. 361, 373 (1989), and "ha[s] 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law,'" *Am. Trucking*, 531 U.S. at 474-75 (quoting *Mistretta*, 488 U.S. at 416) (Scalia, J., dissenting).

There is nothing so special about this delegation that would justify breaking that 90-year streak. Indeed, it is far more specific than many delegations that have been upheld by the Supreme Court—for example, congressional authorization for agencies to regulate in the "public interest," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943), to set "just and reasonable" rates, *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944), or to set "fair and equitable" commodity prices, *Yakus v. United States*, 321 U.S. 414, 420-27 (1944). None of the statutory provisions at issue here come close to the wide outer bounds permitted by modern nondelegation precedent. So the avoidance canon has no place in interpreting any of these statutes.

Ultimately, Plaintiffs' nondelegation-plus-avoidance argument is a bold one, but it is in keeping with a fundamental error that imbues their brief: insistence on an extraordinary level of specificity by Congress in directing DHS's work. What Plaintiffs miss is that our modern "jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372. By contrast, by requiring the level of specificity that Plaintiffs demand here, virtually every modern agency program would be unlawful. For example, there is presumably no federal statute that specifically authorizes government agencies to update their computers to the new version of Windows each year. Or to streamline customer-service at the U.S. Postal Service to submit change-of-address requests online, rather than on paper or in person at the post office. Plaintiffs' understanding of congressional authority—seeking a specific U.S. code citation for every technological or software improvement—would hamper wide swaths of the government. This Court should reject it.

**B. SAVE does not exceed the government's constitutional authority or violate the separation of powers (Counts 2 and 3).**

**1.** Once Plaintiffs' statutory claims are resolved, their constitutional claims follow as a matter of course. That is because Plaintiffs' primary "constitutional" theory is that "Defendants violated the separation of powers by acting in the total absence of authority from Congress." Pls.' Br. at 33 (citation omitted). For all the reasons discussed above, *see supra* at 45-52, that is incorrect—SAVE falls comfortably within statutory authority explicitly delegated by Congress. But regardless, that is really the same statutory claim addressed above—not a separation-of-powers claim—and one that lacks any cause of action under recent D.C. Circuit precedent.

Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The D.C. Circuit recently reaffirmed that principle. *See Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir.) ("*Armstrong* as well as *Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review."), *reh'g en banc denied*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025). So reframing their statutory-authority claim as a constitutional one gets Plaintiffs no closer to relief.

**2.** Separately, Plaintiffs also assert (with little explanation of its relevance to this case) that "[o]ur Constitution provides that only the States—not Congress, and certainly not the President—may decide who is qualified to vote in federal elections." Pls.' Br. at 33-34 (quoting *LULAC*, 2026 WL 252420, at *42). That assertion at least attempts to raise a genuine constitutional claim, rather than repackaging a statutory-interpretation dispute under a different label. But the claim still fails, for the simple reason that none of the actions challenged here involve any federal regulation of elections at all—much less any effort to "decide who is qualified to vote." *Id.* (cleaned up).

For this argument, Plaintiffs rely heavily on Judge Kollar-Kotelly's January 2026 opinion in *LULAC*, 2026 WL 252420. Although Defendants respectfully disagree with much of that opinion, this Court need not weigh in on any of those disagreements. That is because the core of that case is about Executive Order No. 14,248, in which (in the court's view) the President "directed several federal agencies and officers to make a variety of changes to the administration of federal elections." *Id.* at *3; *see, e.g.*, *id.* at *13 ("Section 2(a) of the Executive Order directs the EAC to 'take appropriate action' within 30 days 'to require' people registering to vote using the Federal Form to submit 'documentary proof of United States citizenship.'"). This case, by contrast, challenges no Executive Order, and no regulatory requirements whatsoever. The legal rights and obligations of voters or (voting administrators) are entirely unaffected by the 2025 changes to SAVE. Whatever might be said about Executive Order 14,248, this case does not reflect any effort by the Executive Branch "to arrogate election administration to themselves." Pls.' Br. at 34.

### C. Plaintiffs' Privacy Act claims (purportedly brought under the APA) lack merit (Counts 4, 5, and 6).

As discussed above, this Court should not permit Plaintiffs to bring what are effectively Privacy Act claims that Congress never authorized, simply by wrapping them in APA labeling. But even if they that were permissible, each of these claims would still fail on the merits.

**1. Count 6 – Arbitrary and Capricious.** As discussed above, *see supra* at 42-44, the process for publication of a modified SORN under the Privacy Act is governed by specific notice-and-comment procedures set forth in the Privacy Act. Unlike for an APA rulemaking, however—which starts with a notice of proposed rulemaking and ends with a final rule—a Privacy Act SORN publication does *not* end with any agency obligation to state "in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). So arbitrary-and-capricious review—which is typically based on the quality and the content of the agency's explanation in that "statement" of the final rule's "basis and purpose," *id.*—does not make sense in this distinct Privacy Act context. That is reason enough to reject this claim, and to instead respect the remedial limits of

the Privacy Act. *See supra*, Section IV. In any event, even if the Court were to allow Plaintiffs to import these APA litigation concepts into the Privacy Act, their arguments lack merit.

**i.** Plaintiffs first argue—without any evidence of this purely factual assertion—that Defendants failed to "remain sufficiently open minded" during the comment process. Pls.' Br. at 39 (quoting *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009)). Setting aside the facts, that sort of claim used to be a viable APA theory in the D.C. Circuit. Today, it is not. The Supreme Court now "decline[s] to evaluate . . . final rules under the open-mindedness test" that some lower courts used previously. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 685 (2020); *see Bahman Grp. v. Palluconi*, No. 22-3826 (RDM), 2025 WL 3225196, at *5 (D.D.C. Sep. 29, 2025) (acknowledging the holding in *Little Sisters* that "the APA imposes no general 'open-mindedness' requirement on agencies"). That is because, like other judge-made APA "procedures that [the Supreme Court] ha[s] held invalid, the open-mindedness test violates the general proposition that courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." *Id.* (citing *Vermont Yankee*, 435 U.S. at 524, 549). So even if there were any factual basis in the record for Plaintiffs' cynical assumption that Defendants "predetermined" the outcome of the comment process, Pls.' Br. at 40-41, that would not even state an APA claim—much less a Privacy Act claim, *see id.* at 39-40, given the absence of any obligation in the Privacy Act to respond to comments in the first place. *See supra* at 42-44.

**ii.** Plaintiffs next argue that DHS and SSA "disregarded relevant factors" and "adverse evidence." Pls.' Br. at 41. Again, given the absence of any statutory obligation to publish a statement responding to any of the Privacy Act comments, it is hard to know how and when Defendants should have remedied that concern. In any event, Plaintiffs' arguments on this point turn out to be self-refuting. Other than the issuance of a policy change that Plaintiffs disfavor, *but see FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("a court may not substitute its own policy judgment for that of the agency"), the only evidence Plaintiffs point to for Defendants' supposed "disregard" of these points are *documents in the administrative record. See* Pls.' Br. at 41-42 (repeatedly citing comments or other materials in the administrative record, and nothing else).

Both agencies have certified that those materials *were* considered by the agency, *see* ECF Nos. 64, 65, and those signed certifications are "entitled to a presumption of regularity," *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 577 (2025)). By considering those materials, DHS and SSA satisfied any applicable APA obligation—even if they came to different conclusion than Plaintiffs (or even this Court) might have. *See, e.g.*, *Prometheus Radio*, 592 U.S. at 426 (no APA violation where the agency "did not ignore the Free Press studies," it "simply interpreted them differently").

**iii.** Plaintiffs then argue that Defendants "violated the 'change-in-position' doctrine" by "failing to 'provide a reasoned explanation'" for these policy changes, by "failing to 'display awareness that they were changing position,' and by "failing to 'consider serious reliance interests.'" Pls.' Br. 43 (quoting *Wages*, 604 U.S. at 568). Again, this is one of the more obvious examples of trying to force an APA argument into the rubric of the Privacy Act in a logically incoherent context. Given the absence of any Privacy Act obligation to state "in the rules adopted a concise general statement of their basis and purpose," 5 U.S.C. § 553(c), Defendants never had either the obligation *or* the opportunity to explain any of this.

Regardless, even taking this change-in-position theory on its own terms, it still fails. Defendants were quite obviously "aware[] that they were changing position," *Wages*, 604 U.S. at 568 —that is why press releases accompanied each of the relevant changes, referring to an "[o]verhaul" of SAVE and a "revamped SAVE system," USCIS Press Release (Apr. 22, 2025), *supra* at 7, and exalting "[n]ew options" to "create cases using a Social Security number" and to "create cases in bulk," *Optimizing SAVE*, *supra* at 7. Those press releases (as well as many other documents in the administrative record or otherwise publicly available) also provide a brief but sufficient explanation for all of the relevant changes: in short, the goal was to "optimize this service to provide a single, reliable source for verifying immigration status and U.S. citizenship." *Id.*; *see also, e.g.*, *Voter Registration and Voter List Maintenance Fact Sheet*, *supra* at 8.

As for reliance interests: to the extent Plaintiffs are suggesting there are "serious reliance interests" in keeping one's SSN or citizenship status secret from the Department of Homeland Security—a number and a status that derive entirely from the federal government in the first

place—they have provided no support for that remarkable assertion. Would Plaintiffs have this Court believe that, if only they had been warned about possible future changes to SAVE, green-card holders would have walked out of their citizenship ceremonies early? Or that some of Plaintiffs' members would have declined receipt of a Social Security Number (either at birth, or later in life) out of fear that their citizenship might one day be verified via submission of bulk requests, rather than one-by-one? Those hypotheticals answer themselves.

**2. Count 4 – Compatible Use.** In Count 4, Plaintiffs argue that the new routine uses established by the latest DHS and SSA and SORNs substantively violate the Privacy Act, because they authorize disclosures "for a purpose" that is not "compatible with the purpose for which [the record was collected." Am. Compl. ¶ 220 (quoting 5 U.S.C. § 552a(a)(7)). Plaintiffs are mistaken.

The Office of Management and Budget (OMB)[13] has long construed the compatible-use requirement to include "both functionally equivalent uses . . . [a]s well as other uses that are necessary and proper." OMB, *Guidance on the Privacy Act*, 52 Fed. Reg. 12,990, 12,993 (Apr. 1987); *see also* OMB Circular A-108, *supra*, at 11-12. A straightforward example of a "necessary and proper" routine use is one permitting disclosure to another federal agency performing work "pursuant to a specific statutory charter." 52 Fed. Reg. at 12,993. In other words, when Congress mandates agency action that requires disclosure of agency records, the use is "compatible" for that reason alone. Accordingly, for the reasons discussed above about DHS and SSA's statutory obligations, that congressional mandate is enough to resolve the compatible-use question here.

Even if this Court were to conduct some more searching form of compatibility review, to assess the compatibility of a "functionally equivalent" routine use, courts typically a "dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548-49 (3d Cir. 1989); *see also Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018). Although the D.C. Circuit has yet to "definitively

---

[13] The Privacy Act, 5 U.S.C. § 552a(v), requires OMB to prescribe guidance to agencies in implementing the Privacy Act, and also to provide continuing assistance to and oversight of the implementation of the law.

determine[] the precise meaning of 'compatible,'" *Ames v. DHS*, 861 F.3d 238, 240 240 n.1 (D.D.C. 2017), the court has cited approvingly to the test articulated by the Third Circuit: Whether a "concrete relationship or similarity" exists "between the disclosing agency's purpose in gathering the information and in its disclosure." *USPS v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 145 (D.C. Cir. 1993) (quoting *Britt*, 886 F.2d at 549-50); *see also Ames*, 861 F.3d at 240 n.1. Under that test, an agency need only demonstrate a "meaningful degree of convergence" between collection and disclosure. *Britt*, 886 F.2d at 549. Plaintiffs themselves seem to accept this (relatively forgiving) standard. In their words: "The compatible-use requirement prevents 'personal data collected by one organization for a stated purpose' from being 'used and traded by another organization for a completely unrelated purpose.'" Pls.' Br. at 35 (quoting *Britt*, 886 F.2d at 550).

That test is satisfied here, assuming it applies, *but see* 8 U.S.C. § 1373(a); 52 Fed. Reg. at 12,993. As a threshold matter, as for Plaintiffs' challenge to SSA's disclosure or verification of SSNs, they seem to be starting from the mistaken factual premise that SSA "collected" some form of "personal data" *from* individuals and is now disclosing that "personal data" to DHS. *See* Pls.' Br. at 35 (quoting *Britt*, 886 F.2d at 550). That is backwards: Social Security numbers are issued *by SSA*, to individuals, to simplify the *government's* efforts in identifying and tracking individuals by a unique nine-digit number. *See, e.g.*, C. Puckett, SSA, *The Story of the Social Security Number* (July 2009), https://perma.cc/8Z3Z-DDB3. And for over 80 years, one of the core purposes of the SSN has been to "enable[] government agencies to identify individuals in their records." *Id.* Its "universality has led to its adoption throughout government and the private sector as a chief means of identifying and gathering information about an individual," *id.*—not just to determine "eligibility for SSA benefits," Pls.' Br. at 36, as Plaintiffs' narrowly and anachronistically insist. *See, e.g.*, Puckett, *supra* ("The expansion of SSN use began in 1943 with Executive Order (EO) 9397 requiring federal agencies to use the SSN for the purpose of identifying individuals in any new record systems.").

Given this history, SSA's use of an SSN as a numerical identifier in data-sharing with other government agencies—whether with USCIS, or any other agency with whom SSA is authorized

to share data—is fully compatible with the SSN's longstanding history and use as SSA's primary numerical identifier. *Id*. At the very least, this latest use is not "completely unrelated" to its usual purpose, *Britt*, 886 F.2d at 550. That too is fatal to Plaintiffs' compatible-use claim in Count 4.[14]

**3. Count 5 – Notice and Comment.** As discussed above, Count 5 is moot, because DHS and SSA *have* now complied with the notice-and-comment procedures required by the Privacy Act—whether or not they are applicable. *See supra*, Section II; *see also LULAC*, 2026 WL 252420, at *54 (dismissing an indistinguishable claim as moot). Plaintiffs' own complaint confirms that both SSA and DHS have now "publish[ed] a modified SORN for SAVE" and "solicit[ed] public comment" for more than 30 days. Am. Compl. ¶¶ 232-33. No more was required. *See* 5 U.S.C. § 552a(e)(4), (e)(11). So this claim fails—whether or not Plaintiffs are correct that Defendants *used to be* in violation of the Privacy Act, before publication of those updated SORNs.

### D. Plaintiffs' mandamus and unreasonable delay claims about computer-matching agreements lack merit (Counts 7 and 8).

Plaintiffs' final two claims are their narrowest. There, EPIC (and EPIC alone) challenges DHS's and SSA's alleged failure to publish a document called a "computer matching agreement" relating to the recent changes to SAVE. As already discussed above, *see supra* at 30-33, EPIC lacks standing to bring this claim for multiple independent reasons. That is (by far) the easiest way to resolve these claims. In any event, these claims are also meritless—Plaintiffs are not entitled to mandamus because no "computer matching agreements" were required here (at the very least, certainly not so clearly as to satisfy the high standard for mandamus).

The APA places strict limits on review of alleged agency inaction. Because the APA "carried forward" the common law writ of mandamus in § 706(1), the mandamus standard also applies

[14] This section of Plaintiffs' brief also includes a confusing reference to "voter roll data that DHS is ingesting in bulk from SAVE user agencies and then disclosing to various other federal agencies." Pls.' Br. at 37. It is not clear what Plaintiffs are referring to there, as none of the challenged agency actions in this case are about DHS disclosures of "voter roll data" to other federal agencies. DHS and SSA are not involved in the process by which "state and local officials" collect data "as part of the voter registration process." *Id.* (emphasis omitted). To the extent Plaintiffs are suggesting that state or local officials may have wronged their own citizens in some way, that is not an issue to be resolved in this lawsuit against the United States.

to an APA claim challenging agency inaction. *Norton*, 542 U.S. at 63. So, both Counts 7 and 8 of Plaintiffs' complaint are subject to the mandamus standard. "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *Norton*, 542 U.S. at 64 ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.").

Plaintiffs cannot satisfy these requirements here. As for a "clear and indisputable right to relief" or a "clear duty to act" in the manner that Plaintiffs demand, *Am. Hosp. Ass'n*, 812 F.3d at 189, the text of the Privacy Act itself is fatal. For one thing, the obligation to publish a computer matching agreement only applies to a "computerized comparison of . . . two or more automated systems of records . . . for the purpose of" verifying eligibility for "cash or in-kind assistance or payments under Federal benefit programs" or "recouping payments or delinquent debts under such Federal benefit programs." 5 U.S.C. § 552a(a)(8). Voter verification is not "cash or in-kind assistance or payments under Federal benefit programs." *Id.* And the SSA-DHS information-sharing agreement at issue in this case is not "for the purpose of" any of those subjects. *Id.* So, to the extent that Plaintiffs seek to establish standing via allegations of voting-related harms, they cannot remedy those harms by enforcement of the computer-matching provisions of the Privacy Act.

To be sure, SAVE may also be used for purposes unrelated to voter-verification, including with respect to certain federal benefit programs. But even indulging the fiction that this lawsuit has anything to do with those programs, DHS's longstanding position (dating back to at least 2013) is that so-called "front-end" single-record verification queries are not covered by this part of the Privacy Act, which instead "appl[ies] only to the matching of an entire system of records against another database." GAO, GAO-14-44, *Computer Matching Act* at 15 (2014), https://perma.cc/YMK8-PTD7. The basis for that interpretation is the text of the statute itself, which applies only to a "comparison" of "two or more automated *systems* of *records*," plural, 5 U.S.C. § 552a(a)(8) (emphases added)—not a series of matches of each *individual* record. And

since 2017, SAVE has been fully structured as a "front-end" single-record comparison system.[15] Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶¶ 23-24. Although agencies have sometimes published computer matching agreements even when it is not clear that they are legally required, Computer Matching Act at 15-17, *supra* at 60, if anything that uncertainty and historical inconsistency undermines the notion that mandamus should issue here, to remedy some "clear duty" to act in the face of a "clear and indisputable" right to relief. *Am. Hosp. Ass'n*, 812 F.3d at 189

Finally, to the extent EPIC actually suffered some genuine harm due to the absence of a computer matching agreement, *but see supra* at 30-33, an "adequate alternative remedy exists" under the Privacy Act itself. *Am. Hosp. Ass'n*, 812 F.3d at 189; *see, e.g.*, *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 123 (D.D.C. 2025) (discussing "the remedies provided in the Privacy Act," which offer "a possibility of compensatory relief at a later date"). That is also fatal to Plaintiffs' computer-matching claims.

## VI. Plaintiffs' Requested Relief is Overbroad and Subject to Equitable Limits.

Even if Plaintiffs could prevail on any of their claims, their requested relief is overbroad in several respects, and subject to important equitable limitations.

**a.** First, any relief should be narrowly tailored to remedy any Article III injuries of parties who have established standing. The Supreme Court recently addressed the subject of "universal injunctions" in *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). It is now clear that, in granting equitable relief, a court "may administer complete relief between the parties." *Id.* at 851. But that is also "the maximum a court can provide." *Id.* at 854. Plaintiffs generally recognize this, which is why they previously moved for class certification. ECF No. 17; *see also* Oct. 28, 2025 Hr'g Tr. at 25:18-21 (MR. SUS: "Your Honor, I will state candidly that part of the complication here was

[15] To be clear, the recent switch to bulk *submission* of SAVE requests by SAVE users did not change this. Although users may now *submit* large numbers of requests to USCIS at the same time, the next step is still the individual verification of one individual record at a time, *see* Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶¶ 23-24—not a comparison of two "*systems* of *records*" as defined by the Privacy Act. After all, the SAVE request form is not itself a "system of records" under the Privacy Act. 5 U.S.C. § 552a(a)(5).

introduced by the Supreme Court's decision in *CASA* that requires cases like this to, at least alternatively, be pled as putative class actions."). But, having now withdrawn their class-certification motion and amended their complaint, ECF No. 46 (now including no class-action allegations), they cannot now request nationwide injunctive relief that would run to the benefit of non-parties.

To be sure, in a footnote in *CASA*, the Supreme Court reserved the question (which has previously been addressed by the D.C. Circuit) about the meaning of the "set aside" language in the APA, 5 U.S.C. § 706(2). 606 U.S. at 847 n.10 (quoting 5 U.S.C. § 706(2)); *cf. Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025) (discussing these precedents in the context of a stay request under 5 U.S.C. § 705). But "universal relief, whether by way of injunction or vacatur, strains our separation of powers." *Texas*, 599 U.S. at 703 (Gorsuch, J., concurring). So "a district court should 'think twice—and perhaps twice again—before granting' such sweeping relief." *Id.* at 702 (quoting *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring)). After all, remedies "ordinarily 'operate with respect to specific parties,'" rather than "on legal rules in the abstract," but reading § 706 to authorize universal vacatur would do the opposite. *California v. Texas*, 593 U.S. 659, 671-72 (2021) (citation omitted). This Court should "not lightly assume that Congress has intended to depart from established principles of equity." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).

**b**. For similar reasons, any equitable relief the Court may decide to enter (including vacatur or an injunction) "must be limited to the inadequacy that produced [the] injury in fact." *Gill v. Whitford*, 585 U. S. 48, 66 (2018) (citation omitted). After all, it is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). So, to the extent that the Court determines that any particular feature of SAVE (or the procedures used to implement it) violates the law, and causes particular Plaintiffs an Article III injury, relief should be limited to remedying that particular violation or ordering the government to carry out that procedure.

**c.** Finally, principles of equity and comity also require the Court not to enter relief that would subject the United States to conflicting court orders. In several prior filings, Defendants

have been especially careful to keep Plaintiffs and the Court informed of updates in earlier-filed litigation challenging various aspects of SAVE. *See* Defs.' Opp'n at 6, 39, ECF No. 37; Scheduling Mot. at 1 n.1, ECF No. 57; Notice, ECF No. 59. Plaintiffs explicitly acknowledged that awareness, in support of an extension request. *See* Pls.' Extension Mot. ¶ 6, ECF No. 60 (acknowledging "Defendants' repeated references to those 'other SAVE-related cases'" in this case").

Many months ago, the district court in *Florida* approved a settlement agreement requiring DHS to continue to allow SAVE users to run searches using full or partial Social Security Numbers. *See supra* at 7 (citing *Florida* ECF Nos. 30, 31). That order also specified that "the Court retains jurisdiction over this case for a period of twenty years from the date of this order for the purposes of enforcement of the parties' settlement agreement, which is approved by and incorporated by reference into this order." Order, *Florida* ECF No. 31. Ohio, Indiana, and Iowa also signed that agreement and dismissed their separate lawsuits. *See supra* at 7. All of those events took place before the filing of the operative complaint in this case. Despite their awareness, Plaintiffs never sought to intervene or otherwise object to the *Florida* settlement or order.

As a result of those events, an order from this Court vacating, setting aside, or enjoining the 2025 changes to SAVE would now risk placing the United States "in [the] unenviable position" of facing conflicting orders that impose irreconcilable legal obligations. *NAACP, Jefferson Cnty. Branch v. Brock*, 619 F. Supp. 846, 850 (D.D.C. 1985). As one example, DHS and SSA cannot simultaneously allow SAVE searches via Social Security Number—as required by the judicially enforceable settlement agreement in *Florida*—while also reversing the recent changes to SAVE that would be required by granting some of Plaintiffs' broader requests for relief in this case.

"Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders." *Feller v. Brock*, 802 F.2d 722, 727-28 (4th Cir. 1986). And basic "considerations of comity require more than the usual measure of restraint" in this scenario, when "an injunction sought in one federal proceeding would interfere with another federal proceeding." *Common Cause v. Jud. Ethics Comm'n*, 473 F. Supp. 1251, 1253-54 (D.D.C. 1979). That is another independent reason to refrain from issuing any form of equitable relief here, such as vacatur or an

injunction. *See, e.g.*, *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987) ("Where different outcomes would place the defendant under inconsistent legal duties, the case for the second court's not going into conflict with the first is particularly strong."); *Bergh v. Washington*, 535 F.2d 505, 507 (9th Cir. 1976) ("When an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases."); *Carver v. Knox Cnty.*, 887 F.2d 1287, 1293 (6th Cir. 1989) (noting the "intolerable situation" of a state subject to conflicting injunctions and explaining that "the only common sense approach" is for the courts to speak "with a single voice"); *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981) ("Generally, principles of comity and judicial economy make courts reluctant to exercise jurisdiction over claims involving the orders of coordinate courts."); *W. Gulf Maritime Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) (holding that federal district courts have an obligation to "avoid rulings which may trench upon the authority of sister courts").

## CONCLUSION

For these reasons, this case should be dismissed in its entirety under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6). In the alternative, the Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: April 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | No. 1:25-cv-03501 (SLS) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS (OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT)**


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

STEPHEN M. PEZZI (D.C. Bar No. 995500)
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**ARGUMENT** .......... **2**

**I. PLAINTIFFS LACK ARTICLE III STANDING** .......... **2**

A. Several Plaintiffs lack associational standing for failure to identify any member with Article III standing. .......... 2

B. No Plaintiff has standing to challenge bulk-upload capability. .......... 4

C. All remaining Plaintiffs also lack Article III standing to challenge intra-governmental data-sharing. .......... 6

1. Plaintiffs' alleged privacy-related interests are too speculative and amorphous to support Article III standing. .......... 6

2. Plaintiffs' alleged voting-related injuries are impermissibly speculative, and neither caused by the federal government nor redressable in this suit. .......... 8

3. Plaintiffs' diversion-of-resources theory of organizational standing is inconsistent with recent Supreme Court precedent. .......... 12

4. EPIC's alleged procedural and informational injuries cannot independently support Article III standing. .......... 14

**II. PLAINTIFFS' PRIVACY ACT NOTICE-AND-COMMENT CLAIM (COUNT 5) IS MOOT** .......... **16**

**III. PLAINTIFFS DO NOT CHALLENGE ANY DISCRETE AND FINAL AGENCY ACTION.** .......... **18**

**IV. PLAINTIFFS CANNOT BRING APA CLAIMS PREDICATED ON PRIVACY ACT VIOLATIONS.** .......... **20**

**V. ALL OF PLAINTIFFS' CLAIMS LACK MERIT.** .......... **24**

A. SAVE is authorized by statute (Count 1). .......... 24

B. SAVE does not exceed the government's constitutional authority or violate the separation of powers (Counts 2 and 3). .......... 29

C. Plaintiffs' Privacy Act claims (purportedly brought under the APA) lack merit (Counts 4, 5, and 6). .......... 31

D. Plaintiffs' mandamus and unreasonable delay claims about computer-matching agreements lack merit (Counts 7 and 8). .......... 34

**CONCLUSION** .......... **35**

# TABLE OF AUTHORITIES

## CASES

*AFL-CIO v. Dep't of Lab.*,
No. 25-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026) .................... 6

*AFL-CIO v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025) .................... 21

*Am. Fed'n of Tchrs. v. Bessent*,
152 F.4th 162 (4th Cir. 2025),
*abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026) (en banc) .................... 7, 21

*Am. First Legal Found. v. Greer*,
153 F.4th 1311 (D.C. Cir. 2025) .................... 14

*Am. Hosp. Ass'n v. Burwell*,
812 F.3d 183 (D.C. Cir. 2016) .................... 35

*Am. Legal Found. v. FCC*,
808 F.2d 84 (D.C. Cir. 1987) .................... 4

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .................... 30

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) .................... 21

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .................... 27

*Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989) .................... 33, 34

*Cath. Benefits Ass'n v. Burrows*,
732 F. Supp. 3d 1014 (D.N.D. 2024) .................... 3

*Cell Assocs. v. NIH*,
579 F.2d 1155 (9th Cir. 1978) .................... 21, 22, 24

*Center for Biological Diversity v. Department of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) .................... 13, 14

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) .................... 18, 19

*Cobell v. Norton*,
392 F.3d 461 (D.C. Cir. 2004) .................... 17

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
167 F.4th 605 (2d Cir. 2026) ........ 13

*Crumpton v. United States*,
843 F. Supp. 751 (D.D.C. 1994), *aff'd*, 59 F.3d 1400 (D.C. Cir. 1995) ........ 29

*Davis v. FEC*,
554 U.S. 724 (2008) ........ 4

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........ 30

*Dorsey v. United States*,
567 U.S. 260 (2012) ........ 28

*DSCC v. Trump*,
No. 26-cv-1114 (CJN), --- F. Supp. 3d ----,
2026 WL 1487833 (D.D.C. May 28, 2026) ........ 7, 13, 31

*EPIC v. Dep't of Com.*,
928 F.3d 95 (D.C. Cir. 2019) ........ 15

*EPIC v. PACEI*,
878 F.3d 371 (D.C. Cir. 2017) ........ 15

*FAA v. Cooper*,
566 U.S. 284 (2012) ........ 20

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 4, 12, 14

*FDA v. Wages & White Lion Invs.*,
604 U.S. 542 (2025) ........ 17, 31

*Fletcher v. Peck*,
10 U.S. (6 Cranch) 87 (1810) ........ 28

*Gundy v. United States*,
588 U.S. 128 (2019) ........ 28

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ........ 12

*Humane Soc'y of the U.S. v. Hodel*,
840 F.2d 45 (D.C. Cir. 1988) ........ 4

*Independent Market Monitor for PJM v. FERC*,
162 F.4th 1167 (D.C. Cir. 2025) ........ 14

*Jeffries v. Volume Services America*,
928 F.3d 1059 (D.C. Cir. 2019) .......... 7

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
808 F. Supp. 3d 29 (D.D.C. 2025) .......... 29, 30

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026) .......... 16, 21

*League of Women Voters v. DHS*,
No. 25-cv-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025) .......... 1, 8, 9, 11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) .......... 26, 31, 34

*Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 9

*Mayor & City Council of Balt. v. ATF*,
816 F. Supp. 3d 107 (D.D.C. 2026) .......... 28

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990) .......... 8

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 9

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .......... 11

*Parks v. IRS*,
618 F.2d 677 (10th Cir. 1980) .......... 21

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .......... 22

*Pileggi v. Washington Newspaper Publishing Co., LLC*,
146 F.4th 1219 (D.C. Cir. 2025) .......... 7

*RNC v. North Carolina State Board of Elections*,
120 F.4th 390 (4th Cir. 2024) .......... 13

*Robert F. Kennedy Hum. Rts. v. Dep't of State*,
No. 25-cv-1774 (JEB), 2026 WL 820811 (D.D.C. Mar. 25, 2026) .......... 19-20

*Rotkiske v. Klemm*,
589 U.S. 8 (2019) .......... 26

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001) ... 22

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ... 14

*Sussman v. U.S. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) ... 20

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ... 5, 6, 16, 35

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014) ... 23

*Virginia Coalition for Immigrant Rights v. Beals*,
803 F. Supp. 3d 454 (E.D. Va. 2025),
*appeal filed*, No. 25-2108 (4th Cir. Sept. 17, 2025) ... 13

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ... 32

*Westcott v. McHugh*,
39 F. Supp. 3d 21 (D.D.C. 2014) ... 21

**STATUTES**

5 U.S.C. § 552a ... *passim*

5 U.S.C. § 553 ... 22, 32

8 U.S.C. § 1373 ... *passim*

42 U.S.C. § 405 ... 28

42 U.S.C. § 1306 ... 28

42 U.S.C. § 1320b-7 (note) ... 24

44 U.S.C. § 3501 (note) ... 15

52 U.S.C. § 20501 ... 1, 5, 10, 12

52 U.S.C. § 21083 ... 5, 10

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
Pub. L. No. 104-208, 110 Stat. 3009 ... 24

Immigration Reform and Control Act of 1986,
Pub. L. No. 99-603, 100 Stat. 3359 .......... 24

Judicial Redress Act of 2015,
Pub. L. No. 114-126, 130 Stat. 282 (2016) .......... 22

**RULES**

Federal Rule of Civil Procedure 12 .......... 35

**REGULATIONS**

OMB, *Guidance on the Privacy Act*,
52 Fed. Reg. 12,990 (Apr. 20, 1987) .......... 33

SSA, *Privacy Act of 1974; System of Records*, 89 Fed. Reg. 95,894 (Dec. 3, 2024) .......... 18

USCIS, *Privacy Act of 1974: Asylum Information & Pre-Screening System of Records*,
80 Fed. Reg. 74,781 (Nov. 20, 2015) .......... 18

**OTHER AUTHORITIES**

Jen Fifield & Zach Despart, *The Texas Tribune* (Feb. 13, 2026) .......... 9

SSA, POMS, *GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN) Without Consent* (2023),
https://perma.cc/PE44-2QBK .......... 33

USCIS, *Mem. of Agreement Between DHS, USCIS & Ind. Sec'y of State re: Participation in SAVE for Voter Registration & Voter List Maint. Purposes* (July 8, 2025),
https://perma.cc/A6LC-9CLQ .......... 11

## INTRODUCTION

This case began with the dramatic assertion that, absent an immediate injunction, "millions of eligible voters could be wrongly disenfranchised." Pls.' Mot. to Stay at 17, ECF No. 16. Now, over six months after the denial of Plaintiffs' preliminary-injunction motion, *see League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025), after multiple intervening (and uneventful) elections, and over a year after the challenged improvements to SAVE took effect, it is clear that Plaintiffs' doomsday predictions were wrong.

Now, at summary judgment—after what used to be Plaintiffs' lead claim was mooted by compliance with any applicable Privacy Act procedures—Plaintiffs focus on the agency's statutory and constitutional authority to improve SAVE, continuing to speculate that "millions of Americans' voting and privacy rights" remain "imperil[ed]." Pls.' Opp'n & Reply at 30, ECF No. 99. That rhetoric, however, continues to be a poor fit for the agency actions at issue, which ultimately amount to improved search functionality in an online service offered by the government—a service that is not just authorized, but *required* by law, at least in some form. *See* 8 U.S.C. § 1373(c). Contrary to Plaintiffs' hyperbole, in improving SAVE, Defendants claim no "unprecedented and unlimited power." Pls.' Opp'n & Reply at 24. Defendants' legal interpretations are neither "endless and alarming," nor "absurd and dangerous." *Id.* at 29. And DHS certainly does not seek "the unbounded and undefined authority to do whatever it wants." *Id.* DHS simply wants to comply with its statutory obligations. And it wants to do so by offering modern search functionality that works well for its intended purpose—rather than forever providing the sort of 1980s-era user experience that previously hampered SAVE, and presented serious litigation risk to the government.

Plaintiffs are plainly dissatisfied how at least some States are using information legally obtained via SAVE—which is why, tellingly, the word "Texas" appears a total of 268 times in Plaintiffs' summary-judgment filings. But none of that is a basis for a Privacy Act lawsuit against the United States. After all, as Plaintiffs themselves emphasize, it is States, not the federal government, who have the primary responsibility to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4).

To be clear, Defendants do not want any eligible voters to be disenfranchised. But modernizing SAVE does not disenfranchise anyone. And if SAVE users are complying with their legal obligations under federal law, state law, and the U.S. Constitution—not to mention their contractual obligations with USCIS, as memorialized in their SAVE agreements—nobody *should* be disenfranchised (and certainly not anywhere close to the numbers hypothesized by Plaintiffs' filings). In any event, regardless of how *States* choose to comply with *their* legal obligations, DHS is obligated under federal law to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). USCIS is now doing a better job of fulfilling those requests than ever before. That is good government—not a violation of the law, and certainly not any attempt to exercise "unlimited power." Pls.' Opp'n & Reply at 24.

## ARGUMENT

### I. PLAINTIFFS LACK ARTICLE III STANDING

#### A. Several Plaintiffs lack associational standing for failure to identify any member with Article III standing.

Several of the Plaintiff associations still fail to identify any member with Article III standing for their claims. So, as a matter of preliminary housekeeping, those Plaintiff Associations should be dismissed (or those theories of standing should be rejected).

**League of Women Voters of Louisiana Education Fund.** Despite Defendants' arguments on this subject, *see* Defs.' Br. at 12, ECF No. 77-1, Plaintiff the League of Women Voters of Louisiana Education Fund goes entirely unmentioned in Plaintiffs' latest brief. So that Plaintiff should be dismissed for failure to even try to carry its burden to show Article III standing.

**League of Women Voters of Louisiana (LWVLA) and Virginia (LWVVA).** Plaintiffs do not dispute that LWVLA member J. Doe 4 voted "without incident" in the October 2025 elections in Louisiana about which he or she previously expressed concerns. *See id.* at 12 (citing Decl. of J. Doe 4, ECF No. 16-3). The same is true of J. Doe 6, who is a member of LWVVA. *See id.*

(citing Decl. of J. Doe 6, ECF No. 16-8). And Plaintiffs now concede expressly that, at least for purposes of voting-related injury, LWVLA and LWVVA have not identified any member with standing. *See* Pls.' Opp'n & Reply at 5. Instead, Plaintiffs rely solely on the (preliminary-injunction) declarations of J. Doe 4 and J. Doe 6 for purposes of showing privacy-related injuries. *See id.* Defendants address those theories *infra*, at 6-8. But, due to Plaintiffs' concessions, neither LWVLA nor LWVVA can show associational standing on a theory of voting-related injury.

**League of Women Voters of Texas (LWVTX).** Unlike with the other associations, LWVTX already identified some of its members, including for purposes of Plaintiffs' theories of voting-related injury. *See* Defs.' Br. at 13. Even so, Defendants explained that Plaintiffs did not "allege (much less establish with evidence at the summary-judgment stage) that *any* of these individuals were actually members of LWVTX at the time of the alleged injury that forms the basis of their allegations of Article III standing." *Id.* Instead, it appears that "after denial of their preliminary-injunction motion, Plaintiffs went searching for affected individuals, found a few, and signed them up for membership—and in doing so, tried to sign these associations up for this lawsuit." *Id.*

Any doubt has now been resolved by Plaintiffs' latest filing. In that filing, Plaintiffs do not dispute Defendants' understanding. Instead, despite having the opportunity to supplement the record, Plaintiffs continue to "refuse[] to provide any additional information on this subject." *Id.* at 13 n.6. Indeed, they double down, now openly arguing that this sort of lawsuit-by-recruitment is permissible, and that any argument to the contrary is "made-up." Pls.' Opp'n & Reply at 5.

Defendants did not make anything up. Although Defendants are not aware of any Supreme Court or D.C. Circuit precedent (in either direction) on this precise nuance, other courts have accepted closely analogous arguments from the government. *See Cath. Benefits Ass'n v. Burrows*, 732 F. Supp. 3d 1014, 1028 (D.N.D. 2024) ("[T]he Court agrees that entities should be members of the CBA at the time of the charged conduct and cannot run for protection under CBA membership after the fact."). And more importantly (given the absence of binding precedent) Defendants' position aligns with first principles. The D.C. Circuit itself has emphasized that associational standing should be applied in a way that "prevent[s] associations from being merely law firms with

standing." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988); *Am. Legal Found. v. FCC*, 808 F.2d 84, 91 (D.C. Cir. 1987) (rejecting associational standing in part to avoid an outcome where litigation is "in the hands of concerned bystanders who will use it simply as a vehicle for the vindication of value interests" (citation omitted)); *cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("An organization cannot manufacture its own standing in that way."). That concern is not limited to the germaneness prong (as Plaintiffs assert without explanation, *see* Pls.' Opp'n & Reply at 5), and it is squarely implicated here. In fact, Plaintiffs' only named member, Anthony Nel, is now part of another voting-related case in this Court, brought by the same counsel, that relies on some of the same theories (and same facts) about Mr. Nel's alleged injury—only in that case, in his capacity as "a member of Common Cause of Texas." *See* Decl. of A. Nel ¶ 1, ECF No. 29-8, *Common Cause v. DOJ*, No. 1:26-cv-1352-SLS (D.D.C.). One wonders how many associations will recruit Mr. Nel as a member by the end of the election cycle.

Plaintiffs raise the generic (and undisputed) proposition that standing is determined as of the filing of the complaint. *See* Pls.' Opp'n & Reply at 4 (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008)). But that is fully consistent with Defendants' position: that, at the time of the complaint, LWVTX lacked Article III standing, because of its failure to identify any *member* who suffered any Article III injury. Instead, it identified only someone who had *previously* suffered an injury, and only *after* that injury became a member. This Court need not bless such gimmickry.

**B. No Plaintiff has standing to challenge bulk-upload capability.**

Previously, due to software limitations, SAVE requests had to be submitted one-by-one. Now, multiple SAVE requests can be submitted at the same time, in bulk. Plaintiffs challenge that software-based customer-service improvement and thus request an order "disabling any functionality that allows SAVE users to conduct bulk searches." Pls.' Proposed Order at 1-2, ECF No. 66-12. But until their reply brief, Plaintiffs never even attempted to establish any Article III injury from the acceptance of bulk requests, nor explained how any injury would be redressed by an order requiring SAVE to revert to a more logistically cumbersome, one-by-one submission system. *See* Defs.' Br. at 14-15. That failure was significant because "standing is not dispensed in gross; rather,

plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

Plaintiffs' first response is to accuse Defendants of "misstat[ing] evidence" on this subject, Pls.' Opp'n & Reply at 16, but they do not identify any misstatement. Instead, Plaintiffs cite generic language in the declaration of the President of LWVTX, which says that "Texas 'has run the state's entire list' through SAVE." *Id.* (emphasis omitted) (quoting LeBombard Decl. ¶ 4, ECF No. 66-7). But that is a background fact, not a legal theory supporting standing. In any event, that statement is non-responsive to Defendants' argument. The problem stands: Texas could *always* have run its voter roll through SAVE, even without bulk upload—it just would have taken longer and required more resources. And even if Plaintiffs win on every argument in this case, Texas will *still* be able to run its full voter roll through SAVE—just more slowly. In other words, "the relief that Plaintiffs request on this issue would not actually redress any harm to Plaintiffs—it would just make things harder for government employees." Defs.' Br. at 15.

Remarkably, Plaintiffs' reply confirms that this seems to be the point. Plaintiffs now openly embrace an outcome in which, by court order, States would be forced to "undertake the highly laborious task of conducting tens of millions of individualized searches to check registered voters against SAVE data 'one-by-one,'" instead of through an Excel spreadsheet with multiple rows. Pls.' Opp'n & Reply at 17 (citation omitted). Apparently, Plaintiffs' hope is that judicial invalidation of this software modernization would make SAVE sufficiently cumbersome, old-fashioned, and out-of-date with the modern expectations of computer users, such that States might give up on using it—despite the apparent absence of any better-available tool, and despite States' legal obligations to "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4); *see also id.* § 20501(b)(4).

Although the Luddites might embrace that bizarre theory of standing, Article III does not allow it. Plaintiffs suffer no concrete injury from government computer systems running efficiently instead of inefficiently; and they have no cognizable interest in whether searches of government databases require small or large amounts of human effort. After all, as Defendants already

explained, "[t]here is no tradition in American courts of litigation over whether, for example, a user of government computer systems submits requests via drop-down menu, a text box, one email submission, multiple email submissions, or (as is currently the case for SAVE) by uploading an excel spreadsheet with one or more requests at once." Defs.' Br. at 14 (citing *TransUnion*, 594 U.S. at 417). Plaintiffs cite nothing in response to that argument. Defendants thus remain unaware of any litigation, ever, over anything comparable—much less any case in which a court has ever issued relief that would intentionally degrade government computer software.

**C. All remaining Plaintiffs also lack Article III standing to challenge intra-governmental data-sharing.**

**1.** Plaintiffs' alleged privacy-related interests are too speculative and amorphous to support Article III standing.

As for Plaintiffs' alleged privacy-related harms, a significant portion of those alleged injuries may now be taken off the table. After offering extensive allegations (and lengthy declarations) about how information-sharing "causes them stress," *see* Defs.' Br. at 15-16 (quoting four of many examples), Plaintiffs do not respond to Defendants' explanation of why their "emotional anxiety" cannot support standing. *Id.* at 15-17. So that theory has seemingly been abandoned.

The remainder of Plaintiffs' alleged privacy-related injuries rely on strained analogies to three common-law torts: intrusion upon seclusion, breach of confidence, and defamation. But for the most part, Plaintiffs do not engage with Defendants' arguments about why those analogies are misplaced, *see id.* at 17-23, and thus fail to identify any sufficiently "close historical or common-law analogue for their asserted injury," as required by *TransUnion*, 594 U.S. at 424.

Instead, Plaintiffs' primary retort is that "[m]any courts in this District" have ruled against the government in the context of somewhat similar arguments. Pls.' Opp'n & Reply at 6 (citing *AFL-CIO v. Dep't of Lab.*, No. 25-339 (JDB), 2026 WL 879518, at *10 (D.D.C. Mar. 31, 2026)); *see also id.* at 7 (responding to an argument by Defendants only by asserting that "courts in this District have . . . held otherwise"). Defendants are aware of those decisions—and in fact disclosed their existence, in their opening brief, as a matter of candor to the Court. *See* Defs.' Br. at 19-20

n.8. Even so, they are not binding here. It likewise does not matter, for example, that the en banc Fourth Circuit recently "abrogated" a "Fourth Circuit panel decision on which Defendants" rely. Pls.' Opp'n & Reply at 7 n.6 (citing *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025)). In short, the original Fourth Circuit panel got it right, and the Court should still follow that reasoning—essentially, for the reasons already addressed in Defendants' briefs. Defs.' Br. at 17-23; *see also DSCC v. Trump*, No. 26-cv-1114 (CJN), --- F. Supp. 3d ----, 2026 WL 1487833, at *7 n.2 (D.D.C. May 28, 2026) ("[I]nter-agency sharing of non-sensitive personal information (such as one's name, citizenship status, and age) is not the type of 'intrusion' that a 'reasonable person' would find 'highly offensive.'").

Defendants will not repeat that reasoning again. A few points in Plaintiffs' reply, however, warrant a brief response. First, Plaintiffs cite two D.C. Circuit cases: *Pileggi v. Washington Newspaper Publishing Co., LLC*, 146 F.4th 1219, 1229 (D.C. Cir. 2025), and *Jeffries v. Volume Services America*, 928 F.3d 1059, 1064-65 (D.C. Cir. 2019). Neither helps. Although *Pileggi* found standing based on an analogy to intrusion-upon-seclusion, it did so in the context of disclosure of the plaintiff's "private video viewing history to a third party . . . without her knowledge or consent." 146 F.4th at 1228. This case alleges nothing comparable—it is hard to imagine, for example, anyone reasonably expecting their Social Security Number, or their citizenship status, to remain secret *from the government*. After all, that information came *from* the government in the first place. That is a distinction in kind, not "a question of degree." Pls.' Opp'n & Reply at 7.

Defendants already addressed *Jefferies* in their opening brief. *See* Defs.' Br. at 20-21. In short: that case does not include hardly any analysis of whether the breach-of-confidence "tort has a sufficient historical origin" to satisfy *TransUnion*. *Id.* at 20. That is unsurprising, because it predates *TransUnion*. So *Jefferies* offers no guidance in applying *TransUnion* to these facts.

Finally, as for defamation, Plaintiffs originally accused DHS of "effectively labeling them as criminals" through SAVE responses. Pls.' MSJ Br. at 16, ECF No. 66. But as explained, "a former non-citizen being described as a current non-citizen—even if mistakenly and inaccurately, after naturalization—does not" alone imply any criminal conduct at all. Defs.' Br. at 22. At most,

any (hypothetical) defamation would come (on Plaintiffs' theory) from *States*—who use information from SAVE to police their voter rolls and enforce their laws. *See id.* at 22-23 (citing SAVE agreements that make clear that "[t]he DHS-USCIS response is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right or benefit under any program administered by the User Agency" (citation omitted)).

In response, Plaintiffs insist that their theory "hinge[s] on *DHS's* misrepresentations of fact *to the states*." Pls.' Opp'n & Reply at 8. But that is non-responsive to Defendants' key point—that the only (hypothesized) misrepresentation *by Defendants* would *not* be that anyone was a criminal, only that they were not a U.S. citizen. And that sort of statement (even if mistaken) does not alone "subject [anyone] to hatred, contempt, or ridicule" within the universe of common-law defamation. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 13 (1990) (citation omitted).

**2.** Plaintiffs' alleged voting-related injuries are impermissibly speculative, and neither caused by the federal government nor redressable in this suit.

Plaintiffs' theories of voting-related injury continue to suffer from two major problems: (1) it is speculative—indeed, extremely unlikely—that any member of the Plaintiff associations will ever suffer any of the voting-related injuries that they claim to fear; and (2) even if they do suffer that sort of harm, it will be traceable to the States, not the federal government.

**a.** As for the speculative nature of Plaintiffs' voting-related injuries, this Court has already rejected theories of irreparable harm that are indistinguishable from the voting-related standing theories that Plaintiffs advance now. *See League of Women Voters*, 2025 WL 3198970. To be sure, Defendants recognize that this Court's prior opinion did not issue any holding about Article III standing. *See id.* at *5 n.6 (leaving standing questions "for another day"). Even so, for essentially the same reasons that this Court already rejected those theories in the context of irreparable harm, this Court should now reject them again in the context of Article III standing.

For example, this Court refused "to find irreparable injury because [Plaintiffs'] SSA records are *likely* inaccurate, which *might* lead DHS to return an incorrect 'non-citizen' response to a request from their home state, which *might* then cause the state to terminate their voter registration

or take other adverse actions." *Id.* at *7. But Plaintiffs now rely on exactly the same sort of "speculative chain of possibilities," *Murthy v. Missouri*, 603 U.S. 43, 70 (2024) (citation omitted), that this Court already correctly rejected earlier in the litigation.

To be sure, at that time, "Plaintiffs [had] not identified a single individual who has experienced this hypothetical injury." *League of Women Voters*, 2025 WL 3198970, at *7. Now they seem to have identified less than a handful who may have—though it remains far from clear on the current record "whether the errors occurred because the SAVE responses were inaccurate or because the initial state citizenship verification was flawed." *Id.* Regardless, those isolated examples cannot alone solve Plaintiffs' speculation problem, because "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). And it remains not just speculative, but extraordinarily unlikely that any particular individual (much less a member of one of the Plaintiff organizations) will ever face the sort of problems Plaintiffs' are concerned about here.

Indeed, now that approximately 60 million voter verifications have been performed through SAVE, Decl. of B. Broderick ¶ 22, ECF No. 77-2 ("Broderick Decl."), finding a small handful of mistakes—some of which may be entirely attributable to the States—suggests that the system is working well. Plaintiffs cite articles from *Mother Jones* and *the Texas Tribune* that take the opposite view, *see* Pls.' Opp'n & Reply at 11, but even those articles (if accurate) suggest that the likelihood that any individual is flagged as a possible noncitizen is roughly *one in 10,000, see id.* (citing *Texas Tribune* article, which says: "At least seven states with a total of about 35 million registered voters have publicly reported the results of running their voter rolls through the system. Those searches have identified roughly 4,200 people—about 0.01% of registered voters—as noncitizens." Jen Fifield & Zach Despart, The Texas Tribune (Feb. 13, 2026)). Some substantial portion of those individuals, of course, surely *are* noncitizens. And whatever subset *has* been mistakenly categorized—whether due to an error by SAVE, an error by a State, or both—the odds that one of *those* individuals is *also* a member of any Plaintiff association is exponentially smaller still. These layers of speculation upon speculation are fatal to Plaintiffs' standing.

**b.** Plaintiffs next respond by accusing Defendants of "whitewashing" the record, insisting that the few Texans at issue "did not merely have to correct their records or shuffle paperwork." Pls.' Opp'n & Reply at 9. But, respectfully, that is exactly what Plaintiffs' own declarations show: that Texas *did* provide opportunities to correct or confirm citizenship status in Texas's records. *See* Decl. of A. Nel ¶ 13, ECF No. 66-3; Decl. of A. Doe ¶ 14, ECF No. 66-4; Decl. of B. Doe ¶ 27, ECF No. 66-5; Decl. of C. Doe ¶ 18, ECF No. 66-6. Indeed, several of them successfully confirmed their citizenship, and thus remained registered. *See id*. Mr. Nel could have too, but he refused to send proof of citizenship "by email, mail, or fax" due to unspecified "data security and privacy risks." Decl. of A. Nel ¶ 23. Mr. Nel says he was "only comfortable providing this documentation in person," *id.*—though he offers no explanation of why he has apparently still not pursued that option. Ultimately, nobody likes submitting government paperwork. But that is a far cry from disenfranchisement. The Court should not conflate (as Plaintiffs do) routine verification efforts (handled by state and local government bureaucracy, not the federal government) with any kind of "voter purge," Pls.' Opp'n & Reply at 10—much less a "voter purge" *by Defendants*.

To be clear, Defendants do not mean to minimize the potential burdens that may be faced, in rare cases, if eligible voters are mistakenly flagged as ineligible, and end up having to submit paperwork confirming their eligibility. But no system is perfect. And *some* system is required by federal law. *See, e.g.*, 52 U.S.C. §§ 21083(a)(4), 20501(b)(4).

Ultimately, if Plaintiffs are unhappy with the processes offered by the States—*i.e.*, if they think that the deadlines were too short, or the paperwork required was too inconvenient, or was too burdensome to submit in time—none of those processes is designed or controlled by the federal government. Plaintiffs are simply mistaken to say that Defendants "designed and instructed" any State to "subject[]" anyone "to a 30-day countdown to a voter purge." Pls.' Opp'n & Reply at 9-10. Instead, the standard SAVE agreement says essentially the opposite: that a SAVE response "is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right or benefit under any program administered by the User

Agency." USCIS, *Mem. of Agreement Between DHS, USCIS & Ind. Sec'y of State re: Participation in SAVE for Voter Registration & Voter List Maint. Purposes*, at 9 (July 8, 2025), https://perma.cc/A6LC-9CLQ. Instead, it is the SAVE user who always retains "responsibility to determine the registrant's or registered voter's eligibility for the benefit." *Id.* The agreement likewise specifically requires procedures for "additional verification" for any "voter that does not verify as a U.S. citizen on initial verification," provision of "notice and hearing or other due process available under State or other applicable law" before "any removal from a voter roll," and acknowledges all parties' obligations to comply with other federal and State laws. *See id.* at 4, 6.

Plaintiffs continue to stress that, in rare cases, SAVE may not be able to provide a conclusive response, even after consulting SSA records. But as for what happens next, Plaintiffs continue to make important mistakes and flawed assumptions. For example, Plaintiffs say (citing nothing in the record) that "[u]nder DHS's process, if SAVE cannot verify an individual's U.S. citizenship, then a SAVE user can deny or cancel the individual's voter registration if they fail to provide" proof of citizenship. Pls.' Opp'n & Reply at 14. But there is no "DHS process" that governs the cancellation of voter registrations by State officials. And to the extent Plaintiffs presume the worst about State officials—contrary to the presumption of regularity, *Nieves v. Bartlett*, 587 U.S. 391, 400 (2019)—the Court already addressed this precise issue. Then, as now, "nothing in the current record supports the Plaintiffs' assertion that in lieu of additional verification, a state would remove individuals from voter rolls, deny registration, or pursue criminal investigation based on an inconclusive SAVE response alone." *League of Women Voters*, 2025 WL 3198970, at *7. To the contrary, the standard SAVE agreement warns States *not* to use inconclusive SAVE responses, standing alone, to deny benefits. *See* Mem. of Agreement, *supra*, at 5 ("User Agency cannot deny a benefit based on a SAVE response where additional action is required of the User Agency by SAVE or additional verification is requested by the applicant but has not been completed").

Finally, on causation, Plaintiffs respond that "Texas could not take these actions independently of Defendants." Pls.' Opp'n & Reply at 16 (citation omitted). That is incorrect. Subject to whatever constraints are imposed by other provisions of state and federal law, Texas absolutely

*could* have, for example, sent letters to some subset of its registered voters seeking verification of voter eligibility, without any involvement from the federal government. In other words, SAVE alone is neither necessary nor sufficient for Texas to engage in whatever processes it uses, under State law, to carry out its legal obligations to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4). Indeed, by using SAVE, states like Texas are presumably *more* likely to make correct decisions about voter eligibility than they would without SAVE, given the undisputed absence of any superior database.

**3.** Plaintiffs' diversion-of-resources theory of organizational standing is inconsistent with recent Supreme Court precedent.

Defendants' opening brief explained that Plaintiffs' diversion-of-resources theory of standing—which explicitly relies on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)—is inconsistent with *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024); *see* Defs.' Br. at 29-30. Although in *Alliance* the Supreme Court did not formally overrule *Havens*, it did make clear that "*Havens* was an unusual case" and emphasized that courts should be "careful not to extend the *Havens* holding beyond its context." 602 U.S. at 396.

Plaintiffs fail to heed that lesson. They continue to emphasize the "resources they have expended" in response to the changes to SAVE. Pls.' Opp'n & Reply at 2. But *Alliance* explicitly rejected the argument that "standing exists when an organization diverts its resources in response to a defendant's actions," and corrected the notion (that had grown common in the lower courts) that "*Havens* does not support such an expansive theory of standing." 602 U.S. at 395. And Plaintiffs' repeated references to an alleged "impair[ment]" of their "mission-critical functions," Pls.' Opp'n & Reply at 2, are likewise hard to square with *Alliance* itself. After all, in that case, "the medical associations" also alleged that "FDA ha[d] 'impaired' their 'ability to provide services and achieve their organizational missions.'" *Alliance*, 602 U.S. at 394. That wasn't enough.

Plaintiffs respond that they have cited a few "cases post-dating" *Alliance*, Pls.' Opp'n & Reply at 2, but most are about direct effects on actual voting rights, *see, e.g.*, *RNC v. North Carolina State Board of Elections*, 120 F.4th 390, 395 (4th Cir. 2024),[1] or district-court decisions that make the same mistake as their briefs do, *see, e.g.*, *Virginia Coalition for Immigrant Rights v. Beals*, 803 F. Supp. 3d 454, 465 (E.D. Va. 2025) (mistakenly relying on *Havens*, after *Alliance*, to find standing on the theory that Plaintiffs made "a choice to expend resources in response to threats to the organization's core mission"), *appeal filed*, No. 25-2108 (4th Cir. Sept. 17, 2025). Other courts, however, have recognized that this sort of "diversion of resources" theory "'does not work'" after *Alliance*. *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026); *see also DSCC*, 2026 WL 1487833, at *8 (rejecting *Havens*-based standing in a challenge to an Executive Order because "the Order itself has not imposed any impediment to [plaintiffs'] voter registration and education operations," even if "Plaintiffs have expended and diverted resources in response" to the Order). This Court should follow that authority.

The only post-*Alliance* D.C. Circuit authority that Plaintiffs cite is fully consistent with Defendants' view. For example, Plaintiffs note that *Center for Biological Diversity v. Department of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) ("*CBD*"), quotes *Havens*. The problem for Plaintiffs is that it does so for a proposition that directly *undermines* their theory of standing. In that case, the D.C. Circuit *rejected* an organization's alleged need to "work harder to gather information and expend additional resources to lobby the federal government, file rulemaking petitions, request improved policies, and in other ways urge the government to better protect endangered and threatened species and habitats." *CBD*, 144 F.4th at 315. In rejecting that theory of standing, the D.C. Circuit emphasized that its "conclusion [was] bolstered by the Supreme Court's recent decision in" *Alliance*. *Id.* In *Alliance*, as explained by the D.C. Circuit, the Supreme Court "described *Havens Realty*—the foundation of our organizational injury precedents—as an 'unusual case' and

[1] The Fourth Circuit's opinion in *RNC* (cited by Plaintiffs at pages 20-21 of their opening brief) does not even meaningfully discuss standing. Chief Judge Diaz's concurring opinion, however, goes on at some length to advocate for "an appropriately stricter view of organizational standing" after *Alliance*. *See RNC*, 120 F.4th at 410 (Diaz, C.J., concurring).

cautioned against extending it beyond circumstances in which the challenged action 'directly affected and interfered with [a plaintiff's] core business activities.'" *Id.* (quoting *Alliance*, 602 U.S. at 395-96). Ultimately, what matters is that there is no such "direct[] affect" in this case—the Plaintiff organizations remain entirely free to register voters, educate voters, or assist voters in any way they want. Improving SAVE does not "directly affect[]" or "interfere[]" with any of that. *Id.*

Plaintiffs' second D.C. Circuit case, *Independent Market Monitor for PJM v. FERC*, 162 F.4th 1167, 1172 (D.C. Cir. 2025), is even more helpful to the government. There, the plaintiff—just like Plaintiffs here—tried an analogy to the facts to *Havens* itself, which (in a sense) was also about inaccurate information (in *Havens*, racist lies to prospective black tenants about apartment availability). But as the D.C. Circuit explained: "*Havens Realty*, however, found informational injury under a statute that explicitly created a right to information." *Id.* That was not the case in *Independent Market Monitor*, and it is not the case here. Unlike in *Havens*, none of the Plaintiff organizations here is requesting or receiving any information (accurate or inaccurate) from Defendants, and certainly not "under a statute that . . . explicitly create[s] a right to information." *Id.* at 1172. The D.C. Circuit also specifically warned against "extending *Havens Realty* to . . . cases" that make vague reference to "informational harm" in the absence of a "legal right" to the information at issue. *Id.* at 1173. Again, that caution squarely applies here.

**4.** <u>EPIC's alleged procedural and informational injuries cannot independently support Article III standing.</u>

EPIC's allegations of procedural injury add nothing, because "the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient' to confer Article III standing." *Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1314 (D.C. Cir. 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). As Plaintiffs seem to agree, *see* Pls.' Opp'n & Reply at 21, the ultimate question on procedural harm, then, just tees up the same standing issues addressed above. Because EPIC has not shown a concrete and particularized injury, they also cannot rely on any procedural harm.

As for informational injury, Plaintiffs cannot overcome the significant D.C. Circuit precedent that EPIC itself has generated on this subject. *See EPIC v. Dep't of Com.*, 928 F.3d 95 (D.C. Cir. 2019) ("*EPIC II*"); *EPIC v. PACEI*, 878 F.3d 371 (D.C. Cir. 2017). Plaintiffs are correct that those cases addressed claims brought under the E-Government Act, not the Privacy Act, *see* Pls.' Opp'n & Reply at 18—as Defendants fully acknowledged in their first brief, Defs.' Br. at 31. But as Plaintiffs also seem to recognize, the key question is whether the D.C. Circuit's treatment of the E-Government Act offers "an apt analog for the Privacy Act." Pls.' Opp'n & Reply at 18. And it does: just like the E-Government Act, the Privacy Act "was not designed to vest a general right to information in the public." *EPIC II*, 928 F.3d at 103. Just like the E-Government Act, the Privacy Act (as its title suggests) "was designed to protect individual privacy by focusing agency analysis and improving internal agency decision-making." *Id.* And just like the E-Government Act, the Privacy Act "is fundamentally different from statutes like the Freedom of Information Act (FOIA) where the harm Congress sought to prevent was a lack of information itself." *Id.* In short, the Privacy Act and the E-Government Act are each "directed at individual *privacy*, which is not at stake for EPIC" in the relevant sense—per binding precedent. *EPIC*, 878 F.3d at 378.

Plaintiffs assert in conclusory fashion that "Congress intended for the Privacy Act to vest the public with a right to information and that public transparency was necessary for the Privacy Act to accomplish the legislature's goals." Pls.' Opp'n & Reply at 19. Of course, at that level of generality, the same thing could be said for the E-Government Act, which requires the publication of Privacy Impact Assessments. *See* 44 U.S.C. § 3501 (note). Much the same could even be said about the APA itself, which requires publication of rulemaking documents that provide information in the name of "public transparency." Pls.' Opp'n & Reply at 19. But those sorts of generic notions of the value of information and transparency are insufficient under binding precedent.

Separately, even if Plaintiffs could overcome that precedent, Defendants also explained that EPIC has *already* obtained all material information on the topics it claims to be interested in. Indeed, Plaintiffs explicitly conceded as much at the preliminary-injunction hearing. *See* Defs.'

Br. at 32 (quoting Oct. 28, 2025 Hr'g Tr. at 76:4-6, ECF No. 48 (Mr. Sus: "If they do publish SORNs, that would, we agree, address our informational injuries both for DHS and SSA.")).

Even if there were some small delta between the information EPIC wants and the information that it already has (and even ignoring counsel's straightforward concession), that would only support standing if EPIC could show that the gap caused a concrete injury. In their first brief, Plaintiffs did not even try. Now, EPIC claims that it has "no information on the estimated savings of the program, the approximate number of records, the start and completion dates of the program, procedures governing use and return of records by recipient agencies, or information on accuracy assessments." Pls.' Opp'n & Reply at 20. But in fact, much of that information *is* already public. *See, e.g.*, DHS-AR-221-43 (Privacy Impact Assessment); DHS-AR-114-21 (SORN); DHS-AR-420-31 (DHS-SSA Agreement); DHS-AR-495-504 (SAVE template agreement). Regardless, "[a]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 594 U.S. at 442. Plaintiffs still fail to identify any such "adverse effects" here. *Id.*

## II. Plaintiffs' Privacy Act Notice-and-Comment Claim (Count 5) is Moot.

Count 5 is either moot (if understood correctly) or meritless (if understood as Plaintiffs now try to rehabilitate it to avoid a mootness dismissal).

**a.** Count 5 alleges that, "[i]n overhauling the SAVE system in May 2025, DHS and SSA significantly modified their use and disclosure of information in the SAVE and NUMIDENT systems of records without first publishing modified SORNs and soliciting public comment." Am. Compl. ¶ 231, ECF No. 61. As Defendants explained, this claim is now moot. In short, "[w]hether or not the Privacy Act applies here at all, *but see* 8 U.S.C. § 1373(a), and whether or not the prior SORNs permitted the sharing of this information, DHS and SSA have now published the SORNs and solicited the comments that Plaintiffs alleged were required by the Privacy Act." Defs.' Br. at 34. That moots the claim, as Judge Kollar-Kotelly recently recognized in dismissing a materially indistinguishable claim. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 114 (D.D.C. 2026) ("*LULAC*") ("Now that the agencies have published new SORNs describing routine uses that cover the challenged data-sharing practices and those new

routine uses have gone into effect, . . . [plaintiffs'] claim for injunctive relief against the relevant changes to SAVE and Numident based on the Privacy Act is moot."). So Count 5 is moot.[2]

**b.** Plaintiffs' only response is to reimagine this claim as something else. Now, quoting only their own brief (not the complaint), they assert that Count 5 alleges "that Defendants violated 5 U.S.C. § 552a(e)(11) 'by predetermining they would not consider public comments on the Modified SORNs' and then failing, in fact, to consider those comments." Pls.' Opp'n & Reply at 40 (quoting Pls.' MSJ Br. at 39-40). Defendants are hard pressed to divine that theory from the actual allegations in the complaint. *See* Am. Compl. ¶¶ 228-35. And that exact theory *does* appear elsewhere, as part of an arbitrary-and-capricious claim, *see id.* ¶ 238(b) (alleging that Defendants "failed to consider relevant comments on the 2025 SAVE SORN")—which Defendants addressed in their opening brief, *see* Defs.' Br. at 55-56, and address again below, *see infra* at 31-32.

In any event, no matter how many times it reappears, this theory remains meritless, on both the facts and the law. For one thing, Plaintiffs materially mischaracterize the government's position when they say that "Defendants wrongly assert that the Privacy Act only requires them to '*solicit*[] comments for 30 days' without actually considering any comments received or delaying any new routine uses pending consideration of comments." Pls.' Opp'n & Reply at 40 (quoting Defs.' Br. at 34). Defendants' brief "assert[ed]" no such thing—which is why quotation marks only appear around the first half of that sentence. *Id.*

Regardless, this is all beside the point, because "[b]oth agencies have certified that those materials *were* considered by the agency, *see* ECF Nos. 64, 65, and those signed certifications are 'entitled to a presumption of regularity,' *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 577

---

[2] Plaintiffs are correct that, despite that mootness holding, Judge Kollar-Kotelly ultimately issued what effectively amounts to an obey-the-law declaratory judgment, declaring that certain defendants in that case must "must strictly adhere to the mandates of the Privacy Act." *LULAC*, No. 1:25-cv-00946-CKK, ECF No. 256 (Mar. 31, 2026) (Final Judgment) ¶¶ 4, 5. Setting aside the question of whether a court can or should issue an order merely requiring a defendant to the follow the law (a question more appropriately addressed in the *LULAC* appeal, which is ongoing), *see Cobell v. Norton*, 392 F.3d 461, 475 (D.C. Cir. 2004) (reversing "an order to obey the law"), Plaintiffs do not request any sort of obey-the-law order here. So that wrinkle is irrelevant.

(2025)).” Defs.’ Br. at 56. That is dispositive. Plaintiffs try to rewrite the documents to fit a more nefarious narrative, saying that DHS and SSA “preemptively declar[ed] in both Modified SORNs that new routine uses would automatically take effect after 30 days, notwithstanding any public comments.” Pls.’ Opp’n & Reply at 40 (citing DHS-AR-115 and SSA-AR-207). But the Court can read those documents and see that neither SORN says anything like that.

To be sure, it is true that a new or modified routine use *presumptively* takes effect after 30 days—that is, assuming the agency in question does not decide to make a change in response to comments (which may happen either before or after the 30-day period has run). But that reflects normal operation of this statutory scheme, routine agency practice, and the text of the statute itself. *See* 5 U.S.C. § 552a(e)(11). The use of a 30-day effective date is not novel—it appears in the text of the statute and is routinely invoked (using essentially identical language as was used here) by agencies across the Executive Branch, across administrations. *See, e.g.*, 89 Fed. Reg. 95,894 (Dec. 3, 2024) (SSA: new routine use “is effective January 2, 2025”); 80 Fed. Reg. 74,781 (Nov. 20, 2015) (USCIS: new routine use “will be effective December 30, 2015”). And in the absence of some *evidence* for Plaintiffs’ bold assertion that DHS and SSA preemptively decided to ignore all comments—notwithstanding sworn certifications to the contrary—this theory must fail. That is even more obvious now, at the summary-judgment stage, when Plaintiffs must point to actual evidence, rather than their own allegations in the complaint. *But see* Pls.’ Opp’n & Reply at 39 (Plaintiffs citing only their earlier brief and the allegations in the complaint); *id.* at 45 (brief only).

## III. PLAINTIFFS DO NOT CHALLENGE ANY DISCRETE AND FINAL AGENCY ACTION.

The D.C. Circuit recently held that an information-sharing agreement between federal agencies is not final agency action, at least when that agreement merely implements preexisting statutory authorities. *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026) (“*CTU*”). Just like the agreement at issue in *CTU*, the agreement at issue here “merely outlines the process through which” two government agencies share information. *Id.* at 1236. It is thus a “a nonbinding, nonfinal policy statement,” which “was not the product of notice-and-comment rulemaking,” which the agencies have “never characterized . . . as a ‘rule,’” and which no “party

has argued" that either agency "relies on the [agreement] to justify its actions." *Id.* Accordingly, that agreement "is not reviewable under the APA." *Id.*

Plaintiffs' response to the government's argument—which was based almost entirely on a 2026 decision of the D.C. Circuit in the context of information-sharing agreements between agencies—is to cite a *2008* decision of the D.C. Circuit (about something else), and then accuse Defendants of "fail[ing] to engage" with Plaintiffs' 20-year-old decision (which appeared in Plaintiffs' brief once, as a "see also"). *Compare* Pls.' MSJ Br. at 46 ("see also" citation), *with* Pls.' Opp'n & Reply at 21 (saying that *Venetian Casino* "controls this case"). That approach is telling.

In any event, on the substance, Plaintiffs respond that "the specific terms of the agreement" at issue in *CTU* "are distinguishable." Pls.' Opp'n & Reply at 23. Why? In Plaintiffs' view, because that agreement "laid out how a process 'established by statute' would be carried out," while this agreement "goes well beyond any statutory requirement." *Id.* (quoting *CTU*, 167 F.4th at 1236). But that is a merits argument, not a final-agency-action argument—and one that the plaintiffs in *CTU* made too. *See* 167 F.4th at 1231-35. The D.C. Circuit rejected it. *Id.* at 1236.

Plaintiffs also assert that "in *CTU* the relevant agreement was not legally required for the agencies to take the challenged action," and instead "'merely outlined the process through which' information-sharing can occur." Pls.' Opp'n & Reply at 23 (quoting *CTU*, 167 F.4th 1236). But that is equally true here: it is not correct that "the DHS-SSA SAVE Agreement was a necessary precondition for Defendants' cross-agency data sharing." *Id.* Plaintiffs' cited pages say no such thing—instead, like in *CTU*, they acknowledge that the agencies are bound by pre-existing statutory requirements. *See* DHS-AR-422 ("DHS thus has requested that SSA comply, to the maximum extent possible and permissible under law, with § 1373(a), taking into account federal statutory requirements, as well as other laws, rules, regulations, policies, and requirements regarding verification, information sharing, and confidentiality."). Ultimately, if there is any tension between *Venetian Casino* (from 2008, about disclosures to the public) and *CTU* (from 2026, about information-sharing agreements between government agencies), this Court should follow *CTU*—as Chief Judge Boasberg did recently. *See Robert F. Kennedy Hum. Rts. v. Dep't of State*, No. 25-

cv-1774 (JEB), 2026 WL 820811, at *18 (D.D.C. Mar. 25, 2026) (finding *CTU* "particularly instructive" because "[w]hatever the Agreement set in motion, the consequences Plaintiffs identify flow from agencies' subsequent exercise of statutory authority" rather than the agreement itself).

Plaintiffs continue to argue half-heartedly that the draft SORN publications are also final agency action challenged in this suit—though they notably do not dispute Defendants' observation that (to use Plaintiffs' words) "rescinding the modified SORNs would increase the harm to Plaintiffs," rather than remedy a harm. Pls.' Opp'n & Reply at 23-24. In any event, Defendants' primary argument was that a draft SORN modification "explicitly contemplates 30 days of comments and future agency consideration of those comments before any change may take effect." Defs.' Br. at 38. Plaintiffs' only response is to baselessly assert, yet again, that "the 'proposed' modifications were, in fact, predetermined and final from the outset." Pls.' Opp'n & Reply at 24. They continue to have no support for that remarkable theory of bad-faith government action, other than citations to their own filings. *See id.*; *supra* at 17-18; *infra* at 31-32 (responding to similar points).

## IV. PLAINTIFFS CANNOT BRING APA CLAIMS PREDICATED ON PRIVACY ACT VIOLATIONS.

As explained in detail in Defendants' opening brief (at 39-44), the Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information. *FAA v. Cooper*, 566 U.S. 284, 287 (2012). Congress also specified a detailed set of civil remedies that are (and are not) available for violations of the statute. For example, the statute makes relief available to individuals (but not organizations) in 5 U.S.C. § 552a(g)(1)(D). It provides for money damages in four (and only four) specific instances. *See id.* § 552a(g)(1)-(4). And it allows for injunctive relief in two (and only two) circumstances. *See id.* § 552a(g)(1)(A), (g)(2)(A); 552a(g)(1)(B), (g)(3)(A); *accord Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007).

The logic of Plaintiffs' position suggests that this was all a huge waste of time—because the detailed remedial limitations that Congress wrote into the statute are meaningless. Instead, in Plaintiffs' view, *any* litigant (whether an individual or an organization) can get an injunction for

*any* violation of the Privacy Act, at any time: the Court can simply "grant relief under the APA for agency action that violates the Privacy Act." Pls.' Opp'n & Reply at 34. Plaintiffs are wrong.

Plaintiffs first assert that Defendants "cite no authority" for the proposition that, "where an agency action is subject to review in some manner under a separate statutory review scheme . . . that action must be reviewed within the confines of that scheme." *Id.* (quoting Defs.' Br. at 39). But the very next paragraph of the government's brief cited four cases for this proposition, including one from the Supreme Court. In short, "when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). Such is the case here: "[w]here, as here, [a] statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell Assocs. v. NIH*, 579 F.2d 1155, 1161-62 (9th Cir. 1978)).

Indeed, until 2025, this proposition—in this precise context—was largely taken for granted in this District, where courts have long recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also* Defs.' Br. at 41 (citing six other cases). Plaintiffs respond, correctly, that starting in 2025, "courts in this District have repeatedly held that APA review of Privacy Act violations *is* available in these and similar circumstances." Pls.' Opp'n & Reply at 34 (citing *LULAC*, 818 F. Supp. 3d at 111-13 (SAVE); *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 81 (D.D.C. 2025) (DOGE data access). Again, Defendants are aware of those (non-binding) decisions and proactively disclosed them in their opening brief. *See* Defs.' Br. at 19-20 n.8 & 42 n.10. Respectfully, those decisions are mistaken for the reasons explained here and in other more persuasive authority that comes out the other way. *See Bessent*, 152 F.4th at 175 ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here."), *abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026) (en banc); *Cell Assocs.*, 579

F.2d at 1159-60 ("We think it unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board.").

Defendants also explained why Plaintiffs' position creates "paradoxes and conundrums that make orderly judicial review all but impossible." Defs.' Br. at 42. For example, at the end of an APA rulemaking, the agency "must consider and respond to significant comments received during the period for public comment," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. § 553(c)), usually by publishing a "Final Rule" in the Federal Register. But the Privacy Act contains no such requirement, which is why "agencies typically do not provide such an explanation, and did not provide one here." Defs.' Br. at 43. But that didn't stop Plaintiffs from alleging that the agencies' "non-existent and not-required explanation was insufficient." *Id.* Plaintiffs do not dispute that, under their interpretation, "virtually *every* SORN publication (and OMB guidance since 1975, *see* 81 Fed. Reg. at 94,424) is unlawful under the APA." Defs.' Br at 43. And despite Defendants' explicit invitation, Plaintiffs have still "cited no case (and no example)" of an instance in which an agency was required to publish an APA-style explanation responding to comments submitted during the SORN modification process. *Id.* To Defendants' knowledge, this case would be the first. That is a powerful indication that Plaintiffs' understanding of how the Privacy Act interacts with the APA cannot be right.

Plaintiffs next resort to bankshot inferences from "[s]ubsequent legislative history," Pls.' Opp'n & Reply at 35,[3] despite Supreme Court and D.C. Circuit warnings to the contrary. *See, e.g.*, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001)

[3] On that "subsequent legislative history," it is not clear that Plaintiffs have correctly interpreted the Judicial Redress Act of 2015. Pls.' Opp'n & Reply at 36. Plaintiffs interpret that statute as having explicitly precluded *all* non-Privacy Act remedies for a certain category of individuals. *See id.* But the language they cite could also be read to foreclose only other remedies "under this section" of that statute—thus teeing up the same questions as here about the availability (or not) of APA review, or review under other statutory schemes. *Id.* (quoting Pub. L. No. 114-126, 130 Stat. 282, 283, 284, 5 U.S.C. § 552a 2(b)). Ultimately, the United States need not (and does not) take a position here on the scope of that otherwise-irrelevant statute.

("Because subsequent history is less illuminating than the contemporaneous evidence, respondents face a difficult task in overcoming the plain text[.]") (citation modified); *Verizon v. FCC*, 740 F.3d 623, 639 (D.C. Cir. 2014) ("[S]ubsequent legislative history, however, provides an unreliable guide to legislative intent.") (citation modified). They also try a series of naked policy arguments, but those, too, cannot overcome Congress's decisions in the text of the statute itself.

For example, Plaintiffs list some of the relief they are requesting in this case and suggest that injunctive relief under the APA must be available because "[n]one of these remedies are available to plaintiffs under the Privacy Act." Pls.' Opp'n & Reply at 36. But that is exactly the point. Plaintiffs are seeking judicial remedies for alleged violations of the Privacy Act, even though—in their own words—"[n]one of these remedies are available to plaintiffs under the Privacy Act." *Id.* That is confirmation that their interpretation of the statute is *wrong*, not right.

Similarly, Plaintiffs say that "Defendants concede that the Privacy Act offers *no* relief by its own terms to organizations." *Id.* Again, that is not some damaging "concession" by Defendants—it is a meritorious argument for dismissal of Plaintiffs' Privacy Act claims. Indeed, that sentence is a meaningful concession *by Plaintiffs*. After all, Plaintiffs are organizations seeking relief for alleged violations of the Privacy Act, even though all parties now agree—again, to use Plaintiffs' own words—that "the Privacy Act offers *no* relief by its own terms to organizations." *Id.* In a Privacy Act case brought by organizations, that has to matter. But on Plaintiffs' interpretation, Congress's choice was meaningless.

Finally, Plaintiffs insist that, "[i]f Plaintiffs were relegated to the Privacy Act's limited set of remedies, [their] members would face ongoing burdens on their right to vote, including potentially outright disenfranchisement, which cannot be redressed by damages." Pls.' Opp'n & Reply at 37. That is both incorrect and irrelevant. It is incorrect because anything close to "outright disenfranchisement" is almost surely going to be subject to judicial review for other reasons, under other statutes, and other legal theories (perhaps even the Constitution itself)—regardless of the scope of relief available under the Privacy Act. And it is irrelevant because there is no elections exception to the remedial provisions of the Privacy Act. Congress did not painstakingly specify

the remedies that are (and are not) available under the Privacy Act, just so courts could ignore them in all cases about elections, or any other category of cases that Plaintiffs think is important.

In short, "[w]ere [Plaintiffs] correct in [their] contention that injunctive relief is available for violation of any of the Act's provisions, the detailed remedial scheme adopted by Congress would make little sense." *Cell Assocs.*, 579 F.2d at 1159-60. Plaintiffs' APA claims predicated on alleged violations of the Privacy Act should thus be dismissed for lack of a cause of action.

## V. ALL OF PLAINTIFFS' CLAIMS LACK MERIT.

Because all of Plaintiffs' claims fail for non-merits reasons, the Court need not (and should not) reach the merits at all. If the Court does reach the merits, however, they are easy. In short, DHS is legally obligated—not just authorized—to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). And that response may not be "prohibit[ed], or in any way restrict[ed]" by "any other provision of Federal, State, or local law." *Id.* § 1373(a). Those two sentences largely dispose of Plaintiffs' merits arguments here—notwithstanding their scattered references to the major-questions doctrine, the nondelegation doctrine, and a variety of other more technical Privacy Act quibbles. The recent changes to SAVE—which have now been in effect for more than a year—are lawful.

### A. SAVE is authorized by statute (Count 1).

**1.** SAVE is authorized by the combination of at least three statutory provisions. First, in in the Immigration Reform and Control Act of 1986, Congress provided that DHS "shall implement a system for the verification of immigration status." Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391; 42 U.S.C. § 1320b-7 (note). Second, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009, 3009-546, Congress placed an affirmative "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law,

by providing the requested verification or status information." 8 U.S.C. § 1373(c). Third, also in 1996, Congress separately provided that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* § 1373(b) (similar). In combination, those provisions are more than enough to justify SAVE—both in its original form, and after the 2025 improvements challenged here.

**2.** In response, Plaintiffs' reply starts by devoting several pages of argument to the position that the Immigration Reform and Control Act of 1986, standing alone, does not provide authority for the current version of SAVE. *See* Pls.' Opp'n & Reply at 25-26. Plaintiffs rely on complicated inferences from various cross-references in the 1986 statute to argue that "SAVE was never meant to be used on U.S. citizens." *Id.* at 25. Plaintiffs are wrong about that, *see* Defs.' Br. at 45-46, but even if they were right, that would at most be an argument that worked between 1986 and 1996. That is because, in 1996, Congress made it crystal clear that DHS not only can, but *must* provide verification of the "citizenship *or* immigration status of *any* individual" in response to a proper request. 8 U.S.C. § 1373(c) (emphases added). Obviously, *that* language covers U.S. citizens, and Plaintiffs don't argue otherwise. So the Court need not spend its time asking whether the 2025 changes to SAVE could have been made before 1996. *See* Pls.' Opp'n & Reply at 25-26.

When Plaintiffs eventually get around to addressing the 1996 legislation (codified at 8 U.S.C. § 1373), they argue—citing only their own brief—that "§ 1373(c) at most authorizes *DHS* to respond to governmental inquiries to verify individuals' 'citizenship or immigration status' by 'providing the requested verification or status information' from *DHS's own records*." Pls.' Opp'n & Reply at 27 (partially quoting 8 U.S.C. § 1373(c), and partially adding their own language). Of course, if Congress had said that—*i.e.*, that responses under § 1373(c) must be limited to "DHS's own records"—then this case would be very different. But Congress said nothing of the sort. And "'[i]t is a fundamental principle of statutory interpretation that absent provision[s] cannot be supplied by the courts.' This principle applies not only to adding terms not found in the statute, but

also to imposing limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (alteration in original) (quoting *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019)).

Plaintiffs next argue that "Defendants concede that § 1373(c) lacks specific statutory language authorizing information-sharing across agencies." Pls.' Opp'n & Reply at 27. Perhaps, but that is not a very useful insight—because it is a different subsection that separately confirms that information-sharing across agencies cannot be "prohibit[ed], or in any way restrict[ed]," by "any other provision of Federal, State, or local law." 8 U.S.C. § 1373(a). That language is straightforwardly fatal to Plaintiffs' repeated efforts to rely on "other provision[s] of Federal, State, or local law" to prevent intra-governmental information sharing in this context. *Id.*

For example, notwithstanding the plain text of 8 U.S.C. § 1373, Plaintiffs continue to cite "the Privacy Act" and "other laws" that it interprets as creating "a web of restrictions on inter-agency data sharing" without any "carveouts for § 1373 or SAVE." Pls.' Opp'n & Reply at 27. But that gets the analysis backwards—§ 1373(a) *is* the carveout, which makes clear that SSA could not have, for example, refused to share information with DHS by invoking the Privacy Act, or "other provision[s] of Federal . . . law." In any event, even if the Privacy Act applies here, that does not mean that the recent changes to SAVE exceed DHS's statutory authority—it would mean, at most, that Plaintiffs might have a viable Privacy Act challenge to any unlawful disclosures. Indeed, they bring those very claims, in this very case. If the Privacy Act meaningfully constrains the sharing of this information, then Plaintiffs might conceivably prevail on some of those Privacy Act claims. But none of that adds anything to Plaintiffs' statutory-authority claim.

**3.** Eventually, unable to prevail under the plain text of the statute, Plaintiffs try a variety of extra-textual strategies to move the goalposts. First, Plaintiffs seek application of a novel and gerrymandered "clear statement" rule, that would conveniently apply to any "efforts to nationalize voter list maintenance through a new mass 'voter verification' system," given what Plaintiffs describe as "the major separation-of-powers and federalism implications" of those efforts. Pls.'

Opp'n & Reply at 28. Of course, there are only "major separation-of-powers and federalism implications" if the Court accepts Plaintiffs' dubious constitutional theories. *But see* Defs.' Br. at 53-54; *infra* at 29-31. Regardless, this argument is just another way of saying that the Court should depart from the best reading of the statute and instead read it in Plaintiffs' favor because of Plaintiffs' policy objections to the challenged agency actions. Plaintiffs cite no case that has ever applied a similar clear-statement rule in any remotely similar context. The Court should thus stick to the text of the statute. "The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton County*, 590 U.S. 644, 673-74 (2020).

Next, Plaintiffs largely sound the retreat on the major-questions doctrine, despite spending multiple pages on that subject in their opening brief. *See* Pls.' MSJ Br. at 30-32. In response to the inconvenient fact that this case bears no resemblance to any prior major-questions case, Plaintiffs assert that "[t]he lack of a direct factual analogue" in prior cases "only confirms the unprecedented nature of Defendants' actions." Pls.' Opp'n & Reply at 30. But what, exactly, is unprecedented? SAVE was used for voter-verification purposes during the George W. Bush Administration, the Obama Administration, the first Trump Administration, and the Biden Administration. *See* Broderick Decl. ¶ 20. And although the current version of SAVE integrates more fully with data held by other government agencies, and now allows submission of bulk requests, those sorts of customer-service improvements do not represent any "gargantuan," Pls.' Opp'n & Reply at 30, exercise of agency authority that raises any major question.

Finally, Plaintiffs almost completely surrender on the nondelegation doctrine, disparaging Defendants' arguments as an "irrelevant recitation of non-delegation principles." *Id.* at 29. That is an odd charge, as Defendants *agree* that the nondelegation doctrine *should* be irrelevant here. The only reason Defendants discussed it was to refute *Plaintiffs*' argument that "Defendants' reading of § 1373(a) is irreconcilable with the nondelegation doctrine." Pls.' MSJ Br. at 27-28. Defendants welcome Plaintiffs' belated concession that nondelegation principles are "irrelevant" to this case, Pls.' Opp'n & Reply at 29, if that is what they are now saying. If not—which is unclear,

given the subsequent reference to "constitutional avoidance principles," *id.*—then Defendants have little more to say beyond what they already said in their opening brief. In short, the intelligible-principle test is "not demanding," *Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality op.), and there is nothing so special about this statute that warrants breaking the nondelegation doctrine's 91-year losing streak in the federal courts.

**4.** Plaintiffs also continue to cite two provisions of the Social Security Act that they claim prohibit the recent changes to SAVE. *See* Pls.' Opp'n & Reply at 30-31. But all parties seem to agree that the first one permits sharing of information when "otherwise provided by Federal law," 42 U.S.C. § 1306(a)(1), thus teeing up the same statutory-authority questions already addressed above. *Compare* Defs.' Br. at 49, *with* Pls.' Opp'n & Reply at 30. So the Court need not separately address that provision to decide this case.

As for 42 U.S.C. § 405(c)(2)(C)(viii)(I), Plaintiffs argue that legislation enacted in 1996 cannot justify any of the information-sharing at issue here, because legislation in 1990 purported to permanently raise the bar for that sort of legislation. But Plaintiffs fail to engage with Defendants' ample authority for "the well-established rule that 'one legislature cannot abridge the powers of a succeeding legislature.'" *Mayor & City Council of Balt. v. ATF*, 816 F. Supp. 3d 107, 124 (D.D.C. 2026) (quoting *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810)); *see also Dorsey v. United States*, 567 U.S. 260, 274 (2012). Instead, they cite cases for the undisputed but irrelevant proposition that "repeals by implication are disfavored." Pls.' Opp'n & Reply at 30. But Defendants are not arguing that Congress implicitly repealed any statute—only that the 1990 Congress could not (and did not) abridge the powers of the 1996 Congress. So the Court is left to interpret the text of 8 U.S.C. § 1373, as enacted by the 1996 Congress—without regard to what the 1990 Congress might have expected. (Regardless, none of these arguments apply to the 1986 Act.)

Plaintiffs say that SSA is "disclosing more than just 'citizenship and immigration status' data through SAVE, but also individuals' SSNs, names, dates of birth, and death indicators." Pls.' Opp'n & Reply at 31 n.9. Plaintiffs misread the statute. All that information is (at least) "information *regarding* the citizenship or immigration status" of the people in question, whether or not

all of it *is* "citizenship or immigration status." 8 U.S.C. § 1373(a) (emphasis added). And that data (first provided by DHS *to* SSA) is necessary to ensure that the correct information is connected to the correct individuals. (Also, decedents are not covered by the Privacy Act. *See Crumpton v. United States*, 843 F. Supp. 751, 756 (D.D.C. 1994), *aff'd*, 59 F.3d 1400 (D.C. Cir. 1995)).

**5.** At an absolute minimum, Plaintiffs' challenge to bulk verification must fail on the merits. None of the relevant statutory provisions says anything at all about how USCIS should accept requests, in what form, how many at a time, and so on. So there can be no statutory violation there.

**B. SAVE does not exceed the government's constitutional authority or violate the separation of powers (Counts 2 and 3).**

Plaintiffs offer two arguments in support of what purports to be a constitutional separation-of-powers claim: (1) that "[t]he Executive cannot usurp Congress's legislative authority," Am. Compl. ¶ 209; and (2) that "[t]he Constitution vests 'the power to determine who is qualified to vote' in the States and 'the power to regulate federal election procedures' in the States and Congress," *id.* ¶ 211 (quoting *League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 42 (D.D.C. 2025) ("*LULAC*")). Both claims fail.

Plaintiffs' first "constitutional" theory remains entirely parasitic of their statutory-authority claim. Curiously, Plaintiffs resist this characterization, seemingly against their own interest. After all, it would be *easier* for Plaintiffs to make out "a garden-variety statutory authority claim" than the sort of claim that they claim they are bringing here, which (in their words) alleges "that Defendants have not merely *exceeded* their statutory authority, but rather 'acted with a total absence of authority from Congress *in a domain that the Constitution assigns to Congress and the States*.'" Pls.' Opp'n & Reply at 32 (quoting Pls.' MSJ Br. at 34). Regardless, Defendants stand by their characterization of this claim as "a garden-variety statutory authority claim," *id.*—after all, Defendants' position is that DHS and SSA are exercising authority delegated by Congress, which (if correct) fully disposes of the claim. Plaintiffs' disagreement with that position thus raises a statutory dispute, not a constitutional one. Regardless, the result is the same: if Defendants are correct about the statutory-authority questions, then this claim (however labeled) must fail.

Plaintiffs' second constitutional theory *is* a constitutional theory: that Defendants have "no authority over election administration" under the Elections Clause of the Constitution, Am. Compl. ¶ 212, which instead assigns that role to the States and to Congress. But Defendants are not arguing to the contrary. In responding to voter-verification requests under 8 U.S.C. § 1373(c), DHS is not engaged in election administration at all, and is certainly not setting any voter qualifications—which vary from state to state. Those rules are entirely unaffected by the 2025 changes to SAVE. That is why Plaintiffs' primary authority for this claim—the district court opinions in *LULAC*—has no relevance here. There, unlike here, Plaintiffs challenged an Executive Order that (at least as interpreted by that court) required significant changes to voter-registration rules in all 50 states. *See LULAC*, 808 F. Supp. 3d at 48 (discussing the need for "people registering to vote using the Federal Form to submit 'documentary proof of United States citizenship'" (citation omitted)). So, regardless of whether that case was correctly decided (it is currently on appeal), this case raises no comparable questions about election administration.

That is also why Plaintiffs' references to Executive Order 14,248 are nothing more than a distraction: nothing in *any* Executive Order has been "invoked to justify the SAVE overhaul," contrary to Plaintiffs' unsupported suggestion. Pls.' Opp'n & Reply at 33. The Court will notice that the only legal authorities cited in Defendants' briefs in this case are federal statutes enacted by Congress. And the unremarkable fact that Executive Order 14,248 appeared in DHS's administrative record is irrelevant. There is nothing either surprising or nefarious about DHS *considering* that Executive Order as they prepared the actions at issue here—after all, government agencies need not *ignore* the President's policy preferences, as long as the agencies' actions remain within statutory and constitutional constraints. *See, e.g.*, *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[The President's] faithful execution of the laws enacted by the Congress, however, ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates."); *see also Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) ("[A] court may not set aside an agency's policymaking decision solely because

it might have been influenced by political considerations or prompted by an Administration's priorities."). This case thus raises no question about the legality of Executive Order 14,248.[4]

### C. Plaintiffs' Privacy Act claims (purportedly brought under the APA) lack merit (Counts 4, 5, and 6).

For the reasons Defendants have already explained, Plaintiffs should not be permitted to seek relief for alleged violations of the Privacy Act through the APA—they should be limited to the remedies set forth in the Privacy Act itself. Regardless, whether considered as APA claims or Privacy Act claims, all of them lack merit.

**1. Count 6 – Arbitrary and Capricious.** First, Plaintiffs continue to assert—citing no evidence whatsoever—that "Defendants predetermined the outcome" of the SORN process. Pls.' Opp'n & Reply at 45. Defendants already explained why that assertion is factually baseless. *See supra* at 17-18, 20. It is thus unsurprising that Plaintiffs' only citation for that purely factual assertion continues to be their own filings. But that does not work at summary judgment. And it certainly does not overcome the agency's signed certifications, which are "entitled to a presumption of regularity," *Wages*, 604 U.S. at 577.[5]

Even setting aside the factual baselessness of this theory, it also fails on the law, at least if advanced as an APA claim: there is no longer any such thing as an "open-mindedness test" under the APA. *Little Sisters of the Poor*, 591 U.S. at 685. Now aware of this adverse precedent, Plaintiffs try to rehabilitate their theory, now disclaiming any reliance on what they now call "the outdated 'open minded' test." Pls.' Opp'n & Reply at 45; *but see* Pls.' MSJ Br. at 39 (citing a case that is no longer good law for the proposition that "the agency must remain sufficiently open

[4] Executive Order 14,399 is even further afield. Despite referencing it in two filings—once in a cryptic "Notice," ECF No. 85, and once in the introduction (but not the body) of their reply—Plaintiffs offer no explanation of how (if at all) that Executive Order is relevant here. In any event, that Executive Order has not yet been implemented by any final agency action. *See generally DSCC*, 2026 WL 1487833. So this Court need not (and should not) say anything about it here.

[5] Oddly, Plaintiffs say that Defendants "do not dispute" that they "predetermine[d]" the outcome of the SORN process and "acted essentially as a rubber stamp for the Election EO's directives." Pls.' Opp'n & Reply at 45 (citation omitted). As should be obvious, Defendants dispute both assertions—as is clear from their prior brief and this one. *See* Defs.' Br. at 55-56.

minded”). But by disclaiming that theory, there is no longer any doctrinal home for Plaintiffs’ (baseless) assertion that Defendants “predetermined” the SORN process. The claim fails.

Second, Plaintiffs fault the lack of a written explanation in response to comments received during the SORN process. Again, if such an explanation were required, then virtually every SORN modification (for decades) has violated the APA—without anyone noticing. *See supra* at 22. To be clear, this is not an argument that “the sky will fall if agencies must provide a reasoned explanation in the SORN context,” Pls.’ Opp’n & Reply at 46, this is an argument that no such legal obligation *exists*. *See* 5 U.S.C. § 552a(e)(4), (e)(11). Defendants remain unaware of a single case requiring such an explanation at the close of the SORN modification process. Plaintiffs have certainly not cited one, despite an explicit invitation to refute Defendants’ understanding. *See* Defs.’ Br. at 43. And the idea that this Court should (for the first time ever) extend APA-specific procedures to the distinct context of the Privacy Act cannot be squared with binding precedent. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) (5 U.S.C. § 553 “established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures”).

Third, Plaintiffs argue that Defendants violated the change-in-position doctrine. But other than conclusory assertions, Plaintiffs fail to explain *why* Defendants’ explanations were insufficient. *See* Defs.’ Br. at 56-57. To the extent those explanations are shorter, less formal, and less legalistic than a Rule published in the Federal Register after an APA rulemaking, that is because (until this suit) nobody ever thought that APA rules governed Privacy Act processes like these.[6]

**2. Count 4 – Compatible Use.** In Count 4, Plaintiffs argue that the new routine uses established by the latest DHS and SSA and SORNs substantively violate the Privacy Act, because they authorize disclosures “for a purpose” that is not “compatible with the purpose for which [the

[6] In what reflects an unfortunate and repeated pattern throughout their reply brief, Plaintiffs also say (again) that Defendants “do not respond to, and thus concede” another point that Defendants did, in fact, respond to. *Compare* Pls.’ Opp’n & Reply at 47 (penultimate paragraph, about reliance interests), *with* Defs.’ Br. at 56-57 (carryover paragraph, responding to this argument).

record] was collected." Am. Compl. ¶ 220 (alteration in original) (quoting 5 U.S.C. § 552a(a)(7)). In response, Defendants offered two arguments, but Plaintiffs only respond to one.

First, Defendants set forth the Executive Branch's longstanding position that "when Congress mandates agency action that requires disclosure of agency records, the use is 'compatible' for that reason alone." Defs.' Br. at 57 (citing OMB, *Guidance on the Privacy Act*, 52 Fed. Reg. 12,990, 12,993 (Apr. 20, 1987)). To that first argument, Plaintiffs respond only that Defendants' "statutory authority arguments" are "meritless" "for the reasons" elsewhere in their brief. Pls.' Opp'n & Reply at 38. Defendants, of course, disagree. But more importantly, by failing to dispute the threshold premise—*i.e.*, that a routine use is necessarily "compatible" when it supports disclosures "pursuant to a specific statutory charter," 52 Fed. Reg. at 12,993—the statutory-authority questions in this case now also collapse into the compatible-use question. In other words, if the government's statutory arguments are correct, Plaintiffs cannot prevail on their compatible-use claim. So the Court need not separately address the compatible-use issue at all.

Second, only in the alternative, Defendants also explained why, even in the absence of a "specific statutory charter" justifying these disclosures, *id.*, no records are being disclosed "for a completely unrelated purpose" to their original collection. *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 550 (3d Cir. 1989). Plaintiffs cite SSA statements that SSNs are "sensitive pieces of personal information," but those generic statements are not at all inconsistent with any of Defendants' arguments here. It remains true, for example, that SSA "only disclose[s] an SSN in narrow circumstances in which we have legal authority and where we are able to identify the true number holder." Pls.' Opp'n & Reply at 39 (quoting SSA, POMS, *GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN) Without Consent* (2023), https://perma.cc/PE44-2QBK) (citation modified).[7] This is such a circumstance, and Plaintiffs have not established that any disclosures are being made for any "completely unrelated purpose" here. *Britt*, 886 F.2d at 550.

---

[7] Plaintiffs added "[or verify]" in brackets because SSA is not "disclosing" SSNs to any other agency—instead, USCIS is running searches on SSA records, using SSNs that were provided

Although Plaintiffs continue to focus on "the reasons *state and local* officials originally collected the data before uploading it into SAVE," Pls.' Opp'n & Reply at 39; that only shows the obvious *compatibility* of the uses at issue here. The reason State and Local election officials have this data in the first place is because it was submitted as part of the voter registration process, also to confirm voter eligibility. An additional layer of federal confirmation of that same information, for essentially the same purpose, is plainly not "completely unrelated." *Britt*, 886 F.2d at 550.

**3. Count 5 – Notice and Comment.** As discussed above, Count 5 is moot, because DHS and SSA have now complied with the notice-and-comment procedures of the Privacy Act—whether or not doing so was necessary. And to the extent Plaintiffs now try to reimagine this claim as about the agencies having "predetermined" the outcome of the comment process, that claim fails both because (1) it lacks any factual basis and is contradicted by the record, *see supra* at 17-18 (citing administrative-record certifications and the presumption of regularity), and (2) there is no longer such thing as a claim that an agency was insufficiently open-minded during a rulemaking, *see supra* at 31-32 (quoting *Little Sisters of the Poor*, 591 U.S. at 685).

### D. Plaintiffs' mandamus and unreasonable delay claims about computer-matching agreements lack merit (Counts 7 and 8).

In Counts 7 and 8, EPIC challenges DHS's alleged failure to publish a document called a "computer matching agreement" relating to the recent changes to SAVE. On that claim, Plaintiffs have correctly understood the upshot of DHS's longstanding position (maintained at least since the Obama Administration), which is that so-called "'front-end' single record verification queries are not covered by this part of the Privacy Act." Pls.' Opp'n & Reply at 41. But they fail to understand the legal basis for that interpretation—instead asserting in conclusory fashion that this legal distinction "is nowhere to be found in the text of the Privacy Act." *Id.* at 42.

But as Defendants already explained, "[t]he basis for that interpretation is the text of the statute itself, which applies only to a 'comparison' of 'two or more automated *systems* of *records*,'

---

by States. No SSNs are being disclosed in the first instance *from* SSA to any other agency; either a full or partial SSN is first provided to SSA, which then sends SSN verifications to DHS alone.

plural, 5 U.S.C. § 552a(a)(8) (emphases added)—not a series of matches of each *individual* record." Defs.' Br. at 60. To be sure, that is a subtle distinction, but it is derived from the text of the statute, and Congress's use of the plural words "systems" and "records"—language that implicitly excludes matching of *one* record (singular) to a system of records (plural). And it is likewise undisputed that that is how SAVE has worked since at least 2017. *See* Defs.' Br. at 61 (citing Broderick Decl. ¶¶ 23-24). Plaintiffs' failure to engage with Defendants' primary statutory-interpretation argument is reason enough to reject this claim—applying any standard of review.

That said, Plaintiffs *also* do not dispute that this claim is governed by the mandamus standard. *Compare* Defs.' Br. at 59-60 (explaining why), *with* Pls.' Opp'n & Reply at 41-43 (offering no response). So to prevail, Plaintiffs must "demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). They do not even try to meet that higher standard, so Counts 7 and 8 fail for that reason alone—without the need for this Court to make any definitive pronouncement about the requirements for computer-matching agreements, or whether they apply to front-end verification systems.

Finally, even if any relief were appropriate on Counts 7 or 8, Plaintiffs likewise fail to respond to Defendants' argument that the maximum available relief on these claims would be "an order requiring publication of a computer-matching agreement"—rather than "any of the other, more ambitious relief that Plaintiffs seek, relating to the general operations of" SAVE. Defs.' Br. at 33; *see also TransUnion*, 594 U.S. at 431 ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."). So that remedial argument is also now conceded.

## CONCLUSION

For these reasons, this case should be dismissed in its entirety under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6). In the alternative, the Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: May 29, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*




# Privacy Impact Assessment

for the

# Systematic Alien Verification for Entitlements "SAVE" Program

**DHS Reference No. DHS/USCIS/PIA-006(d)**

**October 31, 2025**

Homeland Security

# Abstract

| 1. **The abstract is the single paragraph that will be used to describe the program and the Privacy Impact Assessment.**[1] |
|---|
| The U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, Verification Division administers the Systematic Alien Verification for Entitlements (SAVE) Program. The SAVE Program is an online inter-governmental service designed to help federal, state, territorial, tribal, local government agencies, benefit-granting agencies, other authorized entities and licensing bureaus, as authorized by law, determine citizenship and immigration status of individuals within their jurisdiction for the purpose of granting benefits, licenses, as well as for other lawful purposes. U.S. Citizenship and Immigration Services is publishing an update to this Privacy Impact Assessment to describe the collection, use, maintenance, and disclosure of personally identifiable information, as well as the risks associated with these updates. The purpose of this update is to discuss the changes to the tool, including: (1) documenting use of the tool for voter registration and voter maintenance list verification, (2) collection of Social Security numbers which may include those of U.S. born citizens for all benefit or license related uses of the program, (3) sharing of information between U.S. Citizenship and Immigration Services, the Social Security Administration, and the Department of State, (4) a new bulk upload feature for the program, and (5) reducing the fee for non-Federal government agencies. |

# Overview

| 2. **The overview provides the context and background necessary to understand the project's purpose and mission and the justification for operating a privacy sensitive project.** |
|---|
| The U.S. Citizenship and Immigration Services administers the SAVE Program. The SAVE Program is an online fee-based intergovernmental initiative designed to help federal, state, tribal, and local government agencies and licensing bureaus confirm immigration status information.[2] |

[1] Pursuant to Section 208 of the E-Government Act of 2002, agencies are required to conduct a Privacy Impact Assessment before developing or procuring Information Technology systems or projects that collect, maintain or disseminate information in identifiable form from or about members of the public. The Office of Management and Budget issued Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002, which defines "information in identifiable form" as information in an Information Technology system or online collection: (i) that directly identifies an individual (e.g., name, address, social security number or other identifying number or code, telephone number, email address, etc.) or (ii) by which an agency intends to identify specific individuals in conjunction with other data elements. Furthermore, an individual is defined as "a citizen of the United States or an alien lawfully admitted for permanent residence."
[2] It is the intent of the current Administration to provide more of a supporting role to state, local, tribal, and territory governments. The U.S. Department of Homeland Security has determined to better serve and support non-Federal

The SAVE Program provides status verifications to requesting federal, state, territorial, tribal, and local government agencies; benefit granting agencies; and other authorized entities and licensing bureaus. The U.S. Citizenship and Immigration Services (or a contractor acting on its behalf) will confirm immigration and/or United States citizenship status as authorized by law, to the extent that such disclosure is necessary to enable these agencies to make decisions. These decisions may relate to: (1) determining eligibility for a federal, state, or local public benefit; (2) issuing a license or grant; (3) issuing a government credential; (4) conducting a background investigation; (5) registering voters or developing/ managing voter maintenance lists; or (6) any other lawful purpose.

A federal, state, territorial, tribal, or local government agency that provides a public benefit or license, or that is otherwise authorized by law to engage in an activity related to the verification of immigration status, may enroll in the SAVE Program as a registered agency. By using the SAVE Program, federal, state, territorial, tribal, and local registered agencies can request immigration status information to determine the applicant's eligibility for a benefit or a license. It is important to note that the program does not make the determinations on an applicant's eligibility for a specific benefit or license or eligibility to vote (at the local, state, or national level). Instead, it provides immigration status information to agencies to allow them to make an informed decision prior to issuing benefits or licenses or denying voting benefits. The registered agency analyzes the SAVE Program's response against the agency's own eligibility criteria to make an award determination. The SAVE Program may not always know the outcome of the benefit adjudication.

The SAVE Program has access to multiple immigration record systems from government agencies to confirm immigration status. All SAVE Program-registered agencies must adhere to a Memorandum of Agreement or Computer Matching Agreement, which include binding responsibilities regarding proper information usage and handling. The Memorandum of Agreement also stipulates the terms for billing and payment, if applicable. As part of its billing and registration process, the SAVE Program collects personally identifiable information, such as the registered agency's point of contact name and professional contact information, as well as registered agency and demographic information. The SAVE Program staff may also collect sensitive information such as registered agency credit card information and other data relevant to the billing process from the federal, state, territorial, tribal, or local government agencies using the SAVE Program. The U.S Citizenship and Immigration Service collects, maintains, and safeguards this information in accordance with U.S. Department of Homeland Security privacy and information technology policies.

The U.S. Citizenship and Immigration Services is currently implementing a comprehensive

government agencies, by eliminating the fees for their use of the SAVE Program.

optimization of the SAVE Program. The U.S. Citizenship and Immigration Services has developed a phased approach to further the U.S. Department of Homeland Security mission. This Privacy Impact Assessment supports use of the SAVE Program for (1) voter registration and voter maintenance list verification; (2) collection of Social Security numbers, which may include those of U.S. born citizens for all benefit- or license-related uses of the program; (3) sharing of information between U.S. Citizenship and Immigration Services, the Social Security Administration, and the Department of State; (4) a new bulk upload feature for the program; and (5) removing the fee for non-Federal government agencies.

***Social Security Administration Data Sharing***

On January 20, 2025, and March 25, 2025, the President issued Executive Orders 14159, *Protecting the American People Against Invasion* and 14248, *Preserving and Protecting the Integrity of American Elections* respectively.[3] Executive Order 14159 includes a requirement for the Secretary to "…promptly issue guidance to ensure maximum compliance by [Department of Homeland Security] personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law...."[4] Executive Order 14248 outlines that, "…Federal laws, such as the National Voter Registration Act (Pub. L. 103-31) and the Help America Vote Act (Pub. L. 107-252), require States to maintain an accurate and current Statewide list of every legally registered voter in the State. And [Department of Homeland Security] is required to share database information with States upon request so they can fulfill this duty."[5] Executive Order 14248 directs the Secretary to "…ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered…" The Department of Homeland Security is also required under Executive Order 14248, in coordination with the Department of Government Efficiency Administrator, to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. § 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements."

The Commissioner of Social Security also must assist states in determining whether individuals are eligible to register and vote by taking all appropriate action to make available the Social

---

[3] *See* Protecting the American People Against Invasion (January 2025) *available at* https://www.federalregister.gov/documents/2025/03/28/2025-05523/preserving-and-protecting-the-integrity-of-american-elections; and Preserving and Protecting the Integrity of American Elections (March 2025) *available at* https://www.federalregister.gov/documents/2025/01/29/2025-02006/protecting-the-american-people-against-invasion.
[4] 8 U.S.C.§ 1373; 8 U.S.C. §1644.
[5] 8 U.S.C. 1373(c).

Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered.[6]

Most registered agencies may not have access in their voter, benefits, or licenses records to a U.S. Department of Homeland Security-issued identifier, (such as Alien Registration Number (Alien Number or A-number), Naturalization Certificate number, or Citizenship Certificate number) to initiate the initial SAVE Program query. To address this concern, the U.S. Citizenship and Immigration Services is incorporating a feature to allow SAVE Program-registered agencies to query records by Social Security numbers. Registered agencies will provide the U.S. Citizenship and Immigration Services with the individual's first and last name(s), date of birth and a full 9-digit or partial Social Security number. Registered agencies may additionally provide a U.S. Department of Homeland Security enumerator. The U.S. Citizenship and Immigration Services will provide the Social Security Administration with this information and in turn they will provide the U. S. Citizenship and Immigration Service with the following responses:

- Social Security number match (True/False);
- Name match (True/False);
- Date of birth match (True/False);
- Citizenship Indicator;
    - "A" - U.S. citizen;
    - "B" - Legal alien, eligible to work;
    - "C" - Legal alien, not eligible to work;
    - "D" – Other;
    - "E" - Alien student - restricted work authorized; and
    - "F" - Conditionally legalized alien.
- Foreign Born indicator (Citizenship code is not present, but individual was foreign born);
- State/Country code;
- American Samoa indicator (True/False);
- Alien Registration number (where applicable);

[6] Executive Order 14248 § 3(a).

- Death indicator (Yes / No); and
- Error code descriptions (transaction and record levels).

Of note, if a registered agency provides the names, dates of birth, and Social Security numbers of U.S. citizens by birth, the SAVE Program will maintain and process this information. For instance, a state may provide the U.S. Citizenship and Immigration Services information for all residents that are registered to vote within their jurisdiction. This would include U.S. citizens by birth. The U. S. Citizenship and Immigration Services will process this information as stated above and provide the appropriate response.

The SAVE Program now has a list processor feature to allow registered agencies to upload a list of individuals' case data instead of creating individual cases. A requesting agency, once signed into the program, will have an option to "upload" a list of individuals for the U.S. Citizenship and Immigration Services to verify citizenship and immigration status. Once uploaded, the SAVE Program creates individual cases for everyone identified on the uploaded list. The U. S. Citizenship and Immigration Services then sends from the list to the Social Security Administration the name, Social Security number, and date of birth of the individuals identified by the registered agency. The Social Security Administration then sends the status information (citizenship indicator noted above) back to the SAVE Program. The SAVE Program, if required, also queries other various systems (see below *List of Federal Systems Used to Respond to Registered Agency Queries*), and provides a consolidated result in each case file. The registered agency has the option of logging back into the program after twenty-four hours and searching for each case or generating a Web Agency Audit Report within the SAVE Program that can provide status information for multiple cases.

Additionally, program users will be able to download a list of individuals from the original list that the registered agency submitted, that the U.S. Citizenship and Immigration Services was not able to process. For example, a registered agency's list may not have a unique identifier for several individuals. To capture these incomplete cases, the program creates a spreadsheet that includes everyone who is not processed and requests additional information such as a Social Security number (corrected Social Security number), or Alien Registration Number. The registered agency can then update the spreadsheet provided with the additional information and upload it again into the program. The U.S. Citizenship and Immigration Services then provides the registered agency's account with the following information:

- Verification number (SAVE Program generated);
- Initial request date;
- Identification type;

- Identification number;
- Last name;
- Benefit code;
- Benefit description;
- Initial request response (Lawful status, No lawful status, Deceased);
- Additional request date;
- Additional request response (Lawful status, No lawful status, Deceased);
- Third step request date;
- Third step resolution (Lawful status, No lawful status, Deceased); and
- Closed date.

***Department of State Data Sharing***

Registered agencies may provide either a U.S. passport number or a photocopy of a U.S. passport as documentation of citizenship or immigration status. If a U.S. passport number is submitted, the SAVE Program will verify it against information from U.S. Department of State-issued passport. Additionally, the SAVE Program will receive or access information in the U.S. Department of State's Consular Consolidated Database / American Citizen Record Query system, which is a consular search engine used by the U.S. Department of State to manage and access records related to United States citizens, particularly for consular protection and services, including managing passport requests and applications.

***State Driver's Licensing Agencies and Other Organizations Maintaining Driver's License Information Data Sharing***

Within the U.S., driver's licenses are the most widely used form of identification. The SAVE Program can use driver's license and state identification card numbers to check and confirm identity information by working with state driver's licensing agencies and national agencies that store driver's license information for legal purposes (such as the National Law Enforcement Telecommunications System). When the registered agency provides a driver's license or state identification card number as the enumerator to verify the identity of the applicant, the SAVE Program will use state driver's licensing agencies or another source (such as the National Law Enforcement Telecommunications System) to validate the information and gain access to other government enumerators. This will allow the SAVE Program to match against other sources to verify immigration status and U.S. citizenship, which will improve accuracy and efficiency for SAVE registered agencies.

***Auditing of Federal and State Oversight Programs Data Sharing***

The SAVE Program will support organizations that have entered into required agreements with the U.S. Citizenship and Immigration Services and have a legal oversight authority over a program or benefit type supported by the SAVE Program through reporting capabilities for auditing purposes. User agencies with a legal authority to monitor and audit benefits granted may view case data such as biographic data, enumerators, case submission date/time, and the SAVE Program response information. Reporting options exist for individual agencies and their case data. Additionally, user agencies with legal authority may now be granted SAVE Program access to view other user agencies' case data through a linking mechanism based on either benefit type granted (e.g. Medicare) or by state. This new account type will have reporting options to view case data. Other account types enable user agencies to create cases within the SAVE Program to verify applicant current eligibility for benefits previously granted. This will allow federal and state oversight agencies to ensure user agencies are properly verifying immigration status or citizenship before making an eligibility determination. Oversight agencies can also ensure previously approved applicants remain eligible for the benefits they are receiving.

***List of Federal Systems Used to Respond to Registered Agency Queries***

The following is a list of federal information systems that the SAVE Program queries for responses to registered agencies:

**United States Citizenship and Immigration Services Systems:**

- Central Index System;[7]
- Electronic Immigration System;[8]
- Computer Linked Application Information Management System 3;[9]
- Enterprise Citizenship and Immigration Services Centralized Operational Repository;[10]
- GLOBAL (not an acronym);

---

[7] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE CENTRAL INDEX SYSTEM, DHS/USCIS/PIA-009, *available at* Privacy Documents for USCIS | Homeland Security.

[8] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE USCIS ELECTRONIC IMMIGRATION SYSTEM, DHS/USCIS/PIA-056, *available at* Privacy Documents for USCIS | Homeland Security.

[9] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE COMPUTER LINKED APPLICATION INFORMATION MANAGEMENT SYSTEM AND ASSOCIATED SYSTEMS, DHS/USCIS/PIA-016, *available at* Privacy Documents for USCIS | Homeland Security.

[10] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE ENTERPRISE CITIZENSHIP AND IMMIGRATIONS SERVICES CENTRALIZED OPERATIONAL REPOSITORY, DHS/USCIS/PIA-023, *available at* Privacy Documents for USCIS | Homeland Security.

- RAILS (not an acronym);[11]
- Customer Profile Management System;[12] and
- Salesforce Customer Relationship Management Customer Relationship Management.

**Other U.S. Department of Homeland Security Systems:**

- U.S. Department of Homeland Security OneNet;
- U.S. Immigration and Customs Enforcement Student and Exchange Visitor Program;[13]
- U.S. Immigration and Customs Enforcement, Enforcement Integrated Database;[14]
- U.S. Customs and Border Protection Arrival and Departure Information System;[15] and
- Transportation Security Administration Office of Intelligence and Analysis Technology Infrastructure Modernization Program.[16]

**Other Federal Agency Systems:**

- U.S. Military Entrance Processing Command Integrated Resource System;
- U.S. Department of Education Federal Student Aid Central Processing System;
- U.S. Department of Health and Human Services Centers for Medicare & Medicaid Services;
- U.S. Social Security Administration Numident system;
- U.S. Department of Justice Executive Office for Immigration's Immigration Review Information Exchange System;

[11] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR RAILS, DHS/USCIS/PIA-075, *available at* Privacy Documents for USCIS | Homeland Security.
[12] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE CUSTOMER PROFILE MANAGEMENT SERVICE, DHS/USCIS/PIA-060, *available at* Privacy Documents for USCIS | Homeland Security.
[13] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR THE STUDENT AND EXCHANGE VISITOR PROGRAM, DHS/ICE/PIA-001, *available at* Privacy Documents for ICE | Homeland Security.
[14] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR THE ENFORCEMENT INTEGRATED DATABASE, DHS/ICE/PIA-015, *available at* Privacy Documents for ICE | Homeland Security.
[15] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, PRIVACY IMPACT ASSESSMENT FOR THE ARRIVAL AND DEPARTURE INFORMATION SYSTEM, DHS/CBP/PIA-024, *available at* Privacy Documents for CBP | Homeland Security.
[16] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, TRANSPORTATION SECURITY ADMINISTRATION, PRIVACY IMPACT ASSESSMENT FOR THE TRANSPORTATION SECURITY ADMINISTRATION OFFICE OF INTELLIGENCE AND ANALYSIS TECHNOLOGY INFRASTRUCTURE MODERNIZATION PROGRAM, DHS/TSA/PIA-042, *available at* Privacy Documents for TSA | Homeland Security.

- U.S. Department of State Consular Consolidated Database; and
- U.S. Department of State American Citizen Record Query System.

## Fair Information Practice Principles

The U.S. Department of Homeland Security conducts Privacy Impact Assessments on developed or procured information technology systems involving the collection, maintenance, or dissemination of information in identifiable form or that make substantial changes to existing information technology that manages information in identifiable form, as required by Public Law 107-347, Section 208, "The E-Government Act of 2002," and any applicable and implementing Office of Management and Budget guidance; or proposed rulemakings affecting personal information as required by Section 222(a)(4) of the Homeland Security Act of 2002; or technologies that sustain, and do not erode, privacy protections relating to the use, collection, and disclosure of personal information pursuant to 6 U.S.C § 142(a)(1).

In response to these obligations, the U.S. Department of Homeland Security Privacy Office developed a set of Fair Information Practice Principles [17] from the underlying concepts of the Privacy Act of 1974[18] to encompass the full scope of the information and interactions of the U.S. Department of Homeland Security. The Fair Information Practice Principles account for the nature and purpose of the information being collected in relation to the U.S. Department of Homeland Security's mission to preserve, protect, and secure. The Fair Information Practice Principles are a set of eight principles that are rooted in the tenets of the Privacy Act.

**3. What specific legal authorities and/or agreements permit the collection of information by the project in question?**

In accordance with a 1986 Congress mandate, the U.S. Citizenship and Immigration Services, previously the Immigraton and Naturalization Service, established the SAVE Program to verify the citizenship and immigration status of individuals seeking government benefits for use by benefit granting agencies when making benefit determinations. The following provides authority for the program to collect, maintain, and share personally identifiable information:

- Immigration and Nationality Act, Public Law 82-414, 66 Statutory 163 (June 27, 1952);
- Homeland Security Act of 2002, Public Law Number 107-296, 116 Statutory 2135

[17] U.S. Department of Homeland Security, Privacy Policy Guidance Memorandum 2008-01, The Fair Information Practice Principles: Framework for Privacy Policy at the Department of Homeland Security (2008), *available at* https://www.dhs.gov/privacy-policy-guidance.
[18] Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

(November 25, 2002);

- Immigration Reform and Control Act of 1986, Public Law 99-603, 11 Statutory 3359 (November 6, 1986);
- Personal Responsibility and Work Opportunity Reconciliation Act of 1996 , Public Law 104-193, 110 Statutory 2105 (August 22, 1996);
- Title IV, Subtitle A, of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104-208, 110 Statutoty 3009 (September 30, 1996);
- Real ID Act of 2005, Public Law 109-13, 119 Statutory 231 (May 11, 2005);
- Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Statutory 119 (Mar. 23, 2010), as amended by the Health Care and Education Reconciliation Act of 2010, Public Law 111-152, 124 Stat. 1029 (March 30, 2010);
- Federal Aviation Administration Extension, Safety and Security Act of 2016, Public Law 114-190, 130 Statutory 615 (July 15, 2016); and
- Social Security Act of 1935, Public Law 74–271, 49 Statutory 620 (Aug. 14, 1935) as amended, 42 U.S.C. § 1306.

In addition, the Systematic Alien Verification for Entitlements Program has an obligation under 8 U.S.C. 1373(c) to "respond to an inquiry by a federal, state or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

The Social Security Administration is aiding by sending to, and receiving, U.S. Department of Homeland Security and U.S. Citizenship and Immigration Services information regarding the citizenship or immigration status, lawful or unlawful, of individuals within its records. The Social Security Administration is authorized to participate in this information sharing under the authority of the Social Security Act, 42 U.S.C. § 1306, and pursuant to 8 U.S.C. § 1373(a).

**4. Will this information be maintained as part of system of records,[19] as defined in the Privacy Act, 5 U.S.C. §552a?**

[19] The term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

Yes, information retrieved by the Social Security Administration, U.S. Department of State, and registered agencies will be maintained in the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program System of Records.[20]

**5. From which population does the project collect, maintain, use, and/or disseminate personally identifiable information?[21]**

☒ a. Members of the public

☐ b. U.S. Department of Homeland Security employees and/or contractors

☐ c. Other federal employees

**6. What personally identifiable information is collected, maintained, used, or disseminated?**

The U.S. Citizenship and Immigration Services may collect the following information about aliens; legal permanent residents; and U.S. born, naturalized, and derived citizens from registered agencies:

- Name (last, first, middle);
- Unique identifiers;
  - Alien Regstriaton Number (Alien number or A-Number)/U. S. Citizenship and Immigration Services Number;
  - I-94 Arrival/Departure Record number;
  - Student and Exchange Visitor Information System Identification number;
  - Receipt number/card number;
  - Naturalized Certificate number; and
  - Citizenship Certificate number.

[20] *See* DHS/USCIS-004 Systematic Alien Verification for Entitlements, 90 Fed. Reg. 48948 (October 31, 2025), *available at* System of Records Notices | Homeland Security.
[21] Personally identifiable information means any information about an individual maintained by an agency, including, but not limited to, education, financial transactions, medical history, and criminal or employment history and information which can be used to distinguish or trace an individual's identity, such as their name, social security number, date and place of birth, mother's maiden name, biometric records, etc., including any other personal information which is linked or linkable to an individual. *See* OMB M-06-19, Reporting Incidents Involving Personally Identifiable Information.

- Visa or Passport (Foreign and/or United Sates) numbers;
- Social Security number or Individual Tax Identification Number;
- Driver's license or state identification number;
- Date of birth;
- Country of birth;
- Citizenship or nationality;
- Class of Admission code and Date of entry;
- File Control Office;
- Benefit sought; and
- Immigration documentation.

The United States Citizenship and Immigration Services shares the following information to the Social Security Administration about U.S. born, naturalized, and/or derived citizens:

- Name (last, first, middle);
- Date of birth;
- Social Security number (full and partial); and
- U.S. Department of Homeland Security-issued identifier (such as Alien Registration Number).

The U. S. Citizenship and Immigration Services maintains the following information from the Social Security Administration:

- Social Security number match (True/False);
- Name match (True/False);
- Date of birth match (True/False);
- Citizenship indicator;
  - "A" - U.S. citizen;
  - "B" - Legal alien, eligible to work;
  - "C" - Legal alien, not eligible to work;
  - "D" – Other;
  - "E" - Alien student - restricted work authorized; and

- "F" - Conditionally legalized alien.

- Foreign Born indicator (Citizenship code is not present, but individual was foreign born);
- State/country code;
- American Samoa indicator (True/False);
- Alien Registration Number (Alien Number or A-Number) (where applicable);
- Death indicator (Yes / No); and
- Error code descriptions (transaction and record levels).

The United States Citizenship and Immigration Services provides the following information to requesting agencies:

- Verification number (system generated);
- Initial request date;
- Identification type;
- Identification number;
- Last name;
- Benefit code;
- Benefit description;
- Initial request response (lawful status, no lawful status, deceased);
- Additional request date;
- Additional request response (lawful status, no lawful status, deceased);
- Third step request date;
- Third step resolution (lawful status, no lawful status, deceased); and
- Closed date.

The U.S. Citizenship and Immigration Services shares the following information to the U.S. Department of State:

- Full name;
- Date of birth;

- Social Security number; and/or
- U.S. passport number.

The U.S. Citizenship and Immigration Services may maintain the following information from the U.S. Department of State:

- Full name;
- Date of birth;
- Certificate of Citizenship;
- Certificate of Naturalization;
- Alien RegistrationNumber (Alien Number or A-Number);
- U.S. passport book or passport card number;
- U.S. passport book or passport card issuance date;
- U.S. passport endorsement code(s) where applicable; and
- Images of U.S. passport book or passport card.

**7. What is the intended use of personally identifiable information?**

The SAVE Program uses personally identifiable information about individuals to help federal, state, territorial, tribal, and local government benefit-granting agencies, other authorized entities and licensing bureaus, as authorized by law, verify the citizenship and/or immigration status of individuals within their jurisdiction as they determine eligibility for benefits, credentials, and licenses; and verify voter registration. The U.S. Citizenship and Immigration Services also uses the personally identifiable information for federal security background investigations and other lawful purposes.

The U.S. Citizenship and Immigration Services uses a variety of data for cross-referencing. In this way, the U. S. Citizenship and Immigration Services ensures that data is accurate and current, identifies inconsistencies between or among databases, and minimizes fraud. Additionally, the U.S. Citizenship and Immigration Services collects personally identifiable information from individual users of the system to provide accountability of system usage in the event of misuse and abuse of the system. Further, the U. S. Citizenship and Immigration Services use personally identifiable information to register SAVE user agencies and other administration functions.

The U. S. Citizenship and Immigration Services will use the Social Security number from

| |
|---|
| requesting agencies to query the Social Security Administration Enumeration System to assist in providing U.S. citizenship or immigration status of individuals. Federal, state, local, tribal, and territory governments generally use the SAVE Program to assist in awards of benefits, voter registration verification, as well as identifying fraud.<br><br>The U.S. Citizenship and Immigration Services will compare U.S. passport information against information available in U.S. Department of State accessed systems to verify a match or no match. Using a passport number, the SAVE Program will be able to verify acquired or derived citizenship for individuals with a U.S. passport directly from the source records. Images of the U.S. Passport document may also be submitted by agencies when applicable to be used by status verifiers as part of the verification process. This ensures that personally identifiable information contained on the document can be used to verify the document and subsequently the citizenship status of the individual. Additionally, the U.S. Citizenship and Immigration Services will use U.S. passport application information, specifically, the Certificate or Citizenship or Certificate of Naturalization, to quickly verify citizenship status in certain cases and reduce its response time to registered users. |

| **8. How long and under which retention schedule is the information retained?** |
|---|
| Pursuant to the National Archives and Records Administration Authority N1-566-08-07, the U.S. Citizenship and Immigration Services maintains records within the SAVE Program for ten years from the date of the completion of the verification, unless the records are part of an ongoing law enforcement investigation in which case the U.S. Citizenship and Immigration Services may retain them until completion of the investigation. |

| **9. With whom will personally identifiable information be shared?** | |
|---|---|
| ☐ Within the Component/Office | Specify: |
| ☒ Other-U.S. Department of Homeland Security Component(s)/Office(s) | Specify: When potential fraud or misuse is indicated by the SAVE Program information, this information may be shared, on a case-by-case basis, with U.S. Department of Homeland Security internal law enforcement organizations to include:<br>• U.S. Immigration and Customs Enforcement; and<br>• U.S. Customs and Border Protection. |

| | |
|---|---|
| ☒ State, local, tribal, or territorial entities | Specify: A list of all requesting agencies and their purpose for accessing the SAVE Program is accessible at https://www.uscis.gov/save/save-agency-search-tool. Additionally SAVE may retrieve information from state driver's license and identification issuing agencies (such as Department of Motor Vehicles). |
| ☐ Public | Specify: |
| ☐ Private sector | Specify: |
| ☐ Foreign governments | Specify: |
| ☐ Foreign entities | Specify: |
| ☒ Other: | Specify: Social Security Administration,<br>U.S. Department of State, and<br>National organizations maintaining driver's license and state identification information (such as the National Law Enforcement Telecommunications System). |

**10. How are individuals provided notice prior to the collection of information? If notice is not provided, explain why not.**

Each registered agency completes a Memorandum of Agreement with the U.S. Citizenship and Immigration Services and agrees to provide notice to individuals within their jurisdiction of their use of information and sharing with the U.S. Citizenship and Immigration Services. Additionally, the U.S. Citizenship and Immigration Services provides notice through this Privacy Impact Assessment as well as system of records notices mentioned in Section 4. Each state holds the responsibility to provide notice of their use of information at the time of their collection or additional use of the information.

**11. What opportunities are available for individuals to consent to uses, decline to provide information, or opt out?**

The U.S. Citizenship and Immigration Services does not provide opportunities to individuals within the jurisdiction of the registered agency to consent to the U.S. Citizenship and Immigration Services use of their information. Pursuant to the above-mentioned legal authorities

| |
|---|
| listed in Section 3, the U. S. Citizenship and Immigration Services must provide individual information to the Social Security Administration and the U.S. Department of State to allow the Requesting Agency to determine the immigration status of applicants and registrants of benefits, licenses, or for voter registration verification. Each registered agency holds the responsibility to provide opportunities for consent of their use of individuals' information. Additionally, each registered agency holds the responsibility to determine whether an individual has a legal right to decline providing information to them based on applicable law. |

| **12. What procedures are in place to allow individuals to correct inaccurate or erroneous information?** |
|---|
| Individuals may request access to their information maintained by the U.S. Citizenship and Immigration Services by submitting a request at https://www.uscis.gov/records/request-records-through-the-freedom-of-information-act-or-privacy-act.<br><br>Requesters are required to provide their Alien Registration Number and/or full name, date, and place of birth, and return address.<br><br>Individuals should provide all written requests to contest or amend their information reviewed by the SAVE Program, with appropriate proof of identity, class of admission, and other relevant identifying information, as well as a statement about the incorrect. Depending on the originating source of information, the request may be satisfied within the U.S. Citizenship and Immigration Services, or the individual may be referred to the appropriate record holding agency. If the source of data is from a U.S. Citizenship and Immigration Services download and the SAVE Program confirms the data is incorrect, often by comparing the documents with the information in the program and cross-referencing other U.S. Citizenship and Immigration Services Verification Information System databases, the SAVE Program will contact the appropriate system owner recommending that the data be corrected.[22] Alternatively, the individual may make an appointment by calling the U.S. Citizenship and Immigration Services Contact Center at 800-375-5283 (TTY 800-767-1833). When appearing for the appointment, the person should provide accompanying supporting documentation, including proof of identity, class of admission, and other relevant identifying information. The SAVE Program customer agencies may change their profile information directly within the U.S. Citizenship and Immigration |

[22] The Verification Information System is a composite information system incorporating data from various U.S. Department of Homeland Security and Social Security Administration databases and functions as the underlying information technology that supports the SAVE Program. The Verification Information System supports the U.S. Citizenship and Immigration Service's ability to verify whether a newly hired employee is authorized to work in the United States and the citizenship or immigration status verification of individuals seeking certain government benefits. The Verification Information System, including the services it houses, is in the Amazon Web Service cloud environment.

Services Verification Information System application. To correct typographic errors in your U.S. Citizenship and Immigration Services record or document, visit egov.uscis.gov/e-request.

**13. What administrative, technical, and physical controls are used to protect the information?**

The SAVE Program requires potential enrollees and customer agencies to register for participation in the program and sign an appropriate data sharing agreement. Once the enrollees submit the required documentation, all users must complete a web-based training course that explains functionality and security requirements.

The Systematic Alien Verification for Entitlements Program's internal users take the mandatory annual U.S. Department of Homeland Security Computer Security Training and the U.S. Citizenship and Immigration Services Privacy Awareness Training. Additionally, staff who administer the SAVE Program are required take special, role-based training. External SAVE Program users complete online tutorials. The tutorials also cover the procedures and policies associated with the use of the SAVE Program and includes privacy-related topics.

The Verification Information System, as the underlying technology supporting the SAVE Program has been Certified and Accredited and received a full authority to operate in April 2014. The system has been approved to participate in the Ongoing Authorization process and is continually monitored for compliance with the National Institute of Science and Technology policies to ensure compliance with the Federal Information System Management Act. The SAVE Program implements access controls for both internal and external customers, such as account names and passwords to access the program. The program has an automated mechanism to ensure that users change their passwords at specified intervals. Additionally, the program implements the following technical controls:

- Password data is encrypted within the system;
- The system is located within a multi-layered firewall architecture;
- The system follows a robust set of security controls that meet the U.S. Department of Homeland Security System Security Policy requirements. The certification and accreditation process ensures that the U.S. Citizenship and Immigration Services documents and verifies these security controls through the certification and accreditation process;
- The system uses secure hypertext transfer protocol protected communications during all data transmissions between the client workstation and the system;

- Passwords are encrypted when making database connections; and
- Procedures are in place to ensure that any potential breaches of information are reported within one hour of being found.

| **14. How does the Component ensure that personally identifiable information is used appropriately?** |
|---|
| The SAVE Program has a comprehensive audit trail tracking and maintenance function that stores information about users who submit queries, when the query was processed, the query response, who received the query response, and when the user received the query response. The audit logs have restricted access based on user roles. These logs are external to system administration access methods and protected from modification. U.S. Citizen and Immigration Services personnel periodically review these audit logs to monitor user activity. Registered agencies must abide by all security requirements that they agreed to when they enrolled in the program. Attempts to evade the security controls can result in loss of access to the SAVE Program.<br><br>Some registered agencies use a single sign-on for all their individual users. In these cases, the SAVE Program will not collect information from individual users because individual users will appear as one agency user. In the case of single sign-on access to users, the U.S. Citizenship and Immigration Services requires the agency to sign an addendum to their Memorandum of Agreement which states that every user of the system must be assigned a unique identifier. If requested, the agency provides this information to the U.S. Citizenship and Immigration Services to allow for a clear audit trail for all transactions. |

## Associated Privacy Risks and Mitigations

| | |
|---|---|
| **Privacy Risk:** | There is a risk that the U.S. Citizenship and Immigration Services may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual. |
| **Mitigation:** | The U.S. Citizenship and Immigration Services **partially mitigates** this risk. Generally, the SAVE Program has a 3-step process. The first step is a general query of the system. However, due to misspelling of names, transposed numbers, or incomplete information, the SAVE Program may produce inaccurate results. To mitigate this, the SAVE Program has a manual step process where a U.S. Citizenship and Immigration Services staff member will try to reconcile the request manually. The third step is for |

| | |
|---|---|
| | the U.S. Citizenship and Immigration Services to get additional documentation from the registered agency. However, this only partially mitigates the risk since the new request using Social Security numbers does not allow for a second and third step review. The U.S. Citizenship and Immigration Services does not have direct access to the Social Security Administration system to support these additional steps. Additionally, registered agencies may not go through all steps to ensure accuracy of information. |

| | |
|---|---|
| **Privacy Risk:** | There is a risk that all United States citizens, including natural born U.S. citizens, have not been provided notice that the SAVE Program collects or maintains their information for citizenship and immigration status. |
| **Mitigation:** | The United States Citizenship and Immigration Services **partially mitigates** this risk. It is the responsibility of each registered agency to provide notice to individuals within their jurisdiction of their use of information and sharing with the U.S. Department of Homeland Security/U.S. Citizenship and Immigration Services. The U.S. Citizenship and Immigration Services is publishing this privacy impact assessment and related System of Records Notice to provide transparency regarding the new categories of information collected and shared to assist registered agencies in verifying citizenship and immigration status of individuals applying for a benefit or license and voter registration verification. The SAVE Program's "Register an Agency for SAVE" explains how an eligible agency can create a Memorandum of Agreement with the U.S. Citizenship and Immigration Services. These agreements require registered user agencies to comply with the Privacy Act of 1974, 5 U.S.C. § 552a, as amended, and other applicable laws, regulations, and policies. These policies include transparency and notice to individuals regarding agencies collection and use of personally identifiable information. |

| | |
|---|---|
| **Privacy Risk:** | There is a risk that the U.S. Citizenship and Immigration Services may use the information it obtains from registered agencies, the Social Security Administration, and the U.S. Department of State, for purposes not authorized by statute or for which it was originally collected. |
| **Mitigation:** | The United States Citizenship and Immigration Services **mitigates this risk** by only collecting information as authorized by the Immigration and Naturalization Act and other authorities mentioned within this Privacy |

| | |
|---|---|
| | Impact Assessment. The purpose for sharing Social Security numbers with the Social Security Administration and receiving information is to allow user agencies to verify the citizenship or immigration status of individuals applying for a benefit, license, or voter registration verification. The purpose for sharing and receiving U.S. passport information with the U.S. Department of State is to verify the citizenship or immigration status of individuals applying for a benefit, license or for voter registration verification. Also, each registered agency must execute a Memorandum of Agreement or Computer Matching Agreement with the U.S. Citizenship and Immigration Services that includes terms that the SAVE Program will be used in accordance with the law. |

| | |
|---|---|
| **Privacy Risk:** | There is a risk that the new category individuals covered by this assessment/notice, specifically, United States born citizens do not have the opportunity to individually participate or consent in how the U.S. Citizenship and Immigration Services uses their information. |
| **Mitigation:** | The U.S. Citizenship and Immigration Services **cannot mitigate** this risk. Each user agency is responsible for complying with federal and local authorities. The U.S. Citizenship and Immigration Services assumes that each user agency factors in the principles of notice, individual participation, and consent prior to providing information to the U.S. Citizenship and Immigration Services. The U.S. Citizenship and Immigration Services only uses the information for the authorized purpose(s) identified within this Privacy Impact Assessment. Individuals should consult their local government agencies to determine the appropriate opt-in or opt-out statute, regulations and policies. |

| | |
|---|---|
| **Privacy Risk:** | There is a risk that individuals may access the SAVE Program that do not have a need to know of the information. |
| **Mitigation:** | The U.S. Citizenship and Immigration Services mitigates this risk by requiring the SAVE Program's potential enrollees and customer agencies to register for participation in the program and sign a Memorandum of Agreement or Computer Matching Agreement. After all required documentation is submitted, all users must complete a web-based training course that explains functionality and security requirements.<br><br>The SAVE Program's internal users complete the mandatory annual privacy |

| | |
|---|---|
| | and information technology training. External program complete take on-line tutorials explaining the program. The tutorials also cover the procedures and policies associated with the use of the program. |

## Contact Official

Brian Broderick
Division Chief (Acting)
Verification Division
U.S. Citizenship and Immigration Services

## Responsible Official

Angela Y. Washington
Component Privacy Officer
Office of Privacy
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
USCIS.PrivacyCompliance@uscis.dhs.gov

## Approval Notice:

By signing below, the U.S. Department of Homeland Security Chief Privacy Officer approves this Privacy Impact Assessment for the SAVE Program. If, however, during the operational course of this program or U.S. Citizenship and Immigration Services' use of this technology changes from what has been documented or the U.S. Department of Homeland Security Privacy Office becomes aware of evidentiary changes to the intended use of the personally identifiable information or the scope of the personally identifiable information collected, of the program or technology is determined to be ineffective, the Chief Privacy Officer reserves the right to revoke approval of this Privacy Impact Assessment.

## Approval Signature

Original, signed copy on file with the U.S. Department of Homeland Security Privacy Office.

________________________________

Roman Jankowski
Chief Privacy Officer
U.S. Department of Homeland Security
Privacy@hq.dhs.gov

# Homeland Security

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
[redacted]
www.dhs.gov/privacy



## PRIVACY THRESHOLD ANALYSIS (PTA)

**This form serves as the official determination to identify the privacy compliance requirements for all Departmental uses of personally identifiable information (PII).**

A Privacy Threshold Analysis (PTA) serves as the document used to identify information technology (IT) systems, information collections/forms, technologies, rulemakings, programs, information sharing arrangements, or pilot projects that involve PII and other activities that otherwise impact the privacy of individuals, and to assess whether there is a need for additional privacy compliance documentation or requirements. A PTA includes a general description of the IT system, information collection, form, technology, rulemaking, program, pilot project, information sharing arrangement, or other Department activity and describes what PII is collected (and from whom) and how that information is used. In accordance with the Fair Information Practice Principles (FIPPs),[1] Component Privacy Officers should consider best practices for privacy safeguards and principles when reviewing and adjudicating PTAs.

Please complete the attached PTA and submit it to your Component Privacy Office. If you do not have a Component Privacy Office, please send the PTA to the DHS Privacy Office:

Senior Director, Privacy Compliance
The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
[redacted]

The Component or DHS Privacy Office will review this form and assess whether any privacy compliance documentation is required. If privacy compliance documentation is required – such as Privacy Impact Assessment (PIA), System of Records Notice (SORN), Privacy Act Statement/Privacy Notice, or Computer Matching Agreement (CMA) – the Component Privacy Office will send you a copy of the relevant compliance template to complete and return.

[1] *See* The Fair Information Practice Principles | Homeland Security.

## PRIVACY THRESHOLD ANALYSIS (PTA)

## SUMMARY INFORMATION

| | | | |
|---|---|---|---|
| **Project, Program, or System Name:** | Systematic Alien Verification for Entitlements Program | | |
| **Component or Office:** | U.S. Citizenship and Immigration Services (USCIS) | **Office or Program:** | Verification Division |
| **FISMA Name (if applicable):** | Verification Information System | **FISMA Number (if applicable):** | **CIS-06285-MAJ-06285** |
| **Type of Project or Program:** | **System** | **Project or program status:** | **Operational** |
| **Date first developed:** | July 7, 2007 | **Pilot launch date:** | N/A |
| **Date of last PTA update** | February 7, 2023 | **Pilot end date:** | N/A |
| **ATO Status (if applicable):**[2] | **Complete** | **Expected ATO/ATP/OA date (if applicable):** | **Ongoing Authorization** |

## PROJECT, PROGRAM, OR SYSTEM MANAGER

| | | | |
|---|---|---|---|
| **Name:** | Irina Sidelnikov | | |
| **Office:** | Office of Information Technology | **Title:** | OIT Project Manager |
| **Phone:** | [redacted] | **Email:** | [redacted] |

## INFORMATION SYSTEM SECURITY OFFICER (ISSO) (IF APPLICABLE)

| | | | |
|---|---|---|---|
| **Name:** | Minh Vo | | |
| **Phone:** | N/A | **Email:** | [redacted] |

[2] The DHS OCIO has implemented a streamlined approach to authorizing an Authority to Operate (ATO), allowing for rapid deployment of new IT systems and initiate using the latest technologies as quickly as possible. This approach is used for selected information systems that meet the required eligibility criteria in order to be operational and connect to the network. For more information, see https://dhsconnect.dhs.gov/org/comp/mgmt/ocio/ciso/Documents/DHS%20ATP%20Guide%20v2.0.pdf#search=atp.

## SPECIFIC PTA QUESTIONS

**1. Reason for submitting the PTA: Updated PTA**

The United States Citizenship and Immigration Services submits this updated Privacy Threshold Analysis to document the United States Citizenship and Immigration Services Verification Division and Office of Technology changes to the Systematic Alien Verification for Entitlements Program. The United States Citizenship and Immigration Services administers the Systematic Alien Verification for Entitlements Program, an inter-governmental initiative that provides a web-based service to help federal, state, territorial, tribal and local agencies and other governmental entities verify United States citizenship or immigration status/category information of applicants for benefits, licenses, or other authorized purposes.

This Privacy Threshold Analysis documents that the Systematic Alien Verification for Entitlements Program has

1. Expanded its search capabilities to allow approved Systematic Alien Verification for Entitlements Program user agencies to verify United States citizenship information using Social Security Numbers and other non-Department of Homeland Security enumerators.
2. A new Social Security Administration system connection to support verification of citizenship/immigration status.
3. A new bulk uploader/list processor function that allows user agencies to upload lists of benefit applicants.
4. Use of the Voter Registration and Voter List Maintenance Verification functionality.
5. The collection of information from the Department of State's Consular Consolidated Database/ American Citizen Record Query system. Additionally, the Systematic Alien Verification for Entitlements Program will integrate with the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data system.

**2025 Updates**

On April 22, 2025, Homeland Security Secretary Kristi Noem, alongside the United States Citizenship and Immigration Services and the Department of Government Efficiency, announced a comprehensive optimization of the Systematic Alien Verification for Entitlements Program to ensure a single, reliable source for verifying immigration status and United States citizenship nationwide. Congressional, federal, and state stakeholders have periodically expressed interest in using the Systematic Alien Verification for Entitlements to verify naturalized and derived citizenship information during voter registration and/or for voter list maintenance. Verification for voter list maintenance purposes often occurs when a state Department of Motor Vehicles compares its records to state voter agency records to determine if individuals on the voter rolls represented that they were other than U.S. citizens when the Department of Motor Vehicles issued their driver's license. The state voter agency then follows up with those individuals as to their citizenship status through state law voter registration challenge procedures. The United States Citizenship and Immigration Services Verification Division is leading this effort and has identified multiple phases to optimize the program. A high-level summary is provided below, while a more detailed description of each phase follows.

- Phase 1: Free Service for State, Local, Tribal, Territory agencies and Bulk Uploader. (Estimated completion: Implemented)
- Phase 2: Integration with the Social Security Administration to allow for full Social Security Number to be used as a non-Department of Homeland Security enumerator. (Estimated completion: Implemented)
- Phase 3: Modify the Security Administration integration to allow for truncated Social Security Numbers (last 4-digits) to be used as a non-Department of Homeland Security enumerator. (Estimated completion: July/August 2025)
- Phase 4: Integration with Customs and Border Protection to enable United States passport data, received from the Department of State, to be used within the Systematic Alien Verification for Entitlements Program. (Estimated completion: To be determined)
- Phase 5: Integration with the Department of Justice to enable an incarceration/felony related flag (the flag will be used internally and will not be sent to the agencies or the applicants). (Estimated completion: To be determined)
- Phase 6: Integration with State Driver's Licensing Agencies to enable a Driver License number to be used as a non-Department of Homeland Security enumerator. (Estimated completion: To be determined

The summary below focuses on phases one (1) through four (4). More detailed information can be found later in this document. Phases five (5) and six (6) are longer term goals of the optimization effort and are still in the exploratory/planning stage. The United States Citizenship and Immigration Services will update this Privacy Threshold Analysis to support the remaining phases during their development.

Phases One (1) through Three (3)

Systematic Alien Verification for Entitlements Program eliminated fees for non-federal users creating Systematic Alien Verification for Entitlements Program cases. User agencies can now create multiple individual cases from a list of data provided by the user. Further, the Systematic Alien Verification for Entitlements Program plans to integrate additional immigration information into search functionality and case results, such as timelines and addresses. Improved automatic status updates and a new user-friendly interface will empower federal, state, local, territorial, and tribal agencies to help prevent individuals who are not qualified for government benefits and licenses from receiving those benefits and licenses. The Department of Homeland Security intends to provide ongoing updates to stakeholders as the Systematic Alien Verification for Entitlements Program Optimization Plan progresses. Systematic Alien Verification for Entitlements Program users must attest to completing the Systematic Alien Verification for Entitlements Program tutorial prior to gaining access to Systematic Alien Verification for Entitlements Program. Users' access is based on their permissions.

The United States Citizenship and Immigration Services has developed and implemented a new bulk uploader/list processor feature to the Systematic Alien Verification for Entitlements Program. This feature will allow program users to upload a list (such as an excel spreadsheet) of benefit applicants to the Systematic Alien Verification for Entitlements Program for processing. Once the list is uploaded, the Systematic Alien Verification for Entitlements Program will accept or not accept the data then, through an automated process, create front-end single-record cases for each entry. Initially the creation of cases using this feature is limited to cases created using an A-number, Citizenship or Naturalization Certificate

number, or Social Security number. Agencies will not be prompted to institute additional verification when using this process but are instructed to resubmit additional information when the process is unable to return a response. Expansion of this feature in the future may include the ability to create cases with additional enumerators and the ability to request configured information not automatically selected for the benefit type.

User agencies will be able to access each case created using the list processor feature in the Systematic Alien Verification for Entitlements system as normal, by viewing the individual case status and response. The Systematic Alien Verification for Entitlements Program also has a feature available to all the user agencies to generate a report that will list all the cases created, the status of the case and the Systematic Alien Verification for Entitlements Program response. Access to generate the report, including what cases are included, will vary depending upon the individual user's permission. United States Citizenship and Immigration Services is providing this verification service for all benefit requests. There are approximately 1,200 user agencies with access to the Systematic Alien Verification for Entitlements Program to verify immigration status for benefits or entitlements, and in fiscal year 2024, the Systematic Alien Verification for Entitlements Program completed over 24.5 million first step verifications.

The Systematic Alien Verification for Entitlements Program was originally designed only to use a Department of Homeland Security-issued enumerator (such as an alien number or A-Number) to query immigration records, specifically, to provide immigration status to Systematic Alien Verification for Entitlements Program user agencies. The Systematic Alien Verification for Entitlements Program is now expanding to allow Systematic Alien Verification for Entitlements Program user agencies to provide a Social Security Number or a United States Passport number to query the Systematic Alien Verification for Entitlements Program.

The Systematic Alien Verification for Entitlements Program will also add the ability for user agencies to verify truncated Social Security Numbers (last 4 digits) against Social Security Administration records. This will allow the Systematic Alien Verification for Entitlements Program to verify all United States citizens including those by birth, which was previously not available. A benefit applicant's Social Security number can only be used for automated initial verification and cannot be used for additional verification, which will continue to require a Department of Homeland Security immigration enumerator since the Systematic Alien Verification for Entitlements Program does not normally collect Social Security Numbers or passport numbers. The addition of the Voter Registration and Voter List Maintenance Verification, and the Social Security Administration connection is now live. The Systematic Alien Verification for Entitlements Program can now verify United States-born citizens for voter verification agencies.

The Department of Homeland Security/United States Citizenship and Immigration Services seeks access to Social Security Administration information accessed through the Department of Homeland Security/United States Citizenship and Immigration Services Verification Information System[3]. The United States Citizenship and Immigration Services and the Social Security Administration agreed to the following limitations on the access to, and disclosure and use of information that identifies a verification request as being generated by United States Citizenship and Immigration Services or associated with a United States Citizenship and Immigration Services program:

[3] Verification Information System provides services to customers through Systematic Alien Verification for Entitlements and E-Verify (the latter of which will not be used for this initiative).

- Data or information that identifies a verification request as being generated by United States Citizenship and Immigration Services or associated with a United States Citizenship and Immigration Services program will remain information owned by United States Citizenship and Immigration Services.
- The United States Citizenship and Immigration Services will use the verification responses generated by the Social Security Administration only for the purposes described in the Information Sharing Agreement between the Department of Homeland Security, United States Citizenship and Immigration Services and the Social Security Administration.
- Data or information that identifies a verification request as being generated by the United States Citizenship and Immigration Services or associated with a United States Citizenship and Immigration Services program will be used only as provided in the Information Sharing Agreement by the Social Security Administration.
- Data or information that identifies a verification request as being generated by United States Citizenship and Immigration Services or associated with the United States Citizenship and Immigration Services program provided by Social Security Administration will not be duplicated or disseminated outside Social Security Administration without prior written approval from United States Citizenship and Immigration Services. The United States Citizenship and Immigration Services will not give such approval unless the redisclosure is required by law or is essential to the conduct of the exchange. In such cases, the Social Security Administration, the agency redisclosing the records, must specify in writing what records will be redisclosed, to whom they will be redisclosed, and the reasons that justify redisclosure.
- The United States Citizenship and Immigration Services will not duplicate or disseminate the verification responses for a purpose not covered by the Information Sharing Agreement, within or outside of its agency, without the written permission of the Social Security Agreement excepted as required by Federal law. The Social Security Administration will not give such permission, unless Federal law requires disclosure, or disclosure is essential to the purpose of this Agreement. For such permission, The United States Citizenship and Immigration Services must specify in writing what data it is requesting to duplicate or disseminate and to whom, and the reasons that justify such duplication or dissemination.

***Administrative Safeguards***

The Social Security Administration and the United States Citizenship and Immigration Services will restrict access to the data matched and to any data created by the match to only those users, for example, employees and contractors, who need it to perform their official duties in connection with the uses of the data authorized in the Information Sharing agreement. Further, the Social Security Administration and the United States Citizenship and Immigration Services will advise all personnel with access about the confidential nature of the data, the safeguards required to protect the data, and the civil and criminal sanctions for noncompliance contained in the applicable Federal laws.

Parties, including all personnel with access to information, will be appropriately educated and trained regarding the proper handling of personally identifiable information and proper care of the information systems to ensure the overall safeguarding and security of the information. The Social Security Administration and the United States Citizenship and Immigration Services will ensure that its

employees, including contractors with the access to any of the information, have completed privacy training on the handling of personally identifiable information.

Phase Four (4)

The United States Citizenship and Immigration Services will need to query other non-United States Citizenship and Immigration Services systems, besides the Social Security Administration's Numident system, with the information provided by the Systematic Alien Verification for Entitlements Program user agency to find the appropriate Department of Homeland Security-issued enumerator to continue with the Systematic Alien Verification for Entitlements Program case processing. For instance, USCIS is researching the possibility of using a United States Passport Number to be able to identify a Department of Homeland Security-issued enumerator. In a case when a User Agency uploads or enters a United States Passport Number instead of a DHS-issued enumerator, the Systematic Alien Verification for Entitlements Program will query another non-United States Citizenship and Immigration Services System using the United States Passport Number along with a unique identifier to find any records and will identify if a Department of Homeland Security-issued enumerator was used by the applicant when applying for a Department of Homeland Security-issued benefit or if a Passport Number was used at a United States Port of Entry and is associated with a Department of Homeland Security-issued enumerator. In this instance, to enable this change, the Systematic Alien Verification for Entitlements Program would integrate with the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data to match a Passport Number against Customs and Border Protection and Department of State records to attempt to locate a Department of Homeland Security issued enumerator.

The TECS (not an acronym) - Travel Documents and Encounter Data stores travel document information (scanned images of documents, biographic information, document details, and photographs) from the United States Citizenship and Immigration Services Lawful Permanent Resident Cards along with Department of State-issued United States passports, visas, foreign passports, enhanced driver's licenses, and enhanced tribal cards. The TECS (not an acronym) - Travel Documents and Encounter Data USPassportRESTService allows interconnected systems to query TECS (not an acronym) - Travel Documents and Encounter Data for United States passport information. For this use case, the Systematic Alien Verification for Entitlements Program user agency will input a passport number into the Systematic Alien Verification for Entitlements Program. The query will trigger the USPassportRESTService to locate the matching United States passport number and return the results to the user. This will allow the Systematic Alien Verification for Entitlements Program to verify all types of United States citizens, including those by birth, which was previously not available. Currently, the Systematic Alien Verification for Entitlements Program only collects passport numbers for foreign issued passports if it is provided with an additional Department of Homeland Security enumerator. The United States Citizenship and Immigration Services E-Verify has an existing connection to the USPassportRESTService, which also resides within the Verification Information System, like Systematic Alien Verification for Entitlements Program.

The following are updates that were planned prior to Secretary Noem's vision for optimizing the Systematic Alien Verification for Entitlements Program and are still in progress.

- Systematic Alien Verification for Entitlements Program will update the responses provided to users as part of the Interface Control Agreement Version 38, which enhances the Systematic Alien Verification for Entitlements Program query logic to provide more accurate information based on the need to know. The Systematic Alien Verification for Entitlements Program will add the collection of an uploaded document such as a Naturalization/Citizenship Certificate Number, when the user submits a second step additional verification, as well as the collection of a reason code, which allows the Systematic Alien Verification for Entitlements Program users to provide additional details regarding the applicant's request, particularly during the additional verification process. The Systematic Alien Verification Entitlements responds to users by providing an immigration status/category or United States citizenship. These additional collections will help Systematic Alien Verification for Entitlements Program identify and remedy data issues, reduce overall manual response times, and allow the Systematic Alien Verification for Entitlements Program to improve the quality of first step automated responses.
- A live site environment will be implemented where Systematic Alien Verification for Entitlements web service users can access new and current interface control agreements. This will streamline the process to update the interface control agreements and ensure that the Systematic Alien Verification for Entitlements Program users have access to the most current information for the Interface Control Agreement Version 38.
- The Systematic Alien Verification for Entitlements Program case response screen will be redesigned so that it is easier to read and allow for the additional information to be submitted. The screen will be packaged in a new way to provide the user clear information during the initial verification.

Additionally, Systematic Alien Verification for Entitlements Program will be collecting information from the Department of State's Consular Consolidated Database / American Citizen Record Query system which is a consular search engine used by the Department of State to manage and access records related to United States citizens, particularly for consular protection and services, including managing passport requests and applications.

**2024 Update**

As part of the Systematic Alien Verification for Entitlements Program's normal review process, the United States Citizenship and Immigration Services intends to access the Department of State's Consular Consolidated Database / American Citizen Record Query system to verify immigration status of applicants for benefits, licenses, and other authorized purposes. The purpose of collecting this information is to confirm the identity of the applicant to determine their status. This process is part of an ongoing effort that began in 2024.

***Background***

The Systematic Alien Verification for Entitlements Program is an online service for registered federal, state, territorial, tribal, and local government agencies to verify immigration status and United States citizenship of applicants seeking benefits or licenses. Systematic Alien Verification for Entitlements

Program is not a database but queries Department of Homeland Security-accessed federal records to provide registered user agencies with a verification response.

In 1986, Congress mandated that the Immigration and Naturalization Service, now United States Citizenship and Immigration Services, establish a system to verify the citizenship and immigration status of individuals seeking government benefits and licenses.

The United States Citizenship and Immigration Services Verification Division administers the Systematic Alien Verification for Entitlements Program, which is an intergovernmental initiative using a web-based service to help federal, state, territorial, tribal and local benefit-issuing and licensing agencies and other governmental entities determine the immigration status or United States citizenship of applicants for public benefits, licenses, grants, credentials, background investigations, and other lawful purposes, so only entitled applicants receive them. Systematic Alien Verification for Entitlements Program verifies immigration status/category and United States citizenship against Department of Homeland Security-accessed records. Historically, the Systematic Alien Verification for Entitlements Program has not verified information for United States born citizens as a Department of Homeland Security immigration enumerator was previously required, but now the Systematic Alien Verification for Entitlements Program can verify United States-born United States citizens against Social Security Administration data. The Systematic Alien Verification for Entitlements Program does not determine an applicant's eligibility for a specific benefit or license, as this is the responsibility of the benefit/license granting agency.

As of April 1, 2025, the Systematic Alien Verification for Entitlements Program has revised its transaction charges for all state, local, tribal, and territorial government agencies using the Systematic Alien Verification for Entitlements Program to eliminate those charges. Federal agencies are still charged a fee to use the Systematic Alien Verification for Entitlements Program. The authority for the Systematic Alien Verification for Entitlements Program, and for particular Systematic Alien Verification for Entitlements Program authorized uses can be found in the Immigration Reform and Control Act[4]; the Personal Responsibility and Work Opportunity Reconciliation Act[5] Title IV, Subtitle A, of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996[6], and the REAL ID Act of 2005[7], the Patient Protection and Affordable Care Act of 2010,[8] and the Federal Aviation Administration Extension, Safety and Security Act of 2016.[9] In addition, the Systematic Alien Verification for Entitlements Program has an obligation under 8 U.S.C. 1373(c) to "respond to an inquiry by a Federal, State or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

[4] Immigration Reform and Control Act of 1986, Public. Law. No. 99-603

[5] Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law No. 104-193, 110 Statute 2168

[6] Title IV, Subtitle A, of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 Public Law 104-208, 110 Statute 3009

[7] REAL ID Act of 2005, Public. Law No.109-13, 119 Statute 231

[8] Patient Protection and Affordable Care Act of 2010, Public Law No. 111-148

[9] Federal Aviation Administration Extension, Safety and Security Act of 2016 (Federal Aviation Administration Act), Public. Law. No. 114-190 § 3405(d) (July 15, 2016).

The United States Citizenship and Immigration Services Verification Division operates the Verification Data Information System as the search engine for Systematic Alien Verification for Entitlements Program and the E-Verify Program. The Verification Data Information System accesses nationally accessible databases of selected immigration records to support both the Systematic Alien Verification for Entitlements Program and the E-Verify Program. The Systematic Alien Verification for Entitlements Program queries an individual's immigration status to help the administering agency determine eligibility for any public benefit, license, or credential based on their United States citizenship or immigration status. The United States Citizenship and Immigration Services is obligated by law to respond to an inquiry by a Federal, state or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

***Systematic Alien Verification for Entitlements Program***

The United States Citizenship and Immigration Services administers the Systematic Alien Verification for Entitlements Program, an inter-governmental initiative that provides a web-based service to help federal, state, territorial, tribal, and local benefits-issuing and licensing agencies and other governmental entities along with Airport Operators verify the United States citizenship and immigration status/category information of applicants for public benefits or licenses (hereinafter "benefits"). Examples of these benefits include Supplemental Security Income Supplemental Nutrition Assistance Program (formerly food stamps), Temporary Assistance for Needy Families cash assistance, Medicaid, Children's Health Insurance Program, REAL ID compliance, and other statutorily authorized purposes, including voter verification.

The Systematic Alien Verification for Entitlements Program also eliminates fees for database searches, breaks down silos for more accurate results, streamlines List Processor submission, and integrates additional immigration information, such as timelines and addresses. Automatic status updates and a new user-friendly interface will empower Federal, state, local, territorial, and tribal agencies to help prevent individuals who are not qualified for government benefits from receiving those benefits. The Department of Homeland Security intends to provide ongoing updates to stakeholders as the Systematic Alien Verification for Entitlements Program Optimization Plan progresses.

Agency use of the Systematic Alien Verification for Entitlements Program is administered by the Verification Division. All user agencies are required to register with the Systematic Alien Verification for Entitlements Program to access the system prior to using the Systematic Alien Verification for Entitlements Program. The Systematic Alien Verification for Entitlements Program is not a source system and connects with federal immigration systems, and now the Social Security Administration's Numident[10] system, to access applicable information. The Systematic Alien Verification for Entitlements Program also has a Case Status Check capability that allows benefit applicants to view the status of their Systematic Alien Verification for Entitlements Program case. The system provides benefit eligibility checks based on the grant dates. The Verification Division has a three (3) tier process when verifying an individual's immigration status or United States citizenship.

[10] NUMIDENT or "Numerical Identification" refers to the master file of Social Security Administration records containing information about individuals who have applied for or been assigned a Social Security Number. This file includes records for applications, claims, and death records related to individuals with a Social Security Number.

Users must perform all additional verification procedures the Systematic Alien Verification for Entitlements Program requires and/or the applicant requests prior to denying a benefit based upon a Systematic Alien Verification for Entitlements Program response. Users must provide all applicants who are denied benefits based solely or in part upon the Systematic Alien Verification for Entitlements Program response adequate written notice and the information necessary to contact the Department of Homeland Security so that applicants may correct their immigration records in a timely manner, if necessary.

***Initial verification***

A Systematic Alien Verification for Entitlements Program user agency accesses their account in the system and either submits requests individually or via a bulk request using the system's new bulk uploader feature. When a Systematic Alien Verification for Entitlements Program user agency submits an online verification request for a benefit applicant, it provides several required identifiers for the benefit applicant from documents presented by the benefit applicant, including first and last name, date of birth, and at least one of the following: an enumerator from the Department of Homeland Security (e.g. Alien number/United States Citizenship and Immigration Services number, Form I-94 Number, Card Number/I-797 Receipt number, Citizenship/Naturalization Certificate Numbers), a Social Security number from Social Security Administration, or a United States passport number from the Department of State. Social Security Numbers and United States passport numbers are new enumerators. Previously, enumerators were solely limited to Department of Homeland Security-issued immigration enumerators.

In the case of a bulk upload the Systematic Alien Verification for Entitlements Program will use an automated process to create individual cases for each benefit applicant on the list.

Using these data fields, the Systematic Alien Verification for Entitlements Program performs an automated query of various Systematic Alien Verification for Entitlements Program-accessed federal databases for relevant records. If a Social Security Number is submitted under this new collection, the Systematic Alien Verification for Entitlements Program will verify this enumerator against the Social Security Administration records, including the Social Security Administration death records and citizenship records. If the individual's Social Security account has a record of an A-number or certificate number, the Social Security Administration will provide that information to the Systematic Alien Verification for Entitlements Program, which will be used to validate that information against the Department of Homeland Security records. If a United States passport number is submitted, the Systematic Alien Verification for Entitlements Program will verify it against the Department of State related records available in the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data system. When the Systematic Alien Verification for Entitlements Program locates a record pertaining to the benefit applicant in any of these federal databases, the Systematic Alien Verification for Entitlements Program displays a verification response to the user agency within seconds.

***Second step, additional verification (Tier 2)***

If the Systematic Alien Verification for Entitlements Program is unable to find a record pertaining to the benefit applicant through the automated first level search of the Department of Homeland Security records, including United States passport records and the Social Security Administration records, it displays a response to the user indicating additional action is required from the user agency, including requesting additional verification when an immigration enumerator is available. If only a Social Security Number is submitted for verification, the user agency will be informed to close the case and submit a new request using either corrected data or an immigration enumerator, since additional verification cannot be conducted with only a Social Security Number.

The Systematic Alien Verification for Entitlements Program user agency may start the additional verification procedure, which may include is an in-depth manual review by Systematic Alien Verification for Entitlements Program staff (Status Verification Analyst) to determine the applicant's immigration status or United States citizenship. At the point at which the "Institute Additional Verification" message is displayed, user agencies must submit the case for additional verification if they are relying on a Systematic Alien Verification for Entitlements Program response to deny a benefit. Additionally, if the user agency receives a response and they have questions about the validity of the response, the user agency may submit a case that already received a Systematic Alien Verification for Entitlements Program response for additional verification. Users must also submit a case for additional verification when requested by the applicant.

User agencies may not rely on a Systematic Alien Verification for Entitlements Program response to approve or deny an application for benefits unless they have followed all required Systematic Alien Verification for Entitlements Program verification procedures. The Systematic Alien Verification for Entitlements Program users are not required to institute additional verification if a user agency has alternate grounds upon which to base its decision to decide a benefit that do not require verification of the applicant's immigration status/category, even where the agency is prompted to do so. Examples of when a user agency has alternate grounds to base a decision that does not require the completion of additional verification include:

- The applicant does not meet eligibility requirements for the benefit unrelated to immigration status/United States citizenship.
- The applicant withdraws their application.
- The applicant cannot be contacted/fails to respond to an agency's request for follow-up.
- The applicant presents documentation the Systematic Alien Verification for Entitlements Program cannot verify (such as a military identification).

This revision adds the collection of an uploaded document which includes immigration enumerators (such as a Form I-94, Arrival/Departure Records, Naturalization/Citizenship Certificate, or passport records) when a case is submitted for second step additional verification as well as a reason code. Reason codes can provide information on why the initial verification was not successful, if the case has been escalated for additional verification, or suggest that additional verification steps may be needed to determine the applicant's status or eligibility for a benefit. Reason codes can also identify if it was a user-initiated additional verification request when the user received an initial Systematic Alien Verification for Entitlements Program response providing an immigration status/category or United States citizenship. These additional collections will help the Systematic Alien Verification for Entitlements Program identify

and remedy data issues, reduce overall manual response times, and allow the Systematic Alien Verification for Entitlements Program to improve the quality of first step automated responses.

If the second step manual search produces relevant information enabling the verification of immigration status, the Systematic Alien Verification for Entitlements Program provides an electronic response to the inquiring user agency.

If the user agency declines second step additional verification, the verification process ceases. Additional screens notify the user agency that closing the case without performing additional verification means the agency does not have a complete Systematic Alien Verification for Entitlements Program response. The Systematic Alien Verification for Entitlements Program user agencies cannot rely upon an incomplete Systematic Alien Verification for Entitlements Program response to deny a benefit.

***Third step Additional Verification with Documents (Tier 3)***

If a benefit applicant's immigration status/category cannot be verified on initial or additional verification step when submitting a Department of Homeland Security enumerator, the system will prompt the user agency to resubmit the case with documents. When the prompt is received, the agency must upload a copy of the front and back of the immigration document the applicant presented to the user agency for the Systematic Alien Verification for Entitlements Program to perform detailed manual research at third step. A Department of Homeland Security immigration enumerator is required for the third step additional verification. The Systematic Alien Verification for Entitlements Program cannot complete third step additional verification using non-immigration documentation. The Systematic Alien Verification for Entitlements Program user agencies are legally authorized to make electronic copies of immigration documents for purposes of verifying immigration status. Cases created with just the Social Security Number or a Passport Number as the enumerator are not subject to this step.

If the third step manual review produces relevant information enabling the verification of immigration status/category or United States citizenship, the Systematic Alien Verification for Entitlements Program provides an electronic response to the user agency.

If a benefit applicant's immigration status/category is not verified after completing third step verification, the Systematic Alien Verification for Entitlements Program will provide additional information or guidance on how to proceed.

If the applicant believes their information in the Department of Homeland Security records is incorrect, the applicant can seek a records correction. User agencies should provide the Systematic Alien Verification for Entitlements Program Fact Sheet and Systematic Alien Verification for Entitlements Program Records: Fast Facts for Benefit Applicants[11] to benefit applicants that may require records correction.

[11] The Systematic Alien Verification for Entitlements Fact Sheet and Systematic Alien Verification for Entitlements Records: Fast Fact for Benefits Applicants is accessible at https://www.uscis.gov/save/benefit-and-license-applicants/resources-for-benefit-and-license-applicants

The Systematic Alien Verification for Entitlements Program user agency continues to have the option of running a web report within the system that will create a file in Adobe format of all cases processed for their organization. The United States Citizenship and Immigration Services provides access to relevant reports of approved or pending cases for Systematic Alien Verification for Entitlements Program user agencies to assist them in managing their Systematic Alien Verification for Entitlements Program cases and monitoring their own compliance with the Systematic Alien Verification for Entitlements Program rules and the federal deeming and reimbursement rules. User agencies can run case-specific reports for quality assurance that will include information, such as name, date of birth, type of benefit, immigration identifier (e.g., A-Number, unexpired foreign passport number, I-94 Arrival/Departure Record), and immigration status, only if the benefit was administered.

***Voter Registration and Voter List Maintenance Verification***

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 expanded the Systematic Alien Verification for Entitlements Program by requiring the program to respond to inquiries by federal, state and local government agencies seeking to verify or determine the citizenship or immigration status of any individual within the jurisdiction of the agency for any lawful purpose. See 8 U.S.C. § 1373(c). This authority allows agencies to use the Systematic Alien Verification for Entitlements Program for verification of citizenship and immigration status outside of the traditional benefit-granting programs covered by the Immigration Reform and Control Act of 1986. This includes voter registration and voter list maintenance purposes, so long as the agency meets the legal requirements for using the Systematic Alien Verification for Entitlements Program and provides the required applicant information, when submitting verification requests.

On January 20, 2025, and March 25, 2025, the President issued Executive Orders 14159, *Protecting the American People Against Invasion*[12] and 14248, *Preserving and Protecting the Integrity of American Elections*[13] respectively. Executive Order 14159 requires the Secretary to "promptly issue guidance to ensure maximum compliance by [Department of Homeland Security] personnel with the provisions of 8 U.S.C. 1373[14] and 8 U.S.C. 1644[15] and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law." Executive Order 14248[16] provides, "Federal laws, such as the National Voter Registration Act (Pub. L. 103-31) and the Help America Vote Act (Pub. L. 107-252), require States to maintain an accurate and current Statewide list of every legally registered voter in the State. Pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Department of Homeland Security/United States Citizenship and Immigration Services is required to share database information with States upon request so they can fulfill this duty. 8 U.S.C. 1373(c)[17]." Executive Order 14159[18] directs the Secretary to "ensure that State and local officials have, without the requirement of the payment

[12] https://www.federalregister.gov/documents/2025/01/29/2025-02006/protecting-the-american-people-against-invasion
[13] https://www.federalregister.gov/documents/2025/03/28/2025-05523/preserving-and-protecting-the-integrity-of-american-elections
[14] 8 USC 1373 Communication between government agencies and the Immigration and Naturalization Service
[15] 8 USC 1644 Communication between State and local government agencies and Immigration and Naturalization Service
[16] Executive Order 14248 Preserving and Protecting the Integrity of American Elections
[17] 8 USC. 1373(c) Obligation to respond to inquiries
[18] Executive Order 14159 Protecting the American People Against Invasion

of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered." The Secretary is also required under Executive Order 14159, in coordination with the Department of Government Efficiency Administrator, to review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507[19], alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements. To support this activity the Attorney General is required to prioritize enforcement of 18 U.S.C. 611[20] and 1015(f)[21] and similar laws that restrict aliens from registering to vote or voting, including through use of: (i) databases or information maintained by the Department of Homeland Security; (ii) State-issued identification records and driver license databases; and (iii) similar records relating to citizenship.

In accordance with federal statutes and policies, the Department of Homeland Security personnel must, in a timely manner, provide verification or immigration status information in response to inquiries from State and local government agencies to verify or ascertain the citizenship or immigration status of individuals. As required by 8 U.S.C. 1373(c), such inquiries must relate to individuals within the jurisdiction of the State or local government agency and must be for a purpose authorized by law. Department of Homeland Security personnel have been directed to comply, to the maximum extent possible and permissible under law, with Section 1373, considering federal statutory requirements, including the Privacy Act of 1974, 5 U.S.C. 552a[22], and 8 U.S.C. 1367[23] (special protected class information); as well as other laws, rules, regulations, policies, and requirements regarding verification, information sharing, and confidentiality.

The Systematic Alien Verification for Entitlements Program user agency registration process determines whether a state voter registration agency meets the legal requirements for using the Systematic Alien Verification for Entitlements Program. As part of registering to use Systematic Alien Verification for Entitlements Program, the agency must provide the Systematic Alien Verification for Entitlements Program all applicable legal authorities and voter registration procedures that authorize the agency to engage in voter registration and/or voter list maintenance activities and verify citizenship status before making individual determinations regarding eligibility for voter registration. The United States Citizenship and Immigration Services provides information on its public facing website to assist user agencies understand the above referenced requirements.[24]

***Current Process - Voter Registration and Voter List Maintenance Verification***

[19] 52 USC 20507 Requirements with respect to administration of voter registration

[20] 18 USC 611 Voting by aliens

[21] 18 USC 1015 (f) Naturalization, citizenship or alien registry, whoever knowingly makes any false statement or claims that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)-Shall be fined under this title or imprisoned not more than five years, or both

[22] 5 USC 552a Records maintained on individuals

[23] 8 USC 1367 Penalties for disclosure of information

[24] The Systematic Alien Verification for Entitlements Voter Registration and Voter List Maintenance Fact Sheet is accessible at https://www.uscis.gov/save/resources/voter-registration-and-voter-list-maintenance-fact-sheet.

In understanding the use of the Systematic Alien Verification for Entitlements Program for voter verification-related purposes (voter registration and voter list maintenance), one should also bear in mind the following limitations and considerations:

- The information needed to verify an individual through the Systematic Alien Verification for Entitlements Program is typically not collected on a voter registration application, although it may be available from other sources, especially driver's license applications.
- The Systematic Alien Verification for Entitlements Program previously was only able verify United States citizenship for naturalized and certain acquired citizens[25] for whom the United States Citizenship and Immigration Services has a record of their citizenship.
- The Systematic Alien Verification for Entitlements Program previously was often unable to verify acquired United States citizens because eligible individuals frequently do not apply for and thus do not receive a determination and certificate of United States citizenship from the United States Citizenship and Immigration Services.
- Department of State adjudicates acquired citizens that may not have a record with the United States Citizenship and Immigration Services via the issuance of U.S. passports. Therefore, obtaining passport information from the Department of State is in progress.
- The Department of State maintains records for individuals who have renounced their citizenship. Once a Certificate of Loss of Nationality is approved by the Department of State indicating the official determination of loss of United States nationality, this information is shared with the United States Citizenship and Immigration Services per 8 USC 1373.[26]
- With the newly established connection to the Social Security Administration's Numident system, the Systematic Alien Verification for Entitlements Program is now able to verify more United States citizens, including United States citizens by birth, when a Social Security Number is provided.

Verification for voter list maintenance purposes often occurs when a state Department of Motor Vehicles compares its records to the state voter agency records to determine if any individuals on the voter rolls identified that they were non-United States citizens when the Department of Motor Vehicles issued their driver's license. The state voter agency would then follow up with those individuals their citizenship status through established state law voter registration challenge procedures. As part of the established voter registration challenge procedures, the State Voter Agency will seek to establish the immigration/citizenship status of the individuals and use Systematic Alien Verification for Entitlements Program as one method to verify the information.

There are likely some situations in which the Systematic Alien Verification for Entitlements Program provides an initial response indicating a non-United States citizen immigration status (e.g., Lawful Permanent Resident) when the registrant is in fact a United States citizen. However, as also noted above, rules for using the Systematic Alien Verification for Entitlements Program prohibit voter registration agencies from relying upon this initial verification response to deny or revoke registration since as by

[25] "Acquired citizenship" refers to U.S. citizenship conveyed to children through the naturalization of parents or, under certain circumstances, at birth to foreign-born children of U.S. citizens, provided certain conditions are met.
[26] 8 USC 1873 outlines the communication between government agencies and the Immigration and Naturalization Service.

asserting United States citizenship as part of registering to vote, registrants inherently disagree with any initial response indicating they are not a United States citizen.

***Shortfalls in data accuracy in the system could cause incomplete or false results.***

According to Systematic Alien Verification for Entitlements Program subject matter experts, the situations in which the Systematic Alien Verification for Entitlements Program provides an initial non-United States citizen immigration status for a United States citizen who has a certificate of naturalization or citizenship from the United States Citizenship and Immigration Services, or legacy Immigration and Naturalization Service can happen for a variety of reasons. In some instances, the initial non-United States citizen response is due to the lack of an electronic record with the Social Security Administration showing United States citizenship (which was not reliably recorded pre-1981), or the lack of an electronic record of a United States Citizenship and Immigration Services naturalization or acquired citizenship certificate, which is more likely for older certificates issued before recording them in electronic systems became a consistent practice. In addition, although the electronic record-matching algorithms in the United States Citizenship and Immigration Services Person Centric Service that the Systematic Alien Verification for Entitlements Program uses are very good, the United States Citizenship and Immigration Services previously identified and subsequently fixed two algorithm issues that caused Systematic Alien Verification for Entitlements Program to provide an initial verification response of Lawful Permanent Resident for some naturalized citizens and a small number of acquired United States citizens. But again, many of the safeguards noted above are designed to address any imperfections in records and algorithms used to match them.

The delay between the issuance a Certificate of Naturalization during a naturalization ceremony and when the certificate is reflected in source systems and made available to the Systematic Alien Verification for Entitlements Program rarely, if ever, causes the Systematic Alien Verification for Entitlements Program to provide an initial response of non-United States citizen immigration status. It typically takes about one business day plus a few hours for an electronic record of the certificate to be available to the Systematic Alien Verification for Entitlements Program once it is input by the responsible United States Citizenship and Immigration Services office. The Systematic Alien Verification for Entitlements Program rarely, if ever, receives requests to verify United States citizenship during this time.

Additionally, the United States Citizenship and Immigration Services is not the source agency for Social Security Administration related information. While the United States Citizenship and Immigration Services assumes the accuracy of the Social Security Administration data, it cannot verify accuracy of the information and relies on the Social Security Administration to ensure the data accuracy, timeliness, and integrity of their own data.

***Customs and Border Protection Integration***

The Systematic Alien Verification for Entitlements Program will integrate with the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data. Customs and Border Protection is now permitting the Systematic Alien Verification for Entitlements Program to query TECS (not an acronym) Travel Documents and Encounter Data system to find a match to US passport information in Customs and Border Protection holdings. The TECS (not an acronym) - Travel Documents and Encounter Data system stores travel document information (i.e. scanned images of documents, biographic information, document details, and photographs) from the United States Citizenship and Immigration Services Lawful Permanent Resident Cards, Department of State-issued United States

passports and visas, foreign passports, enhanced driver's licenses, and enhanced tribal cards. The TECS (not an acronym) - Travel Documents and Encounter Data USPassportRESTService allows interconnected systems to query TECS (not an acronym) - Travel Documents and Encounter Data for United States passport information. For this use case, the Systematic Alien Verification for Entitlements Program user agencies will input a United States passport number into the Systematic Alien Verification for Entitlements Program system.

The query will trigger the USPassportRESTService to locate the matching United States passport number and return the results to the user. This will allow the Systematic Alien Verification for Entitlements Program to verify all types of United States citizens, including those by birth, which was previously not available. Currently, the United States Citizenship and Immigration Services E-Verify Program has an existing connection to the USPassportRESTService, which also resides within the Verification Information System, like the Systematic Alien Verification for Entitlements Program.

Customs and Border Protection has the authority to collect passport photos pursuant to 5 USC 552a (4).[27] Customs and Border Protection receives a routine feed from the Department of State with US passports as they are issued and/or updated. Customs and Border Protection also collects passport information primarily on all travelers seeking to enter the United States at ports of entry. Customs and Border Protection uses this information as part of Agency operations.

***Social Security Administration Data Sharing***

The Information Sharing Agreement between the Department of Homeland Security-United States Citizenship and Immigration Services and the Social Security Administration documents the Social Security Administration's support by matching data submitted through the Systematic Alien Verification for Entitlements Program to Social Security Administration records in the Social Security Administration's master files of Social Security Number holders and Social Security Number Applications. The United States Citizenship and Immigration Services will only submit verification requests to the Social Security Administration for authorized purposes.

The United States Citizenship and Immigration Services Verification Division and Social Security Administration connection is now live and now connects the Systematic Alien Verification for Entitlements Program with the Social Security Administration's Numident system. Prior to the connection, the United States Citizenship and Immigration Services and Social Security Administration executed a Letter of Agreement that identifies the authorities for both organizations as well as purposes and the data exchange. The United States Citizenship and Immigration Services will document this sharing in a separate Privacy Threshold Analysis.

The Systematic Alien Verification for Entitlements Program performs an automated query of various Systematic Alien Verification for Entitlements Program-accessed federal databases for relevant records. Now, if a Social Security Number is submitted by a user agency, the Systematic Alien Verification for Entitlements Program will verify this enumerator against the Social Security Administration Numident system including the death and citizenship records. If the individual's Social Security account has a record of an A-number or certificate number, the Social Security Administration will provide that information to the Systematic Alien Verification for Entitlements Program, which will in turn be used to

[27] 5 USC 552a (4) Records maintained on individuals - collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph.

validate the information against the Department of Homeland Security records. Verifying citizenship status using Social Security Administration data will be made available to all Systematic Alien Verification for Entitlements Program user agencies.

***Department of State Data Sharing***

If a United States passport number is submitted, the Systematic Alien Verification for Entitlements Program will verify it against information from Department of State-issued passports maintained by the Custom Boarder Protection. Additionally, Systematic Alien Verification for Entitlements Program will collect information from the Department of State's Consular Consolidated Database / American Citizen Record Query system, which is a consular search engine used by the Department of State to manage and access records related to United States citizens, particularly for consular protection and services, including managing passport requests and applications.

Department of Homeland Security-Department of State Memorandum of Agreement Appendix A allows this query of passport information to be used in Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data to support its missions, including but not limited to verification of United States passports, whenever the document is presented as proof of identity to obtain a benefit, privilege, status, or credential from the Department of Homeland Security, for vetting and screening purposes, and/or for transportation security, national security, law enforcement, border security (including biometric entry and exit initiatives), immigration (including verification purposes such as E-Verify) and counterterrorism purposes.

***User Agencies Memoranda of Agreement***

All user agency memorandums of agreements contain similar provisions to protect the due process and other rights of individuals for whom states or other user agencies submit verification requests to the Systematic Alien Verification for Entitlements Program[28]. The United States Citizenship and Immigration Services has an online tool that allows the public to search if a federal, state, local, tribal, or territorial agency is registered with the Systematic Alien Verification for Entitlement Program.[29]

| | |
|---|---|
| **2. From whom does the Project, Program, or System collect, maintain, use, or disseminate information?** *Please check all that apply.* | ☐ This project does not collect, collect, maintain, use, or disseminate any personally identifiable information[30]<br>☒ Members of the public |

[28] The Systematic Alien Verification for Entitlements Program memorandum of agreement is assessable at https://www.uscis.gov/save/prospective-user-agencies/register-an-agency-for-save and under the "How to Register for SAVE" section.
[29] The Systematic Alien Verification for Entitlement Program search tool is accessible at https://www.uscis.gov/save/save-agency-search-tool.
[30] DHS defines personal information as "Personally Identifiable Information" or PII, which is any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual, regardless of whether the individual is a U.S. citizen, lawful permanent resident, visitor to the U.S., or employee or contractor to the Department. "Sensitive PII" is PII, which if lost, compromised, or disclosed without authorization, could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual. For the purposes of this PTA, SPII and PII are treated the same.

| | |
|---|---|
| | ☒ U.S. Persons (U.S citizens or lawful permanent residents)<br>☒ non-U.S. Persons<br>☒ DHS Employees/Contractors (list Components): United States Citizenship and Immigration Services<br>☐ Other federal employees or contractors (list agencies): *Click here to enter text.* |
| **2(a) Is information meant to be collected from or about sensitive/protected populations?** | ☐ No<br>☒ 8 USC § 1367 protected individuals (e.g., T, U, VAWA)[31]<br>☒ Refugees/Asylees<br>☐ Other. Please list: |

**3. What specific information about individuals is collected, maintained, used, or disseminated?**

***Information Collected from Requesting Agencies about applicants for benefits, licenses, or other authorized purposes:***

- Full Name
- Date of birth
- Benefit sought
- Driver license
- State Identification
- Citizenship or nationality
- Country of birth
- A-Number
- Social Security Number
- Alias
- Customer Agency-issued Case Number

***Unique Immigration Identifiers Used:***

[31] This involves the following types of individuals: T nonimmigrant status (Victims of Human Trafficking), U nonimmigrant status (Victims of Criminal Activity), or Violence Against Women Act (VAWA). For more information about 1367 populations, please see: DHS Management Directive 002-02, Implementation of Section 1367 Information Provisions, *available at* http://dhsconnect.dhs.gov/org/comp/mgmt/policies/Directives/002-02.pdf.

- Alien number
- United States Citizenship and Immigration Services Number
- I-94 Admission Record Number (a 11-digit admission record assigned to foreign visitors entering the United States by the United States Customs and Border Protection)
- Student and Exchange Visitor Information System Identification Number
- Naturalization or Citizenship Certificate Number
- Card Number / I-797 Receipt Number (unique identifier assigned by the United States Citizenship and Immigration Services to track an immigration application or petition).
- Visa Number
- Foreign passport number (if submitted with another immigration enumerator and issuing country)

***Other Identifiers:***

- Social Security Number including a truncated version of the Social Security Number where only the last four digits are displayed, with the initial five digits are masked using asterisks (*) or XXXXX
- United States Passport Number
- Agency Data Universal Numbering System

***Other Information:***

**Additional information requested by the agency**:

- Employment Authorization Document History
- Grant Date
- Affidavit of Support Sponsor Data[32]
  - Full name
  - Current mailing address - In care of name (if any)
  - Current physical address
  - Country of domicile
  - Date of birth
  - Country of birth
  - Social Security Number
  - Immigration Status
  - Sponsors A-number (if any)
  - United States Citizenship and Immigration Services Online Account Number (if any)
  - Military service
  - Employment and income
  - Federal tax return information

[32] A United States Citizenship and Immigration Services Affidavit of Support sponsor is an individual who signs a legal contract, Form I-864, agreeing to financially support an intending immigrant, ensuring they won't become a public charge. This sponsor is typically the U.S. citizen, lawful permanent resident, or U.S. national who filed the immigrant petition.

- Sponsor Deeming and Agency Reimbursement Information Collection
    - Whether the benefit-granting agency approved or denied the application for the means-tested public benefit.
    - If the benefit-granting agency denied the application, if the denial was based upon the information that the Systematic Alien Verification for Entitlements Program provided in its response to the citizenship and immigration status verification request from the benefit-granting agency.
    - Whether the benefit-granting agency deemed sponsor/household member income and, if not, the exception or reason for not doing so.
    - Whether the benefit-granting agency sent the sponsor a reimbursement request letter (yes/no).
    - Whether the sponsor complied with his or her reimbursement obligation.
    - Whether the benefit-granting agency conducted a collection action or other proceedings if the sponsor did not comply with his or her reimbursement obligation (yes/no and if yes, the status, court or forum, and docket or matter number).

- Data collected on Form I-864, Affidavit of Support Under Section 213A of the Immigration and Nationality Act
    - Principal Immigrant:
        - Full name
        - Current mailing address - In care of name (if any)
        - Current physical address
        - Country of Citizenship or Nationality
        - Date of birth
        - Alien Registration number
        - United States Citizenship and Immigration Services Online Account Number (if any)
        - Daytime telephone number
    - Principal Immigrant Family Members:
        - Full name
        - Relationship to Principal Immigrant
        - Alien Registration number
        - United States Citizenship and Immigration Services Online Account Number (if any)
        - Daytime telephone number
    - Interpreter's Contact Information, Certification and Signature:
        - Full name
        - Telephone number
        - Email address (if any)
        - Interpreter's certification and signature
    - Preparer's Contact Information:
        - Daytime number
        - Mobile number (if any)
        - Email address (if any)
        - Signature

- Cuban/Haitian, Immigration Status

- Violence Against Women's Act
- Request Document Review
- Citizenship Status
- Immigration Documentation (uploaded by the user agency to perform additional verification)

***Agency User Information***

- Agency point of contact name
- Agency point of contact phone number
- Initiated on
- Initiated by

***Information Shared with Social Security Administration:***

- Full Name
- Date of Birth
- Social Security Number

***DATA Received and Maintained from Social Security Administration:***

- Social Security Number Match: True/False
- Name Match: True/False
- Date of Birth Match: True/False
- Citizenship Indicator**:**
- "A" - United States citizen
- "B" - Legal alien, eligible to work
- "C" - Legal alien, not eligible to work
- "D" - Other
- "E" - Alien Student - restricted work authorized
- "F" - Conditionally legalized alien
- Foreign Born Indicator: Citizenship code is not present, but individual was foreign born
- Alien Registration Number: Where applicable
- Certificate Number**:** Where applicable
- Death Indicator: Yes Deceased / Not Deceased
- Error Code Descriptions**:** Transaction and record levels

***Information Shared with TECS (not an acronym) – TECS (not an acronym)-Travel Documents and Encounter Data for Passport query:***

- Full Name
- Date of Birth
- United States passport number

***Information Provided to Requesting User Agencies:***

- Case Verification Number: a Systematic Alien Verification for Entitlements Program generated number
- Initial Request Date
- Identification Type
- Identification Number
- Last Name
- Benefit Code
- Benefit Description
- Initial Request Response: Lawful Status, No Lawful Status, Deceased
- Additional Request Date
- Additional Request Response: Lawful Status, No Lawful Status, Deceased
- Third Step Request Date
- Third Step Resolution: Lawful Status, No Lawful Status, Deceased

***Additional information for immigrants requested from agencies for which they established the authority/need to receive***

- Employment authorization document history
- Grant date
- Affidavit of Support Sponsor Data
- Cuban/Haitian Entrant Information
- Violence Against Women's Act information
- Immigration Status
- Request document review
- Citizenship status
- Photo
- Closed Date
- Receipt number

**3(a) Does this Project, Program, or System collect, maintain, use, or disseminate Social Security numbers (SSN) or other types of stand-alone sensitive information?[33] If applicable, check all that apply.**

[33] Sensitive PII (or sensitive information) is PII that if lost, compromised, or disclosed without authorization, could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual. More information can be found in the DHS Handbook for Safeguarding Sensitive Personally Identifiable Information, *available at* https://www.dhs.gov/publication/handbook-safeguarding-sensitive-personally-identifiable-information.

| | |
|---|---|
| ☒ Social Security number<br>☒ Alien Number (A-Number)<br>☐ Tax Identification Number<br>☒ Visa Number<br>☒ Passport Number<br>☐ Bank Account, Credit Card, or other financial account numbers | ☐ Social Media Handle/ID<br>☒ Driver's License/State ID Number<br>☐ Biometric identifiers *(e.g., FIN, EID)*<br>☒ Biometrics.[34] *Please list modalities (e.g., fingerprints, DNA, iris scans): Click here to enter text.*<br>☒ Other. *Please list:* Form I-94 number, Student and Exchange Visitor Information System Identification number, Naturalization / Citizenship Certificate number, Permanent Resident Card number / Receipt number, and Visa number. |
| **3(b) Please provide the specific legal basis for the collection of SSN:** | The Social Security Number is collected from applicants and is used to verify their immigration status/United States citizenship. div. C, title VI, Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-707, codified at 8 U.S.C. 1373 (a) and (c). Authority for having a system for verification of citizenship and immigration status of individuals seeking government benefits is governed by the Immigration Reform and Control Act of 1986 Pub. L. No. 99-603, 100 Stat. 3359.<br>Sections 415 and 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, authorizes the collection and use of Social Security Numbers to verify entitlement to public benefits, licenses, and credentials. |

| **3(c) If the SSN is needed to carry out the functions and/or fulfill requirements of the Project, System, or Program, please explain why it is necessary and how it will be used.** |
|---|
| The Social Security Number is used to assist in identity verification for user agencies and in determining benefits eligibility. If possible, the United States Citizenship and Immigration Services will use a truncated Social Security Number if provided by the user agency. |

[34] If related to IDENT/HART and applicable, please complete all Data Access Request Analysis (DARA) requirements. This form provides privacy analysis for DHS' IDENT, soon to be HART. The form replaces a PTA where IDENT is a service provider for component records. PRIV uses this form to better understand how data is currently shared, will be shared and how data protection within IDENT will be accomplished. IDENT is a biometrics service provider and any component or agency submitting data to IDENT is a data provider.

| |
|---|
| **3(d) If the Project, Program, or System requires the use of SSN, what actions are being taken to abide by Privacy Policy Instruction 047-01-010, *SSN Collection and Use Reduction*,[35] which requires the use of privacy-enhancing SSN alternatives when there are technological, legal, or regulatory limitations to eliminating the SSN? Note:** *even if you are properly authorized to collect SSNs, you are required to use an alternate unique identifier. If there are technological, legal, or regulatory limitations to eliminating the SSN, privacy-enhancing alternatives should be taken, such as masking, truncating, or encrypting the SSN, or blocking the display of SSNs in hard copy or digital formats.* |
| The United States Citizenship and Immigration Services has traditionally used an alternative number to the Social Security Number to access records to determine the citizenship/immigration status of user agencies benefit applicants in compliance with the Department of Homeland Security privacy-related policies. However, United States Citizenship and Immigration Services now needs to collect Social Security numbers to facilitate user agencies' ability to submit a request for citizenship/immigrations status of benefit applicants. The United States Citizenship and Immigration Services is working to implement use of the truncated form of a Social Security number (i.e. the last four numbers of a Social Security number rather than the full identifier) to retrieve information from the Social Security Administration. The Systematic Alien Verification for Entitlements Program's user interface will mask the full Social Security Number during data inputs, except for when information is submitted via the bulk uploader. In compliance with the security policy for Social Security numbers, server-side encryption is used for Amazon Simple Storage Service[36] and Amazon Relational Database Services[37] databases. This uses key management provided by Amazon Web Services for the storage buckets and Relational Database Services databases where Social Security Numbers are housed. Social Security Numbers and Personally Identifiable Information are not exposed in any hard copy documents available for extract from the information system. Additionally, in accordance with the National Institute of Science and Technology and Department of Homeland Security information security and privacy policies, the Systematic Alien Verification for Entitlements Program maintains moderate level controls for the confidentiality of information within the tool. |

| | |
|---|---|
| **4. How does the Project, Program, or System retrieve information?** | ☒ By a unique identifier.[38] Please list all unique identifiers used:<br>• Full name<br>• Alias |

[35] *See* https://www.dhs.gov/publication/privacy-policy-instruction-047-01-010-ssn-collection-and-use-reduction.
[36] Amazon Simple Storage Service (Amazon S3) is an object storage service offering industry-leading scalability, data availability, security, and performance. Organizations can use this service to store, manage, analyze, and protect any amount of data for virtually any use case, such as data lakes, cloud-native applications, and mobile apps.
[37] Amazon Relational Database Service (Amazon RDS) is an easy-to-manage relational database service optimized for total cost of ownership. It is simple to set up, operate, and scale with demand. Amazon RDS automates undifferentiated database management tasks, such as provisioning, configuring, backing up, and patching. Amazon RDS allows customers to create a new database in minutes and offers flexibility to customize databases to meet their needs.
[38] Generally, a unique identifier is considered any type of "personally identifiable information," meaning any information that permits the identity of an individual to be directly or indirectly inferred, including any other information which is linked or linkable to that individual regardless of whether the individual is a U.S. citizen, lawful permanent resident, visitor to the U.S., or employee or contractor to the Department.

| | |
|---|---|
| | • Date of birth<br>• Immigration enumerator:<br>    o Alien number/United States Citizenship and Immigration Services Number,<br>    o Form I-94, Arrival/Departure Record number,<br>    o Student and Exchange Visitor Information System Identification number,<br>    o Citizenship or Naturalization Certificate number<br>    o Card Number / I-797 Receipt Number,<br>    o Visa Number, or<br>    o Foreign passport number (if submitted with another immigration enumerator) and issuing country<br>• Social Security Number<br>• United States passport number<br>• Customer Agency-issued Case Number<br>• Case Verification Number<br><br>☐ By a non-unique identifier or other means. Please describe:<br>*Click here to enter text.* |

| | |
|---|---|
| **5. What is the records retention schedule(s) for the information collected for each category type** (include the records schedule number)? *If no schedule has been approved, please provide proposed schedule or plans to determine it.*<br><br>*Note: If no records schedule is in place or are unsure of the applicable records schedule, please reach out to the appropriate Records Management Office.*[39] | Data within Systematic Alien Verification for Entitlements Program is retained for 10 years after the final match determination of the employee or applicant in accordance with NARA approved records retention schedule N1-566-08-07.<br><br>All United States Citizenship and Immigration Services verification requests will be documented in a transactional database. The retention period is 10 years. The database is not accessible to the public, except as permitted. |

[39] *See* https://dhsconnect.dhs.gov/org/comp/mgmt/ocio/cdod/rm/Pages/DHS-Records-Officers.aspx

| | |
|---|---|
| **5(a) How does the Project, Program, or System ensure that records are disposed of or deleted in accordance with the retention schedule** (e.g., technical/automatic purge, manual audit)? | Data is automatically purged annually based on NARA disposal schedule N1-566-08-07. |
| **6. Does this Project, Program, or System connect, receive, or share PII with any other DHS/Component projects, programs, or systems?**[40] | ☐ No.<br>☒ Yes. If yes, please list:<br>**United States Citizenship and Immigration Services Systems:**<br>• Central Index System<br>• Electronic Immigration System<br>• Computer Linked Application Information Management System 3<br>• Enterprise Citizenship and Immigration Services Centralized Operational Repository<br>• GLOBAL (not an acronym)<br>• RAILS (not an acronym)<br>• Customer Profile Management System<br>• Reengineered Naturalization Application Casework System<br>• Marriage Fraud Amendment System<br>• Salesforce Customer Relationship Management Customer Relationship Management[41]<br>**Department of Homeland Security Systems:**<br>• Department of Homeland Security OneNet<br>• Immigration and Custom Enforcement Student and Exchange Visitor Information System<br>• Immigration and Custom ENFORCE Integrated Database |

[40] PII may be shared, received, or connected to other DHS systems directly, automatically, or by manual processes.
[41] Provides a unified platform where data from different departments can be accessed and used to improve customer interactions.

| | |
|---|---|
| | • Customs and Border Protection Arrival and Departure Information System<br>• Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data - USPassportRESTService<br>• Transportation Security Administration Technology Infrastructure Modernization and Vetting and Credentialing System |
| **7. Does this Project, Program, or System connect, receive, or share PII with any external (non-DHS) government or non-government partners or systems?** | ☐ No.<br>☒ Yes. If yes, please list:<br>The following are systems/organizations that the Systematic Alien Verification for Entitlements Program collects/shares information to support user agencies' requests:<br>• United States Military Entrance Processing Command Integrated Resource System<br>• Department of Education Federal Student Aid Central Processing System<br>• Department of Health and Human Services Centers for Medicare & Medicaid Services<br>• Social Security Administration Numident system<br>• Department of Justice Executive Office for Immigration's Immigration Review Information Exchange System<br>• Department of State Consular Consolidated Database Passport<br>The following are systems/organizations that the Systematic Alien Verification for Entitlements provides information that determine benefit eligibility:<br>• Various federal agencies in their role as a user agency |

| | |
|---|---|
| | • Various state, local, tribal, and territory agencies in their role as a Systematic Alien Verification for Entitlements Program user agency |
| **8. Is this sharing pursuant to new or existing information sharing agreement (MOU, MOA, LOI, RTA, etc.)? *If applicable, please provide agreement as an attachment.*** | Existing<br>Please describe applicable information sharing governance in place:<br>• Letter of Agreement between United States Citizenship and Immigration Services and Social Security Administration<br>• Information Sharing Agreement between the Department of Homeland Security, United States Citizenship and Immigration Services and the Social Security Administration regarding citizenship<br>• Computer Matching Agreement with Department of Education<br>• Memorandum of Agreements between United States Citizenship and Immigration Services and each individual user agency |
| **9. Does the Project, Program, or System or have a mechanism to track external disclosures of an individual's PII?** | ☐ No. What steps will be taken to develop and maintain the accounting: *Click here to enter text.*<br>☒ Yes. In what format is the accounting maintained if appropriate (e.g., disclosures to the Department of Justice Office of Special Counsel, Immigration and Customs Enforcement). Verification Information System also has a transactional log that enables the recreation of accounting of disclosures. |
| **10. Does this Project, Program, or System use or collect data involving or from any of the following technologies:** | ☐ Social Media<br>☐ Advanced analytics[42]<br>☐ Live PII data for testing |

[42] The autonomous or semi-autonomous examination of Personally Identifiable Information using sophisticated techniques and tools to draw conclusions. Advanced Analytics could include human-developed or machine-developed algorithms and encompasses, but is not limited to, the following: data mining, pattern and trend analysis, complex event processing, machine learning or deep learning, artificial intelligence, predictive analytics, big data analytics.

| | |
|---|---|
| | ☒ No |
| **11. Does this Project, Program, or System use data to conduct electronic searches, queries, or analyses in an electronic database to discover or locate a predictive pattern or an anomaly indicative of terrorist or criminal activity on the part of any individual(s) (i.e., data mining)?[43] This does not include subject-based searches.** | ☒ No.<br><br>☐ Yes. If yes, please elaborate: *Click here to enter text.* |
| **11(a) Is information used for research, statistical, or other similar purposes? If so, how will the information be de-identified, aggregated, or otherwise privacy-protected?** | ☒ No.<br><br>☐ Yes. If yes, please elaborate: *Click here to enter text.* |
| **12. Does the planned effort include any interaction or intervention with human subjects[44] via pilot studies, exercises, focus groups, surveys, equipment or technology, observation of public behavior, review of data sets, etc. for <u>research purposes</u>** | ☒ No.<br><br>☐ Yes. If yes, please reach out to the DHS Compliance Assurance Program Office (CAPO) for <u>independent</u> review and approval of this effort.[45] |
| **13. Does the Project, Program, or System provide role-based or additional privacy training for personnel who have access, <u>in addition</u> to annual privacy training required of all DHS personnel?** | ☒ No.<br><br>☐ Yes. If yes, please list: *Click here to enter text.* |

[43] Is this a program involving pattern-based queries, searches, or other analyses of one or more electronic databases, where—
(A) a department or agency of the Federal Government, or a non-Federal entity acting on behalf of the Federal Government, is conducting the queries, searches, or other analyses to discover or locate a predictive pattern or anomaly indicative of terrorist or criminal activity on the part of any individual or individuals.
(B) the queries, searches, or other analyses are not subject-based and do not use personal identifiers of a specific individual, or inputs associated with a specific individual or group of individuals, to retrieve information from the database or databases; and
(C) the purpose of the queries, searches, or other analyses is not solely—
(i) the detection of fraud, waste, or abuse in a government agency or program; or
(ii) the security of a government computer system.

[44] Human subject means a living individual about whom an investigator conducting research: (1) obtains information or biospecimens through intervention or interaction with the individual, and uses, studies, or analyzes the information or biospecimens; or (2) obtains, uses, studies, analyzes, or generates identifiable private information or identifiable biospecimens.

[45] For more information about CAPO and their points of contact, please see: https://www.dhs.gov/publication/capo or https://collaborate.st.dhs.gov/orgs/STCSSites/SitePages/Home.aspx?orgid=36. For more information about the protection of human subjects, please see DHS Directive 026-04: https://www.dhs.gov/sites/default/files/publications/mgmt/general-science-and-innovation/mgmt-dir_026-04-protection-of-human-subjects_revision-01.pdf.

| **14. Is there a FIPS 199 determination?**[46] | ☐ No.<br><br>☒ Yes. Please indicate the determinations for each of the following:<br><br>Confidentiality:<br>☐ Low ☒ Moderate ☐ High ☐ Undefined<br><br>Integrity:<br>☐ Low ☒ Moderate ☐ High ☐ Undefined<br><br>Availability:<br>☐ Low ☒ Moderate ☐ High ☐ Undefined |
|---|---|

## PTA REVIEW

## (TO BE COMPLETED BY COMPONENT PRIVACY OFFICE REVIEWER)

| | |
|---|---|
| **Component Privacy Office Reviewer:** | Chiquita Jones/LeVar Sykes |
| **Component Privacy Office Senior Reviewer:** | Shannon DiMartino |
| **PRIVCATS ID Number:** | 0019946 |
| **Date submitted to Component Privacy Office:** | May 5, 2025 |
| **Concurrence from other Component Reviewers involved (if applicable):** | Catherine Shorten, Customs and Border Protection, concurrence provided 6/5/2025 |

**Component Privacy Office Recommendation:**
*Please include recommendation below, including what new privacy compliance documentation is needed, as well as any specific privacy risks/mitigations, as necessary.*

The United States Citizenship and Immigration Services submits this updated Privacy Threshold Analysis to document the United States Citizenship and Immigration Services Verification Division and Office of Technology (OIT) changes to the Systematic Alien Verification for Entitlements Program. The United States Citizenship and Immigration Services administers the Systematic Alien Verification for Entitlements Program which is an inter-governmental initiative that provides a web-based service to help

[46] FIPS 199 is the Federal Information Processing Standard Publication 199, Standards for Security Categorization of Federal Information and Information Systems and is used to establish security categories of information systems. For more information, see https://www.nist.gov/itl/fips-general-information.

federal, state, territorial, tribal and local agencies and other governmental entities verify United States citizenship or immigration status/category information of applicants for benefits, licenses, or other authorized purposes.

This Privacy Threshold Analysis documents the following changes to the Systematic Alien Verification for Entitlements Program:

1. Expanded search capabilities to allow approved Systematic Alien Verification for Entitlements Program user agencies to verify United States citizenship information using Social Security Numbers and other non-Department of Homeland Security enumerators.
2. A new Social Security Administration system connection to support verification of citizenship/immigration status.
3. A new bulk uploader/list processor function that allows user agencies to upload lists of benefit applicants.
4. Use of the Voter Registration and Voter List Maintenance Verification functionality.
5. The collection of information from the Department of State's Consular Consolidated Database/ American Citizen Record Query system.
6. An integration with the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data system.

The United States Citizenship and Immigration Services Privacy Office recommends Privacy Impact Assessment coverage for the Systematic Alien Verification for Entitlements Program to comply with the eGovernment Act of 2002 as it "collects, maintains, or disseminates information that is in an identifiable form." The information collected, used, stored, and/or disseminated by the Systematic Alien Verification for Entitlements Program meets the definition of Personally Identifiable Information ("PII")/Sensitive Personally Identifiable Information ("SPII")[47] as it "permits the identity of an individual to be directly or indirectly inferred, including any other information that is linked or linkable to that individual, regardless of whether that individual is a United States citizen, legal permanent resident, or a visitor to the United States, or employee or contractor to the Department." Specifically, the Systematic Alien Verification for Entitlements Program involves information from members of the public applying for benefits, licenses, or other authorized purposes which may include (1) United States citizens and legal permanent residents, (2) individuals who are now current United States citizens and legal permanent residents after previously naturalizing or adjusting their status, or (3) individuals who may ultimately naturalize to become United States citizens or adjust their status to receive legal permanent residency in the future. Depending on the eligibility category certain individuals may be eligible to apply for adjustment of status as soon as one (1) year after their initial immigration benefit is granted,[48] therefore the United States Citizenship and Immigration Services Privacy Office recommends requiring Privacy Impact Assessment coverage for the Systematic Alien Verification for Entitlements Program to ensure all current and future United States

[47] Personally Identifiable Information (PII) has numerous official definitions, but in general, it is defined as any information that can be used to identify an individual directly or indirectly, such as a name, email address, Social Security Number or IP address. Sensitive PII (SPII) is generally defined as any PII that if lost, stolen, or disclosed without authorization could result in significant harm to an individual.

[48] For more information on eligibility categories please refer to: https://www.uscis.gov/green-card/green-card-eligibility-categories.

citizens and legal permanent residents have transparency into how the United States Citizenship and Immigration Services may collect, store, use, and share the information they previously provided to the United States Citizenship and Immigration Services.

The Privacy Office's Technology Oversight Branch recommends that the Systematic Alien Verification for Entitlements Program continues to be designated as a privacy sensitive program that requires privacy compliance coverage. The Technology Oversight Branch recommends that with the new updates to the program documented in this Privacy Threshold Analysis the Systematic Alien Verification for Entitlements Program be identified as not in compliance with the Privacy Act of 1974, as amended, or the E-Government Act of 2002. A Privacy Impact Assessment update and a System of Records Notice update should be published prior to the program's changed collection and use of Personally Identifiable Information, including information on natural born United States citizens. Further, the sharing of Personally Identifiable Information with the Social Security Administration should occur after the System of Records Notice has gone through the required 30-day comment period. The following are the Technology Oversight Branch's recommendations for privacy compliance coverage and additional requirements:

**Privacy Impact Assessment**

- A new Privacy Impact Assessment Update for DHS/USCIS/PIA-006 Systematic Alien Verification for Entitlements Program must be completed before collection and use of additional information. Specifically, these Privacy Impact Assessment updates would include, but are not limited to:
  - The collection of Social Security Numbers and other information from the Social Security Administration regarding United States citizens, including natural born citizens.
  - The change in legal rationale for now collecting and maintaining Social Security Numbers of United States natural born citizens.
  - The collection and use of Passport Numbers from the Department of State via new system connections.
  - The addition of the Voter Registration and Voter List Maintenance Verification process, including how this process may verify the citizenship status of natural born United States citizens.
  - The implementation of the bulk case upload functionality for User Agencies.
  - Additional privacy risks and mitigation strategies regarding notice, consent, and data accuracy.

**System of Records Notice**

- An update to DHS/USCIS-004 Systematic Alien Verification for Entitlements Program must be completed before the collection and sharing of additional information. Specifically, these System of Records Notice updates would include, but are not limited to changes to the following sections:
  - Purpose: The System of Records Notice does not currently include the verification of voter registration and voter maintenance lists.

  - Categories of Individuals: Currently, USCIS specifically informs the public it only collects information on naturalized or acquired United States citizens. This section must be updated to discuss that information on natural born United States citizens will also be collected.
  - Categories of Records: The System of Records Notice currently informs the public that the Systematic Alien Verification for Entitlements Program only collects Social Security Number of immigrants on the United States Citizenship and Immigration Services Form G-845. This section must be updated to cover the expanded collection and use of Social Security Numbers.
  - Sources of Records: The System of Records Notice currently doesn't include the Social Security Administration system of records. This section must be updated to reflect all new source systems including the Social Security Administration Numident system.
- DHS/CBP-011 Customs and Border Protection Primary and Secondary Processing (TECS (not an acronym)) National SAR Initiative December 19, 2008 (73 Federal Register 77778)
- STATE-26 Passport Records, March 24, 2015 (80 Federal Register 15653)
- STATE-39 Visa Records, November 8, 2021 (86 Federal Register 61822)
- SSA-60-0058 Master Files of Social Security Number Holders and Social Security Number Applications, February 20, 2025 (90 Federal Register 10025)

The following is a Plan of Action to ensure that the Systematic Alien Verification for Entitlements Program is brought into compliance with all federal statutes, regulations, and Department of Homeland Security policies.

**<u>USCIS Privacy's Action Plan for the Systematic Alien Verification for Entitlements Program</u>**

The Systematic Alien Verification for Entitlements Program is an inter-governmental initiative that provides a web-based service to help federal, state, territorial, tribal and local agencies and other governmental entities verify United States citizenship or immigration status/category information of applicants for benefits, licenses, or other authorized purposes.

**Action Plan**

This plan outlines priority actions necessary to advance the goal and objective of ensuring the Systematic Alien Verification for Entitlements Program is compliant with all applicable privacy laws, regulations, and polices. These actions will ensure that the use of technology by United States Citizenship and Immigration Services and the Systematic Alien Verification for Entitlements Program sustains and does not erode privacy protections relating to the collection, use, dissemination, maintenance, and disposal of personal information. These actions include actively working with the Verification Division, Office of Chief Counsel and the Customs and Border Protection Office of Privacy on this Privacy Threshold Analysis and the draft System of Records Notice along with continued collaboration with these stakeholders and others such as the Department of Homeland Security Privacy Office to ensure Systematic Alien Verification for Entitlements Program is in compliance.

**Actions to Be Taken**

To meet these objectives the United States Citizenship and Immigration Services Office of Privacy will complete the following activities:

- Receive United States Citizenship and Immigration Services Chief Privacy Officer adjudication of the initial Systematic Alien Verification for Entitlements Program Privacy Threshold Analysis:
  - Adjudication - Estimated Date of Completion: July 2025
- Draft an updated Systematic Alien Verification for Entitlement Program Privacy Impact Assessment meeting all requirements identified above and submit the draft to the Department of Homeland Security Office of Privacy.
  - Initial Draft - Estimated Date of Completion: July 2025
  - Office of Chief Counsel Review – Estimated Date of Completion: July 2025
  - Submission to Department of Homeland Security – Estimated Date of Completion: August 2025
  - Publication – Estimated August 2025
- Draft an updated Systematic Alien Verification for Entitlement Program System of Records Notice meeting all requirements identified above and submit the draft to the Department of Homeland Security Office of Privacy.
  - Initial Draft - Estimated Date of Completion: June 2025
  - Office of Chief Counsel Review – Estimated Date of Completion: June 2025
  - Submission to Department of Homeland Security – Estimated Date of Completion: July 2025
  - Submission to the Office of Management and Budget and Congress – Estimated July 2025
  - Publication – Estimated July 2025
  - End of 30-day commenting period (and sharing of new routine uses) Estimated August/September 2025
- Draft a Privacy Threshold Analysis documenting the new Systematic Alien Verification for Entitlement Program information sharing agreement between the United States Citizenship and Immigration Services and the Social Security Administration and receive the Chief Privacy Officer's adjudication of the Privacy Threshold Analysis.
  - Estimated Date of Completion: July 2025
- Determine the applicability of the Computer Matching and Privacy Protection Act of 1988 to new or changed aspects of the Systematic Alien Verification for Entitlements Program including the new bulk upload functionality for User Agencies.
  - Hold a discussion regarding the Computer Matching Agreement impacts with representatives from the Department of Homeland Security Privacy Office, United States

Citizenship and Immigration Services Office of Chief Counsel and Office of Privacy, and Department of Homeland Security Office of General Council.

  - Date of Completion: June 2025

- Decide on the need for Computer Matching Agreements with user agencies versus the current Memorandum of Agreements in place with each Systematic Alien Verification for Entitlement Program user agency:

  - Estimated Date of Completion: July 2025

This Privacy Threshold Analysis and Action Plan focuses predominantly on Phases One through Four of the Systematic Alien Verification for Entitlements Program Optimization effort as Phase Five and Phase Six are longer term goals of the optimization effort and are still in the exploratory/planning stage. The United States Citizenship and Immigration Services will update this Privacy Threshold Analysis and Action Plan as needed to support the remaining phases during their development and ensure the Systematic Alien Verification for Entitlements Program is compliant with all applicable laws, regulations, and Department of Homeland Security policies.

The updated Privacy Threshold Analyst should also provide, at a minimum, the following updates:

- New status types that Systematic Alien Verification for Entitlements Program may provide to the user agencies and how any additional verification is completed.
- A discussion about the update to the user memorandum of agreements and the creation of the voter verification specific memorandum of agreements.
- Confirm all responses from the Customs and Border Protection via the use of their USPassportRESTService when matching United States Passport numbers.
- Discuss Customs and Border Protection authority/purpose for collecting United States Passport related photographs and collection of those photographs by the United States Citizenship and Immigration Services.
- A description of how the information received via the integration with the Department of Justice to enable an incarceration/felony related flag will be used internally and if any related information will be sent to the user agencies or the applicants.
- If the Systematic Alien Verification for Entitlements Program will use the existing connection by the E-Verify Program to the USPassportRESTService or will it be a new connection.
- Additional use case information for the Systematic Alien Verification for Entitlements Program use of Department of State information from the USPassportRESTService and the Department of State's Consular Consolidated Database / American Citizen Record Query system.
- Clarification regarding user agency benefit applicants accessing the Systematic Alien Verification for Entitlements Program.
- Additional information regarding notification provided to United States citizens regarding user agencies use of their information.
- What information may be provided to the user agency about the VAWA status of an individual.

- Discussion of if there could be instances when a natural born United States citizen is unable to be verified based on the data available. Also, if all United States citizens would be able to be verified via the SSA information.
- Confirmation if there are additional responses (besides Lawful Status, No Lawful Status, or Deceased) provided to user agencies now that United States citizens can also be verified.
- A discussion of any updates regarding any new agreements between Department of State and Customs and Border Protection for the sharing and use of United States Passport number information.
- Confirmation of if there is still a connection with the Reengineered Naturalization Application Casework System (which was previously decommissioned) or how information from the previously decommissioned system is still accessed.

## PTA ADJUDICATION

## (TO BE COMPLETED BY THE COMPONENT PRIVACY OFFICE APPROVER)

| | |
|---|---|
| **Component Privacy Office Approver:** | **Angela Y. Washington** |
| **PTA Approval Date:** | July 17, 2025 |
| **PTA Expiration Date:** | October 17, 2025 |

## DESIGNATION

| | |
|---|---|
| **Privacy Sensitive System:** | Yes |
| **Category of System:** | System<br>If "other" is selected, please describe: *Click here to enter text.* |
| **Determination:** | ☐ Project, Program, System in compliance with full coverage.<br>☐ Project, Program, System in compliance with interim coverage.<br>☐ Project, Program, System in compliance until changes implemented.<br>☒ Project, Program, System not in compliance. |
| **PIA:** | **PIA Update is required.**<br>• DHS/USCIS/PIA-006 Systematic Alien Verification for Entitlement Program<br>  ○ This PIA must be updated to document all identified system/programmatic changes. |

| | |
|---|---|
| **SORN:** | **SORN update is required.**<br>• DHS/USCIS-004 Systematic Alien Verification for Entitlements Program, May 27, 2020 (85 FR 31798)<br>  ○ This SORN must be updated to document all identified changes.<br>• DHS/CBP-011 Customs and Border Protection Primary and Secondary Processing (TECS (not an acronym)) National SAR Initiative December 19, 2008 (73 Federal Register 77778)<br>• STATE-26 Passport Records, March 24, 2015 (80 Federal Register 15653)<br>• STATE-39 Visa Records, November 8, 2021 (86 Federal Register 61822)<br>• SSA-60-0058 Master Files of Social Security Number Holders and Social Security Number Applications, February 20, 2025 (90 Federal Register 10025) |

**Component Privacy Office Adjudication:**
*Please describe rationale for privacy compliance determination above, and any further action(s) that must be taken by Component.*

The USCIS Office of Privacy is submitting this Privacy Threshold Analysis (PTA) to document the Systematic Alien Verification for Entitlements (SAVE) Program. The Systematic Alien Verification for Entitlements Program is an intergovernmental initiative using a web-based service to help federal, state, territorial, tribal and local benefit-issuing and licensing agencies and other governmental entities determine the immigration status or United States citizenship of applicants for public benefits, licenses, grants, credentials, background investigations, and other lawful purposes, so only entitled applicants receive them. The Systematic Alien Verification for Entitlements Program verifies immigration status/category and United States citizenship against Department of Homeland Security-accessed records. The Systematic Alien Verification for Entitlements Program is not a database but queries Department of Homeland Security-accessed federal records to provide registered user agencies with a verification response. The Systematic Alien Verification for Entitlements Program does not determine an applicant's eligibility for a specific benefit or license, as this is the responsibility of the benefit/license granting agency.

This Privacy Threshold Analysis is being submitted to document multiple updates and planned updates to the Systematic Alien Verification for Entitlements Program as part of the comprehensive optimization of the Systematic Alien Verification for Entitlements Program to ensure a single, reliable source for verifying immigration status and United States citizenship nationwide. This Privacy Threshold Analysis documents the following key changes: (1) an expanded search capabilities to allow approved Systematic Alien Verification for Entitlements Program user agencies to verify United States citizenship information using Social Security Numbers and other non-Department of Homeland Security enumerators, (2) a new Social Security Administration system connection to support verification of citizenship/immigration status, (3) a new bulk uploader/list processor function that allows user agencies to upload lists of benefit applicants, (4) the use of the Voter Registration and Voter List Maintenance Verification functionality, (5) the collection of information from the Department of State's Consular Consolidated Database/ American

Citizen Record Query system, and (6) an integration with the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data system.

After a thorough review of the PTA, the USCIS Office of Privacy continues to designate the Systematic Alien Verification for Entitlements Program as a privacy sensitive system/program requiring both Privacy Impact Assessment (PIA) and System of Records Notice (SORN) coverage as it collects/uses Personally Identifiable Information (PII) as well as Sensitive Personally Identifiable Information (SPII) from members of the public, including legal permanent residents and United States Citizens.

The United States Citizenship and Immigration Services Office of Privacy recommends Privacy Impact Assessment coverage for the Systematic Alien Verification for Entitlements Program to comply with the eGovernment Act of 2002 as it "collects, maintains, or disseminates information that is in an identifiable form." The information collected, used, stored, and/or disseminated by the Systematic Alien Verification for Entitlements Program meets the definition of Personally Identifiable Information ("PII")/Sensitive Personally Identifiable Information ("SPII")[49] as it "permits the identity of an individual to be directly or indirectly inferred, including any other information that is linked or linkable to that individual, regardless of whether that individual is a United States citizen, legal permanent resident, or a visitor to the United States, or employee or contractor to the Department." Specifically, the Systematic Alien Verification for Entitlements Program involves information from members of the public applying for benefits, licenses, or other authorized purposes which may include (1) United States citizens and legal permanent residents, (2) individuals who are now current United States citizens and legal permanent residents after previously naturalizing or adjusting their status, or (3) individuals who may ultimately naturalize to become United States citizens or adjust their status to receive legal permanent residency in the future. Depending on the eligibility category certain individuals may be eligible to apply for adjustment of status as soon as one (1) year after their initial immigration benefit is granted,[50] therefore the United States Citizenship and Immigration Services Office of Privacy recommends requiring Privacy Impact Assessment coverage for the Systematic Alien Verification for Entitlements Program to ensure all current and future United States citizens and legal permanent residents have transparency into how the United States Citizenship and Immigration Services may collect, store, use, and share the information they previously provided to the United States Citizenship and Immigration Services.

Privacy Impact Assessment (PIA) coverage is provided by the following:

- DHS/USCIS/PIA-006 Systematic Alien Verification for Entitlement Program
    - **For the Systematic Alien Verification for Entitlement Program to be in compliance with the eGovernment Act of 2002, this Privacy Impact Assessment must be**

[49] Personally Identifiable Information (PII) has numerous official definitions, but in general, it is defined as any information that can be used to identify an individual directly or indirectly, such as a name, email address, Social Security Number or IP address. Sensitive PII (SPII) is generally defined as any PII that if lost, stolen, or disclosed without authorization could result in significant harm to an individual.
[50] For more information on eligibility categories please refer to: https://www.uscis.gov/green-card/green-card-eligibility-categories.

**updated to reflect the identified system and programmatic changes along with a privacy risk assessment of these changes including but not limited to new collections of data, new populations impacted including natural born US citizens, new system connections, new data sharing, and a new bulk upload/reporting functionality.**

System of Records Notice (SORN) coverage is required as the information in the Systematic Alien Verification for Entitlement Program is retrieved by a personal identifier. System of Records Notice coverage is provided by the following:

- DHS/USCIS-004 Systematic Alien Verification for Entitlements Program, May 27, 2020 (85 FR 31798)
  - **For the Systematic Alien Verification for Entitlement Program to be in compliance with the Privacy Act of 1974, this System of Records Notice must be updated to reflect the identified system and programmatic changes including that the System of Records will now include information on natural born United States citizens in addition to naturalized or acquired United States citizens. Updates to the System of Records Notice should include but are not limited to updates in the Purpose, Categories of Individuals, Categories of Records, and the Sources of Records sections.**
- DHS/CBP-011 Customs and Border Protection Primary and Secondary Processing (TECS (not an acronym)) National SAR Initiative December 19, 2008 (73 Federal Register 77778)
- STATE-26 Passport Records, March 24, 2015 (80 Federal Register 15653)
- STATE-39 Visa Records, November 8, 2021 (86 Federal Register 61822)
- SSA-60-0058 Master Files of Social Security Number Holders and Social Security Number Applications, February 20, 2025 (90 Federal Register 10025)

While there are currently published SORNs and PIAs associated with the Systematic Alien Verification for Entitlement Program, these documents to not sufficiently provide coverage for the recently implemented and planned system and programmatic changes documented in this Privacy Threshold Analysis. Therefore, the Systematic Alien Verification for Entitlement Program is not in compliance. An updated Privacy Impact Assessment and an updated System of Records Notice must be published for the Systematic Alien Verification for Entitlement Program to be brought into compliance.

An action plan has been developed to enable the Systematic Alien Verification for Entitlement Program to be brought into compliance with all federal laws, statutes, regulations, and Department of Homeland Security policies. A high-level summary of the action plan is as follows:

- Complete the initial Systematic Alien Verification for Entitlements Program Privacy Threshold Analysis.

- Publish an updated Systematic Alien Verification for Entitlement Program Privacy Impact Assessment to the Department of Homeland Security Office of Privacy website.
- Publish an updated Systematic Alien Verification for Entitlement Program System of Records Notice in the Federal Register and address any comments received during the 30-day public comment period.
- Complete a Privacy Threshold Analysis documenting the new Systematic Alien Verification for Entitlement Program information sharing agreement between the United States Citizenship and Immigration Services and the Social Security Administration.
- Determine the applicability of the Computer Matching and Privacy Protection Act of 1988 and complete any identified requirements.
- Update the Systematic Alien Verification for Entitlements Program Privacy Threshold Analysis and Action Plan as needed to support the ongoing optimization effort.

The Office of Privacy approves this Privacy Threshold Analysis for 3 months to formally document the current privacy posture of the Systematic Alien Verification for Entitlement Program.

# PRIVACY THRESHOLD ANALYSIS (PTA)

**This form serves as the official determination to identify the privacy compliance requirements for all Departmental uses of personally identifiable information (PII).**

A Privacy Threshold Analysis (PTA) serves as the document used to identify information technology (IT) systems, information collections/forms, technologies, rulemakings, programs, information sharing arrangements, or pilot projects that involve PII and other activities that otherwise impact the privacy of individuals, and to assess whether there is a need for additional privacy compliance documentation or requirements. A PTA includes a general description of the IT system, information collection, form, technology, rulemaking, program, pilot project, information sharing arrangement, or other Department activity and describes what PII is collected (and from whom) and how that information is used. In accordance with the Fair Information Practice Principles (FIPPs),[1] Component Privacy Officers should consider best practices for privacy safeguards and principles when reviewing and adjudicating PTAs.

Please complete the attached PTA and submit it to your Component Privacy Office. If you do not have a Component Privacy Office, please send the PTA to the DHS Privacy Office:

Senior Director, Privacy Compliance
The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
[redacted]

The Component or DHS Privacy Office will review this form and assess whether any privacy compliance documentation is required. If privacy compliance documentation is required – such as Privacy Impact Assessment (PIA), System of Records Notice (SORN), Privacy Act Statement/Privacy Notice, or Computer Matching Agreement (CMA) – the Component Privacy Office will send you a copy of the relevant compliance template to complete and return.

[1] *See* The Fair Information Practice Principles | Homeland Security.

Homeland Security

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
[redacted]
www.dhs.gov/privacy



## PRIVACY THRESHOLD ANALYSIS (PTA)

### SUMMARY INFORMATION

| | | | |
|---|---|---|---|
| **Project, Program, or System Name:** | Systematic Alien Verification for Entitlements Program | | |
| **Component or Office:** | U.S. Citizenship and Immigration Services (USCIS) | **Office or Program:** | Verification Division |
| **FISMA Name (if applicable):** | Verification Information System | **FISMA Number (if applicable):** | **CIS-06285-MAJ-06285** |
| **Type of Project or Program:** | **System** | **Project or program status:** | **Operational** |
| **Date first developed:** | July 7, 2007 | **Pilot launch date:** | N/A |
| **Date of last PTA update** | February 7, 2023 | **Pilot end date:** | N/A |
| **ATO Status (if applicable):**[2] | **Complete** | **Expected ATO/ATP/OA date (if applicable):** | **Ongoing Authorization** |

### PROJECT, PROGRAM, OR SYSTEM MANAGER

| | | | |
|---|---|---|---|
| **Name:** | Irina Sidelnikov | | |
| **Office:** | Office of Information Technology | **Title:** | OIT Project Manager |
| **Phone:** | [redacted] | **Email:** | [redacted] |

### INFORMATION SYSTEM SECURITY OFFICER (ISSO) (IF APPLICABLE)

| | | | |
|---|---|---|---|
| **Name:** | Minh Vo | | |
| **Phone:** | N/A | **Email:** | [redacted] |

[2] The DHS OCIO has implemented a streamlined approach to authorizing an Authority to Operate (ATO), allowing for rapid deployment of new IT systems and initiate using the latest technologies as quickly as possible. This approach is used for selected information systems that meet the required eligibility criteria in order to be operational and connect to the network. For more information, see https://dhsconnect.dhs.gov/org/comp/mgmt/ocio/ciso/Documents/DHS%20ATP%20Guide%20v2.0.pdf#search=atp.

## SPECIFIC PTA QUESTIONS

**1. Reason for submitting the PTA: Updated PTA**

The United States Citizenship and Immigration Services submits this updated Privacy Threshold Analysis to document the United States Citizenship and Immigration Services Verification Division and Office of Technology changes to the Systematic Alien Verification for Entitlements Program. The United States Citizenship and Immigration Services administers the Systematic Alien Verification for Entitlements Program, an inter-governmental initiative that provides a web-based service to help federal, state, territorial, tribal and local agencies and other governmental entities verify United States citizenship or immigration status/category information of applicants for benefits, licenses, or other authorized purposes.

This Privacy Threshold Analysis documents that the Systematic Alien Verification for Entitlements Program has

1. Expanded its search capabilities to allow approved Systematic Alien Verification for Entitlements Program user agencies to verify United States citizenship information using Social Security Numbers and other non-Department of Homeland Security enumerators.
2. A new Social Security Administration system connection to support verification of citizenship/immigration status.
3. A new bulk uploader/list processor function that allows user agencies to upload lists of benefit applicants.
4. Use of the Voter Registration and Voter List Maintenance Verification functionality.
5. The collection of information from the Department of State's Consular Consolidated Database/ American Citizen Record Query system. Additionally, the Systematic Alien Verification for Entitlements Program will integrate with the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data system.

**2025 Updates**

On April 22, 2025, Homeland Security Secretary Kristi Noem, alongside the United States Citizenship and Immigration Services and the Department of Government Efficiency, announced a comprehensive optimization of the Systematic Alien Verification for Entitlements Program to ensure a single, reliable source for verifying immigration status and United States citizenship nationwide. Congressional, federal, and state stakeholders have periodically expressed interest in using the Systematic Alien Verification for Entitlements to verify naturalized and derived citizenship information during voter registration and/or for voter list maintenance. Verification for voter list maintenance purposes often occurs when a state Department of Motor Vehicles compares its records to state voter agency records to determine if individuals on the voter rolls represented that they were other than U.S. citizens when the Department of Motor Vehicles issued their driver's license. The state voter agency then follows up with those individuals as to their citizenship status through state law voter registration challenge procedures. The United States Citizenship and Immigration Services Verification Division is leading this effort and has identified multiple phases to optimize the program. A high-level summary is provided below, while a more detailed description of each phase follows.

- Phase 1: Free Service for State, Local, Tribal, Territory agencies and Bulk Uploader. (Estimated completion: Implemented)
- Phase 2: Integration with the Social Security Administration to allow for full Social Security Number to be used as a non-Department of Homeland Security enumerator. (Estimated completion: Implemented)
- Phase 3: Modify the Security Administration integration to allow for truncated Social Security Numbers (last 4-digits) to be used as a non-Department of Homeland Security enumerator. (Estimated completion: July/August 2025)
- Phase 4: Integration with Customs and Border Protection to enable United States passport data, received from the Department of State, to be used within the Systematic Alien Verification for Entitlements Program. (Estimated completion: To be determined)
- Phase 5: Integration with the Department of Justice to enable an incarceration/felony related flag (the flag will be used internally and will not be sent to the agencies or the applicants). (Estimated completion: To be determined)
- Phase 6: Integration with State Driver's Licensing Agencies to enable a Driver License number to be used as a non-Department of Homeland Security enumerator. (Estimated completion: To be determined

The summary below focuses on phases one (1) through four (4). More detailed information can be found later in this document. Phases five (5) and six (6) are longer term goals of the optimization effort and are still in the exploratory/planning stage. The United States Citizenship and Immigration Services will update this Privacy Threshold Analysis to support the remaining phases during their development.

Phases One (1) through Three (3)

Systematic Alien Verification for Entitlements Program eliminated fees for non-federal users creating Systematic Alien Verification for Entitlements Program cases. User agencies can now create multiple individual cases from a list of data provided by the user. Further, the Systematic Alien Verification for Entitlements Program plans to integrate additional immigration information into search functionality and case results, such as timelines and addresses. Improved automatic status updates and a new user-friendly interface will empower federal, state, local, territorial, and tribal agencies to help prevent individuals who are not qualified for government benefits and licenses from receiving those benefits and licenses. The Department of Homeland Security intends to provide ongoing updates to stakeholders as the Systematic Alien Verification for Entitlements Program Optimization Plan progresses. Systematic Alien Verification for Entitlements Program users must attest to completing the Systematic Alien Verification for Entitlements Program tutorial prior to gaining access to Systematic Alien Verification for Entitlements Program. Users' access is based on their permissions.

The United States Citizenship and Immigration Services has developed and implemented a new bulk uploader/list processor feature to the Systematic Alien Verification for Entitlements Program. This feature will allow program users to upload a list (such as an excel spreadsheet) of benefit applicants to the Systematic Alien Verification for Entitlements Program for processing. Once the list is uploaded, the Systematic Alien Verification for Entitlements Program will accept or not accept the data then, through an automated process, create front-end single-record cases for each entry. Initially the creation of cases using this feature is limited to cases created using an A-number, Citizenship or Naturalization Certificate

number, or Social Security number. Agencies will not be prompted to institute additional verification when using this process but are instructed to resubmit additional information when the process is unable to return a response. Expansion of this feature in the future may include the ability to create cases with additional enumerators and the ability to request configured information not automatically selected for the benefit type.

User agencies will be able to access each case created using the list processor feature in the Systematic Alien Verification for Entitlements system as normal, by viewing the individual case status and response. The Systematic Alien Verification for Entitlements Program also has a feature available to all the user agencies to generate a report that will list all the cases created, the status of the case and the Systematic Alien Verification for Entitlements Program response. Access to generate the report, including what cases are included, will vary depending upon the individual user's permission. United States Citizenship and Immigration Services is providing this verification service for all benefit requests. There are approximately 1,200 user agencies with access to the Systematic Alien Verification for Entitlements Program to verify immigration status for benefits or entitlements, and in fiscal year 2024, the Systematic Alien Verification for Entitlements Program completed over 24.5 million first step verifications.

The Systematic Alien Verification for Entitlements Program was originally designed only to use a Department of Homeland Security-issued enumerator (such as an alien number or A-Number) to query immigration records, specifically, to provide immigration status to Systematic Alien Verification for Entitlements Program user agencies. The Systematic Alien Verification for Entitlements Program is now expanding to allow Systematic Alien Verification for Entitlements Program user agencies to provide a Social Security Number or a United States Passport number to query the Systematic Alien Verification for Entitlements Program.

The Systematic Alien Verification for Entitlements Program will also add the ability for user agencies to verify truncated Social Security Numbers (last 4 digits) against Social Security Administration records. This will allow the Systematic Alien Verification for Entitlements Program to verify all United States citizens including those by birth, which was previously not available. A benefit applicant's Social Security number can only be used for automated initial verification and cannot be used for additional verification, which will continue to require a Department of Homeland Security immigration enumerator since the Systematic Alien Verification for Entitlements Program does not normally collect Social Security Numbers or passport numbers. The addition of the Voter Registration and Voter List Maintenance Verification, and the Social Security Administration connection is now live. The Systematic Alien Verification for Entitlements Program can now verify United States-born citizens for voter verification agencies.

The Department of Homeland Security/United States Citizenship and Immigration Services seeks access to Social Security Administration information accessed through the Department of Homeland Security/United States Citizenship and Immigration Services Verification Information System[3]. The United States Citizenship and Immigration Services and the Social Security Administration agreed to the following limitations on the access to, and disclosure and use of information that identifies a verification request as being generated by United States Citizenship and Immigration Services or associated with a United States Citizenship and Immigration Services program:

[3] Verification Information System provides services to customers through Systematic Alien Verification for Entitlements and E-Verify (the latter of which will not be used for this initiative).

- Data or information that identifies a verification request as being generated by United States Citizenship and Immigration Services or associated with a United States Citizenship and Immigration Services program will remain information owned by United States Citizenship and Immigration Services.
- The United States Citizenship and Immigration Services will use the verification responses generated by the Social Security Administration only for the purposes described in the Information Sharing Agreement between the Department of Homeland Security, United States Citizenship and Immigration Services and the Social Security Administration.
- Data or information that identifies a verification request as being generated by the United States Citizenship and Immigration Services or associated with a United States Citizenship and Immigration Services program will be used only as provided in the Information Sharing Agreement by the Social Security Administration.
- Data or information that identifies a verification request as being generated by United States Citizenship and Immigration Services or associated with the United States Citizenship and Immigration Services program provided by Social Security Administration will not be duplicated or disseminated outside Social Security Administration without prior written approval from United States Citizenship and Immigration Services. The United States Citizenship and Immigration Services will not give such approval unless the redisclosure is required by law or is essential to the conduct of the exchange. In such cases, the Social Security Administration, the agency redisclosing the records, must specify in writing what records will be redisclosed, to whom they will be redisclosed, and the reasons that justify redisclosure.
- The United States Citizenship and Immigration Services will not duplicate or disseminate the verification responses for a purpose not covered by the Information Sharing Agreement, within or outside of its agency, without the written permission of the Social Security Agreement excepted as required by Federal law. The Social Security Administration will not give such permission, unless Federal law requires disclosure, or disclosure is essential to the purpose of this Agreement. For such permission, The United States Citizenship and Immigration Services must specify in writing what data it is requesting to duplicate or disseminate and to whom, and the reasons that justify such duplication or dissemination.

***Administrative Safeguards***

The Social Security Administration and the United States Citizenship and Immigration Services will restrict access to the data matched and to any data created by the match to only those users, for example, employees and contractors, who need it to perform their official duties in connection with the uses of the data authorized in the Information Sharing agreement. Further, the Social Security Administration and the United States Citizenship and Immigration Services will advise all personnel with access about the confidential nature of the data, the safeguards required to protect the data, and the civil and criminal sanctions for noncompliance contained in the applicable Federal laws.

Parties, including all personnel with access to information, will be appropriately educated and trained regarding the proper handling of personally identifiable information and proper care of the information systems to ensure the overall safeguarding and security of the information. The Social Security Administration and the United States Citizenship and Immigration Services will ensure that its

employees, including contractors with the access to any of the information, have completed privacy training on the handling of personally identifiable information.

Phase Four (4)

The United States Citizenship and Immigration Services will need to query other non-United States Citizenship and Immigration Services systems, besides the Social Security Administration's Numident system, with the information provided by the Systematic Alien Verification for Entitlements Program user agency to find the appropriate Department of Homeland Security-issued enumerator to continue with the Systematic Alien Verification for Entitlements Program case processing. For instance, USCIS is researching the possibility of using a United States Passport Number to be able to identify a Department of Homeland Security-issued enumerator. In a case when a User Agency uploads or enters a United States Passport Number instead of a DHS-issued enumerator, the Systematic Alien Verification for Entitlements Program will query another non-United States Citizenship and Immigration Services System using the United States Passport Number along with a unique identifier to find any records and will identify if a Department of Homeland Security-issued enumerator was used by the applicant when applying for a Department of Homeland Security-issued benefit or if a Passport Number was used at a United States Port of Entry and is associated with a Department of Homeland Security-issued enumerator. In this instance, to enable this change, the Systematic Alien Verification for Entitlements Program would integrate with the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data to match a Passport Number against Customs and Border Protection and Department of State records to attempt to locate a Department of Homeland Security issued enumerator.

The TECS (not an acronym) - Travel Documents and Encounter Data stores travel document information (scanned images of documents, biographic information, document details, and photographs) from the United States Citizenship and Immigration Services Lawful Permanent Resident Cards along with Department of State-issued United States passports, visas, foreign passports, enhanced driver's licenses, and enhanced tribal cards. The TECS (not an acronym) - Travel Documents and Encounter Data USPassportRESTService allows interconnected systems to query TECS (not an acronym) - Travel Documents and Encounter Data for United States passport information. For this use case, the Systematic Alien Verification for Entitlements Program user agency will input a passport number into the Systematic Alien Verification for Entitlements Program. The query will trigger the USPassportRESTService to locate the matching United States passport number and return the results to the user. This will allow the Systematic Alien Verification for Entitlements Program to verify all types of United States citizens, including those by birth, which was previously not available. Currently, the Systematic Alien Verification for Entitlements Program only collects passport numbers for foreign issued passports if it is provided with an additional Department of Homeland Security enumerator. The United States Citizenship and Immigration Services E-Verify has an existing connection to the USPassportRESTService, which also resides within the Verification Information System, like Systematic Alien Verification for Entitlements Program.

The following are updates that were planned prior to Secretary Noem's vision for optimizing the Systematic Alien Verification for Entitlements Program and are still in progress.

- Systematic Alien Verification for Entitlements Program will update the responses provided to users as part of the Interface Control Agreement Version 38, which enhances the Systematic Alien Verification for Entitlements Program query logic to provide more accurate information based on the need to know. The Systematic Alien Verification for Entitlements Program will add the collection of an uploaded document such as a Naturalization/Citizenship Certificate Number, when the user submits a second step additional verification, as well as the collection of a reason code, which allows the Systematic Alien Verification for Entitlements Program users to provide additional details regarding the applicant's request, particularly during the additional verification process. The Systematic Alien Verification Entitlements responds to users by providing an immigration status/category or United States citizenship. These additional collections will help Systematic Alien Verification for Entitlements Program identify and remedy data issues, reduce overall manual response times, and allow the Systematic Alien Verification for Entitlements Program to improve the quality of first step automated responses.
- A live site environment will be implemented where Systematic Alien Verification for Entitlements web service users can access new and current interface control agreements. This will streamline the process to update the interface control agreements and ensure that the Systematic Alien Verification for Entitlements Program users have access to the most current information for the Interface Control Agreement Version 38.
- The Systematic Alien Verification for Entitlements Program case response screen will be redesigned so that it is easier to read and allow for the additional information to be submitted. The screen will be packaged in a new way to provide the user clear information during the initial verification.

Additionally, Systematic Alien Verification for Entitlements Program will be collecting information from the Department of State's Consular Consolidated Database / American Citizen Record Query system which is a consular search engine used by the Department of State to manage and access records related to United States citizens, particularly for consular protection and services, including managing passport requests and applications.

**2024 Update**

As part of the Systematic Alien Verification for Entitlements Program's normal review process, the United States Citizenship and Immigration Services intends to access the Department of State's Consular Consolidated Database / American Citizen Record Query system to verify immigration status of applicants for benefits, licenses, and other authorized purposes. The purpose of collecting this information is to confirm the identity of the applicant to determine their status. This process is part of an ongoing effort that began in 2024.

***Background***

The Systematic Alien Verification for Entitlements Program is an online service for registered federal, state, territorial, tribal, and local government agencies to verify immigration status and United States citizenship of applicants seeking benefits or licenses. Systematic Alien Verification for Entitlements

Program is not a database but queries Department of Homeland Security-accessed federal records to provide registered user agencies with a verification response.

In 1986, Congress mandated that the Immigration and Naturalization Service, now United States Citizenship and Immigration Services, establish a system to verify the citizenship and immigration status of individuals seeking government benefits and licenses.

The United States Citizenship and Immigration Services Verification Division administers the Systematic Alien Verification for Entitlements Program, which is an intergovernmental initiative using a web-based service to help federal, state, territorial, tribal and local benefit-issuing and licensing agencies and other governmental entities determine the immigration status or United States citizenship of applicants for public benefits, licenses, grants, credentials, background investigations, and other lawful purposes, so only entitled applicants receive them. Systematic Alien Verification for Entitlements Program verifies immigration status/category and United States citizenship against Department of Homeland Security-accessed records. Historically, the Systematic Alien Verification for Entitlements Program has not verified information for United States born citizens as a Department of Homeland Security immigration enumerator was previously required, but now the Systematic Alien Verification for Entitlements Program can verify United States-born United States citizens against Social Security Administration data. The Systematic Alien Verification for Entitlements Program does not determine an applicant's eligibility for a specific benefit or license, as this is the responsibility of the benefit/license granting agency.

As of April 1, 2025, the Systematic Alien Verification for Entitlements Program has revised its transaction charges for all state, local, tribal, and territorial government agencies using the Systematic Alien Verification for Entitlements Program to eliminate those charges. Federal agencies are still charged a fee to use the Systematic Alien Verification for Entitlements Program. The authority for the Systematic Alien Verification for Entitlements Program, and for particular Systematic Alien Verification for Entitlements Program authorized uses can be found in the Immigration Reform and Control Act[4]; the Personal Responsibility and Work Opportunity Reconciliation Act[5] Title IV, Subtitle A, of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996[6], and the REAL ID Act of 2005[7], the Patient Protection and Affordable Care Act of 2010,[8] and the Federal Aviation Administration Extension, Safety and Security Act of 2016.[9] In addition, the Systematic Alien Verification for Entitlements Program has an obligation under 8 U.S.C. 1373(c) to "respond to an inquiry by a Federal, State or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

---

[4] Immigration Reform and Control Act of 1986, Public. Law. No. 99-603

[5] Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law No. 104-193, 110 Statute 2168

[6] Title IV, Subtitle A, of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 Public Law 104-208, 110 Statute 3009

[7] REAL ID Act of 2005, Public. Law No.109-13, 119 Statute 231

[8] Patient Protection and Affordable Care Act of 2010, Public Law No. 111-148

[9] Federal Aviation Administration Extension, Safety and Security Act of 2016 (Federal Aviation Administration Act), Public. Law. No. 114-190 § 3405(d) (July 15, 2016).

The United States Citizenship and Immigration Services Verification Division operates the Verification Data Information System as the search engine for Systematic Alien Verification for Entitlements Program and the E-Verify Program. The Verification Data Information System accesses nationally accessible databases of selected immigration records to support both the Systematic Alien Verification for Entitlements Program and the E-Verify Program. The Systematic Alien Verification for Entitlements Program queries an individual's immigration status to help the administering agency determine eligibility for any public benefit, license, or credential based on their United States citizenship or immigration status. The United States Citizenship and Immigration Services is obligated by law to respond to an inquiry by a Federal, state or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

***Systematic Alien Verification for Entitlements Program***

The United States Citizenship and Immigration Services administers the Systematic Alien Verification for Entitlements Program, an inter-governmental initiative that provides a web-based service to help federal, state, territorial, tribal, and local benefits-issuing and licensing agencies and other governmental entities along with Airport Operators verify the United States citizenship and immigration status/category information of applicants for public benefits or licenses (hereinafter "benefits"). Examples of these benefits include Supplemental Security Income Supplemental Nutrition Assistance Program (formerly food stamps), Temporary Assistance for Needy Families cash assistance, Medicaid, Children's Health Insurance Program, REAL ID compliance, and other statutorily authorized purposes, including voter verification.

The Systematic Alien Verification for Entitlements Program also eliminates fees for database searches, breaks down silos for more accurate results, streamlines List Processor submission, and integrates additional immigration information, such as timelines and addresses. Automatic status updates and a new user-friendly interface will empower Federal, state, local, territorial, and tribal agencies to help prevent individuals who are not qualified for government benefits from receiving those benefits. The Department of Homeland Security intends to provide ongoing updates to stakeholders as the Systematic Alien Verification for Entitlements Program Optimization Plan progresses.

Agency use of the Systematic Alien Verification for Entitlements Program is administered by the Verification Division. All user agencies are required to register with the Systematic Alien Verification for Entitlements Program to access the system prior to using the Systematic Alien Verification for Entitlements Program. The Systematic Alien Verification for Entitlements Program is not a source system and connects with federal immigration systems, and now the Social Security Administration's Numident[10] system, to access applicable information. The Systematic Alien Verification for Entitlements Program also has a Case Status Check capability that allows benefit applicants to view the status of their Systematic Alien Verification for Entitlements Program case. The system provides benefit eligibility checks based on the grant dates. The Verification Division has a three (3) tier process when verifying an individual's immigration status or United States citizenship.

[10] NUMIDENT or "Numerical Identification" refers to the master file of Social Security Administration records containing information about individuals who have applied for or been assigned a Social Security Number. This file includes records for applications, claims, and death records related to individuals with a Social Security Number.

Users must perform all additional verification procedures the Systematic Alien Verification for Entitlements Program requires and/or the applicant requests prior to denying a benefit based upon a Systematic Alien Verification for Entitlements Program response. Users must provide all applicants who are denied benefits based solely or in part upon the Systematic Alien Verification for Entitlements Program response adequate written notice and the information necessary to contact the Department of Homeland Security so that applicants may correct their immigration records in a timely manner, if necessary.

***Initial verification***

A Systematic Alien Verification for Entitlements Program user agency accesses their account in the system and either submits requests individually or via a bulk request using the system's new bulk uploader feature. When a Systematic Alien Verification for Entitlements Program user agency submits an online verification request for a benefit applicant, it provides several required identifiers for the benefit applicant from documents presented by the benefit applicant, including first and last name, date of birth, and at least one of the following: an enumerator from the Department of Homeland Security (e.g. Alien number/United States Citizenship and Immigration Services number, Form I-94 Number, Card Number/I-797 Receipt number, Citizenship/Naturalization Certificate Numbers), a Social Security number from Social Security Administration, or a United States passport number from the Department of State. Social Security Numbers and United States passport numbers are new enumerators. Previously, enumerators were solely limited to Department of Homeland Security-issued immigration enumerators.

In the case of a bulk upload the Systematic Alien Verification for Entitlements Program will use an automated process to create individual cases for each benefit applicant on the list.

Using these data fields, the Systematic Alien Verification for Entitlements Program performs an automated query of various Systematic Alien Verification for Entitlements Program-accessed federal databases for relevant records. If a Social Security Number is submitted under this new collection, the Systematic Alien Verification for Entitlements Program will verify this enumerator against the Social Security Administration records, including the Social Security Administration death records and citizenship records. If the individual's Social Security account has a record of an A-number or certificate number, the Social Security Administration will provide that information to the Systematic Alien Verification for Entitlements Program, which will be used to validate that information against the Department of Homeland Security records. If a United States passport number is submitted, the Systematic Alien Verification for Entitlements Program will verify it against the Department of State related records available in the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data system. When the Systematic Alien Verification for Entitlements Program locates a record pertaining to the benefit applicant in any of these federal databases, the Systematic Alien Verification for Entitlements Program displays a verification response to the user agency within seconds.

***Second step, additional verification (Tier 2)***

If the Systematic Alien Verification for Entitlements Program is unable to find a record pertaining to the benefit applicant through the automated first level search of the Department of Homeland Security records, including United States passport records and the Social Security Administration records, it displays a response to the user indicating additional action is required from the user agency, including requesting additional verification when an immigration enumerator is available. If only a Social Security Number is submitted for verification, the user agency will be informed to close the case and submit a new request using either corrected data or an immigration enumerator, since additional verification cannot be conducted with only a Social Security Number.

The Systematic Alien Verification for Entitlements Program user agency may start the additional verification procedure, which may include is an in-depth manual review by Systematic Alien Verification for Entitlements Program staff (Status Verification Analyst) to determine the applicant's immigration status or United States citizenship. At the point at which the "Institute Additional Verification" message is displayed, user agencies must submit the case for additional verification if they are relying on a Systematic Alien Verification for Entitlements Program response to deny a benefit. Additionally, if the user agency receives a response and they have questions about the validity of the response, the user agency may submit a case that already received a Systematic Alien Verification for Entitlements Program response for additional verification. Users must also submit a case for additional verification when requested by the applicant.

User agencies may not rely on a Systematic Alien Verification for Entitlements Program response to approve or deny an application for benefits unless they have followed all required Systematic Alien Verification for Entitlements Program verification procedures. The Systematic Alien Verification for Entitlements Program users are not required to institute additional verification if a user agency has alternate grounds upon which to base its decision to decide a benefit that do not require verification of the applicant's immigration status/category, even where the agency is prompted to do so. Examples of when a user agency has alternate grounds to base a decision that does not require the completion of additional verification include:

- The applicant does not meet eligibility requirements for the benefit unrelated to immigration status/United States citizenship.
- The applicant withdraws their application.
- The applicant cannot be contacted/fails to respond to an agency's request for follow-up.
- The applicant presents documentation the Systematic Alien Verification for Entitlements Program cannot verify (such as a military identification).

This revision adds the collection of an uploaded document which includes immigration enumerators (such as a Form I-94, Arrival/Departure Records, Naturalization/Citizenship Certificate, or passport records) when a case is submitted for second step additional verification as well as a reason code. Reason codes can provide information on why the initial verification was not successful, if the case has been escalated for additional verification, or suggest that additional verification steps may be needed to determine the applicant's status or eligibility for a benefit. Reason codes can also identify if it was a user-initiated additional verification request when the user received an initial Systematic Alien Verification for Entitlements Program response providing an immigration status/category or United States citizenship. These additional collections will help the Systematic Alien Verification for Entitlements Program identify

and remedy data issues, reduce overall manual response times, and allow the Systematic Alien Verification for Entitlements Program to improve the quality of first step automated responses.

If the second step manual search produces relevant information enabling the verification of immigration status, the Systematic Alien Verification for Entitlements Program provides an electronic response to the inquiring user agency.

If the user agency declines second step additional verification, the verification process ceases. Additional screens notify the user agency that closing the case without performing additional verification means the agency does not have a complete Systematic Alien Verification for Entitlements Program response. The Systematic Alien Verification for Entitlements Program user agencies cannot rely upon an incomplete Systematic Alien Verification for Entitlements Program response to deny a benefit.

***Third step Additional Verification with Documents (Tier 3)***

If a benefit applicant's immigration status/category cannot be verified on initial or additional verification step when submitting a Department of Homeland Security enumerator, the system will prompt the user agency to resubmit the case with documents. When the prompt is received, the agency must upload a copy of the front and back of the immigration document the applicant presented to the user agency for the Systematic Alien Verification for Entitlements Program to perform detailed manual research at third step. A Department of Homeland Security immigration enumerator is required for the third step additional verification. The Systematic Alien Verification for Entitlements Program cannot complete third step additional verification using non-immigration documentation. The Systematic Alien Verification for Entitlements Program user agencies are legally authorized to make electronic copies of immigration documents for purposes of verifying immigration status. Cases created with just the Social Security Number or a Passport Number as the enumerator are not subject to this step.

If the third step manual review produces relevant information enabling the verification of immigration status/category or United States citizenship, the Systematic Alien Verification for Entitlements Program provides an electronic response to the user agency.

If a benefit applicant's immigration status/category is not verified after completing third step verification, the Systematic Alien Verification for Entitlements Program will provide additional information or guidance on how to proceed.

If the applicant believes their information in the Department of Homeland Security records is incorrect, the applicant can seek a records correction. User agencies should provide the Systematic Alien Verification for Entitlements Program Fact Sheet and Systematic Alien Verification for Entitlements Program Records: Fast Facts for Benefit Applicants[11] to benefit applicants that may require records correction.

[11] The Systematic Alien Verification for Entitlements Fact Sheet and Systematic Alien Verification for Entitlements Records: Fast Fact for Benefits Applicants is accessible at https://www.uscis.gov/save/benefit-and-license-applicants/resources-for-benefit-and-license-applicants

The Systematic Alien Verification for Entitlements Program user agency continues to have the option of running a web report within the system that will create a file in Adobe format of all cases processed for their organization. The United States Citizenship and Immigration Services provides access to relevant reports of approved or pending cases for Systematic Alien Verification for Entitlements Program user agencies to assist them in managing their Systematic Alien Verification for Entitlements Program cases and monitoring their own compliance with the Systematic Alien Verification for Entitlements Program rules and the federal deeming and reimbursement rules. User agencies can run case-specific reports for quality assurance that will include information, such as name, date of birth, type of benefit, immigration identifier (e.g., A-Number, unexpired foreign passport number, I-94 Arrival/Departure Record), and immigration status, only if the benefit was administered.

***Voter Registration and Voter List Maintenance Verification***

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 expanded the Systematic Alien Verification for Entitlements Program by requiring the program to respond to inquiries by federal, state and local government agencies seeking to verify or determine the citizenship or immigration status of any individual within the jurisdiction of the agency for any lawful purpose. See 8 U.S.C. § 1373(c). This authority allows agencies to use the Systematic Alien Verification for Entitlements Program for verification of citizenship and immigration status outside of the traditional benefit-granting programs covered by the Immigration Reform and Control Act of 1986. This includes voter registration and voter list maintenance purposes, so long as the agency meets the legal requirements for using the Systematic Alien Verification for Entitlements Program and provides the required applicant information, when submitting verification requests.

On January 20, 2025, and March 25, 2025, the President issued Executive Orders 14159, *Protecting the American People Against Invasion*[12] and 14248, *Preserving and Protecting the Integrity of American Elections*[13] respectively. Executive Order 14159 requires the Secretary to "promptly issue guidance to ensure maximum compliance by [Department of Homeland Security] personnel with the provisions of 8 U.S.C. 1373[14] and 8 U.S.C. 1644[15] and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law." Executive Order 14248[16] provides, "Federal laws, such as the National Voter Registration Act (Pub. L. 103-31) and the Help America Vote Act (Pub. L. 107-252), require States to maintain an accurate and current Statewide list of every legally registered voter in the State. Pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Department of Homeland Security/United States Citizenship and Immigration Services is required to share database information with States upon request so they can fulfill this duty. 8 U.S.C. 1373(c)[17]." Executive Order 14159[18] directs the Secretary to "ensure that State and local officials have, without the requirement of the payment

[12] https://www.federalregister.gov/documents/2025/01/29/2025-02006/protecting-the-american-people-against-invasion
[13] https://www.federalregister.gov/documents/2025/03/28/2025-05523/preserving-and-protecting-the-integrity-of-american-elections
[14] 8 USC 1373 Communication between government agencies and the Immigration and Naturalization Service
[15] 8 USC 1644 Communication between State and local government agencies and Immigration and Naturalization Service
[16] Executive Order 14248 Preserving and Protecting the Integrity of American Elections
[17] 8 USC. 1373(c) Obligation to respond to inquiries
[18] Executive Order 14159 Protecting the American People Against Invasion

of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered." The Secretary is also required under Executive Order 14159, in coordination with the Department of Government Efficiency Administrator, to review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507[19], alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements. To support this activity the Attorney General is required to prioritize enforcement of 18 U.S.C. 611[20] and 1015(f)[21] and similar laws that restrict aliens from registering to vote or voting, including through use of: (i) databases or information maintained by the Department of Homeland Security; (ii) State-issued identification records and driver license databases; and (iii) similar records relating to citizenship.

In accordance with federal statutes and policies, the Department of Homeland Security personnel must, in a timely manner, provide verification or immigration status information in response to inquiries from State and local government agencies to verify or ascertain the citizenship or immigration status of individuals. As required by 8 U.S.C. 1373(c), such inquiries must relate to individuals within the jurisdiction of the State or local government agency and must be for a purpose authorized by law. Department of Homeland Security personnel have been directed to comply, to the maximum extent possible and permissible under law, with Section 1373, considering federal statutory requirements, including the Privacy Act of 1974, 5 U.S.C. 552a[22], and 8 U.S.C. 1367[23] (special protected class information); as well as other laws, rules, regulations, policies, and requirements regarding verification, information sharing, and confidentiality.

The Systematic Alien Verification for Entitlements Program user agency registration process determines whether a state voter registration agency meets the legal requirements for using the Systematic Alien Verification for Entitlements Program. As part of registering to use Systematic Alien Verification for Entitlements Program, the agency must provide the Systematic Alien Verification for Entitlements Program all applicable legal authorities and voter registration procedures that authorize the agency to engage in voter registration and/or voter list maintenance activities and verify citizenship status before making individual determinations regarding eligibility for voter registration. The United States Citizenship and Immigration Services provides information on its public facing website to assist user agencies understand the above referenced requirements.[24]

***Current Process - Voter Registration and Voter List Maintenance Verification***

[19] 52 USC 20507 Requirements with respect to administration of voter registration

[20] 18 USC 611 Voting by aliens

[21] 18 USC 1015 (f) Naturalization, citizenship or alien registry, whoever knowingly makes any false statement or claims that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)-Shall be fined under this title or imprisoned not more than five years, or both

[22] 5 USC 552a Records maintained on individuals

[23] 8 USC 1367 Penalties for disclosure of information

[24] The Systematic Alien Verification for Entitlements Voter Registration and Voter List Maintenance Fact Sheet is accessible at https://www.uscis.gov/save/resources/voter-registration-and-voter-list-maintenance-fact-sheet.

In understanding the use of the Systematic Alien Verification for Entitlements Program for voter verification-related purposes (voter registration and voter list maintenance), one should also bear in mind the following limitations and considerations:

- The information needed to verify an individual through the Systematic Alien Verification for Entitlements Program is typically not collected on a voter registration application, although it may be available from other sources, especially driver's license applications.
- The Systematic Alien Verification for Entitlements Program previously was only able verify United States citizenship for naturalized and certain acquired citizens[25] for whom the United States Citizenship and Immigration Services has a record of their citizenship.
- The Systematic Alien Verification for Entitlements Program previously was often unable to verify acquired United States citizens because eligible individuals frequently do not apply for and thus do not receive a determination and certificate of United States citizenship from the United States Citizenship and Immigration Services.
- Department of State adjudicates acquired citizens that may not have a record with the United States Citizenship and Immigration Services via the issuance of U.S. passports. Therefore, obtaining passport information from the Department of State is in progress.
- The Department of State maintains records for individuals who have renounced their citizenship. Once a Certificate of Loss of Nationality is approved by the Department of State indicating the official determination of loss of United States nationality, this information is shared with the United States Citizenship and Immigration Services per 8 USC 1373.[26]
- With the newly established connection to the Social Security Administration's Numident system, the Systematic Alien Verification for Entitlements Program is now able to verify more United States citizens, including United States citizens by birth, when a Social Security Number is provided.

Verification for voter list maintenance purposes often occurs when a state Department of Motor Vehicles compares its records to the state voter agency records to determine if any individuals on the voter rolls identified that they were non-United States citizens when the Department of Motor Vehicles issued their driver's license. The state voter agency would then follow up with those individuals their citizenship status through established state law voter registration challenge procedures. As part of the established voter registration challenge procedures, the State Voter Agency will seek to establish the immigration/citizenship status of the individuals and use Systematic Alien Verification for Entitlements Program as one method to verify the information.

There are likely some situations in which the Systematic Alien Verification for Entitlements Program provides an initial response indicating a non-United States citizen immigration status (e.g., Lawful Permanent Resident) when the registrant is in fact a United States citizen. However, as also noted above, rules for using the Systematic Alien Verification for Entitlements Program prohibit voter registration agencies from relying upon this initial verification response to deny or revoke registration since as by

---

[25] "Acquired citizenship" refers to U.S. citizenship conveyed to children through the naturalization of parents or, under certain circumstances, at birth to foreign-born children of U.S. citizens, provided certain conditions are met.

[26] 8 USC 1873 outlines the communication between government agencies and the Immigration and Naturalization Service.

asserting United States citizenship as part of registering to vote, registrants inherently disagree with any initial response indicating they are not a United States citizen.

***Shortfalls in data accuracy in the system could cause incomplete or false results.***

According to Systematic Alien Verification for Entitlements Program subject matter experts, the situations in which the Systematic Alien Verification for Entitlements Program provides an initial non-United States citizen immigration status for a United States citizen who has a certificate of naturalization or citizenship from the United States Citizenship and Immigration Services, or legacy Immigration and Naturalization Service can happen for a variety of reasons. In some instances, the initial non-United States citizen response is due to the lack of an electronic record with the Social Security Administration showing United States citizenship (which was not reliably recorded pre-1981), or the lack of an electronic record of a United States Citizenship and Immigration Services naturalization or acquired citizenship certificate, which is more likely for older certificates issued before recording them in electronic systems became a consistent practice. In addition, although the electronic record-matching algorithms in the United States Citizenship and Immigration Services Person Centric Service that the Systematic Alien Verification for Entitlements Program uses are very good, the United States Citizenship and Immigration Services previously identified and subsequently fixed two algorithm issues that caused Systematic Alien Verification for Entitlements Program to provide an initial verification response of Lawful Permanent Resident for some naturalized citizens and a small number of acquired United States citizens. But again, many of the safeguards noted above are designed to address any imperfections in records and algorithms used to match them.

The delay between the issuance a Certificate of Naturalization during a naturalization ceremony and when the certificate is reflected in source systems and made available to the Systematic Alien Verification for Entitlements Program rarely, if ever, causes the Systematic Alien Verification for Entitlements Program to provide an initial response of non-United States citizen immigration status. It typically takes about one business day plus a few hours for an electronic record of the certificate to be available to the Systematic Alien Verification for Entitlements Program once it is input by the responsible United States Citizenship and Immigration Services office. The Systematic Alien Verification for Entitlements Program rarely, if ever, receives requests to verify United States citizenship during this time.

Additionally, the United States Citizenship and Immigration Services is not the source agency for Social Security Administration related information. While the United States Citizenship and Immigration Services assumes the accuracy of the Social Security Administration data, it cannot verify accuracy of the information and relies on the Social Security Administration to ensure the data accuracy, timeliness, and integrity of their own data.

***Customs and Border Protection Integration***

The Systematic Alien Verification for Entitlements Program will integrate with the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data. Customs and Border Protection is now permitting the Systematic Alien Verification for Entitlements Program to query TECS (not an acronym) Travel Documents and Encounter Data system to find a match to US passport information in Customs and Border Protection holdings. The TECS (not an acronym) - Travel Documents and Encounter Data system stores travel document information (i.e. scanned images of documents, biographic information, document details, and photographs) from the United States Citizenship and Immigration Services Lawful Permanent Resident Cards, Department of State-issued United States

passports and visas, foreign passports, enhanced driver's licenses, and enhanced tribal cards. The TECS (not an acronym) - Travel Documents and Encounter Data USPassportRESTService allows interconnected systems to query TECS (not an acronym) - Travel Documents and Encounter Data for United States passport information. For this use case, the Systematic Alien Verification for Entitlements Program user agencies will input a United States passport number into the Systematic Alien Verification for Entitlements Program system.

The query will trigger the USPassportRESTService to locate the matching United States passport number and return the results to the user. This will allow the Systematic Alien Verification for Entitlements Program to verify all types of United States citizens, including those by birth, which was previously not available. Currently, the United States Citizenship and Immigration Services E-Verify Program has an existing connection to the USPassportRESTService, which also resides within the Verification Information System, like the Systematic Alien Verification for Entitlements Program.

Customs and Border Protection has the authority to collect passport photos pursuant to 5 USC 552a (4).[27] Customs and Border Protection receives a routine feed from the Department of State with US passports as they are issued and/or updated. Customs and Border Protection also collects passport information primarily on all travelers seeking to enter the United States at ports of entry. Customs and Border Protection uses this information as part of Agency operations.

***Social Security Administration Data Sharing***

The Information Sharing Agreement between the Department of Homeland Security-United States Citizenship and Immigration Services and the Social Security Administration documents the Social Security Administration's support by matching data submitted through the Systematic Alien Verification for Entitlements Program to Social Security Administration records in the Social Security Administration's master files of Social Security Number holders and Social Security Number Applications. The United States Citizenship and Immigration Services will only submit verification requests to the Social Security Administration for authorized purposes.

The United States Citizenship and Immigration Services Verification Division and Social Security Administration connection is now live and now connects the Systematic Alien Verification for Entitlements Program with the Social Security Administration's Numident system. Prior to the connection, the United States Citizenship and Immigration Services and Social Security Administration executed a Letter of Agreement that identifies the authorities for both organizations as well as purposes and the data exchange. The United States Citizenship and Immigration Services will document this sharing in a separate Privacy Threshold Analysis.

The Systematic Alien Verification for Entitlements Program performs an automated query of various Systematic Alien Verification for Entitlements Program-accessed federal databases for relevant records. Now, if a Social Security Number is submitted by a user agency, the Systematic Alien Verification for Entitlements Program will verify this enumerator against the Social Security Administration Numident system including the death and citizenship records. If the individual's Social Security account has a record of an A-number or certificate number, the Social Security Administration will provide that information to the Systematic Alien Verification for Entitlements Program, which will in turn be used to

[27] 5 USC 552a (4) Records maintained on individuals - collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph.

validate the information against the Department of Homeland Security records. Verifying citizenship status using Social Security Administration data will be made available to all Systematic Alien Verification for Entitlements Program user agencies.

***Department of State Data Sharing***

If a United States passport number is submitted, the Systematic Alien Verification for Entitlements Program will verify it against information from Department of State-issued passports maintained by the Custom Boarder Protection. Additionally, Systematic Alien Verification for Entitlements Program will collect information from the Department of State's Consular Consolidated Database / American Citizen Record Query system, which is a consular search engine used by the Department of State to manage and access records related to United States citizens, particularly for consular protection and services, including managing passport requests and applications.

Department of Homeland Security-Department of State Memorandum of Agreement Appendix A allows this query of passport information to be used in Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data to support its missions, including but not limited to verification of United States passports, whenever the document is presented as proof of identity to obtain a benefit, privilege, status, or credential from the Department of Homeland Security, for vetting and screening purposes, and/or for transportation security, national security, law enforcement, border security (including biometric entry and exit initiatives), immigration (including verification purposes such as E-Verify) and counterterrorism purposes.

***User Agencies Memoranda of Agreement***

All user agency memorandums of agreements contain similar provisions to protect the due process and other rights of individuals for whom states or other user agencies submit verification requests to the Systematic Alien Verification for Entitlements Program[28]. The United States Citizenship and Immigration Services has an online tool that allows the public to search if a federal, state, local, tribal, or territorial agency is registered with the Systematic Alien Verification for Entitlement Program.[29]

| | |
|---|---|
| **2. From whom does the Project, Program, or System collect, maintain, use, or disseminate information?** *Please check all that apply.* | ☐ This project does not collect, collect, maintain, use, or disseminate any personally identifiable information[30]<br>☒ Members of the public |

[28] The Systematic Alien Verification for Entitlements Program memorandum of agreement is assessable at https://www.uscis.gov/save/prospective-user-agencies/register-an-agency-for-save and under the "How to Register for SAVE" section.
[29] The Systematic Alien Verification for Entitlement Program search tool is accessible at https://www.uscis.gov/save/save-agency-search-tool.
[30] DHS defines personal information as "Personally Identifiable Information" or PII, which is any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual, regardless of whether the individual is a U.S. citizen, lawful permanent resident, visitor to the U.S., or employee or contractor to the Department. "Sensitive PII" is PII, which if lost, compromised, or disclosed without authorization, could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual. For the purposes of this PTA, SPII and PII are treated the same.

| | |
|---|---|
| | ☒ U.S. Persons (U.S citizens or lawful permanent residents)<br>☒ non-U.S. Persons<br>☒ DHS Employees/Contractors (list Components): United States Citizenship and Immigration Services<br>☐ Other federal employees or contractors (list agencies): *Click here to enter text.* |
| **2(a) Is information meant to be collected from or about sensitive/protected populations?** | ☐ No<br>☒ 8 USC § 1367 protected individuals (e.g., T, U, VAWA)[31]<br>☒ Refugees/Asylees<br>☐ Other. Please list: |

**3. What specific information about individuals is collected, maintained, used, or disseminated?**

***Information Collected from Requesting Agencies about applicants for benefits, licenses, or other authorized purposes:***

- Full Name
- Date of birth
- Benefit sought
- Driver license
- State Identification
- Citizenship or nationality
- Country of birth
- A-Number
- Social Security Number
- Alias
- Customer Agency-issued Case Number

***Unique Immigration Identifiers Used:***

[31] This involves the following types of individuals: T nonimmigrant status (Victims of Human Trafficking), U nonimmigrant status (Victims of Criminal Activity), or Violence Against Women Act (VAWA). For more information about 1367 populations, please see: DHS Management Directive 002-02, Implementation of Section 1367 Information Provisions, *available at* http://dhsconnect.dhs.gov/org/comp/mgmt/policies/Directives/002-02.pdf.

- Alien number
- United States Citizenship and Immigration Services Number
- I-94 Admission Record Number (a 11-digit admission record assigned to foreign visitors entering the United States by the United States Customs and Border Protection)
- Student and Exchange Visitor Information System Identification Number
- Naturalization or Citizenship Certificate Number
- Card Number / I-797 Receipt Number (unique identifier assigned by the United States Citizenship and Immigration Services to track an immigration application or petition).
- Visa Number
- Foreign passport number (if submitted with another immigration enumerator and issuing country)

***Other Identifiers:***

- Social Security Number including a truncated version of the Social Security Number where only the last four digits are displayed, with the initial five digits are masked using asterisks (*) or XXXXX
- United States Passport Number
- Agency Data Universal Numbering System

***Other Information:***

**Additional information requested by the agency**:

- Employment Authorization Document History
- Grant Date
- Affidavit of Support Sponsor Data[32]
    - Full name
    - Current mailing address - In care of name (if any)
    - Current physical address
    - Country of domicile
    - Date of birth
    - Country of birth
    - Social Security Number
    - Immigration Status
    - Sponsors A-number (if any)
    - United States Citizenship and Immigration Services Online Account Number (if any)
    - Military service
    - Employment and income
    - Federal tax return information

[32] A United States Citizenship and Immigration Services Affidavit of Support sponsor is an individual who signs a legal contract, Form I-864, agreeing to financially support an intending immigrant, ensuring they won't become a public charge. This sponsor is typically the U.S. citizen, lawful permanent resident, or U.S. national who filed the immigrant petition.

- Sponsor Deeming and Agency Reimbursement Information Collection
    - Whether the benefit-granting agency approved or denied the application for the means-tested public benefit.
    - If the benefit-granting agency denied the application, if the denial was based upon the information that the Systematic Alien Verification for Entitlements Program provided in its response to the citizenship and immigration status verification request from the benefit-granting agency.
    - Whether the benefit-granting agency deemed sponsor/household member income and, if not, the exception or reason for not doing so.
    - Whether the benefit-granting agency sent the sponsor a reimbursement request letter (yes/no).
    - Whether the sponsor complied with his or her reimbursement obligation.
    - Whether the benefit-granting agency conducted a collection action or other proceedings if the sponsor did not comply with his or her reimbursement obligation (yes/no and if yes, the status, court or forum, and docket or matter number).

- Data collected on Form I-864, Affidavit of Support Under Section 213A of the Immigration and Nationality Act
    - Principal Immigrant:
        - Full name
        - Current mailing address - In care of name (if any)
        - Current physical address
        - Country of Citizenship or Nationality
        - Date of birth
        - Alien Registration number
        - United States Citizenship and Immigration Services Online Account Number (if any)
        - Daytime telephone number
    - Principal Immigrant Family Members:
        - Full name
        - Relationship to Principal Immigrant
        - Alien Registration number
        - United States Citizenship and Immigration Services Online Account Number (if any)
        - Daytime telephone number
    - Interpreter's Contact Information, Certification and Signature:
        - Full name
        - Telephone number
        - Email address (if any)
        - Interpreter's certification and signature
    - Preparer's Contact Information:
        - Daytime number
        - Mobile number (if any)
        - Email address (if any)
        - Signature

- Cuban/Haitian, Immigration Status

- Violence Against Women's Act
- Request Document Review
- Citizenship Status
- Immigration Documentation (uploaded by the user agency to perform additional verification)

***Agency User Information***

- Agency point of contact name
- Agency point of contact phone number
- Initiated on
- Initiated by

***Information Shared with Social Security Administration:***

- Full Name
- Date of Birth
- Social Security Number

***DATA Received and Maintained from Social Security Administration:***

- Social Security Number Match: True/False
- Name Match: True/False
- Date of Birth Match: True/False
- Citizenship Indicator:
- "A" - United States citizen
- "B" - Legal alien, eligible to work
- "C" - Legal alien, not eligible to work
- "D" - Other
- "E" - Alien Student - restricted work authorized
- "F" - Conditionally legalized alien
- Foreign Born Indicator: Citizenship code is not present, but individual was foreign born
- Alien Registration Number: Where applicable
- Certificate Number: Where applicable
- Death Indicator: Yes Deceased / Not Deceased
- Error Code Descriptions: Transaction and record levels

***Information Shared with TECS (not an acronym) – TECS (not an acronym)-Travel Documents and Encounter Data for Passport query:***

- Full Name
- Date of Birth
- United States passport number

***Information Provided to Requesting User Agencies:***

- Case Verification Number: a Systematic Alien Verification for Entitlements Program generated number
- Initial Request Date
- Identification Type
- Identification Number
- Last Name
- Benefit Code
- Benefit Description
- Initial Request Response: Lawful Status, No Lawful Status, Deceased
- Additional Request Date
- Additional Request Response: Lawful Status, No Lawful Status, Deceased
- Third Step Request Date
- Third Step Resolution: Lawful Status, No Lawful Status, Deceased

***Additional information for immigrants requested from agencies for which they established the authority/need to receive***

- Employment authorization document history
- Grant date
- Affidavit of Support Sponsor Data
- Cuban/Haitian Entrant Information
- Violence Against Women's Act information
- Immigration Status
- Request document review
- Citizenship status
- Photo
- Closed Date
- Receipt number

**3(a) Does this Project, Program, or System collect, maintain, use, or disseminate Social Security numbers (SSN) or other types of stand-alone sensitive information?[33] If applicable, check all that apply.**

[33] Sensitive PII (or sensitive information) is PII that if lost, compromised, or disclosed without authorization, could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual. More information can be found in the DHS Handbook for Safeguarding Sensitive Personally Identifiable Information, *available at* https://www.dhs.gov/publication/handbook-safeguarding-sensitive-personally-identifiable-information.

| | |
|---|---|
| ☒ Social Security number<br>☒ Alien Number (A-Number)<br>☐ Tax Identification Number<br>☒ Visa Number<br>☒ Passport Number<br>☐ Bank Account, Credit Card, or other financial account numbers | ☐ Social Media Handle/ID<br>☒ Driver's License/State ID Number<br>☐ Biometric identifiers *(e.g., FIN, EID)*<br>☒ Biometrics.[34] *Please list modalities (e.g., fingerprints, DNA, iris scans): Click here to enter text.*<br>☒ Other. *Please list:* Form I-94 number, Student and Exchange Visitor Information System Identification number, Naturalization / Citizenship Certificate number, Permanent Resident Card number / Receipt number, and Visa number. |
| **3(b) Please provide the specific legal basis for the collection of SSN:** | The Social Security Number is collected from applicants and is used to verify their immigration status/United States citizenship. div. C, title VI, Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-707, codified at 8 U.S.C. 1373 (a) and (c). Authority for having a system for verification of citizenship and immigration status of individuals seeking government benefits is governed by the Immigration Reform and Control Act of 1986 Pub. L. No. 99-603, 100 Stat. 3359.<br><br>Sections 415 and 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, authorizes the collection and use of Social Security Numbers to verify entitlement to public benefits, licenses, and credentials. |

**3(c) If the SSN is needed to carry out the functions and/or fulfill requirements of the Project, System, or Program, please explain why it is necessary and how it will be used.**

The Social Security Number is used to assist in identity verification for user agencies and in determining benefits eligibility. If possible, the United States Citizenship and Immigration Services will use a truncated Social Security Number if provided by the user agency.

[34] If related to IDENT/HART and applicable, please complete all Data Access Request Analysis (DARA) requirements. This form provides privacy analysis for DHS' IDENT, soon to be HART. The form replaces a PTA where IDENT is a service provider for component records. PRIV uses this form to better understand how data is currently shared, will be shared and how data protection within IDENT will be accomplished. IDENT is a biometrics service provider and any component or agency submitting data to IDENT is a data provider.

| |
|---|
| **3(d) If the Project, Program, or System requires the use of SSN, what actions are being taken to abide by Privacy Policy Instruction 047-01-010, *SSN Collection and Use Reduction*,[35] which requires the use of privacy-enhancing SSN alternatives when there are technological, legal, or regulatory limitations to eliminating the SSN? Note:** *even if you are properly authorized to collect SSNs, you are required to use an alternate unique identifier. If there are technological, legal, or regulatory limitations to eliminating the SSN, privacy-enhancing alternatives should be taken, such as masking, truncating, or encrypting the SSN, or blocking the display of SSNs in hard copy or digital formats.* |
| The United States Citizenship and Immigration Services has traditionally used an alternative number to the Social Security Number to access records to determine the citizenship/immigration status of user agencies benefit applicants in compliance with the Department of Homeland Security privacy-related policies. However, United States Citizenship and Immigration Services now needs to collect Social Security numbers to facilitate user agencies' ability to submit a request for citizenship/immigrations status of benefit applicants. The United States Citizenship and Immigration Services is working to implement use of the truncated form of a Social Security number (i.e. the last four numbers of a Social Security number rather than the full identifier) to retrieve information from the Social Security Administration. The Systematic Alien Verification for Entitlements Program's user interface will mask the full Social Security Number during data inputs, except for when information is submitted via the bulk uploader. In compliance with the security policy for Social Security numbers, server-side encryption is used for Amazon Simple Storage Service[36] and Amazon Relational Database Services[37] databases. This uses key management provided by Amazon Web Services for the storage buckets and Relational Database Services databases where Social Security Numbers are housed. Social Security Numbers and Personally Identifiable Information are not exposed in any hard copy documents available for extract from the information system. Additionally, in accordance with the National Institute of Science and Technology and Department of Homeland Security information security and privacy policies, the Systematic Alien Verification for Entitlements Program maintains moderate level controls for the confidentiality of information within the tool. |

| | |
|---|---|
| **4. How does the Project, Program, or System retrieve information?** | ☒ By a unique identifier.[38] Please list all unique identifiers used:<br>• Full name<br>• Alias |

[35] *See* https://www.dhs.gov/publication/privacy-policy-instruction-047-01-010-ssn-collection-and-use-reduction.
[36] Amazon Simple Storage Service (Amazon S3) is an object storage service offering industry-leading scalability, data availability, security, and performance. Organizations can use this service to store, manage, analyze, and protect any amount of data for virtually any use case, such as data lakes, cloud-native applications, and mobile apps.
[37] Amazon Relational Database Service (Amazon RDS) is an easy-to-manage relational database service optimized for total cost of ownership. It is simple to set up, operate, and scale with demand. Amazon RDS automates undifferentiated database management tasks, such as provisioning, configuring, backing up, and patching. Amazon RDS allows customers to create a new database in minutes and offers flexibility to customize databases to meet their needs.
[38] Generally, a unique identifier is considered any type of "personally identifiable information," meaning any information that permits the identity of an individual to be directly or indirectly inferred, including any other information which is linked or linkable to that individual regardless of whether the individual is a U.S. citizen, lawful permanent resident, visitor to the U.S., or employee or contractor to the Department.

| | |
|---|---|
| | • Date of birth<br>• Immigration enumerator:<br>  ○ Alien number/United States Citizenship and Immigration Services Number,<br>  ○ Form I-94, Arrival/Departure Record number,<br>  ○ Student and Exchange Visitor Information System Identification number,<br>  ○ Citizenship or Naturalization Certificate number<br>  ○ Card Number / I-797 Receipt Number,<br>  ○ Visa Number, or<br>  ○ Foreign passport number (if submitted with another immigration enumerator) and issuing country<br>• Social Security Number<br>• United States passport number<br>• Customer Agency-issued Case Number<br>• Case Verification Number<br><br>☐ By a non-unique identifier or other means. Please describe:<br>*Click here to enter text.* |

| | |
|---|---|
| 5. **What is the records retention schedule(s) for the information collected for each category type** (include the records schedule number)? *If no schedule has been approved, please provide proposed schedule or plans to determine it.*<br><br>*Note: If no records schedule is in place or are unsure of the applicable records schedule, please reach out to the appropriate Records Management Office.*[39] | Data within Systematic Alien Verification for Entitlements Program is retained for 10 years after the final match determination of the employee or applicant in accordance with NARA approved records retention schedule N1-566-08-07.<br><br>All United States Citizenship and Immigration Services verification requests will be documented in a transactional database. The retention period is 10 years. The database is not accessible to the public, except as permitted. |

[39] *See* https://dhsconnect.dhs.gov/org/comp/mgmt/ocio/cdod/rm/Pages/DHS-Records-Officers.aspx

| | |
|---|---|
| **5(a) How does the Project, Program, or System ensure that records are disposed of or deleted in accordance with the retention schedule** (e.g., technical/automatic purge, manual audit)? | Data is automatically purged annually based on NARA disposal schedule N1-566-08-07. |
| **6. Does this Project, Program, or System connect, receive, or share PII with any other DHS/Component projects, programs, or systems?**[40] | ☐ No.<br>☒ Yes. If yes, please list:<br>**United States Citizenship and Immigration Services Systems:**<br>• Central Index System<br>• Electronic Immigration System<br>• Computer Linked Application Information Management System 3<br>• Enterprise Citizenship and Immigration Services Centralized Operational Repository<br>• GLOBAL (not an acronym)<br>• RAILS (not an acronym)<br>• Customer Profile Management System<br>• Reengineered Naturalization Application Casework System<br>• Marriage Fraud Amendment System<br>• Salesforce Customer Relationship Management Customer Relationship Management[41]<br>**Department of Homeland Security Systems:**<br>• Department of Homeland Security OneNet<br>• Immigration and Custom Enforcement Student and Exchange Visitor Information System<br>• Immigration and Custom ENFORCE Integrated Database |

[40] PII may be shared, received, or connected to other DHS systems directly, automatically, or by manual processes.
[41] Provides a unified platform where data from different departments can be accessed and used to improve customer interactions.

| | |
|---|---|
| | • Customs and Border Protection Arrival and Departure Information System<br>• Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data - USPassportRESTService<br>• Transportation Security Administration Technology Infrastructure Modernization and Vetting and Credentialing System |
| **7. Does this Project, Program, or System connect, receive, or share PII with any external (non-DHS) government or non-government partners or systems?** | ☐ No.<br>☒ Yes. If yes, please list:<br>The following are systems/organizations that the Systematic Alien Verification for Entitlements Program collects/shares information to support user agencies' requests:<br>• United States Military Entrance Processing Command Integrated Resource System<br>• Department of Education Federal Student Aid Central Processing System<br>• Department of Health and Human Services Centers for Medicare & Medicaid Services<br>• Social Security Administration Numident system<br>• Department of Justice Executive Office for Immigration's Immigration Review Information Exchange System<br>• Department of State Consular Consolidated Database Passport<br>The following are systems/organizations that the Systematic Alien Verification for Entitlements provides information that determine benefit eligibility:<br>• Various federal agencies in their role as a user agency |

| | |
|---|---|
| | • Various state, local, tribal, and territory agencies in their role as a Systematic Alien Verification for Entitlements Program user agency |
| **8. Is this sharing pursuant to new or existing information sharing agreement (MOU, MOA, LOI, RTA, etc.)? *If applicable, please provide agreement as an attachment.*** | Existing<br>Please describe applicable information sharing governance in place:<br>• Letter of Agreement between United States Citizenship and Immigration Services and Social Security Administration<br>• Information Sharing Agreement between the Department of Homeland Security, United States Citizenship and Immigration Services and the Social Security Administration regarding citizenship<br>• Computer Matching Agreement with Department of Education<br>• Memorandum of Agreements between United States Citizenship and Immigration Services and each individual user agency |
| **9. Does the Project, Program, or System or have a mechanism to track external disclosures of an individual's PII?** | ☐ No. What steps will be taken to develop and maintain the accounting: *Click here to enter text.*<br>☒ Yes. In what format is the accounting maintained if appropriate (e.g., disclosures to the Department of Justice Office of Special Counsel, Immigration and Customs Enforcement). Verification Information System also has a transactional log that enables the recreation of accounting of disclosures. |
| **10. Does this Project, Program, or System use or collect data involving or from any of the following technologies:** | ☐ Social Media<br>☐ Advanced analytics[42]<br>☐ Live PII data for testing |

[42] The autonomous or semi-autonomous examination of Personally Identifiable Information using sophisticated techniques and tools to draw conclusions. Advanced Analytics could include human-developed or machine-developed algorithms and encompasses, but is not limited to, the following: data mining, pattern and trend analysis, complex event processing, machine learning or deep learning, artificial intelligence, predictive analytics, big data analytics.

| | |
|---|---|
| | ☒ No |
| **11. Does this Project, Program, or System use data to conduct electronic searches, queries, or analyses in an electronic database to discover or locate a predictive pattern or an anomaly indicative of terrorist or criminal activity on the part of any individual(s) (i.e., data mining)?[43] This does not include subject-based searches.** | ☒ No.<br>☐ Yes. If yes, please elaborate: *Click here to enter text.* |
| **11(a) Is information used for research, statistical, or other similar purposes? If so, how will the information be de-identified, aggregated, or otherwise privacy-protected?** | ☒ No.<br>☐ Yes. If yes, please elaborate: *Click here to enter text.* |
| **12. Does the planned effort include any interaction or intervention with human subjects[44] via pilot studies, exercises, focus groups, surveys, equipment or technology, observation of public behavior, review of data sets, etc. for research purposes** | ☒ No.<br>☐ Yes. If yes, please reach out to the DHS Compliance Assurance Program Office (CAPO) for independent review and approval of this effort.[45] |
| **13. Does the Project, Program, or System provide role-based or additional privacy training for personnel who have access, in addition to annual privacy training required of all DHS personnel?** | ☒ No.<br>☐ Yes. If yes, please list: *Click here to enter text.* |

[43] Is this a program involving pattern-based queries, searches, or other analyses of one or more electronic databases, where—
(A) a department or agency of the Federal Government, or a non-Federal entity acting on behalf of the Federal Government, is conducting the queries, searches, or other analyses to discover or locate a predictive pattern or anomaly indicative of terrorist or criminal activity on the part of any individual or individuals.
(B) the queries, searches, or other analyses are not subject-based and do not use personal identifiers of a specific individual, or inputs associated with a specific individual or group of individuals, to retrieve information from the database or databases; and
(C) the purpose of the queries, searches, or other analyses is not solely—
(i) the detection of fraud, waste, or abuse in a government agency or program; or
(ii) the security of a government computer system.

[44] Human subject means a living individual about whom an investigator conducting research: (1) obtains information or biospecimens through intervention or interaction with the individual, and uses, studies, or analyzes the information or biospecimens; or (2) obtains, uses, studies, analyzes, or generates identifiable private information or identifiable biospecimens.

[45] For more information about CAPO and their points of contact, please see: https://www.dhs.gov/publication/capo or https://collaborate.st.dhs.gov/orgs/STCSSites/SitePages/Home.aspx?orgid=36. For more information about the protection of human subjects, please see DHS Directive 026-04: https://www.dhs.gov/sites/default/files/publications/mgmt/general-science-and-innovation/mgmt-dir_026-04-protection-of-human-subjects_revision-01.pdf.

| **14. Is there a FIPS 199 determination?**[46] | ☐ No.<br><br>☒ Yes. Please indicate the determinations for each of the following:<br><br>Confidentiality:<br>☐ Low ☒ Moderate ☐ High ☐ Undefined<br><br>Integrity:<br>☐ Low ☒ Moderate ☐ High ☐ Undefined<br><br>Availability:<br>☐ Low ☒ Moderate ☐ High ☐ Undefined |
|---|---|

**PTA REVIEW**

**(TO BE COMPLETED BY COMPONENT PRIVACY OFFICE REVIEWER)**

| | |
|---|---|
| **Component Privacy Office Reviewer:** | Chiquita Jones/LeVar Sykes |
| **Component Privacy Office Senior Reviewer:** | Shannon DiMartino |
| **PRIVCATS ID Number:** | 0019946 |
| **Date submitted to Component Privacy Office:** | May 5, 2025 |
| **Concurrence from other Component Reviewers involved (if applicable):** | Catherine Shorten, Customs and Border Protection, concurrence provided 6/5/2025 |

| **Component Privacy Office Recommendation:**<br>*Please include recommendation below, including what new privacy compliance documentation is needed, as well as any specific privacy risks/mitigations, as necessary.* |
|---|
| The United States Citizenship and Immigration Services submits this updated Privacy Threshold Analysis to document the United States Citizenship and Immigration Services Verification Division and Office of Technology (OIT) changes to the Systematic Alien Verification for Entitlements Program. The United States Citizenship and Immigration Services administers the Systematic Alien Verification for Entitlements Program which is an inter-governmental initiative that provides a web-based service to help |

[46] FIPS 199 is the Federal Information Processing Standard Publication 199, Standards for Security Categorization of Federal Information and Information Systems and is used to establish security categories of information systems. For more information, see https://www.nist.gov/itl/fips-general-information.

federal, state, territorial, tribal and local agencies and other governmental entities verify United States citizenship or immigration status/category information of applicants for benefits, licenses, or other authorized purposes.

This Privacy Threshold Analysis documents the following changes to the Systematic Alien Verification for Entitlements Program:

1. Expanded search capabilities to allow approved Systematic Alien Verification for Entitlements Program user agencies to verify United States citizenship information using Social Security Numbers and other non-Department of Homeland Security enumerators.
2. A new Social Security Administration system connection to support verification of citizenship/immigration status.
3. A new bulk uploader/list processor function that allows user agencies to upload lists of benefit applicants.
4. Use of the Voter Registration and Voter List Maintenance Verification functionality.
5. The collection of information from the Department of State's Consular Consolidated Database/ American Citizen Record Query system.
6. An integration with the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data system.

The United States Citizenship and Immigration Services Privacy Office recommends Privacy Impact Assessment coverage for the Systematic Alien Verification for Entitlements Program to comply with the eGovernment Act of 2002 as it "collects, maintains, or disseminates information that is in an identifiable form." The information collected, used, stored, and/or disseminated by the Systematic Alien Verification for Entitlements Program meets the definition of Personally Identifiable Information ("PII")/Sensitive Personally Identifiable Information ("SPII")[47] as it "permits the identity of an individual to be directly or indirectly inferred, including any other information that is linked or linkable to that individual, regardless of whether that individual is a United States citizen, legal permanent resident, or a visitor to the United States, or employee or contractor to the Department." Specifically, the Systematic Alien Verification for Entitlements Program involves information from members of the public applying for benefits, licenses, or other authorized purposes which may include (1) United States citizens and legal permanent residents, (2) individuals who are now current United States citizens and legal permanent residents after previously naturalizing or adjusting their status, or (3) individuals who may ultimately naturalize to become United States citizens or adjust their status to receive legal permanent residency in the future. Depending on the eligibility category certain individuals may be eligible to apply for adjustment of status as soon as one (1) year after their initial immigration benefit is granted,[48] therefore the United States Citizenship and Immigration Services Privacy Office recommends requiring Privacy Impact Assessment coverage for the Systematic Alien Verification for Entitlements Program to ensure all current and future United States

[47] Personally Identifiable Information (PII) has numerous official definitions, but in general, it is defined as any information that can be used to identify an individual directly or indirectly, such as a name, email address, Social Security Number or IP address. Sensitive PII (SPII) is generally defined as any PII that if lost, stolen, or disclosed without authorization could result in significant harm to an individual.

[48] For more information on eligibility categories please refer to: https://www.uscis.gov/green-card/green-card-eligibility-categories.

citizens and legal permanent residents have transparency into how the United States Citizenship and Immigration Services may collect, store, use, and share the information they previously provided to the United States Citizenship and Immigration Services.

The Privacy Office's Technology Oversight Branch recommends that the Systematic Alien Verification for Entitlements Program continues to be designated as a privacy sensitive program that requires privacy compliance coverage. The Technology Oversight Branch recommends that with the new updates to the program documented in this Privacy Threshold Analysis the Systematic Alien Verification for Entitlements Program be identified as not in compliance with the Privacy Act of 1974, as amended, or the E-Government Act of 2002. A Privacy Impact Assessment update and a System of Records Notice update should be published prior to the program's changed collection and use of Personally Identifiable Information, including information on natural born United States citizens. Further, the sharing of Personally Identifiable Information with the Social Security Administration should occur after the System of Records Notice has gone through the required 30-day comment period. The following are the Technology Oversight Branch's recommendations for privacy compliance coverage and additional requirements:

**Privacy Impact Assessment**

- A new Privacy Impact Assessment Update for DHS/USCIS/PIA-006 Systematic Alien Verification for Entitlements Program must be completed before collection and use of additional information. Specifically, these Privacy Impact Assessment updates would include, but are not limited to:
  - The collection of Social Security Numbers and other information from the Social Security Administration regarding United States citizens, including natural born citizens.
  - The change in legal rationale for now collecting and maintaining Social Security Numbers of United States natural born citizens.
  - The collection and use of Passport Numbers from the Department of State via new system connections.
  - The addition of the Voter Registration and Voter List Maintenance Verification process, including how this process may verify the citizenship status of natural born United States citizens.
  - The implementation of the bulk case upload functionality for User Agencies.
  - Additional privacy risks and mitigation strategies regarding notice, consent, and data accuracy.

**System of Records Notice**

- An update to DHS/USCIS-004 Systematic Alien Verification for Entitlements Program must be completed before the collection and sharing of additional information. Specifically, these System of Records Notice updates would include, but are not limited to changes to the following sections:
  - Purpose: The System of Records Notice does not currently include the verification of voter registration and voter maintenance lists.

- Categories of Individuals: Currently, USCIS specifically informs the public it only collects information on naturalized or acquired United States citizens. This section must be updated to discuss that information on natural born United States citizens will also be collected.
- Categories of Records: The System of Records Notice currently informs the public that the Systematic Alien Verification for Entitlements Program only collects Social Security Number of immigrants on the United States Citizenship and Immigration Services Form G-845. This section must be updated to cover the expanded collection and use of Social Security Numbers.
- Sources of Records: The System of Records Notice currently doesn't include the Social Security Administration system of records. This section must be updated to reflect all new source systems including the Social Security Administration Numident system.

- DHS/CBP-011 Customs and Border Protection Primary and Secondary Processing (TECS (not an acronym)) National SAR Initiative December 19, 2008 (73 Federal Register 77778)
- STATE-26 Passport Records, March 24, 2015 (80 Federal Register 15653)
- STATE-39 Visa Records, November 8, 2021 (86 Federal Register 61822)
- SSA-60-0058 Master Files of Social Security Number Holders and Social Security Number Applications, February 20, 2025 (90 Federal Register 10025)

The following is a Plan of Action to ensure that the Systematic Alien Verification for Entitlements Program is brought into compliance with all federal statutes, regulations, and Department of Homeland Security policies.

**USCIS Privacy's Action Plan for the Systematic Alien Verification for Entitlements Program**

The Systematic Alien Verification for Entitlements Program is an inter-governmental initiative that provides a web-based service to help federal, state, territorial, tribal and local agencies and other governmental entities verify United States citizenship or immigration status/category information of applicants for benefits, licenses, or other authorized purposes.

**Action Plan**

This plan outlines priority actions necessary to advance the goal and objective of ensuring the Systematic Alien Verification for Entitlements Program is compliant with all applicable privacy laws, regulations, and polices. These actions will ensure that the use of technology by United States Citizenship and Immigration Services and the Systematic Alien Verification for Entitlements Program sustains and does not erode privacy protections relating to the collection, use, dissemination, maintenance, and disposal of personal information. These actions include actively working with the Verification Division, Office of Chief Counsel and the Customs and Border Protection Office of Privacy on this Privacy Threshold Analysis and the draft System of Records Notice along with continued collaboration with these stakeholders and others such as the Department of Homeland Security Privacy Office to ensure Systematic Alien Verification for Entitlements Program is in compliance.

**Actions to Be Taken**

To meet these objectives the United States Citizenship and Immigration Services Office of Privacy will complete the following activities:

- Receive United States Citizenship and Immigration Services Chief Privacy Officer adjudication of the initial Systematic Alien Verification for Entitlements Program Privacy Threshold Analysis:
  - Adjudication - Date of Completion: July 2025
- Draft an updated Systematic Alien Verification for Entitlement Program Privacy Impact Assessment meeting all requirements identified above and submit the draft to the Department of Homeland Security Office of Privacy.
  - Initial Draft - Complete
  - Office of Chief Counsel Review – Complete
  - Submission to Department of Homeland Security – Date of Completion: September 2025
  - Publication – Estimated September 2025
- Draft an updated Systematic Alien Verification for Entitlement Program System of Records Notice meeting all requirements identified above and submit the draft to the Department of Homeland Security Office of Privacy.
  - Initial Draft - Complete
  - Office of Chief Counsel Review – Complete
  - Submission to Department of Homeland Security – Date of Completion: September 2025
  - Submission to the Office of Management and Budget and Congress – Estimated September 2025
  - Publication – Estimated September 2025
  - End of 30-day commenting period (and sharing of new routine uses) Estimated October/November 2025
- Draft a Privacy Threshold Analysis documenting the new Systematic Alien Verification for Entitlement Program information sharing agreement between the United States Citizenship and Immigration Services and the Social Security Administration and receive the Chief Privacy Officer's adjudication of the Privacy Threshold Analysis.
  - Estimated Date of Completion: September 2025
- Determine the applicability of the Computer Matching and Privacy Protection Act of 1988 to new or changed aspects of the Systematic Alien Verification for Entitlements Program including the new bulk upload functionality for User Agencies.
  - Hold a discussion regarding the Computer Matching Agreement impacts with representatives from the Department of Homeland Security Privacy Office, United States Citizenship and Immigration Services Office of Chief Counsel and Office of Privacy, and Department of Homeland Security Office of General Council.

  - Date of Completion: June 2025
- Decide on the need for Computer Matching Agreements with user agencies versus the current Memorandum of Agreements in place with each Systematic Alien Verification for Entitlement Program user agency:
  - Date of Completion: July/August 2025

This Privacy Threshold Analysis and Action Plan focuses predominantly on Phases One through Four of the Systematic Alien Verification for Entitlements Program Optimization effort as Phase Five and Phase Six are longer term goals of the optimization effort and are still in the exploratory/planning stage. The United States Citizenship and Immigration Services will update this Privacy Threshold Analysis and Action Plan as needed to support the remaining phases during their development and ensure the Systematic Alien Verification for Entitlements Program is compliant with all applicable laws, regulations, and Department of Homeland Security policies.

The updated Privacy Threshold Analyst should also provide, at a minimum, the following updates:

- New status types that Systematic Alien Verification for Entitlements Program may provide to the user agencies and how any additional verification is completed.
- A discussion about the update to the user memorandum of agreements and the creation of the voter verification specific memorandum of agreements.
- Confirm all responses from the Customs and Border Protection via the use of their USPassportRESTService when matching United States Passport numbers.
- Discuss Customs and Border Protection authority/purpose for collecting United States Passport related photographs and collection of those photographs by the United States Citizenship and Immigration Services.
- A description of how the information received via the integration with the Department of Justice to enable an incarceration/felony related flag will be used internally and if any related information will be sent to the user agencies or the applicants.
- If the Systematic Alien Verification for Entitlements Program will use the existing connection by the E-Verify Program to the USPassportRESTService or will it be a new connection.
- Additional use case information for the Systematic Alien Verification for Entitlements Program use of Department of State information from the USPassportRESTService and the Department of State's Consular Consolidated Database / American Citizen Record Query system.
- Clarification regarding user agency benefit applicants accessing the Systematic Alien Verification for Entitlements Program.
- Additional information regarding notification provided to United States citizens regarding user agencies use of their information.
- What information may be provided to the user agency about the VAWA status of an individual.

- Discussion of if there could be instances when a natural born United States citizen is unable to be verified based on the data available. Also, if all United States citizens would be able to be verified via the SSA information.
- Confirmation if there are additional responses (besides Lawful Status, No Lawful Status, or Deceased) provided to user agencies now that United States citizens can also be verified.
- A discussion of any updates regarding any new agreements between Department of State and Customs and Border Protection for the sharing and use of United States Passport number information.
- Confirmation of if there is still a connection with the Reengineered Naturalization Application Casework System (which was previously decommissioned) or how information from the previously decommissioned system is still accessed.

## PTA ADJUDICATION

## (TO BE COMPLETED BY THE COMPONENT PRIVACY OFFICE APPROVER)

| | |
|---|---|
| **Component Privacy Office Approver:** | **Angela Y. Washington** |
| **PTA Approval Date:** | September 11, 2025 |
| **PTA Expiration Date:** | December 11, 2025 |

## DESIGNATION

| | |
|---|---|
| **Privacy Sensitive System:** | Yes |
| **Category of System:** | System<br>If “other” is selected, please describe: *Click here to enter text.* |
| **Determination:** | ☐ Project, Program, System in compliance with full coverage.<br>☒ Project, Program, System in compliance with interim coverage.<br>☐ Project, Program, System in compliance until changes implemented.<br>☐ Project, Program, System not in compliance. |
| **PIA:** | **PIA Update is required.**<br>• DHS/USCIS/PIA-006 Systematic Alien Verification for Entitlement Program<br>  ○ This PIA must be updated to document all identified system/programmatic changes. |

| | |
|---|---|
| **SORN:** | **SORN update is required.**<br>• DHS/USCIS-004 Systematic Alien Verification for Entitlements Program, May 27, 2020 (85 FR 31798)<br>  o This SORN must be updated to document all identified changes.<br>• DHS/CBP-011 Customs and Border Protection Primary and Secondary Processing (TECS (not an acronym)) National SAR Initiative December 19, 2008 (73 Federal Register 77778)<br>• STATE-26 Passport Records, March 24, 2015 (80 Federal Register 15653)<br>• STATE-39 Visa Records, November 8, 2021 (86 Federal Register 61822)<br>• SSA-60-0058 Master Files of Social Security Number Holders and Social Security Number Applications, February 20, 2025 (90 Federal Register 10025) |

**Component Privacy Office Adjudication:**
*Please describe rationale for privacy compliance determination above, and any further action(s) that must be taken by Component.*

The USCIS Office of Privacy is submitting this Privacy Threshold Analysis (PTA) to document the Systematic Alien Verification for Entitlements (SAVE) Program. The Systematic Alien Verification for Entitlements Program is an intergovernmental initiative using a web-based service to help federal, state, territorial, tribal and local benefit-issuing and licensing agencies and other governmental entities determine the immigration status or United States citizenship of applicants for public benefits, licenses, grants, credentials, background investigations, and other lawful purposes, so only entitled applicants receive them. The Systematic Alien Verification for Entitlements Program verifies immigration status/category and United States citizenship against Department of Homeland Security-accessed records. The Systematic Alien Verification for Entitlements Program is not a database but queries Department of Homeland Security-accessed federal records to provide registered user agencies with a verification response. The Systematic Alien Verification for Entitlements Program does not determine an applicant's eligibility for a specific benefit or license, as this is the responsibility of the benefit/license granting agency.

This Privacy Threshold Analysis is being submitted to document multiple updates and planned updates to the Systematic Alien Verification for Entitlements Program as part of the comprehensive optimization of the Systematic Alien Verification for Entitlements Program to ensure a single, reliable source for verifying immigration status and United States citizenship nationwide. This Privacy Threshold Analysis documents the following key changes: (1) an expanded search capabilities to allow approved Systematic Alien Verification for Entitlements Program user agencies to verify United States citizenship information using Social Security Numbers and other non-Department of Homeland Security enumerators, (2) a new Social Security Administration system connection to support verification of citizenship/immigration status, (3) a new bulk uploader/list processor function that allows user agencies to upload lists of benefit applicants, (4) the use of the Voter Registration and Voter List Maintenance Verification functionality, (5) the collection of information from the Department of State's Consular Consolidated Database/ American

Citizen Record Query system, and (6) an integration with the Customs and Border Protection TECS (not an acronym) - Travel Documents and Encounter Data system.

After a thorough review of the PTA, the USCIS Office of Privacy continues to designate the Systematic Alien Verification for Entitlements Program as a privacy sensitive system/program requiring both Privacy Impact Assessment (PIA) and System of Records Notice (SORN) coverage as it collects/uses Personally Identifiable Information (PII) as well as Sensitive Personally Identifiable Information (SPII) from members of the public, including legal permanent residents and United States Citizens.

The United States Citizenship and Immigration Services Office of Privacy recommends Privacy Impact Assessment coverage for the Systematic Alien Verification for Entitlements Program to comply with the eGovernment Act of 2002 as it "collects, maintains, or disseminates information that is in an identifiable form." The information collected, used, stored, and/or disseminated by the Systematic Alien Verification for Entitlements Program meets the definition of Personally Identifiable Information ("PII")/Sensitive Personally Identifiable Information ("SPII")[49] as it "permits the identity of an individual to be directly or indirectly inferred, including any other information that is linked or linkable to that individual, regardless of whether that individual is a United States citizen, legal permanent resident, or a visitor to the United States, or employee or contractor to the Department." Specifically, the Systematic Alien Verification for Entitlements Program involves information from members of the public applying for benefits, licenses, or other authorized purposes which may include (1) United States citizens and legal permanent residents, (2) individuals who are now current United States citizens and legal permanent residents after previously naturalizing or adjusting their status, or (3) individuals who may ultimately naturalize to become United States citizens or adjust their status to receive legal permanent residency in the future. Depending on the eligibility category certain individuals may be eligible to apply for adjustment of status as soon as one (1) year after their initial immigration benefit is granted,[50] therefore the United States Citizenship and Immigration Services Office of Privacy recommends requiring Privacy Impact Assessment coverage for the Systematic Alien Verification for Entitlements Program to ensure all current and future United States citizens and legal permanent residents have transparency into how the United States Citizenship and Immigration Services may collect, store, use, and share the information they previously provided to the United States Citizenship and Immigration Services.

Privacy Impact Assessment (PIA) coverage is provided by the following:

- DHS/USCIS/PIA-006 Systematic Alien Verification for Entitlement Program
    - **For the Systematic Alien Verification for Entitlement Program to be in compliance with the eGovernment Act of 2002, this Privacy Impact Assessment must be**

[49] Personally Identifiable Information (PII) has numerous official definitions, but in general, it is defined as any information that can be used to identify an individual directly or indirectly, such as a name, email address, Social Security Number or IP address. Sensitive PII (SPII) is generally defined as any PII that if lost, stolen, or disclosed without authorization could result in significant harm to an individual.

[50] For more information on eligibility categories please refer to: https://www.uscis.gov/green-card/green-card-eligibility-categories.

**updated to reflect the identified system and programmatic changes along with a privacy risk assessment of these changes including but not limited to new collections of data, new populations impacted including natural born US citizens, new system connections, new data sharing, and a new bulk upload/reporting functionality.**

System of Records Notice (SORN) coverage is required as the information in the Systematic Alien Verification for Entitlement Program is retrieved by a personal identifier. System of Records Notice coverage is provided by the following:

- DHS/USCIS-004 Systematic Alien Verification for Entitlements Program, May 27, 2020 (85 FR 31798)
    - **For the Systematic Alien Verification for Entitlement Program to be in compliance with the Privacy Act of 1974, this System of Records Notice must be updated to reflect the identified system and programmatic changes including that the System of Records will now include information on natural born United States citizens in addition to naturalized or acquired United States citizens. Updates to the System of Records Notice should include but are not limited to updates in the Purpose, Categories of Individuals, Categories of Records, and the Sources of Records sections.**
- DHS/CBP-011 Customs and Border Protection Primary and Secondary Processing (TECS (not an acronym)) National SAR Initiative December 19, 2008 (73 Federal Register 77778)
- STATE-26 Passport Records, March 24, 2015 (80 Federal Register 15653)
- STATE-39 Visa Records, November 8, 2021 (86 Federal Register 61822)
- SSA-60-0058 Master Files of Social Security Number Holders and Social Security Number Applications, February 20, 2025 (90 Federal Register 10025)

While there are currently published SORNs and PIAs associated with the Systematic Alien Verification for Entitlement Program, these documents to not sufficiently provide coverage for the recently implemented and planned system and programmatic changes documented in this Privacy Threshold Analysis. Therefore, the Systematic Alien Verification for Entitlement Program is not in compliance. An updated Privacy Impact Assessment and an updated System of Records Notice must be published for the Systematic Alien Verification for Entitlement Program to be brought into compliance.

An action plan has been developed to enable the Systematic Alien Verification for Entitlement Program to be brought into compliance with all federal laws, statutes, regulations, and Department of Homeland Security policies. A high-level summary of the action plan is as follows:

- Complete the initial Systematic Alien Verification for Entitlements Program Privacy Threshold Analysis.

- Publish an updated Systematic Alien Verification for Entitlement Program Privacy Impact Assessment to the Department of Homeland Security Office of Privacy website.
- Publish an updated Systematic Alien Verification for Entitlement Program System of Records Notice in the Federal Register and address any comments received during the 30-day public comment period.
- Complete a Privacy Threshold Analysis documenting the new Systematic Alien Verification for Entitlement Program information sharing agreement between the United States Citizenship and Immigration Services and the Social Security Administration.
- Determine the applicability of the Computer Matching and Privacy Protection Act of 1988 and complete any identified requirements.
- Update the Systematic Alien Verification for Entitlements Program Privacy Threshold Analysis and Action Plan as needed to support the ongoing optimization effort.

The Office of Privacy approves this Privacy Threshold Analysis for 3 months to formally document the current privacy posture of the Systematic Alien Verification for Entitlement Program.

---

On September 10, 2025, USCIS provided the draft Privacy Impact Assessment and System of Records Notice for the Systematic Alien Verification for Entitlements Program to DHS Privacy. These documents reference the collection, use, maintenance, and sharing of the following:

- Information on natural born United States citizens in addition to naturalized or acquired United States citizens
- Voter registration verification
- Social security numbers, including its truncated format
- Sharing of information with the Social Security Administration.

Interim coverage is provided for three (3) months while the Privacy Impact Assessment and System of Records Notice are being reviewed for approval, signature, and publication by DHS Privacy. This interim coverage is only granted for the programmatic changes documented in the Privacy Impact Assessment and System of Records Notice which are currently pending DHS Privacy review.

Any programmatic changes not included in the scope of this Privacy Threshold Analysis will require an update to the Privacy Threshold Analysis to ensure sufficient privacy risk analysis can be completed and any further compliance documentation update requirements can be identified. Further, any programmatic changes to the Systematic Alien Verification for Entitlements Program not documented in these two privacy compliance documents, will require additional updates to the Privacy Impact Assessment and System of Records Notice to be completed and submitted to DHS Privacy prior to receiving interim coverage.

**LETTER AGREEMENT PROVIDING FOR INFORMATION SHARING BETWEEN THE DEPARTMENT OF HOMELAND SECURITY (DHS), U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS) AND THE SOCIAL SECURITY ADMINISTRATION (SSA) REGARDING CITIZENSHIP**

**Issue:** DHS currently provides, through the USCIS Systematic Alien Verification for Entitlements (SAVE) system, citizenship and immigration status verification services for over 1,200 Federal, State, and local agencies that need to verify citizenship or immigration status to determine eligibility for a benefit or license they administer (including SSA, for verifying eligibility for SSNs). The SAVE system was established pursuant to provisions in the Immigration Reform and Control Act of 1986 (IRCA). 42 U.S.C. § 1320b-7(d). IRCA required that agencies determining eligibility for a number of specified Federal benefit programs,[1] including Food Stamps (now SNAP), unemployment compensation, Medicaid and Supplemental Security Income (SSI) review immigration documentation of aliens requesting benefits that includes "the individual's alien admission number or alien file number," and then use that documentation and number to verify with the former Immigration and Naturalization Service (INS) (now DHS)[2] whether the alien has a status corresponding to eligibility for the benefit.

While the vast majority of agencies participating in SAVE use the system only to verify aliens' immigration status, there are a few that use it to verify the U.S. citizenship of individuals who are registering, or have previously registered, to vote. SAVE is not able to verify the citizenship of U.S. citizens born in the United States, but it is able to verify citizenship obtained through naturalization or, in certain cases where DHS has relevant records, the citizenship of a foreign-born person that was acquired, either at birth or subsequently, by operation of law (such as through qualifying U.S. citizen parentage).

In all cases, SAVE requires the user agency to provide the name, date of birth and a unique identifier (A-number, I-94 number, or certificate of citizenship or naturalization number) in order to proceed with verification of a U.S. citizen. In some cases, states are able to provide this unique identifier for voters they wish to verify (typically, from a driver's license record), but more often than not states cannot provide a unique identifier because it is not information included on the approved federal nationwide voter registration application or otherwise normally collected by states from voter registrants. Agencies enter into a Memorandum of Agreement (MOA) with USCIS to use SAVE. Because SAVE is configured to search based on a unique identifier, the MOA requires them to provide the unique identifier in order to initiate verification of an individual.

---

[1] These programs are all Federally funded and governed overall by Federal statute and regulation, but in some cases (such as SNAP and unemployment compensation) the direct interaction with applicants, including verification, is the responsibility of a State agency. Voting is similar in that respect in that Federal laws govern and protect the right to vote in Federal elections guaranteed to adult citizens by the Constitution, but voter registration and election administration are handled by state and local government.

[2] Under the transition provisions of the Homeland Security Act of 2002, prior references in law to an agency or official whose function was transferred to the new DHS are deemed to refer to DHS or its appropriate component or official. *See, e.g.*, 6 U.S.C. § 557.

Some states have complained to DHS-USCIS about the limitation on their ability to verify voters caused by the unique identifier requirement and have demanded, citing 8 U.S.C. § 1373(a) and (c), that DHS-USCIS provide a means to verify them without this requirement. The President issued Executive Order (EO) 14159, *Protecting the American People Against Invasion*,[3] which requires the Secretary to "promptly issue guidance to ensure maximum compliance by [DHS] personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law."[4]

More recently, the President issued EO 14248, *Preserving and Protecting the Integrity of American Elections*.[5] EO 14248 provides, "Federal laws, such as the National Voter Registration Act (Pub. L. 103-31) and the Help America Vote Act (Pub. L. 107-252), require States to maintain an accurate and current Statewide list of every legally registered voter in the State. And [DHS] is required to share database information with States upon request so they can fulfill this duty. 8 U.S.C. 1373(c)."[6] The EO directs the Secretary to "ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered."[7] The Secretary is also required under the EO, in coordination with the DOGE Administrator, to review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. § 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements.[8]

To support this activity the Attorney General is required to prioritize enforcement of 18 U.S.C. §§ 611 and 1015(f) and similar laws that restrict aliens from registering to vote or voting, including through use of: (i) databases or information maintained by DHS; (ii) State-issued identification records and driver license databases; and (iii) similar records relating to citizenship.[9]

The Commissioner of Social Security also must assist states in determining whether individuals are eligible to register and vote by taking all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered.[10]

---

[3] 90 Fed. Reg. 8,443 (Jan. 20, 2025).

[4] EO 14159, § 18.

[5] 90 Fed. Reg. 14,005 (Mar. 25, 2025).

[6] EO 14248 § 1.

[7] *Id.* § 2(b)(i).

[8] *Id.* § 2(b)(iii).

[9] *Id.* § 2(e).

[10] *Id.* § 3(a).

Accordingly, as required by these Executive Orders, DHS personnel must timely provide verification or immigration status information in response to inquiries from State and local government agencies to verify or ascertain the citizenship or immigration status of individuals. As required by 8 U.S.C. § 1373(c), such inquiries must relate to individuals within the jurisdiction of the State or local government agency and must be for a purpose authorized by law. DHS personnel have been directed to comply, to the maximum extent possible and permissible under law, with section 1373, taking into account federal statutory requirements, including the Privacy Act of 1974, 5 U.S.C. § 552a, and 8 U.S.C. § 1367 (special protected class information); as well as other laws, rules, regulations, policies, and requirements regarding verification, information sharing, and confidentiality.

DHS currently has systems in place, such as SAVE and U.S. Immigration and Customs Enforcement's Law Enforcement Support Center (LESC), to respond to inquiries from State and local government agencies to verify or ascertain the citizenship or immigration status of individuals. But neither 8 U.S.C. § 1373(c) nor § 1644 requires DHS to limit responses only to inquiries through the systems currently in place. If DHS possesses the requested verification or status information—whether or not in a system, such as SAVE or LESC—DHS must provide such information in accordance with §§ 1373(c) and 1644.

USCIS has requested SSA assistance with respect to information regarding citizenship in its possession that would greatly assist with this and falls within § 1373(a)'s reference to "information regarding the citizenship . . . of any individual." This request is consistent with the spirit of these EOs, the references to interagency communication in § 1373(a), and DHS efforts to fully implement these authorities in order to provide as responsive and comprehensive responses as possible to State and local information requests under § 1373(c) in accord with DHS's broad interpretation of its responsibilities. DHS thus has requested that SSA comply, to the maximum extent possible and permissible under law, with § 1373(a), taking into account federal statutory requirements, as well as other laws, rules, regulations, policies, and requirements regarding verification, information sharing, and confidentiality.

**Proposal to address the issue:** SAVE's citizenship information verification initiative seeks to provide timely verification of citizenship or immigration status information in response to voter verification and other authorized inquiries from Federal, State, territorial, tribal and local government agencies seeking to verify or ascertain the citizenship or immigration status of individuals within their jurisdiction by using a social security number, or part thereof, as a search term or method to locate additional information in DHS-USCIS accessed records regarding the individual.

DHS-USCIS seeks access to SSA information accessed through the DHS-USCIS Verification Information System (VIS)[11] for the purpose of verifying the citizenship and immigration status for benefits and licenses, as authorized by section 103 of the Immigration and Nationality Act, Pub. L No. 82-414, as amended, 8 U.S.C. § 1103, Section 121(c)(1), Part C, of the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 42 U.S.C. § 1320b-7 and note, and section 642 of the Illegal Immigration Reform and Immigrant

[11] VIS provides services to customers through SAVE and E-Verify (the latter of which will not be used for this initiative).

Responsibility Act of 1996, Pub. L. No. 104-208, as amended, 8 U.S.C. § 1373(c).

SSA is providing assistance by sending to, and receiving from, DHS-USCIS information regarding the citizenship or immigration status, lawful or unlawful, of individuals within its records. SSA is authorized to participate in this information sharing under the authority of the Social Security Act, 42 U.S.C. § 1306, and pursuant to 8 U.S.C. § 1373(a).

This information sharing is also subject to requirements of:

- The Privacy Act of 1974, 5 U.S.C. § 552a;
- The Federal Information Security Management Act of 2014 (Pub. L. 113-283);
- 20 C.F.R. § 401.120; and

other laws, rules, regulations and applicable agency policies.

DHS-USCIS seeks SSA support by matching data submitted through SAVE to SSA records in SSA's Master Files of Social Security Number (SSN) Holders and SSN Applications, System of Record Notice 60-0058, 90 Fed. Reg. 10025 (Feb. 20, 2025) ("Enumeration System"). Specifically, SAVE User Agencies input information into SAVE from benefit applications, and DHS-USCIS sends the information to SSA to confirm or not confirm that the SSN, name, and date of birth match information in SSA records. SSA is also asked to provide DHS-USCIS an indication of United States citizenship, if available.

For other SAVE use cases including those for non-voter registration or list maintenance benefit eligibility checks, USCIS may use a full or partial SSN to acquire from SSA an Alien Registration Number (ARN) to access the necessary DHS records within SAVE.

After SAVE checks the SSA and USCIS-accessed databases, DHS-USCIS sends a response to the User Agency in SAVE indicating the individual's citizenship or immigration status, with a code of admission and a narrative description or that additional information is needed to complete the verification (called additional verification). If DHS-USCIS is unable to complete the verification, SAVE will indicate that no record was found and to resubmit with more information as a retry to verify the individual's citizenship or immigration status. In scenarios where a DHS enumerator was provided and unable to provide a verification at initial response, SAVE will request additional verification with documents and try again to resolve the case through a manual review process.

**Description of Matched Records**

Systems of Records

SSA will disclose to USCIS data from the Enumeration System, 60-0058.

USCIS will maintain information provided by SSA in its system of records entitled, "DHS/U.S. Citizenship and Immigration Services (USCIS)-004 Systematic Alien Verification for Entitlements (SAVE) Program System of Records."

Specified Data Elements

1. USCIS will provide SSA with the individual's name, including other names used as applicable, date of birth, and either the full or partial SSN.

2. SSA will provide USCIS a "verified" or "not verified" response and in the case of a "not verified" response, the reason for the "not verified" will be provided. In rare circumstances, SSA is unable to disclose the reason why an SSN did not verify. In these cases, SSA will provide a reason of "other".

3. SSA's responses will contain the following:

- SSN Match (True/False)
- Full SSN for all matches (when a partial SSN is provided)
- Name Match (True/False)
- Date of Birth Match (True/False)
- Citizenship/Foreign Indicator
  - Blank – Citizenship code is blank and foreign-born indicator is blank
  - * - Citizenship code is blank and foreign-born indicator is *
  - "A" - U.S. Citizen
  - "B" - Legal alien, eligible to work
  - "C" - Legal alien, not eligible to work
  - "D" - Other
  - "E" - Alien Student - restricted work authorized
  - "F" - Conditionally legalized alien
- Alien Registration Number (where applicable)
- Death Indicator (Yes Deceased / Not Deceased)
- Error code descriptions (transaction and record levels)

**SSA's Responsibilities:**

Under DHS-USCIS' SAVE process SSA will provide electronic response codes to USCIS' SAVE queries. These codes report which data elements sent to SSA by SAVE (name, SSN, and date of birth) match data elements in the Enumeration System. The codes also report if there is a death or fraud indicator in the Enumeration System and the person's citizenship status, as recorded in the Enumeration System.

SSA will provide responses to the SAVE queries within one second or less.

SSA will inform USCIS when its systems have a scheduled outage or planned maintenance that may negatively affect service.

SSA will safeguard any personally identifiable information (PII) obtained from SAVE agencies through the SAVE process in accordance with the Privacy Act (5 U.S.C. § 552a), the Social Security Act (42 U.S.C. § 1306(a)), and SSA regulations (20 C.F.R. Part 401). SSA will limit access to this information to SSA employees involved in resolving SAVE cases, USCIS employees who administer SAVE, and individuals or entities authorized by the U.S. Government to evaluate SAVE.

**USCIS' Responsibilities:**

USCIS will only submit verification requests to SSA for authorized purposes.

USCIS will notify SSA of any pending or final changes in the statutory or regulatory requirements concerning SAVE.

USCIS will inform SSA if the SAVE system or other related connectivity system has a scheduled outage or planned maintenance that may negatively affect service.

After discovering a connectivity issue that may negatively affect SAVE service, USCIS will inform SSA.

USCIS will safeguard any PII obtained from SSA in accordance with the Privacy Act (5 U.S.C. § 552a) and the Federal Information Security Modernization Act. SSA will limit access to this information to SSA employees involved in resolving SAVE cases, USCIS employees who administer SAVE, and individuals or entities authorized by the U.S. Government to evaluate SAVE.

**Records Usage, Duplication and Redisclosure**

The parties acknowledge that information sent by USCIS to SSA for verification requests will be matched against existing SSA- accessed data holdings which may contain the same information. As such, the information provided about an individual within a verification request by USCIS to SSA will not be considered SSA-owned information. Information that identifies a verification request as being generated by USCIS or associated with a USCIS program will be protected as set forth in this Agreement and as required by law.

USCIS and SSA agree to the following limitations on the access to, and disclosure and use of information that identifies a verification request as being generated by USCIS or associated with an USCIS program:

Data or information that identifies a verification request as being generated by USCIS or associated with a USCIS program will remain information owned by USCIS.

USCIS will use the verification responses generated by SSA only for the purposes described in this Agreement.

Data or information that identifies a verification request as being generated by USCIS or associated with a USCIS program will be used only as provided in this Agreement by SSA.

Data or information that identifies a verification request as being generated by USCIS or associated with a USCIS program provided by SSA will not be duplicated or disseminated outside SSA without prior written approval from USCIS. USCIS will not give such approval unless the redisclosure is required by law or is essential to the conduct of the exchange. In such cases, SSA, the agency redisclosing the records, must specify in writing what records will be redisclosed, to whom they will be redisclosed, and the reasons that justify redisclosure.

USCIS will not duplicate or disseminate the verification responses for a purpose not covered by this Agreement, within or outside of its agency, without the written permission of SSA, excepted as required by Federal law. SSA will not give such permission, unless Federal law requires disclosure or disclosure is essential to the purpose of this Agreement. For such permission, USCIS must specify in writing what data it is requesting to duplicate or disseminate and to whom, and the reasons that justify such duplication or dissemination.

All USCIS verification requests will be documented in a transactional database. The retention period is 10 years. The database is not accessible to the public, except as permitted by law.

USCIS and SSA recognizes that they may need to disclose information pursuant to an audit by appropriate government oversight authorities. In the event USCIS or SSA needs to disclose information that identifies a verification request or a verification response covered by this Agreement for purposes of appropriate government oversight, the audited agency shall endeavor to coordinate with source agency in writing in advance of such dissemination, to the extent practicable and consistent with applicable law and policy. USCIS and SSA will take steps to ensure that any disclosures taken in these circumstances are limited to information that is relevant and necessary for the identified purpose.

**Security Procedures**

SSA and USCIS will comply with the Federal Information Security Management Act (FISMA), 44 U.S.C. § 3551 et seq., as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. 113-283); FIPS, Mandatory Security Processing Standards 199 & 200; related OMB circulars and memoranda, including revised Circular A-130, Management of Federal Information Resources (July 28, 2016); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations (FAR). These laws, regulations, and directives provide requirements for safeguarding Federal information systems and PII used in Federal agency business processes, as well as related reporting requirements.

FISMA requirements apply to all Federal contractors, organizations, or sources that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. Each agency receiving information under this DSA is responsible for oversight and compliance of its contractors and agents with FISMA requirements.

Loss Reporting

If either SSA or USCIS experiences an incident involving the loss or breach of PII provided by SSA or USCIS under the terms of this agreement, they will follow the incident reporting guidelines issued by the OMB. In the event of a reportable incident under OMB guidance involving PII, the agency experiencing the incident is responsible for following its established procedures, including notification to the proper organizations (e.g., United States Computer Emergency Readiness Team, the agency's privacy office). In addition, the agency experiencing the incident (e.g., electronic or paper) will notify the other agency's Systems Security Contact named in this agreement. If USCIS is unable to speak with the SSA Breach Contact within one hour or if for some other reason notifying the SSA Systems Security Contact is not practicable (e.g., it is outside of the normal business hours), USCIS will call SSA's National Network Service Center toll free at [redacted].

If SSA experiences or suspects that there is a loss or breach of USCIS information, it will notify the USCIS Security Operations Center (SOC) at [redacted] and will follow up with an email to USCIS SOC [redacted] and the USCIS Office of Privacy ([redacted] within one hour of suspecting or confirming an incident.

Breach Notification

SSA and USCIS will follow PII breach notification policies and related procedures issued by OMB. If the agency that experienced the breach determines that the risk of harm requires notification to affected individuals or other remedies, that agency will carry out these remedies without cost to the other agency.

Administrative Safeguards

SSA and USCIS will restrict access to the data matched and to any data created by the match to only those users, e.g., employees, contractors, etc., who need it to perform their official duties in connection with the uses of the data authorized in this agreement. Further, SSA and USCIS will advise all personnel with access, the confidential nature of the data, the safeguards required to protect the data, and the civil and criminal sanctions for noncompliance contained in the applicable Federal laws.

Parties, including all personnel with access to the information, will be appropriately educated and trained regarding the proper handling of PII and proper care of the information systems to ensure the overall safeguarding and security of the information. SSA and USCIS will ensure that its employees, including contractors with the access to any of the information, have completed privacy training on the handling of PII which includes

information on applicable laws, regulations, and policies related to information privacy and security.

Physical Safeguards

SSA and USCIS will store the data matched and any data created by the match in an area that is physically and technologically secure from access by unauthorized persons during duty hours as well as non-duty hours or when not in use (e.g., door locks, card keys, biometric identifiers, etc.). Only authorized personnel will transport the data matched and any data created by the match. SSA and USCIS will establish appropriate safeguards for such data, as determined by a risk-based assessment of the circumstances involved.

Technical Safeguards

SSA and USCIS will process the data matched and any data created by the match under the immediate supervision and control of authorized personnel in a manner that will protect the confidentiality of the data, so that unauthorized persons cannot retrieve any data by computer, remote terminal, or other means. Systems personnel must enter personal identification numbers when accessing data on the agencies' systems. SSA and USCIS will strictly limit authorization to those electronic data areas necessary for the authorized analyst to perform his or her official duties.

Application of Policy and Procedures

SSA and USCIS will adopt policies and procedures to ensure that each agency uses the information contained in their respective records or obtained from each other solely as provided in this agreement. SSA and USCIS will comply with these guidelines and any subsequent revisions.

Onsite Inspection

NIST Special Publication 800-37, Revision 2, encourages agencies to accept each other's security assessments in order to reuse information system resources and/or to accept each other's assessed security posture in order to share information.

NIST 800-37 further encourages that this type of reciprocity is best achieved when agencies are transparent and make available sufficient evidence regarding the security state of an information system so that an authorizing official from another organization can use that evidence to make credible, risk-based decisions regarding the operation and use of that system or the information it processes, stores, or transmits. Consistent with that guidance, the parties agree to make available to each other upon request system security evidence for the purpose of making risk-based decisions. Requests for this information may be made by either party at any time throughout the duration or any extension of this agreement.

Retention and Destruction of Information

USCIS will destroy the response file generated through this data exchange as soon as the information has served the matching program purpose and all legal retention requirements established in conjunction with the National Archives and Records Administration under applicable procedures have been met. In case of such retention for evidentiary purposes, USCIS will retire the retained data in accordance with the applicable Federal Records Retention Schedule (44 U.S.C. § 3303a).

The information provided by USCIS is not used by SSA for any purpose other than data exchange. USCIS's electronic request files are a transitory nature, or 'transitory records', specifically 'intermediate input files' as defined in General Records Schedule 5.2, Item 010. SSA will protect transitory records in the same manner that it protects SSA records. The Input/Tickler file will be destroyed when no longer needed for business use.

**Duration of Agreement**

This agreement shall be effective upon the signature of the last signatory hereto and shall continue in effect until and unless modified or terminated in accordance with the provisions of this Agreement.

**Modification and Termination**

Modifications to this Agreement must be in writing and agreed to by the parties.

This Agreement may be terminated by either party upon 30 days advance written notice.

If legislation is enacted that affects SAVE functions or provides for new functionality, the parties agree to modify this Agreement as appropriate to cover any new provisions.

**Contacts:**

USCIS Contacts:

David M. Jennings
Associate Chief - Business & Technology Integration
Verification Division (VER)
Immigration Records and Identity Services (IRIS)
U.S. Citizenship and Immigration Services (USCIS)
Department of Homeland Security (DHS)
[redacted]

USCIS Security Operations Center (SOC)
phone: [redacted]
[redacted]

SSA Contacts

Breach Reporting
Andrea Huseth, Division Director
Office of Privacy and Disclosure
Office of the General Counsel
6401 Security Boulevard
Baltimore, MD 21235
Telephone: [redacted]
Email: [redacted]

**Disclaimers**

SSA is not liable for any damages or loss resulting from errors in information provided to USCIS under this Agreement. Furthermore, SSA is not liable for damages or loss resulting from the destruction of any materials or data provided by USCIS. All information furnished to USCIS will be subject to the limitations and qualifications, if any, transmitted with such information. If, because of any such error, loss, or destruction attributable to SSA, the services must be re-performed by SSA, the additional cost thereof will be treated as a part of the full costs incurred in compiling and furnishing such information and will be paid by USCIS.

USCIS is not liable for any damages or loss resulting from errors in SSA information provided to USCIS under this Agreement. All information furnished to SSA will be subject to the limitations and qualifications, if any, transmitted with such information. If, because of any such error, loss, or destruction attributable to SSA, the services must be re-performed by SSA, the additional cost thereof will not be treated as a part of the full costs incurred in compiling and furnishing such information and will not be paid by USCIS.

The performance or delivery by SSA of the goods and/or services described herein and the timeliness of said delivery are authorized only to the extent that they are consistent with proper performance of the official duties and obligations of SSA. If for any reason SSA delays or fails to provide services, or discontinues the services or any part thereof, SSA is not liable for any damages or loss resulting from such delay or for any such failure or discontinuance.

The performance or delivery by USCIS of the goods and/or services described herein and the timeliness of said delivery are authorized only to the extent that they are consistent with proper performance of the official duties and obligations of USCIS. If for any reason USCIS delays or fails to provide services, or discontinues the services or any part thereof, USCIS is not liable for any damages or loss resulting from such delay or for any such failure or discontinuance.

**Integration**

This Agreement, and the attached system map constitute the entire Agreement of the parties with respect to its subject matter and supersede all other agreements between the parties regarding its subject matter.

There have been no representations, warranties, or promises made outside of this Agreement. This Agreement shall take precedence over any other documents that may be in conflict with it.

**Resolution Mechanism**

Disagreements on the interpretation of the provisions of this MOA that cannot be resolved between USCIS and the SSA point of contact should be provided in writing to the authorized officials at both agencies for resolution. If settlement cannot be reached at this level, the disagreement will be elevated to the next level in accordance with DHS- USCIS procedures for final resolution.

**Authorizing Signatures and Dates**

The signatories below warrant and represent that they have the competent authority on behalf of their respective agencies to enter into the obligations set forth in this Agreement.

**Electronic Signature Acknowledgement:** The signatories may sign this document electronically by using an approved electronic signature process. By signing this document electronically, the signatories agree that the signature they provide has the same meaning and legal validity and effect as a handwritten signature.

**Social Security Administration**

Sean Brune Digitally signed by Sean Brune Date: 2025.05.15 08:58:24 -04'00'

Sean Brune
Assistant Deputy Commissioner,
Office of Mission Support
Social Security Administration

Date:________________________

**U.S. Department of Homeland Security**

BRIAN J BRODERICK Digitally signed by BRIAN J BRODERICK Date: 2025.05.15 10:09:48 -04'00'

Brian J. Broderick
Chief (Acting), Verification Division
U.S. Citizenship and Immigration Services

Date:________________________

**DEPARTMENT OF HOMELAND SECURITY (DHS) PRIVACY OFFICE**

**NARRATIVE STATEMENT**

**PROPOSAL TO PUBLISH AN UPDATE TO A SYSTEM OF RECORDS**

**DHS/USCIS-004 SYSTEMATIC ALIEN VERIFICATION FOR ENTITLEMENTS (SAVE) PROGRAM SYSTEM OF RECORDS**

Purpose: The purpose of this system is to provide a service (fee-based for federal agencies) that assists federal, state, territorial, tribal, and local benefit-granting agencies, licensing bureaus, and other authorized entities for any legally mandated purpose in accordance with an authorizing statute to verify the U.S. citizenship and immigration status of individuals, to include naturalized, derived, and U.S. citizens by birth, within their jurisdiction applying for benefits, and to otherwise efficiently administer their programs, to the extent that such disclosure is necessary to enable these agencies and entities to make decisions related to (1) determining eligibility for a federal, state, territorial, tribal, or local public benefit; (2) issuing a license or grant; (3) issuing a government credential; (4) conducting a background investigation; (5) voter verification or (6) any other lawful purpose. This system is also used for the Department of Homeland Security (DHS)/U.S. Citizenship and Immigration Services (USCIS) bond management purposes under section 213 of the Immigration and Nationality Act.

Authority: Authority for having a system for verification of citizenship and immigration status is found in Immigration and Nationality Act, Pub. L. 82-414, 66 Stat. 163 (June 27, 1952), as amended, Immigration Reform and Control Act, Pub. L. 99-603, 100 Stat. 3359 (Nov. 6, 1986); Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. 104-193, 110 Stat. 2105 (Aug. 22, 1996); Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. 104-208, 110 Stat. 3009 (Sept. 30, 1996); (8 U.S.C 1373(c)); the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231 (May 11, 2005); Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (Mar. 23, 2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, 124 Stat. 1029 (Mar. 30, 2010); and the Federal Aviation Administration (FAA)-Extension, Safety, and Security Act of 2016, Pub. L. 114-190, 130 Stat. 615 (July 15, 2016), 8 CFR Part 213a (Affidavits of Support on Behalf of Immigrants).

Effect on Individual Privacy: DHS/USCIS evaluated the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system and determined that it has a **major** impact on individual privacy that is outweighed by DHS's interest in assisting federal, state, territorial, tribal, and local benefit-granting agencies, licensing bureaus, and other authorized entities to verify the U.S. citizenship and immigration status of individuals, to include naturalized, derived, and U.S. citizens by birth, within their jurisdiction applying for benefits, and to otherwise efficiently administer their programs. DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program assists DHS/USCIS in meeting its statutory obligation to administer SAVE. DHS/USCIS must collect personally identifiable information to meet this statutory requirement because the data collected from the user agency must be verified against data collected by DHS, USCIS, and other federal agencies to verify citizenship and/or immigration status.

Additionally, DHS/USCIS evaluated several privacy risks related to transparency/notice and

individual participation. The following are examples of the privacy risks and mitigations documented in the related updated SAVE Program Privacy Impact Assessment:

There is a **privacy risk** that all United States citizens, including natural born U.S. citizens, have not been provided notice that the SAVE collects or maintains their information for citizenship and immigration status.

DHS/USCIS **partially mitigates** this risk. It is the responsibility of each registered agency to provide notice to individuals within their jurisdiction of their use of information and sharing with DHS/USCIS. DHS/USCIS is publishing this privacy impact assessment and related System of Records Notice to provide transparency regarding the new categories of information collected and shared to assist registered agencies in verifying citizenship and immigration status of individuals applying for a benefit or license and voter registration verification. The SAVE Program's "Register an Agency for SAVE" explains how an eligible agency can create a memorandum of agreement with the DHS/USCIS. These agreements require registered user agencies to comply with the Privacy Act of 1974, 5 U.S.C. § 552a, as amended, and other applicable laws, regulations, and policies. These policies include transparency and notice to individuals regarding agencies collection and use of personally identifiable information.

There is a **privacy risk** that the new category individuals covered by this assessment/notice, specifically natural born United States citizens, do not have the opportunity to individually participate or consent in how DHS/USCIS uses their information.

DHS/USCIS **cannot mitigate** this risk. Each user agency is responsible for complying with federal and local authorities. DHS/USCIS assumes that each user agency factors in the principles of notice, individual participation, and consent prior to providing information to DHS/USCIS. DHS/USCIS only uses the information for the authorized purpose(s). Individuals should consult their local government agencies to determine the appropriate opt-in or opt-out statute, regulations and policies.

There is a **privacy risk** that the DHS/USCIS may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual.

DHS/USCIS **partially mitigates** this risk. Generally, SAVE has a 3-step process. The first step is a general query of the system. However, due to misspellings of names, transposed numbers, or incomplete information, SAVE may produce inaccurate results. To mitigate this, SAVE has a manual step process where a DHS/USCIS staff member will try to reconcile the request manually. The third step is for DHS/USCIS to get additional documentation from the registered agency. However, this only partially mitigates the risk since the new request using Social Security numbers does not allow for a second and third step review. DHS/USCIS does not have direct access to the Social Security Administration system to support these additional steps. Additionally, registered agencies may not go through all steps to ensure accuracy of information.

There is a **privacy risk** that the DHS/USCIS may use the information it obtains from registered agencies, the Social Security Administration, and the Department of State, for purposes not

authorized by statute or for which it was originally collected.

DHS/USCIS **mitigates this risk** by only collecting information as authorized by the Immigration and Naturalization Act and other authorities mentioned in the Privacy Impact Assessment. The purpose for sharing Social Security numbers with the Social Security Administration and receiving information is to allow user agencies to verify the citizenship or immigration status of individuals applying for a benefit, license, or voter registration verification. The purpose for sharing and receiving U.S. passport information with the Department of State is to verify the citizenship or immigration status of individuals applying for a benefit, license or for voter registration verification. DHS/USCIS will not use the information for any other purposes than to facilitate verification of status to user agencies or to report potential fraud. The Immigration Reform and Control Act (ICRA) of 1986 Section 121 (c)(1) specifically mentions that the program is not to be used for administrative (non-criminal) enforcement. Also, each registered agency must execute a memorandum of agreement or computer matching agreement with DHS/USCIS that includes terms that the SAVE will be used in accordance with the law.

Risk of Unauthorized Access: Records in this system are safeguarded in accordance with applicable rules and policies, including all applicable DHS automated systems security and access policies. Strict controls have been imposed to minimize the risk of compromising the information that is being stored. Access to the computer system containing the records in this system is limited to those individuals who have a need-to-know the information for the performance of their official duties and who have appropriate clearances or permissions.

Compatibility of Routine Uses: The Department of Homeland Security Privacy Office has reviewed the routine uses in this proposed system of records notice and found all of them to be compatible with the purpose of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program. In addition to those disclosures generally permitted under 5 U.S.C. § 552a(b) of the Privacy Act, all or a portion of the records or information contained in this system may be disclosed outside DHS as a routine use pursuant to 5 U.S.C. § 552a(b)(3) as follows:

Routine Use:
A. To the Department of Justice (DOJ), including Offices of the U.S. Attorneys, or other federal agency conducting litigation or in proceedings before any court, adjudicative, or administrative body, when it is relevant or necessary to the litigation and one of the following is a party to the litigation or has an interest in such litigation:

1. DHS or any component thereof

2. Any employee or former employee of DHS in his/her official capacity,

3. Any employee or former employee of DHS in his/her individual capacity when DOJ or DHS has agreed to represent the employee, or

4. The United States or any agency thereof.

Compatibility Analysis:

This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to the Department of Justice (DOJ) and other federal agencies when DHS determines that the use of those records is relevant and necessary for the conduct of litigation or other legal proceedings for which DHS or DOJ is a party to the litigation or has a vested interest in the litigation .

Routine Use:
B. To a congressional office from the record of an individual in response to an inquiry from that congressional office made at the request of the individual to whom the record pertains.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records in response to congressional requests made on behalf of the individual on which the record is maintained.

Routine Use:
C. To the National Archives and Records Administration (NARA) or General Services Administration (GSA) pursuant to records management inspections being conducted under the authority of 44 U.S.C. 2904 and 2906.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to the National Archives and Records Administration (NARA) or General Services Administration (GSA) to facilitate the inspection of records. This ensures that records are being maintained in a manner consistent with established retention schedules.

Routine Use:
D. To an agency or organization for the purpose of performing audit or oversight operations as authorized by law, but only such information as is necessary and relevant to such audit or oversight function.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to facilitate legally authorized audits and oversight operations, and ensure that records are being maintained in accordance with established retention policies and procedures.

Routine Use:
E. To appropriate agencies, entities, and persons when (1) DHS suspects or has confirmed that there has been a breach of the system of records; (2) DHS has determined that as a result of the suspected or confirmed breach there is a risk of harm to individuals, DHS (including its information systems, programs, and operations), the Federal Government, or national security; and (3) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with DHS's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to agencies, entities, and persons to assist in the response to a suspected or confirmed breach. The sharing of information allows DHS to mitigate, remedy, and respond to the impacts of the suspected or confirmed breach.

Routine Use:
F. To another Federal agency or Federal entity, when DHS determines that information from this system of records is reasonably necessary to assist the recipient agency or entity in (1) responding to a suspected or confirmed breach or (2) preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal Government, or national security, resulting from a suspected or confirmed breach.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to assist the recipient agency or entity in responding to a suspected or confirmed breach or preventing, minimizing, or remedying the risk of harm to individuals.

Routine Use:
G. To an appropriate federal, state, tribal, local, international, or foreign law enforcement agency or other appropriate authority charged with investigating or prosecuting a violation or enforcing or implementing a law, rule, regulation, or order, when a record, either on its face or in conjunction with other information, indicates a violation or potential violation of law, which includes criminal, civil, or regulatory violations and such disclosure is proper and consistent with the official duties of the person making the disclosure.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to federal, state, local, and other government agencies, as well as international and foreign law enforcement agencies to investigate and prosecute violations or potential violations of law.

Routine Use:
H. To contractors and their agents, grantees, experts, consultants, and others performing or working on a contract, service, grant, cooperative agreement, or other assignment for DHS, when necessary to accomplish an agency function related to this system of records. Individuals provided information under this routine use are subject to the same Privacy Act requirements and limitations on disclosure as are applicable to DHS officers and employees.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to contractors and others performing work on behalf of the department to facilitate the completion of department-related functions.

Routine Use:
I. To approved federal, state, tribal, and local government agencies for any legally mandated purpose in accordance with their authorizing statute or law and when an approved Memorandum of Agreement or Computer Matching Agreement is in place between DHS and the entity.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to approved federal, state, tribal, and local government agencies for any legally mandated purpose in accordance with their authorizing statute or law and when an approved Memorandum of Agreement or Computer Matching Agreement is in place between DHS and the entity. This routine use is compatible because it assists in the administration of an approved Memorandum of Agreement or Computer Matching Agreement that is in place between DHS and the entity.

Routine Use:
J. To a federal, state, tribal, or local government agency that oversees or administers federal means-tested public benefits for purposes of seeking reimbursement from sponsors for the value of benefits provided to sponsored applicants, as well as reporting on overall sponsor deeming and reimbursement efforts to appropriate administrative and oversight agencies.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to a federal, state, tribal, or local government agency that oversees or administers federal means-tested public benefits for purposes of seeking reimbursement from sponsors for the value of benefits provided to sponsored applicants, as well as reporting on overall sponsor deeming and reimbursement efforts to appropriate administrative and oversight agencies. This routine use is compatible because it assists in the administration and enforcement of immigration laws.

Routine Use:
K. To airport operators to determine the eligibility of individuals seeking unescorted access to any Security Identification Display Area of an airport, as required by the FAA Extension, Safety, and Security Act of 2016.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to airport operators to determine the eligibility of individuals seeking unescorted access to any Security Identification Display Area of an airport. This routine use is compatible because it assists in the administration and enforcement of immigration laws and ensuring public and national safety.

Routine Use:
L. To the Social Security Administration and other federal, state, tribal, territorial, local, governments and other authorized entities to support U.S. citizenship and immigration status verification when a DHS approved agreement is in place between DHS and the entity.

Compatibility Analysis:

This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to federal, state, tribal, territorial, local governments and other authorized entities to help verify U.S. citizenship and immigration status of benefit applicants and voter registrations. The routine use is compatible because it is necessary to enable user agencies to make decisions related to (1) determining eligibility for a federal, state, territorial, tribal, or local public benefit; (2) issuing a license or grant; (3) issuing a government credential; (4) conducting a background investigation; (5) voter verification or (6) any other lawful purpose.

Routine Use:
M. To federal, state, territorial, tribal, local, and other entities that have a legal authority to provide oversight of programs and benefits supported by SAVE for auditing of program requirements and when a DHS-approved agreement (e.g. Memorandum of Agreement (MOA) or Computer Matching Agreement (CMA)) is in place between DHS and the entity. The routine use is compatible because it enables USCIS to assist user agencies to efficiently administer their programs.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to entities with a legal authority to audit or oversee the SAVE case verification records created by other user agencies to ensure compliance with program or benefits U.S. citizenship and immigration status eligibility requirements.

Routine Use:
N. To the news media and the public, with the approval of the Chief Privacy Officer in consultation with counsel, when there exists a legitimate public interest in the disclosure of the information, when disclosure is necessary to preserve confidence in the integrity of DHS, or when disclosure is necessary to demonstrate the accountability of DHS's officers, employees, or individuals covered by the system, except to the extent the Chief Privacy Officer determines that release of the specific information in the context of a particular case would constitute a clearly unwarranted invasion of personal privacy.

Compatibility Analysis:
This routine use allows DHS to disclose records maintained as part of the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program system of records to the news media and the public in order to preserve the confidence of the public in the DHS, and to demonstrate the accountability of the department, its officers and employees, especially when the records pertaining to individual's U.S. citizenship and immigration status are outweighed by the public interest's in shedding light on DHS/USCIS ability to ensure and enhance SAVE.

Applicable OMB Control Numbers:

| **Form** | **Form Name** | **OMB Control #** | **Expiration Date** |
|---|---|---|---|
| G-845 | Verification Request | 1615-0101 | 8/31/2028 |

List of Changes:

1. Clarifies and informs the public that SAVE has removed transaction charges for all state, local, tribal, and territorial government agencies that use the system. Federal agencies are still charged a fee to use SAVE.
2. Adds individuals that are U.S. citizens by birth to the categories of individuals covered by the system.
3. Updates the categories of records in the system to include collecting both full and truncated (last four digits) Social Security number (other than those collected on Form G-845, *Verification Request*), U.S. passport number, driver's license number, and information from the Social Security Administration.
4. Revises the record source categories to add SSA-60-0058 Master Files of Social Security Number Holders and Social Security Number Applications, February 20, 2025 (90 Fed. Reg. 10025), and state or other national agencies that issue or maintain driver's license information.
5. Amends the routine uses section of the System of Records Notice (SORN) to include adding Routine Use L, sharing with Social Security Administration and other federal organizations; and Routine Use M, to support sharing with federal agencies (e.g. the Department of Health and Human Services) to support auditing of federal programs administered by state, local, and tribal governments (e.g. Medicaid).
6. Includes non-substantive changes, including reorganizing of categories of records, change in the use of terms such as from "derived" citizen/citizenship to "acquired" citizen/citizenship, and spelling out of form names from the previously published notice.

U.S. Citizenship and Immigration Services

## MEMORANDUM OF AGREEMENT

**BETWEEN THE DEPARTMENT OF HOMELAND SECURITY,**
**U.S. CITIZENSHIP AND IMMIGRATION SERVICES**
**AND**
**Brevard County Supervisor of Elections**
**REGARDING PARTICIPATION IN THE SAVE PROGRAM FOR VOTER REGISTRATION AND VOTER LIST MAINTENANCE PURPOSES**

### I. PARTIES.

The parties to this Systematic Alien Verification for Entitlements (SAVE) Memorandum of Agreement (MOA) are the Department of Homeland Security, U.S. Citizenship and Immigration Services (DHS-USCIS), and the Brevard County Supervisor of Elections (User Agency).

### II. AUTHORITY.

The authorities governing this MOA include, but are not limited to, the following:

- Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended.
- Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, as amended.
- Section 642 of Div. C, Title VI of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended (8 U.S.C. §1373(c)).
- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.
- The Inter-Governmental Cooperation Act, 31 U.S.C. § 6501, et seq., as amended.
- The Federal Information Security Management Act of 2014 (Pub. L. 113-283), as amended.
- National Voter Registration Act of 1993, 52 U.S.C. § 20501, Pub. L. No. 103-31, 107 Stat. 77, as amended.
- Help America Vote Act of 2002, 52 U.S.C. § 20901, Pub. L. No. 107-252, § 303, 116 Stat. 1666, as amended.

Additionally, the authorities governing this MOA that are specific to this User Agency's request to use SAVE, include but are not limited to the following:

- **Florida Statutes, Title IX, Chapter 97, §§ 97.041, 97.052, 97.053, 97.073, and Chapter 98, §§ 98.015, 98.035, 98.045, 98.065, 98.075, 98.093.** as amended

Pursuant to the requirements of the Office of Management and Budget (OMB) Circular A-97,

which establishes the President's guidelines for implementing the Intergovernmental

Cooperation Act, 31 U.S.C. § 6501, et seq., as amended, the User Agency certifies that it cannot procure the U.S. citizenship information and immigration status information verification services requested pursuant to this MOA reasonably and expeditiously through ordinary business channels.

## III. PURPOSE.

The purpose of this MOA is to establish the terms and conditions for the User Agency's participation in SAVE to verify the U.S. citizenship and immigration status information of registrants and registered voters within User Agency's jurisdiction for **voter registration and voter list maintenance** (benefit) in the **Brevard County** State of **Florida.**[1]

SAVE verifies User Agency-provided information against DHS-accessed records, including immigration, naturalization and acquired citizenship records using an immigration enumerator issued by DHS (immigration enumerator) or other government issued enumerator(s) permitted by SAVE. SAVE may only be able to verify acquired U.S. citizens in certain situations.[2]

SAVE will provide information to the User Agency by:

1) Initial response (initial verification) to an on-line inquiry by the User Agency; and

2) Additional verification procedures, where applicable.

## IV. RESPONSIBILITIES.

### A. DHS-USCIS agrees to:

(1) Provide to the User Agency, in a manner determined by DHS-USCIS, an immigration status and U.S. citizenship information verification process under SAVE;

(2) Respond to properly submitted verification requests from the User Agency by providing the limited information noted in the **PURPOSE** section above, i.e., a verification case number and U.S. citizenship or immigration status, if any;

[1] "Participation" in SAVE is as described in the DHS/USCIS/SAVE Privacy Impact Assessment - 006. See Systematic Alien Verification for Entitlements (SAVE) Program | Homeland Security (dhs.gov).

[2] "Acquired citizenship" is defined as citizenship conveyed to children through the naturalization of parents or, under certain circumstances, at birth to foreign-born children of U.S. citizens, provided certain conditions are met. SAVE is only able to verify information that relates to information found in the databases accessed by the system. Accordingly, if the User Agency provides an immigration enumerator for an individual with acquired citizenship who has not applied for a Certificate of Citizenship with USCIS, the agency may not have that individual's citizenship information available in the databases accessed, and SAVE may not be able to confirm that individual's acquired citizenship.

(3) Process and respond to properly submitted additional verification requests[3] from the User Agency. Response time to additional verification requests may vary depending upon DHS-USCIS workload, available resources, and the registrant's or registered voter's specific circumstances;

(4) Provide to the User Agency operating instructions necessary for the User Agency to designate users within the purview of the User Agency;

(5) Provide to the User Agency SAVE point of contact information for questions or problems regarding the User Agency's participation in SAVE;

(6) Provide access to training and information regarding the laws, policies, and procedures that govern verifying, safeguarding, using, maintaining, and disclosing certain citizenship and immigration status information;

(7) Provide the User Agency access to additional verification processes, with requirements identified by SAVE;

(8) Recover no more than its actual costs. SAVE transaction charges are found on the SAVE website. SAVE transaction charges and methods of payment are subject to change upon prior written notification to the User Agency;

(9) Bill and collect reimbursements for transaction fees, if any, charged by SAVE for access and usage by submitting invoices to the User Agency's payment office at the address specified in writing by the User Agency, with a copy furnished to the User Agency POC. DHS-USCIS may submit invoices when the work is completed or as otherwise authorized. The User Agency's High Level Identifier, tax identification number, and associated dollar amounts will be referenced on all invoices; and

(10) Promptly initiate year-end and closeout adjustments for any final costs once known.

**B. User Agency agrees to:**

(1) SAVE System Use.

(a) Provide the necessary information in the manner SAVE requires to respond to User Agency requests for verification of immigration status or U.S. citizenship information. The following information from the applicant is required to create and submit a request for initial automated verification:

- First name and last name;
- Date of birth; and
- At least one of the following:

[3] "Additional verification" is as described in the DHS/USCIS/SAVE Privacy Impact Assessment - 006. See Systematic Alien Verification for Entitlements (SAVE) Program | Homeland Security (dhs.gov).

- o A DHS issued citizenship or immigration enumerator (for example, A-Number/USCIS Number, Certificate of Naturalization Number, Certificate of Citizenship Number, I-94 Number, Card Number / I-797 Receipt Number, or SEVIS ID); or
- o Other government issued enumerator permitted by SAVE.

SAVE may modify requirements for SAVE cases and will provide written notification (e.g., by e-mail or update to SAVE website) to User Agency of any changes. Only enumerators accepted in SAVE can be submitted for verification.

Cases submitted for additional verification may require different enumerators than what the User Agency used to create the SAVE case and submit for initial verification. User Agency will only submit requests for additional verification using enumerators permitted by SAVE. Additional information obtained from the applicant's immigration or citizenship documentation may be required for additional verification. Scanned documents and other electronically submitted information may also be required for additional verification.

User Agency must request additional verification when required by SAVE for any registrant or registered voter that does not verify as a U.S. citizen on initial verification, including in all cases where the User Agency receives any SAVE response other than that of U.S. citizen. If the User Agency does not request additional verification or SAVE does not verify the registrant or registered voter as a U.S. citizen after conducting additional verification, the User Agency must contact the registrant or registered voter to obtain proof of U.S. citizenship, if necessary under the circumstances to fulfill the purpose of this MOA and in accordance with the provisions of this MOA and Federal and State law.

User Agency consents to electronic-only submission of all verification requests and additional information, including all information submitted for SAVE additional verification. SAVE will reject non-electronic (i.e., paper or fax) verification requests and information submissions.

(b) Ensure and report to DHS-USCIS that, before using SAVE and whenever subsequently required by DHS-USCIS (e.g., for SAVE system enhancements), all users performing verification procedures complete SAVE-required training, including: reviewing the SAVE Program Guide, taking the latest version of SAVE tutorial(s), and maintaining a working knowledge of requirements contained therein and in this MOA, as updated. These instructional materials will address the policies and procedures governing use of the program, including (1) program access, (2) verification procedures, (3) disclosure of information and privacy protections, (4) non-discrimination requirements, and (5) records correction procedures for registrants and registered voters;

(c) Ensure users are provided with, maintain, and use SAVE User IDs and access SAVE only while they need to perform verification procedures and promptly terminate user access when requested by SAVE, or if the user separates from the User Agency or otherwise no longer needs SAVE access;

(d) Ensure all users performing verification procedures only use SAVE with respect to verification of registrant or registered voter U.S. citizenship information or immigration status information for the specified benefit and comply with all other requirements contained in the SAVE Program Guide and other SAVE guidance, the SAVE tutorial, and this MOA, and updates to these requirements;

(e) Ensure that all Users performing verification procedures have contact information for SAVE and DHS-USCIS;

(f) Ensure all users perform any additional verification procedures SAVE requires and/or the registrant or registered voter requests after the User Agency initiates a verification request. User Agency cannot deny a benefit based on a SAVE response where additional action is required of the User Agency by SAVE or additional verification is requested by the applicant but has not been completed;

(g) Use any information provided by DHS-USCIS under this MOA solely for lawful purposes, namely the purpose above of verifying U.S. citizenship information and immigration status information of registrants and registered voters within User Agency's jurisdiction for determining eligibility for voter registration and to vote in Brevard County, and limit use of such information in accordance with this and all other provisions of this MOA;

(h) Comply with the requirements of the Federal Information Security Modernization Act of 2014 (Pub. L. No. 113-283, as amended) and OMB guidance as applicable to access, electronic storage, transport of records between agencies, and the internal processing of records received by either agency under the terms of this MOA;

(i) Maintain physical, administrative, and technical safeguards for SAVE information and access methods to ensure that it is not used for any other purpose than described in this MOA and protect its confidentiality, including ensuring that it is not disclosed to any unauthorized person(s) without the prior written consent of DHS-USCIS;[4]

(j) Comply with the Privacy Act of 1974, 5 U.S.C. § 552a, as amended, and other applicable laws, regulations, and policies, including but not limited to all OMB and DHS privacy guidance, in conducting verification procedures pursuant to this MOA, and in safeguarding, maintaining, and disclosing any data provided or received pursuant to the MOA. Information shared as a result of this MOA shall be considered DHS-USCIS information. Responses to third party requests for such information should be consistent with federal law and DHS policy, including but not limited to the provisions of the Freedom of Information Act, 5 U.S.C. § 552;

[4] Each registrant or registered voter seeking access to information regarding themself may do so by submitting a written signed request to DHS-USCIS. Instructions for submitting such requests may be found on the Freedom of Information/Privacy Act page of www.uscis.gov.

(k) Comply with federal laws prohibiting discrimination against registrants or registered voters and discriminatory use of SAVE based upon the national origin, color, race, sex, religion, age, or disability of the registrant or registered voter, including but not limited to the National Voter Registration Act, 52 U.S.C. § 20501 et seq., as amended; the Help America Vote Act, 52 U.S.C. § 20901, as amended; the Voting Rights Act, 52 U.S.C. § 10301 et seq., as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended. In accordance with the Rehabilitation Act of 1973, as amended, and related agency implementing regulations, User Agency will provide reasonable modifications for individuals with disabilities to ensure effective communication;

(l) Comply with the requirements of Executive Order 13166 ("Improving Access to Services for Persons with Limited English Proficiency," 65 Fed. Reg. 50,121 (Aug. 16, 2000)), to take reasonable steps to provide limited English proficiency (LEP) persons interacting with their respective agency with meaningful access to federally conducted programs and activities, including services and benefits, in accordance with LEP guidance set forth by the U.S. Department of Justice and any other applicable authorities;

(m) Provide written notice to registrants and registered voters that any information they provide may be subject to verification. User Agency will inform in writing each registrant or registered voter covered by this Agreement that their citizenship or immigration status may be verified against federal records;

(n) Provide all registrants or registered voters who are not verified as U.S. citizens based solely or in part on the SAVE response with the opportunity to use the User Agency's existing process to appeal the denial and to contact DHS-USCIS to correct their immigration records prior to a final decision, if necessary. (Information for how to contact DHS to correct immigration records is available in the SAVE Records Fast Facts for Benefit Applicants on the SAVE and USCIS websites.) Benefit applicants may need to correct their records with other government agencies depending on the error;

(o) Provide or cause to be provided to all individuals with respect to whom User Agency or another agency intends to deny registration or proceed with any removal from a voter roll or other action removing or limiting the right to vote, or with civil or criminal enforcement action, because or based in whole or in part upon any information received pursuant to this MOA, with any right to notice and hearing or other due process available under State or other applicable law;

(p) Refrain from using SAVE, or assisting any person or entity, to comply with the employment eligibility verification requirements of section 274A of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

(2) Account Compliance.

(a) Provide DHS-USCIS with the current e-mail, U.S. postal service address, physical address, name, and telephone number of the User Agency authorized representative for any notifications,

questions or problems that may arise in connection with the User Agency's participation in SAVE and with notification of changes in the use of SAVE by the User Agency;

(b) Notify DHS-USCIS immediately whenever there is reason to believe a violation of this MOA has occurred;

(c) Notify DHS-USCIS immediately whenever there is reason to believe a breach of personally identifiable information has occurred as a result of User Agency action or inaction pursuant to OMB Memorandum M-17-12, "Preparing for and Responding to a Breach of Personally Identifiable Information" or successor guidance;

(d) Allow DHS-USCIS to monitor and review all records and documents related to the use, abuse, misuse, fraudulent use or improper use of SAVE by the User Agency, including, but not limited to original registrant or registered voter consent documents required by the Privacy Act, 5 U.S.C. § 552a or other applicable authority;

(e) Allow DHS-USCIS to conduct desk audits and/or site visits to review User Agency's compliance with this MOA and all other SAVE-related policies, procedures, guidance and laws applicable to conducting verification and safeguarding, maintaining, and disclosing any data provided or received pursuant to this MOA;

(f) Allow DHS-USCIS to perform audits of User Agency's user IDs use and access, SAVE Training Records, SAVE financial records, SAVE biographical information, system profiles and usage patterns and other relevant data;

(g) Allow DHS-USCIS to interview any and all User Agency SAVE system users and any and all contact persons or other personnel within the User Agency regarding any and all questions or problems which may arise in connection with the User Agency's participation in SAVE;

(h) Allow DHS-USCIS to monitor system access and usage and to assist SAVE users as necessary to ensure compliance with the terms of this MOA and SAVE requirements by its authorized agents or designees; and

(i) Take corrective measures in a timely manner to address all lawful requirements and recommendations on every written finding including, but not limited to, those of DHS-USCIS regarding waste, fraud, and abuse, and discrimination or any unauthorized use or misuse of the SAVE system or SAVE data, non-compliance with the terms, conditions and safeguards of this MOA, SAVE procedures or other applicable law, regulation or policy.

(3) Reimbursement.

(a) The User Agency certifies that, each fiscal year, it will obligate funds sufficient to reimburse DHS-USCIS under a current appropriation for the coming year for any anticipated charges.

(b) Pay the transaction charges reflected on the SAVE website, which along with methods of payment are subject to change upon prior written notification to the User Agency.

(c) Pay in full the amount due, if any, within 30 days of the invoice date. The User Agency will pay any applicable sales, use, excise, and like taxes, where required by law, that are stated on each invoice. Regardless of payment type, the User Agency will clearly indicate the User Agency High Level Identifier with remittance; and

(d) Promptly discuss and resolve issues and questions with DHS-USCIS regarding payments. Delinquent payments shall be handled in accordance with the Debt Collection and Improvement Act of 1996, 31 U.S.C. § 3701. Interest on all unpaid balances shall be charged at the rate of the current value of funds to the United States Treasury effective on the date of the invoice. The rate is the Treasury tax and loan rate. It is published annually or quarterly by the Secretary of the Treasury in the Federal Register and the Treasury Fiscal Requirements Manual Bulletins. Handling charges will accrue at monthly rates of $5.00 for each of the first two months of delinquency and $10.00 for each month thereafter. In addition to interest and handling charges, if DHS-USCIS does not receive payment within 90 days of the invoice, 6% per annum additional interest will be assessed. Charges will be computed from the date of the invoice and will accrue monthly with the applicable interest and handling charges. In the case of any late payment, the amount received will be applied in this sequence: (1) to any accrued penalty and handling charges: (2) to any accrued interest; and (3) to outstanding principal. Failure to timely pay may result in suspension or termination of services.

## V. POINTS OF CONTACT.

**USCIS SAVE**
U.S. Citizenship and Immigration Services
Department of Homeland Security
Attn: SAVE Operations
5900 Capital Gateway Drive, Mail Stop 2620
Camp Springs, MD 20588-0009
Phone: (877) 469-2563 E-mail: SAVE.help@uscis.dhs.gov

**USER AGENCY**

Brevard County Supervisor of Elections
Donald Hoffman Supervisor of Elections
525 N John Rodes Blvd
Melbourne, FL 32934
321-633-2175 dhoffman@votebrevard.gov

## VI. OTHER PROVISIONS.

A. MOA Responsibilities. Consistent with applicable laws, regulations, and policies, and the availability of User Agency resources, User Agency will commit personnel and resources

sufficient to support this MOA. Only authorized employees, agents, or designees of DHS-USCIS and the User Agency will carry out the requirements of this MOA. In carrying out these responsibilities, they will operate within the scope of applicable regulations, specifically delegated authorities, the program authorities and funding limitations and terms and conditions of this MOA. The User Agency will also ensure that all local officials responsible for voter registration use information obtained from SAVE and provided by the User Agency in accordance with the terms and conditions of this MOA.

B. Determining Benefit Eligibility. This MOA is limited to the provision of verification services. DHS-USCIS will verify limited citizenship and immigration status information but will not recommend to the User Agency whether to issue the benefit. The DHS-USCIS response is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right or benefit under any program administered by the User Agency. The User Agency has the responsibility to determine the registrant's or registered voter's eligibility for the benefit.

C. Criminal Penalties.

(1) DHS-USCIS reserves the right to use information from the User Agency for any purpose permitted by law, including, but not limited to, the prosecution of violations of Federal administrative or criminal law.

(2) The User Agency acknowledges that the information it receives from DHS-USCIS is governed by the Privacy Act of 1974, 5 U.S.C. Section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this MOA may be subject to criminal penalties.

D. Third Party Liability.

(1) Each party to this MOA shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution and/or performance of this MOA, whether civil or criminal, and retain responsibility for the payment of any corresponding liability.

(2) Nothing in this MOA is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any third party against the United States, its agencies, officers, or employees or the User Agency.

E. Disputes. Disagreements on the interpretation of the provisions of this MOA that cannot be resolved between SAVE and the User Agency point of contact should be provided in writing to the authorized officials at both agencies for resolution. If settlement cannot be reached at this level, the disagreement will be elevated to the next level in accordance with DHS-USCIS procedures for final resolution.

F. Conflicts. This MOA constitutes the full MOA on this subject between DHS-USCIS and the User Agency. Any inconsistency or conflict between or among the provisions of this MOA, will be resolved in the following order of precedence: (1) this MOA and (2) other documents incorporated by reference in this MOA (e.g., transaction charges).

G. Severability. Nothing in this MOA is intended to conflict with current law or regulation or the directives of DHS, DHS-USCIS, or the User Agency. If a term of this MOA is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOA shall remain in full force and effect. In the event of a conflict that prevents either party from fulfilling its obligations, this MOA may be immediately canceled without providing the 30-day notice period referenced in Section IX.

H. Assignment. The User Agency may not assign this MOA, nor may it assign any of its rights or obligations under this MOA. To the extent allowable by law, this MOA shall inure to the benefit of, and be binding upon, any successors to DHS-USCIS and the User Agency without restriction.

I. Waiver. No waiver by either party of any breach of any provision of this MOA shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOA shall not be construed to be a waiver thereof.

J. Compliance with Other Laws. Nothing in this MOA is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 et seq., as amended; the Help America Vote Act, 52 U.S.C. § 20901 et seq., as amended; the Voting Rights Act, 52 U.S.C. § 10301 et seq., as amended; the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended; and all applicable state law.

## VII. EFFECTIVE DATE.

This MOA shall be effective when the DHS-USCIS authorized official and User Agency authorized official have both signed the MOA. This MOA shall continue in effect until and unless modified or terminated in accordance with the provisions of this MOA.

## VIII. MODIFICATION.

A. This MOA is subject to periodic review by DHS-USCIS, its authorized agents or designees, and, if necessary, periodic modification and/or renewal to assure compliance with current law, policy, and standard operating procedure(s). This MOA constitutes the complete MOA between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of both parties evidenced in writing and signed by both parties and appended to this agreement.

B. DHS-USCIS may accomplish unilateral administrative modifications to revise transaction charges and methods of payment, effective upon prior written notification to the User Agency. Either party may accomplish a unilateral administrative modification to change POC

information. A written bilateral modification (i.e., agreed to and signed by authorized officials of both parties) is required to change any other term of this MOA.

## IX. TERMINATION.

Either party may terminate this MOA at any time by providing 30 days written notice of intent. DHS-USCIS and User Agency, when feasible, will consult with the other party and attempt to reconcile issues before terminating this MOA. Notwithstanding any other provision in the MOA, DHS-USCIS may suspend or terminate this MOA, and thereby the Agency's use of SAVE for voter registration and voter list maintenance purposes, without prior notice if deemed necessary because of a requirement of law or policy, upon a determination by DHS-USCIS that there has been a breach of system integrity or security by the User Agency or a failure by the User Agency to comply with established procedures or legal requirements, including but not limited to failure to pay.

Written notices shall be sent to the addresses of the POCs listed herein and shall be effective upon receipt. Either party may change its POC by written notice to the other party.

The foregoing, in conjunction with the incorporated references, constitutes the full agreement on this subject between DHS-USCIS and the User Agency. This MOA supersedes all previous agreements governing the provision of verification services related to voter registration and voter list maintenance. Those agreements are explicitly acknowledged to be null and void.

The undersigned represent that they are authorized to enter into this MOA on behalf of DHS-USCIS and the User Agency, respectively.

BRIAN J BRODERICK
Digitally signed by BRIAN J BRODERICK
Date: 2025.06.23 12:30:02 -04'00'

**Brian J. Broderick**
**(Acting) Chief, Verification Division**
**U.S. Citizenship and Immigration Services**
**Department of Homeland Security**

**Date**

**Tim Bobanic**
**Supervisor of Elections**
**2725 Judge Fran Jamieson Way**
**Building C, Suite 105**
**Melbourne, FL 32940**

6/13/2025
**Date**

# MEMORANDUM OF AGREEMENT

**BETWEEN THE DEPARTMENT OF HOMELAND SECURITY,**
**U.S. CITIZENSHIP AND IMMIGRATION SERVICES**
**AND**
**Flagler County Supervisor of Elections**
**REGARDING PARTICIPATION IN THE SAVE PROGRAM FOR VOTER REGISTRATION AND VOTER LIST MAINTENANCE PURPOSES**

## I. PARTIES.

The parties to this Systematic Alien Verification for Entitlements (SAVE) Memorandum of Agreement (MOA) are the Department of Homeland Security, U.S. Citizenship and Immigration Services (DHS-USCIS), and the **Flagler County Supervisor of Elections** (User Agency).

## II. AUTHORITY.

The authorities governing this MOA include, but are not limited to, the following:

- Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended.
- Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, as amended.
- Section 642 of Div. C, Title VI of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended (8 U.S.C. §1373(c)).
- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.
- The Inter-Governmental Cooperation Act, 31 U.S.C. § 6501, et seq., as amended.
- The Federal Information Security Management Act of 2014 (Pub. L. 113-283), as amended.
- National Voter Registration Act of 1993, 52 U.S.C. § 20501, Pub. L. No. 103-31, 107 Stat. 77, as amended.
- Help America Vote Act of 2002, 52 U.S.C. § 20901, Pub. L. No. 107-252, § 303, 116 Stat. 1666, as amended.

Additionally, the authorities governing this MOA that are specific to this User Agency's request to use SAVE, include but are not limited to the following:

- **Florida Statutes, Title IX, Chapter 97, §§ 97.041, 97.052, 97.053, 97.073, and Chapter 98, §§ 98.015, 98.035, 98.045, 98.065, 98.075, 98.093. as amended**

Pursuant to the requirements of the Office of Management and Budget (OMB) Circular A-97,

which establishes the President's guidelines for implementing the Intergovernmental Cooperation Act, 31 U.S.C. § 6501, et seq., as amended, the User Agency certifies that it cannot procure the U.S. citizenship information and immigration status information verification services requested pursuant to this MOA reasonably and expeditiously through ordinary business channels.

## III. PURPOSE.

The purpose of this MOA is to establish the terms and conditions for the User Agency's participation in SAVE to verify the U.S. citizenship and immigration status information of registrants and registered voters within User Agency's jurisdiction for **voter registration and voter list maintenance** (benefit) in the **Flagler** County of **Florida**.[1]

SAVE verifies User Agency-provided information against DHS-accessed records, including immigration, naturalization and acquired citizenship records using an immigration enumerator issued by DHS (immigration enumerator) or other government issued enumerator(s) permitted by SAVE. SAVE may only be able to verify acquired U.S. citizens in certain situations.[2]

SAVE will provide information to the User Agency by:

1) Initial response (initial verification) to an on-line inquiry by the User Agency; and

2) Additional verification procedures, where applicable.

## IV. RESPONSIBILITIES.

### A. DHS-USCIS agrees to:

(1) Provide to the User Agency, in a manner determined by DHS-USCIS, an immigration status and U.S. citizenship information verification process under SAVE;

(2) Respond to properly submitted verification requests from the User Agency by providing the limited information noted in the **PURPOSE** section above, i.e., a verification case number and U.S. citizenship or immigration status, if any;

---

[1] "Participation" in SAVE is as described in the DHS/USCIS/SAVE Privacy Impact Assessment - 006. See Systematic Alien Verification for Entitlements (SAVE) Program | Homeland Security (dhs.gov).

[2] "Acquired citizenship" is defined as citizenship conveyed to children through the naturalization of parents or, under certain circumstances, at birth to foreign-born children of U.S. citizens, provided certain conditions are met. SAVE is only able to verify information that relates to information found in the databases accessed by the system. Accordingly, if the User Agency provides an immigration enumerator for an individual with acquired citizenship who has not applied for a Certificate of Citizenship with USCIS, the agency may not have that individual's citizenship information available in the databases accessed, and SAVE may not be able to confirm that individual's acquired citizenship.

(3) Process and respond to properly submitted additional verification requests[3] from the User Agency. Response time to additional verification requests may vary depending upon DHS-USCIS workload, available resources, and the registrant's or registered voter's specific circumstances;

(4) Provide to the User Agency operating instructions necessary for the User Agency to designate users within the purview of the User Agency;

(5) Provide to the User Agency SAVE point of contact information for questions or problems regarding the User Agency's participation in SAVE;

(6) Provide access to training and information regarding the laws, policies, and procedures that govern verifying, safeguarding, using, maintaining, and disclosing certain citizenship and immigration status information;

(7) Provide the User Agency access to additional verification processes, with requirements identified by SAVE;

(8) Recover no more than its actual costs. SAVE transaction charges are found on the SAVE website. SAVE transaction charges and methods of payment are subject to change upon prior written notification to the User Agency;

(9) Bill and collect reimbursements for transaction fees, if any, charged by SAVE for access and usage by submitting invoices to the User Agency's payment office at the address specified in writing by the User Agency, with a copy furnished to the User Agency POC. DHS-USCIS may submit invoices when the work is completed or as otherwise authorized. The User Agency's High Level Identifier, tax identification number, and associated dollar amounts will be referenced on all invoices; and

(10) Promptly initiate year-end and closeout adjustments for any final costs once known.

**B. User Agency agrees to:**

(1) SAVE System Use.

(a) Provide the necessary information in the manner SAVE requires to respond to User Agency requests for verification of immigration status or U.S. citizenship information. The following information from the applicant is required to create and submit a request for initial automated verification:

- First name and last name;
- Date of birth; and
- At least one of the following:

[3] "Additional verification" is as described in the DHS/USCIS/SAVE Privacy Impact Assessment - 006. See Systematic Alien Verification for Entitlements (SAVE) Program | Homeland Security (dhs.gov).

- A DHS issued citizenship or immigration enumerator (for example, A-Number/USCIS Number, Certificate of Naturalization Number, Certificate of Citizenship Number, I-94 Number, Card Number / I-797 Receipt Number, or SEVIS ID); or
- Other government issued enumerator permitted by SAVE.

SAVE may modify requirements for SAVE cases and will provide written notification (e.g., by e-mail or update to SAVE website) to User Agency of any changes. Only enumerators accepted in SAVE can be submitted for verification.

Cases submitted for additional verification may require different enumerators than what the User Agency used to create the SAVE case and submit for initial verification. User Agency will only submit requests for additional verification using enumerators permitted by SAVE. Additional information obtained from the applicant's immigration or citizenship documentation may be required for additional verification. Scanned documents and other electronically submitted information may also be required for additional verification.

User Agency must request additional verification when required by SAVE for any registrant or registered voter that does not verify as a U.S. citizen on initial verification, including in all cases where the User Agency receives any SAVE response other than that of U.S. citizen. If the User Agency does not request additional verification or SAVE does not verify the registrant or registered voter as a U.S. citizen after conducting additional verification, the User Agency must contact the registrant or registered voter to obtain proof of U.S. citizenship, if necessary under the circumstances to fulfill the purpose of this MOA and in accordance with the provisions of this MOA and Federal and State law.

User Agency consents to electronic-only submission of all verification requests and additional information, including all information submitted for SAVE additional verification. SAVE will reject non-electronic (i.e., paper or fax) verification requests and information submissions.

(b) Ensure and report to DHS-USCIS that, before using SAVE and whenever subsequently required by DHS-USCIS (e.g., for SAVE system enhancements), all users performing verification procedures complete SAVE-required training, including: reviewing the SAVE Program Guide, taking the latest version of SAVE tutorial(s), and maintaining a working knowledge of requirements contained therein and in this MOA, as updated. These instructional materials will address the policies and procedures governing use of the program, including (1) program access, (2) verification procedures, (3) disclosure of information and privacy protections, (4) non-discrimination requirements, and (5) records correction procedures for registrants and registered voters;

(c) Ensure users are provided with, maintain, and use SAVE User IDs and access SAVE only while they need to perform verification procedures and promptly terminate user access when requested by SAVE, or if the user separates from the User Agency or otherwise no longer needs SAVE access;

(d) Ensure all users performing verification procedures only use SAVE with respect to verification of registrant or registered voter U.S. citizenship information or immigration status information for the specified benefit and comply with all other requirements contained in the SAVE Program Guide and other SAVE guidance, the SAVE tutorial, and this MOA, and updates to these requirements;

(e) Ensure that all Users performing verification procedures have contact information for SAVE and DHS-USCIS;

(f) Ensure all users perform any additional verification procedures SAVE requires and/or the registrant or registered voter requests after the User Agency initiates a verification request. User Agency cannot deny a benefit based on a SAVE response where additional action is required of the User Agency by SAVE or additional verification is requested by the applicant but has not been completed;

(g) Use any information provided by DHS-USCIS under this MOA solely for lawful purposes, namely the purpose above of verifying U.S. citizenship information and immigration status information of registrants and registered voters within User Agency's jurisdiction for determining eligibility for voter registration and to vote in Flagler, and limit use of such information in accordance with this and all other provisions of this MOA;

(h) Comply with the requirements of the Federal Information Security Modernization Act of 2014 (Pub. L. No. 113-283, as amended) and OMB guidance as applicable to access, electronic storage, transport of records between agencies, and the internal processing of records received by either agency under the terms of this MOA;

(i) Maintain physical, administrative, and technical safeguards for SAVE information and access methods to ensure that it is not used for any other purpose than described in this MOA and protect its confidentiality, including ensuring that it is not disclosed to any unauthorized person(s) without the prior written consent of DHS-USCIS;[4]

(j) Comply with the Privacy Act of 1974, 5 U.S.C. § 552a, as amended, and other applicable laws, regulations, and policies, including but not limited to all OMB and DHS privacy guidance, in conducting verification procedures pursuant to this MOA, and in safeguarding, maintaining, and disclosing any data provided or received pursuant to the MOA. Information shared as a result of this MOA shall be considered DHS-USCIS information. Responses to third party requests for such information should be consistent with federal law and DHS policy, including but not limited to the provisions of the Freedom of Information Act, 5 U.S.C. § 552;

[4] Each registrant or registered voter seeking access to information regarding themself may do so by submitting a written signed request to DHS-USCIS. Instructions for submitting such requests may be found on the Freedom of Information/Privacy Act page of www.uscis.gov.

(k) Comply with federal laws prohibiting discrimination against registrants or registered voters and discriminatory use of SAVE based upon the national origin, color, race, sex, religion, age, or disability of the registrant or registered voter, including but not limited to the National Voter Registration Act, 52 U.S.C. § 20501 et seq., as amended; the Help America Vote Act, 52 U.S.C. § 20901, as amended; the Voting Rights Act, 52 U.S.C. § 10301 et seq., as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended. In accordance with the Rehabilitation Act of 1973, as amended, and related agency implementing regulations, User Agency will provide reasonable modifications for individuals with disabilities to ensure effective communication;

(l) Comply with the requirements of Executive Order 13166 ("Improving Access to Services for Persons with Limited English Proficiency," 65 Fed. Reg. 50,121 (Aug. 16, 2000)), to take reasonable steps to provide limited English proficiency (LEP) persons interacting with their respective agency with meaningful access to federally conducted programs and activities, including services and benefits, in accordance with LEP guidance set forth by the U.S. Department of Justice and any other applicable authorities;

(m) Provide written notice to registrants and registered voters that any information they provide may be subject to verification. User Agency will inform in writing each registrant or registered voter covered by this Agreement that their citizenship or immigration status may be verified against federal records;

(n) Provide all registrants or registered voters who are not verified as U.S. citizens based solely or in part on the SAVE response with the opportunity to use the User Agency's existing process to appeal the denial and to contact DHS-USCIS to correct their immigration records prior to a final decision, if necessary. (Information for how to contact DHS to correct immigration records is available in the SAVE Records Fast Facts for Benefit Applicants on the SAVE and USCIS websites.) Benefit applicants may need to correct their records with other government agencies depending on the error;

(o) Provide or cause to be provided to all individuals with respect to whom User Agency or another agency intends to deny registration or proceed with any removal from a voter roll or other action removing or limiting the right to vote, or with civil or criminal enforcement action, because or based in whole or in part upon any information received pursuant to this MOA, with any right to notice and hearing or other due process available under State or other applicable law;

(p) Refrain from using SAVE, or assisting any person or entity, to comply with the employment eligibility verification requirements of section 274A of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

(2) <u>Account Compliance</u>.

(a) Provide DHS-USCIS with the current e-mail, U.S. postal service address, physical address, name, and telephone number of the User Agency authorized representative for any notifications,

questions or problems that may arise in connection with the User Agency's participation in SAVE and with notification of changes in the use of SAVE by the User Agency;

(b) Notify DHS-USCIS immediately whenever there is reason to believe a violation of this MOA has occurred;

(c) Notify DHS-USCIS immediately whenever there is reason to believe a breach of personally identifiable information has occurred as a result of User Agency action or inaction pursuant to OMB Memorandum M-17-12, "Preparing for and Responding to a Breach of Personally Identifiable Information" or successor guidance;

(d) Allow DHS-USCIS to monitor and review all records and documents related to the use, abuse, misuse, fraudulent use or improper use of SAVE by the User Agency, including, but not limited to original registrant or registered voter consent documents required by the Privacy Act, 5 U.S.C. § 552a or other applicable authority;

(e) Allow DHS-USCIS to conduct desk audits and/or site visits to review User Agency's compliance with this MOA and all other SAVE-related policies, procedures, guidance and laws applicable to conducting verification and safeguarding, maintaining, and disclosing any data provided or received pursuant to this MOA;

(f) Allow DHS-USCIS to perform audits of User Agency's user IDs use and access, SAVE Training Records, SAVE financial records, SAVE biographical information, system profiles and usage patterns and other relevant data;

(g) Allow DHS-USCIS to interview any and all User Agency SAVE system users and any and all contact persons or other personnel within the User Agency regarding any and all questions or problems which may arise in connection with the User Agency's participation in SAVE;

(h) Allow DHS-USCIS to monitor system access and usage and to assist SAVE users as necessary to ensure compliance with the terms of this MOA and SAVE requirements by its authorized agents or designees; and

(i) Take corrective measures in a timely manner to address all lawful requirements and recommendations on every written finding including, but not limited to, those of DHS-USCIS regarding waste, fraud, and abuse, and discrimination or any unauthorized use or misuse of the SAVE system or SAVE data, non-compliance with the terms, conditions and safeguards of this MOA, SAVE procedures or other applicable law, regulation or policy.

(3) Reimbursement.

(a) The User Agency certifies that, each fiscal year, it will obligate funds sufficient to reimburse DHS-USCIS under a current appropriation for the coming year for any anticipated charges.

(b) Pay the transaction charges reflected on the SAVE website, which along with methods of payment are subject to change upon prior written notification to the User Agency.

(c) Pay in full the amount due, if any, within 30 days of the invoice date. The User Agency will pay any applicable sales, use, excise, and like taxes, where required by law, that are stated on each invoice. Regardless of payment type, the User Agency will clearly indicate the User Agency High Level Identifier with remittance; and

(d) Promptly discuss and resolve issues and questions with DHS-USCIS regarding payments. Delinquent payments shall be handled in accordance with the Debt Collection and Improvement Act of 1996, 31 U.S.C. § 3701. Interest on all unpaid balances shall be charged at the rate of the current value of funds to the United States Treasury effective on the date of the invoice. The rate is the Treasury tax and loan rate. It is published annually or quarterly by the Secretary of the Treasury in the Federal Register and the Treasury Fiscal Requirements Manual Bulletins. Handling charges will accrue at monthly rates of $5.00 for each of the first two months of delinquency and $10.00 for each month thereafter. In addition to interest and handling charges, if DHS-USCIS does not receive payment within 90 days of the invoice, 6% per annum additional interest will be assessed. Charges will be computed from the date of the invoice and will accrue monthly with the applicable interest and handling charges. In the case of any late payment, the amount received will be applied in this sequence: (1) to any accrued penalty and handling charges: (2) to any accrued interest; and (3) to outstanding principal. Failure to timely pay may result in suspension or termination of services.

**V. POINTS OF CONTACT.**

**<u>USCIS SAVE</u>**
U.S. Citizenship and Immigration Services
Department of Homeland Security
Attn: SAVE Operations
5900 Capital Gateway Drive, Mail Stop 2620
Camp Springs, MD 20588-0009
Phone: (877) 469-2563 E-mail: SAVE.help@uscis.dhs.gov

**<u>USER AGENCY</u>**
Flagler County Supervisor of Elections
Kaiti Lenhart
Supervisor of Elections
PO Box 901
Bunnell, FL 32110
(386)313-4170 klenhart@flaglerelections.gov

**VI. OTHER PROVISIONS.**

A. <u>MOA Responsibilities</u>. Consistent with applicable laws, regulations, and policies, and the availability of User Agency resources, User Agency will commit personnel and resources

sufficient to support this MOA. Only authorized employees, agents, or designees of DHS-USCIS and the User Agency will carry out the requirements of this MOA. In carrying out these responsibilities, they will operate within the scope of applicable regulations, specifically delegated authorities, the program authorities and funding limitations and terms and conditions of this MOA. The User Agency will also ensure that all local officials responsible for voter registration use information obtained from SAVE and provided by the User Agency in accordance with the terms and conditions of this MOA.

B. Determining Benefit Eligibility. This MOA is limited to the provision of verification services. DHS-USCIS will verify limited citizenship and immigration status information but will not recommend to the User Agency whether to issue the benefit. The DHS-USCIS response is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right or benefit under any program administered by the User Agency. The User Agency has the responsibility to determine the registrant's or registered voter's eligibility for the benefit.

C. Criminal Penalties.

(1) DHS-USCIS reserves the right to use information from the User Agency for any purpose permitted by law, including, but not limited to, the prosecution of violations of Federal administrative or criminal law.

(2) The User Agency acknowledges that the information it receives from DHS-USCIS is governed by the Privacy Act of 1974, 5 U.S.C. Section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this MOA may be subject to criminal penalties.

D. Third Party Liability.

(1) Each party to this MOA shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution and/or performance of this MOA, whether civil or criminal, and retain responsibility for the payment of any corresponding liability.

(2) Nothing in this MOA is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any third party against the United States, its agencies, officers, or employees or the User Agency.

E. Disputes. Disagreements on the interpretation of the provisions of this MOA that cannot be resolved between SAVE and the User Agency point of contact should be provided in writing to the authorized officials at both agencies for resolution. If settlement cannot be reached at this level, the disagreement will be elevated to the next level in accordance with DHS-USCIS procedures for final resolution.

F. Conflicts. This MOA constitutes the full MOA on this subject between DHS-USCIS and the User Agency. Any inconsistency or conflict between or among the provisions of this MOA, will be resolved in the following order of precedence: (1) this MOA and (2) other documents incorporated by reference in this MOA (e.g., transaction charges).

G. Severability. Nothing in this MOA is intended to conflict with current law or regulation or the directives of DHS, DHS-USCIS, or the User Agency. If a term of this MOA is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOA shall remain in full force and effect. In the event of a conflict that prevents either party from fulfilling its obligations, this MOA may be immediately canceled without providing the 30-day notice period referenced in Section IX.

H. Assignment. The User Agency may not assign this MOA, nor may it assign any of its rights or obligations under this MOA. To the extent allowable by law, this MOA shall inure to the benefit of, and be binding upon, any successors to DHS-USCIS and the User Agency without restriction.

I. Waiver. No waiver by either party of any breach of any provision of this MOA shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOA shall not be construed to be a waiver thereof.

J. Compliance with Other Laws. Nothing in this MOA is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 et seq., as amended; the Help America Vote Act, 52 U.S.C. § 20901 et seq., as amended; the Voting Rights Act, 52 U.S.C. § 10301 et seq., as amended; the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended; and all applicable state law.

**VII. EFFECTIVE DATE.**

This MOA shall be effective when the DHS-USCIS authorized official and User Agency authorized official have both signed the MOA. This MOA shall continue in effect until and unless modified or terminated in accordance with the provisions of this MOA.

**VIII. MODIFICATION.**

A. This MOA is subject to periodic review by DHS-USCIS, its authorized agents or designees, and, if necessary, periodic modification and/or renewal to assure compliance with current law, policy, and standard operating procedure(s). This MOA constitutes the complete MOA between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of both parties evidenced in writing and signed by both parties and appended to this agreement.

B. DHS-USCIS may accomplish unilateral administrative modifications to revise transaction charges and methods of payment, effective upon prior written notification to the User Agency. Either party may accomplish a unilateral administrative modification to change POC

information. A written bilateral modification (i.e., agreed to and signed by authorized officials of both parties) is required to change any other term of this MOA.

**IX. TERMINATION.**

Either party may terminate this MOA at any time by providing 30 days written notice of intent. DHS-USCIS and User Agency, when feasible, will consult with the other party and attempt to reconcile issues before terminating this MOA. Notwithstanding any other provision in the MOA, DHS-USCIS may suspend or terminate this MOA, and thereby the Agency's use of SAVE for voter registration and voter list maintenance purposes, without prior notice if deemed necessary because of a requirement of law or policy, upon a determination by DHS-USCIS that there has been a breach of system integrity or security by the User Agency or a failure by the User Agency to comply with established procedures or legal requirements, including but not limited to failure to pay.

Written notices shall be sent to the addresses of the POCs listed herein and shall be effective upon receipt. Either party may change its POC by written notice to the other party.

The foregoing, in conjunction with the incorporated references, constitutes the full agreement on this subject between DHS-USCIS and the User Agency. This MOA supersedes all previous agreements governing the provision of verification services related to voter registration and voter list maintenance. Those agreements are explicitly acknowledged to be null and void.

The undersigned represent that they are authorized to enter into this MOA on behalf of DHS-USCIS and the User Agency, respectively.

BRIAN J BRODERICK Digitally signed by BRIAN J BRODERICK Date: 2025.06.26 13:15:54 -04'00'

**Brian J. Broderick**
**(Acting) Chief, Verification Divison**
**U.S. Citizenship and Immigration Services**
**Department of Homeland Security**

Date

Kaiti Lenhart Digitally signed by Kaiti Lenhart Date: 2025.06.26 08:18:21 -04'00'

**Kaiti Lenhart**
**Supervisor of Elections**
**PO Box 901**
**Bunnell, FL 32110**

06/26/2025

**Date**

Current as of January 2026

How to Download Our Manuals in PDF (PDF, 244.72 KB)

**Last Reviewed/Updated Date 01/13/2026**

Last Reviewed/Updated: 01/13/2026

# Table of Contents


## 1. Introduction

- 1.1 Background
- 1.2 Purpose of the Guide
- 1.3 SAVE Transaction Charges

- 1.4 Privacy and Security Statement

## 2. Save Hierarchy and User Roles

- 2.1 SAVE Hierarchy – Organization Levels and Associated User Roles
- 2.2 Super User – Roles and Responsibilities
- 2.3 Supervisor Users – Roles and Responsibilities
- 2.4 General User Types – Roles and Responsibilities

## 3. Accessing Save

- 3.1 Accessing SAVE via Web Browser
- 3.2 Creating / Linking a Login.gov Account to SAVE
- 3.3 Navigating to SAVE
- 3.4 SAVE Home Page Overview

## 4. Department Management

- 4.1 Adding a Department
- 4.2 Searching, Viewing, and Modifying Existing Departments

## 5. Group Management

- 5.1 Adding a Group
- 5. 2 Searching, Viewing, Modifying, and Deleting Existing Groups

## 6. User Management

- 6.1 Adding New Users

- 6.2 Searching Existing Users

## 7. User Site Administration for All Users

- 7.1 Link Existing SAVE User Accounts
- 7.2 Delete SAVE User Accounts

## 8. Case Creation

- 8.1 How to Create a Case
- 8.2 How to Submit Cases in Bulk
- 8.3 Duplicate Case Blocking

## 9. Case Response

- 9.1 Initial Response
- 9.2 Additional Verification

## 10. Case Management

- 10.1 Bulk Upload File Management

## 11. Additional Features in SAVE – Overview

- 11.1 Photo Tool
- 11.2 Form I-766 Employment Authorization Document (EAD) History
- 11.3 Grant Date
- 11.4 Sponsors/Household Members (Affidavit of Support)
- 11.5 Cuban-Haitian Entrant

- 11.6 Violence Against Women Act (VAWA)

12. Reports

- 12.1 Month End Agency Transactions by Benefit Report
- 12.2 Month End Transactions by User Summary Report
- 12.3 SAVE Billing Transaction Report

13. Save Helpful Resources

# 1. Introduction

## 1.1 Background

SAVE is a secure, online service administered by U.S. Citizenship and Immigration Services (USCIS) that enables federal, state, local, territorial, and tribal agencies to verify the immigration status and U.S. citizenship of individuals applying for or receiving public benefits or licenses and for other authorized purposes. SAVE supports registered agencies' ability to protect the integrity of their programs by preventing ineligible individuals from receiving benefits or licenses which they are not entitled to receive, thereby preserving U.S. resources. SAVE does not determine an individual's eligibility for benefits.

## 1.2 Purpose of the Guide

This guide provides information on using the SAVE system, including user roles, creating verification requests, submitting cases for additional verification, and receiving responses. It focuses on using SAVE via a secure web browser, though some agencies may use a web services application. Users must follow the requirements in this guide and their agency's Memorandum of Agreement (MOA). Additional resources are available in SAVE under Help > Resources.

## 1.3 SAVE Transaction Charges

SAVE is fee based for federal agencies. SAVE does not currently charge transaction fees for state, local, tribal, and territorial government agencies. For more information, see the SAVE Transaction Charges web page.

## 1.4 Privacy and Security Statement

Information collected by the User Agency and provided by SAVE is subject to the Privacy Act of 1974 (5 U.S.C § 552a) and must be protected from unauthorized disclosure. It is also covered by the System of Records Notice DHS/USCIS-044 Systematic Alien Verification for Entitlements (SAVE) Program System of Records, Oct.

31, 2025, 90 FR 48948. It is the User Agency's and the user's responsibility to ensure that all SAVE information is safeguarded and used only for the purposes found in the SAVE MOA between DHS-USCIS and the User Agency, as well as protected as required by applicable laws, including the Privacy Act of 1974 and 8 U.S.C. 1367 (special protected class information); as well as other laws, rules, regulations, policies and requirements regarding verification, information sharing and confidentiality.

# 2. Save Hierarchy and User Roles

SAVE has organizational levels and user roles to manage users, review case submissions, and generate reports. Functions available depend on the user's role.

## 2.1 SAVE Hierarchy – Organization Levels and Associated User Roles

There are three levels within an agency's profile.

- Agency / Super User: Highest level Responsible for managing the agency's hierarchy, user roles, and accounts.
- Department / Supervisor User: Second level Manages departments and groups within the agency.
- Group / General User: Lowest level. Manages groups within departments.



## 2.2 Super User – Roles and Responsibilities

The Super User administers the entire agency, managing the organizational hierarchy, user roles, and accounts. They can add/modify departments, add/modify/delete groups (Deleting a Group within a Department will delete all user Accounts assigned to that Group), add/delete user roles, update their own profiles, manage verification cases, and run reports. Each agency must have one active Super User account.

Super Users cannot create or modify cases in SAVE, unless they are also assigned to another role that allows these functions. If a user leaves the agency or no longer needs access to SAVE, you must delete the user's account.

## 2.3 Supervisor Users – Roles and Responsibilities

**Updating Profiles**: Supervisor Users can update their own profile. Supervisor Users manage their assigned department, including all groups and general users. They can add/modify/delete groups, add/delete user roles, update profiles, create/manage verification cases, and run reports. Each department must have at least one active Supervisor User.

If a user leaves the Department or Group or no longer needs access to SAVE, you must delete the user's account.

## 2.4 General User Types – Roles and Responsibilities

There are four General User roles:

- General User 1 – Cannot View Immigration Status Verifier (ISV) Responses;
- General User 2 – Can view User Initiated ISV Responses;
- General User 3 – Can view ISV Responses for All Users in Group; and
- General User 4 – Can view ISV Responses for All Users in Department.

| **Role** | **General User 1** | **General User 2** | **General User 3** | **General User 4** |
|---|---|---|---|---|
| Create initial verification cases. | X | X | X | X |
| View and complete self-submitted initial verification cases. | X | X | X | X |

| | | | | |
|---|---|---|---|---|
| Submit cases for additional verification. | X | X | X | X |
| Update their own profile | X | X | X | X |
| View and complete self-submitted additional verification cases. | X | X | X | X |
| View and complete additional verification cases submitted by all General Users within same Group. | | | X | X |
| View and complete additional verification cases submitted by all General Users assigned to Groups within their Department. | | | | X |
| Run and view reports. | | | X | X |

# 3. Accessing Save

All users can access SAVE via a web browser, and some agency users can access SAVE via a web services application. For web services, contact your agency.

## 3.1 Accessing SAVE via Web Browser

Registered users can access SAVE at https://save.uscis.gov/save/app/client/ui/home using supported browsers (Google Chrome, Microsoft Edge, Mozilla Firefox or Apple Safari).

## 3.2 Creating / Linking a Login.gov Account to SAVE

Users need a Login.gov account to access SAVE. To activate a new SAVE user account:

1. Go to https://save.uscis.gov/save/app/client/ui/home.
2. Agree to the Use Agreement.
3. Sign in or create a Login.gov account.
4. Select Continue to SAVE.

## 3.3 Navigating to SAVE

After logging in, users will see the Dashboard, where they can update their profile and link additional user accounts. Users must complete a 15–20 minute tutorial and certify to completion before creating SAVE cases.

### 3.4 SAVE Home Page Overview

The home page includes:

- **Navigation Menu:** Displays features available in SAVE based on user role.
- **SAVE Welcome Banner:** Shows user's name, role, agency ID, and agency name.
- **Message Center:** Displays current processing times and recent announcements.

## 4. Department Management

This section explains how to add, search, and modify Departments in SAVE. Each Agency must create an organizational hierarchy in SAVE with at least one Department and one Group before adding users. Only Super Users can add and modify departments. Supervisor Users can view department information but cannot edit it. Users will only see features in SAVE that their role allows them to access.

### 4.1 Adding a Department

1. From the navigation menu, select the Agency drop-down and click Departments.




2. On the Department Search page, click Add Department.




3. Enter the Department Name and click Add Department.




4. Review the Department information in the Department Profile page.




5. Click Home in the navigation menu to return to the SAVE home page.

## 4.2 Searching, Viewing, and Modifying Existing Departments

1. From the navigation menu, select the Agency drop-down and click Departments.




2. Locate the Department by entering the Department name in the Search by Department field or by scrolling through the list of departments.

Users can customize the view by clicking Customize Columns to select which columns to display. Columns can be sorted by clicking the column title (Department, Department Code, Access Methods, or Last Modified By).

3. Click the name of the Department to view its profile.




4. To update the Department's information, click Edit Department Information.




1. Update the Department name.
2. Click Save to save the updated profile information.
3. Click Home in the navigation menu to return to the SAVE home page.

## 5. Group Management

This section explains how to add, search, view, modify and delete Groups in SAVE. Each agency must create an organizational hierarchy in SAVE that includes at least one Department and one Group before adding users. Group management is like department management.

Super Users and Supervisor Users can add, modify, and delete groups. Super Users can manage any Group within an Agency while Supervisor Users are only able to add, modify and delete Groups for the Department they are in. Users will only see the features in SAVE that they have permission to access based on their user role.

## 5.1 Adding a Group

1. From the navigation menu, select the Agency drop-down and click Groups.




2. On the Groups page, click Add Group.




3. In the Add Group page, enter the required information. Select the department the group will be under using the Department dropdown field. Enter the name of the group in the Group field.




After entering all the information, click Add Group.

4. Review the information on the Group Profile page.




Click Home in the navigation menu to return to the SAVE homepage.

## 5. 2 Searching, Viewing, Modifying, and Deleting Existing Groups

1. From the navigation menu, select the Agency drop-down and click Groups.

On the Groups page, users can customize their view by clicking Customize Columns to select which columns to display. Sort columns by clicking one of the column titles: Group, Department, or Last Modified By. Users can locate a group by scrolling through the list.




3. To search for a Group, enter the Group name in the Search by Group field. Select the Group name when it appears while typing or press Enter to display search results.




4. Click the link associated with the Group name to view the Group Profile page.




5. From the Group Profile page, the group's information can be modified, or the Group can be deleted.

6. To modify Group information, click Edit Group Information. Enter the new group name in the Group field and click SAVE.




7. To delete a Group, click Delete Group at the bottom of the Group Profile page.




8. A pop-up window will appear asking “Are you sure you want to delete the group [Insert Group Name] from SAVE?” Click Yes, Delete Group to remove the Group or Cancel to return to the Group Profile page without deleting the Group. A pop-up window will appear asking, “Are you sure you want to delete the group [Insert Group Name] from SAVE?” Click Yes, Delete Group to remove the Group or Cancel to return to the Group Profile page without deleting the Group.

Deleting a group from a department will also delete all the users within the group.



After deleting a group, a message will appear indicating "The group [Insert Group Name] was successfully deleted."




9. Click Home in the navigation menu to return to the SAVE home page.

# 6. User Management

This section describes how to manage an agency's account, including adding, deleting, and searching for users. Super Users can add, modify, and delete all user roles across the entire agency. Supervisor Users can add, modify, and delete other Supervisor Users or General Users within their Department. The steps for adding, searching, modifying, and deleting users are the same regardless of role.

## 6.1 Adding New Users

Users can be added to SAVE once the Super User establishes the agency's organizational hierarchy by creating at least one Department and one Group.

1. From the navigation menu, select the Agency drop down and click Users.




2. Select the + Add User button.




3. Enter the required information on the Add New User Account page, including the new user's email address, the user role, Department, and Group.




Click Next.

4. The SAVE system will check if the email address is associated with an existing SAVE user. Depending on the records, you will either enter the new user's information, including name and phone number, or review the account information. On the User Account Information page, SAVE will auto-populate a new User ID. The Super User or Supervisor User can accept the User ID or enter a new one. The User ID must contain 8 alphanumeric characters.




Click Continue.

5. The new user will receive an email with an activation link. The new user account status will change to active upon the new user signing in.


SAVE
Home
Search Cases
Reports
Agency
Help
Lauren Sharman
User Administration
Manage Users
Pending Activation
An email has been sent to Carol.Jackson@hud.cms.gov with an activation link. The user account status will move to 'Active' upon sign in.

# Carol Jackson's User Account

PENDING ACTIVATION

Users are able to update their own profile information within SAVE.

| Name | User ID |
| --- | --- |
| Carol Jackson | CJAC1234 |
| **Email Address** | **Phone Number** |
| Carol.Jackson@hud.cms.gov | (234) 234-2345 |

| Department | Group |
|---|---|
| Driver Services | Field Administration |

| User Role | Last Login |
|---|---|
| GENERAL_USER | --- |

---

Delete Account

U.S. Department of Homeland Security U.S. Citizenship and Immigration Services Accessibility Statement Viewer Software




## 6.2 Searching Existing Users

Super Users and Supervisor Users can view and search for users within their Agency or Department, depending on their access level. This feature helps manage user accounts. If a user leaves the Agency or no longer needs access to SAVE, the user's account must be deleted.

1. From the navigation menu, select the Agency drop down and click Users.




2. Locate a user by:

- Entering the User ID, User Last or First Name or User Email in the search box,
- Clicking Show Filters; or
- Scrolling through the list of users.




If you click Show Filters, you can search by User Role, User Status, and/or Group filters. Only one filter option per drop-down category can be selected at a time. To return to the full list, clear the filter by selecting Any under the category.




3. Click on the User ID to open the account or click the Actions icons to view, edit (update the user role, Department, and Group), or delete the account.

# 7. User Site Administration for All Users

SAVE users manage their user profile, and link and delete user accounts on the Dashboard screen. Users must keep their user profile information up to date.

### How to Update Your User Profile

#### Step 1: Update User Profile Page

Access the SAVE Dashboard when you log in to SAVE or by selecting Dashboard from under your username on the homepage.




#### Step 2: Update Your User Information

By clicking Edit, on the User Profile page you can update any of the following fields:

- First Name
- Middle Initial
- Last Name
- Phone Number

- Phone Number Extension
- Email Address (Note: If you want to update your email to an address that is not available, you need to add it first to your Login.gov account).




**Step 3: Save Your Changes**

To save your changes, click Save. You must complete all fields marked required to continue.

## 7.1 Link Existing SAVE User Accounts

SAVE users can link their existing accounts from the Dashboard. Linking accounts is a manual, one-time process. Users can link all accounts at once or individually.

Follow these steps to link your existing accounts:

Step 1: From your SAVE Dashboard in the Select a User Account section, click Link User Account.




Enter the User ID and Password to authenticate.

# Link Existing User Account

X

Once linked, this user account will share the same user profile information as other linked accounts.

Enter your User ID and password to authenticate and link your existing user account.

**User ID** (required)

**Password** (required)

Forgot password

**Show password**

Cancel

Link Account

Click Link Account.

Step 2: Review and confirm the user account and User ID will be linked to your user profile.




Click Continue.

Your linked user accounts will display as Active in your user profile. Your name, email, and phone number will be the same for all active user accounts.




## 7.2 Delete SAVE User Accounts

From the Dashboard you can also delete an account based on your user permissions.

Click the delete icon for the desired User ID.


An official website of the United States government Here's how you know
SAVE
Carol Jackson
Dashboard
Your user accounts are linked to your user profile. Your name, email, and phone number will be the same for all user accounts
User Profile
Name
Carol Jackson
Are you sure you want to delete this user account?
X
You will no longer be able to access the user account with User ID MMUR0001.
Cancel
Yes, Delete User Account
Select a User Account
+ Add Account
Select the 'User ID' to access the user account.
Have additional user accounts? Use the 'Link User Account' button to link an existing user account to your user profile.
User ID
Status
Agency
Department
Group
Role
Actions
MMUR0001
ACTIVE
DMV - 1
Driver Services
Commercial Licenses
Supervisor
MMUR1234
ACTIVE
DMV - 1
Driver Services
Commercial Licenses
General User
MACV0033
PENDING ACTIVATION
DMV - 12
Vehicle Services
Title and Registration
Super User
Rows Per Page
10
1 - 1 of 1 item
Page
1
of 1




Select Yes, Delete User Account.

# 8. Case Creation

SAVE verifies User Agency-provided information against DHS-accessed records, including immigration and U.S. citizenship records. The SAVE Verification process includes Initial Verification, which is automated, and Additional Verification which includes electronic and manual processes.  Additional verification can only be conducted using an immigration enumerator.

SAVE cannot verify a benefit applicant's immigration status or U.S. citizenship using a driver's license number, U.S. passport number, foreign passport number unless with another immigration enumerator, Consular Report of Birth Abroad or other non-DHS documentation. Additionally, SAVE cannot verify an applicant's U.S. citizenship or immigration status using only first and last name, address or telephone number.

To increase the likelihood of an immediate response without additional verification, user agencies should enter all available identifiers SAVE allows, exactly as they appear on the applicant's document(s).

For additional information about immigration documents and immigration identifiers user agencies may encounter, see SAVE's Commonly Used Immigration Documents page.

## 8.1 How to Create a Case

SAVE is enumerator-based, allowing users to enter multiple enumerators regardless of document type. Follow these steps to create a case:

### Step 1: Initial Verification - Case Creation

The minimum requirements for requesting an applicant's status at Initial Verification are:

- First and Last Name;
- Date of Birth;
- Numeric identifier such as A-Number/USCIS number, I-94 number, Student and Exchange Visitor Information System (SEVIS) ID number, Naturalization/Citizenship Certificate number, Card number/Receipt number, Social Security number, or Unexpired Foreign Passport number with another immigration enumerator; and

- Benefit(s) the applicant is seeking.

SAVE cannot verify an applicant's status or U.S. citizenship on name and date of birth or numeric identifier alone; be sure you enter all required information.

From the navigation menu, click Cases and select Create New Case or select Create New Case on the welcome banner.




### Step 2: Enter Information & Select Benefit(s)

Enter applicant's information and as many numeric identifiers as available.




Select the desired benefit(s). Depending on your Agency’s configurations, Grant Date, EADs, and/or Sponsorship may automatically be selected and displayed by a lock icon.

**List of benefits:**



Please select all of the benefits that the applicant is requesting from your agency. You must select at least one.

- [ ] Adoption Asst
- [ ] Adult Education
- [ ] Commercial License
- [ ] Driver License
- [ ] Education Asst
- [ ] Employment
- [ ] Energy Assistance
- [ ] Food Stamps
- [ ] Health
- [ ] Housing Assistance
- [ ] Medicaid
- [ ] Military Service
- [ ] SNAP
- [ ] SSN
- [ ] State ID Card
- [ ] Survivors Insurance
- [ ] Unemployment Insuran

If you would like SAVE to further examine the document(s), select Request Document Review, upload document(s) and click Continue.




**File constraints:**

- File type: .JPG, .JPEG, .PNG, or .PDF
- File size: no larger than 5MB; and
- Only one file may be uploaded to a case.

### Step 3: Review Case Details

Review the information entered before initiating the case to ensure accuracy.



Create New Case

1 Case Creation — 2 Photo Match — 3 Additional Verification — 4 Case Result — 5 Case Closure

Review Case Details

Review case information for accuracy. If there are any errors, select "Go Back" to edit the information. Data entry errors prolong the verification process.

**Last Name / Surname / Family Name**
hart

**First Name / Given Name**
david

**Middle Name**
---

**Date of Birth**
10/15/2000

**A-Number/USCIS Number**
270637255

**Requested Benefits**
Employment
Housing Assistance

**Agency Requests**
Employment Authorization Document
Grant Date

Attached Document
None

**Agency Point of Contact Name**
User Name

**Agency Point of Contact Phone Number**
2025072783

Initiate Verification | Go Back

If everything is correct, select Initiate Verification. If you need to edit an entry, click Go Back.

The system determines the most appropriate response based on the information entered.

After Initiating Verification, SAVE may present the photo match screen if your agency is configured to use it. SAVE will display a copy of the photo it has on file. Users must indicate whether the photo displayed matches the photo on the document the applicant is presenting and select continue.

## 8.2 How to Submit Cases in Bulk

SAVE allows for bulk submission and creation of cases through a Bulk Upload tool available when logged into SAVE through a web browser connection. Follow these steps to submit and create cases in bulk:

### Step 1: Initial Verification – Case Submission and Creation

From the Bulk Uploader, user agencies can download a CSV template file. The minimum requirements for case creation through the bulk upload tool are:

- First and last name;
- Date of birth;
- Numeric identifier such as A-Number/USCIS number, Naturalization/Citizenship Certificate number, or Social Security number; and
- Benefit the applicant is seeking (each bulk upload must be for the same benefit(s)).

From the navigation menu, click Cases and select Bulk Uploader.




### Step 2: Download the CSV Template and Enter Information

Select Download Template File.

## Bulk Upload

Bulk Upload Tool | File History Dashboard

# Bulk Upload Tool

To complete your bulk upload, please download and use the provided csv template for your submission. **Do not modify the first row of the template.** It contains required headers that must remain unchanged for your submission to be processed successfully

Once you upload your file we will begin processing and analysis. We will review the contents and notify you of any issues in the next step. Any duplicate records previously submitted for case creation will be omitted.

If you need additional information on how to use SAVE Bulk Uploader, please refer to our SAVE Bulk Uploader How To Guide.

Download Template File

**Upload File** (required)

.csv file format required. Files larger than 1GB may experience upload issues.

Drag file here or choose from folder

**Benefit Type** (required)

Please select an appropriate Benefit Type from below list.

- [ ] Medicaid
- [ ] Driver License
- [ ] Food Stamps
- [ ] NASA Contractor Empl




Open the CSV template and add the required information for applicants, including as many permitted numeric identifiers by applicant as available. Remember to double-check the information entered to ensure required fields contain data. If entering the last four digits of the Social Security number, convert this column to a text format before submission to avoid losing any leading zeros. To do this, select the Social Security Number column, right-click the selected column, select “Format Cells" from the dropdown, select "Text" from the left-hand menu, and then click "OK". When finished reviewing data, remember to delete instruction rows.



Save the CSV file and upload it to SAVE.






Select the Benefit Types(s) associated with the file and read and accept the Acknowledgment.

Bulk Upload

Bulk Upload Tool | File History Dashboard

# Bulk Upload Tool

To complete your bulk upload, please download and use the provided csv template for your submission. **Do not modify the first row of the template.** It contains required headers that must remain unchanged for your submission to be processed successfully

Once you upload your file we will begin processing and analysis. We will review the contents and notify you of any issues in the next step. Any duplicate records previously submitted for case creation will be omitted.

If you need additional information on how to use SAVE Bulk Uploader, please refer to our SAVE Bulk Uploader How To Guide.

Download Template File

**Upload File** (required)

.csv file format required. Files larger than 1GB may experience upload issues.

**Selected file** Change file

CS TEST BULK UPLOAD.csv

**Benefit Type** (required)

Please select an appropriate Benefit Type from below list.

- [x] Medicaid
- [x] Driver License
- [ ] Food Stamps
- [ ] NASA Contractor Empl




### Step 3: Submit Bulk Upload Cases and View Results

Select Submit. SAVE will notify you of the acceptance of your bulk upload immediately.




Records will follow one of two courses:

- **Submitted for processing**: Any records that were submitted successfully will be sent for further processing. Processing may take 24 hours. You can monitor your file's status on the Upload History page. Do not attempt to resubmit successfully submitted SAVE cases while you wait for your file to process. Individual case results can be retrieved from the Search Cases page once created.
- **Action Required**: Any records with field level validation errors will not be submitted for processing. User Agencies can view the records that contained errors by selecting Download Error File. User agencies should correct information and create new cases, either individually or through a new CSV file upload.

There are additional options to manage cases created through the Bulk Upload Tool. Please see 10.1 Bulk Upload File Management for more information.

## 8.3 Duplicate Case Blocking

If a duplicate case is submitted, the user will receive an Unable to Create Case response with the verification number for the original case. Follow the instructions in the response and click Close.




Locate and track the original case using the Find Case or Search Cases functions.

# 9. Case Response

When a case is created, SAVE electronically compares information the agency enters against DHS-accessed federal records to provide registered user agencies with an initial response. Response options vary based on information used to create the case and data returned to SAVE in the query. The majority of SAVE cases can be resolved with the initial response, but there are times when additional verification, sometimes including a manual review, is required by SAVE or requested by the user agency.

## 9.1 Initial Response

There are additional options to view initial responses associated to cases created through the Bulk Upload Tool. Please see 10.1 Bulk Upload File Management for more information.

If the system locates the applicant's U.S. citizenship or immigration status based on the provided information, SAVE will display the citizenship or immigration status in a green box at the top of the Case Result page.




If the system was unable to provide the applicant's U.S. citizenship or immigration status at initial response, SAVE will display an initial response either requesting additional verification on the existing case or requesting the user agency to close the existing case and resubmit with additional information.

If you receive an initial response of Institute Additional Verification or Institute Additional Verification with documents, you must request Additional Verification to receive a final SAVE response.

**Additional Verification | Case Status: Agency Action Required**

1 Case Creation — 2 Photo Match — 3 **Additional Verification** — 4 Case Result — 5 Case Closure

## SAVE Response

**Institute Additional Verification**

SAVE was unable to verify the applicant's status on electronic initial verification. There may have been an issue electronically locating the records or additional verification may be required due to conflicting data or the nature of the applicant's status. This is not a final response and should not be used to determine benefit eligibility. Please Institute Additional Verification so SAVE can conduct more research and return the correct status.

## SAVE Response Details

**Case Verification Number**

0025183134389UT

## Employment Authorization History

Not Applicable

**Special Comments**

Enter any additional comments here. Maximum 400 characters.

400 characters left

**Agency Requests**

- Employment Authorization Document (EAD)
- Grant Date
- ☐ Cuban/Haitian Entrant
- ☐ Cuban/Haitian Immigration Details
- ☐ Immigration Status Details
- ☐ Immigration Status as of 8/22/1996
- ☐ Violence Against Women Act (VAWA)
- ☐ Citizenship Status

SAVE needs a copy of the applicant's immigration documentation in order to perform additional verification. Please upload a copy below.

**Upload File** (required)

Maximum upload size is 5MB. Supported file types are .jpeg, .png and .pdf.

Drag file to upload or browse to upload file.

**Initiate Additional Verification**

**Close Case** **Close Case and Create New Case**

## Agency Submitted Details

**Full Name**

System Test

**Date of Birth**

12/12/1999

**A-Number/USCIS Number**

234567890

**Initiated On**

07/02/2025

**Initiated By**

APSOTA12

**Point of Contact Name**

Test Tester

**Point of Contact Phone Number**

(123) 456-7891

**Requested Benefits**

Driver License

**Agency Requests**

Employment Authorization Document

Grant Date

**Attached Document**

None

For cases created using only a Social Security Number, SAVE compares the information against Social Security Administration records. Initial response options may differ depending on applicant records and data returned to SAVE. User agencies will be unable to request additional verification from USCIS for any cases where SAVE does not have access to an immigration enumerator, either because it was not provided at case creation or it was not returned from SSA when comparing a Social Security Number against SSA records. SAVE can only conduct additional verification if an immigration enumerator is available.

**Case Result | Case Status: Status Returned** Print

1 Case Creation — 2 Photo Match — 3 Additional Verification — 4 **Case Result** — 5 Case Closure

## SAVE Response

**Applicant Status:** No Record Found With SSA – Resubmit With Additional Information

SAVE was unable to locate a record with the Social Security Administration (SSA), and as a result, this case is now closed. If there was an error, create a new case with corrected data or include an immigration enumerator (such as an A-Number/USCIS Number, Form I-94, Arrival/Departure Record Number, SEVIS ID Number, Naturalization/Citizenship Certificate Number, or Visa Number).

A record may not be located due to discrepancies between the name, date of birth, and/or Social Security number (SSN) submitted for this benefit or license applicant and the records held by the SSA. Data entry errors may have caused this mismatch, resulting in no records found. If you believe this response is in error, please direct the benefit applicant to visit SSA's page on correcting records for more information: SSA Personal Record Correction.

## SAVE Response Details

**Case Verification Number**
0025183140812SU

**Grant Date**
Not Applicable

## Employment Authorization History

Not Applicable

## Agency Submitted Details

**Full Name**
John Name

**Date of Birth**
01/01/2000

**Social Security Number**
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

**Initiated On**
07/02/2025

**Initiated By**
APSOTA12

**Point of Contact Name**
Test Tester

**Point of Contact Phone Number**
(123) 456-7891

**Requested Benefits**
Driver License

**Agency Requests**
Employment Authorization Document
Grant Date

**Attached Document**
None




The Case Result page provides a record of data you submitted and the most current results from SAVE.

On the Case Result | Case Result Status Returned page, the user can:

1. Click Close Case if you are satisfied with the SAVE response;
2. Click Close Case and Create New Case to request Initial Verification on a new case; or
3. Click “Still Not Sure? Institute Additional Verification” to begin escalating the case.

All SAVE cases must be closed. SAVE will automatically close some cases that remain open after 240 days.

## 9.2 Additional Verification

After initial verification, SAVE may provide a response instructing a user to institute additional verification. Users must follow proper SAVE verification procedures, including performing additional verification if required by SAVE or requested by the applicant. Users may also submit a case for additional verification if they received an unexpected response or have questions about the response.

User agencies are unable to request additional verification for any cases where SAVE does not have access to an immigration enumerator, either because it was not provided at case creation or it was not returned from SSA when comparing a Social Security number against SSA records. SAVE can only conduct additional verification if an immigration enumerator is available.

User agencies may not rely on an initial SAVE response to deny an application for benefits where additional verification is required by SAVE or requested by the applicant. They must follow all required SAVE verification procedures.

There are additional options to Institute Additional Verification for cases created through the Bulk Upload Tool. Please see 10.1 Bulk Upload File Management for more information.

### Step 1: Institute Additional Verification

Select one of the following to request additional verification:

- “Still Not Sure? Institute Additional Verification” at the bottom of Case Result screen. Use this option for additional verification requests when you receive an unexpected SAVE response, you have questions about the response, or if the benefit applicant requests additional verification; or
- “Institute Additional Verification” for cases where SAVE prompts you to request additional verification to receive a final SAVE response.

### Step 2: Add Additional Information

On the Case Result | Case Status page, users have the option of adding additional information such as:

1. **Special Comments**: Use this field to request specific information and/or explain why the initial response requires further review.
2. **Upload File**: Use this section during any case escalation to upload a copy of the immigration documents provided to you by the applicant, especially most recently issued immigration documents. If you receive an Institute Additional Verification with Documents initial response, you will be required to upload a copy of the applicant's immigration document(s) to continue with case resolution. Note: A copy of a Social Security Card alone is not sufficient for additional verification; an immigration document is required.




Click Initiate Additional Verification to submit the additional information.

## Step 3: Receive Additional Verification Response

When a case is submitted for Additional Verification, users will receive a Case Under Review response until SAVE is finished processing the case. For current processing times, see SAVE Verification Response Times.




While the additional information is being reviewed, the case will show a DHS Verification in Process status on the Search Cases page.

# 10. Case Management

## Navigation Menu Options

The navigation menu allows SAVE users to access the home page, search and create cases, run reports, and access helpful resources. The navigation menu is available on every page.

### Search Cases

Supervisor Users and General Users can locate cases from the navigation menu or on the welcome banner.




Select Cases on the navigation menu:

1. Click Find Case and enter the Case Verification Number;
2. Click Search Cases and enter Case Number, Applicant Last Name, or Applicant Enumerator; or
3. Enter Case Status, Create Date, Created By – and/or Created by User in the filters.




Super Users should select Search Cases on the navigation menu or on the welcome banner and follow steps 2 or 3 above.

All users can also scroll down the Search Cases page and select from Open and Closed cases to view your desired case.




Super Users do not have access to the Find Case function.

## 10.1 Bulk Upload File Management

User Agencies can monitor the status of files submitted and cases created through the Bulk Upload Tool from the File History Dashboard. Each file upload will display with the associated information. Viewing permissions may be limited by user role.




Once the File Status shows Partially Completed or Completed, users will be able to take additional actions.

Cases Escalated Column: User agencies are notified of cases that are eligible for bulk escalation to additional verification. Only the initial response of "Institute Additional Verification" can be bulk escalated. Navigate to the "Search Cases" page to escalate all other cases individually as needed. Note: Bulk escalation is not an option for cases created for Voter Verification (Voter Registration and/or Voter List Maintenance). Cases created for Voter Verification are automatically escalated to additional verification when eligible.

From the Actions Column select the three dots in the row of the file you would like to action.

- Download Response File: This option allows the user to download a file of all the cases within the bulk upload file. When cases failed submission, the error(s) identifying reason for failure are returned. If

cases were created, the initial response is returned. For cases requiring additional verification, responses will be available once they are completed. User Agencies can view current response time for additional verification from the SAVE Verification Response Time page on the SAVE website. Note: If applicable, Response File will present with last updated date. When additional case responses are available, User Agencies will need to select ‘Check Latest Response File’ which will populate the additional responses. User Agencies will see the prompt ‘Fetching Latest Response File’ which may take several minutes. During this time other actions can be performed. Once file is ready, users will be able to download.

- Escalate Eligible Cases: This option allows the user to bulk escalate any eligible cases within the bulk upload file to additional verification. If selected, any cases reflected as “Eligible” in the Bulk Escalation column will update to “Escalated."
- Download Original File: This option allows the user to download the original file used to create the Bulk Upload.

# 11. Additional Features in SAVE – Overview

The level of detail provided in a SAVE response may vary depending on whether the agency has access to additional features in SAVE. SAVE contains certain features available to user agencies based on their technical or legal needs. These features streamline the verification process for agencies who need additional information in the SAVE response to issue the benefit or license as identified in their agency’s MOA with SAVE.

Users will only be able to see features that their agency has access to. Certain features may be automatically selected when creating a case, while other features may require the user to select the feature.

The following section provides an overview of the common SAVE features that may be assigned to a user agency depending upon the agency’s technical and legal needs.

- Photo Tool (technical configuration)
- Employment Authorization Document History (legal configuration)
- Grant Date (legal configuration)
- Affidavit of Support (legal configuration)
- Cuban-Haitian Entrant (legal configuration)
- VAWA (legal configurations)

Agencies may have access to additional features depending upon their technical needs or legal authorities. For more information about features not described in this Guide, contact your agency.

In addition to the applicant's immigration status, your agency has asked that we provide you with the following information (if available) in order to determine the applicant's eligibility.

- Employment Authorization Document (EAD)
- Grant Date

Please select any of the following additional pieces of information if you need them to determine the applicant's eligibility (or press continue if you don't need anything else).

- [ ] Cuban/Haitian Immigration Details
- [ ] Immigration Status Details
- [ ] Immigration Status as of 8/22/1996
- [ ] Violence Against Women Act (VAWA)
- [ ] Request Document Review
- [ ] Citizenship Status

Continue

## 11.1 Photo Tool

Photo Tool is an initial verification feature in SAVE available to all agencies. The Photo Tool helps users confirm the identity of the benefit applicant by displaying a photo of the benefit applicant available in DHS records to compare against the documentation submitted to the agency. This supports the agency in determining the validity of the documentation, the overall verification process, and in some instances, the ability to rapidly detect fraud.

## Step 1: How to Use the Photo Tool

After following the steps to complete initial verification, a photo from DHS records will display under the Photo Match screen, if available. If SAVE does not return a photo and the Agency has access to the Photo Tool, this means that there is no photo currently available in the system. If an Agency does not have access to the Photo Tool feature, a photo will not be returned, even if there is a photo associated with the applicant's information.

The user will be asked to select one of the following:

- Yes, this photo matches – Select when the photo displayed matches the photo on the document.
- No, this photo does not match – Select when the photo displayed does not match the document.
- No photo available – Select when the agency does not have a photo to compare against the photo displayed in the Photo Match screen.




## Step 2: SAVE Response - Photo Tool

SAVE will not provide a response until the user selects an option on the Photo Match screen. The response will depend on the user's selection:

- Yes, this photo matches – SAVE will return the Initial Verification Response. Users can close the case or submit the case for additional verification as needed.
- No, this photo does not match – SAVE will instruct the user to submit the case for additional verification. Users must upload a copy of the document and submit the case for additional verification so SAVE staff can review the case before providing a response.
- No photo available - SAVE will return the Initial Verification Response. Users can close the case or submit the case for additional verification as needed.

Once a photo confirmation selection is made, the system will return the Initial Verification Response below the photo confirmation section.

## 11.2 Form I-766 Employment Authorization Document (EAD) History

The EAD History feature is available to agencies required by law to verify the applicant's employment authorization history for determining benefit eligibility. For example, agencies issuing unemployment benefits may need an applicant's EAD history to determine work authorization during the requested period.

Agencies with access to this feature can receive up to 24 months of an applicant's EAD history during initial verification.

Note: Some individuals have an immigration status/category that is employment authorized incident to their immigration status without an EAD as proof of employment authorization. If the individual never applied for and received a Form I-766, EAD, there is no EAD history to provide.

### Step 1: How to Request EAD History

If an agency has access to the EAD history feature, it will automatically be applied after selecting a benefit type when creating a SAVE case. The lock icon indicates that the EAD History button is automatically applied. If the agency does not have access, users will not see this option.




If additional verification is requested, EAD History will automatically be included.

### Step 2: SAVE Response – EAD History Information

For agencies that receive EAD history information, the SAVE response will include an Employment Authorization Document History section. Depending on whether EAD information is located, the response

will include:

- This section will include two years of EAD history. If the EAD validity period was automatically extended by USCIS, SAVE will provide the auto-extended expiration date, if available. The EAD History section will display:
- The EAD category the employment authorization is based on under the Provision of Law Code;
- The start date the EAD is valid from; and
- The end date of the EAD.




- Employment Authorization Document History Data Not Located: This section will indicate Not Applicable.




The EAD History information provided in a SAVE response at additional verification is generally like the information provided in an initial verification response.

## 11.3 Grant Date

The Grant Date feature is available to agencies required by law to verify the applicant's Grant Date as part of determining eligibility for benefits. For example, agencies determining whether an individual is a "qualified alien" for various federal public benefits may require grant date information.

### Step 1: How to Request Grant Date Information

If an agency has access to the Grant Date feature, it will automatically be applied after selecting a benefit type when creating a SAVE case. The lock icon indicates the Grant Date button is automatically selected. If the agency does not have access to the Grant Date feature, users will not see this option.

If additional verification is requested, Grant Date will automatically be requested.

In addition to the applicant's immigration status, your agency has asked that we provide you with the following information (if available) in order to determine the applicant's eligibility.

Employment Authorization Document (EAD)

Grant Date

Please select any of the following additional pieces of information if you need them to determine the applicant's eligibility (or press continue if you don't need anything else).

### Step 2: SAVE Response – Grant Date

For agencies that receive Grant Date information, the system will return the grant date information under the Grant Date field for the immigration statuses/categories listed below, when available, including.

- Naturalized U.S. Citizens;
- Lawful Permanent Residents;
- Asylees;
- Refugees;
- Conditional Residents;
- Family Unity applicants;
- American Indians Born in Canada;
- Cuban-Haitian Entrants;
- Parolees;
- T non-immigrants (at additional only); and
- U non-immigrants (at additional only).

**Grant Date**

09/01/2021

If SAVE cannot locate a Grant Date, the response will display "Not Applicable".




The Grant Date information provided in a SAVE response during additional verification is like the information provided in an initial verification response.

## 11.4 Sponsors/Household Members (Affidavit of Support)

The Sponsor feature, which provides information from the USCIS Form I-864, Affidavit of Support, is available to agencies that are required by law to verify the applicant's sponsorship information as part of determining eligibility for the benefit or for reimbursement. For example, agencies that provide federal public needs-based benefits may require access to the sponsor's information from the Affidavit of Support as part of making that determination or to seek reimbursement.

### Step 1: How to Request Sponsor Information

If an agency has access to the Sponsor feature, it will automatically be applied after selecting a benefit type when creating a SAVE case. The lock icon indicates that the Sponsors/Household Members button is automatically selected. If the agency does not have access to the Affidavit of Support feature, users will not see this option.




### Step 2: SAVE Response – Sponsor Information

For agencies configured by SAVE to receive sponsor information, the SAVE response will include a Sponsors/Household Members section. This information is provided for certain lawful permanent residents (LPRs) when available at initial verification.

The information provided under this section will include data on the sponsor(s). Information on multiple sponsors is provided in the event of joint sponsorship, with a maximum of five sponsors. The sponsor information includes sponsor first and last name, sponsor middle initial (optional), sponsor's social security number, and sponsor's address.

If the sponsor information cannot be provided, the SAVE response will indicate one of the following:

- No Data Found;
- Not Applicable; or
- The sponsors section will be blank.

In some situations, the initial SAVE response may instruct the agency to submit the case for additional verification to receive the sponsor's information using the response "Please Institute Additional Verification if you need sponsor information."




During additional verification, sponsor information will be provided when requested for lawful permanent residents (LPRs), conditional residents (CRs), and United States Citizens (USCs).

## 11.5 Cuban-Haitian Entrant

The Cuban-Haitian Entrant feature is available to agencies required by law to verify whether the applicant is a Cuban-Haitian Entrant as part of determining benefit eligibility. Cuban-Haitian Entrant is not an immigration status, but a term related to federal public benefit eligibility, such as Medicaid or refugee assistance.

### Step 1: How to Request Cuban-Haitian Entrant Information

If an agency is configured by SAVE to access the Cuban-Haitian Entrant feature, users can request and receive the information by selecting the Cuban-Haitian Entrant button after selecting the benefit type. If an agency does not have access to the Cuban-Haitian Entrant feature, users will not see this option.




When the Cuban-Haitian Immigration Entrant button is selected, users are required to upload a scanned copy of the applicant's immigration document prior to submitting the case. Once the file is uploaded, the user can submit the case by clicking Continue. For instructions on how to upload a document, please refer to the Additional Verification section.

### Step 2: SAVE Response – Cuban-Haitian Entrant Information

For agencies with access to the Cuban-Haitian Entrant feature, the SAVE response will include whether the individual is a Cuban-Haitian Entrant.

## 11.6 Violence Against Women Act (VAWA)

The VAWA (Violence Against Women Act) feature is available to agencies that are required by law to verify the applicant's VAWA data as part of determining eligibility as a "qualified alien" for various federal public benefits. Individuals who were battered or subjected to extreme cruelty and apply for VAWA related immigration relief may become eligible for a broad range of federal and state public benefits if they can establish that they are a "qualified alien."

### Step 1: How to Request VAWA Information

Agencies configured by SAVE for access to the VAWA feature can request and receive VAWA information. After selecting a corresponding benefit type when creating a case, users will be able to select the box for Violence Against Women Act (VAWA).




When the VAWA button is selected, users must upload a scanned copy of the applicant's immigration document before submitting the case. Once the file is uploaded, the user can submit the case by clicking Continue. For instructions on how to upload a document, refer to the Additional Verification section.

### Step 2: SAVE Response - VAWA

For agencies with access to the VAWA feature, the SAVE response will include a VAWA Applicable section providing the information. Possible SAVE responses include:

- Approved VAWA Self-Petition
- Pending Prima Facie VAWA Self-Petition




### Documentation and Photo Retention Policy

User agencies may only use immigration documents provided by an applicant and photos provided through Photo Tool for the purpose of determining the applicant's eligibility. Use of these photos is limited to the application process for which they have been submitted by a benefit applicant. User agencies must safeguard such documents and photos, protect their confidentiality, and ensure that they are not disclosed to any unauthorized person or used for any unauthorized purpose. Furthermore, participating user agencies must comply with the Privacy Act, 5 U.S.C. § 552a laws, rules, regulations, policies and requirements regarding verification, information sharing and confidentiality in safeguarding, using, maintaining and disclosing such documents and photos.

Such documents and photos may only be retained by the user agency for as long as necessary to adjudicate the benefit being sought, unless retention is otherwise required by applicable records retention requirements.

## 12. Reports

From the navigation menu select Reports and click Run Report on your desired report.

Either Adobe Acrobat Reader or Microsoft Excel is required to view reports, depending on the report selected.




## 12.1 Month End Agency Transactions by Benefit Report

This report displays the total number of billable-type transactions initiated by an Agency by benefit name for a specified month and year. Billable transactions are Initial Verification requests initiated by a user.




## 12.2 Month End Transactions by User Summary Report

This report displays the total number of transactions initiated by a user within an Agency/program/state for a specified month and fiscal year. The Additional Verification query counts in this report may differ from the SAVE Billing Transaction report which counts cases completed.



Home Search Cases Reports Agency Help User Name

Reports

# Month End Agency Transactions By User Summary Report

This report displays the total number of transactions initiated by a user within an agency/program/state for a specified month and fiscal year. The additional verification query counts in this report may differ from the SAVE Billing Transaction report which counts cases completed. In this report, third step verifications include Manual G-845s with a valid initial verification number. However, manual G-845 transactions without case verification number are not included in this report since they are not associated with an electronic VIS user.

Fiscal Year (required)

Month (required)

State

Department

Group

User

Back Generate Report

## 12.3 SAVE Billing Transaction Report

This report displays the total number of billable transactions completed for a specified month and fiscal year beginning January 2016. Billable transactions are initial verifications, which are recognized for billing purposes as cases are resolved. Only cases with a system response are charged a fee.

This report may not match the Month End Agency Transactions by User Summary Report because billing is based on completed verifications, not initiated verifications.




## 13. Save Helpful Resources

From the navigation menu, click Help to access SAVE resources, glossary, customer support and the site map.

### Resources Overview

Click Resources from the Help dropdown menu to access materials such as:

- SAVE Tutorial
- SAVE Program Guide
- Fact Sheets




Click Contact Us from the Help dropdown menu to access SAVE customer service information:

### SAVE Customer Service

SAVE users may check on the status of a pending SAVE Verification Case. Please provide the SAVE Case Verification Number, so Customer Service can better serve you.

- **Phone**: 1-877-469-2563
- **International Phone Number**: 1-571-293-7538
- **TTY**: 1-877-875-6028
- **Hours of operation**: 8:00 am to 8:00 pm (EST) Monday – Friday (except federal holidays)

Also, SAVE CaseCheck lets benefit applicants check the status of their SAVE verification case as part of an application for a public benefit or license. To learn more visit, SAVE CaseCheck.

### Technical Assistance

You are encouraged to email save.help@uscis.dhs.gov with your questions and suggestions.

Department of Homeland Security (DHS)
U.S. Citizenship and Immigration Services (USCIS)
Immigration Records and Identity Services (IRIS)
Verification Division (VER)



# Tutorial

## Introduction to SAVE and the Verification Process for SAVE Users

**July 17, 2025**

**SAVE (Systematic Alien Verification for Entitlements) supports user agencies by helping protect the integrity of public benefits and licenses.**



DHS-AR-001484

JA 568

# Disclaimer

*This presentation is intended for federal, state, territorial, tribal, and local benefit-granting agencies. This presentation provides basic guidance about the rules and responsibilities during the U.S. citizenship and immigration status verification process. SAVE users must review the Tutorial and certify completion of their review before creating cases in SAVE.*

*This presentation is not intended for paid distribution. USCIS reserves all rights in its trademarks and grants no license by providing this presentation.*

*Visit uscis.gov/SAVE for more information, including additional guidance and updates.*

# Agenda

- SAVE Overview and Verification Requirements
- Case Creation
- SAVE Responses
- Agency/User Management
- Resources and Customer Support

# What is SAVE?

- Systematic Alien Verification for Entitlements (SAVE) is a secure, online service administered by U.S. Citizenship and Immigration Services (USCIS) that enables federal, state, local, territorial, and tribal agencies to verify the U.S. citizenship and immigration status/category of benefit and license applicants.
- SAVE supports registered agencies to help protect the integrity of their benefit and license programs by providing information to ensure that only eligible individuals receive them.
- SAVE **does not** determine an applicant's eligibility for benefits/licenses.

# SAVE Charges

- SAVE has transaction charges for federal agencies only. More information is available at uscis.gov/save/about-save/transaction-charges. *Effective April 1, 2025, SAVE has eliminated transaction charges for ALL state, local, tribal and territorial government agencies.*

- Federal agencies pay a single charge per verification case.

- No charges apply for agencies without activity during each billing month.




- Minimum monthly service charge of $25 for each month in which a federal user agency submits at least one initial verification request.

- When the total cost of verifications exceed $25, agencies will be charged according to the total volume of transactions beyond $25.

# Requirements For Verification

**To create a SAVE case, the user agency must provide:**

- Applicant's biographic information:First name, last name, and date of birth
- Benefit requested by applicant

**AND**

- Unique Numeric Identifier (at least one):
  - USCIS/Alien Registration Number (A-number) (9 digits)
  - Form I-94: Arrival/Departure Record Number (11 digits)
  - Student and Exchange Visitor Information System (SEVIS) ID number (Starts with 'N' followed by up to 11 digits)
  - Naturalization / Citizenship Certificate Number
  - Card Number/ I-797 Receipt Number
  - Visa Number
  - Foreign Passport Number (with another immigration enumerator)
  - Social Security number (SSN) (For initial verification only)

**NOTE:** While SAVE includes a field to submit an unexpired foreign passport number, this field can only be used with an immigration identifier above.

# Unique Numeric Identifiers / Enumerators

**These are the unique numeric identifiers / enumerators currently permitted by SAVE for case creation:**

- **Alien Number / USCIS Number:** Also referred to as "A-number." A unique number assigned to an alien by the Department of Homeland Security. The USCIS Number is the same as the A-Number without the "A" prefix. The A-number must be 9 digits (numerals only) when data entered.
- **I-94 Number:** An 11-character identifier found on Form I-94 or Form I-94A Arrival-Departure Record.
- **Card Number / Form I-797 Receipt Number:** A unique 13-character identifier that USCIS provides for each application or petition it receives. The agency uses it to identify and track its cases.
  - The receipt number consists of three letters followed by 10 numbers.
  - Found on the top left of the Notices of Action (I-797), on the back of the Permanent Resident Card (Form I-551), or on the back and front of the Employment Authorization Document (Form I-766).
- **Student and Exchange Visitor Information System (SEVIS) ID number:** Unique identifier consisting of a letter (N) followed by up to 11 digits. Located on the top right-hand corner of the DS-2019, Certificate of Eligibility for Exchange Visitors Status (J-Nonimmigrant) and the top left corner of the Form I-20, Certificate of Eligibility for Non-Immigrant Student Status.

# Unique Numeric Identifiers / Enumerators Continued

- **Naturalization or Citizenship Certificate Number:** Typically located in the upper right-hand corner of the certificate, are alphanumeric and a minimum of six characters provided on each certificate of naturalization or citizenship issued by USCIS.

- **Visa Number:** Also known as the visa foil number, the eight character visa number is the red number printed on the bottom right of a visa issued by the U.S. Department of State.

- **Foreign Passport Number:** A foreign passport does not serve as evidence of an immigration status in the United States. However, when provided with an immigration enumerator, its information can be used to locate an applicant's records in systems accessed by SAVE. You must also provide the country of issuance.

- **Social Security number (SSN):** A unique 9-digit number issued by the Social Security Administration.
  - When SAVE is unable to verify using SSN alone, users will receive a response indicating to create a new case with corrected data or an immigration enumerator.

- **Important Notes:**
  - User agencies should create SAVE cases with all available enumerators, exactly as they appear on the applicant's document(s). This increases the likelihood of an applicant status response at initial verification and reduces the need for additional verification.
  - SAVE cases cannot be created using a driver's license number, U.S. passport number, Consular Report of Birth Abroad (CRBA), or other non-DHS documentation. SAVE also cannot verify U.S. citizenship using only name and date of birth.

# Case Creation

July 17, 2025

# Options for Case Creation

There are two ways to create a case in SAVE:

- **Individually:** Select "Create New Case" to create one case in SAVE.

**OR**

- **Bulk:** Select "Bulk Uploader" to create multiple cases in SAVE through an import process.



# Individual Case Creation

## How to create a case individually:

- Enter the applicant's information from the documents presented to you. Required information is marked with a red asterisk:
  - First Name
  - Last Name
  - Date of Birth
- Enter at least one unique numeric identifier. (Select the "?" icon for information about the identifier.)
- Providing more than one numeric identifier increases the likelihood that SAVE will provide an immigration status response at initial verification.



# Individual Case Creation - Select Benefit(s)

- Select all the benefits the applicant is requesting from your agency.
- Additional information identified with a “lock” icon may be auto-requested if needed to determine eligibility for a selected benefit.
- Select any additional pieces of information needed to determine eligibility for the benefit.
  - Selection may require additional information and document upload, bypassing initial verification.
- Click Continue







DHS-AR-001495

JA 579

# Individual Case Creation - Review Case Details

- Before Initiating Verification, double check the data to ensure everything was entered properly.
- Everything matches – click "Initiate Verification"
- Changes Needed – click "Go Back"






DHS-AR-001496

JA 580

# Individual Case Creation - Photo Match

- Depending upon the information USCIS has about the applicant, a photo might be displayed.

- Compare the photo displayed in SAVE to the photo in the document provided by the applicant. Make a confirmation using the following options:

| If you selected… | SAVE will respond with… |
| --- | --- |
| **Yes, this photo matches** | Initial Verification Response |
| **No, this photo does not match** | Institute Additional Verification |
| **No photo displayed** | Initial Verification Response |



# Bulk Case Submission

**Users can also submit cases in bulk:**

- Download the CSV Template File.
- Required Fields are marked with an asterisk (*):
  - First Name
  - Last Name
  - Date of Birth
- Fields Marked with two asterisks (**) indicate a minimum of one must be filled:
  - A-Number/USCIS Number
  - Naturalization or Citizenship Certificate Number
  - Social Security Number

  ***Note:*** To create a case using another identifier permitted by SAVE, create the case individually.
- Delete instructions row and save template as a CSV (Comma delimited) (*.csv) file.






DHS-AR-001498

JA 582

# Bulk Case Creation - Submitting Bulk Upload

- Upload the saved CSV file.
  - Files larger then 1GB may experience upload issues.
- Select the Benefit Type(s) associated with the file.
  - Only include cases for the same benefit type. Benefit type(s) will apply to all cases in the file.
  - Information automatically requested based on benefit type will be requested.
  - Additional information requests requiring manual selection, cannot be requested in bulk upload. Create the case individually.
- Click on the Acknowledgement link and read the Notice - Bulk Upload Verification Services.
- Select that you have read and accept the Acknowledgement
- Select Submit.






DHS-AR-001499

JA 583

# Bulk Case Creation - Submission and Processing

- Cases successfully submitted will be created into individual cases.
  - Processing may take 24 hours.
- Cases that failed submission will be identified by the error preventing case creation.
  - Select Download Error File to view the records that contained errors
  - Correct information and create as new cases, either individually or through a new CSV file upload
  - Do not resubmit cases that were successfully submitted to avoid system lags
- Individual Case Results can be viewed from the Search Cases page once created.



# Duplicate Case Response – Unable to Create Case

- When a user tries to submit a duplicate case at initial verification, either individually or in bulk, SAVE will provide an "Unable to Create Case" response.

- A case is a duplicate only if the original case is still open and the following data elements are identical to those in the original case:
  - Applicant's name, date of birth, and numeric enumerator;
  - Benefit(s) the case is submitted for; and
  - Any additional information requests (for example, grant date).

# Duplicate Case Response – Unable to Create Case

- Instead of creating a duplicate case, the “Unable to Create Case” response will provide the verification number for the original case.
- The user can locate and track the original case by using the Case Search function.



# Search Cases

After a case is created in SAVE, using a browser or a web service account, you can log into the SAVE browser system to locate your case and continue required actions.

- Click “Find Case” to locate the case using the SAVE case verification number.
- Click “Search Cases” to locate the case using the applicant enumerator or last name.
  - Filters Available:
    - Case Status
    - Creation Date
    - Created By
- Depending upon user roles, users can view open and closed case.



# SAVE Reports

- SAVE provides reporting options to help user agencies manage cases.
  - Options may differ based on account type and user role.

- Each report type contains a brief overview of the data that will return.
  - Microsoft Excel or Adobe Acrobat Reader required to view output.







DHS-AR-001504

JA 588

# Bulk Upload File Management – File History Dashboard

- The File History Dashboard allows user agencies to monitor the status of files submitted through the Bulk Upload Tool
  - Viewing permissions may be limited by user role.
- From the Actions Column select the three dots in the row of the file you would like to action.
  - **Download Response File**: This option allows the user to download a file of all the cases within the bulk upload file. If cases were created, the initial response is returned. When cases failed submission, the error(s) identifying reason for failure are returned.
  - **Escalate Eligible Cases**: This option allows the user to bulk escalate any eligible cases within the bulk upload file to additional verification. If selected, any cases reflected as "Eligible" in the Bulk Escalation column will update to "Escalated".
    - NOTE: Only the initial response of "Institute Additional Verification" can be bulk escalated. Navigate to the "Search Cases" page to escalate all other cases individually as needed.
  - **Download Original File**: This option allows the user to download the original file used to create the Bulk Upload.




SAVE



DHS-AR-001505

JA 589

# SAVE Responses

# Initial Case Response – Immigration Enumerator

- Once a case is created, SAVE electronically compares the information submitted against federal records available to SAVE to return an initial response.
- Response options vary based on the information used to create the SAVE case and data returned in the query.
- Applicant Status Responses, for cases with an immigration enumerator, may include additional information as applicable.
  - Example: Most Recent Class of Admission or Grant Date
- Responses requiring additional action from the user include:
  - Institute Additional Verification
  - Institute Third Level Verification
  - Unable to Process
  - Resubmit with Documents






# Initial Case Response – SSN Only

- Cases created with a Social Security number (SSN) are compared against Social Security Administration (SSA) records.

- Some initial response options for cases verified using an SSN include:
  - **United States Citizen (Per SSA Record)**
  - **Deceased (per SSA Record)**
  - **No Record Found with SSA – Resubmit with Additional Information**
    - A record could not be located with SSA using the information provided. Check for data entry errors and create a new case with corrected information or provide additional information.
  - **Immigration Enumerator Required – Resubmit with Additional Information**
    - SAVE located a record with SSA but requires an immigration enumerator to complete verification and provide a SAVE response.



SAVE Response

**Applicant Status:** No Record Found With SSA – Resubmit With Additional Information

SAVE was unable to locate a record with the Social Security Administration (SSA), and as a result, this case is now closed. If there was an error, create a new case with corrected data or include an immigration enumerator (such as an A-Number/USCIS Number, Form I-94, Arrival/Departure Record Number, SEVIS ID Number, Naturalization/Citizenship Certificate Number, or Visa Number).

A record may not be located due to discrepancies between the name, date of birth, and/or Social Security number (SSN) submitted for this benefit or license applicant and the records held by the SSA. Data entry errors may have caused this mismatch, resulting in no records found. If you believe this response is in error, please direct the benefit applicant to visit SSA's page on correcting records for more information: SSA Personal Record Correction.

**Important notes for cases with only an SSN:**

- Additional verification can only be conducted with an immigration enumerator. Cases that receive any of the SSN specific responses will not be eligible for additional verification and should be checked and created with corrected or additional information.
- If there is an error with an applicant's SSA records, user agencies should direct applicants to contact SSA to update their records. Visit ssa.gov/personal-record for more information.

# SAVE Responses That Require Additional Verification

Reasons for requesting additional verification:

- Receiving an initial response requesting additional verification.
  - Not a final SAVE response. Some cases cannot receive an automated initial verification response and require further research to complete verification.
- Receiving a SAVE response that you do not believe is accurate or is missing information.




- Receiving a SAVE response the benefit applicant does not agree with and requests additional verification.
  - Additional verification is required when requested by the applicant for a SAVE response to be final.
  - If there is an error in the applicant's records, they must contact the agency that maintains the record for any corrections. SAVE cannot correct records. For more information see the SAVE Records Fast Facts for Benefit Applicants on the SAVE website.
- Other requirement per your agency's Memorandum of Agreement (MOA).



# Initiating Additional Verification

Use the “Special Comments” field to request specific information and/or explain why an initial response requires further review.

Upload Documents:

- Save a copy of all immigration documents presented to you by the applicant (front and back) to your computer;
- Combine documents into one file;
- Check that the documents are legible; and
- Upload the file.



# Case Under Review / Case Results

- Additional verification is a research-intensive search of immigration databases conducted by a Status Verifier.
- User will see “Case Under Review” until SAVE returns a status for that case.
- Email alerts are sent after SAVE completes verification and a response is available.
- Response times vary depending on the complexity of the case.
  - Visit the SAVE Verification Response Time page for more information about current processing times.






# Agency / User Management

# SAVE Dashboard

Users enter SAVE on the Dashboard which has the following options:

- User Profile
  - Contains Name, Email Address, and Phone Number tied to user account(s).
  - Profile information is connected to all associate user accounts.
  - To update user information within profile select Edit.
- Linked User Account(s)
  - Select Link User Account to find and link additional user accounts that you have not yet migrated to access with Login.gov.
  - Select the User ID to access a user account.
  - To return to the Dashboard select your name in the upper right-hand corner, then Dashboard.



# SAVE Hierarchy

SAVE has organizational levels and user roles to manage users, review case submissions, and generate reports. Functions available depend on the user's role.

- There are three main roles within an agency's profile:
  - **Super User**: Located at the Agency level and is responsible for managing the agency's hierarchy, user roles, and accounts.
  - **Supervisor User**: Located at the Department level and is responsible for managing departments and groups within the agency.
  - **General User** (There are four types of General Users): Manages groups within departments.




- There is one unique role for Department of Education:
  - **Third Step Only Users** (Designated for Federal Student Aid): Cannot create or initiate cases.

# User Roles

- **SAVE Super User** – Administrator for the agency
  - Add Departments
  - Add / Delete Groups and all user levels
  - Cannot Initiate / work cases

- **SAVE Supervisor** – Administrator for Departments and Groups
  - Initiate Cases
  - Add / Delete Groups, Supervisors, and general users under the same group as them

- **General User - View ISV responses** for all users in **Department**
  - Initiate Cases
  - View, complete, and close verification cases created by General Users assigned to Groups within the Department

- **General User - View ISV responses** for all users in **Group**
  - Initiate Cases
  - View, complete, and close verification cases created by General Users assigned within assigned Groups

All user roles can edit their own profile information which includes Name, Phone Number, and Email Address.

# Super User & Supervisor: Manage Agency / Users

- SAVE Super Users and Supervisors can manage Users, Groups, or Departments.
- **Add** a user by selecting the blue “Add User” button
- Search and filter options allow you to view users.
  - **View** user information by selecting the “eye” icon
  - **Delete** users by selecting the “trashcan” icon
  - **Edit** user information by selecting the “pencil” icon
    - **Note**: You may only edit user’s role or status in SAVE.  A user’s name, phone number, and email address are only editable from the User Profile by the user themselves.






DHS-AR-001516

JA 600

# Super User & Supervisor: Add New User

- Enter the new user's email address, user role, department, and group.
  - If a user already exists with the same data points you entered, you will be blocked from creating a duplicate.
- Depending on existing records associated to the user's email address either:
  - Enter remaining new user information; or
  - Review the account information presented.
- Accept the User ID or enter a new one.
- Once created, the new user will receive an email with an activation link.






DHS-AR-001517

JA 601

# Resources and Customer Support

# SAVE Browser: Message Center / SAVE Website: News & Alerts

- SAVE shares the latest immigration and system updates with users both in the system and on the public website:
  - Message Center: Accessible when logged into SAVE from the homepage.
  - News & Alerts: Accessible from the SAVE public website, under Current Users.



# SAVE Browser: Help, Resources

- Helpful resources for user agencies can be found when logged into the SAVE system under Help, Resources. They include:
  - Guidance and Manuals
  - Fact Sheets
  - SAVE Tutorial
  - Frequently Asked Questions
  - Benefit Applicant Materials






DHS-AR-001520

JA 604

# SAVE Website: Public Resources

- SAVE shares multiple resources for current and prospective user agencies on the SAVE Public Website.
- **Current User Agencies** can access guidance materials, fact sheets and more, including:
  - Commonly Used Immigration Documents: Provides examples of documents and where to locate information needed to create a SAVE case.
  - SAVE Webinars: Users can sign up for free webinar options held monthly.
- **Prospective User Agencies** can access information on registering and view a webinar option focused on learning about SAVE.



# SAVE Website: Benefit and License Applicants

- Benefit Applicants can also access resources from the SAVE public website, including:
  - An on-demand (recorded) webinar.
  - Fact sheets and guidance materials.
  - SAVE CaseCheck: Allows applicants to follow the progress of their SAVE case online and confirms when a SAVE case is pending or returned to the agency.






DHS-AR-001522

JA 606

# SAVE Customer Support




SAVE User Agencies can contact SAVE Agency Customer Support by phone or email:

- **Hours of Operation:**
  - Monday-Friday (excluding federal holidays)
  - 8 a.m. – 8 p.m. (Eastern)
- **By Phone:** (877) 469-2563
  - International Phone Number: (571) 293-7538
  - TTY: (877) 875-6028
- **By E-Mail:** **SAVE.help@uscis.dhs.gov**

***This contact information is for agency use only.***

- Applicants with questions for USCIS should visit the USCIS Contact Us page for more information.

More information is also available on the SAVE Website at **uscis.gov/SAVE.**

U.S. Citizenship and Immigration Services

MENU

Home > SAVE > Current User Agencies > Guidance > Voter Registration and Voter List Maintenance Fact Sheet

# Voter Registration and Voter List Maintenance Fact Sheet

## Background

SAVE is an online service administered by U.S. Citizenship and Immigration Services (USCIS) within the Department of Homeland Security (DHS), that allows registered federal, state, and local government agencies to verify immigration status and U.S. citizenship of individuals seeking benefits, licenses, and for other authorized purposes.

Federal law allows only U.S. citizens to vote in federal elections, and SAVE is an effective tool that registered agencies, such as State divisions of elections, can use to verify U.S. citizenship for voter registration, voter list maintenance, or oversight of these processes (collectively, "voter verification"). When provided with required data elements, SAVE can usually verify U.S.-born citizens, naturalized U.S. citizens [1], and in certain cases, acquired U.S. citizens [2]. SAVE can also verify immigration status if the individual is not a U.S. citizen, and whether the individual is deceased, if that information is retrievable.

SAVE provides verification information but does not determine an individual's eligibility to register to vote, stay on a voting roll, or vote in an election. SAVE has offered voter verification services since 2005; election agencies from over 27 states are currently registered. Registered user agencies can be found using the SAVE Agency Search Tool.

To register to use SAVE, user agency officials must sign a SAVE Memorandum of Agreement (MOA) which includes the legal authorities, processes, and requirements related to voter verification. A sample voter verification MOA is posted on SAVE's agency registration webpage.

## What You Should Know

- **SAVE is not a source database of U.S. citizens and immigrants.** SAVE is an information service whereby user agencies submit information (such as name, date of birth, and an enumerator) and SAVE uses that information to query against source government systems, including those maintained by DHS, Department of State (DoS), and the Social Security Administration (SSA) to ve[...] retrievable, a point-in-time response that includes the individual's U.S. citizen[...]us.

Need Help? Chat with Emma™

- **SAVE is not the only way to determine U.S. citizenship.** SAVE only verifies and provides information about an individual's U.S. citizenship or immigration status based on available information held in various U.S. government systems and is one of many methods that voter verification agencies may use to verify U.S. citizenship.
- **SAVE optimized its service in 2025 to better serve voter verification agencies.** This optimization allowed agencies accessing SAVE through a web browser to create cases using a Social Security number (SSN) and to submit cases in bulk. SAVE also eliminated transaction charges for state and local agencies.
- **When a user agency creates a case using an SSN, SAVE first queries SSA databases.** Based on SSA data, SAVE can verify the U.S. citizenship of most U.S.-born individuals as well as check the SSA Death Master File. If SSA data confirm that the individual has an Alien number (A-number or USCIS number), that number is then used to query data available to DHS to confirm the U.S. citizenship or immigration status of the individual. When an SSN matches SSA records, and SSA and DHS records do not indicate U.S. citizenship, the SSN may also be used to check DoS records for evidence of U.S. citizenship. This would verify U.S. citizenship, for example, for an individual who acquired citizenship through a parent and was issued a U.S. passport but never updated his or her SSA records or applied for a Certificate of Citizenship with USCIS. If no match is found with SSA data, the voter verification agency is prompted to confirm their data and create a new case with corrected or additional information.
- **When an enumerator held in DHS data is available, whether entered by the agency or retrieved from an associated record within SSA or DHS, SAVE may use this data to provide a status response.** If a DHS enumerator (such as an A-Number or Naturalization/Citizenship Certificate Number) is provided or associated with an SSN within DHS systems, SAVE will retrieve applicable records to provide a SAVE response. If a U.S. passport number, U.S. passport card number, or other relevant identifier is located, SAVE searches DoS records. SAVE may provide a U.S. citizen response, an immigration status response (for example, Lawful Permanent Resident), or request additional information.
- **SAVE can only verify data it can access.** SAVE can verify U.S. citizenship for U.S. born citizens and citizens who have naturalized or have acquired U.S. citizenship provided there is a government record available to SAVE through DHS, DoS, or SSA systems. Accordingly, SAVE may not be able to confirm U.S. citizenship for an individual who: (1) is not designated as a U.S. citizen in SSA records, (2) has not received a Certificate of Citizenship or Naturalization from USCIS, and (3) has never been issued evidence of U.S. citizenship by DoS.
- **SAVE cases cannot be created using only a name and date of birth.** SAVE requires certain government-issued enumerators to create a case, such as an Alien Number or Social Security number, and cannot currently search using state-issued enumerators, such as driver's license numbers.
- **User agencies must take additional steps when required by SAVE for any case response other than "United States Citizen."** SAVE prohibits agencies from rejecting a voter registration or removing an individual from a voter roll based on a SAVE response until the agency has completed all SAVE-required steps. SAVE cases that initially determine a status other than U.S. citizen are automatically escalated to additional (manual) verification, and agencies may request additional verification if they receive an

unexpected SAVE response. Agencies are required to provide all registrants or registered voters who are not verified as U.S. citizens with the opportunity to provide proof of U.S. citizenship and to contact the relevant agency to correct their citizenship records, if necessary.

# Summary of How Voter Verification Agencies Use SAVE to Verify U.S. Citizenship

- All SAVE users must complete required training, review program guidance, view the latest version of the SAVE Tutorial and maintain a working knowledge of requirements contained in the SAVE MOA.
- The voter verification agency submits or enters registrant or registered voter information into SAVE (individually or in bulk) and creates an electronic initial verification request. The information required to submit a SAVE case includes the individual's: first name, last name, date of birth, and one or more government-issued enumerators (for example, an A-number/USCIS Number, Certificate of Naturalization Number, Certificate of Citizenship Number, or Social Security number).
- SAVE usually provides an automated response within seconds (which includes, for example, citizenship indicator, death indicator, or instructions to submit a new case with additional information). Cases submitted in large volumes using the SAVE Bulk Upload tool are each processed as individual SAVE cases and typically receive initial responses within a day but may take longer depending on the total file size.
- If SAVE matches to government records and determines a potential non-U.S. citizen status (e.g., Lawful Permanent Resident), the case is automatically escalated for additional review, which includes a manual review of system responses and files available in federal records, prior to the result being displayed to the agency. If, after manual review, SAVE returns a final non-U.S. citizen response, user agencies must, as applicable to the situation, permit the registrant or registered voter an opportunity to correct their records with the appropriate Federal agency (e.g., SSA, DoS, or DHS) and/or present proof of citizenship in accordance with federal and state law prior to relying on a SAVE result to deny registration or remove someone from a voting roll. User agencies must also permit the registrant or registered voter to utilize any existing appeals process and must provide any right to notice, a hearing, and other due process available under applicable law. Information on federal record correction is available at SAVE Records: Fast Facts for Benefit Applicants (PDF, 59.08 KB).
  - If a case was created using a Social Security number as the only enumerator and SSA cannot match to a record, SAVE will close the case and instruct the user agency to review the original submission for data entry errors and create a new case with new or additional information. A no-match result based on SSA data is not a final SAVE response and cannot be used to deny registration or remove someone from a voting roll.
  - In some cases, SAVE requests that an agency upload a document as part of the manual review process [3]. All additional verification steps required by SAVE must be completed to be considered a final SAVE response.

---

[1] For purposes of this Fact Sheet, “naturalized citizenship” refers to U.S. citizenship granted following an application for naturalization and meeting the requirements established by Congress in the Immigration and Nationality Act.

[2] For purposes of this Fact Sheet, “acquired citizenship” is defined as citizenship conveyed to children through the naturalization of parents or, under certain circumstances, at birth to foreign-born children of U.S. citizens, provided certain conditions are met. SAVE is only able to verify information that relates to information found in the databases accessed by the system. Accordingly, if the User Agency provides an immigration enumerator for an individual with acquired citizenship who has not applied for a Certificate of Citizenship with USCIS, the agency may not have that individual’s citizenship information available in the DHS databases accessed, and SAVE may not be able to confirm that individual’s acquired citizenship.

[3] Voter verification agencies should complete all additional verification steps required by SAVE to receive a final SAVE case response, or may use other processes or tools that allow them to make a definitive citizenship determination.

Last Reviewed/Updated: 08/27/2025

U.S. Citizenship and Immigration Services

MENU

[Home](#) > [SAVE](#) > [Current User Agencies](#) > [Guidance](#) > Voter Registration and Voter List Maintenance Fact Sheet

# Voter Registration and Voter List Maintenance Fact Sheet

## Background

SAVE is an online service administered by U.S. Citizenship and Immigration Services (USCIS) within the Department of Homeland Security (DHS), that allows registered federal, state, and local government agencies to verify immigration status and U.S. citizenship of individuals seeking benefits, licenses, and for other authorized purposes.

Federal law allows only U.S. citizens to vote in federal elections, and SAVE is an effective tool that registered agencies, such as State divisions of elections, can use to verify U.S. citizenship for voter registration, voter list maintenance, or oversight of these processes (collectively, "voter verification"). When provided with required data elements, SAVE can usually verify U.S.-born citizens, naturalized U.S. citizens [1], and in certain cases, acquired U.S. citizens [2]. SAVE can also verify immigration status if the individual is not a U.S. citizen, and whether the individual is deceased, if that information is retrievable.

SAVE provides verification information but does not determine an individual's eligibility to register to vote, stay on a voting roll, or vote in an election. SAVE has offered voter verification services since 2005; election agencies from over 27 states are currently registered. Registered user agencies can be found using the SAVE Agency Search Tool.

To register to use SAVE, user agency officials must sign a SAVE Memorandum of Agreement (MOA) which includes the legal authorities, processes, and requirements related to voter verification. A sample voter verification MOA is posted on SAVE's agency registration webpage.

## What You Should Know

- **SAVE is not a source database of U.S. citizens and immigrants.** SAVE is an information service whereby user agencies submit information (such as name, date of birth, and an enumerator) and SAVE uses that information to query against source government systems, including those maintained by DHS, Department of State (DoS), and the Social Security Administration (SSA) to ve[…] retrievable, a point-in-time response that includes the individual's U.S. citizen[…]s.

Need Help? Chat with Emma™

- **SAVE is not the only way to determine U.S. citizenship.** SAVE only verifies and provides information about an individual's U.S. citizenship or immigration status based on available information held in various U.S. government systems and is one of many methods that voter verification agencies may use to verify U.S. citizenship.
- **SAVE optimized its service in 2025 to better serve voter verification agencies.** This optimization allowed agencies accessing SAVE through a web browser to create cases using a Social Security number (SSN) and to submit cases in bulk. SAVE also eliminated transaction charges for state and local agencies.
- **When a user agency creates a case using an SSN, SAVE first queries SSA databases.** Based on SSA data, SAVE can verify the U.S. citizenship of most U.S.-born individuals as well as check the SSA Death Master File. If SSA data confirm that the individual has an Alien number (A-number or USCIS number), that number is then used to query data available to DHS to confirm the U.S. citizenship or immigration status of the individual. When an SSN matches SSA records, and SSA and DHS records do not indicate U.S. citizenship, the SSN may also be used to check DoS records for evidence of U.S. citizenship. This would verify U.S. citizenship, for example, for an individual who acquired citizenship through a parent and was issued a U.S. passport but never updated his or her SSA records or applied for a Certificate of Citizenship with USCIS. If no match is found with SSA data, the voter verification agency is prompted to confirm their data and create a new case with corrected or additional information.
- **When an enumerator held in DHS data is available, whether entered by the agency or retrieved from an associated record within SSA or DHS, SAVE may use this data to provide a status response.** If a DHS enumerator (such as an A-Number or Naturalization/Citizenship Certificate Number) is provided or associated with an SSN within DHS systems, SAVE will retrieve applicable records to provide a SAVE response. If a U.S. passport number, U.S. passport card number, or other relevant identifier is located, SAVE searches DoS records. SAVE may provide a U.S. citizen response, an immigration status response (for example, Lawful Permanent Resident), or request additional information.
- **SAVE can only verify data it can access.** SAVE can verify U.S. citizenship for U.S. born citizens and citizens who have naturalized or have acquired U.S. citizenship provided there is a government record available to SAVE through DHS, DoS, or SSA systems. Accordingly, SAVE may not be able to confirm U.S. citizenship for an individual who: (1) is not designated as a U.S. citizen in SSA records, (2) has not received a Certificate of Citizenship or Naturalization from USCIS, and (3) has never been issued evidence of U.S. citizenship by DoS.
- **SAVE cases cannot be created using only a name and date of birth.** SAVE requires certain government-issued enumerators to create a case, such as an Alien Number or Social Security number, and cannot currently search using state-issued enumerators, such as driver's license numbers.
- **User agencies must take additional steps when required by SAVE for any case response other than "United States Citizen."** SAVE prohibits agencies from rejecting a voter registration or removing an individual from a voter roll based on a SAVE response until the agency has completed all SAVE-required steps. SAVE cases that initially determine a status other than U.S. citizen are automatically escalated to additional (manual) verification, and agencies may request additional verification if they receive an

unexpected SAVE response. Agencies are required to provide all registrants or registered voters who are not verified as U.S. citizens with the opportunity to provide proof of U.S. citizenship and to contact the relevant agency to correct their citizenship records, if necessary.

# Summary of How Voter Verification Agencies Use SAVE to Verify U.S. Citizenship

- All SAVE users must complete required training, review program guidance, view the latest version of the SAVE Tutorial and maintain a working knowledge of requirements contained in the SAVE MOA.
- The voter verification agency submits or enters registrant or registered voter information into SAVE (individually or in bulk) and creates an electronic initial verification request. The information required to submit a SAVE case includes the individual's: first name, last name, date of birth, and one or more government-issued enumerators (for example, an A-number/USCIS Number, Certificate of Naturalization Number, Certificate of Citizenship Number, or Social Security number).
- SAVE usually provides an automated response within seconds (which includes, for example, citizenship indicator, death indicator, or instructions to submit a new case with additional information). Cases submitted in large volumes using the SAVE Bulk Upload tool are each processed as individual SAVE cases and typically receive initial responses within a day but may take longer depending on the total file size.
- If SAVE matches to government records and determines a potential non-U.S. citizen status (e.g., Lawful Permanent Resident), the case is automatically escalated for additional review, which includes a manual review of system responses and files available in federal records, prior to the result being displayed to the agency. If, after manual review, SAVE returns a final non-U.S. citizen response, user agencies must, as applicable to the situation, permit the registrant or registered voter an opportunity to correct their records with the appropriate Federal agency (e.g., SSA, DoS, or DHS) and/or present proof of citizenship in accordance with federal and state law prior to relying on a SAVE result to deny registration or remove someone from a voting roll. User agencies must also permit the registrant or registered voter to utilize any existing appeals process and must provide any right to notice, a hearing, and other due process available under applicable law. Information on federal record correction is available at SAVE Records: Fast Facts for Benefit Applicants (PDF, 59.08 KB).
  - If a case was created using a Social Security number as the only enumerator and SSA cannot match to a record, SAVE will close the case and instruct the user agency to review the original submission for data entry errors and create a new case with new or additional information. A no-match result based on SSA data is not a final SAVE response and cannot be used to deny registration or remove someone from a voting roll.
  - In some cases, SAVE requests that an agency upload a document as part of the manual review process [3]. All additional verification steps required by SAVE must be completed to be considered a final SAVE response.

---

[1] For purposes of this Fact Sheet, “naturalized citizenship” refers to U.S. citizenship granted following an application for naturalization and meeting the requirements established by Congress in the Immigration and Nationality Act.

[2] For purposes of this Fact Sheet, “acquired citizenship” is defined as citizenship conveyed to children through the naturalization of parents or, under certain circumstances, at birth to foreign-born children of U.S. citizens, provided certain conditions are met. SAVE is only able to verify information that relates to information found in the databases accessed by the system. Accordingly, if the User Agency provides an immigration enumerator for an individual with acquired citizenship who has not applied for a Certificate of Citizenship with USCIS, the agency may not have that individual’s citizenship information available in the DHS databases accessed, and SAVE may not be able to confirm that individual’s acquired citizenship.

[3] Voter verification agencies should complete all additional verification steps required by SAVE to receive a final SAVE case response, or may use other processes or tools that allow them to make a definitive citizenship determination.

Last Reviewed/Updated: 08/27/2025

# UNITED STATES GOVERNMENT GENERAL TERMS & CONDITIONS (GT&C) FS Form 7600A

Agreement Between Federal Program Agencies for Intragovernmental Reimbursable, Buy/Sell Activity. In accordance with TFM Volume 1, Part 2, Chapter 4700, Appendix 8.

https://www.fiscal.treasury.gov/fsservices/gov/acctg/g_invoice/g_invoice_home.htm

| NEW OR MODIFIED GT&C | | |
|---|---|---|
| General Terms and Conditions (GT&C) Number | GT&C Number:A2505-070-028-078576 | |
| | Requesting Agency (Buyer) | Servicing Agency (Seller) |
| | Agency Agreement Tracking Number:CISIRWA25065 | Agency Agreement Tracking Number:RAFDHS250004 |
| | Modification Number:0 | |
| | Status:Open | |

| AGENCY INFORMATION | | | |
|---|---|---|---|
| 1. | | Requesting Agency (Buyer) | Servicing Agency (Seller) |
| | Agency Name | Department of Homeland Security (DHS) United States Citizenship & Immigration Services (USCIS) | Social Security Administration |
| | Group Name | SAVE Program | DCRDP ODEPPIN RA |
| | Group Description | 5900 Capital Gateway Drive, Camp Springs, MD 20588 | Office of Data Exchange, Policy Publications, & International Negotiation Reimbursable Agreements |
| | Document Inheritance Indicator | Yes | Yes |
| | Agency Location Code (ALC) | 70011512 | 28040001 |
| | ALC Description | 70011512 - 070 - Department of Homeland Security - CITIZENSHIP & IMMIGRATION SVCS | 28040001 - 028 - SOCIAL SECURITY ADMINISTRATION - HQ - DIV. OF CENTRAL ACCTING OPERATIONS |
| | Subordinate Group | | DCRDP OISP RA - Office of Income Security Programs Reimbursable Agreements |
| | Cost Center | 07-20-0600-00-00-00-00 | |
| | Business Unit | Headquarters | |
| | Department ID | VER | |

GT&C INFORMATION

| | | | |
|---|---|---|---|
| 2. | GT&C Title | Citizenship and Immigration Status Verification Services | |
| 3. | Business Application | Standard Order Processing | |
| 4. | Order Originating Partner Indicator | Requesting Agency | |
| 5. | Agreement Period | Start Date: 05/15/2025 | End Date: 09/30/2025 |
| 6. | Termination Days | 30 | |
| 7. | Agreement Type | Multiple | |
| 8. | Advance Payment Indicator | Are Advance Payments allowed for GT&C? No<br><br>*If "Yes", the Servicing Agency Advance Payment Authority Title and Citation are required upon creation of an Order against this GT&C. | |
| 9. | Assisted Acquisition Indicator | Will this GT&C accommodate Assisted Acquisitions? No<br><br>*If "Yes", the Servicing Agency provides acquisition support in awarding and managing contracts on behalf of the Requesting Agency's requirements for products or services. Lines 17 & 18 below for additional detail. | |
| **ESTIMATED AGREEMENT AMOUNT** | | | |
| 10. | Total Direct Cost Amount | $196,397.17 | |
| | Total Overhead Fees and Charges Amount | $0.00 | |
| | Total Estimated Amount | $196,397.17 | |
| | Enforce Total Remaining Amount | Should G-Invoicing enforce the total value of orders to remain below the Total Amount on the GT&C? Yes<br><br>*If "Yes", G-Invoicing will not allow Order total to exceed the GT&C total. | |
| **ADDITIONAL AGREEMENT INFORMATION** | | | |
| 11. | Explanation of Overhead Fees and Charges | | |
| 12. | Requesting Scope | | |
| 13. | Requesting Roles | | |
| 14. | Servicing Roles | Refer to Information Sharing Letter Agreement. | |
| 15. | Restrictions | | |
| 16. | Assisted Acquisitions Small Business Credit Clause | The Servicing Agency will allocate the socio-economic credit to the Requesting Agency for any contract actions it has executed on behalf of the Requesting Agency. | |
| 17. | Disputes | Disputes related to this IAA shall be resolved in accordance with instructions provided in the Treasury Financial Manual (TFM) Volume I, Part 2, Chapter 4700, Appendix 5; Intragovernmental Transaction (IGT) Guide, at http://tfm.fiscal.treasury.gov/content/tfm/v1/p2/c470.html. | |
| 18. | Requesting Assisted Acquisitions | | |
| 19. | Servicing Assisted Acquisitions | | |
| 20. | Requesting Clauses | | |

| | | |
|---|---|---|
| 21. | Servicing Clauses | The estimated cost set forth in this agreement is based upon SSA s rough order of magnitude cost estimate to perform systems development work for this effort and is based on an estimated 40 million transactions.<br><br>Within G-Invoicing, SSA may use G-Invoicing Representative Approvers to ministerially approve agreements (GT&C and Orders). Please refer to the Approved PDF Agreement in the attachment section of this GT&C and any underlying Orders for SSA s official approval. |
| 22. | Intentionally left blank | |
| 23. | Intentionally left blank | |

## CLOSE GT&C

| | |
|---|---|
| 24. | |

## REJECT GT&C

| | |
|---|---|
| 25. | |

## PREPARER INFORMATION

| | | |
|---|---|---|
| 26. | Preparer Name | Anastasia Collins |
| | Preparer Phone | 4109655413 |
| | Preparer Email | anastasia.collins@ssa.gov |

## AGREEMENT APPROVALS

By signing this agreement, you authorize the General Terms and Conditions as stated, and that the scope of the work can be fulfilled. By signing, you agree to periodically review the terms and conditions of the agreement and make any necessary modifications to the GT&C and any affected Order(s)

| | | Requesting Initial Approval (required) | Servicing Initial Approval (required) |
|---|---|---|---|
| 27. | Name | KAREN TYLER | Jamillah Jackson |
| | Signature | Electronic Approval On File | Electronic Approval On File |
| | Title | MPA (b)(6) | Representative Approver on behalf of Jessica Burns MacBride |
| | Email | | jamillah.n.jackson@ssa.gov |
| | Phone | | 4109653747 |
| | Fax | | |
| | Date Signed | 07/29/2025 | 07/30/2025 |
| | | Requesting Final Approval (required) | Servicing Final Approval (required) |
| 28. | Name | NICOLE WALKER | Jamillah Jackson |
| | Signature | Electronic Approval On File | Electronic Approval On File |
| | Title | Acting Budget Officer (b)(6) | Representative Approver on behalf of Jessica Burns MacBride |
| | Email | | jamillah.n.jackson@ssa.gov |
| | Phone | | 4109653747 |
| | Fax | | |
| | Date Signed | 07/29/2025 | 07/30/2025 |

| ATTACHMENTS | | | |
|---|---|---|---|
| Name | File Alias | Updated By | Date/Time |
| SSA Signed RAFDHS_250004_7600A orc3a.pdf | | Collins, Anastasia (S) | 08/28/2025 07:55 AM |
| Legal Agreement USCIS SSA 5-15-25 fe.pdf | | Collins, Anastasia (S) | 06/24/2025 01:19 PM |
| SOW - SSA_D. AkpanOCC07082025 SSA cmts 7.31.25 final tracked.docx | | RAY, KALISHA (R) | 08/11/2025 01:30 PM |
| VER250028.pdf | | RAY, KALISHA (R) | 08/04/2025 10:21 AM |

UNITED STATES GOVERNMENT
ORDER FORM
FS FORM 7600B

BUREAU OF THE Fiscal Service U.S. DEPARTMENT OF THE TREASURY

Agreement Between Federal Program Agencies for Intragovernmental Reimbursable, Buy/Sell Activity.
In accordance with TFM Volume 1, Part 2, Chapter 4700, Appendix 8.

https://www.fiscal.treasury.gov/g-invoice

G-Invoicing Required Fields have an (*)

| NEW OR MODIFIED ORDER | | | |
|---|---|---|---|
| 1. | *Order Number | Order Number: O2508-070-028-115617 | |
| | | Order Modification Number: 0 | |
| 2. | Order Status | Open | |
| 3. | *General Terms & Conditions (GT&C) Number | A2505-070-028-078576 | |
| 4. | *Order Create Date | 08/08/2025 | |
| PARTNER INFORMATION | | | |
| 5. | *Assisted Acquisition Indicator | No | |
| 6. | *Period of Performance | Start Date: 05/15/2025 | End Date: 09/30/2025 |
| | | Requesting Agency (Buyer) | Servicing Agency (Seller) |
| 7. | *Agency Location Code (ALC) | 70011512 | 28040001 |
| 8. | *Agency Name | Department of Homeland Security - CITIZENSHIP & IMMIGRATION SVCS | SOCIAL SECURITY ADMINISTRATION - HQ - DIV. OF CENTRAL ACCTING OPERATIONS |
| 9. | Group Name | SAVE Program | DCRDP ODEPPIN RA |
| 10. | Cost Center | 07-20-0600-00-00-00-00 | |
| 11. | Business Unit | Headquarters | |
| 12. | Department ID | VER | |
| 13. | Order Tracking Number | CISIRWA25065 | RAFDHS250004 |
| 14. | Unique Entity ID | R76CSFHNTQK5 | |
| 15. | Funding Office Code (Buyer Only) | | |
| 16. | Funding Agency Code (Buyer Only) | | |

| | | | |
|---|---|---|---|
| 17. | Comments | | The estimated cost set forth in this agreement is based upon SSA s rough order of magnitude cost estimate to perform systems development work for this effort and is based on an estimated 40 million transactions.<br><br>Within G-Invoicing, SSA may use Representative Approvers to ministerially approve agreements. Please refer to the Approved PDF Agreement in the attachment section of this Order for SSA's official approval. |
| | | AUTHORITY INFORMATION | |
| 18. | * Statutory Authority Fund Type Code | Economy Act | |
| 19. | Statutory Authority Fund Type Title | | |
| 20. | Statutory Authority Fund Type Citation | | |
| | | Requesting Agency (Buyer) | Servicing Agency (Seller) |
| 21. | Program Authority Title | | Section 1106(b) of the Social Security Act |
| 22. | Program Authority Citation | | Social Security Act, 42 U.S.C. § 1306 |
| | | ADVANCE INFORMATION | |
| | | (Required by Servicing Agency if there is an advance.) | |
| 23. | Advance Revenue Recognition Methodology | | |
| 24. | Advance Revenue Recognition Description (required if "Other") | | |
| 25. | Advance Payment Authority Title | | |
| 26. | Advance Payment Authority Citation | | |
| 27. | Total Advance Amount | | |
| | | DELIVERY INFORMATION | |
| | | (Requesting Agency completes this section.) | |
| 28. | * FOB Point | Source/Origin | |
| 29. | Constructive Receipt Days | | |
| 30. | Acceptance Point | Source/Origin | |
| 31. | Place of Acceptance | | |
| 32. | Inspection Point | | |

| | | | |
|---|---|---|---|
| 33. | | Place of Inspection | |
| ORDER BILLING | | | |
| (Servicing Agency completes this section.) | | | |
| 34. | | *Billing Frequency | Quarterly |
| 35. | | Billing Frequency Explanation | |
| ORDER BILLING | | | |
| (Requesting Agency completes this section.) | | | |
| 36. | | Priority Order Indicator | No |
| 37. | | Capital Planning and Investment control (CPIC) | No |
| LINE ITEM | | | |
| L1 | | *Line Number | 1 |
| L1 | | Order Line Status | Active |
| L1 | | *Item Code | 9999 |
| L1 | | *Item Description | verification of citizenship information. |
| L1 | | *Line Costs Unit of Measure (UOM) | DO |
| L1 | | *Unit of Measure Description | Dollars, U.S. |
| L1 | | Total Line Costs | $196,397.17 |
| L1 | | Order Line Advance Amount | |
| L1 | | Product/Service Identifier | |
| L1 | | *Capitalized Asset Indicator | False |
| L1 | | Item UID Required Indicator | No |
| L1 | | *Type of Service Requirements | Severable |
| SCHEDULE SUMMARY | | | |
| L1 | S1 | *Schedule Number | 1 |
| L1 | S1 | Advance Pay Indicator | No |
| L1 | S1 | *Cancel Status (schedule) | Active |
| L1 | S1 | *Schedule Unit Cost/Price | $1.00 |
| L1 | S1 | *Order Schedule Quantity | 196,397.17 |
| L1 | S1 | Order Schedule Amount | $196,397.17 |

## SCHEDULE FUNDING INFORMATION

| | | | Requesting Agency (Buyer) | | | | | | | | Servicing Agency (Seller) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| L1 | S1 | * Agency TAS | SP | ATA | AID | BPOA | EPOA | A | MAIN | SUB | SP | ATA | AID | BPOA | EPOA | A | MAIN | SUB |
| | | | | | 070 | | | X | 5088 | 000 | | | 028 | 2025 | 2025 | | 8704 | 000 |

| | | | Requesting Agency (Buyer) | Servicing Agency (Seller) |
|---|---|---|---|---|
| L1 | S1 | * Agency Business Event Type Code | DISNGF | COLL |
| L1 | S1 | Object Class Code | 25.3 | 11.1 |
| L1 | S1 | Additional Accounting Classification | CISIRWA25065 | |
| L1 | S1 | * Description of Products and/or Services including Bona Fide Need for this order (Buyer Only) | verification of citizenship information. | |

## SLOA INFORMATION

* To capture Agency Internal Accounting

| | | | Requesting Agency (Buyer) | Servicing Agency (Seller) |
|---|---|---|---|---|
| L1 | S1 | Accounting Classification Reference Number | | |
| L1 | S1 | Reimbursable Flag | | Reimbursable |
| L1 | S1 | Federal Award Identifier Number (FAIN) | | |
| L1 | S1 | Unique Record Identifier (URI) | | |
| L1 | S1 | Activity Address | | |
| L1 | S1 | Budget Line Item | | |
| L1 | S1 | Budget Fiscal Year | | 2025 |
| L1 | S1 | Security Cooperation (FMS) | | |
| L1 | S1 | Security Cooperation Implementing Agency Code | | |
| L1 | S1 | Security Cooperation Case Line Item Identifier | | |
| L1 | S1 | Sub-Allocation | | |
| L1 | S1 | Agency Accounting Identifier | | |
| L1 | S1 | Funding Center Identifier | | 4008048 |
| L1 | S1 | Cost Center Identifier | | |
| L1 | S1 | Project Identifier | | |
| L1 | S1 | Activity Identifier | | 6163 |

| | | | | |
|---|---|---|---|---|
| L1 | S1 | Disbursing Identifier | | |
| L1 | S1 | Cost Element Code | | |
| L1 | S1 | Work Order Number | | |
| L1 | S1 | Functional Area | | |
| L1 | S1 | Agency Security Cooperation Case Designator | | |
| L1 | S1 | Parent Award Identifier (PAID) | | |
| L1 | S1 | Procurement Instrument Identifier (PIID) | | |
| SCHEDULE SHIPPING INFORMATION | | | | |
| (Requesting Agency completes this section.) | | | | |
| L1 | S1 | Ship To Address Identifier | | |
| L1 | S1 | Ship To Agency Title | | |
| L1 | S1 | Address 1 | | |
| L1 | S1 | Address 2 | | |
| L1 | S1 | Address 3 | | |
| L1 | S1 | Ship To City | | |
| L1 | S1 | Ship To Postal Code | | |
| L1 | S1 | Ship To State | | |
| L1 | S1 | Ship To Country | | |
| L1 | S1 | Ship To Location Description | | |
| L1 | S1 | Delivery/Shipping Information for Product Special Shipping Information | | |
| L1 | S1 | Delivery/Shipping POC Name | | |
| L1 | S1 | Delivery/Shipping Information for Product POC Title | | |
| L1 | S1 | Delivery/Shipping Information for Product POC E-mail Address | | |
| L1 | S1 | Delivery/Shipping Information for Product POC Telephone Number | | |
| | | | Requesting Agency (Buyer) | Servicing Agency (Seller) |

| | | | |
|---|---|---|---|
| L1 S1 | Agency Additional Information | | The estimated cost set forth in this agreement is based upon SSA s rough order of magnitude cost estimate to perform systems development work for this effort and is based on an estimated 40 million transactions. |
| CLOSE ORDER | | | |
| 38. | Closing Date | | |
| | Closing Comments | | |
| REJECT ORDER | | | |
| 39. | Reject Date | 08/29/2025 | |
| | Reject Comments | Updates to line description, type of service requirements, and bona fide need fields. | |
| AGENCY POINTS OF CONTACTS (POC) | | | |
| | | Requesting Agency (Buyer) | Servicing Agency (Seller) |
| 40. | * Agency POC Name | Kalisha Ray (b)(6) | Anastasia Collins |
| | * Agency POC E-mail | [redacted] | Anastasia.Collins@ssa.gov |
| | * Agency POC Phone No | | 410-965-5413 |
| | Agency POC Fax No | | |
| AGREEMENT APPROVALS | | | |
| Funding Official | | | |
| The Funds Approving Officials, as identified by the Requesting Agency and Servicing Agency, certify that the funds are accurately cited and can be properly accounted for per the purposes set forth in the Order. The Requesting Agency Funding Official signs to obligate funds. The Servicing Agency Funding Official signs to start the work, and to bill, collect, and properly account for funds from the Requesting Agency, in accordance with the agreement. | | | |
| | | Requesting Agency (Buyer) | Servicing Agency (Seller) |
| 41. | * Funding Official Name | Chauncey Burrell | Jamillah Jackson |
| | * Signature | Electronic Approval On File | Electronic Approval On File |
| | Funding Official Title | Management and Program Analyst (b)(6) | Representative Approver on behalf of Susan Wilschke |
| | * Funding Official E-mail | [redacted] | jamillah.n.jackson@ssa.gov |
| | * Funding Official Phone No | | 4109653747 |
| | Funding Official Fax No | | |
| | Funding Official Date Signed | 08/06/2025 | 09/04/2025 |
| Program Official | | | |
| The Program Officials, as identified by the Requesting Agency and Servicing Agency, must ensure that the scope of work is properly defined and can be fulfilled for this order. The Program Official may or may not be the Contracting Officer depending on each agency's IAA business process. | | | |
| | | Requesting Agency (Buyer) | Servicing Agency (Seller) |
| 42. | * Program Official Name | Chirag Bhavsar | Jamillah Jackson |

| | | | |
|---|---|---|---|
| | * Signature | Electronic Approval On File | Electronic Approval On File |
| | Program Official Title | Associate Chief of Operations (b)(6) | Representative Approver on behalf of Susan Wilschke |
| | * Program Official E-mail | | jamillah.n.jackson@ssa.gov |
| | * Program Official Phone No | | 4109653747 |
| | Program Official Fax No | | |
| | Program Official Date Signed | 08/07/2025 | 09/04/2025 |
| AGENCY PREPARER INFORMATION | | | |
| | | Requesting Agency (Buyer) | Servicing Agency (Seller) |
| 43. | * Name | KALISHA RAY | Anastasia Collins |
| | * Phone No | | 4109655413 |
| | * E-mail Address | | anastasia.collins@ssa.gov |
| ATTACHMENTS | | | |
| Name | File Alias | Uploaded By | Date/Time |
| SSA Signed RAFDHS_250004_7600B orc3a.pdf | | (b)(6) | 08/28/2025 08:20 AM |

U.S. Citizenship
and Immigration
Services

# Statement of Work

1. **Title of Project**

   Citizenship and Immigration Status Verification Services

2. **Period of Performance**

   05/15/25-09/30/25

3. **Authority**

   Reimbursement for activities related to this Statement of Work (SOW) shall be in accordance with the Economy Act, 31 U.S.C. 1535.

   DHS-USCIS is authorized to participate in this information sharing under the authority of the Immigration and Nationality Act, Section 103, 8 U.S.C. § 1103, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Section 642, codified at 8 U.S.C. § 1373(c).

   SSA will provide DHS-USCIS information in accordance with 8 U.S.C. § 1373(a) and 42 U.S.C. § 1306.

   This information sharing is also subject to requirements of:

   - The Privacy Act of 1974, 5 U.S.C. § 552a;
   - The Federal Information Security Management Act of 2014 (FISMA; Pub. L. 113-283);
   - 20 C.F.R. § 401.120; and

   other laws, rules, regulations and applicable agency policies

4. **Parties**

   The parties to this Statement of Work are the U.S. Citizenship and Immigration Services (USCIS) also known as the "Requesting Agency," and the Social Security Administration (SSA), also known as the "Servicing Agency."

   **The Agency Point of Contacts:**

5. **USCIS Technical Representative**

   Chirag Bhavsar, [redacted] (b)(6)

6. **USCIS Program Manager**

   Brian Broderick [redacted]

7. **SSA Point of Contact:**

   Anastasia Collins, Anastasia.collins@ssa.gov, 410-965-5413

8. **Project Background**

   SAVE's citizenship information verification initiative seeks to provide timely

verification of citizenship or immigration status information in response to voter verification and other authorized inquiries from Federal, State, territorial, tribal and local government agencies seeking to verify or ascertain the citizenship or immigration status of individuals within their jurisdiction by using a social security number, or part thereof, as a search term or method to locate additional information in DHS-USCIS accessed records regarding the individual.

DHS-USCIS seeks access to SSA information accessed through the DHS-USCIS Verification Information System (VIS) for the purpose of verifying the citizenship and immigration status for benefits and licenses, as authorized by section 103 of the Immigration and Nationality Act, Pub. L No. 82-414, as amended, 8 U.S.C. § 1103, Section 121(c)(1), Part C, of the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 42 U.S.C. § 1320b-7 and note, and section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, as amended, 8 U.S.C. § 1373(c).

SSA is providing assistance by sending to, and receiving from, DHS-USCIS information regarding the citizenship or immigration status, lawful or unlawful, of individuals within its records.

**9. Scope**

This Statement of Work, the Information Sharing Letter Agreement (dated May 15, 2025), and the applicable financial forms (i.e., FS Forms 7600A and 7600B) constitute the entire Agreement of the Parties with respect to the purposes set forth in this Agreement. SSA and DHS-USCIS have made no representations, warranties, or promises outside of this Agreement for use of data as described in this Agreement. This Agreement takes precedence over any other documents that may be in conflict with it, including any conflicting terms in any Interconnection Security Agreement ("ISA") entered into in accordance with NIST SP 800-47 governing the interconnection between information technology systems that will be utilized for the transfer of information under this Agreement.

**10. SSA's Responsibilities**

Under DHS-USCIS' SAVE process SSA will provide electronic response codes to USCIS' SAVE queries. These codes report which data elements sent to SSA by SAVE (name, SSN, and date of birth) match data elements in the Master Files of Social Security Number (SSN) Holders and SSN Applications ("Enumeration System"), 60-0058, system of records. The codes also report if there is a death or fraud indicator in the Enumeration System and the person's citizenship status, as recorded in the Enumeration System.

SSA will provide responses to the SAVE queries within one second or less.

SSA will inform USCIS when its systems have a scheduled outage or planned maintenance that may negatively affect service.

SSA will safeguard any personally identifiable information (PII) obtained from SAVE agencies through the SAVE process in accordance with FISMA. SSA will limit access to this information to SSA employees involved in resolving SAVE cases, USCIS employees who administer SAVE, and individuals or entities authorized by the U.S. Government to evaluate SAVE.

**USCIS' Responsibilities:**
USCIS will only submit verification requests to SSA for authorized purposes.

USCIS will notify SSA of any pending or final changes in the statutory or regulatory requirements concerning SAVE.

USCIS will inform SSA if the SAVE system or other related connectivity system has a scheduled outage or planned maintenance that may negatively affect service.

After discovering a connectivity issue that may negatively affect SAVE service, USCIS will inform SSA.

USCIS will safeguard any PII obtained from SSA in accordance with the Privacy Act (5 U.S.C. § 552a) and FISMA. USCIS will limit access to this information to USCIS employees involved in resolving SAVE cases, USCIS employees who administer SAVE, and individuals or entities authorized by the U.S. Government to evaluate SAVE.

**11. Security Components**

SSA and USCIS will comply with FISMA, 44 U.S.C. § 3551 et seq., as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. 113-283); FIPS, Mandatory Security Processing Standards 199 & 200; related OMB circulars and memoranda, including revised Circular A- 130, Management of Federal Information Resources (July 28, 2016); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations (FAR). These laws, regulations, and directives provide requirements for safeguarding Federal information systems and PII used in Federal agency business processes, as well as related reporting requirements.

FISMA requirements apply to all Federal contractors, organizations, or sources that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. Each agency receiving information under this DSA is responsible for oversight and compliance of its contractors and agents with FISMA requirements.

**12. Deliverables**

SSA will disclose to USCIS data from the Enumeration System, 60-0058, last published in full at 90 Fed. Reg. 10025 (February 20, 2025).

USCIS will maintain information provided by SSA in its system of records entitled,

"DHS/U.S. Citizenship and Immigration Services (USCIS)-004 Systematic Alien Verification for Entitlements (SAVE) Program System of Records."

Specified Data Elements

1. USCIS will provide SSA with the individual's name, including other names used as applicable, date of birth, and either the full or partial SSN.

2. SSA will provide USCIS a "verified" or "not verified" response and in the case of a "not verified" response, the reason for the "not verified" will be provided. In rare circumstances, SSA is unable to disclose the reason why an SSN did not verify. In these cases, SSA will provide a reason of "other".

3. SSA's responses will contain the following:

- SSN Match (True/False)
- Full SSN for all matches (when a partial SSN is provided)
- Name Match (True/False)
- Date of Birth Match (True/False)
- Citizenship/Foreign Indicator
    - Blank – Citizenship code is blank and foreign-born indicator is blank
    - Citizenship code is blank and foreign-born indicator is *
    - "A" - U.S. Citizen
    - "B" - Legal alien, eligible to work
    - "C" - Legal alien, not eligible to work
    - "D" - Other
    - "E" - Alien Student - restricted work authorized
    - "F" - Conditionally legalized alien
- Alien Registration Number (where applicable)
- Death Indicator (Yes Deceased / Not Deceased)
- Error code descriptions (transaction and record levels)

An applicant for an original SSN provides identifying information, including citizenship, upon application for that number. However, there is no obligation for the SSN holder to report a subsequent change in immigration status to SSA unless that SSN holder files a claim for benefits. Thus, some previously established citizenship information in SSA's records might not be current. There is no obligation for an individual to report to SSA a change in their citizenship or immigration status until they request a replacement card or file a claim for a Social Security benefit. While the citizenship information is accurate for SSA's program purposes, if used later for other purposes, it may not be current. SSA is not the custodian of U.S. citizenship records

For individuals whom USCIS provides only a partial SSN, SSA will search our Numident database using USCIS' supplied names and DOBs, and will only return a response record and full SSN in situations where the alpha search identifies a single individual.

**13. Place of Performance**

The performance or delivery by USCIS of the goods and/or services described herein and the timeliness of said delivery are authorized only to the extent that they are consistent with proper performance of the official duties and obligations of USCIS. If for any reason USCIS delays or fails to provide services, or discontinues the services or any part thereof, USCIS is not liable for any damages or loss resulting from such delay or for any such failure or discontinuance.

The performance or delivery by SSA of the goods and/or services described herein and the timeliness of said delivery are authorized only to the extent that they are consistent with the duties described in the Information Sharing Letter Agreement. If for any reason SSA delays or fails to provide services, or discontinues the services or any part thereof, SSA is not liable for any damages or loss resulting from such delay or for any such failure or discontinuance.

Under DHS-USCIS' SAVE process SSA will provide electronic response codes to USCIS' SAVE queries. These codes report which data elements sent to SSA by SAVE (name, SSN, and date of birth) match data elements in the Enumeration System. The codes also report if there is a death or fraud indicator in the Enumeration System and the person's citizenship status, as recorded in the Enumeration System.

This SOW shall be effective upon the signature of the last signatory hereto and shall continue until the end of the Period of Performance described in Section 2.

**14. Billings and Accompanying Documentation**

SSA will bill USCIS for services rendered on a quarterly basis using the Treasury G-Invoicing System and collect said charges via Intra-governmental Payment and Collection (IPAC).

Accompanying documentation includes the LETTER AGREEMENT PROVIDING FOR INFORMATION SHARING BETWEEN THE DEPARTMENT OF HOMELAND SECURITY (DHS), U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS) AND THE SOCIAL SECURITY ADMINISTRATION (SSA) REGARDING CITIZENSHIP, and the FS Forms 7600A and 7600B.

**15. Modification**

Modifications to this Agreement must be in writing and agreed to by the parties.
This Agreement may be terminated by either party upon 30 days advance written notice.
If legislation is enacted that affects SAVE functions or provides for new functionality, the parties agree to modify this Agreement as appropriate to cover any new provisions.

**16. Dispute Resolution**

Disagreements on the interpretation of the provisions of this SOW that cannot be resolved between USCIS and the SSA point of contact should be provided in writing to the authorized officials at both agencies for resolution. If settlement cannot be reached at

this level, the disagreement will be elevated to the next level in accordance with DHS-USCIS procedures for final resolution.

**17. Termination**

This Agreement may be terminated by either party upon 30 days advance written notice **or terminated in accordance with the provisions of** this Agreement.

# REQUISITION — MATERIALS-SUPPLIES-EQUIPMENT

SEE INSTRUCTIONS ON REVERSE

1. NUMBER: VER250028

2. DATE: 21-MAY-2025

3. ACTIVITY SYMBOL: See Attachment A

4. TO: NAME AND ADDRESS -- PROCUREMENT SECTION (OR STOREROOM)
USCIS
BURLINGTON CONTRACTING OFFICE
70 KIMBALL AVE
SOUTH BURLINGTON, VT 05403

5. FROM: NAME AND ADDRESS -- REQUISITIONER
DHS-USCIS-VERIFICATION DIVISION
[redacted] (b)(6)
5900 CAPITAL GATEWAY DRIVE, MAIL STOP 2600
CAMP SPRINGS, MD 20529-0009
US

| STOCK NUMBER | DESCRIPTION OF ARTICLE (MAKE, MODEL, TYPE, SIZE, COLOR, MFGR., ETC) | QUANTITY | UNIT | COST: UNIT PRICE | COST: AMOUNT | ACTION CODE |
|---|---|---|---|---|---|---|
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| CLIN 0001 | INITIAL DEVELOPMENT COSTS AND TRANSACTIONS | 1 | EA | 196,397 17 | 196,397 17 | |

**Justification:**
TO FUND THE SOCIAL SECURITY ADMINISTRATION (SSA) SAVE OPTIMIZATION INITIAL DEVELOPMENT COSTS AND QUERIES. PROPOSED POP: 5/23/58-5/22/26

**Recommended Vendor:**
No Recommended Vendor

13. SIGNATURE OF APPROVING OFFICIAL: F L OWENS — Date: 21-MAY-2025

14. TITLE OF APPROVING OFFICIAL: SUPVY MGMT & PROG ANAL

24. SIGNATURE OF FUNDING OFFICIAL: R A COX — Date: 21-MAY-2025

25. TITLE OF FUNDING OFFICIAL: MGMT & PROG ANAL

15. TOTAL: 196,397 17

16. KEY TO ACTION CODE

| | | | |
|---|---|---|---|
| S | SUBSTITUTE ITEM | 2 | CANCELLED--NOT STOCKED |
| B | BACK ORDERED | 3 | CANCELLED--NOT ABLE TO IDENTIFY |
| D | PURCHASED FOR DIRECT SHIPMENT | 0 | OTHER -- AS INDICATED |
| 1 | CANCELLED--STOCK EXHAUSTED | | |

PROCUREMENT SECTION (OR STOREROOM)

17. DATE RECEIVED

18. APPROVED

19. PURCHASE ORDER — DATE / NUMBER

I CERTIFY THAT THE ABOVE ARTICLES -- COLUMNS 3, 9 AND 12 - HAVE BEEN RECEIVED.

| 20. LOCATION | 21. DATE | 22. SIGNATURE | 23. TITLE |
|---|---|---|---|
| | | | |

United States Department Of Homeland Security
Us Citizenship & Immigration Svcs
FORM G-514 (REV. 8-1-5

## INSTRUCTIONS

### Use

Use Form G-514 - continued on Form G-514.1 -- To requisition materials, supplies, and equipment through the Procurement section of the Regional (or Central) Office; or from a Service-operated Storeroom.

### Copies - Distribution

Prepared by requistioner in an original and tw o copies, sending original (w hite) and Copy 1 (pink) to: Procurement Section (or Storeroom), and retaining Copy 2 (green). Procurement Section (or Storeroom) shall, as a rule, pack Copy 1 w ith shipment, or return it to requisitioner w ith appropriate advice.

### Entries

**By requisitioner:**

1. Number consecutively, beginning w ith number one each fiscal year, and prefix w ith alphabetic location symbol and last tw o digits of fiscal year (e.g., MIA-58-1, MIA-58-2, MIA-58-3, etc., MIA-59-1, MIA-59-2, MIA-59-3, etc.). Number continuation sheets w ith numerical suffix(e.g., MIA-58-1.1, MIA-58-1.2, MIA-58-1.3, etc).
2. Enter date of preparation.
3. Enter numerical symbol of activity w hich w ill benefit from use of articles.
4. Enter name and address of Procurement section (or Storeroom)(e.g., Procurement Section, Immigration and Naturalization Service, Richmond, VA).
5. Enter full name, title, and address so that shipping label may be prepared w ithout reference to address directory. If consignee is other than requisitioner, enter shipping instructions under Entry 7.
6. Enter form numbers; stock number show n in "Stores Stock Catalog" and "Federal Supply Schedules."
7. Enter full description of article; attach sketches, plans, samples, etc. If consignee is other than requisitioner, enter shipping instructions.
8. Enter issue - unit quantity.
9. Enter unit of issue (e.g., each, doz., C, gross, ream, M; lb., cw t, ton: bag, ball, bbl., bot., box, can, pkg., roll, tube; pt., qt., gal., etc.)

13. Signature of approving official.
14. Enter title of approving official.
24. Signature of funding official.
25. Enter title of funding official.

**By Procurement Section ( or Storeroom):**

10. Enter unit price.
11. Enter product of Entries 8 and 10.
12. Enter symbol of action taken. See Entry 16.
15. Enter total of amounts under Entry 11.
17. Enter date requisition received.
18. Signature of approving officer.
19. Enter, if issued, date and number of purchase order.

**By consignee:**

20. Enter address - city and state.
21. Enter date shipment received.
22. Signature of employee authorized to accept delivery.
23. Enter title of receiving employee.

# Form G-514

## REQUISITION - MATERIALS-SUPPLIES-EQUIPMENT
Activity Symbols
ATTACHMENT A

REQUISITION NUMBER: **VER250028**

| Item No. | Contract No. | Task Ord No. | Project | Task | Fund | Program | Organization | Object | UDF | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | SSASV01 | 000 | EX | 11-04-00-000 | 07-20-0000-00-00-00-00 | GE-25-11-00 | 000000 | $196,397.17 |

APPROPRIATION SYMBOL CROSSWALK:

| FUND | FY | TAS | TITLE | AMOUNT |
|---|---|---|---|---|
| EX | 2025 | 70X5088 | Immigration Examination Fees, Immigration Services, Department of Homeland Security | 196,397.17 |

**United States Department Of Homeland Security**
**Us Citizenship & Immigration Svcs**
**FORM G-514 (REV. 8-1-5**