No. 26-5243

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

LEAGUE OF WOMEN VOTERS, *et al.*,
*Plaintiffs-Appellees*,

*v.*

DEPARTMENT OF HOMELAND SECURITY, *et al.*,
*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Columbia
Case No. 1:25-cv-03501
The Honorable Sparkle L. Sooknanan

# BRIEF FOR AMICI CURIAE STATE OF KANSAS AND THIRTEEN OTHER STATES IN SUPPORT OF DEFENDANTS-APPELLANTS

KRIS W. KOBACH
*Attorney General of Kansas*

DWIGHT R. CARSWELL
*Acting Solicitor General of Kansas*
(Counsel of Record)
RYAN J. OTT
*Assistant Solicitor General*

120 S.W. 10th Ave., 2nd Floor
Topeka, KS 66612
(785) 296-2215
dwight.carswell@ag.ks.gov

[additional counsel listed after signature page]

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amici curiae* States of Kansas, Alabama, Arkansas, Florida, Idaho, Indiana, Iowa, Louisiana, Mississippi, Missouri, Nebraska, South Carolina, Tennessee, and West Virginia submit this certificate as to parties, rulings, and related cases.

### A. Parties and Amici

The plaintiffs in the district court, and appellees here, are League of Women Voters, League of Women Voters of Texas, League of Women Voters of Louisiana, League of Women Voters Louisiana Education Fund, League of Women Voters of Virginia, and the Electronic Privacy Information Center. The defendants, and appellants here, are the United States Department of Homeland Security, Markwayne Mullin, in his official capacity as Secretary of Homeland Security, the Social Security Administration, and Frank Bisgnano, in his official capacity as Commissioner of Social Security. The State of Texas intervened as a defendant in the district court.

*Amici* here are the States of Kansas, Alabama, Arkansas, Florida, Idaho, Indiana, Iowa, Louisiana, Mississippi, Missouri, Nebraska, South Carolina, Tennessee, and West Virginia.

### B. Rulings Under Review

The ruling under review in this appeal is the district court's order, entered on June 22, 2026, granting the plaintiffs' motion for summary judgment and invalidating the 2025 modifications to the SAVE program

### C. Related Cases

Related to this proceeding is *Florida v. United States Department of Homeland Security*, 836 F. Supp. 3d 1171 (N.D. Fla. 2026), *appeal filed July 21, 2026*, where the Northern District of Florida approved a settlement requiring the federal government to provide access to the modified SAVE program. The district court's order here is in direct conflict with the Northern District of Florida's order.

/s/ Dwight R. Carswell
Dwight R. Carswell

*Counsel for Amicus Curiae*
*State of Kansas*

Dated: November 13, 2026

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... iv

**GLOSSARY** .......... xi

**INTEREST OF AMICI STATES** .......... 1

**SUMMARY OF THE ARGUMENT** .......... 5

**ARGUMENT** .......... 7

- **I. The 2025 SAVE modifications are authorized by the "notwithstanding" clauses in 8 U.S.C. § 1373.** .......... 10
- **II. The 2025 SAVE modifications are consistent with the Social Security Act, the Privacy Act, and the APA.** .......... 15
- **III. The arguments against the 2025 SAVE modifications do not implicate the modification allowing users to submit bulk requests.** .......... 21

**CONCLUSION** .......... 23

**ADDITIONAL COUNSEL** .......... 24

**CERTIFICATE OF COMPLIANCE** .......... 25

# TABLE OF AUTHORITIES

## Cases

*Ames v. United States Department of Homeland Security*,
861 F.3d 238 (D.C. Cir. 2017) ........ 16

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ........ 1

*Carrington v. Rash*,
380 U.S. 89, (1965) ........ 1

*City and Cnty. of San Francisco v. Barr*,
965 F.3d 753 (9th Cir. 2020) ........ 13

*Department of Homeland Security v. League of Women Voters*,
609 U.S. __, 2026 WL 2879700 (2026) ........ 8, 10, 12, 13, 14

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
489 U.S. 214 (1989) ........ 1

*F.A.A. v. Cooper*,
566 U.S. 284 (2012) ........ 16

*Florida v. United States Department of Homeland Security*,
836 F. Supp. 3d 1171 (N.D. Fla. 2026) ........ 3, 13

*League of Women Voters v. Department of Homeland Security*,
2026 WL 2643439 (D.C. Cir. 2026) ........ 9, 15, 17, 19, 21

*League of Women Voters v. Department of Homeland Security*,
835 F. Supp. 3d 79 (D.D.C. 2026) ........ 13, 17

*N.L.R.B. v. SW General, Inc*,
580 U.S. 288 (2017) .......... 11

*PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011) .......... 11, 12

*Purcell v. Gonzalez*,
549 U.S. 1(2006) .......... 1, 3

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*,
9 F.3d 138 (D.C. Cir. 1993) .......... 17

**Statutes**

18 U.S.C. § 611 .......... 1, 8

42 U.S.C. § 405 .......... 15, 16, 19

49 Stat. 620 .......... 15

49 Stat. 638 .......... 15

5 U.S.C. § 552a .......... 5, 16, 17

52 U.S.C. § 10101 .......... 1, 8

52 U.S.C. §§ 20501 .......... 1, 8

52 U.S.C. §§ 20507 .......... 1, 8

52 U.S.C. §§ 21083 .......... 1, 8

8 U.S.C. § 1373 .......... 5, 10, 11, 12, 13, 14

86 Stat. 1329 .......... 16

86 Stat. 1364 .......... 16

## Other Authorities

90 Fed. Reg. 14006 .......... 9

90 Fed. Reg. 48949-50 .......... 20

90 Fed. Reg. 48950 .......... 20

90 Fed. Reg. 48951 .......... 21, 22

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 126-27 (2012) .......... 11

Ala. Const. Art. VIII, § 177 .......... 2

Alaska Const. Art. V, § 1 .......... 2

Ariz. Const. Art. VII, § 2 .......... 2

Ark. Const. Art. III, § 1 .......... 2

Black's Law Dictionary 1091 (7th ed. 1999) .......... 11

Cal. Const. Art. II, § 2 .......... 2

Colo. Const. Art. VII, § 1 .......... 2

Conn. Const. Art. § 1 .......... 2

Consumer Financial Protection Bureau, *The Importance of Keeping Social Security Numbers Safe*, https://files.consumerfinance.gov/f/documents/cfpb_building_block_activities_keeping-social-security-numbers-safe_handout.pdf .......... 19

Del. Const. Art. V, § 2 ........ 2

District of Columbia Bar Admissions,
*Character and Fitness* (requiring SSN),
https://admissions.dcappeals.gov/browseform.action?applicationId=240&formId=240&startNew=true ........ 19

Fla. Const. Art. VI, § 2 ........ 2

Florida Board of Bar Examiners,
*Frequently Asked Questions* (providing SSN is required),
https://www.floridabarexam.org/web/website.nsf/faq.xsp ........ 19

Ga. Const. Art. II, § 1, para. II ........ 2

Haw. Const. Art. II, § 1 ........ 2

Idaho Const. Art VI, § 2 ........ 2

Identification of Tax-payers under Title VIII, of the Social Security Act,
1 Fed. Reg. 2023, 2024 (Nov. 7, 1936) ........ 15

Ill. Const. Art. III, § 1 ........ 2

Ind. Const. Art. II, § 2 ........ 2

Iowa Const. Art. II, § 1 ........ 2

Kan. Const. Art. V, § 1 ........ 2

Kansas Bar Admissions,
*Admission by Examination* (requiring last four digits of SSN,
https://admissions.kscourts.gov/browseform.action?formId=935&sid=3418004&ssid=3518004&applicationId=341 ........ 19

Ky. Const. Suffrage and Elections, § 145 .............................................. 2

La. Const. Art. I, § 10 .............................................................................. 2

Mass. Const. Articles of Amendment, § 3 .............................................. 2

Md. Const. Art I, § 1 ................................................................................ 2

Me. Const. Art. II, § 1 .............................................................................. 2

Mich. Const. Art. II, § 1 ............................................................................ 2

Minn. Const. Art. VII, § 1 ......................................................................... 2

Miss. Const. Art. XII, § 241 ..................................................................... 2

Mo. Const. Art. VIII, § 2 ........................................................................... 2

Mont. Const. Art. IV, § 2 .......................................................................... 2

N.C. Const. Art. VI, § 1 ............................................................................ 2

N.D. Const. Art. II, § 1 ............................................................................. 2

N.H. Const. Part First, Art. 11th .............................................................. 2

N.J. Const. Art. II, § 1 .............................................................................. 2

N.M. Const. Art. VII, § 1 .......................................................................... 2

N.Y. Const. Art. II, § 1 .............................................................................. 2

Neb. Const. Art. VI, § 1 ............................................................................ 2

Nev. Const. Art. II, § 1 ............................................................................. 2

Ohio Const. Art. II, § 1 .......... 2

Okla. Const. Art. III, § 1 .......... 2

Or. Const. Art. II, § 2 .......... 2

Pa. Const. Art. VII, § 1 .......... 2

Pub. L. No. 74-271, § 808 .......... 15

Pub. L. No. 92-603, § 137 .......... 16

Qualifications of Freemen and Freewomen, § 42 .......... 2

R.I. Const. Art. II, § 12 .......... 2

S.C. Const. Art. II, § 4 .......... 2

S.D. Const. Art. VII, § 2 .......... 2

Social Security Administration,
*Report to Congress on Options for Enhancing the Social Security Card*, https://www.ssa.gov/history/reports/ssnreportc6.html .......... 18

Social Security Administration,
*Request Social Security Number for the First Time*,
https://www.ssa.gov/number-card/request-number-first-time .......... 19

Social Security Amendments of 1972 .......... 16

Tenn. Const. Art. IV, § 1 .......... 2

Tex. Const. Art. VI, §§ 1-2 .......... 2

The State Bar of California, *Registration*
(listing SSN as a requirement for application,
https://www.calbar.ca.gov/admissions/requirements/registration .... 19

Utah Const. Art. IV, § 5 .......... 2

Va. Const. Art. II, § 1 .......... 2

Vt. Const. Ch. 2 .......... 2

W. Va. Const. Art. IV, § 1 .......... 2

Wash Const. Art. VI, § 1 .......... 2

Webster's Third New International Dictionary 1545 (1986) .......... 11

Wis. Const. Art. III, § 1 .......... 2

Wyo. Const. Art. VI, § 5 .......... 2

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| DHS | Department of Homeland Security |
| HAVA | Help America Vote Act |
| IIRIRA | Illegal Immigration and Immigrant Responsibility Act |
| NVRA | National Voter Registration Act |
| SAVE | Systematic Alien Verification for Entitlements |
| SSA | Social Security Administration |
| SSN | Social Security Number |

## INTEREST OF AMICI STATES

*Amici curiae* States of Kansas, Alabama, Arkansas, Florida, Idaho, Indiana, Iowa, Louisiana, Mississippi, Missouri, Nebraska, South Carolina, Tennessee, and West Virginia hold a compelling interest in protecting the integrity of their elections. *See Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). Confidence in the integrity of our elections "is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). "Voter fraud drives honest citizens out of the democratic process" and leave voters "who fear their legitimate votes will be outweighed by fraudulent ones" feeling disenfranchised. *Id.* States have unquestionable constitutional authority to decide who is eligible to vote, *Carrington v. Rash*, 380 U.S. 89, 91 (1965), but this authority has "little value without the power to enforce" their eligibility rules. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013).

States also have a duty under federal law to ensure their voter rolls are accurate, updated, and free from ineligible voters. 52 U.S.C. §§ 21083(a)(4), 20501(b)(4); 20507(a)(4). Federal law bars noncitizens

from voting in federal elections. 18 U.S.C. § 611(a); 52 U.S.C. § 10101(a)(1). Likewise, States do not permit noncitizens to vote in state elections, with all stating in their constitutions that U.S. citizens may vote and several even having constitutional provisions preventing noncitizens from voting.[1] In light of these qualifications to vote, the federal government has provided the Systematic Alien Verification for Entitlements (SAVE) program to permit States to verify the citizenship status of their voters and applicants. But the program previously

---

[1] Ala. Const. Art. VIII, § 177(a); Alaska Const. Art. V, § 1; Ariz. Const. Art. VII, § 2(A); Ark. Const. Art. III, § 1(a)(1); Cal. Const. Art. II, § 2(a); Colo. Const. Art. VII, § 1; Conn. Const. Art. § 1; Del. Const. Art. V, § 2(a); Fla. Const. Art. VI, § 2; Ga. Const. Art. II, § 1, para. II; Haw. Const. Art. II, § 1; Idaho Const. Art VI, § 2; Ill. Const. Art. III, § 1; Ind. Const. Art. II, § 2(a); Iowa Const. Art. II, § 1; Kan. Const. Art. V, § 1(a); Ky. Const. Suffrage and Elections, § 145; La. Const. Art. I, § 10(A); Me. Const. Art. II, § 1; Md. Const. Art I, § 1; Mass. Const. Articles of Amendment, § 3; Mich. Const. Art. II, § 1; Minn. Const. Art. VII, § 1; Miss. Const. Art. XII, § 241; Mo. Const. Art. VIII, § 2; Mont. Const. Art. IV, § 2; Neb. Const. Art. VI, § 1; Nev. Const. Art. II, § 1; N.H. Const. Part First, Art. 11th; N.J. Const. Art. II, § 1, ¶ 3(a); N.M. Const. Art. VII, § 1; N.Y. Const. Art. II, § 1; N.C. Const. Art. VI, § 1; N.D. Const. Art. II, § 1; Ohio Const. Art. II, § 1; Okla. Const. Art. III, § 1; Or. Const. Art. II, § 2(1); Pa. Const. Art. VII, § 1; R.I. Const. Art. II, § 1; S.C. Const. Art. II, § 4; S.D. Const. Art. VII, § 2; Tenn. Const. Art. IV, § 1; Tex. Const. Art. VI, §§ 1-2; Utah Const. Art. IV, § 5; Vt. Const. Ch. 2, Qualifications of Freemen and Freewomen, § 42; Va. Const. Art. II, § 1; Wash Const. Art. VI, § 1; W. Va. Const. Art. IV, § 1; Wis. Const. Art. III, § 1(2); Wyo. Const. Art. VI, § 5.

suffered from several flaws, including its inability to verify the citizenship status of U.S.-born individuals and its requirement that inquiries be submitted one at a time.

In 2025, President Trump sought to remedy these deficiencies through Executive Order No. 14248. The 2025 modifications to SAVE permitted States to use Social Security numbers when submitting inquiries and to upload bulk requests, rather than doing so individually. This greatly aided the participant States in their quest to ensure the accuracy of their voter rolls and, in some cases, was even necessary for certain States to comply with their own state laws. *See Florida v. United States Department of Homeland Security*, 836 F. Supp. 3d 1171 (N.D. Fla. 2026), *appeal filed July 21, 2026*.

The district court's order invalidating the 2025 SAVE modifications, in addition to being grounded on faulty statutory interpretation, hinders the States from performing their duty of effectively ensuring the accuracy of their voter rolls and from ensuring that noncitizens do not vote in federal and state elections. The district court's order has undermined confidence in the integrity of *amici* States' elections and the democratic process. *See Purcell*, 549 U.S. at 4.

This Court should correct the district court's erroneous statutory interpretation and restore this valuable arrow to the States' quivers.

## SUMMARY OF THE ARGUMENT

In invalidating the 2025 modifications to the SAVE program, the district court ignored the plain language of the statute and well-settled statutory interpretation principles.

First, 8 U.S.C. § 1373(a) and (b) contain two "notwithstanding clauses" that expressly authorize DHS to request and receive information relating to citizenship and immigration status from other agencies. In addition, subsection (c) requires DHS to respond to inquiries from States seeking to learn the citizenship or immigration status of an individual.

Second, the Privacy Act permits the disclosure of records in the course of a "routine use." 5 U.S.C. § 552a(b)(3). The district court too narrowly limited the routine use of Social Security numbers to work authorization and benefit qualification. Social Security numbers are routinely used by a variety of governmental and private entities to establish an individual's identity. The 2025 SAVE modifications permit States to use an individual's Social Security number to determine their eligibility to vote as U.S. citizens.

Third, the modified SAVE program does not share Social Security numbers or any other related "records" with the States. Rather, States input an individual's identifying information, such as a Social Security number, and SAVE runs a query. The response a State receives from SAVE for each individual is either a confirmation of citizenship or a reply that citizenship cannot be confirmed and that the State should seek more information.

Fourth, the district court did not analyze the propriety of the 2025 modifications allowing for bulk requests, merely invalidating it with the rest of the modifications. But the bulk request modification merely gave States the ability to submit multiple requests at a time, rather than input each in individually. Nothing in the Social Security Act, Privacy Act, or APA suggests this is improper. The ability for States to submit bulk requests greatly assists them in performing their federal and state duties of ensuring only U.S. citizens vote in their elections. Without the bulk request modification, States are forced to spend valuable time and resources entering the same information one at a time.

## ARGUMENT

The district court drastically overstated the 2025 modifications to SAVE. Reading the district court's lengthy order, one gets the impression of a far-reaching program designed to intrude into the private data of American citizens by sharing Americans' Social Security numbers (SSNs) between federal agencies and with the various States participating in the SAVE program.

But the reality is quite different. Rather, President's executive order updated a widely used program designed to help States verify voters' citizenship status, but that contained several deficiencies,[2] to better help States ensure the accuracy of their voter rolls. The federal government's actions are well within the bounds of the Social Security Act, the Privacy Act, and the Administrative Procedure Act (APA). The district court's order was based on faulty statutory interpretation,

---

[2] Judge Katsas's dissent laid out those deficiencies: "First, [SAVE] could not verify the citizenship of individuals born in the United States. Second, SAVE could access only DHS records linked to an individual's DHS numeric identifier, such as an alien registration number. It could not access records of the Social Security Administration (SSA) or conduct searches using Social Security numbers (SSNs). Third, SAVE could process verification requests only one individual at a time; it could not process bulk requests." *League of Women Voters*, 2026 WL 26434439, at *14 (Katsas, J., dissenting).

ignoring the plain text to reach a desired result. Given that, and with the Supreme Court's stay order strongly suggesting the federal government's success on the merits, *see Department of Homeland Security v. League of Women Voters*, 609 U.S. __, 2026 WL 2879700, at *2-3 (2026), this Court should reverse the district court's grant of summary judgment.

Only U.S. citizens may vote in federal elections. 18 U.S.C. § 611(a); 52 U.S.C. § 10101(a)(1); *see also Arcia v. Fla. Secretary of State*, 772 F.3d 1335, 1344 (11th Cir. 2014) ("The National Voter Registration Act (NVRA) is premised on the assumption that citizenship is one of the requirements for eligibility to vote."). And no state permits noncitizens to vote in state elections; in fact, several States prevent noncitizen voting in their constitutions.[3]

Congress also requires States to ensure their voter registration records are accurate. 52 U.S.C. §§ 21083(a)(4), 20501(b)(4). The NVRA and Help America Vote Act (HAVA) require States to keep their voter registration records updated and to make efforts to remove ineligible registrants from the voter rolls. The President's Executive Order

---

[3] *See supra note 1.*

requires the Secretary of the Department of Homeland Security (DHS), consistent with applicable law, to ensure States have access to "appropriate systems for verifying the citizenship or immigration status" of applicants or registered voters. 90 Fed. Reg. 14006. Since 2005, States have been able to use SAVE to verify that its voters are citizens. *League of Women Voters v. Department of Homeland Security*, 2026 WL 2643439, at *14 (D.C. Cir. 2026) (Katsas, J., dissenting). Today, 27 States use SAVE for that purpose.[4] *Id.*

While SAVE has assisted the States in their responsibility of ensuring that only U.S. citizens are registered to vote, it fell short in several glaring aspects, particularly in its inability to confirm the citizenship status of those born in the U.S. and by not permitting bulk inquiries. *See League of Women Voters*, 2026 WL 2643439, at *14 (Katsas, J., dissenting). The 2025 updates to SAVE, then, were necessary changes to the program to help States fulfil their duty.

---

[4] Those States have used SAVE quite extensively. As Judge Katsas noted, from January 1, 2025, to April 1, 2026, States have made approximately 60 million voter-verification requests to SAVE. *League of Women Voters*, 2026 WL 2643439, at *14 (Katsas, J., dissenting).

## I. The 2025 SAVE modifications are authorized by the "notwithstanding" clauses in 8 U.S.C. § 1373.

The plaintiff organizations claim the 2025 SAVE modifications violate the Social Security Act, Privacy Act, and APA. But, as the Supreme Court noted, their arguments run into a statutory obstacle: "In 1996, Congress . . . separately and expressly authorized DHS to request and receive information relating to citizenship and immigration status from other agencies, including [the Social Security Administration (SSA)], in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)." *DHS*, 2026 WL 2879700, at *2.

The pertinent IIRIRA statute, 8 U.S.C. § 1373, contains two "notwithstanding" clauses. *See id.* Section 1373(a) states:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [DHS] information regarding the citizenship or immigration status, lawful or unlawful, or any individual.

Likewise, § 1373(b) provides:

> Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual.

The "following" activities in § 1373(b) include (1) sending this information to or requesting it from DHS, (2) maintaining the information, and (3) exchanging the information with any other Federal, State, or local government entity. 8 U.S.C. § 1373(b)(1)-(3).

The use of "notwithstanding" in these statutory sections is key to the validity of the 2025 SAVE updates. The ordinary meaning of "notwithstanding" is "in spite of," or "without prevention or obstruction by." Webster's Third New International Dictionary 1545 (1986); Black's Law Dictionary 1091 (7th ed. 1999) ("Despite; in spite of"); *see N.L.R.B. v. SW General, Inc*, 580 U.S. 288, 301 (2017). "Notwithstanding" "shows which provision prevails in the event of a clash." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 126-27 (2012); *see N.L.R.B.*, 580 U.S. at 301. A "notwithstanding" clause confirms, rather than constrains, the breadth of a statute. *N.L.R.B.*, 580 U.S. at 302.

Historically, "notwithstanding" clauses were used to "specify the degree to which a new statute was meant to repeal older, potentially conflicting statutes in the same field." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621-22 (2011). The "notwithstanding" provision recognizes the new statute might contradict prior law and repeals any contradictory law.

*Id.* at 622. "Notwithstanding" provisions operate to instruct courts "not to apply the general presumption against implied repeals." *Id.* Further, a "notwithstanding" provision tells courts not to strain to find ways to reconcile seemingly conflicting laws. *Id.* ("A [notwithstanding] provision thus was a useful way for legislatures to specify that they did not want courts distorting the new law to accommodate the old.").

In 8 U.S.C. § 1373, Congress prohibited interference with disclosing information regarding citizenship status to DHS "[n]otwithstanding any other provisions of Federal, State, or local law." By doing so, Congress "necessarily authorized" DHS to obtain this information. *See DHS*, 2026 WL 2879700, at *2. Not only that, but § 1373(b) prevents prohibiting or restricting DHS from maintaining those records or exchanging information with the States regarding information from those records, such as whether individuals are U.S. citizens. By using these two "notwithstanding" clauses, Congress clearly signaled any prior apparently conflicting law would not apply.

To read § 1373 otherwise would place DHS "in the impossible predicament of either disclosing information consistent with section 1373 but in violation of legislation like the Social Security Act and

Privacy Act or withholding that information consistent with those Acts but in violation of section 1373." *DHS*, 2026 WL 2879700, at *2. The "notwithstanding" provisions do not permit this impossible choice but solves any conflict in favor of § 1373. *See id.* ("It is improbable that Congress intended to place officials in such a bind when it passed IIRIRA, so section 1373 likely supersedes restrictions on disclosure elsewhere in the Code.").

The Ninth Circuit has recognized a similar interpretation of the "notwithstanding" clauses in § 1373. The Ninth Circuit acknowledged that § 1373's "notwithstanding" clauses permitted sharing information about a person's immigration status. *City and Cnty. of San Francisco v. Barr*, 965 F.3d 753, 762-63 (9th Cir. 2020) (holding provisions of the "Values Act" did not conflict with § 1373 because it restricted the sharing of release status and contact information but did not prohibit sharing of information regarding immigration status).

The district court erred, then, by invoking the canon against implied presumption to excise § 1373's "notwithstanding" from its calculus. *League of Women Voters v. Department of Homeland Security*,

835 F. Supp. 3d 79, 135-36 (D.D.C. 2026); *see also Florida*, 836 F. Supp. 3d at 1177 (disagreeing with Judge Sooknanan's analysis).

The Supreme Court also recognized § 1373 contained an additional provision supporting this interpretation. Section 1373(c) "requires DHS to respond to inquiries from state and local agencies 'seeking to verify or ascertain the citizenship or immigration status of any individual'" by providing the requested verification or status information. *See DHS*, 2026 WL 2879700, at *3. Combined with the "notwithstanding" clauses, § 1373 contemplates an information-sharing program exactly like the modified SAVE program. *See id.*

Section 1373 permits DHS to request and store the information contained in the updated SAVE program and to share the immigration status of individuals with the States. Indeed, the statute even requires it. *See* 8 U.S.C. § 1373(c). Given the requirements of § 1373, this Court can and should stop its analysis here. *See DHS*, 2026 WL 2879700, at *3 ("In light of these provisions, this Court is likely to reverse the District Court's holding that the federal defendants violated the Social Security Act, the Privacy Act, and the APA."). The 2025 SAVE modifications are permissible under federal law. This Court should

reverse the district court and permit the States to use a critical program in fulfilling their vital duties of protecting the integrity of the election process by maintaining accurate voter rolls.

## II. The 2025 SAVE modifications are consistent with the Social Security Act, the Privacy Act, and the APA.

If this Court does proceed to analyze the 2025 SAVE modifications under the Social Security Act, Privacy Act, and APA, it should still reverse the district court's faulty statutory interpretation.

To start, as Judge Katsas recognized, any bar preventing the SSA's disclosures to DHS does not apply because the SSA obtains and maintains the relevant records pursuant to laws enacted before 1990.[5] *League of Women Voters*, 2026 WL 2643439, at *16 (Katsas, J., dissenting). The Social Security Act of 1935 authorized the SSA to create and maintain SSNs.[6] *Id.* And amendments to the Social Security Act in 1972 required the SSA to require applicants for SSNs to provide

---

[5] 42 U.S.C. § 405(c)(2)(C)(viii)(I) ("Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record.").

[6] Pub. L. No. 74-271, § 808, 49 Stat. 620, 638; Identification of Tax-payers under Title VIII, of the Social Security Act, 1 Fed. Reg. 2023, 2024 (Nov. 7, 1936).

evidence that established citizenship or alien status, among other things.[7] *Id.* The SSA, then, creates, obtains, and maintains SSNs and related records pursuant to statutes enacted before 1990, and thus 42 U.S.C. § 405(c)(2)(C)(viii)(I) does not apply to prevent the SSA from sharing SSNs and related records with DHS in response to a SAVE inquiry.

Even if 42 U.S.C. § 405(c)(2)(C)(viii)(I) applied, the Social Security Act and Privacy Act do not invalidate the 2025 SAVE modifications. The Privacy Act requires agencies to create safeguards to protect individuals from the harmful disclosure of confidential records. *F.A.A. v. Cooper*, 566 U.S. 284, 294-95 (2012); 5 U.S.C. § 552a(e)(10). A "record" means "any item, collection, or grouping of information about an individual that is maintained by an agency," including "the identifying number" assigned to that particular individual. 5 U.S.C. § 552a(a)(4). The Privacy Act contains exceptions allowing an agency to disclose a record in the course of a "routine use" of the record. 5 U.S.C. § 552a(b)(3); *Ames v. United States Department of Homeland Security*,

[7] Social Security Amendments of 1972, Pub. L. No. 92-603, § 137(2), 86 Stat. 1329, 1364-65 (codified at 42 U.S.C. § 405(c)(2)(B)(ii)).

861 F.3d 238, 240 (D.C. Cir. 2017). "Routine use" means "with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7). A disclosure of a record is "compatible" if it does not conflict with or frustrate the purpose for which the record was collected.[8] *League of Women Voters*, 2026 WL 2643439, at *19 (Katsas, J., dissenting); *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 9 F.3d 138, 144 (D.C. Cir. 1993) (opinion of Silberman, J.); *id.* at 146-47 (Williams, J. concurring in part).

The district court here concluded DHS's use of the SSNs and other related data for voter citizenship verification through the modified SAVE program was not a routine use under the Privacy Act because the SSA primarily collects SSNs "for purposes concerning work authorization and eligibility for SSA benefits." *League of Women Voters*, 835 F. Supp. 3d at 79. Because the SSA never collected this information

---

[8] Judge Katsas recognized that other circuits, relying on legislative history, required "'some meaningful degree of convergence' between the purposes of collection and disclosure." *League of Women Voters*, 2026 WL 2643439, at *19 (Katsas, J., dissenting) (collecting cases) But, as Judge Katsas recognized, determining the precise definition of compatibility is not necessary here because the modified SAVE satisfies any compatibility test. *Id.*

for "the maintenance of 'U.S. citizenship records' for voter verification," the district court concluded using SSNs to determine citizenship status for voter eligibility did not qualify as a routine use. *Id.* The district court discounted the federal defendants' argument that government agencies widely use SSNs to identify and gather information about an individual. *Id.* at 126.

The district court painted with too narrow a brush. While SSNs might have originally been created "for purposes concerning work authorization and eligibility for SSA benefits," SSN numbers are routinely used for much more by both governmental and private parties. Many States require SSNs to obtain a driver's license.[9] SSNs, or similar identifying numbers,[10] are routinely required by governmental and private entities to participate in various professions, programs, and activities. SSNs are used for filing taxes, applying for loans, mortgages,

---

[9] Social Security Administration, *Report to Congress on Options for Enhancing the Social Security Card*, https://www.ssa.gov/history/reports/ssnreportc6.html.

[10] This argument speaks only to U.S. citizens. Noncitizens may be eligible to participate in several of these activities but must verify their identity and lawful residence by other means. But this also proves the point. In these situations, SSNs are used for a similar purpose to identifying numbers for noncitizens—to verify the identity of the individual.

and credit cards, opening bank accounts, opening utility services, and background checks, among various other things.[11] Indeed, many attorneys had to provide SSNs when applying for the bar exam.[12]

SSNs, then, are routinely used for far more than work authorization and eligibility for SSA benefits. A primary use of SSNs is to establish and confirm an individual's identity, which is the core of a state's inquiry to the modified SAVE program. Even if SSNs' original purpose was work authorization and benefit eligibility, disclosing that data to confirm voter eligibility "neither conflicts with nor frustrates

---

[11] Social Security Administration, *Request Social Security Number for the First Time*, https://www.ssa.gov/number-card/request-number-first-time; Consumer Financial Protection Bureau, *The Importance of Keeping Social Security Numbers Safe*, https://files.consumerfinance.gov/f/documents/cfpb_building_block_activities_keeping-social-security-numbers-safe_handout.pdf; *see also* 42 U.S.C. § 405(c)(2)(C) (listing various benefits which require SSNs).

[12] *See* District of Columbia Bar Admissions, *Character and Fitness* (requiring SSN), https://admissions.dcappeals.gov/browseform.action?applicationId=240&formId=240&startNew=true; Kansas Bar Admissions, *Admission by Examination* (requiring last four digits of SSN, https://admissions.kscourts.gov/browseform.action?formId=935&sid=3418004&ssid=3518004&applicationId=341; The State Bar of California, *Registration* (listing SSN as a requirement for application, https://www.calbar.ca.gov/admissions/requirements/registration; Florida Board of Bar Examiners, *Frequently Asked Questions* (providing SSN is required), https://www.floridabarexam.org/web/website.nsf/faq.xsp.

those initial purposes." *League of Women Voters*, 2026 WL 2643439, at *19 (Katsas, J., dissenting).

Additionally, the modified SAVE program does not involve sharing SSNs or any related "records" with the participating States. Rather, it is the State that provides the identifying information, including SSNs, to DHS. 90 Fed. Reg. 48949-50.[13] The States provide this data to DHS through SAVE. 90 Fed. Reg. 48950. SAVE then connects to the internal USCIS Verification Data Integration Service and processes the request using the State-provided data. 90 Fed. Reg. 48950. If the USCIS Verification Data Integration Service locates a corresponding record, it will send a response to SAVE, and SAVE will send a SAVE case response. 90 Fed. Reg. 48950. If SAVE cannot provide an initial response verifying the person's immigration status or U.S. citizenship, it will provide instructions to the State on actions to take, including requesting additional information. 90 Fed. Reg. 48950.

---

[13] This data "may include last name, first name, middle name, date of birth, Social Security number, passport number, driver's license number, one or more DHS immigration enumerators . . ., and other information from immigration documentation." 90 Fed. Reg. 48950.

DHS does not disclose SSNs or related records to the States. *League of Women Voters*, 2026 WL 2643439, at *17 (Katsas, J., dissenting). Rather, its disclosure to the States is limited to whether the person is a citizen or whether an individual's citizenship could not be confirmed. In other words, DHS does not even confirm a person is a noncitizen. Rather, DHS prompts the requesting state to seek more information to confirm a person's citizenship status.

The States must have the necessary identifying information, including a partial or full SSN, before submitting an inquiry to SAVE. DHS returns no information or records to the requesting State, only confirming a person's citizenship or directing the State to obtain more information.

## III. The arguments against the 2025 SAVE modifications do not implicate the modification allowing users to submit bulk requests.

The 2025 SAVE modifications included permitting SAVE users to submit bulk requests, uploading a list of multiple names instead of entering each individual one at a time. 90 Fed. Reg. 48951. Though the district court invalidated all of the 2025 modifications to SAVE, it left unwritten any explanation as to why the ability to submit bulk requests

violated the Social Security Act, Privacy Act, or APA. And, frankly, there is no statutory reason to invalidate the ability to make bulk requests. That modification merely gives SAVE users the ability to submit a list of requests rather than input the information for each person individually. It makes no substantial alterations to the program, just merely saves time for the user.[14]

Though the State submits a bulk request, SAVE, through an automated process, then creates "front-end single-record cases for each entry." 90 Fed. Reg. 48951. In other words, what the State submits as a bulk request is automatically split by SAVE into individual queries. The bulk requests to SAVE are then answered individually. 90 Fed. Reg. 48951. The State is informed for each individual either that the person is a U.S. citizen or citizenship could not be confirmed. From there, the State can act in compliance with its own laws and federal law to determine whether that individual is an ineligible voter. The

---

[14] Indeed, the ability to make bulk requests could be utilized equally even if SAVE users cannot utilize SSNs in their inquiries by entering the pre-modification information from multiple individuals in a bulk inquiry rather than individually. Thus, this modification can be analyzed independently from the merits of the SAVE modification allowing States to submit requests using SSNs.

modification permitting bulk requests then does not substantially change the SAVE program or violate federal law. Rather, it makes the request process simpler and assists States in removing ineligible voters from their voter rolls.

## CONCLUSION

The 2025 SAVE modifications were statutorily permissible changes to the SAVE program to assist States in carrying out their duty to maintain accurate voter rolls containing only U.S. citizens. The district court erred in invalidating the modifications. This Court should reverse and permit the federal government to assist States in ensuring the integrity of their elections.

Respectfully submitted,

KRIS W. KOBACH
*Attorney General of Kansas*

*/s/ Dwight R. Carswell*
DWIGHT R. CARSWELL
*Acting Solicitor General of Kansas*
(Counsel of Record)
RYAN J. OTT
*Assistant Solicitor General*
120 S.W. 10th Ave., 2nd Floor
Topeka, KS 66612
(785) 296-2215
dwight.carswell@ag.ks.gov

## ADDITIONAL COUNSEL

Steve Marshall
Attorney General
*State of Alabama*

Tim Griffin
Attorney General
*State of Arkansas*

James Uthmeier
Attorney General
*State of Florida*

Raúl Labrador
Attorney General
*State of Idaho*

Theodore E. Rokita
Attorney General
*State of Indiana*

Brenna Bird
Attorney General
*State of Iowa*

Liz Murrill
Attorney General
*State of Louisiana*

Lynn Fitch
Attorney General
*State of Mississippi*

Catherine Hanaway
Attorney General
*State of Missouri*

Michael T. Hilgers
Attorney General
*State of Nebraska*

Alan Wilson
Attorney General
*State of South Carolina*

Jonathan Skrmetti
Attorney General
*State of Tennessee*

John B. McCuskey
Attorney General
*State of West Virginia*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, this brief contains 4,458 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6), as required by Rules 29(a)(5) and 32(a)(7) and D.C. Cir. R. 32(e), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Dwight R. Carswell
Dwight R. Carswell

*Counsel for Amicus Curiae*
*State of Kansas*

Date: November 13, 2026